# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

ATLANTIC SEA ISLAND GROUP LLC,  )
)
                             **Plaintiff,**  )
      **v.**  )      **Civil Action No. _____**
)
SEAN T. CONNAUGHTON  )
Administrator  )
Maritime Administration, and  )
)
MARY E. PETERS,  )
Secretary  )
Department of Transportation,  )
)
                       **Defendants.**  )
_____

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Atlantic Sea Island Group LLC ("ASIG") hereby moves, pursuant to Federal Rule of Civil Procedure 65, for entry of a preliminary injunction enjoining the decision issued by defendant the Administrator of the Maritime Administration on December 2, 2007, which designated the State of New Jersey as an additional "adjacent coastal State" for purposes of the federal government's consideration of the Application submitted by ASIG for a license to construct and operate the Safe Harbor Energy Liquefied Natural Gas Deepwater Port, pursuant to the Deepwater Port Act, 33 U.S.C. § 1501 et seq.; and for entry of an order directing the defendants to resume processing plaintiff's Application under the mandatory timetable established by that statute.

The attached Memorandum of Points and Authorities is submitted in support of the Motion.

Respectfully submitted,

_____

JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 15, 2008                    Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ATLANTIC SEA ISLAND GROUP LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | |
| **SEAN T. CONNAUGHTON** ) | |
| **Administrator** ) | |
| **Maritime Administration, and** ) | **[PROPOSED] ORDER** |
| ) | |
| **MARY E. PETERS,** ) | |
| **Secretary** ) | |
| **Department of Transportation,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

Upon consideration of the Motion of Plaintiff Atlantic Sea Island Group LLC

("ASIG") for a preliminary injunction enjoining the decision of defendant the

Administrator of the Maritime Administration issued on December 2, 2007 designating

the State of New Jersey as an additional "adjacent coastal State" for purposes of

consideration of ASIG's Application for a license to construct and operate the Safe

Harbor Energy Liquefied Natural Gas Deepwater Port, pursuant to the Deepwater Port

Act, 33 U.S.C. § 1501 et seq.; and for entry of an order directing the defendants to

resume processing plaintiff's Application under the mandatory timetable established by

that statute, and upon consideration of the responses thereto, and for good cause show, it

is:

ORDERED that plaintiff's Motion for a Preliminary Injunction is granted;

ORDERED, that the decision of defendant the Administrator of the Maritime Administration issued on December 2, 2007 designating the State of New Jersey as an additional "adjacent coastal State" for purposes of consideration of ASIG's Application for a license to construct and operate the Safe Harbor Energy Liquefied Natural Gas Deepwater Port is hereby enjoined pending entry of a final Judgment in this action; and it is further:

ORDERED, that defendants shall resume processing plaintiff's Application for a license pursuant to the timetable established by the Deepwater Port Act, 33 U.S.C. § 1501 et seq.

_____

United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **ATLANTIC SEA ISLAND GROUP LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **SEAN T. CONNAUGHTON** | ) |
| **Administrator** | ) |
| **Maritime Administration, and** | ) |
| | ) |
| **MARY E. PETERS,** | ) |
| **Secretary** | ) |
| **Department of Transportation,** | ) |
| | ) |
| **Defendants.** | ) |

**Civil Action No. _____**

_____

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 15, 2008

Counsel for Plaintiff
Atlantic Sea Island Group LLC

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

**BACKGROUND** ...................................................................................................3

A.  The Standard for Designation of an Additional "Adjacent Coastal State" ....................3

B.  The Rule Governing Petitions for "Adjacent Coastal State" Status..............................6

C.  ASIG's Application for the Safe Harbor Energy LNG Deepwater Port ........................7

D.  New Jersey's Petition for Designation as an "Adjacent Coastal State"........................9

E.  The Administrator's Designation of New Jersey as an Additional
    "Adjacent Coastal State" for the Safe Harbor Energy Project.....................................10

F.  The Administrator's Denial of ASIG's Request for Reconsideration ..........................11

**SUMMARY OF ARGUMENT** ..................................................................................13

I.  **ASIG HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS**..14

   A.  **The Administrator Usurped the Authority Delegated to the Coast
       Guard to Designate Additional "Adjacent Coastal States"** ................14

      1.  Under the Governing Regulation, the Commandant Has
          Authority To Designate an Additional "Adjacent Coastal
          State" ............................................................................................14

      2.  The Administrator Erred in Claiming that the Coast Guard
          Lacked Authority To Make Additional "Adjacent Coastal
          State" Designations ......................................................................17

         a.  The Original Delegation of Authority to the
             Coast Guard ......................................................................17

         b.  The Revised Delegation of Authority in 1997 .....................18

         c.  Transfer of the Coast Guard and its Delegated
             Authorities..........................................................................20

      3.  An Informal Agreement Between the Agencies Cannot
          Trump the DWPA and the Formal Delegations............................21

   B.  **The Administrator Violated the Applicable Statutory Deadline**.........23

   C.  **The Administrator Violated the Deepwater Port Act, as a Matter
       of Law, by Failing to Apply the Substantive Standard that Congress
       Enacted**................................................................................................25

   D.  **The Administrator's Action Was Arbitrary or Capricious Because
       the Record Did Not Contain Evidence that the Risk of Damage
       to the Coastal Environment of New Jersey Would Be "Equal to or
       Greater Than" the Risk of Damage to the Coastal Environment of
       New York** ...............................................................................................28

i

1. The Administrator Failed to Perform the Comparative Assessment of Risks to the "Coastal Environments" of New York and New Jersey Required by Section 1508(a)(2) ...............29

2. The NOAA Letter Did Not Support the Administrator's Decision ...................................................................................32

3. New Jersey's Petition Failed To Show that he Risk to Its Coastal Environment Exceeded the Risk to New York ..............................33

   a. Reliance on an Alternative Not Pursued. ..................................34

   b. Major Environmental Risks Experienced Primarily , or in Some Instances Only by New York, that New Jersey Did Not Address .34

   c. New Jersey Relied on Risks that Do Not Affect Its Coastal Environment.......................................................35

   **4. The Administrator's After-the-Fact Justifications in Denying Reconsideration Do Not Provide a Rational Basis for the Designation** ...................................................................37

   a. Application of Tests Not Authorized by Statute...................37

   b. Factors Cited by New Jersey in its Petition ..........................39

   c. Reliance on a Factor Never Cited by New Jersey in its Petition .............................................................42

**II. THE EQUITABLE FACTORS STRONGLY SUPPORT ISSUANCE OF A PRELIMINARY INJUNCTION**...............................................41

   **A. Unless a Preliminary Injunction Is Issued, ASIG Will Suffer Injury While the Case is Being Litigated**................................41

   1. Injury Resulting from the Agencies' Decision to "Stop The Clock"...................................................................43

   2. Injuries Arising from the Distortions of the Review Process Caused by the Grant of an Unlawful Veto Power to New Jersey...................................................................44

   **B. The Administrator and New Jersey Will Not Suffer Harm In the Interim if a Preliminary Injunction Is Issued** ..........................48

   **C. The Public Interest Strongly Supports a Preliminary Injunction**.......49

**CONCLUSION** .................................................................53

# TABLE OF AUTHORITIES

Page

**CASES**

*Amoco Production Co. v. Gambell,*
480 U.S. 531 (1987)............................................................................................50

*AT&T, Inc. v. FCC*, 452 F.3d 830 (D.C. Cir. 2006) ........................................30

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................12

*Brendsel v. OFHEO,*
339 F. Supp. 2d 52 (D.D.C. 2004)..............................................................44, 51

*Express One Int'l. Inc. v. United States Postal Service,*
814 F. Supp 87 (D.D.C. 1992)...........................................................................45

*Long Island Care at Home, Ltd. v Coke,*
____ U.S. ___, 127 S. Ct. 2339 (2007)..............................................................23

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992)...........................................................................................23

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.,*
463 U.S. 29 (1983)......................................................................................26, 27

*Mova Pharmaceutical Corp. v. Shalala,*
140 F.3d 1060 (D.C. Cir. 1998) ........................................................................13

*Patriot, Inc. v. HUD,*
963 F. Supp. 1 (D.D.C. 1997)............................................................................45

*Population Institute v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986)...............44

*Shipbuilders Council v. Department of Homeland Security,*
481 F. Supp. 2d 550 (E.D. Va. 2007) ...............................................................12

*Williams Gas Processing – Gulf Coast Co. v. FERC*,
475 F.3d 319 (D.C. Cir. 2006).....................................................................29, 30

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)...........................44

**STATUTES**

5 U.S.C. § 702......................................................................................................12

5 U.S.C. § 704......................................................................................................12

Deepwater Port Act of 1974

33 U.S.C. § 1501 <u>et seq</u>. ................................................................................................1

33 U.S.C. § 1501 (a)(5)..........................................................................................51

33 U.S.C. § 1502(5) ...........................................................................................5, 36

33 U.S.C. § 1504(c)(1)..............................................................................................4

33 U.S.C. § 1504(g)...................................................................................................4

33 U.S.C. § 1504(i).........................................................................................4, 6, 43

33 U.S.C. § 1508(a)(1).........................................................................................4, 6

*33 U.S.C. § 1508(a)(2)................................................................................. *passim*

33 U.S.C. § 1508(b)(1) ..............................................................................................4

33 U.S.C. § 1508(b)(2) .....................................................................................6, 8, 49

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, § 888 .....20, 21, 22

N.J.S.A. § 12:5-3..................................................................................................36

## REGULATIONS

33 C.F.R. § 148.5 (2006) .......................................................................................22

33 C.F.R. parts 148-150 (2006) ..............................................................................7

33 C.F.R. § 148.217 (2004) ....................................................................................15

33 C.F.R. § 148.217(b) (2006) ...................................................................9, 15, 31

33 C.F.R. § 148.217(c) (2006) ................................................................................15

*33 C.F.R. § 148.217(d) (2004)..............................................................................14

33 C.F.R. § 148.217(d) (2006)......................................................................7, 22, 23

33 C.F.R. § 148.217(d) (2006)....................................................................19, 25, 26

49 C.F.R. § 1.46(s) (1975) ......................................................................................18

49 C.F.R. § 1.44(o) (1975)......................................................................................18

49 C.F.R. § 1.46(s) (2006) ......................................................................................19

49 C.F.R. § 1.66(aa) (2006) ....................................................................................19

N.J.A.C. § 7.7E-1.2(b)(1) .......................................................................................36

**LEGISLATIVE MATERIALS**

*S. Rep. No. 93-127 (1974), 93rd Cong., 2d Sess. (Oct. 2, 1974),
reprinted at 1974 U.S.C.C.A.N. 7529 ........................................................5,6,17,22,27, 28

H. Conf. Rep. No. 93-1605, 93rd Cong., 2d Sess. (Dec. 16, 1974)
reprinted at 1974 U.S.C.C.A.N. 7622 ................................................................................28

**OTHER MATERIALS**

Arthur D. Little, Inc., "Methodology for Designation of Adjacent Coastal States,"
U.S. Coast Guard Report No. CG-WDWP-1-76 ...............................................................31

Atlantic Sea Island Group, LLC, Safe Harbor Energy Liquefied Natural Gas
Deepwater Port License Application, 72 Fed. Reg. 49,041 (Aug. 27, 2007) .................8, 9

Congressional Research Service, Liquefied Natural Gas (LNG) Import Terminals:
Siting, Safety and Regulations, CRS Rep. No. RL32205 (May 1, 2007).........................52

Deepwater Ports, 67 Fed. Reg. 37,920 (May 30, 2002)....................................................15

Deepwater Ports, 69 Fed. Reg. 724 (Jan. 6, 2004).....................................................15, 16

Deepwater Ports, 71 Fed. Reg. 57,643 (Sept. 29, 2006)................................................7, 16

Doc. No. USCG-2—7-28535-0069 ...................................................................................24

Docket Entry 333, USCG-2004-17696-333 ......................................................................43

Maritime Administration News Listing, "Cabrillo Port: record of Decision
issued to deny LNG license application," posted July 16, 2007........................................42

Organization and Delegation of Powers and Duties,
40 Fed. Reg. 43,901, 43,906 (Sept. 24, 1975) .................................................................18

Organizations and Delegations of Powers and Duties; Delegation to the
Commandant, United States Coast Guard and Administrator, Maritime
Administration, 62 Fed. Reg. 11,3823 (Mar. 12, 1997)...............................................18, 19

Organization and Delegation of Powers and Duties, Update of Secretarial
68 Fed. Reg. 36,496 (June 18, 2003) ...............................................................................21

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **ATLANTIC SEA ISLAND GROUP LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **SEAN T. CONNAUGHTON** | ) |
| **Administrator** | ) |
| **Maritime Administration, and** | ) |
| | ) |
| **MARY E. PETERS,** | ) |
| **Secretary** | ) |
| **Department of Transportation,** | ) |
| | ) |
| **Defendants.** | ) |

**Civil Action No. _____**

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Atlantic Sea Island Group LLC (ASIG) seeks a preliminary injunction of the November 2, 2007 decision by the Administrator of the Maritime Administration designating New Jersey as an additional "adjacent coastal State" for ASIG's Application under the Deepwater Port Act, 33 U.S.C. §1501 et seq. ("DWPA"), for a license to construct the Safe Harbor Energy Liquefied Natural Gas Deepwater Port. (Attachment 1)

The Administrator's decision gave New Jersey the power to veto or to impose mandatory conditions on the construction of an urgently needed facility for the importation and distribution of liquefied natural gas ("LNG"), to be built off the coast of New York and to help the New York metropolitan region meet its increased demand for this environmentally beneficial fuel. Under the Administrator's decision, New Jersey could veto construction of the port even if all interested federal agencies and New York conclude that its construction would be in the national and New York's interest.

ASIG has a strong, indeed overwhelming, likelihood of success on the merits of its claim that the Administrator's action was illegal:

(1)  The Administrator did not have authority to make this designation, which had been delegated to the Commandant of the U.S. Coast Guard, not to the Administrator.

(2)  Even assuming that he did have jurisdiction to decide the issue, the Administrator either acted on a time-barred request or acted after the statutory deadline for making this designation had expired.

(3)  The Administrator failed to apply the stringent legal standard enacted by Congress in 33 U.S.C. § 1508(a)(2), which permits designation of a State as an additional "adjacent coastal State" only if the record shows "a risk of damage to the coastal environment of [the petitioning] State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port . . . ."  (Emphasis added)  The Administrator never performed the required comparison of the totality of the risks presented by the proposed project to the "coastal environments" of New York and New Jersey.  Instead, he applied a test not authorized by the DWPA that was based the "magnitude and scope" of the port and the possibility that it could have a "significant" impact on New Jersey, a standard that Congress had considered but expressly rejected in adopting the statute in 1974.

(4)  The Administrator did not point to any facts to support his decision or otherwise provide a rational basis for the designation.  The administrative record contained no factual material upon which a rational decisionmaker could have concluded that the risk of damage to the "coastal environment" of New Jersey was "equal to or greater than" the risk posed to the "coastal environment" of New York.  To the contrary,

2

the record contained extensive information on the potential risks posed to the "coastal environment" of New York, primarily in the information set forth in ASIG's Application.

The equitable considerations strongly support the issuance of a preliminary injunction. ASIG currently is suffering irreparable injury for which it has no remedy at law. Preliminary injunctive relief should be granted because corrective relief granted at the conclusion of the litigation will not remedy the substantial irreparable harm that ASIG will suffer in the interim. In particular, the environmental and safety review processes that the federal agencies are required to conduct for ASIG's Application within the tight statutory deadline will be substantially and irrevocably affected, to ASIG's detriment, if they occur under the overhanging cloud of New Jersey's unlawful power to veto or to impose mandatory conditions on the project.

## BACKGROUND

ASIG has applied for a federal license under the DWPA to construct the Safe Harbor Energy deepwater port, to be located in federal waters on the Outer Continental Shelf 13.5 miles south of Long Beach, New York and 19 miles from the coast of New Jersey. This lawsuit challenges the legality of a final decision by the Maritime Administrator granting New Jersey's petition for designation as an additional "adjacent coastal State" for this application under 33 U.S.C. § 1508(a)(2).

### A.  The Standard for Designation of an Additional "Adjacent Coastal State."

The DWPA establishes the procedures and substantive criteria for licensing the construction and operation of deepwater LNG ports. In recognition of the importance of these infrastructure projects to the country's energy supply, the DWPA established an accelerated, mandatory timetable within which all governmental agencies must complete

3

their analyses of the environmental, safety, and other aspects of the project. The timetable is triggered by publication of a Federal Register Notice that the application for a license submitted by the sponsor of the project was "complete." 33 U.S.C. § 1504(c)(1). The law requires that all public hearings on the application must be held within 240 days of publication of the Notice and that the final decision must be issued within 330 days of publication. 33 U.S.C. §§ 1504(g), (i)(1).

Section 1508(b)(1) of the DWPA provides that a license to construct and operate a deepwater port shall not be issued "without the approval of the Governor of each adjacent coastal State." 33 U.S.C. § 1508(b)(1). It also gives the Governor of an "adjacent coastal State" the lesser, but still extraordinary, power to impose mandatory conditions that must be included in the federal license for the port. *Id.*

Section 1508(a) establishes three pathways by which a State may be designated an "adjacent coastal State." Section 1508(a)(1) provides that a State shall be designated as an "adjacent coastal State" if it is: (a) directly connected by pipeline to the proposed deepwater port; or (b) located within 15 miles of the proposed port. Section 1508(a)(2) provides a third pathway by which a State that does not qualify under Section 1508(a)(1) may petition for designation as an additional "adjacent coastal State":

> The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State <u>equal to or greater than the risk posed to a State directly connected by pipeline</u> to the proposed deepwater port. . . .

(Emphasis added). This lawsuit challenges the Administrator's designation of New Jersey as an additional "adjacent coastal State" through the third pathway.

The DWPA strictly limited in several respects the circumstances in which a petition of a State for designation as an additional "adjacent coastal State" may be granted in order to prevent abuse of the extraordinary power to veto or impose mandatory conditions in a federal license that is provided "adjacent coastal States."

-- First, short statutory deadlines were established for submission and resolution of a petition so that the designation of an additional "adjacent coastal State" would not disrupt the accelerated timetable for consideration and resolution of a deepwater port application.  Section 1508(a)(2) provides that a request for designation must be made within 14 days after publication of the Notice and must be resolved "not later than the 45[th] day after the date [the Secretary] receives such a request from a State. . . ."

-- Second, only a strictly defined range of possible effects -- risks posed to the petitioning State's "coastal environment" -- may be considered in resolving the request.  The term "coastal environment" is then defined narrowly to mean the "navigable waters" of the State and "the adjacent shorelines."  Section 1502(5).

-- Third, the risk of damage to the "coastal environment" of the petitioning State must be "equal to or greater than" the risk posed to the "coastal environment" of the State directly connected by pipeline to the project.  Section 1508(a)(2).

The legislative history of the DWPA shows that Congress adopted these stringent conditions from concern that if a broader provision were adopted, "it is questionable whether any deepwater port will be constructed."  Letter dated Aug. 22, 1974 from Secretary of the Interior Morton to Chairman Jackson, S. Rep. No. 93-127, 93d Cong., 2d Sess. (Oct. 2, 1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7591.  The Executive Branch

recommended that Congress eliminate provisions that would have permitted designation under less stringent conditions out of concern that:

> Delegation by Congress of any Federal agency to designate "adjacent coastal States" would almost assure a veto of each proposed deepwater port.  The responsible Federal agency would be pressured to designate all States which may be remotely affected by an oil spill as "adjacent coastal States" in order to avoid criticism in the event of a spill.  To avoid the same criticism, officials from States which would not directly benefit from a deepwater port and which were designated as "adjacent coastal States" would be pressured into disapproving the license application.

Letter dated June 24, 1974 from Acting Secretary of the Interior Whitaker to Chairman Magnuson, S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7594.

The DWPA expressly provides that a State that does not meet the criteria for designation as an "adjacent coastal State" shall have "the opportunity to make its views known to, and shall be given <u>full consideration</u> by, the Secretary regarding the location, construction, and operation of a deepwater port."  33 U.S.C. § 1508(b)(2) (emphasis added).  Similarly, all environmental risks, including those to the area beyond the "coastal environment" of a State, narrowly defined, are considered by the federal agencies in their reviews.  While a State that does not meet the stringent requirements for designation as an additional "adjacent coastal State" has its views fully considered on all environmental risks, it does not have the power to veto or to impose binding conditions in the federal license as a State designated under Section 1508(a)(1) possesses.

**B.  The Rule Governing Petitions for "Adjacent Coastal State" Status.**

The DWPA delegated implementing authority to the Secretary of Transportation, the Department in which the U.S. Coast Guard was located in 1974.  The Secretary in turn delegated to the Commandant of the Coast Guard authority to receive applications to construct deepwater ports and to conduct the review process by which the application is

evaluated.   The Coast Guard also has issued the principal implementing rules under which the statute is administered.  See 33 C.F.R. parts 148-150 (2006).

In September 2006, the Coast Guard issued 33 C.F.R. § 148.217(d), as amended, the only rule in the Code of Federal Regulations that governs resolution of a State's petition for designation as an additional "adjacent coastal State."  *See* Deepwater Ports, 71 Fed. Reg. 57,643 (Sept. 29, 2006).  It provides:

> If after receiving NOAA's recommendations the Commandant (G-P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G-P), in concurrence with the MARAD Administrator, will so designate it.  If the Commandant (G-P), in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

(Emphasis added).  Section 148.217(d) expressly provides that the decision whether to designate an additional State as an additional "adjacent coastal State" will be made by the Commandant of the Coast Guard, not by the Administrator.

## C.  ASIG's Application for the Safe Harbor Energy LNG Deepwater Port.

On May 8, 2007, ASIG submitted to the Coast Guard and the Maritime Administration a revised Application, approximately 5,000 pages in length, for authorization to construct the Safe Harbor Energy port.  The port would be located in federal waters 13.5 miles off the coast of New York and 19 miles from the coast of New Jersey.  The port would be connected by an undersea pipeline to an existing pipeline through an offshore connection in the waters of New York State.  Upon approval, the port is estimated to take five years to construct at an estimated cost of $1.7 billion.

The port is designed to receive LNG, regasify it, and transmit through existing distribution infrastructure up to two billion cubic feet per day of natural gas to the New York metropolitan area.  Natural gas is a clean burning fuel that is considered superior to

other fossil fuels, such as coal or petroleum fuel oils.  The offshore location of the port would minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, minimize visual impacts, and minimize safety and security issues presented by onshore LNG terminals.

The Application was submitted after several years of study and many discussions with federal and New York State agencies about the potential environmental impacts of the port, especially the risks presented to the air, water, and coastal zone.  The Application and its supporting documents spell out in great detail the potential risks to the environment in federal and New York State waters .  In particular, since the facility would be a gasification plant, substantial attention was paid to possible air emissions. ASIG discussed at length with the New York Department of Environmental Conservation the protocols for the air quality monitoring to be conducted as part of the environmental review process.  In addition, ASIG and New York discussed the easement needed for the pipeline to cross the State's undersea lands to connect with the existing pipeline.

On August 15, 2007, the Coast Guard and the Maritime Administration notified ASIG that its application was deemed "complete."  (Attachment  2)  On August 27, 2007, the Maritime Administration published in the Federal Register a Notice that the ASIG license application had been determined to be complete.  Atlantic Sea Island Group LLC, Safe Harbor Energy Liquefied Natural Gas Deepwater Port License Application, 72 Fed. Reg. 49,041 (Aug. 27, 2007) (Attachment 3).  As the Administrator noted:

> The Act requires adherence to a strict timeline for processing an application. Once we determine that an application contains the required information, we must hold public hearings on the application within 240 days, and the Maritime Administrator must render a decision on the application within 330 days.

*Id*.  The Notice designated New York, the State directly connected to the port by pipeline and located within 15 miles of it, as the "adjacent coastal State."  72 Fed. Reg. at 49,041.

### D.  New Jersey's Petition for Designation as an "Adjacent Coastal State."

By letter dated September 6, 2007, the Governor of New Jersey requested that the Commandant of the Coast Guard and the Administrator designate New Jersey as an additional "adjacent coastal State" for this project.  (Attachment 4)  The letter was docketed on September 10, 2007.

The Governor's letter was three pages in length.  It contained no documentation or analyses of the potential risks of the project to the State's "coastal environment," as required by the governing Coast Guard rule.  33 C.F.R. § 148.217(b)(3)-(4).  Rather, the letter argued in four paragraphs that the potential risks presented by the project to certain environmental and commercial interests of New Jersey, several of which were not within its "coastal environment," could be equal to or greater than the comparable risks posed to the New York coastal environment.  The letter did not attempt to demonstrate that the totality of risks to the coastal environment of New Jersey was "equal to or greater than" the totality of risks presented to the coastal environment of New York.

On September 24, 2007, ASIG's counsel responded to the Governor's petition and demonstrated why the State's submission did not satisfy the statutory standard for designation as an additional "adjacent coastal State."  (Attachment 5)

On September 28, 2007, the Administrator sent the Governor an interim response that acknowledged receipt of the State's request.  (Attachment 6)  The Administrator stated that he would review New Jersey's request under the legal standard established by Section 1508(a)(2) – *i.e.*, after considering the recommendation of the Administrator of

NOAA, he would grant "adjacent coastal State" status if the risk of damage to the requesting State's coastal environment <u>is equal to or greater than</u> the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port."  (Emphasis added).

On October 17, 2007, NOAA submitted a letter to the Maritime Administration in response to its notification that New Jersey had submitted a request for designation as an "adjacent coastal State."  On information and belief, the NOAA letter was one and one-quarter pages long.  It contained no meaningful analysis of the risks posed by the project to the coastal environments of New York or New Jersey, and did not attempt to perform a comparative analysis of the risks posed to the "coastal environments" of the two States.[1]

### E.  The Administrator's Designation of New Jersey as an Additional <u>"Adjacent Coastal State" for the Safe Harbor Energy Project.</u>

On November 2, 2007, 53 days after the Governor's letter was docketed, the Administrator issued a unilateral decision which "determined that New Jersey is an Adjacent Coastal State as defined under the Act and is so designated for the proposed Safe Harbor deepwater port project."  (Attachment 1)  The Commandant of the Coast Guard did not sign this decision.  The Administrator never acknowledged the existence of the Coast Guard rule which states that the Commandant will exercise this authority.

---

[1] Statements about the NOAA letter are made on "information and belief" because the Maritime Administration has failed to place this letter in the docket, even though the Administrator relied on it in making his decision, and has denied a Freedom of Information Act request for its release.  (Attachment 7)  This document will play an important role in the Court's resolution of this case.  The Court should order the Administrator to produce this document immediately.

In making this determination, the Administrator did not apply the standard established by Section 1508(a)(2), and instead applied a different standard not authorized by the DWPA.  The Administrator stated that he had relied:

> upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

(*Id*. at 1)  Further, the Administrator never conducted the comparative analysis of the totality of the risks the project presented to the coastal environments of New York and New Jersey as required by Section 1508(a)(2).  The decision never stated that the risks to the coastal environment of New Jersey would be "equal to or greater than" the risks to the coastal environment of New York.  Further, the letter did not cite any evidence that purportedly would have supported a conclusion that the risks to the coastal environment of New Jersey would be "equal to or greater than" the risks to New York.

**F.  The Administrator's Denial of ASIG's Request for Reconsideration.**

On December 3, 2007, ASIG submitted to the Secretary of Transportation and the Administrator a request for reconsideration of the Administrator's November 2, 2007 decision.  (Attachment 8)  The request raised many of the same issues that are presented in this lawsuit.

Employees of the Maritime Administration and the Coast Guard have orally informed counsel for ASIG that they have "stopped the clock" on further processing of ASIG's Application, for purposes of the statutory deadlines established by the DWPA, until resolution of ASIG's challenge to the Administrator's action.  Affidavit of David G. Dickman (Attachment 9).

On December 21, 2007, the Governor of New Jersey submitted a letter to the Commandant of the Coast Guard and the Administrator which requested that the prior designation be upheld.  (Attachment 10)  The Governor's letter provided no evidence or analyses concerning the comparative impacts of the potential risks of the project on the coastal environments of New York and New Jersey.

On February 8, 2008, the Maritime Administrator denied ASIG's request for reconsideration of his November 2, 2007 decision.  (Attachment 11)  In attempting to respond to the arguments presented by ASIG, the Administrator's after-the-fact response provided further grounds for concluding that his decision had been arbitrary, capricious, or contrary to law.

The Administrator's designation of New Jersey as an additional "adjacent coastal State" constitutes "final agency action" for which ASIG may obtain judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.  As the Supreme Court held in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997):

> [T]wo conditions must be satisfied for agency action to be "final":  First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences flow.

*Id.* at 177-78.  *See Shipbuilders Council v. Department of Homeland Security*, 481 F. Supp. 2d 550, 555 (E.D. Va. 2007).  The designation represents the culmination of the agency's decisionmaking process on New Jersey's petition.  Further, this decision determines the rights of ASIG and New Jersey, and legal consequences will flow from it.  As the Administrator stated in his November 2, 2007 letter, his decision means that the

Governor of New Jersey has the authority "to approve, disapprove, or approve with conditions the deepwater port license application for the Safe Harbor project."

## SUMMARY OF ARGUMENT

To obtain a preliminary injunction, ASIG must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by issuance of the injunction. *E.g.*, *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). Under this test, the Court should grant ASIG a preliminary injunction staying the Administrator's designation of New Jersey as an additional "adjacent coastal State."

ASIG has an overwhelming likelihood of success on the merits. The Administrator's designation was arbitrary, capricious, or contrary to law, because: (1) he lacked authority to make such a designation, which rests with the Coast Guard; (2) assuming he had such authority, he acted after the statutory deadline for designation of an additional "adjacent coastal State" had expired, or acted on a request that was statutorily time-barred; (3) he failed to apply the mandatory statutory standard for designation established by Section 1508(a)(2); and (4) due to the inadequacy of the submission by New Jersey, the administrative record contained no evidence upon which the Administrator rationally could have concluded that the potential harm to the "coastal environment" of New Jersey was "equal to or greater than" the potential harm to the "coastal environment" of New York, especially in light of the extensive discussion of the potential risks to the New York environment in ASIG's Application.

The equitable considerations strongly support issuance of a preliminary injunction. If interim relief is not granted, ASIG will suffer irreparable harm while this case is litigated. By contrast, if an injunction is granted, the Administrator and New Jersey will not suffer interim harm during the period of time that would be required to resolve the case on cross-motions for summary judgment. Given the strong public interest in favor of conducting the review process in the manner Congress provided, the Court should grant a preliminary injunction staying the Administrator's decision and ordering the federal agencies to "start the clock" on consideration of the Application.

## I. ASIG HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. The Administrator Usurped the Authority Delegated to the Coast Guard To Designate Additional "Adjacent Coastal States."

The Administrator did not have legal authority to designate New Jersey as an additional "adjacent coastal State" under Section 1508(a)(2). The Secretary of Transportation long ago delegated that authority to the Commandant of the Coast Guard, and that delegation may now be modified or rescinded only by Act of Congress.

**1. Under the Governing Regulation, the Commandant Has Authority To Designate an Additional "Adjacent Coastal State."** The Code of Federal Regulations contains only one rule governing designation of an additional "adjacent coastal State," 33 C.F.R. §148.217(d). That rule was issued by the Coast Guard, not the Maritime Administration. It expressly provides that the authority to designate an additional "adjacent coastal State" will be exercised by the Coast Guard. On the face of this regulation, the Maritime Administrator's purported designation of New Jersey usurped the Coast Guard's authority and is contrary to law.

The current Coast Guard rule stems from a Notice of Proposed Rulemaking published on May 30, 2002.  Deepwater Ports, 67 Fed. Reg. 37,920 (May 30, 2002). Proposed § 148.217(d) provided the Commandant would designate additional "adjacent coastal States:"

> If, after receiving NOAA's recommendations, the Commandant (G-M) determines that the State should be considered as an adjacent coastal State, the Commandant (G-M) designates it as an adjacent coastal State.  If the Commandant (G-M) denies the request, the Commandant (G-M) notifies the Governor of the requesting State of the denial.

At the time the NPRM was issued, the Coast Guard was part of the Department of Transportation.  Before its issuance, this proposed rule would have been reviewed and approved by the Office of the Secretary and other interested components of the Department, including the Maritime Administration.  Whatever the Administrator may assert today, the publication of the proposal is strong evidence that as of mid-2002, the Department of Transportation believed that the Coast Guard had been delegated the authority to designate an additional "adjacent coastal State."

On January 6, 2004, the Coast Guard promulgated an interim final rule governing designation of an additional "adjacent coastal State."  33 C.F.R. § 148.217 (2004). Deepwater Ports, 69 Fed. Reg. 724 (Jan. 6, 2004).  The rule provided that a petition for designation must be submitted to the Commandant and that the Commandant would send a copy of the request to NOAA asking for its recommendations.  Id., §§ 148.217(b)-(c). Section 148.217(d) (2004) further provided:

> If after receiving NOAA's recommendations, the Commandant (G-M) determines that the State should be considered as an adjacent coastal State, the Commandant (G-M) designates it as an adjacent coastal State.  If the Commandant (G-M) denies the request, the Commandant notifies the Governor of the requesting State of the denial.

(Emphasis added); *see* 69 Fed. Reg. at 754.    This regulation, whose language is essentially identical to the proposal published in 2002, explicitly provided that the decision whether to grant a petition for designation as an additional "adjacent coastal State" was made by the Commandant of the Coast Guard.  The rule provided no role for the Maritime Administrator in making that designation.

In September 2006, the Coast Guard published a final rule amending Section 148.217(d) and established the sole rule in the Code of Federal Regulations that currently governs determination of a State's petition for designation as an additional "adjacent coastal State."  Deepwater Ports, 71 Fed. Reg. 57,643 (Sept. 29, 2006).  This rule amended Section 148.217(d) to provide a subordinate role for the Administrator in designating additional "adjacent coastal States," subject to the overall authority of the Commandant. As amended, the rule now provides:

> If after receiving NOAA's recommendations the Commandant (G-P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G-P), in concurrence with the MARAD Administrator, will so designate it.  If the Commandant (G-P), in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

(Emphasis added).

The governing regulation thus provides that the designation of an additional "adjacent coastal State" is made by the Commandant, not by the Administrator.  While the Commandant chose to limit his discretion by providing that he would make this determination "in concurrence with the MARAD Administrator," he did not delegate or surrender to the Administrator his authority to make the designation.  The Administrator's role is derivative of, and subordinate to, the authority of the Commandant.

For this reason, the Administrator's decision designating New Jersey as an additional "adjacent coastal State" on his own authority violates Section 148.217(d).

**2.   The Administrator Erred in Claiming that the Coast Guard Lacked Authority To Make Additional "Adjacent Coastal State" Designations.**   In denying reconsideration, the Administrator attempted to explain away the Coast Guard's regulation by asserting that the rule itself is unlawful because "the USCG was never delegated the authority to make a § 1508(a)(2) ACS determination . . . ." (Attachment 11 at 2)  He claims that this "authority was reserved for the sole discretion of the Secretary of Transportation" and that "[t]he Secretary reserved that authority until delegation to the Maritime Administrator in 2003."  (*Id.*)  The Administrator cites no authority for this proposition, and there is none.   To the contrary, the Coast Guard's current rule implements the consistent and longstanding delegation of authority under the DWPA.

**a.  The Original Delegation of Authority to the Coast Guard.**  The DWPA delegated implementing authority to the Secretary of Transportation, the Department in which the Coast Guard was located in 1974, at a time in which the Maritime Administration was located in the Department of Commerce.  Congress viewed the Coast Guard as the appropriate lead agency for the regulation and licensing of deepwater ports based on its experience and expertise in navigational safety and marine environmental protection.  <u>See</u> S. Rep. No. 93-1217, reprinted in 1974 U.S.C.C.A.N. 7529, 7536-37.

On September 24, 1975, the Secretary of Transportation delegated the following authorities to the Commandant of the Coast Guard:

> (s) Carry out the functions and responsibilities vested in the Secretary by the Deepwater Port Act of 1974, (33 U.S.C. § 1501-1524), <u>except as reserved</u> by § 1.44(o) and <u>delegated</u> by § 1.53(o).

17

49 C.F.R. § 1.46(s) (1975) (emphasis added); *see* <u>Organization and Delegation of Powers</u> <u>and Duties</u>, 40 Fed. Reg. 43,901, 43,906 (Sept. 24, 1975).  The Secretary retained specifically enumerated powers under the DWPA, which included in relevant part:

> (o) *Deepwater Ports*.  The following powers and duties relating to the Deepwater Port Act of 1974 (33 U.S.C. 1501-1524):
>
> (1) The authority to issue, transfer, amend or renew a license for the construction and operation of a deepwater port (33 U.S.C. 1503(b))
>
> (2) Approval of fees charged by adjacent coastal States for use of a deepwater port and directly related land based facilities (33 U.S.C. 1504(h)(2)).

49 C.F.R. § 1.44(o) (1975).  *See* 40 Fed. Reg. at 43,904-43,905.  With respect to "adjacent coastal States," the Secretary withheld from the Commandant only the authority to approve fees by "adjacent coastal States" for use of a port.  He did not retain any other powers related to "adjacent coastal States," including in particular authority to designate additional "adjacent coastal States" under Section 1508(a)(2).  Thus, pursuant to the plain language of 49 C.F.R. § 1.46(s), the authority to designate an additional "adjacent coastal State" resided with the Commandant of the Coast Guard.

**b.  The Revised Delegation of Authority in 1997.**  In 1981, the Maritime Administration was transferred to the Department of Transportation.  In 1997, the Secretary revised the Delegations of Authority under the DWPA to define the respective authorities of the Commandant and the Maritime Administrator, at a time when both agencies were located within the Department.  <u>Organizations and Delegations of Powers</u> <u>and Duties; Delegation to the Commandant, United States Coast Guard and</u> <u>Administrator, Maritime Administration</u>, 62 Fed. Reg. 11,382 (Mar. 12, 1997).

The Secretary delegated the following authority to the Commandant:

(s) Carry out the following powers and duties vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524):

(1) The authority to process applications for the issuance, transfer or amendment of a license for the construction and operation of a deepwater port (33 U.S.C. 1503(b)) in coordination with the Administrator of the Maritime Administration.

(2) Carry out other functions and responsibilities vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524), except as reserved [to the Secretary] . . . and delegated [to the Administrator of the Maritime Administration].

49 C.F.R. § 1.46(s). Subsection (s)(2) essentially carried forward the original delegation of authority to the Commandant in 1975, i.e., to carry out all other functions vested in the Secretary by the DWPA except those specifically reserved to the Secretary or delegated to the Administrator. The Delegation specifically retained only the authority to issue transfer, amend or renew a license for the construction and operation of a deepwater port under Section 1503(b). 62 Fed. Reg. at 11,382.

The Secretary also delegated, in relevant part, the following authorities to the Administrator:

(aa) Carry out the following powers and duties vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524):

(1) The authority to process applications for the issuance, transfer, or amendment of a license for the construction and operation of a deepwater port (33 U.S.C. 1503(bb)) (sic) in coordination with the Commandant of the Coast Guard.

(2) Approval of fees charged by adjacent coastal States for use of a deepwater port and directly related land-based facilities (33 U.S.C. 1504(h)(2)). . . . .

49 C.F.R. § 1.66(aa). This rule delegated to the Administrator all but one of the powers that had been withheld from the Commandant in 1975, including the authority to approve fees charged by "adjacent coastal States." The Secretary did not, however, delegate any

19

other authority with respect to "adjacent coastal States" to the Administrator, including in particular the authority to designate additional "adjacent coastal States." Thus, as in the prior delegation, the plain language of the Secretary's order provided that the authority to designate an additional "adjacent coastal State" resided with the Commandant.

  **c. Transfer of the Coast Guard and its Delegated Authorities.** On November 25, 2002, Congress adopted the Homeland Security Act, which transferred the Coast Guard to the newly created Department of Homeland Security. Section 888(b) of that statute, Pub. L. No. 107-296, 116 Stat. 2135, 2249, provided:

> There are transferred to the Department [of Homeland Security] the authorities, functions, personnel, and assets of the Coast Guard . . . including the authorities and functions of the Secretary of Transportation relating thereto.

This provision codified prior delegations of authority made by the Secretary of Transportation to the Commandant of the Coast Guard, including the delegations made under the DWPA, and transferred them with the agency to the Department of Homeland Security. Section 888(c) further provided that the authorities vested in the Commandant at the time of transfer can be redelegated or removed only by act of Congress.

> Notwithstanding any other provision of this Act, the authorities, functions, and capabilities of the Coast Guard to permit its missions shall be maintained intact and without significant reduction after the transfer of the Coast Guard to the Department [of Homeland Security], except as specified in subsequent Acts.

  In June 2003, the Secretary delegated to the Administrator the authority to issue, transfer, amend, or reinstate a license for the construction and operation of deepwater ports under Section 1503(b), the DWPA authority that the Secretary had retained in 1997. The Secretary formally recognized that the Coast Guard retained all statutory and delegated authority after its transfer that it previously had had as part of his Department:

The USCG retained the statutory and delegated authorities upon its transfer to the Department of Homeland Security . . . Pub. L. No. 107-296, section 888. This rule does not change the authorities delegated to the USCG and to MARAD nor does it change the coordination between the USCG and MARAD for processing license applications.

Organization and Delegation of Powers and Duties, Update of Secretarial Delegations, 68 Fed. Reg. 36,496 (June 18, 2003).

In sum, the current Coast Guard rule providing that it will make the determination whether an additional "adjacent coastal State" shall be designated is consistent with the long history of delegations of authority by the Secretary. Under Sections 888(b)-(c) of the Homeland Security Act, that authority cannot now be redelegated by the Secretary or transferred by agreement between the agencies. It may be transferred only by Congress.

**3.  An Informal Agreement Between the Agencies Cannot Trump the DWPA and the Formal Delegations.**  In denying reconsideration, the Administrator responded to ASIG's argument that he did not possess the necessary authority to make designations under Section 1508(a)(2) by relying upon an alleged informal understanding with the Coast Guard that the Maritime Administration would serve as the "lead decisionmaking agency" under the DWPA and asserted that the Coast Guard agreed with his position that his authority as "lead decisionmaking agency" extended to designation of additional "adjacent coastal States."  (Attachment 11 at 2-3).  The Administrator's reliance on this informal understanding is emblematic of his attempt to justify the designation on grounds that are not found in the statute.  Such an inter-agency agreement could not trump the terms of the DWPA, prior formal delegations, or specific existing regulations.

The term "lead decisionmaking agency" does not appear in the DWPA and has no legal force and effect.  An informal understanding between the two agencies cannot

trump the plain language of the Coast Guard rule, particularly when that rule has gone through public notice and comment on three occasions.  In any event, the purported understanding between the agencies is unlawful and invalid because it would contradict the provisions of the Homeland Security Act freezing prior delegations to the Coast Guard.  It also would be inconsistent with the expressed intent of Congress that "the U.S. Coast Guard would have the predominant role in regulating the construction and operation of deepwater ports regardless of which Federal agency issued the license" and that "the Committees agreed that the Coast Guard should play the major role in licensing and regulating deepwater ports."  S. Rep. No. 93-1217, reprinted at 1974 U.S.C.C.A.N. 7529, 7536.  *See id.* at 7537.

In denying reconsideration, the Administrator also argued that the explicit language of 33 C.F.R. § 148.217(d) does not govern because a general definitional term in the rule creates an ambiguity, and therefore the informal agreement between the agencies controls the power to designate.  (Attachment 11 at 3)  The Administrator pointed to the definitional section of the rule, 33 C.F.R. § 148.5, which provides:

> Adjacent coastal State means any coastal State which:
>
>     (1)  Would be directly connected by pipeline to a deepwater port, as proposed in an application;
>     (2)  Would be located within 15 miles of any such proposed deepwater port; or
>     (3)  Is designated as an adjacent coastal State by the Administrator of the Maritime Administration under 33 U.S.C. 1508(a)(2).

The Administrator claimed that the third provision in the definition made ambiguous the otherwise explicit language of Section 148.217(d), which states in three places that the Commandant will designate additional "adjacent coastal States." Therefore, according to

the Administrator, the informal, non-published agreement between the Coast Guard and the Maritime Administration determines who has the authority to designate.

Even assuming there is an ambiguity, the Administrator's argument ignores the governing rule that, when interpreting a regulation, the specific provision controls the general.  For example, in *Long Island Care at Home, Ltd. v. Coke*, ___ U.S. ____, 127 S. Ct. 2339 (2007), the Supreme Court considered whether a specific agency rule addressing an issue was valid and binding in light of a general definitional provision that created a conflict.  The Court held that "the specific governs the general" and upheld the specific rule that set forth how a statutory power would be applied to regulated entities.  *Id*. at 2348-49.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 484-85 (1992).

Therefore, the Court should find that, even if there is an ambiguity between the substantive provision and the definitional section, the specific language of 33 C.F.R. § 148.217(d) controls, and the Commandant must designate additional "adjacent coastal States."  The purpose of this rule is to set forth which official would make the designation, and it states in three places that the Commandant will decide.

**B.  The Administrator Violated the Applicable Statutory Deadline.**

The Administrator purported to grant New Jersey's petition for designation as an additional "adjacent coastal State" on November 2, 2007.  Even assuming that he had such authority, his action was unlawful either because he acted after the expiration of the 45 day statutory deadline for resolution of such a petition or because he acted on a request that was statutorily time-barred.

Section 1508(a)(2) provides that "[t]he Secretary shall make the designation required by this paragraph not later than the 45[th] day after the date he receives such a

request from a State."  New Jersey's petition was dated September 6, 2007 and was formally posted in the docket of this matter on September 10, 2007.[2]  Thus, if the date of docketing were to be considered the date the agency received the letter, the statutory deadline for determination of the petition expired no later than October 25, 2007. However, the Administrator did not make his decision until November 2, 2007, more than a week after the statutory deadline expired.  The Administrator's action therefore is void on its face for violation of the statutory deadline.

In denying ASIG's request for reconsideration, the Administrator attempted to defend the timing of his decision by arguing:

> Because there are so many forms in which to communicate, it is necessary and practical to the proper implementation of the statute that we establish one method as the official method of receipt for the Administrator.  The September 18[th] date is based not on telephone, email, fax, or docket notices but on the date the letter request was posted to the Administrator's controlled correspondence database.

(Attachment 11 at 5)   Accepting the Administrator's argument at face value, if "the official date the Administrator is deemed to have received" the petition is September 18, 2007, then the Governor violated Section 1508(a)(2) by failing to submit the petition until 22 days after publication of the Federal Register Notice.  Under these circumstances, consideration of New Jersey's request is statutorily time-barred.

Strict compliance with the deadlines established by the DWPA is critical, because the statute requires that all public hearings on ASIG's Application must be held within 240 days of its submission and that the Administrator's final decision must be issued within 330 days of its submission.  The Administrator cannot have it both ways.  In

---

[2]*See* Doc.. No. USCG-2007-28535-0069, *available at* http://www.regulations.gov/ Fdmspublic/component/main?main=DocketDetail &d=USCG 2007-28535 (last viewed Feb. 13, 2008).

considering the operation of the two deadlines established by Section 1508(a)(2), he must pick a single date of submission for purposes of both calculations. Whichever date is applied, either the petition itself or the Administrator's action on the request violates a statutory deadline. In any event, the designation is illegal.

## C. The Administrator Violated the Deepwater Port Act, as a Matter of Law, By Failing to Apply the Substantive Standard that Congress Enacted.

An agency action is arbitrary, capricious, or contrary to law if "the agency relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Administrator's action was unlawful because he failed to apply the statutory standard in Section 1508(a)(2), but instead utilized a standard that Congress had specifically considered and rejected in 1974.

In Section 1508(a)(2), Congress deliberately adopted a narrow substantive standard for designation of an "additional adjacent coastal State," to prevent abuse of the extraordinary power such a designation conferred upon a State to veto or to impose binding conditions upon a federal license. The statute provides that a petitioning State may be designated if, and only if, it is found that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. . . . "

By imposing an "equal to or greater than standard," Congress required that a comparative analysis of the potential risks posed by the project to the two States be conducted. The Administrator's decision shows on its face that he did not apply the standard required by Section 1508(a)(2). The operative sentence of the decision states:

upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have determined that New Jersey is an Adjacent Coastal State as defined in the Act and is so designated. . . .

The differences in the standard required by the DWPA and the one actually applied by the Administrator are obvious and critical. Section 1508(a)(2) requires a comparison of the potential risks to the coastal environments of New York and New Jersey; however, the decision does not refer to the risks presented to New York, and the Administrator never performed the required comparative risk assessment. Rather, the Administrator relied upon factors not authorized by the DWPA -- the "magnitude and scope" of the proposed project and the Administrator's subjective determination of its potential environmental impact on New Jersey, which the Administrator characterized as "significant." Under *State Farm*, the Administrator's decision is invalid as a matter of law, because he failed to apply the standard that Congress adopted and based his decision on criteria that were not authorized.

In denying reconsideration based on this argument, the Administrator stated that in adopting Section 1508(a)(2), "Congress . . . sought an equitable approach" among the States. (Attachment 11 at 2) His fundamental misunderstanding of the statute led directly to the legal errors from which ASIG seeks relief. The legislative history of the DWPA shows that Congress consciously rejected an "equitable" approach that would have authorized designation of a petitioning State as an additional "adjacent coastal State" based on a determination that the project would have a significant impact on its coastal environment.

The Senate version of the bill that became the DWPA would have permitted designation of an additional "adjacent coastal State" if the State:

would in the opinion of the Administrator of the National Oceanic and Atmospheric Administration experience <u>substantial environmental risk</u> should an oil or natural gas discharge occur from the deepwater port or from a vessel operating in the safety zone around the port.

S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7530. This approach would have permitted designation based on the extent of the potential environmental risk alone, without consideration of the relative risks presented to the environments of the petitioning State and the "pipeline" State.

The Executive Branch objected strongly to inclusion of any provision that would have allowed designation of a petitioning State as an "adjacent coastal State," thus granting it a veto power over the project, based solely on whether the risk to its "coastal environment" could be characterized as "substantial." In particular, in a letter dated August 22, 1974 to Chairman Jackson of the Senate Committee on Interior and Insular Affairs, the Secretary of the Interior expressed the Administration's concern that:

the third condition . . . would extend this [the ability to prevent construction of a proposed deepwater port] to States that are some distance from the proposed facility and that may be affected by a possible oil spill. <u>The provision is so broad that if it is not deleted, it is questionable whether any deepwater port will be constructed</u>.

Letter of Aug. 22, 1974 from Secretary of the Interior Morton to Chairman Jackson (Aug. 22, 1974), reprinted at 1974 U.S.C.C.A.N. 7589, 7591 (emphasis added).

In response to this criticism, the Conference Committee eliminated the "substantial risk of serious damage" test to which the Administration objected and replaced it with the current objective "comparative assessment" standard in Section 1508(a)(2). The Conference Committee Report explicitly states that the provision actually enacted permits designation of a petitioning State as an "adjacent coastal State" only if the implementing agency determines that "there is a risk of damage to the coastal

27

environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port."  H. Conf. Rep. No. 93-1605, 93rd Cong., 2d Sess. (Dec. 16, 1974), reprinted in 1974 U.S.C.C.A.N. 7622, 7636.

In denying reconsideration, the Administrator did not challenge ASIG's showing, based on the legislative history, that the criteria on which he had based the determination – the "magnitude and scope" of the project and the potential for "significant" environmental impact upon New Jersey – were impermissible.  Rather, he claimed that, after setting forth these criteria in the first clause of the sentence, he stated in the second clause that he determined that New Jersey was an Adjacent Coastal State "as defined under the Act, and that use of the phrase "as defined under the Act" incorporated the "equal to or greater than" standard.  (Attachment 11 at 3-4)

However, the bare assertion by the agency head that he complied with the law cannot trump the reality that the only factors on which he explicitly relied were in impermissible criteria.  It is a core principle of administrative law that an agency's decision can be upheld only on the grounds that the agency itself articulated.  *E.g., Williams Gas Processing—Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006).  The standard the Administrator applied here was illegal, and he never performed the comparative analysis mandated by Section 1508(a)(2).  Accordingly, his designation of New Jersey as an additional "adjacent coastal State" was unlawful.

**D. The Administrator's Action Was Arbitrary or Capricious Because the Record Did Not Contain Evidence That the Risk of Damage of the Port to the Coastal Environment of New Jersey Would Be "Equal to or Greater Than" the Risk of Damage to the Coastal Environment of New York.**

In denying reconsideration, the Administrator responded to ASIG's showing that he had not made a factual finding sufficient to sustain his decision by denying that he was under an obligation to articulate any findings.

> As to a factual finding, the statute requires nothing further than a decision be made by the Administrator, by delegation from the Secretary, of whether the State meets the requirements of the statute to be designated an [Adjacent Coastal State]. There is no basis in the statute for your claim that our finding be subject to public scrutiny.

(Attachment 11 at 4). On its face, this claim demonstrates that the Administrator's action was arbitrary and capricious. The APA requires the agency to articulate a rational basis for its decision, and the determination may be sustained only on its stated rationale. *Williams Gas*, 475 F.3d at 326; *AT&T, Inc. v. FCC*, 452 F.3d 830, 837 (D.C. Cir. 2006). The Administrator has admitted that his decision provided no factual support for the designation of New Jersey, and it therefore cannot survive judicial review.

In any event, the administrative record does not contain evidence upon which a rational decisionmaker could have concluded that the risk of damage to the "coastal environment" of New Jersey would be "equal to or greater than" the risk posed to New York, given the extensive discussion and mitigation of risks to the "coastal environment" New York in the Application and the absence of evidence of risks to the "coastal environment" of New Jersey.

**1.  The Administrator Failed To Perform the Comparative Assessment of Risks to the "Coastal Environments of New York and New Jersey Required by Section 1508(a)(2).** Section 1508 (a)(2) establishes a "totality" test for determining

29

whether designation is justified – *i.e.,* whether the total risk posed by the project to the coastal environment of New Jersey must be equal to or greater than the total risk posed to the coastal environment of New York.[3]  The required comparative analysis is a complex undertaking, requiring collection and analysis of substantial bodies of information within 45 days.  The Coast Guard rule governing consideration of a petition for designation accordingly requires the Governor of a petitioning State to submit "facts and available documentation or analyses concerning the risk of damage to the coastal environment of the State" and to explain why he believes "the risk of damage to its coastal environment is equal to or greater than the risk" to a State directly connected by pipeline to the project. 33 C.F.R. § 148.217(b)(3)-(4).  New Jersey did not comply with this rule and did not submit any documentation or analyses of potential risks to its coastal environment.  By contrast, ASIG's Application discussed at great length the risks posed to the "coastal environment" of New York and the steps to address them.

The best publicly available description of how the comparative assessment required by Section 1508(a)(2) for designation of an additional "adjacent coastal State" should be conducted is set forth in a 75-page Methodology Report prepared by a Coast Guard contractor in December 1975 and revised on March 12, 1976.  Arthur D. Little, Inc., "Methodology for Designation of Adjacent Coastal States," U.S. Coast Guard Report No. CG-WDWP-1-76.  (Attachment 12)  The Methodology Report provided that the Coast Guard should (1) assess, based upon interpretation of the license applicant's data, independent risks to the coastal environments of the States directly connected by

---

[3] In denying reconsideration, the Administrator agreed that this is the proper standard. He stated:  "[I] agree with you that the comparative risk analysis must evaluate the totality of impacts."  (Attachment 11 at 4).

pipeline to the port; then (2) evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential environmental damage it submits; and finally (3) make a comparison of the risks to the coastal environment of each State on a resource-by-resource basis. *Id*. at 6. With respect to the second factor, the "Petitioning States claiming damage potential from deepwater port-related developments should quantify the extent to which these indicators (or other factors) are the basis for their claim." *Id*. at 22. Agency officials reviewing the petition for designation:

> will consider evidence in those categories of concern identified by the petitioning State. However, they will also have available (and consider) data on all categories for the "pipeline" State as submitted by the applicant for a deepwater port license. This implies that petitioning States should attempt to present as comprehensive a package of evidence as possible, in order not to foreclose comparative evaluation in categories which will be examined for the "pipeline" State.

(Attachment 12 at 42).

In its request for reconsideration, ASIG showed that no meaningful comparative assessment could have been performed in the manner suggested by the Methodology Report. The Application discussed in detail many potential risks to New York, and the only other materials in the record were the one and one-quarter page letter from NOAA and a three page letter from the State that did not contain the required documentation and analyses. In denying reconsideration, the Administrator argued that he is not required "to concur with NOAA or USCG [Coast Guard], or to follow USCG methods or publish a factual finding." (Attachment 11 at 5) This is a red herring designed to distract attention from the fact that he conducted no comparative assessment of the totality of the risks to the two States and thus failed to comply with the statutory standard.

ASIG referenced the 1976 Methodology Report to illuminate the minimum evidence gathering and analysis that was required in 1976, at a time when environmental decisionmaking was in its infancy. In the ensuing 30 years, the level of analysis required by federal courts under the APA's arbitrary and capricious standard has become substantially more demanding. The Administrator's failure to undertake even the simple kind of review required in 1976 highlights the failure of his decision to articulate <u>any</u> rational process for making the statutorily-required comparative assessment.

**2.   <u>The NOAA Letter Did Not Support the Administrator's Decision</u>.**   The Administrator stated that he based his decision "upon consideration of the NOAA recommendation." (Attachment 1 at 1)  Despite ASIG's repeated requests, the Maritime Administration has refused to place the NOAA letter in the docket and has refused to disclose it in response to ASIG's Freedom of Information Act request. (Attachment 7) The Court should order the Administrator to produce this letter immediately, as it is an indispensable part of the record on review.

On information and belief, the NOAA letter does not support the Administrator's decision. The letter is one and one-quarter pages long. A letter of that length cannot have provided the required comparative analysis of the risks presented to New York and New Jersey, especially given the 5,000-page ASIG application that discusses potential effects on the "coastal environment" of New York.

The inadequacy of the NOAA letter as a basis for this decision is demonstrated by the effort that NOAA performed in the only prior case in which it made a recommendation concerning designation of an additional "adjacent coastal State." In February 1976, the Coast Guard asked NOAA to analyze whether the risks arising from

32

oil discharges from vessels in transit for the proposed Seadock deepwater port showed that the risks to the coastal environment of Florida, the petitioning State, were greater than the risks to Texas, the "pipeline" State.  On March 25, 1976 NOAA submitted to the Coast Guard a 233 page report conducting a comparative analysis on the merits of this issue.[4]  The analysis provided by NOAA in the Seadock project stands in stark contrast to the short letter NOAA submitted here.

**3.    New Jersey's Petition Failed To Show that the Risk to its Coastal Environment Exceeded the Risk to New York.**  In support of its petition, New Jersey submitted a three page letter that contained no facts, documentation or analyses, as required by the governing Coast Guard rule, and did not attempt to compare the totality of the risks to its "coastal environment" with the totality of risks to the "coastal environment" of New York as discussed in the Application.  (Attachment 4)  The letter contained only four paragraphs of lawyers' arguments, unsupported by evidence.

During the years that it was preparing its Application, ASIG had multiple conversations with relevant New Jersey officials and exchanged information with New Jersey agencies concerning the potential impacts of the project on its coastal environment and the mitigation steps ASIG was taking to address these potential impacts.  ASIG believed that these interactions had been successful in addressing New Jersey's concerns.  On August 22, 2007, one week after ASIG's Application was formally deemed "complete," an ASIG consultant received an e-mail from the Deputy Commissioner of the New Jersey Department of Environmental Protection, which stated:

---

[4] NOAA, Analysis of the Risk of Damage to the States of Florida and Texas from the Seadock, Inc. Proposed Deepwater Port (Mar. 25, 1976), available at http://unicorn.csc noaa.gov/docs/czic/TD224.F6_A63_1976/4590.pdf (last visited Feb. 14, 2008).

the NJ DEP [Department of Environmental Protection] has reviewed the proposal and based on its current configuration, <u>the Department has no regulatory issues that Atlantic Sea Isle Group must deal with</u>. Given the distance off NJ's coast and the fact that the current proposal has all of the infrastructure going coast (*sic*)through NYC, <u>New Jersey has no jurisdiction in this matter</u>. . . .

(Attachment 13 (emphasis added))  On September 6, 2007, two weeks later, the Governor submitted a petition that took a different position from that of his Department of Environmental Protection.  The change in the State's position in the days immediately prior to the statutory deadline for submission of the petition may explain why the State failed to submit the evidence and analyses required by the Coast Guard rule.

 **a.  Reliance on an Alternative Not Pursued.**  In the Governor's letter, the leading argument was that "an alternative pipeline alignment" considered as part of the environmental analysis in ASIG's Application would have been less than nine miles from the State.  (Attachment 4 at 1-2)  However, this pipeline route was not the recommended alternative in the ASIG Application and is not the one ASIG seeks to construct.  <u>Atlantic Sea Island Group Safe Harbor Energy LNG Deepwater Port License Application</u> (May 2007) ("Application") Vol. 3, Part 1, Topic Report 99 at 9-40 (Attachment 14).  The Administrator did not rely on this argument in his decision.  (Attachment 1 at 2)

 **b.  Major Environmental Risks Experienced Primarily, on in Some Instances Only by New York, That New Jersey Did Not Address.**  The Governor's letter did not even discuss the greatest environmental risk presented by this LNG gasification plant – air emissions.  The Application shows that over the last 100 years, the predominant wind at the port site blows from west to east and would take these emissions out to sea.  The second most common wind direction, however, is from south to north and would take air emissions over the "coastal environment" of New York.  Application, Vol.2, Ex. O at O-

15 to O-16 (Attachment 15). This factor, which would have weighed heavily in any true comparative assessment, to a significant extent affects only the coastal environment of New York. Further, the project pipeline will intersect the existing natural gas infrastructure in the navigable waters of New York State. ASIG will have to obtain an easement from New York and an environmental permit to disturb these submerged lands. Letter dated September 6, 2007 from State of New York, Bureau of Land Management, to ASIG (Attachment 16). There is no similar direct impact on the "coastal environment" of New Jersey.

    **c.**    **New Jersey Relied on Risks that Do Not Affect Its "Coastal Environment."** Many of the risks discussed in the Governor's letter do not fall within the narrow definition of the term "coastal environment" that Congress included in the DWPA as part of its deliberate effort to limit the scope of the designation mechanism to truly extraordinary cases. The DWPA defines "coastal environment" as follows:

> [C]oastal environment means the navigable waters (including the lands therein and thereunder) and the adjacent shorelines (sic) including waters therein and thereunder). . . .

33 U.S.C. § 1502(5). Thus, the risks to be examined for determination of "adjacent coastal State" status under Section 1508(a)(2) are restricted to those related to "navigable waters" of New Jersey. Under federal and State law, those waters extend three nautical miles from the New Jersey shoreline. *See* N.J.S.A. § 12:5-3; N.J.A.C. § 7.7E-1.2(b)(1).

    The Governor's letter discussed the potential for adverse effects on fishing in the area of Cholera Bank, where the port is to be built. (Attachment 4 at 2) Cholera Bank is approximately 19 miles from the New Jersey coast and thus does not fall within the statutory definition of New Jersey's "coastal environment," which extends only three

miles from its shoreline.  Any adverse impacts on fish in Cholera Bank will be considered as part of the general federal environmental review, but by law are not properly considered in performing the strictly delimited "coastal environment" comparison mandated for determination of an additional "adjacent coastal State."

New Jersey also asserted that, because the predominant ocean currents were toward New Jersey, turbidity and other water quality impacts, and any spills during construction and operation of the facility would be toward its "coastal environment." However, New Jersey provided no support for this assertion, and studies and information in the Application show that it is incorrect.  First, the predominant surface and near surface ocean currents in the vicinity of the project run to the southeast, away from the New Jersey shoreline.  Application, Vol. 2, Exhibit O at O-8 to O-11 (Attachment 15). Second, the propagation of spills of LNG on the ocean would be most strongly affected by wind and waves, rather than sub-surface currents.  At the port, the winds and waves are predominantly from the west, once again carrying any effects away from New Jersey. *Id*. at O-15 to O-16, O-18 to O-20.

After ASIG sought reconsideration, on December 21, 2007, the Governor of New Jersey submitted a second, one page letter to the Administrator supporting designation. This letter did not provide any further information about the comparative risks the project presented to the coastal environments of the two States.  (Attachment 10).

In sum, despite two opportunities, New Jersey submitted no information about the potential risk to its "coastal environment" that could overcome the detailed analysis of risks to the "coastal environment" of New York in the Application.  Even if New Jersey could have shown that one or more risks to its coastal environment existed and was

36

"equal to or greater than" the comparable risks to New York, that showing still would not satisfy the statutory standard that the overall risk to New Jersey be "equal to or greater than" the overall risk to New York.

**4.**    **The Administrator's After-the-Fact Justifications in Denying Reconsideration Do Not Provide a Rational Basis for the Designation.**    In the February 8, 2008 denial of reconsideration, the Administrator tried and failed to suggest a rational basis for his original decision.

**a. Application of Tests Not Authorized by Statute.**    The principal defect in the letter denying reconsideration is the same as the fatal flaw in the original decision – the Administrator ignored the standards required by Section 1508(a)(2) and applied criteria not authorized by the DWPA.

First, the Administrator shifted the burden of proof on the comparative analysis from New Jersey to ASIG, by stating that ASIG failed to demonstrate "why New Jersey's coastal environment is not subject to risk equal to or greater than that posed to New York."  (Attachment 11 at 1)  This test violates Section 1508(a)(2) and implementing Coast Guard rules, which require the petitioning State to submit information sufficient to establish that the risks to its "coastal environment" are "equal to or greater than" the risks to the State connected to the port by pipeline, which are primarily set forth in its Application.[5]

_____

[5] See also Methodology Report (Attachment 12 at 5) ("The present policy of the Department of Transportation allows States the opportunity to show proof of environmental risk to their coastal environments.  It is therefore assumed that the data requirements described [in the Report] would be fulfilled by petitioning States in their own interest.").

Second, the Administrator relied on what he characterized as "legitimate regional interests" – that New York and New Jersey share environmental and economic concerns and that their ports are near each other. (Attachment 11 at 2) However, Congress specified in Section 1508(a)(2) that designation must be based on a comparison of the risks to "coastal environment" of each State, not on a broader consideration of the shared interests of the States in a region. That factor may be appropriate for consideration in the general environmental reviews conducted by the federal agencies, but it is not a valid consideration in the designation process.

**b. Factors Cited by New Jersey in its Petition.** In denying reconsideration, the Administrator relied upon some of the factors cited by New Jersey in its submission, but which he had not relied upon in his decision. These factors fail to show that the risks to the "coastal environment" of New Jersey exceed those presented to New York's "coastal environment." For example, the Administrator noted that "alternate sites required under the National Environmental Policy Act to be reasonably foreseeable bring the possible final site to within 9 miles of [New Jersey]" (Attachment 11 at 2). However, as stated above, ASIG is not pursuing the alternative pipeline route addressed by this statement. The proposed pipeline runs through the navigable waters of New York; while the "coastal environment" of New York will be affected by this alignment, New Jersey's will not.

The Administrator relied on the possible adverse effects on fishing near Cholera Bank. (*Id*.). As noted above, this risk, if it exists, does not fall within the "coastal environment" of either New Jersey or New York. The Administrator also asserted that the staging areas for the construction and operation of the port affect New York and New Jersey equally. Id. This factor is neutral, at best. In any event, it is contradicted by the

Application, which states that support for port operations will be based in Ocean Side, (Application, Vol. 3, Part 1, Topic Report 1, at 1-8 (Attachment 17)).

    **c. Reliance on a Factor Never Cited by New Jersey in its Petition.** The Administrator further sought to cure this fatal defect in his decision by reliance on a factor that he never referred to in his decision and that New Jersey did not mention in its petition – the risk of "[a]n LNG-fueled explosion or fire" that could affect the coastal environment. (Attachment 11 at 4) This argument fails for several reasons.

    First, there is no scientific basis for the suggestion that such an event would have an impact that would affect New Jersey's "coastal zone" 16 miles from the site. There is no evidence on the record, or in recently published scientific studies regarding LNG spills on water, that would support this contention.[6] Thus, there is no evidence the New Jersey

---

[6] The Administrator stated that an LNG-fueled explosion or fire might have a significant impact on the "marine environment," without citing a basis for this assertion. (Attachment 11 at 4) "Marine environment is not a term recognized in Section 1508(a)(2), which requires consideration of risks to the "coastal environment," which extends out to the three mile limit.

    With respect to the Administrator's assertion that the risk of fire or explosion is at least as great to New Jersey's coastal environment as to New York's, there have been several studies conducted in recent years (some with the assistance of or at the behest of the Coast Guard) regarding risks associated with LNG spills on water. None of these studies concluded that an LNG spill would disperse or affect persons or the environment at a distance of 16 miles from the site of the spill, the distance to the coastal environment of New Jersey. *See, e.g.*, Sandia National Laboratories, <u>Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water</u> (December 2004) at 81-88, available at www.fossil.energy.govprograms/oilgas storage/lng/sandia_lng_1204.pde (summarizing various studies that provide farthest distance to lower flammable limit of LNG spills is approximately 2.5 miles); Sandia National Laboratories, <u>Review of the Independent Risk Assessment of the Proposed Cabrillo Liquefied Natural Gas Deepwater Port Project</u> (January 2006) at 24, available at www/osti.gov/enerygcitations/servlets/purl/877718-rsBlk/877718.pdf (estimating maximum distance to lower flammable limit for discharge of the contents of 2 LNG tanks to be 11,175 meters (6.9 miles) in optimum wind conditions).

"coastal environment" would be impacted by even a major spill of LNG from the project or LNG tankers operating in the vicinity of the port.

Second, the Administrator apparently based this determination on the belief that currents in the vicinity of the Safe Harbor Energy port run toward New Jersey. As stated above, this is inaccurate as the predominant surface and sub-surface current is toward the southeast, away from the New Jersey coast. Application, Vol. 2, Exhibit O at O-8 to O-11 (Attachment 15). Moreover, relevant scientific studies confirm that, in the case of an LNG spill, surface winds and waves are the primary determinant of the dispersion direction of any vapors from an LNG spill.[7] As shown in the Application, the predominant winds at the port are from the west to the east, away from New Jersey, and secondarily, primarily toward New York. *Id.* at O-15 to O-16. Further, the waves, while southerly, are primarily to the southeast, again, away from the New Jersey coastal environment. *Id.* at O-18 to O-20.

---

With respect to the Administrator's claim that there is a risk of explosion to the New Jersey "coastal environment," a study conducted by ABS Consulting for the Federal Energy Regulatory Commission on LNG releases from LNG carriers concluded: "Although LNG vapors can explode (i.e. create large overpressures) if ignited within a confined space, such as a building or structure, there is no evidence suggesting that LNG is explosive when ignited in unconfined open areas. Experiments to determine whether unconfined methane-air mixtures will explode have been conducted and, to date, have been negative." ABS Consulting, Consequence Assessment Methods for Incidents Involving Releases from Liquefied Natural Gas Carriers (May 13, 2004) at 3, available at www.ferc.gov/industries/lng/safety/reports/cons-model.pdf..

[7] A scientific paper on the Maritime Administration's website confirms this fact. Michael Hightower, Safety and Risk Management of Large LNG Spills Over Water (undated) at 2 (many site-specific and system specific variables must be considered in quantifying the likelihood and results of LNG spills, including "site-specific environmental factors such as waves, wind and terrain" – current is not mentioned) . *See also id.*, at 2, Figure 1 (showing waves affect liquid spread and wind affects vapor and fire dispersion), available at www.marad.dot.gov./DWP/LNG/documents/Safety_and_Risk Management_of_Large_LNG_Spills_Over_Water.pdf.

In sum, the Administrator never performed the comparative assessment required by law.  In addition, the record did not contain material that would have permitted a rational decision maker to conclude that the risks to New Jersey were "equal to or greater than" the totality of the risks to New York described and mitigated in the Application.

## II.  THE EQUITABLE FACTORS STRONGLY SUPPORT ISSUANCE OF A PRELIMINARY INJUNCTION.

The equitable factors, taken together with ASIG's showing of probability of success on the merits of its claim, strongly support the issuance of a preliminary injunction to stay the Administrator's decision pending resolution of this lawsuit.

### A.  Unless a Preliminary Injunction Is Issued, ASIG Will Suffer Irreparable Injury While The Case Is Being Litigated.

ASIG is suffering and will continue to suffer serious and irreparable injury unless a preliminary injunction is issued at this time against the Administrator's unlawful designation of New Jersey as an additional "adjacent coastal State."  That decision is currently harming ASIG's ability to obtain fair consideration of its Application pursuant to the procedural and substantive standards that Congress intended to be applied in considering proposals to license these critical infrastructure facilities.  Under Section 1508(b)(1), the federal government "shall not issue a license without the approval of the Governor of each adjacent coastal State."  The designation of New Jersey as an additional "adjacent coastal State" has given it the unwarranted authority to stop the Safe Harbor Energy project dead in its tracks or to insist upon conditions in the federal license that would make the project impossible to build or economically infeasible to operate.

The risk that an "adjacent coastal State" will exercise a veto over a project is substantial, as demonstrated by the disposition of two applications within the last 19

months.  On June 5, 2007, the Administrator denied an application for the proposed Cabrillo LNG deepwater port based on the disapproval of the Governor of the "adjacent coastal State" of California.[8]  Similarly, on June 21, 2006, the Administrator denied the application for the Main Pass Energy Hub project based on the disapproval of the Governor of the "adjacent coastal State" of Louisiana.[9]

Corrective relief granted upon entry of a final judgment at the end of the litigation will not remedy the substantial irreparable harm that ASIG is currently suffering and will continue to suffer while the case is being litigated.  This injury takes several forms.

1. **Injury Resulting from the Agencies' Decision To "Stop the Clock."**  ASIG is currently suffering irreparable harm from the failure of the agencies to adhere to the statutory schedule for consideration of its Application.  33 U.S.C. § 1504(i)  While the request for reconsideration was pending, the Coast Guard and the Maritime Administration orally informed counsel for ASIG that they had "stopped the clock" -- that is, suspended the running of the statutory timetable for consideration of its Application -- pending resolution of ASIG's challenge to the Administrator's decision. (Attachment 9)  It is likely the agencies will continue to keep the clock stopped until the additional "adjacent coastal State" issue is resolved.  This regulatory delay has caused and will continue to inflict substantial injuries on ASIG.

ASIG is an independent company created for the purpose of constructing and operating the Safe Harbor Energy LNG port.  The Administrator's decision puts in

---

[8] Maritime Administration News Listing, "Cabrillo Port:  Record of Decision issued to deny LNG license application," available at www.marad.gov/DWP/LNG/Port_news/news_detail.asp?ID=49.

[9] The Secretary's Decision on the Deepwater Port License Application of Freeport-McMoran Energy LLC (June 21, 2006), available at http://www.regulations.gov fdmspublic/Component/main?main=DocumentDetail&o=090000064802c913c.

jeopardy ASIG's ability to pursue the project for which it was created.  ASIG is well-financed and has presented a substantial Application to build a critically-needed energy infrastructure project for the New York metropolitan region.  As an independent company, however, ASIG has no revenue stream from other projects; it must finance the costs of pursuing the license application process from investor capital.

ASIG already has expended many millions of dollars in planning fees to prepare its application.  It has retained multiple groups of consultants who will prepare the environmental studies and conduct the public meetings that are required as part of the DWPA review process.  These groups cannot begin their work, however, because the federal agencies have "stopped the clock" and will not give the instructions and approvals necessary for the license review process to proceed.

Every day that the clock is stopped increases the cost of funding the environmental studies and ultimately of constructing this $1.7 billion project.  At a conservative estimate of 3 percent annual inflation in construction costs, every month that the clock is stopped increases construction costs by in excess of $4 million, plus the associated costs in overhead and consultants.  ASIG has no adequate remedy at law for the harm it currently is suffering and will suffer in the future.  If the Administrator's designation of New Jersey ultimately is overturned as unlawful, ASIG will not be able to sue the United States for monetary damages because there is no relevant waiver of sovereign immunity. *See Brendsel v. OFHEO*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004); *Population Institute v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (loss of a $10 million appropriation was irreparable injury because the government would distribute the funds to others during the pendency of the litigation, leaving plaintiff with no avenue to

43

recover the money). *Cf. Wisconsin Gas Go. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (courts ask whether "adequate compensatory or other corrective relief would be available at a later date"; "recoverable monetary loss" is usually insufficient to support a finding of irreparable harm).

Further, the delay has disrupted ASIG's ability to negotiate contracts with the entities that will supply the labor and materials necessary to construct the facility. *Express One Int'l, Inc. v. United States Postal Service*, 814 F. Supp. 87, 91 (D.D.C. 1992)

The delay is irreparably injuring ASIG's ability to obtain the necessary supply of gas for this facility. As an independent entity, ASIG does not have its own sources of natural gas to sell. It must enter into long-term supply contracts in foreign countries to obtain this natural gas. Its ability to negotiate long-term supply contracts has been substantially undermined by the Administrator's grant of a veto to New Jersey and the attendant stopping of the clock and halting of progress on the project. These injuries to ASIG's reputation and goodwill are irreparable and not compensable by monetary damages. *See Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

**2. Injuries Arising from the Distortions of the Review Process Caused by the Grant of an Unlawful Veto Power to New Jersey.** ASIG is being irreparably injured by the threat presented by New Jersey's unlawful power to veto or impose mandatory licensing conditions that will cloud the review of its Application. The adverse effects being experienced by ASIG are precisely the harms that Congress sought to prevent in adopting stringent limitations on the designation of an additional "adjacent coastal State."

In considering the DWPA, Congress recognized that unless the authority to approve petitions for designation and the power to veto or impose mandatory licensing

conditions on deepwater ports were narrowly drawn, "it is questionable whether any deepwater port will be constructed."  S. Rep. No. 93-127, reprinted in 1974 U.S.C.C.A.N. at 7591.  Congress also responded to the Executive Branch's understanding that unless strict conditions were imposed, the political course of least resistance for the federal agency delegated the power to designate additional "adjacent coastal States" would be to give into the political pressure "to designate all States which may be remotely affected" by operation of the port, to avoid criticism in the case of an environmental discharge.  S. Rep. No. 93-127, reprinted in 1974 U.S.C.C.A.N. at 7594.  The Executive Branch also was concerned by the political risk that "[t]o avoid the same criticism, officials from States which would not directly benefit from a deepwater port and which were designated as 'adjacent coastal States' would be pressured into disapproving the . . . application."  *Id.*

In the Safe Harbor Energy project, the first of the harms that Congress sought to avoid has already occurred.  The Administrator has yielded to the urge to avoid criticism by ignoring the procedural and substantive standards of the DWPA and by designating New Jersey as an additional "adjacent coastal State" without regard to the limitations Congress adopted.  He justified this action on the ground that Congress sought "an equitable approach" among States in designations as additional "adjacent coastal States." (Attachment 11 at 2)  Nothing is further from the truth.  The legislative history clearly shows that Congress intended that the authority to veto or impose licensing conditions to an additional State other than the one directly connected to the project would be granted only in extraordinary cases, where the petitioning State could demonstrate that it would suffer harm "equal to or greater than" the "pipeline" State.  Congress strictly limited such designations out of concern that an "equitable" approach – that is, one driven by political

considerations, pressure from Congressional delegations, and the bureaucratic instinct to avoid criticism – would defeat the country's ability to build critical deepwater ports .

In the November 2, 2007 decision, the Administrator explicitly relied on the "magnitude and scope" of the project and its potential for what he characterized as "significant" impact on New Jersey, but never conducted the comparative analysis of the risks to the "coastal environments" of these two States that Congress required.  Due to New Jersey's failure to submit environmental analyses, there were no facts in the record on which the Administrator could have relied to overcome the voluminous facts in the Application concerning the effects on New York.  When ASIG demonstrated these errors in the request for reconsideration, the Administrator denied the need to present any rational basis of facts to support his decision and again failed to present a comparative analysis of the totality of the risks to the "coastal environments" of the two States.  Rather, he continued to apply criteria not authorized by the DWPA and relied upon factors that were refuted by the extensive environmental analyses in the Application.

Unless a preliminary injunction is issued, the effects of the Administrator's error will be irreversible.  If the review of the Application is conducted under the cloud cast by New Jersey's unlawful power to veto or impose conditions on the license, the federal agencies necessarily will have to start negotiation immediately with the State to determine what license conditions, if any, would be sufficient to persuade it to withhold exercise of its veto.  New Jersey would have it within its power to refuse to negotiate with the federal agencies and instead simply to dictate the conditions, if any, that would be required to persuade it to stay its veto.

Even if New Jersey were prepared to discuss the matter, the existence of its unlawful power would have a devastating effect on ASIG and the Congressionally-imposed timetable for consideration of its Application.  It took ASIG two years to discuss appropriate environmental conditions with New York and federal agencies, to conduct the required environmental studies, and to revise its Application at great expense to reflect these conditions.  If ASIG is now required to conduct similar negotiations with New Jersey to avoid imposition of its veto, a considerable period of time and expense would be required to revise the Application further.  In addition, environmental laws and regulations impose limits on the useful life of the data that must be submitted to support a project.  ASIG would face the threat that the delays occasioned by the need to satisfy New Jersey would make its current data stale and require it to conduct a new round of studies to satisfy New York.

Unless a preliminary injunction is granted, the negotiations with New Jersey about how it will exercise its unlawful power would occur while this lawsuit is being litigated.  The decisions resulting from the discussions between the federal agencies and New Jersey, with while the threat of New Jersey's exercising its power overhanging review of the Application, will be impossible to back out of the process even if injunctive relief is granted at the end of the case.  Given the iterative and evolutionary nature of decisionmaking in large environmental projects, it will not be possible after the fact to reverse engineer the consultation process and remove from the federal agencies' final position the concerns, conditions and restrictions that were initially included to avoid a threatened State veto.  For these reasons, ASIG will suffer irreparable harm in the interim

while this litigation is being conducted, and the grant of full relief at the end of the process will not remedy or compensate for that harm.

Accordingly, the Court should issue a preliminary injunction at this stage of the litigation, in light of the overwhelming showing that the Administrator's action was unlawful and the strong likelihood that ASIG will suffer irreparable injury in the interim period necessary for resolution of the case on cross-motions for summary judgment.

### B.  The Maritime Administrator and New Jersey Will Not Suffer Harm in the Interim if a Preliminary Injunction Is Issued.

If a preliminary injunction is granted staying the Administrator's illegal decision, neither the agency nor New Jersey will suffer harm during the interim period necessary for resolution of this lawsuit on the merits.

Issuance of a preliminary injunction would not require the Maritime Administration to undertake any significant administrative activity or expend federal funds.  The only effect of the issuance of a stay would be that the processing of ASIG's application would continue through the usual multi-agency process established under the DWPA, but without the unlawful New Jersey veto hanging over the federal agencies' ultimate decision about whether construction of the port should be authorized, and if so under what environmental protection conditions.

New Jersey will not suffer irreparable injury if the Administrator's decision is stayed.  First, the August 22, 2007 e-mail from the Deputy Commissioner of the New Jersey Department of Environmental Protection stating that "the Department has no regulatory issues that Atlantic Sea Isle Group must deal with" dispels any notion that the coastal environment of New Jersey would face irreparable injury if a stay were granted.

Second, 33 U.S.C. § 1508(b)(2) provides that, even if it is not an additional "adjacent coastal State," New Jersey "shall have the opportunity to make its views known to, and shall be given full consideration by" the federal agencies conducting the DWPA reviews. Thus, if a preliminary injunction is issued, New Jersey's concerns will be fully addressed by the federal agencies whether or not it has the status of an "adjacent coastal State." The only difference in the two situations is that New Jersey will have to persuade the federal agencies that its views should be accommodated based on their merits, rather than being able to impose its policy position to override the considered judgment of the relevant federal agencies through the unlawful veto authority granted it by the Maritime Administrator.

Finally, if the Court were to issue a preliminary injunction but later were to hold for the Administrator on the merits, New Jersey would not be harmed in the short interim period required for final disposition on cross-motions for summary judgment. Once the federal agencies restarted the clock, its views concerning the risks posed to its coastal environment would be given full consideration during the review process. If the Court subsequently held for the Administrator on the merits, New Jersey could insist upon its position through its restored veto power. By contrast, ASIG would be irreparably harmed in the interim if a preliminary injunction is not issued and it the federal agency review were conducted under the cloud cast by the unlawful designation of New Jersey. For this reason, the balance of harms strongly supports issuance of a preliminary injunction.

## C. The Public Interest Strongly Supports a Preliminary Injunction.

The public interest will benefit substantially if a preliminary injunction is granted, through the assurance that an Application for a significant proposed addition to the

nation's energy infrastructure will receive a fair review on the merits through the procedures and substantive criteria that Congress enacted in the DWPA.

In considering the public interest factor, the courts traditionally have looked to the underlying statutory purposes at issue. *See e.g. Amoco Production Co. v. Gambell*, 480 U.S. 531, 544-46 (1987). Applying the purposes that underline the DWPA, the public interest factor strongly supports the issuance of a preliminary injunction.

First, "the public has a profound interest in assuring that [the agency] acts within the limits on authority established by Congress." *Brendsel*, 339 F. Supp. 2d at 67.

Second, in adopting the DWPA and extending its scope to include liquefied natural gas terminals in 2002, Congress recognized the strong national interest in providing a one-stop application window for these critically-needed parts of the national energy infrastructure, in order to assure adequate supplies of natural gas to respond to increasing demand and to diversify the nation's sources of supply to minimize the adverse effects of disruptions due to political or operational reasons. In particular, Section 1(a)(5) of the DWPA, 33 U.S.C. § 1501(a)(5) declares that it is the intent of Congress to:

> promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States and transporting oil or natural gas from the outer continental shelf while minimizing tanker traffic and the risks attendant thereto . . . .

Further, the public interest is strongly served by ensuring that the Maritime Administrator adheres to the standards for designating an additional "adjacent coastal State" established by Congress in Section 1508(a)(2). As the Executive Branch stated in arguing successfully for rejection of the approach adopted in the Senate version of the bill and for adopting of the narrower standard ultimately adopted, there were great concerns

that if a broader test were followed, "it is questionable whether any deepwater port will be constructed."   Letter of Aug. 22, 1974 from Secretary of the Interior Morton to Chairman Jackson, reprinted at 1974 U.S.C.C.A.N. 7589, 7591.  Congress made a policy decision in adopting Section 1508(a)(2) about which standard would appropriately balance the interests of the States other than those to which the deepwater port would be connected by pipeline and the overall national interest in facilitating the construction of necessary energy infrastructure projects, under appropriate protective conditions.  The Administrator's decision departs from the balancing of these interests enacted by Congress.  The public interest would be served by issuing a preliminary injunction to protect "the underlying statutory purposes" and the policy decisions adopted by Congress in the DWPA.

Finally, the public interest in a secure energy supply would be strongly served if the decision on the application to license the Safe Harbor Energy project is made under the statutory standards adopted by Congress.  The demand for natural gas in the United States continues to grow.  Total domestic consumption of natural gas is projected to increase from 22.4 trillion cubic feet in 2004 to 27.0 trillion cubic feet in 2025.  The Middle Atlantic region of the United States, which includes New Jersey, New York and Pennsylvania, is expected to experience an annual average increase in natural gas consumption of 0.7 percent per year during this time period. Id.  On a national basis, imports of natural gas are projected to increase from 500 billion cubic feet per year in 2003 to 6.4 trillion cubic feet in 2025.  As the Administrator has stated, use of deepwater LNG facilities will permit the United States "to receive large amounts of natural gas in an

environmentally safe and efficient manner" and will "contribute to greater energy independence . . . reduce growing port congestion and enhance safety and security."[10]

The Safe Harbor Energy port is designed to receive LNG, regasify it, and transmit through the existing distribution infrastructure up to two billion standard cubic feet per day of natural gas, thereby providing a strategic and critically-needed energy supply to help satisfy the significantly increased energy demands to be presented in the near future by the New York metropolitan area. Natural gas is a clean burning fuel that is environmentally superior to other fossil fuel energy sources, such as coal or fuel oil, in several respects including lesser greenhouse gas emissions. The offshore location of the proposed port will minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, and minimize visual impacts. Further, the offshore location of the proposed port will significant reduce the safety and security risks that are associated with LNG terminals that are located onshore. *See* Congressional Research Service, <u>Liquefied Natural Gas (LNG) Import Terminals: Siting, Safety and Regulation</u>, CRS Rep. No. RL32205 (May 1, 2007).

Given the urgent public need for expanded and diversified sources of supply for environmentally-friendly national gas, there is a strong public interest that the application to construct and operate the Safe Harbor Energy port be considered under the balanced procedural and substantive criteria set forth in the DWPA and that the process not be distorted by the grant of an unlawful veto power to the State of New Jersey to prevent construction of this important project to be built off the coast of New York.

---

[10] Maritime Administration, Home Page, Deepwater Port Licensing for LNG and Oil, available at <u>www.marad.dot.gov/DWP/LNG/index.asp</u>. .

In sum, each of the equitable factors strongly supports issuance of a preliminary injunction.  Taking these factors together with the overwhelming showing of likelihood of success on the merits, the Court should issue a preliminary injunction to stay the effect of the Maritime Administrator's November 2, 2007 designation of New Jersey as an additional "adjacent coastal State" pending the final resolution of this litigation on the merits.

## Conclusion

The Court should grant ASIG preliminary injunctive relief and enjoin the Maritime Administrator's November 2, 2007 decision designating New Jersey as an "adjacent coastal State" for the Safe Harbor Energy project.  The Court also should order the defendants to restart the statutory clock for consideration of ASIG's Application.

Respectfully submitted,

_____
JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 15, 2008                    Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **ATLANTIC SEA ISLAND GROUP LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | )     **Civil Action No. _____** |
| | ) |
| **SEAN T. CONNAUGHTON** | ) |
| **Administrator** | ) |
| **Maritime Administration, and** | ) |
| | ) |
| **MARY E. PETERS,** | ) |
| **Secretary** | ) |
| **Department of Transportation,** | ) |
| | ) |
| **Defendants.** | ) |

_____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 15, 2008

Counsel for Plaintiff
Atlantic Sea Island Group LLC

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

**BACKGROUND** ................................................................................................3

A.  The Standard for Designation of an Additional "Adjacent Coastal State" ...................3

B.  The Rule Governing Petitions for "Adjacent Coastal State" Status.............................6

C.  ASIG's Application for the Safe Harbor Energy LNG Deepwater Port ........................7

D.  New Jersey's Petition for Designation as an "Adjacent Coastal State".......................9

E.  The Administrator's Designation of New Jersey as an Additional
"Adjacent Coastal State" for the Safe Harbor Energy Project.....................................10

F.  The Administrator's Denial of ASIG's Request for Reconsideration ..........................11

**SUMMARY OF ARGUMENT** ....................................................................................13

I.  **ASIG HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS**..14

A.  **The Administrator Usurped the Authority Delegated to the Coast
Guard to Designate Additional "Adjacent Coastal States"** ................14

1.  Under the Governing Regulation, the Commandant Has
Authority To Designate an Additional "Adjacent Coastal
State" .............................................................................................14

2.  The Administrator Erred in Claiming that the Coast Guard
Lacked Authority To Make Additional "Adjacent Coastal
State" Designations ........................................................................17

a.  The Original Delegation of Authority to the
Coast Guard ........................................................................17

b.  The Revised Delegation of Authority in 1997 ......................18

c.  Transfer of the Coast Guard and its Delegated
Authorities...........................................................................20

3.  An Informal Agreement Between the Agencies Cannot
Trump the DWPA and the Formal Delegations.............................21

B.  **The Administrator Violated the Applicable Statutory Deadline**.........23

C.  **The Administrator Violated the Deepwater Port Act, as a Matter
of Law, by Failing to Apply the Substantive Standard that Congress
Enacted**.................................................................................................25

D.  **The Administrator's Action Was Arbitrary or Capricious Because
the Record Did Not Contain Evidence that the Risk of Damage
to the Coastal Environment of New Jersey Would Be "Equal to or
Greater Than" the Risk of Damage to the Coastal Environment of
New York** .............................................................................................28

i

1.  The Administrator Failed to Perform the Comparative Assessment of Risks to the "Coastal Environments" of New York and New Jersey Required by Section 1508(a)(2) ................29

2.  The NOAA Letter Did Not Support the Administrator's Decision ...................................................................................32

3.  New Jersey's Petition Failed To Show that he Risk to Its Coastal Environment Exceeded the Risk to New York .............................33

    a.  Reliance on an Alternative Not Pursued. ..................................34

    b.  Major Environmental Risks Experienced Primarily , or in Some Instances Only by New York, that New Jersey Did Not Address .34

    c.  New Jersey Relied on Risks that Do Not Affect Its Coastal Environment......................................................................35

**4.  The Administrator's After-the-Fact Justifications in Denying Reconsideration Do Not Provide a Rational Basis for the Designation** ...................................................................................37

    a.   Application of Tests Not Authorized by Statute...................37

    b.   Factors Cited by New Jersey in its Petition ..........................39

    c.   Reliance on a Factor Never Cited by New Jersey in its Petition ..............................................................42

**II.  THE EQUITABLE FACTORS STRONGLY SUPPORT ISSUANCE OF A PRELIMINARY INJUNCTION**...............................................................41

**A.  Unless a Preliminary Injunction Is Issued, ASIG Will Suffer Injury While the Case is Being Litigated**................................................41

1.  Injury Resulting from the Agencies' Decision to "Stop The Clock"...................................................................................43

2.  Injuries Arising from the Distortions of the Review Process Caused by the Grant of an Unlawful Veto Power to New Jersey ...................................................................................44

**B.  The Administrator and New Jersey Will Not Suffer Harm In the Interim if a Preliminary Injunction Is Issued** ............................48

**C.  The Public Interest Strongly Supports a Preliminary Injunction**.......49

**CONCLUSION** .........................................................................................53

# TABLE OF AUTHORITIES

Page

**CASES**

*Amoco Production Co. v. Gambell,*
480 U.S. 531 (1987)..............................................................................................50

*AT&T, Inc. v. FCC*, 452 F.3d 830 (D.C. Cir. 2006) .........................................30

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................12

*Brendsel v. OFHEO,*
339 F. Supp. 2d 52 (D.D.C. 2004).................................................................44, 51

*Express One Int'l. Inc. v. United States Postal Service,*
814 F. Supp 87 (D.D.C. 1992).........................................................................45

*Long Island Care at Home, Ltd. v Coke,*
____ U.S. ___, 127 S. Ct. 2339 (2007).............................................................23

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992)..........................................................................................23

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.,*
463 U.S. 29 (1983)........................................................................................26, 27

*Mova Pharmaceutical Corp. v. Shalala,*
140 F.3d 1060 (D.C. Cir. 1998)........................................................................13

*Patriot, Inc. v. HUD,*
963 F. Supp. 1 (D.D.C. 1997)...........................................................................45

*Population Institute v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986)...............44

*Shipbuilders Council v. Department of Homeland Security,*
481 F. Supp. 2d 550 (E.D. Va. 2007) ...............................................................12

*Williams Gas Processing – Gulf Coast Co. v. FERC*,
475 F.3d 319 (D.C. Cir. 2006)......................................................................29, 30

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)............................44

**STATUTES**

5 U.S.C. § 702..................................................................................................12

5 U.S.C. § 704..................................................................................................12

Deepwater Port Act of 1974

33 U.S.C. § 1501 <u>et seq</u>. ........................................................................................1

33 U.S.C. § 1501 (a)(5)........................................................................................51

33 U.S.C. § 1502(5) ........................................................................................5, 36

33 U.S.C. § 1504(c)(1)..........................................................................................4

33 U.S.C. § 1504(g) ..............................................................................................4

33 U.S.C. § 1504(i)......................................................................................4, 6, 43

33 U.S.C. § 1508(a)(1)......................................................................................4, 6

*33 U.S.C. § 1508(a)(2).................................................................................. *passim*

33 U.S.C. § 1508(b)(1) ..........................................................................................4

33 U.S.C. § 1508(b)(2) ..................................................................................6, 8, 49

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, § 888 .....20, 21, 22

N.J.S.A. § 12:5-3.................................................................................................36

## REGULATIONS

33 C.F.R. § 148.5 (2006) ....................................................................................22

33 C.F.R. parts 148-150 (2006) ............................................................................7

33 C.F.R. § 148.217 (2004) ................................................................................15

33 C.F.R. § 148.217(b) (2006) ..................................................................9, 15, 31

33 C.F.R. § 148.217(c) (2006) ...........................................................................15

*33 C.F.R. § 148.217(d) (2004)..........................................................................14

33 C.F.R. § 148.217(d) (2006)..................................................................7, 22, 23

33 C.F.R. § 148.217(d) (2006)..............................................................19, 25, 26

49 C.F.R. § 1.46(s) (1975) ..................................................................................18

49 C.F.R. § 1.44(o) (1975)..................................................................................18

49 C.F.R. § 1.46(s) (2006) ..................................................................................19

49 C.F.R. § 1.66(aa) (2006) ................................................................................19

N.J.A.C. § 7.7E-1.2(b)(1) ....................................................................................36

**LEGISLATIVE MATERIALS**

*S. Rep. No. 93-127 (1974), 93rd Cong., 2d Sess. (Oct. 2, 1974),
reprinted at 1974 U.S.C.C.A.N. 7529 ........................................................5,6,17,22,27, 28

H. Conf. Rep. No. 93-1605, 93rd Cong., 2d Sess. (Dec. 16, 1974)
reprinted at 1974 U.S.C.C.A.N. 7622 ................................................................................28

**OTHER MATERIALS**

Arthur D. Little, Inc., "Methodology for Designation of Adjacent Coastal States,"
U.S. Coast Guard Report No. CG-WDWP-1-76 ..............................................................31

Atlantic Sea Island Group, LLC, Safe Harbor Energy Liquefied Natural Gas
Deepwater Port License Application, 72 Fed. Reg. 49,041 (Aug. 27, 2007) .................8, 9

Congressional Research Service, Liquefied Natural Gas (LNG) Import Terminals:
Siting, Safety and Regulations, CRS Rep. No. RL32205 (May 1, 2007).........................52

Deepwater Ports, 67 Fed. Reg. 37,920 (May 30, 2002)...................................................15

Deepwater Ports, 69 Fed. Reg. 724 (Jan. 6, 2004).....................................................15, 16

Deepwater Ports, 71 Fed. Reg. 57,643 (Sept. 29, 2006)..............................................7, 16

Doc. No. USCG-2—7-28535-0069 ...................................................................................24

Docket Entry 333, USCG-2004-17696-333 ......................................................................43

Maritime Administration News Listing, "Cabrillo Port: record of Decision
issued to deny LNG license application," posted July 16, 2007.........................................42

Organization and Delegation of Powers and Duties,
40 Fed. Reg. 43,901, 43,906 (Sept. 24, 1975) .................................................................18

Organizations and Delegations of Powers and Duties; Delegation to the
Commandant, United States Coast Guard and Administrator, Maritime
Administration, 62 Fed. Reg. 11,3823 (Mar. 12, 1997)...............................................18, 19

Organization and Delegation of Powers and Duties, Update of Secretarial
68 Fed. Reg. 36,496 (June 18, 2003) ...............................................................................21

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————
**ATLANTIC SEA ISLAND GROUP LLC,**          )
                                           )
                        **Plaintiff,**      )
          **v.**                            )          **Civil Action No. _____**
                                           )
**SEAN T. CONNAUGHTON**                     )
**Administrator**                           )
**Maritime Administration, and**            )
                                           )
**MARY E. PETERS,**                         )
**Secretary**                               )
**Department of Transportation,**           )
                                           )
———————————————————**Defendants.**    )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Atlantic Sea Island Group LLC (ASIG) seeks a preliminary injunction of the November 2, 2007 decision by the Administrator of the Maritime Administration designating New Jersey as an additional "adjacent coastal State" for ASIG's Application under the Deepwater Port Act, 33 U.S.C. §1501 et seq. ("DWPA"), for a license to construct the Safe Harbor Energy Liquefied Natural Gas Deepwater Port. (Attachment 1)

The Administrator's decision gave New Jersey the power to veto or to impose mandatory conditions on the construction of an urgently needed facility for the importation and distribution of liquefied natural gas ("LNG"), to be built off the coast of New York and to help the New York metropolitan region meet its increased demand for this environmentally beneficial fuel. Under the Administrator's decision, New Jersey could veto construction of the port even if all interested federal agencies and New York conclude that its construction would be in the national and New York's interest.

ASIG has a strong, indeed overwhelming, likelihood of success on the merits of its claim that the Administrator's action was illegal:

(1)  The Administrator did not have authority to make this designation, which had been delegated to the Commandant of the U.S. Coast Guard, not to the Administrator.

(2)  Even assuming that he did have jurisdiction to decide the issue, the Administrator either acted on a time-barred request or acted after the statutory deadline for making this designation had expired.

(3)  The Administrator failed to apply the stringent legal standard enacted by Congress in 33 U.S.C. § 1508(a)(2), which permits designation of a State as an additional "adjacent coastal State" only if the record shows "a risk of damage to the coastal environment of [the petitioning] State <u>equal to or greater than the risk posed to a State directly connected by pipeline</u> to the proposed deepwater port . . . ."  (Emphasis added) The Administrator never performed the required comparison of the totality of the risks presented by the proposed project to the "coastal environments" of New York and New Jersey.  Instead, he applied a test not authorized by the DWPA that was based the "magnitude and scope" of the port and the possibility that it could have a "significant" impact on New Jersey, a standard that Congress had considered but expressly rejected in adopting the statute in 1974.

(4)  The Administrator did not point to any facts to support his decision or otherwise provide a rational basis for the designation.  The administrative record contained no factual material upon which a rational decisionmaker could have concluded that the risk of damage to the "coastal environment" of New Jersey was "equal to or greater than" the risk posed to the "coastal environment" of New York.  To the contrary,

the record contained extensive information on the potential risks posed to the "coastal environment" of New York, primarily in the information set forth in ASIG's Application.

The equitable considerations strongly support the issuance of a preliminary injunction. ASIG currently is suffering irreparable injury for which it has no remedy at law. Preliminary injunctive relief should be granted because corrective relief granted at the conclusion of the litigation will not remedy the substantial irreparable harm that ASIG will suffer in the interim. In particular, the environmental and safety review processes that the federal agencies are required to conduct for ASIG's Application within the tight statutory deadline will be substantially and irrevocably affected, to ASIG's detriment, if they occur under the overhanging cloud of New Jersey's unlawful power to veto or to impose mandatory conditions on the project.

## BACKGROUND

ASIG has applied for a federal license under the DWPA to construct the Safe Harbor Energy deepwater port, to be located in federal waters on the Outer Continental Shelf 13.5 miles south of Long Beach, New York and 19 miles from the coast of New Jersey. This lawsuit challenges the legality of a final decision by the Maritime Administrator granting New Jersey's petition for designation as an additional "adjacent coastal State" for this application under 33 U.S.C. § 1508(a)(2).

### A. The Standard for Designation of an Additional "Adjacent Coastal State."

The DWPA establishes the procedures and substantive criteria for licensing the construction and operation of deepwater LNG ports. In recognition of the importance of these infrastructure projects to the country's energy supply, the DWPA established an accelerated, mandatory timetable within which all governmental agencies must complete

3

their analyses of the environmental, safety, and other aspects of the project. The timetable is triggered by publication of a Federal Register Notice that the application for a license submitted by the sponsor of the project was "complete." 33 U.S.C. § 1504(c)(1). The law requires that all public hearings on the application must be held within 240 days of publication of the Notice and that the final decision must be issued within 330 days of publication. 33 U.S.C. §§ 1504(g), (i)(1).

Section 1508(b)(1) of the DWPA provides that a license to construct and operate a deepwater port shall not be issued "without the approval of the Governor of each adjacent coastal State." 33 U.S.C. § 1508(b)(1). It also gives the Governor of an "adjacent coastal State" the lesser, but still extraordinary, power to impose mandatory conditions that must be included in the federal license for the port. *Id.*

Section 1508(a) establishes three pathways by which a State may be designated an "adjacent coastal State." Section 1508(a)(1) provides that a State shall be designated as an "adjacent coastal State" if it is: (a) directly connected by pipeline to the proposed deepwater port; or (b) located within 15 miles of the proposed port. Section 1508(a)(2) provides a third pathway by which a State that does not qualify under Section 1508(a)(1) may petition for designation as an additional "adjacent coastal State":

> The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. . . .

(Emphasis added). This lawsuit challenges the Administrator's designation of New Jersey as an additional "adjacent coastal State" through the third pathway.

The DWPA strictly limited in several respects the circumstances in which a petition of a State for designation as an additional "adjacent coastal State" may be granted in order to prevent abuse of the extraordinary power to veto or impose mandatory conditions in a federal license that is provided "adjacent coastal States."

-- First, short statutory deadlines were established for submission and resolution of a petition so that the designation of an additional "adjacent coastal State" would not disrupt the accelerated timetable for consideration and resolution of a deepwater port application.  Section 1508(a)(2) provides that a request for designation must be made within 14 days after publication of the Notice and must be resolved "not later than the 45th day after the date [the Secretary] receives such a request from a State. . . ."

-- Second, only a strictly defined range of possible effects -- risks posed to the petitioning State's "coastal environment" -- may be considered in resolving the request. The term "coastal environment" is then defined narrowly to mean the "navigable waters" of the State and "the adjacent shorelines."  Section 1502(5).

-- Third, the risk of damage to the "coastal environment" of the petitioning State must be "equal to or greater than" the risk posed to the "coastal environment" of the State directly connected by pipeline to the project.  Section 1508(a)(2).

The legislative history of the DWPA shows that Congress adopted these stringent conditions from concern that if a broader provision were adopted, "it is questionable whether any deepwater port will be constructed."  Letter dated Aug. 22, 1974 from Secretary of the Interior Morton to Chairman Jackson, S. Rep. No. 93-127, 93d Cong., 2d Sess. (Oct. 2, 1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7591.  The Executive Branch

recommended that Congress eliminate provisions that would have permitted designation under less stringent conditions out of concern that:

> Delegation by Congress of any Federal agency to designate "adjacent coastal States" would almost assure a veto of each proposed deepwater port. The responsible Federal agency would be pressured to designate all States which may be remotely affected by an oil spill as "adjacent coastal States" in order to avoid criticism in the event of a spill. To avoid the same criticism, officials from States which would not directly benefit from a deepwater port and which were designated as "adjacent coastal States" would be pressured into disapproving the license application.

Letter dated June 24, 1974 from Acting Secretary of the Interior Whitaker to Chairman Magnuson, S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7594.

The DWPA expressly provides that a State that does not meet the criteria for designation as an "adjacent coastal State" shall have "the opportunity to make its views known to, and shall be given <u>full consideration</u> by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added). Similarly, all environmental risks, including those to the area beyond the "coastal environment" of a State, narrowly defined, are considered by the federal agencies in their reviews. While a State that does not meet the stringent requirements for designation as an additional "adjacent coastal State" has its views fully considered on all environmental risks, it does not have the power to veto or to impose binding conditions in the federal license as a State designated under Section 1508(a)(1) possesses.

**B. The Rule Governing Petitions for "Adjacent Coastal State" Status.**

The DWPA delegated implementing authority to the Secretary of Transportation, the Department in which the U.S. Coast Guard was located in 1974. The Secretary in turn delegated to the Commandant of the Coast Guard authority to receive applications to construct deepwater ports and to conduct the review process by which the application is

evaluated.  The Coast Guard also has issued the principal implementing rules under which the statute is administered.  See 33 C.F.R. parts 148-150 (2006).

In September 2006, the Coast Guard issued 33 C.F.R. § 148.217(d), as amended, the only rule in the Code of Federal Regulations that governs resolution of a State's petition for designation as an additional "adjacent coastal State."  *See* Deepwater Ports, 71 Fed. Reg. 57,643 (Sept. 29, 2006).  It provides:

> If after receiving NOAA's recommendations the Commandant (G-P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G-P), in concurrence with the MARAD Administrator, will so designate it.  If the Commandant (G-P), in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

(Emphasis added).  Section 148.217(d) expressly provides that the decision whether to designate an additional State as an additional "adjacent coastal State" will be made by the Commandant of the Coast Guard, not by the Administrator.

## C.  ASIG's Application for the Safe Harbor Energy LNG Deepwater Port.

On May 8, 2007, ASIG submitted to the Coast Guard and the Maritime Administration a revised Application, approximately 5,000 pages in length, for authorization to construct the Safe Harbor Energy port.  The port would be located in federal waters 13.5 miles off the coast of New York and 19 miles from the coast of New Jersey.  The port would be connected by an undersea pipeline to an existing pipeline through an offshore connection in the waters of New York State.  Upon approval, the port is estimated to take five years to construct at an estimated cost of $1.7 billion.

The port is designed to receive LNG, regasify it, and transmit through existing distribution infrastructure up to two billion cubic feet per day of natural gas to the New York metropolitan area.  Natural gas is a clean burning fuel that is considered superior to

other fossil fuels, such as coal or petroleum fuel oils.  The offshore location of the port would minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, minimize visual impacts, and minimize safety and security issues presented by onshore LNG terminals.

The Application was submitted after several years of study and many discussions with federal and New York State agencies about the potential environmental impacts of the port, especially the risks presented to the air, water, and coastal zone.  The Application and its supporting documents spell out in great detail the potential risks to the environment in federal and New York State waters .  In particular, since the facility would be a gasification plant, substantial attention was paid to possible air emissions. ASIG discussed at length with the New York Department of Environmental Conservation the protocols for the air quality monitoring to be conducted as part of the environmental review process.  In addition, ASIG and New York discussed the easement needed for the pipeline to cross the State's undersea lands to connect with the existing pipeline.

On August 15, 2007, the Coast Guard and the Maritime Administration notified ASIG that its application was deemed "complete."  (Attachment  2)  On August 27, 2007, the Maritime Administration published in the Federal Register a Notice that the ASIG license application had been determined to be complete.  Atlantic Sea Island Group LLC, Safe Harbor Energy Liquefied Natural Gas Deepwater Port License Application, 72 Fed. Reg. 49,041 (Aug. 27, 2007) (Attachment 3).  As the Administrator noted:

> The Act requires adherence to a strict timeline for processing an application. Once we determine that an application contains the required information, we must hold public hearings on the application within 240 days, and the Maritime Administrator must render a decision on the application within 330 days.

*Id.*  The Notice designated New York, the State directly connected to the port by pipeline and located within 15 miles of it, as the "adjacent coastal State."  72 Fed. Reg. at 49,041.

### D.  New Jersey's Petition for Designation as an "Adjacent Coastal State."

By letter dated September 6, 2007, the Governor of New Jersey requested that the Commandant of the Coast Guard and the Administrator designate New Jersey as an additional "adjacent coastal State" for this project.  (Attachment 4)  The letter was docketed on September 10, 2007.

The Governor's letter was three pages in length.  It contained no documentation or analyses of the potential risks of the project to the State's "coastal environment," as required by the governing Coast Guard rule.  33 C.F.R. § 148.217(b)(3)-(4).  Rather, the letter argued in four paragraphs that the potential risks presented by the project to certain environmental and commercial interests of New Jersey, several of which were not within its "coastal environment," could be equal to or greater than the comparable risks posed to the New York coastal environment.  The letter did not attempt to demonstrate that the totality of risks to the coastal environment of New Jersey was "equal to or greater than" the totality of risks presented to the coastal environment of New York.

On September 24, 2007, ASIG's counsel responded to the Governor's petition and demonstrated why the State's submission did not satisfy the statutory standard for designation as an additional "adjacent coastal State."  (Attachment 5)

On September 28, 2007, the Administrator sent the Governor an interim response that acknowledged receipt of the State's request.  (Attachment 6)  The Administrator stated that he would review New Jersey's request under the legal standard established by Section 1508(a)(2) – *i.e.*, after considering the recommendation of the Administrator of

NOAA, he would grant "adjacent coastal State" status if the risk of damage to the requesting State's coastal environment <u>is equal to or greater than</u> the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port." (Emphasis added).

On October 17, 2007, NOAA submitted a letter to the Maritime Administration in response to its notification that New Jersey had submitted a request for designation as an "adjacent coastal State." On information and belief, the NOAA letter was one and one-quarter pages long. It contained no meaningful analysis of the risks posed by the project to the coastal environments of New York or New Jersey, and did not attempt to perform a comparative analysis of the risks posed to the "coastal environments" of the two States.[1]

### E. The Administrator's Designation of New Jersey as an Additional <u>"Adjacent Coastal State" for the Safe Harbor Energy Project.</u>

On November 2, 2007, 53 days after the Governor's letter was docketed, the Administrator issued a unilateral decision which "determined that New Jersey is an Adjacent Coastal State as defined under the Act and is so designated for the proposed Safe Harbor deepwater port project." (Attachment 1) The Commandant of the Coast Guard did not sign this decision. The Administrator never acknowledged the existence of the Coast Guard rule which states that the Commandant will exercise this authority.

---

[1] Statements about the NOAA letter are made on "information and belief" because the Maritime Administration has failed to place this letter in the docket, even though the Administrator relied on it in making his decision, and has denied a Freedom of Information Act request for its release. (Attachment 7) This document will play an important role in the Court's resolution of this case. The Court should order the Administrator to produce this document immediately.

In making this determination, the Administrator did not apply the standard established by Section 1508(a)(2), and instead applied a different standard not authorized by the DWPA.  The Administrator stated that he had relied:

> upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

(*Id*. at 1)  Further, the Administrator never conducted the comparative analysis of the totality of the risks the project presented to the coastal environments of New York and New Jersey as required by Section 1508(a)(2).  The decision never stated that the risks to the coastal environment of New Jersey would be "equal to or greater than" the risks to the coastal environment of New York.  Further, the letter did not cite any evidence that purportedly would have supported a conclusion that the risks to the coastal environment of New Jersey would be "equal to or greater than" the risks to New York.

**F.  The Administrator's Denial of ASIG's Request for Reconsideration.**

On December 3, 2007, ASIG submitted to the Secretary of Transportation and the Administrator a request for reconsideration of the Administrator's November 2, 2007 decision.  (Attachment 8)  The request raised many of the same issues that are presented in this lawsuit.

Employees of the Maritime Administration and the Coast Guard have orally informed counsel for ASIG that they have "stopped the clock" on further processing of ASIG's Application, for purposes of the statutory deadlines established by the DWPA, until resolution of ASIG's challenge to the Administrator's action.  Affidavit of David G. Dickman (Attachment 9).

On December 21, 2007, the Governor of New Jersey submitted a letter to the Commandant of the Coast Guard and the Administrator which requested that the prior designation be upheld.  (Attachment 10)  The Governor's letter provided no evidence or analyses concerning the comparative impacts of the potential risks of the project on the coastal environments of New York and New Jersey.

On February 8, 2008, the Maritime Administrator denied ASIG's request for reconsideration of his November 2, 2007 decision.  (Attachment 11)  In attempting to respond to the arguments presented by ASIG, the Administrator's after-the-fact response provided further grounds for concluding that his decision had been arbitrary, capricious, or contrary to law.

The Administrator's designation of New Jersey as an additional "adjacent coastal State" constitutes "final agency action" for which ASIG may obtain judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.  As the Supreme Court held in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997):

> [T]wo conditions must be satisfied for agency action to be "final":  First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences flow.

*Id.* at 177-78.  *See Shipbuilders Council v. Department of Homeland Security*, 481 F. Supp. 2d 550, 555 (E.D. Va. 2007).  The designation represents the culmination of the agency's decisionmaking process on New Jersey's petition.  Further, this decision determines the rights of ASIG and New Jersey, and legal consequences will flow from it. As the Administrator stated in his November 2, 2007 letter, his decision means that the

Governor of New Jersey has the authority "to approve, disapprove, or approve with conditions the deepwater port license application for the Safe Harbor project."

## SUMMARY OF ARGUMENT

To obtain a preliminary injunction, ASIG must show:  (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by issuance of the injunction.  *E.g.*, *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  Under this test, the Court should grant ASIG a preliminary injunction staying the Administrator's designation of New Jersey as an additional "adjacent coastal State."

ASIG has an overwhelming likelihood of success on the merits.  The Administrator's designation was arbitrary, capricious, or contrary to law, because: (1) he lacked authority to make such a designation, which rests with the Coast Guard; (2) assuming he had such authority, he acted after the statutory deadline for designation of an additional "adjacent coastal State" had expired, or acted on a request that was statutorily time-barred; (3) he failed to apply the mandatory statutory standard for designation established by Section 1508(a)(2); and (4) due to the inadequacy of the submission by New Jersey, the administrative record contained no evidence upon which the Administrator rationally could have concluded that the potential harm to the "coastal environment" of New Jersey was "equal to or greater than" the potential harm to the "coastal environment" of New York, especially in light of the extensive discussion of the potential risks to the New York environment in ASIG's Application.

13

The equitable considerations strongly support issuance of a preliminary injunction. If interim relief is not granted, ASIG will suffer irreparable harm while this case is litigated. By contrast, if an injunction is granted, the Administrator and New Jersey will not suffer interim harm during the period of time that would be required to resolve the case on cross-motions for summary judgment. Given the strong public interest in favor of conducting the review process in the manner Congress provided, the Court should grant a preliminary injunction staying the Administrator's decision and ordering the federal agencies to "start the clock" on consideration of the Application.

## I. ASIG HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. The Administrator Usurped the Authority Delegated to the Coast Guard To Designate Additional "Adjacent Coastal States."

The Administrator did not have legal authority to designate New Jersey as an additional "adjacent coastal State" under Section 1508(a)(2). The Secretary of Transportation long ago delegated that authority to the Commandant of the Coast Guard, and that delegation may now be modified or rescinded only by Act of Congress.

**1. Under the Governing Regulation, the Commandant Has Authority To Designate an Additional "Adjacent Coastal State."** The Code of Federal Regulations contains only one rule governing designation of an additional "adjacent coastal State," 33 C.F.R. §148.217(d). That rule was issued by the Coast Guard, not the Maritime Administration. It expressly provides that the authority to designate an additional "adjacent coastal State" will be exercised by the Coast Guard. On the face of this regulation, the Maritime Administrator's purported designation of New Jersey usurped the Coast Guard's authority and is contrary to law.

The current Coast Guard rule stems from a Notice of Proposed Rulemaking published on May 30, 2002. Deepwater Ports, 67 Fed. Reg. 37,920 (May 30, 2002). Proposed § 148.217(d) provided the Commandant would designate additional "adjacent coastal States:"

> If, after receiving NOAA's recommendations, the Commandant (G-M) determines that the State should be considered as an adjacent coastal State, the Commandant (G-M) designates it as an adjacent coastal State. If the Commandant (G-M) denies the request, the Commandant (G-M) notifies the Governor of the requesting State of the denial.

At the time the NPRM was issued, the Coast Guard was part of the Department of Transportation. Before its issuance, this proposed rule would have been reviewed and approved by the Office of the Secretary and other interested components of the Department, including the Maritime Administration. Whatever the Administrator may assert today, the publication of the proposal is strong evidence that as of mid-2002, the Department of Transportation believed that the Coast Guard had been delegated the authority to designate an additional "adjacent coastal State."

On January 6, 2004, the Coast Guard promulgated an interim final rule governing designation of an additional "adjacent coastal State." 33 C.F.R. § 148.217 (2004). Deepwater Ports, 69 Fed. Reg. 724 (Jan. 6, 2004). The rule provided that a petition for designation must be submitted to the Commandant and that the Commandant would send a copy of the request to NOAA asking for its recommendations. Id., §§ 148.217(b)-(c). Section 148.217(d) (2004) further provided:

> If after receiving NOAA's recommendations, the Commandant (G-M) determines that the State should be considered as an adjacent coastal State, the Commandant (G-M) designates it as an adjacent coastal State. If the Commandant (G-M) denies the request, the Commandant notifies the Governor of the requesting State of the denial.

15

(Emphasis added); *see* 69 Fed. Reg. at 754.   This regulation, whose language is essentially identical to the proposal published in 2002, explicitly provided that the decision whether to grant a petition for designation as an additional "adjacent coastal State" was made by the Commandant of the Coast Guard.  The rule provided no role for the Maritime Administrator in making that designation.

In September 2006, the Coast Guard published a final rule amending Section 148.217(d) and established the sole rule in the Code of Federal Regulations that currently governs determination of a State's petition for designation as an additional "adjacent coastal State."  <u>Deepwater Ports</u>, 71 Fed. Reg. 57,643 (Sept. 29, 2006).  This rule amended Section 148.217(d) to provide a subordinate role for the Administrator in designating additional "adjacent coastal States," subject to the overall authority of the Commandant. As amended, the rule now provides:

> If after receiving NOAA's recommendations <u>the Commandant</u> (G-P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, <u>the Commandant</u> (G-P), in concurrence with the MARAD Administrator, will so designate it.  If <u>the Commandant</u> (G-P), in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

(Emphasis added).

The governing regulation thus provides that the designation of an additional "adjacent coastal State" is made by the Commandant, not by the Administrator.  While the Commandant chose to limit his discretion by providing that he would make this determination "in concurrence with the MARAD Administrator," he did not delegate or surrender to the Administrator his authority to make the designation.  The Administrator's role is derivative of, and subordinate to, the authority of the Commandant.

For this reason, the Administrator's decision designating New Jersey as an additional "adjacent coastal State" on his own authority violates Section 148.217(d).

**2.    The Administrator Erred in Claiming that the Coast Guard Lacked Authority To Make Additional "Adjacent Coastal State" Designations.**  In denying reconsideration, the Administrator attempted to explain away the Coast Guard's regulation by asserting that the rule itself is unlawful because "the USCG was never delegated the authority to make a § 1508(a)(2) ACS determination . . . ." (Attachment 11 at 2)  He claims that this "authority was reserved for the sole discretion of the Secretary of Transportation" and that "[t]he Secretary reserved that authority until delegation to the Maritime Administrator in 2003."  (*Id.*)  The Administrator cites no authority for this proposition, and there is none.  To the contrary, the Coast Guard's current rule implements the consistent and longstanding delegation of authority under the DWPA.

**a.  The Original Delegation of Authority to the Coast Guard.**  The DWPA delegated implementing authority to the Secretary of Transportation, the Department in which the Coast Guard was located in 1974, at a time in which the Maritime Administration was located in the Department of Commerce.  Congress viewed the Coast Guard as the appropriate lead agency for the regulation and licensing of deepwater ports based on its experience and expertise in navigational safety and marine environmental protection.  See S. Rep. No. 93-1217, reprinted in 1974 U.S.C.C.A.N. 7529, 7536-37.

On September 24, 1975, the Secretary of Transportation delegated the following authorities to the Commandant of the Coast Guard:

> (s) Carry out the functions and responsibilities vested in the Secretary by the Deepwater Port Act of 1974, (33 U.S.C. § 1501-1524), except as reserved by § 1.44(o) and delegated by § 1.53(o).

17

49 C.F.R. § 1.46(s) (1975) (emphasis added); *see* <u>Organization and Delegation of Powers</u> <u>and Duties</u>, 40 Fed. Reg. 43,901, 43,906 (Sept. 24, 1975).   The Secretary retained specifically enumerated powers under the DWPA, which included in relevant part:

> (o) *Deepwater Ports*.  The following powers and duties relating to the Deepwater Port Act of 1974 (33 U.S.C. 1501-1524):
>
> (1) The authority to issue, transfer, amend or renew a license for the construction and operation of a deepwater port (33 U.S.C. 1503(b))
>
> (2) Approval of fees charged by adjacent coastal States for use of a deepwater port and directly related land based facilities (33 U.S.C. 1504(h)(2)).

49 C.F.R. § 1.44(o) (1975).  *See* 40 Fed. Reg. at 43,904-43,905.  With respect to "adjacent coastal States," the Secretary withheld from the Commandant only the authority to approve fees by "adjacent coastal States" for use of a port.  He did not retain any other powers related to "adjacent coastal States," including in particular authority to designate additional "adjacent coastal States" under Section 1508(a)(2).  Thus, pursuant to the plain language of 49 C.F.R. § 1.46(s), the authority to designate an additional "adjacent coastal State" resided with the Commandant of the Coast Guard.

**b.  The Revised Delegation of Authority in 1997.**  In 1981, the Maritime Administration was transferred to the Department of Transportation.  In 1997, the Secretary revised the Delegations of Authority under the DWPA to define the respective authorities of the Commandant and the Maritime Administrator, at a time when both agencies were located within the Department.  <u>Organizations and Delegations of Powers</u> <u>and Duties; Delegation to the Commandant, United States Coast Guard and</u> <u>Administrator, Maritime Administration</u>, 62 Fed. Reg. 11,382 (Mar. 12, 1997).

The Secretary delegated the following authority to the Commandant:

(s) Carry out the following powers and duties vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524):

(1) The authority to process applications for the issuance, transfer or amendment of a license for the construction and operation of a deepwater port (33 U.S.C. 1503(b)) in coordination with the Administrator of the Maritime Administration.

(2) Carry out other functions and responsibilities vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524), except as reserved [to the Secretary] . . . and delegated [to the Administrator of the Maritime Administration].

49 C.F.R. § 1.46(s). Subsection (s)(2) essentially carried forward the original delegation of authority to the Commandant in 1975, i.e., to carry out all other functions vested in the Secretary by the DWPA except those specifically reserved to the Secretary or delegated to the Administrator. The Delegation specifically retained only the authority to issue transfer, amend or renew a license for the construction and operation of a deepwater port under Section 1503(b). 62 Fed. Reg. at 11,382.

The Secretary also delegated, in relevant part, the following authorities to the Administrator:

(aa) Carry out the following powers and duties vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524):

(1) The authority to process applications for the issuance, transfer, or amendment of a license for the construction and operation of a deepwater port (33 U.S.C. 1503(bb)) (sic) in coordination with the Commandant of the Coast Guard.

(2) Approval of fees charged by adjacent coastal States for use of a deepwater port and directly related land-based facilities (33 U.S.C. 1504(h)(2)). . . . .

49 C.F.R. § 1.66(aa). This rule delegated to the Administrator all but one of the powers that had been withheld from the Commandant in 1975, including the authority to approve fees charged by "adjacent coastal States." The Secretary did not, however, delegate any

other authority with respect to "adjacent coastal States" to the Administrator, including in particular the authority to designate additional "adjacent coastal States." Thus, as in the prior delegation, the plain language of the Secretary's order provided that the authority to designate an additional "adjacent coastal State" resided with the Commandant.

   c. **Transfer of the Coast Guard and its Delegated Authorities.** On November 25, 2002, Congress adopted the Homeland Security Act, which transferred the Coast Guard to the newly created Department of Homeland Security. Section 888(b) of that statute, Pub. L. No. 107-296, 116 Stat. 2135, 2249, provided:

> There are transferred to the Department [of Homeland Security] the authorities, functions, personnel, and assets of the Coast Guard . . . including the authorities and functions of the Secretary of Transportation relating thereto.

This provision codified prior delegations of authority made by the Secretary of Transportation to the Commandant of the Coast Guard, including the delegations made under the DWPA, and transferred them with the agency to the Department of Homeland Security. Section 888(c) further provided that the authorities vested in the Commandant at the time of transfer can be redelegated or removed only by act of Congress.

> Notwithstanding any other provision of this Act, the authorities, functions, and capabilities of the Coast Guard to permit its missions shall be maintained intact and without significant reduction after the transfer of the Coast Guard to the Department [of Homeland Security], except as specified in subsequent Acts.

   In June 2003, the Secretary delegated to the Administrator the authority to issue, transfer, amend, or reinstate a license for the construction and operation of deepwater ports under Section 1503(b), the DWPA authority that the Secretary had retained in 1997. The Secretary formally recognized that the Coast Guard retained all statutory and delegated authority after its transfer that it previously had had as part of his Department:

The USCG retained the statutory and delegated authorities upon its transfer to the Department of Homeland Security . . . Pub. L. No. 107-296, section 888.  This rule does not change the authorities delegated to the USCG and to MARAD nor does it change the coordination between the USCG and MARAD for processing license applications.

Organization and Delegation of Powers and Duties, Update of Secretarial Delegations, 68 Fed. Reg. 36,496 (June 18, 2003).

In sum, the current Coast Guard rule providing that it will make the determination whether an additional "adjacent coastal State" shall be designated is consistent with the long history of delegations of authority by the Secretary.  Under Sections 888(b)-(c) of the Homeland Security Act, that authority cannot now be redelegated by the Secretary or transferred by agreement between the agencies. It may be transferred only by Congress.

**3.  An Informal Agreement Between the Agencies Cannot Trump the DWPA and the Formal Delegations.**  In denying reconsideration, the Administrator responded to ASIG's argument that he did not possess the necessary authority to make designations under Section 1508(a)(2) by relying upon an alleged informal understanding with the Coast Guard that the Maritime Administration would serve as the "lead decisionmaking agency" under the DWPA and asserted that the Coast Guard agreed with his position that his authority as "lead decisionmaking agency" extended to designation of additional "adjacent coastal States."  (Attachment 11 at 2-3).  The Administrator's reliance on this informal understanding is emblematic of his attempt to justify the designation on grounds that are not found in the statute.  Such an inter-agency agreement could not trump the terms of the DWPA, prior formal delegations, or specific existing regulations.

The term "lead decisionmaking agency" does not appear in the DWPA and has no legal force and effect.  An informal understanding between the two agencies cannot

trump the plain language of the Coast Guard rule, particularly when that rule has gone through public notice and comment on three occasions. In any event, the purported understanding between the agencies is unlawful and invalid because it would contradict the provisions of the Homeland Security Act freezing prior delegations to the Coast Guard. It also would be inconsistent with the expressed intent of Congress that "the U.S. Coast Guard would have the predominant role in regulating the construction and operation of deepwater ports regardless of which Federal agency issued the license" and that "the Committees agreed that the Coast Guard should play the major role in licensing and regulating deepwater ports." S. Rep. No. 93-1217, reprinted at 1974 U.S.C.C.A.N. 7529, 7536. *See id.* at 7537.

In denying reconsideration, the Administrator also argued that the explicit language of 33 C.F.R. § 148.217(d) does not govern because a general definitional term in the rule creates an ambiguity, and therefore the informal agreement between the agencies controls the power to designate. (Attachment 11 at 3) The Administrator pointed to the definitional section of the rule, 33 C.F.R. § 148.5, which provides:

> Adjacent coastal State means any coastal State which:
>
>     (1) Would be directly connected by pipeline to a deepwater port, as proposed in an application;
>     (2) Would be located within 15 miles of any such proposed deepwater port; or
>     (3) Is designated as an adjacent coastal State by the Administrator of the Maritime Administration under 33 U.S.C. 1508(a)(2).

The Administrator claimed that the third provision in the definition made ambiguous the otherwise explicit language of Section 148.217(d), which states in three places that the Commandant will designate additional "adjacent coastal States." Therefore, according to

the Administrator, the informal, non-published agreement between the Coast Guard and the Maritime Administration determines who has the authority to designate.

Even assuming there is an ambiguity, the Administrator's argument ignores the governing rule that, when interpreting a regulation, the specific provision controls the general. For example, in *Long Island Care at Home, Ltd. v. Coke*, ___ U.S. ____, 127 S. Ct. 2339 (2007), the Supreme Court considered whether a specific agency rule addressing an issue was valid and binding in light of a general definitional provision that created a conflict. The Court held that "the specific governs the general" and upheld the specific rule that set forth how a statutory power would be applied to regulated entities. *Id.* at 2348-49. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 484-85 (1992).

Therefore, the Court should find that, even if there is an ambiguity between the substantive provision and the definitional section, the specific language of 33 C.F.R. § 148.217(d) controls, and the Commandant must designate additional "adjacent coastal States." The purpose of this rule is to set forth which official would make the designation, and it states in three places that the Commandant will decide.

**B. The Administrator Violated the Applicable Statutory Deadline.**

The Administrator purported to grant New Jersey's petition for designation as an additional "adjacent coastal State" on November 2, 2007. Even assuming that he had such authority, his action was unlawful either because he acted after the expiration of the 45 day statutory deadline for resolution of such a petition or because he acted on a request that was statutorily time-barred.

Section 1508(a)(2) provides that "[t]he Secretary shall make the designation required by this paragraph not later than the 45[th] day after the date he receives such a

request from a State."  New Jersey's petition was dated September 6, 2007 and was formally posted in the docket of this matter on September 10, 2007.[2]  Thus, if the date of docketing were to be considered the date the agency received the letter, the statutory deadline for determination of the petition expired no later than October 25, 2007. However, the Administrator did not make his decision until November 2, 2007, more than a week after the statutory deadline expired.  The Administrator's action therefore is void on its face for violation of the statutory deadline.

In denying ASIG's request for reconsideration, the Administrator attempted to defend the timing of his decision by arguing:

> Because there are so many forms in which to communicate, it is necessary and practical to the proper implementation of the statute that we establish one method as the official method of receipt for the Administrator.  The September 18[th] date is based not on telephone, email, fax, or docket notices but on the date the letter request was posted to the Administrator's controlled correspondence database.

(Attachment 11 at 5)  Accepting the Administrator's argument at face value, if "the official date the Administrator is deemed to have received" the petition is September 18, 2007, then the Governor violated Section 1508(a)(2) by failing to submit the petition until 22 days after publication of the Federal Register Notice.  Under these circumstances, consideration of New Jersey's request is statutorily time-barred.

Strict compliance with the deadlines established by the DWPA is critical, because the statute requires that all public hearings on ASIG's Application must be held within 240 days of its submission and that the Administrator's final decision must be issued within 330 days of its submission.  The Administrator cannot have it both ways.  In

---

[2] *See* Doc.. No. USCG-2007-28535-0069, *available at* http://www.regulations.gov/ Fdmspublic/component/main?main=DocketDetail &d=USCG 2007-28535 (last viewed Feb. 13, 2008).

considering the operation of the two deadlines established by Section 1508(a)(2), he must pick a single date of submission for purposes of both calculations. Whichever date is applied, either the petition itself or the Administrator's action on the request violates a statutory deadline. In any event, the designation is illegal.

### C. The Administrator Violated the Deepwater Port Act, as a Matter of Law, By Failing to Apply the Substantive Standard that Congress Enacted.

An agency action is arbitrary, capricious, or contrary to law if "the agency relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Administrator's action was unlawful because he failed to apply the statutory standard in Section 1508(a)(2), but instead utilized a standard that Congress had specifically considered and rejected in 1974.

In Section 1508(a)(2), Congress deliberately adopted a narrow substantive standard for designation of an "additional adjacent coastal State," to prevent abuse of the extraordinary power such a designation conferred upon a State to veto or to impose binding conditions upon a federal license. The statute provides that a petitioning State may be designated if, and only if, it is found that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. . . . "

By imposing an "equal to or greater than standard," Congress required that a comparative analysis of the potential risks posed by the project to the two States be conducted. The Administrator's decision shows on its face that he did not apply the standard required by Section 1508(a)(2). The operative sentence of the decision states:

upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have determined that New Jersey is an Adjacent Coastal State as defined in the Act and is so designated. . . .

The differences in the standard required by the DWPA and the one actually applied by the Administrator are obvious and critical. Section 1508(a)(2) requires a comparison of the potential risks to the coastal environments of New York and New Jersey; however, the decision does not refer to the risks presented to New York, and the Administrator never performed the required comparative risk assessment. Rather, the Administrator relied upon factors not authorized by the DWPA -- the "magnitude and scope" of the proposed project and the Administrator's subjective determination of its potential environmental impact on New Jersey, which the Administrator characterized as "significant." Under *State Farm*, the Administrator's decision is invalid as a matter of law, because he failed to apply the standard that Congress adopted and based his decision on criteria that were not authorized.

In denying reconsideration based on this argument, the Administrator stated that in adopting Section 1508(a)(2), "Congress . . . sought an equitable approach" among the States. (Attachment 11 at 2) His fundamental misunderstanding of the statute led directly to the legal errors from which ASIG seeks relief. The legislative history of the DWPA shows that Congress consciously rejected an "equitable" approach that would have authorized designation of a petitioning State as an additional "adjacent coastal State" based on a determination that the project would have a significant impact on its coastal environment.

The Senate version of the bill that became the DWPA would have permitted designation of an additional "adjacent coastal State" if the State:

26

> would in the opinion of the Administrator of the National Oceanic and Atmospheric Administration experience <u>substantial environmental risk</u> should an oil or natural gas discharge occur from the deepwater port or from a vessel operating in the safety zone around the port.

S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7530. This approach would have permitted designation based on the extent of the potential environmental risk alone, without consideration of the relative risks presented to the environments of the petitioning State and the "pipeline" State.

The Executive Branch objected strongly to inclusion of any provision that would have allowed designation of a petitioning State as an "adjacent coastal State," thus granting it a veto power over the project, based solely on whether the risk to its "coastal environment" could be characterized as "substantial." In particular, in a letter dated August 22, 1974 to Chairman Jackson of the Senate Committee on Interior and Insular Affairs, the Secretary of the Interior expressed the Administration's concern that:

> the third condition . . . would extend this [the ability to prevent construction of a proposed deepwater port] to States that are some distance from the proposed facility and that may be affected by a possible oil spill. <u>The provision is so broad that if it is not deleted, it is questionable whether any deepwater port will be constructed</u>.

Letter of Aug. 22, 1974 from Secretary of the Interior Morton to Chairman Jackson (Aug. 22, 1974), reprinted at 1974 U.S.C.C.A.N. 7589, 7591 (emphasis added).

In response to this criticism, the Conference Committee eliminated the "substantial risk of serious damage" test to which the Administration objected and replaced it with the current objective "comparative assessment" standard in Section 1508(a)(2). The Conference Committee Report explicitly states that the provision actually enacted permits designation of a petitioning State as an "adjacent coastal State" only if the implementing agency determines that "there is a risk of damage to the coastal

27

environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." H. Conf. Rep. No. 93-1605, 93[rd] Cong., 2d Sess. (Dec. 16, 1974), reprinted in 1974 U.S.C.C.A.N. 7622, 7636.

In denying reconsideration, the Administrator did not challenge ASIG's showing, based on the legislative history, that the criteria on which he had based the determination – the "magnitude and scope" of the project and the potential for "significant" environmental impact upon New Jersey – were impermissible. Rather, he claimed that, after setting forth these criteria in the first clause of the sentence, he stated in the second clause that he determined that New Jersey was an Adjacent Coastal State "as defined under the Act, and that use of the phrase "as defined under the Act" incorporated the "equal to or greater than" standard. (Attachment 11 at 3-4)

However, the bare assertion by the agency head that he complied with the law cannot trump the reality that the only factors on which he explicitly relied were in impermissible criteria. It is a core principle of administrative law that an agency's decision can be upheld only on the grounds that the agency itself articulated. *E.g., Williams Gas Processing—Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006). The standard the Administrator applied here was illegal, and he never performed the comparative analysis mandated by Section 1508(a)(2). Accordingly, his designation of New Jersey as an additional "adjacent coastal State" was unlawful.

**D. The Administrator's Action Was Arbitrary or Capricious Because the Record Did Not Contain Evidence That the Risk of Damage of the Port to the Coastal Environment of New Jersey Would Be "Equal to or Greater Than" the Risk of Damage to the Coastal Environment of New York.**

In denying reconsideration, the Administrator responded to ASIG's showing that he had not made a factual finding sufficient to sustain his decision by denying that he was under an obligation to articulate any findings.

> As to a factual finding, the statute requires nothing further than a decision be made by the Administrator, by delegation from the Secretary, of whether the State meets the requirements of the statute to be designated an [Adjacent Coastal State]. There is no basis in the statute for your claim that our finding be subject to public scrutiny.

(Attachment 11 at 4). On its face, this claim demonstrates that the Administrator's action was arbitrary and capricious. The APA requires the agency to articulate a rational basis for its decision, and the determination may be sustained only on its stated rationale. *Williams Gas*, 475 F.3d at 326; *AT&T, Inc. v. FCC*, 452 F.3d 830, 837 (D.C. Cir. 2006). The Administrator has admitted that his decision provided no factual support for the designation of New Jersey, and it therefore cannot survive judicial review.

In any event, the administrative record does not contain evidence upon which a rational decisionmaker could have concluded that the risk of damage to the "coastal environment" of New Jersey would be "equal to or greater than" the risk posed to New York, given the extensive discussion and mitigation of risks to the "coastal environment" New York in the Application and the absence of evidence of risks to the "coastal environment" of New Jersey.

**1. The Administrator Failed To Perform the Comparative Assessment of Risks to the "Coastal Environments of New York and New Jersey Required by Section 1508(a)(2).** Section 1508 (a)(2) establishes a "totality" test for determining

29

whether designation is justified – *i.e.,* whether the total risk posed by the project to the coastal environment of New Jersey must be equal to or greater than the total risk posed to the coastal environment of New York.[3]  The required comparative analysis is a complex undertaking, requiring collection and analysis of substantial bodies of information within 45 days.  The Coast Guard rule governing consideration of a petition for designation accordingly requires the Governor of a petitioning State to submit "facts and available documentation or analyses concerning the risk of damage to the coastal environment of the State" and to explain why he believes "the risk of damage to its coastal environment is equal to or greater than the risk" to a State directly connected by pipeline to the project. 33 C.F.R. § 148.217(b)(3)-(4).  New Jersey did not comply with this rule and did not submit any documentation or analyses of potential risks to its coastal environment.  By contrast, ASIG's Application discussed at great length the risks posed to the "coastal environment" of New York and the steps to address them.

The best publicly available description of how the comparative assessment required by Section 1508(a)(2) for designation of an additional "adjacent coastal State" should be conducted is set forth in a 75-page Methodology Report prepared by a Coast Guard contractor in December 1975 and revised on March 12, 1976.  Arthur D. Little, Inc., "Methodology for Designation of Adjacent Coastal States," U.S. Coast Guard Report No. CG-WDWP-1-76.  (Attachment 12)  The Methodology Report provided that the Coast Guard should (1) assess, based upon interpretation of the license applicant's data, independent risks to the coastal environments of the States directly connected by

---

[3] In denying reconsideration, the Administrator agreed that this is the proper standard. He stated:  "[I] agree with you that the comparative risk analysis must evaluate the totality of impacts."  (Attachment 11 at 4).

pipeline to the port; then (2) evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential environmental damage it submits; and finally (3) make a comparison of the risks to the coastal environment of each State on a resource-by-resource basis. *Id*. at 6. With respect to the second factor, the "Petitioning States claiming damage potential from deepwater port-related developments should quantify the extent to which these indicators (or other factors) are the basis for their claim." *Id*. at 22. Agency officials reviewing the petition for designation:

> will consider evidence in those categories of concern identified by the petitioning State. However, they will also have available (and consider) data on all categories for the "pipeline" State as submitted by the applicant for a deepwater port license. This implies that petitioning States should attempt to present as comprehensive a package of evidence as possible, in order not to foreclose comparative evaluation in categories which will be examined for the "pipeline" State.

(Attachment 12 at 42).

In its request for reconsideration, ASIG showed that no meaningful comparative assessment could have been performed in the manner suggested by the Methodology Report. The Application discussed in detail many potential risks to New York, and the only other materials in the record were the one and one-quarter page letter from NOAA and a three page letter from the State that did not contain the required documentation and analyses. In denying reconsideration, the Administrator argued that he is not required "to concur with NOAA or USCG [Coast Guard], or to follow USCG methods or publish a factual finding." (Attachment 11 at 5) This is a red herring designed to distract attention from the fact that he conducted no comparative assessment of the totality of the risks to the two States and thus failed to comply with the statutory standard.

ASIG referenced the 1976 Methodology Report to illuminate the minimum evidence gathering and analysis that was required in 1976, at a time when environmental decisionmaking was in its infancy. In the ensuing 30 years, the level of analysis required by federal courts under the APA's arbitrary and capricious standard has become substantially more demanding. The Administrator's failure to undertake even the simple kind of review required in 1976 highlights the failure of his decision to articulate <u>any</u> rational process for making the statutorily-required comparative assessment.

**2.**   <u>**The NOAA Letter Did Not Support the Administrator's Decision.**</u>   The Administrator stated that he based his decision "upon consideration of the NOAA recommendation." (Attachment 1 at 1) Despite ASIG's repeated requests, the Maritime Administration has refused to place the NOAA letter in the docket and has refused to disclose it in response to ASIG's Freedom of Information Act request. (Attachment 7) The Court should order the Administrator to produce this letter immediately, as it is an indispensable part of the record on review.

On information and belief, the NOAA letter does not support the Administrator's decision. The letter is one and one-quarter pages long. A letter of that length cannot have provided the required comparative analysis of the risks presented to New York and New Jersey, especially given the 5,000-page ASIG application that discusses potential effects on the "coastal environment" of New York.

The inadequacy of the NOAA letter as a basis for this decision is demonstrated by the effort that NOAA performed in the only prior case in which it made a recommendation concerning designation of an additional "adjacent coastal State." In February 1976, the Coast Guard asked NOAA to analyze whether the risks arising from

oil discharges from vessels in transit for the proposed Seadock deepwater port showed that the risks to the coastal environment of Florida, the petitioning State, were greater than the risks to Texas, the "pipeline" State.  On March 25, 1976 NOAA submitted to the Coast Guard a 233 page report conducting a comparative analysis on the merits of this issue.[4]  The analysis provided by NOAA in the Seadock project stands in stark contrast to the short letter NOAA submitted here.

**3.    New Jersey's Petition Failed To Show that the Risk to its Coastal Environment Exceeded the Risk to New York.**  In support of its petition, New Jersey submitted a three page letter that contained no facts, documentation or analyses, as required by the governing Coast Guard rule, and did not attempt to compare the totality of the risks to its "coastal environment" with the totality of risks to the "coastal environment" of New York as discussed in the Application.  (Attachment 4)  The letter contained only four paragraphs of lawyers' arguments, unsupported by evidence.

During the years that it was preparing its Application, ASIG had multiple conversations with relevant New Jersey officials and exchanged information with New Jersey agencies concerning the potential impacts of the project on its coastal environment and the mitigation steps ASIG was taking to address these potential impacts.  ASIG believed that these interactions had been successful in addressing New Jersey's concerns.  On August 22, 2007, one week after ASIG's Application was formally deemed "complete," an ASIG consultant received an e-mail from the Deputy Commissioner of the New Jersey Department of Environmental Protection, which stated:

---

[4] NOAA, Analysis of the Risk of Damage to the States of Florida and Texas from the Seadock, Inc. Proposed Deepwater Port (Mar. 25, 1976), available at http://unicorn.csc noaa.gov/docs/czic/TD224.F6_A63_1976/4590.pdf (last visited Feb. 14, 2008).

the NJ DEP [Department of Environmental Protection] has reviewed the proposal and based on its current configuration, <u>the Department has no regulatory issues that Atlantic Sea Isle Group must deal with</u>.  Given the distance off NJ's coast and the fact that the current proposal has all of the infrastructure going coast (*sic*)through NYC, <u>New Jersey has no jurisdiction in this matter</u>. . . .

(Attachment 13 (emphasis added))  On September 6, 2007, two weeks later, the Governor submitted a petition that took a different position from that of his Department of Environmental Protection.  The change in the State's position in the days immediately prior to the statutory deadline for submission of the petition may explain why the State failed to submit the evidence and analyses required by the Coast Guard rule.

      **a.  Reliance on an Alternative Not Pursued.**  In the Governor's letter, the leading argument was that "an alternative pipeline alignment" considered as part of the environmental analysis in ASIG's Application would have been less than nine miles from the State.  (Attachment 4 at 1-2)  However, this pipeline route was not the recommended alternative in the ASIG Application and is not the one ASIG seeks to construct.  <u>Atlantic Sea Island Group Safe Harbor Energy LNG Deepwater Port License Application</u> (May 2007) ("Application") Vol. 3, Part 1, Topic Report 99 at 9-40 (Attachment 14).  The Administrator did not rely on this argument in his decision.  (Attachment 1 at 2)

      **b.  Major Environmental Risks Experienced Primarily, on in Some Instances Only by New York, That New Jersey Did Not Address.**  The Governor's letter did not even discuss the greatest environmental risk presented by this LNG gasification plant – air emissions.  The Application shows that over the last 100 years, the predominant wind at the port site blows from west to east and would take these emissions out to sea.  The second most common wind direction, however, is from south to north and would take air emissions over the "coastal environment" of New York.  Application, Vol.2, Ex. O at O-

15 to O-16 (Attachment 15).  This factor, which would have weighed heavily in any true comparative assessment, to a significant extent affects only the coastal environment of New York.   Further,  the  project  pipeline  will  intersect  the  existing  natural  gas infrastructure in the navigable waters of New York State.  ASIG will have to obtain an easement from New York and an environmental permit to disturb these submerged lands. Letter dated September 6, 2007 from State of New York, Bureau of Land Management, to ASIG (Attachment 16).  There is no similar direct impact on the "coastal environment" of New Jersey.

     **c.    New  Jersey  Relied  on  Risks  that  Do  Not  Affect  Its  "Coastal Environment."**  Many of the risks discussed in the Governor's letter do not fall within the narrow definition of the term "coastal environment" that Congress included in the DWPA as part of its deliberate effort to limit the scope of the designation mechanism to truly extraordinary cases.  The DWPA defines "coastal environment" as follows:

> [C]oastal environment means the navigable waters (including the lands therein and thereunder) and the adjacent shorelines (sic) including waters therein and thereunder). . . .

33 U.S.C. § 1502(5).  Thus, the risks to be examined for determination of "adjacent coastal State" status under Section 1508(a)(2) are restricted to those related to "navigable waters" of New Jersey.  Under federal and State law, those waters extend three nautical miles from the New Jersey shoreline.  *See* N.J.S.A. § 12:5-3; N.J.A.C. § 7.7E-1.2(b)(1).

     The Governor's letter discussed the potential for adverse effects on fishing in the area of Cholera Bank, where the port is to be built.  (Attachment 4 at 2)  Cholera Bank is approximately 19 miles from the New Jersey coast and thus does not fall within the statutory definition of New Jersey's "coastal environment," which extends only three

miles from its shoreline.  Any adverse impacts on fish in Cholera Bank will be considered as part of the general federal environmental review, but by law are not properly considered in performing the strictly delimited "coastal environment" comparison mandated for determination of an additional "adjacent coastal State."

New Jersey also asserted that, because the predominant ocean currents were toward New Jersey, turbidity and other water quality impacts, and any spills during construction and operation of the facility would be toward its "coastal environment." However, New Jersey provided no support for this assertion, and studies and information in the Application show that it is incorrect.  First, the predominant surface and near surface ocean currents in the vicinity of the project run to the southeast, away from the New Jersey shoreline.  Application, Vol. 2, Exhibit O at O-8 to O-11 (Attachment 15). Second, the propagation of spills of LNG on the ocean would be most strongly affected by wind and waves, rather than sub-surface currents.  At the port, the winds and waves are predominantly from the west, once again carrying any effects away from New Jersey. *Id*. at O-15 to O-16, O-18 to O-20.

After ASIG sought reconsideration, on December 21, 2007, the Governor of New Jersey submitted a second, one page letter to the Administrator supporting designation. This letter did not provide any further information about the comparative risks the project presented to the coastal environments of the two States.  (Attachment 10).

In sum, despite two opportunities, New Jersey submitted no information about the potential risk to its "coastal environment" that could overcome the detailed analysis of risks to the "coastal environment" of New York in the Application.  Even if New Jersey could have shown that one or more risks to its coastal environment existed and was

"equal to or greater than" the comparable risks to New York, that showing still would not satisfy the statutory standard that the overall risk to New Jersey be "equal to or greater than" the overall risk to New York.

**4.    The Administrator's After-the-Fact Justifications in Denying Reconsideration Do Not Provide a Rational Basis for the Designation.**    In the February 8, 2008 denial of reconsideration, the Administrator tried and failed to suggest a rational basis for his original decision.

**a. Application of Tests Not Authorized by Statute.**    The principal defect in the letter denying reconsideration is the same as the fatal flaw in the original decision – the Administrator ignored the standards required by Section 1508(a)(2) and applied criteria not authorized by the DWPA.

First, the Administrator shifted the burden of proof on the comparative analysis from New Jersey to ASIG, by stating that ASIG failed to demonstrate "why New Jersey's coastal environment is not subject to risk equal to or greater than that posed to New York."  (Attachment 11 at 1)  This test violates Section 1508(a)(2) and implementing Coast Guard rules, which require the petitioning State to submit information sufficient to establish that the risks to its "coastal environment" are "equal to or greater than" the risks to the State connected to the port by pipeline, which are primarily set forth in its Application.[5]

---

[5] See also Methodology Report (Attachment 12 at 5) ("The present policy of the Department of Transportation allows States the opportunity to show proof of environmental risk to their coastal environments.  It is therefore assumed that the data requirements described [in the Report] would be fulfilled by petitioning States in their own interest.").

Second, the Administrator relied on what he characterized as "legitimate regional interests" – that New York and New Jersey share environmental and economic concerns and that their ports are near each other.  (Attachment 11 at 2)  However, Congress specified in Section 1508(a)(2) that designation must be based on a comparison of the risks to "coastal environment" of each State, not on a broader consideration of the shared interests of the States in a region.  That factor may be appropriate for consideration in the general environmental reviews conducted by the federal agencies, but it is not a valid consideration in the designation process.

**b.  Factors Cited by New Jersey in its Petition.**  In denying reconsideration, the Administrator relied upon some of the factors cited by New Jersey in its submission, but which he had not relied upon in his decision.  These factors fail to show that the risks to the "coastal environment" of New Jersey exceed those presented to New York's "coastal environment."  For example, the Administrator noted that "alternate sites required under the National Environmental Policy Act to be reasonably foreseeable bring the possible final site to within 9 miles of [New Jersey]"  (Attachment 11 at 2).  However, as stated above, ASIG is not pursuing the alternative pipeline route addressed by this statement. The proposed pipeline runs through the navigable waters of New York; while the "coastal environment" of New York will be affected by this alignment, New Jersey's will not.

The Administrator relied on the possible adverse effects on fishing near Cholera Bank.  (*Id*.).  As noted above, this risk, if it exists, does not fall within the "coastal environment" of either New Jersey or New York.  The Administrator also asserted that the staging areas for the construction and operation of the port affect New York and New Jersey equally.  Id.  This factor is neutral, at best.  In any event, it is contradicted by the

Application, which states that support for port operations will be based in Ocean Side, (Application, Vol. 3, Part 1, Topic Report 1, at 1-8 (Attachment 17)).

    **c.  Reliance on a Factor Never Cited by New Jersey in its Petition.**  The Administrator further sought to cure this fatal defect in his decision by reliance on a factor that he never referred to in his decision and that New Jersey did not mention in its petition – the risk of "[a]n LNG-fueled explosion or fire" that could affect the coastal environment.  (Attachment 11 at 4)  This argument fails for several reasons.

    First, there is no scientific basis for the suggestion that such an event would have an impact that would affect New Jersey's "coastal zone" 16 miles from the site.  There is no evidence on the record, or in recently published scientific studies regarding LNG spills on water, that would support this contention.[6]  Thus, there is no evidence the New Jersey

---

[6] The Administrator stated that an LNG-fueled explosion or fire might have a significant impact on the "marine environment," without citing a basis for this assertion. (Attachment 11 at 4)    "Marine environment is not a term recognized in Section 1508(a)(2), which requires consideration of risks to the "coastal environment," which extends out to the three mile limit.

    With respect to the Administrator's assertion that the risk of fire or explosion is at least as great to New Jersey's coastal environment as to New York's, there have been several studies conducted in recent years (some with the assistance of or at the behest of the Coast Guard) regarding risks associated with LNG spills on water.  None of these studies concluded that an LNG spill would disperse or affect persons or the environment at a distance of 16 miles from the site of the spill, the distance to the coastal environment of New Jersey. *See, e.g.*, Sandia National Laboratories, Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water (December 2004) at 81-88, available at www.fossil.energy.govprograms/oilgas storage/lng/sandia_lng_1204.pde (summarizing various studies that provide farthest distance to lower flammable limit of LNG spills is approximately 2.5 miles); Sandia National Laboratories, Review of the Independent Risk Assessment of the Proposed Cabrillo Liquefied Natural Gas Deepwater Port Project (January 2006) at 24, available at www/osti.gov/enerygcitations/servlets/purl/877718-rsBlk/877718.pdf (estimating maximum distance to lower flammable limit for discharge of the contents of 2 LNG tanks to be 11,175 meters (6.9 miles) in optimum wind conditions).

"coastal environment" would be impacted by even a major spill of LNG from the project or LNG tankers operating in the vicinity of the port.

Second, the Administrator apparently based this determination on the belief that currents in the vicinity of the Safe Harbor Energy port run toward New Jersey. As stated above, this is inaccurate as the predominant surface and sub-surface current is toward the southeast, away from the New Jersey coast. Application, Vol. 2, Exhibit O at O-8 to O-11 (Attachment 15). Moreover, relevant scientific studies confirm that, in the case of an LNG spill, surface winds and waves are the primary determinant of the dispersion direction of any vapors from an LNG spill.[7] As shown in the Application, the predominant winds at the port are from the west to the east, away from New Jersey, and secondarily, primarily toward New York. *Id*. at O-15 to O-16. Further, the waves, while southerly, are primarily to the southeast, again, away from the New Jersey coastal environment. *Id*. at O-18 to O-20.

_____

With respect to the Administrator's claim that there is a risk of explosion to the New Jersey "coastal environment," a study conducted by ABS Consulting for the Federal Energy Regulatory Commission on LNG releases from LNG carriers concluded: "Although LNG vapors can explode (i.e. create large overpressures) if ignited within a confined space, such as a building or structure, there is no evidence suggesting that LNG is explosive when ignited in unconfined open areas. Experiments to determine whether unconfined methane-air mixtures will explode have been conducted and, to date, have been negative." ABS Consulting, Consequence Assessment Methods for Incidents Involving Releases from Liquefied Natural Gas Carriers (May 13, 2004) at 3, available at www.ferc.gov/industries/lng/safety/reports/cons-model.pdf..

[7] A scientific paper on the Maritime Administration's website confirms this fact. Michael Hightower, Safety and Risk Management of Large LNG Spills Over Water (undated) at 2 (many site-specific and system specific variables must be considered in quantifying the likelihood and results of LNG spills, including "site-specific environmental factors such as waves, wind and terrain" – current is not mentioned) . *See also id*., at 2, Figure 1 (showing waves affect liquid spread and wind affects vapor and fire dispersion), available at www.marad.dot.gov./DWP/LNG/documents/Safety_and_Risk Management_of_Large_LNG_Spills_Over_Water.pdf.

In sum, the Administrator never performed the comparative assessment required by law.  In addition, the record did not contain material that would have permitted a rational decision maker to conclude that the risks to New Jersey were "equal to or greater than" the totality of the risks to New York described and mitigated in the Application.

## II.  THE EQUITABLE FACTORS STRONGLY SUPPORT ISSUANCE OF A PRELIMINARY INJUNCTION.

The equitable factors, taken together with ASIG's showing of probability of success on the merits of its claim, strongly support the issuance of a preliminary injunction to stay the Administrator's decision pending resolution of this lawsuit.

### A.  Unless a Preliminary Injunction Is Issued, ASIG Will Suffer Irreparable Injury While The Case Is Being Litigated.

ASIG is suffering and will continue to suffer serious and irreparable injury unless a preliminary injunction is issued at this time against the Administrator's unlawful designation of New Jersey as an additional "adjacent coastal State."  That decision is currently harming ASIG's ability to obtain fair consideration of its Application pursuant to the procedural and substantive standards that Congress intended to be applied in considering proposals to license these critical infrastructure facilities.  Under Section 1508(b)(1), the federal government "shall not issue a license without the approval of the Governor of each adjacent coastal State."  The designation of New Jersey as an additional "adjacent coastal State" has given it the unwarranted authority to stop the Safe Harbor Energy project dead in its tracks or to insist upon conditions in the federal license that would make the project impossible to build or economically infeasible to operate.

The risk that an "adjacent coastal State" will exercise a veto over a project is substantial, as demonstrated by the disposition of two applications within the last 19

months.  On June 5, 2007, the Administrator denied an application for the proposed Cabrillo LNG deepwater port based on the disapproval of the Governor of the "adjacent coastal State" of California.[8]  Similarly, on June 21, 2006, the Administrator denied the application for the Main Pass Energy Hub project based on the disapproval of the Governor of the "adjacent coastal State" of Louisiana.[9]

Corrective relief granted upon entry of a final judgment at the end of the litigation will not remedy the substantial irreparable harm that ASIG is currently suffering and will continue to suffer while the case is being litigated.  This injury takes several forms.

1. **Injury Resulting from the Agencies' Decision To "Stop the Clock."**  ASIG is currently suffering irreparable harm from the failure of the agencies to adhere to the statutory schedule for consideration of its Application.  33 U.S.C. § 1504(i)  While the request for reconsideration was pending, the Coast Guard and the Maritime Administration orally informed counsel for ASIG that they had "stopped the clock" -- that is, suspended the running of the statutory timetable for consideration of its Application -- pending resolution of ASIG's challenge to the Administrator's decision. (Attachment 9)  It is likely the agencies will continue to keep the clock stopped until the additional "adjacent coastal State" issue is resolved.  This regulatory delay has caused and will continue to inflict substantial injuries on ASIG.

ASIG is an independent company created for the purpose of constructing and operating the Safe Harbor Energy LNG port.  The Administrator's decision puts in

---

[8] Maritime Administration News Listing, "Cabrillo Port:  Record of Decision issued to deny LNG license application," available at www.marad.gov/DWP/LNG/Port_news/news_detail.asp?ID=49.

[9] The Secretary's Decision on the Deepwater Port License Application of Freeport-McMoran Energy LLC (June 21, 2006), available at http://www.regulations.gov fdmspublic/Component/main?main=DocumentDetail&o=090000064802c913c.

jeopardy ASIG's ability to pursue the project for which it was created.  ASIG is well-financed and has presented a substantial Application to build a critically-needed energy infrastructure project for the New York metropolitan region.  As an independent company, however, ASIG has no revenue stream from other projects; it must finance the costs of pursuing the license application process from investor capital.

ASIG already has expended many millions of dollars in planning fees to prepare its application.  It has retained multiple groups of consultants who will prepare the environmental studies and conduct the public meetings that are required as part of the DWPA review process.  These groups cannot begin their work, however, because the federal agencies have "stopped the clock" and will not give the instructions and approvals necessary for the license review process to proceed.

Every day that the clock is stopped increases the cost of funding the environmental studies and ultimately of constructing this $1.7 billion project.  At a conservative estimate of 3 percent annual inflation in construction costs, every month that the clock is stopped increases construction costs by in excess of $4 million, plus the associated costs in overhead and consultants.  ASIG has no adequate remedy at law for the harm it currently is suffering and will suffer in the future.  If the Administrator's designation of New Jersey ultimately is overturned as unlawful, ASIG will not be able to sue the United States for monetary damages because there is no relevant waiver of sovereign immunity. *See Brendsel v. OFHEO*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004); *Population Institute v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (loss of a $10 million appropriation was irreparable injury because the government would distribute the funds to others during the pendency of the litigation, leaving plaintiff with no avenue to

recover the money).  *Cf. Wisconsin Gas Go. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (courts ask whether "adequate compensatory or other corrective relief would be available at a later date"; "recoverable monetary loss" is usually insufficient to support a finding of irreparable harm).

Further, the delay has disrupted ASIG's ability to negotiate contracts with the entities that will supply the labor and materials necessary to construct the facility. *Express One Int'l, Inc. v. United States Postal Service*, 814 F. Supp. 87, 91 (D.D.C. 1992)

The delay is irreparably injuring ASIG's ability to obtain the necessary supply of gas for this facility.  As an independent entity, ASIG does not have its own sources of natural gas to sell.  It must enter into long-term supply contracts in foreign countries to obtain this natural gas.  Its ability to negotiate long-term supply contracts has been substantially undermined by the Administrator's grant of a veto to New Jersey and the attendant stopping of the clock and halting of progress on the project.  These injuries to ASIG's reputation and goodwill are irreparable and not compensable by monetary damages.  *See Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

**2.  Injuries Arising from the Distortions of the Review Process Caused by the Grant of an Unlawful Veto Power to New Jersey.**  ASIG is being irreparably injured by the threat presented by New Jersey's unlawful power to veto or impose mandatory licensing conditions that will cloud the review of its Application.  The adverse effects being experienced by ASIG are precisely the harms that Congress sought to prevent in adopting stringent limitations on the designation of an additional "adjacent coastal State."

In considering the DWPA, Congress recognized that unless the authority to approve petitions for designation and the power to veto or impose mandatory licensing

conditions on deepwater ports were narrowly drawn, "it is questionable whether any deepwater port will be constructed."  S. Rep. No. 93-127, reprinted in 1974 U.S.C.C.A.N. at 7591.  Congress also responded to the Executive Branch's understanding that unless strict conditions were imposed, the political course of least resistance for the federal agency delegated the power to designate additional "adjacent coastal States" would be to give into the political pressure "to designate all States which may be remotely affected" by operation of the port, to avoid criticism in the case of an environmental discharge.  S. Rep. No. 93-127, reprinted in 1974 U.S.C.C.A.N. at 7594.  The Executive Branch also was concerned by the political risk that "[t]o avoid the same criticism, officials from States which would not directly benefit from a deepwater port and which were designated as 'adjacent coastal States' would be pressured into disapproving the . . . application."  *Id.*

In the Safe Harbor Energy project, the first of the harms that Congress sought to avoid has already occurred.  The Administrator has yielded to the urge to avoid criticism by ignoring the procedural and substantive standards of the DWPA and by designating New Jersey as an additional "adjacent coastal State" without regard to the limitations Congress adopted.  He justified this action on the ground that Congress sought "an equitable approach" among States in designations as additional "adjacent coastal States." (Attachment 11 at 2)  Nothing is further from the truth.  The legislative history clearly shows that Congress intended that the authority to veto or impose licensing conditions to an additional State other than the one directly connected to the project would be granted only in extraordinary cases, where the petitioning State could demonstrate that it would suffer harm "equal to or greater than" the "pipeline" State.  Congress strictly limited such designations out of concern that an "equitable" approach – that is, one driven by political

considerations, pressure from Congressional delegations, and the bureaucratic instinct to avoid criticism – would defeat the country's ability to build critical deepwater ports .

In the November 2, 2007 decision, the Administrator explicitly relied on the "magnitude and scope" of the project and its potential for what he characterized as "significant" impact on New Jersey, but never conducted the comparative analysis of the risks to the "coastal environments" of these two States that Congress required.  Due to New Jersey's failure to submit environmental analyses, there were no facts in the record on which the Administrator could have relied to overcome the voluminous facts in the Application concerning the effects on New York.  When ASIG demonstrated these errors in the request for reconsideration, the Administrator denied the need to present any rational basis of facts to support his decision and again failed to present a comparative analysis of the totality of the risks to the "coastal environments" of the two States. Rather, he continued to apply criteria not authorized by the DWPA and relied upon factors that were refuted by the extensive environmental analyses in the Application.

Unless a preliminary injunction is issued, the effects of the Administrator's error will be irreversible.  If the review of the Application is conducted under the cloud cast by New Jersey's unlawful power to veto or impose conditions on the license, the federal agencies necessarily will have to start negotiation immediately with the State to determine what license conditions, if any, would be sufficient to persuade it to withhold exercise of its veto.  New Jersey would have it within its power to refuse to negotiate with the federal agencies and instead simply to dictate the conditions, if any, that would be required to persuade it to stay its veto.

Even if New Jersey were prepared to discuss the matter, the existence of its unlawful power would have a devastating effect on ASIG and the Congressionally-imposed timetable for consideration of its Application. It took ASIG two years to discuss appropriate environmental conditions with New York and federal agencies, to conduct the required environmental studies, and to revise its Application at great expense to reflect these conditions. If ASIG is now required to conduct similar negotiations with New Jersey to avoid imposition of its veto, a considerable period of time and expense would be required to revise the Application further. In addition, environmental laws and regulations impose limits on the useful life of the data that must be submitted to support a project. ASIG would face the threat that the delays occasioned by the need to satisfy New Jersey would make its current data stale and require it to conduct a new round of studies to satisfy New York.

Unless a preliminary injunction is granted, the negotiations with New Jersey about how it will exercise its unlawful power would occur while this lawsuit is being litigated. The decisions resulting from the discussions between the federal agencies and New Jersey, with while the threat of New Jersey's exercising its power overhanging review of the Application, will be impossible to back out of the process even if injunctive relief is granted at the end of the case. Given the iterative and evolutionary nature of decisionmaking in large environmental projects, it will not be possible after the fact to reverse engineer the consultation process and remove from the federal agencies' final position the concerns, conditions and restrictions that were initially included to avoid a threatened State veto. For these reasons, ASIG will suffer irreparable harm in the interim

while this litigation is being conducted, and the grant of full relief at the end of the process will not remedy or compensate for that harm.

Accordingly, the Court should issue a preliminary injunction at this stage of the litigation, in light of the overwhelming showing that the Administrator's action was unlawful and the strong likelihood that ASIG will suffer irreparable injury in the interim period necessary for resolution of the case on cross-motions for summary judgment.

### B.  The Maritime Administrator and New Jersey Will Not Suffer Harm in the Interim if a Preliminary Injunction Is Issued.

If a preliminary injunction is granted staying the Administrator's illegal decision, neither the agency nor New Jersey will suffer harm during the interim period necessary for resolution of this lawsuit on the merits.

Issuance of a preliminary injunction would not require the Maritime Administration to undertake any significant administrative activity or expend federal funds.  The only effect of the issuance of a stay would be that the processing of ASIG's application would continue through the usual multi-agency process established under the DWPA, but without the unlawful New Jersey veto hanging over the federal agencies' ultimate decision about whether construction of the port should be authorized, and if so under what environmental protection conditions.

New Jersey will not suffer irreparable injury if the Administrator's decision is stayed.  First, the August 22, 2007 e-mail from the Deputy Commissioner of the New Jersey Department of Environmental Protection stating that "the Department has no regulatory issues that Atlantic Sea Isle Group must deal with" dispels any notion that the coastal environment of New Jersey would face irreparable injury if a stay were granted.

Second, 33 U.S.C. § 1508(b)(2) provides that, even if it is not an additional "adjacent coastal State," New Jersey "shall have the opportunity to make its views known to, and shall be given full consideration by" the federal agencies conducting the DWPA reviews. Thus, if a preliminary injunction is issued, New Jersey's concerns will be fully addressed by the federal agencies whether or not it has the status of an "adjacent coastal State." The only difference in the two situations is that New Jersey will have to persuade the federal agencies that its views should be accommodated based on their merits, rather than being able to impose its policy position to override the considered judgment of the relevant federal agencies through the unlawful veto authority granted it by the Maritime Administrator.

Finally, if the Court were to issue a preliminary injunction but later were to hold for the Administrator on the merits, New Jersey would not be harmed in the short interim period required for final disposition on cross-motions for summary judgment. Once the federal agencies restarted the clock, its views concerning the risks posed to its coastal environment would be given full consideration during the review process. If the Court subsequently held for the Administrator on the merits, New Jersey could insist upon its position through its restored veto power. By contrast, ASIG would be irreparably harmed in the interim if a preliminary injunction is not issued and it the federal agency review were conducted under the cloud cast by the unlawful designation of New Jersey. For this reason, the balance of harms strongly supports issuance of a preliminary injunction.

C. **The Public Interest Strongly Supports a Preliminary Injunction**.

The public interest will benefit substantially if a preliminary injunction is granted, through the assurance that an Application for a significant proposed addition to the

nation's energy infrastructure will receive a fair review on the merits through the procedures and substantive criteria that Congress enacted in the DWPA.

In considering the public interest factor, the courts traditionally have looked to the underlying statutory purposes at issue. *See e.g. Amoco Production Co. v. Gambell*, 480 U.S. 531, 544-46 (1987). Applying the purposes that underline the DWPA, the public interest factor strongly supports the issuance of a preliminary injunction.

First, "the public has a profound interest in assuring that [the agency] acts within the limits on authority established by Congress." *Brendsel*, 339 F. Supp. 2d at 67.

Second, in adopting the DWPA and extending its scope to include liquefied natural gas terminals in 2002, Congress recognized the strong national interest in providing a one-stop application window for these critically-needed parts of the national energy infrastructure, in order to assure adequate supplies of natural gas to respond to increasing demand and to diversify the nation's sources of supply to minimize the adverse effects of disruptions due to political or operational reasons. In particular, Section 1(a)(5) of the DWPA, 33 U.S.C. § 1501(a)(5) declares that it is the intent of Congress to:

> promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States and transporting oil or natural gas from the outer continental shelf while minimizing tanker traffic and the risks attendant thereto . . . .

Further, the public interest is strongly served by ensuring that the Maritime Administrator adheres to the standards for designating an additional "adjacent coastal State" established by Congress in Section 1508(a)(2). As the Executive Branch stated in arguing successfully for rejection of the approach adopted in the Senate version of the bill and for adopting of the narrower standard ultimately adopted, there were great concerns

that if a broader test were followed, "it is questionable whether any deepwater port will be constructed." Letter of Aug. 22, 1974 from Secretary of the Interior Morton to Chairman Jackson, reprinted at 1974 U.S.C.C.A.N. 7589, 7591. Congress made a policy decision in adopting Section 1508(a)(2) about which standard would appropriately balance the interests of the States other than those to which the deepwater port would be connected by pipeline and the overall national interest in facilitating the construction of necessary energy infrastructure projects, under appropriate protective conditions. The Administrator's decision departs from the balancing of these interests enacted by Congress. The public interest would be served by issuing a preliminary injunction to protect "the underlying statutory purposes" and the policy decisions adopted by Congress in the DWPA.

Finally, the public interest in a secure energy supply would be strongly served if the decision on the application to license the Safe Harbor Energy project is made under the statutory standards adopted by Congress. The demand for natural gas in the United States continues to grow. Total domestic consumption of natural gas is projected to increase from 22.4 trillion cubic feet in 2004 to 27.0 trillion cubic feet in 2025. The Middle Atlantic region of the United States, which includes New Jersey, New York and Pennsylvania, is expected to experience an annual average increase in natural gas consumption of 0.7 percent per year during this time period. Id. On a national basis, imports of natural gas are projected to increase from 500 billion cubic feet per year in 2003 to 6.4 trillion cubic feet in 2025. As the Administrator has stated, use of deepwater LNG facilities will permit the United States "to receive large amounts of natural gas in an

environmentally safe and efficient manner" and will "contribute to greater energy independence . . . reduce growing port congestion and enhance safety and security."[10]

The Safe Harbor Energy port is designed to receive LNG, regasify it, and transmit through the existing distribution infrastructure up to two billion standard cubic feet per day of natural gas, thereby providing a strategic and critically-needed energy supply to help satisfy the significantly increased energy demands to be presented in the near future by the New York metropolitan area. Natural gas is a clean burning fuel that is environmentally superior to other fossil fuel energy sources, such as coal or fuel oil, in several respects including lesser greenhouse gas emissions. The offshore location of the proposed port will minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, and minimize visual impacts. Further, the offshore location of the proposed port will significant reduce the safety and security risks that are associated with LNG terminals that are located onshore. *See* Congressional Research Service, Liquefied Natural Gas (LNG) Import Terminals: Siting, Safety and Regulation, CRS Rep. No. RL32205 (May 1, 2007).

Given the urgent public need for expanded and diversified sources of supply for environmentally-friendly national gas, there is a strong public interest that the application to construct and operate the Safe Harbor Energy port be considered under the balanced procedural and substantive criteria set forth in the DWPA and that the process not be distorted by the grant of an unlawful veto power to the State of New Jersey to prevent construction of this important project to be built off the coast of New York.

---

[10] Maritime Administration, Home Page, Deepwater Port Licensing for LNG and Oil, available at www.marad.dot.gov/DWP/LNG/index.asp.  .

In sum, each of the equitable factors strongly supports issuance of a preliminary injunction.  Taking these factors together with the overwhelming showing of likelihood of success on the merits, the Court should issue a preliminary injunction to stay the effect of the Maritime Administrator's November 2, 2007 designation of New Jersey as an additional "adjacent coastal State" pending the final resolution of this litigation on the merits.

<u>**Conclusion**</u>

The Court should grant ASIG preliminary injunctive relief and enjoin the Maritime Administrator's November 2, 2007 decision designating New Jersey as an "adjacent coastal State" for the Safe Harbor Energy project.  The Court also should order the defendants to restart the statutory clock for consideration of ASIG's Application.

Respectfully submitted,

_____
JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 15, 2008                              Counsel for Plaintiff

53

1



U.S. Department
of Transportation
**Maritime
Administration**

NOV 2 2007

The Honorable Jon S. Corzine
Governor of New Jersey
Trenton, New Jersey 08624-0001

Re:  New Jersey Adjacent Coastal State Designation

Dear Governor Corzine:

This letter is in response to your request for the designation of New Jersey as an Adjacent
Coastal State for the proposed Safe Harbor Energy deepwater port project (Safe Harbor).
As indicated in my letter of September 28, 2007, the Maritime Administrator, by
delegated authority, and in accordance with Section 1508(a)(2) of the Deepwater Port Act
of 1974 (the Act), shall make such a designation only after receiving the recommendation
of the Administrator of the National Oceanic and Atmospheric Administration (NOAA).
On October 17, 2007, my office received the NOAA recommendation.

Accordingly, upon consideration of the NOAA recommendation, as well as the
magnitude and scope of the proposed project and its potential for significant
environmental impact to the State of New Jersey, I have determined that New Jersey is an
Adjacent Coastal State as defined under the Act and is so designated for the proposed
Safe Harbor deepwater port project.  This determination has been made consistent with
the particular set of facts and circumstances underlying the request.  Pursuant to the
requirements set forth at Section 1508(b) of the Act, the Administrator shall not issue a
license without the approval of the Governor of an Adjacent Coastal State.  Therefore, we
look forward to forging a strong working relationship with your office to successfully
address your concerns and requirements of Safe Harbor in securing a safe and effective
means of importing natural gas into the United States.

As the Governor of an Adjacent Coastal State, you are afforded the authority in
accordance with the requirements of the Act to approve, disapprove, or approve with
conditions the deepwater port license application for the Safe Harbor project.  Such
license conditions may include, but are not limited to:  1) requiring environmental
monitoring and mitigation measures; 2) the collection of fees to offset any economic,
environmental, and administrative costs that may be incurred by your state associated
with the construction and operation of the proposed deepwater port; and 3) other
conditions to ensure that the proposed port will conform with New Jersey's
environmental programs.

To this end, we would like to arrange a meeting in the near future with you and your immediate staff to further discuss your concerns regarding the proposed Safe Harbor project. Please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov to arrange the most convenient meeting time.

We look forward to working with you and your staff, and I appreciate the time and attention you have given to this important matter.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:     The Honorable Eliot Spitzer
        The Honorable Frank R. Lautenberg
        Vice Admiral Conrad C. Lautenbacher, Jr., NOAA
        Admiral Thad W. Allen, USCG

**2**



U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Phone: (202) 372-1454
Fax: (202) 372-1908
Email: mary.k.jager@uscg.mil

16713

August 15, 2007

Mr. William VanHerwarde
Executive Vice President
Atlantic Sea Island Group LLC
Chrysler Building 26th Floor
405 Lexington Avenue
New York, NY 10174

Dear Mr. VanHerwarde:

In accordance with the Deepwater Port Act, Title 33, United States Code 1504(e)(1), we have completed our review of the Atlantic Sea Island Group LLC (ASIG) deepwater port license application to own, construct, and operate a liquefied natural gas deepwater port submitted on September 13, 2006, the supplemental information submitted on May 8, 2007, and your responses to our June 27, 2007 letter of incompleteness. Based on our review we have determined that the application appears to contain sufficient information to begin processing. This project will be known as Safe Harbor Energy.

While we have received sufficient information to initiate the processing of the application, there are still outstanding items that will need to be provided in order for incorporation into the draft Environmental Impact Statement (EIS). The Coast Guard has identified, by separate letter, the environmental consultant selected by them for assisting in the development of the EIS. ASIG will need to execute a contract quickly to facilitate the timely processing of your application and the development of an Environmental Impact Statement in accordance with the National Environmental Policy Act (NEPA). As agreed to in your August 6 meeting with Maritime Administration officials, this may include an additional contractor to conduct a comprehensive study of the impacts associated with decommissioning of the proposed island after its useful life, including an independent financial review of cost estimates provided for removal of the island. We have agreed to accept this information at a later date but it will need to be completed and or included in the Draft EIS. You should also expect to receive periodic requests for additional information or clarification of existing information already in your submission from us to satisfy requirements under NEPA and DWPA.

We will be publishing a Notice of Application in the Federal Register that will designate New York as the adjacent coastal state for the proposed deepwater port. Additional coastal states may be designated in the future as well. Throughout this process, we will consult with the State of New York and several other federal agencies to ensure timely processing of your application in order for the Maritime Administrator, on behalf of the Secretary of Transportation, to render an informed licensing decision.

If you have any questions, please don't hesitate to contact Ms. Mary Jager of my staff at (202) 372-1454 or Mr. Keith Lesnick of the Maritime Administration at (202) 366-1624. We look forward to working with you in the future.

Sincerely,

M.A. PRESCOTT
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
By direction

H. KEITH LESNICK
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration

**3**

comments. Comments should also state the commenter's interest in the waiver application, and address the waiver criteria given in § 388.4 of MARAD's regulations at 46 CFR Part 388.

**DATES:** Submit comments on or before September 26, 2007.

**ADDRESSES:** Comments should refer to docket number MARAD–2007–29041. Written comments may be submitted by hand or mail to the Docket Clerk, U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590. You may also send comments electronically via the Internet at *http://dmses.dot.gov/submit/*. All comments will become part of this docket and will be available for inspection and copying at the above address between 10 a.m. and 5 p.m., E.T., Monday through Friday, except federal holidays. An electronic version of this document and all documents entered into this docket is available on the World Wide Web at *http://dms.dot.gov.*

**FOR FURTHER INFORMATION CONTACT:** Joann Spittle, U.S. Department of Transportation, Maritime Administration, 1200 New Jersey Avenue, SE., Room W21–203, Washington, DC 20590. Telephone 202–366–5979.

**SUPPLEMENTARY INFORMATION:** As described by the applicant the intended service of the vessel TIN TIN is:

*Intended Use:* "Slipstream Maritime Services, LLC will operate Tin Tin as a chartered vessel for up to 6 passengers. Trips will range from one to five days and are specifically designed as therapeutic experiential sailing trips with sailing instruction included."

*Geographic Region:* "Puget Sound, WA."

## Privacy Act

Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000 (Volume 65, Number 70; Pages 19477–78) or you may visit *http://dms.dot.gov.*

Dated: August 16, 2007.

By order of the Maritime Administrator.

**Daron T. Threet,**

*Secretary, Maritime Administration.*

[FR Doc. E7–16857 Filed 8–24–07; 8:45 am]

**BILLING CODE 4910–81–P**

## DEPARTMENT OF TRANSPORTATION

### Maritime Administration

**[USCG–2007–28535]**

### Atlantic Sea Island Group LLC, Safe Harbor Energy Liquefied Natural Gas Deepwater Port License Application

**AGENCY:** Maritime Administration, DOT.

**ACTION:** Notice of application.

**SUMMARY:** The Coast Guard and the Maritime Administration announce that they have received an application for the licensing of a natural gas deepwater port, and that the application appears to contain the required information. This notice summarizes the applicant's plans and the procedures that will be followed in considering the application.

**DATES:** The Deepwater Port Act of 1974, as amended, requires any public hearing on this application to be held not later than 240 days after this notice, and requires a decision on the application to be made not later than 90 days after the final public hearing.

**ADDRESSES:** The public docket for USCG–2007–28535 is maintained by the: Docket Management Facility, U.S. Department of Transportation, 1200 New Jersey Ave., SE., West Building Ground Floor W12–140, Washington, DC 20590–0001.

Docket contents are available for public inspection and copying, at this address, in room W12–140, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Facility's telephone is 202–366–9329, its fax is 202–493–2251, and its website for electronic submissions or for electronic access to docket contents is *http://dms.dot.gov.*

**FOR FURTHER INFORMATION CONTACT:** Mary K. Jager, U.S. Coast Guard, telephone: 202–372–1454, e-mail: *Mary.K.Jager@uscg.mil* or Andrew Tibbetts, U.S. Maritime Administration, telephone: 202–366–5473, e-mail: *andrew.tibbetts@dot.gov.* If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone: 202–493–0402.

**SUPPLEMENTARY INFORMATION:**

## Receipt of Application

On May 8, 2007, the Coast Guard and the Maritime Administration received an application from Atlantic Sea Island Group LLC (ASIG), Chrysler Building, 405 Lexington Avenue, 26th Floor, New York, NY 10174; for all Federal authorizations required for a license to own, construct, and operate a deepwater port governed by the Deepwater Port

Act of 1974, as amended, 33 U.S.C. 1501 *et seq.* (the Act). On August 15, 2007, we determined that the application appears to contain all information required by the Act.

## Background

According to the Act, a deepwater port is a fixed or floating manmade structure other than a vessel, or a group of structures, located beyond State seaward boundaries and used or intended for use as a port or terminal for the transportation, storage, and further handling of oil or natural gas for transportation to any State.

A deepwater port must be licensed by the Maritime Administrator (by delegated authority of the Secretary of Transportation, published on June 18, 2003 (68 FR 36496)). Statutory and regulatory requirements for licensing appear in 33 U.S.C. 1501 *et seq.* and in 33 CFR part 148. Under delegations from and agreements between the Secretary of Transportation and the Secretary of Homeland Security, applications are processed by the Coast Guard and the Maritime Administration. Each application is considered on its merits.

The Act requires adherence to a strict timeline for processing an application. Once we determine that an application contains the required information, we must hold public hearings on the application within 240 days, and the Maritime Administrator must render a decision on the application within 330 days. We will publish additional **Federal Register** notices to inform you of these public hearings and other procedural milestones, including environmental review. The Maritime Administrator's decision, and other key documents, will be filed in the public docket.

At least one public hearing must take place in each adjacent coastal State. For purposes of the Act, New York is the adjacent coastal State for this application. Other States can apply for adjacent coastal State status in accordance with 33 U.S.C. 1508(a)(2).

## Summary of the Application

Atlantic Sea Island Group LLC (ASIG), proposes to own, construct, and operate a deepwater port, named Safe Harbor Energy, in the Federal waters of the Atlantic Outer Continental Shelf in the area known as the New York Bight region in MMS lease area NK18–12 block 6655. The proposed location is approximately 13.5 miles south of the City of Long Beach on Long Island and 23 miles southeast of New York Harbor entrance, in an area between the Ambrose-to-Nantucket and Hudson

Canyon-to-Ambrose shipping lanes, located at approximately 40°23′ N and 73°36′ E, in water depth of between 60 and 70 feet.

The deepwater port, Safe Harbor Energy, consists of three components: An island to be constructed of natural sand, gravel, and rock materials surrounded by armored breakwaters, consisting of prefabricated caissons, armor units, and rock; an LNG receiving, storage, and regasification facility; and a subsea pipeline that would transport the natural gas to an offshore connection with the Transcontinental Gas Pipeline Corporation's pipeline system. The pipeline would consist of two parallel 36-inch-diameter pipe segments extending 12.8 miles from the island. Safe Harbor Energy will include berthing and offloading space for two conventional LNG vessels with capacity of 70,000 m³ to 270,000 m³. Additionally, it would accommodate support vessels including docking/firefighting tugs and crew support launches. The storage portion would include four (4) 180,000 m³ full-containment storage tanks. The regasification equipment would be an ambient air heat exchange type. Safe Harbor Energy would have an average throughput capacity of approximately 1.15 billion standard cubic feet per day (bscfd).

A shore based facility will be used to facilitate movement of personnel, equipment, supplies, and disposable materials between the port and shore.

Construction of the deepwater port would be expected to take approximately five (5) years; with startup of commercial operations following construction, should a license be issued. The deepwater port would be designed, constructed, and operated in accordance with applicable codes and standards and would have an expected operating life of approximately 25 years.

**Privacy Act**

Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000, (Volume 65, Number 70, Pages 19477–78) or you may visit *http://dms.dot.gov*.

**Authority:** 49 CFR 1.66.

By Order of the Maritime Administrator.

Dated: August 17, 2007.

Daron T. Threet,
*Secretary, Maritime Administration.*
[FR Doc. E7–16875 Filed 8–24–07; 8:45 am]
BILLING CODE 4910–81–P

**DEPARTMENT OF TRANSPORTATION**

**Surface Transportation Board**

**[STB Docket No. AB–55 (Sub-No. 680X)]**

**CSX Transportation, Inc.— Abandonment Exemption—in Portsmouth County, VA**

CSX Transportation, Inc. (CSXT), has filed a notice of exemption under 49 CFR part 1152 subpart F—*Exempt Abandonments* to abandon a 0.50-mile rail line on its Southern Region, Florence Division, Portsmouth Subdivision, from railroad milepost SA 0.28 to railroad milepost SA 0.78, in Portsmouth, Portsmouth County, VA. The line traverses United States Postal Service Zip Code 23704.

CSXT has certified that: (1) No local traffic has moved over the line for at least 2 years; (2) any overhead traffic on the line can be rerouted over other lines; (3) no formal complaint filed by a user of rail service on the line (or by a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or with any U.S. District Court or has been decided in favor of complainant within the 2-year period; and (4) the requirements at 49 CFR 1105.7 (environmental report), 49 CFR 1105.8 (historic report), 49 CFR 1105.11 (transmittal letter), 49 CFR 1105.12 (newspaper publication), and 49 CFR 1152.50(d)(1) (notice to governmental agencies) have been met.

As a condition to this exemption, any employee adversely affected by the abandonment shall be protected under *Oregon Short Line R. Co.— Abandonment—Goshen*, 360 I.C.C. 91 (1979). To address whether this condition adequately protects affected employees, a petition for partial revocation under 49 U.S.C. 10502(d) must be filed.

Provided no formal expression of intent to file an offer of financial assistance (OFA) has been received, this exemption will be effective on September 26, 2007, unless stayed pending reconsideration. Petitions to stay that do not involve environmental issues,[1] formal expressions of intent to

file an OFA under 49 CFR 1152.27(c)(2),[2] and trail use/rail banking requests under 49 CFR 1152.29 must be filed by September 6, 2007. Petitions to reopen or requests for public use conditions under 49 CFR 1152.28 must be filed by September 17, 2007, with the Surface Transportation Board, 395 E. Street, SW., Washington, DC 20423–0001.

A copy of any petition filed with the Board should be sent to CSXT's representative: Steven C. Armbrust, 500 Water Street, J–150, Jacksonville, FL 32202.

If the verified notice contains false or misleading information, the exemption is void *ab initio*.

CSXT has filed environmental and historic reports addressing the effects, if any, of the abandonment on the environment and historic resources. SEA will issue an environmental assessment (EA) by August 31, 2007. Interested persons may obtain a copy of the EA by writing to SEA (Room 1100, Surface Transportation Board, Washington, DC 20423–0001) or by calling SEA, at (202) 245–0305. [Assistance for the hearing impaired is available through the Federal Information Relay Service (FIRS) at 1–800–877–8339.] Comments on environmental and historic preservation matters must be filed within 15 days after the EA becomes available to the public.

Environmental, historic preservation, public use, or trail use/rail banking conditions will be imposed, where appropriate, in a subsequent decision.

Pursuant to the provisions of 49 CFR 1152.29(e)(2), CSXT shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line. If consummation has not been effected by CSXT's filing of a notice of consummation by August 27, 2008, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire.

Board decisions and notices are available on our Web site at *http://www.stb.dot.gov*.

Decided: August 20, 2007.

---

[1] The Board will grant a stay if an informed decision on environmental issues (whether raised by a party or by the Board's Section of Environmental Analysis (SEA) in its independent investigation) cannot be made before the exemption's effective date. *See Exemption of Out-of-Service Rail Lines*, 5 I.C.C.2d 377 (1989). Any request for a stay should be filed as soon as possible so that the Board may take appropriate action before the exemption's effective date.

[2] Each OFA must be accompanied by the filing fee, which currently is set at $1,300. *See* 49 CFR 1002.2(f)(25).

**4**



**State of New Jersey**

OFFICE OF THE GOVERNOR
PO Box 001
TRENTON NJ 08625-0001

JON S. CORZINE
*Governor*

September 6, 2007

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

Atlantic Sea Island Group LLC has applied to the Coast Guard and the Maritime
Administration for a license to own, construct and operate a deepwater LNG port in the
Atlantic Ocean off New Jersey and New York. Notice of the application, known as Safe
Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535), was
published in the Federal Register on August 27, 2007. The notice indicates that because
of the proposed island's proximity to New York, New York has been designated an
adjacent coastal state under the Deepwater Port Act. The proposed island would be
within 15 miles of New York and is approximately 19 miles from New Jersey. However,
the proposed alternative pipeline alignment that is part of the deepwater port application
would be well within the 15 mile standard to designate New Jersey an adjacent coastal
state. As defined in the Deepwater Port Act, the deepwater port subject to this licensing
includes all components and equipment, including pipelines, pumping or compressor
stations, service platforms, buoys mooring lines, and similar facilities that are approved
or proposed for construction and operation as part of the deepwater port. By this
definition alone New Jersey should be considered an adjacent coastal state due to the
proximity of the alternative alignment.

The Deepwater Port Act also provides for a state to be designated an adjacent
coastal state if there is a risk of damage to the coastal environment of such state equal to
or greater than the risk posed to a state directly connected by pipeline to the deepwater
port. The proposed port will connect to the existing Transco pipeline running from

Morgan, New Jersey to Long Beach, New York. Thus, New Jersey considers that it is directly connected to the deepwater port. Moreover, the alternative pipeline alignment would be less than 9 miles from New Jersey, well within the 15 mile criterion.

Regardless of whether the connection to the Transco pipeline emanating from the New Jersey shore constitutes a direct connection to either state, New Jersey's coastal environment is equally impacted by the proposed facilities as New York's coastal environment. New Jersey has robust commercial and recreational fisheries that are vital to the State's economy, as well as to the history and character of New Jersey's coastal environment. The proposed facility will destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally approved coastal management program. Not only will the creation of an island over this prime fishing area be detrimental to this unique environment but the proposed facility's exclusion zone will prohibit vessels in a 633 acre area, further diminishing this important resource.

The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high… The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Accordingly, any impediments to navigation would adversely affect New Jersey in a manner equal to or greater than its effects on New York.

The predominant current direction in the area of the proposed deepwater port is toward New Jersey. Accordingly, turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as to the important commercial and recreational fishing grounds surrounding the proposed port, as would any spills at the island during construction and operation of the facility.

The application does not specify the exact location of shore based facilities that would service the deepwater port, or from which construction would be staged. However, it does indicate that the facilities would be located within a 40 mile radius of the proposed island. This radius includes shore facilities in New Jersey. Accordingly, the effects on the coastal environment of New Jersey for construction staging and long-term service of the deepwater port would be felt in New Jersey in equal or greater amount than in New York.

New Jersey should be designated an adjacent coastal state under the Deepwater Port Act because the alternative pipeline alignment will be well within 15 miles of New Jersey's Coast, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the

coastal environment of New York. It is imperative that New Jersey be an integral part of the review of this proposal due to the inherent risks associated with a deepwater port within as busy of a port region as the New Jersey/ New York Port complex.

Sincerely,

Jon S. Corzine
Governor

c:    Mr. H. Keith Lesnick, MARAD
      Mr. Mark A. Prescott, USCG

**5**



VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James H. Burnley IV

(202) 344-4054

jhburnley@venable.com

September 24, 2007

**VIA HAND DELIVERY**
Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second Street SW
Washington, D.C. 20593

**VIA HAND DELIVERY**
Sean T. Connaughton
Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

RE:   Safe Harbor Energy Deepwater Port Application

Dear Admiral Allen and Administrator Connaughton:

On September 6, 2007, the Honorable Jon S. Corzine, Governor of the State of New Jersey, requested that State be designated an "adjacent coastal state" for purposes of consideration by your agencies of the Deepwater Port License application submitted by the Atlantic Sea Island Group for the project known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535).  Pursuant to the Notice of Application published by the Maritime Administration ("MarAd") in the Federal Register on August 27, 2007, the State of New York was designated as the adjacent coastal state for purposes of the Safe Harbor Energy project.

On behalf of the Atlantic Sea Island Group, we are writing in opposition to the New Jersey request for designation as an adjacent coastal state because New Jersey does not meet the requirements under the Deepwater Port Act ("DWPA") for such designation.  The DWPA defines an "adjacent coastal state" as "any coastal state which (A) would be directly connected by pipeline to a deepwater port, as proposed in an application; (B) would be located within 15 miles of any such proposed deepwater port; or (C) is designated by the Secretary in accordance with section 1508(a)(2) of this title." 33 U.S.C. § 1502(1).  Pursuant to section 1508(a)(1) of the Act, the Secretary is required to, upon issuing notice of the application in the Federal Register, designate an adjacent coastal state if it meets the criteria in (A) or (B) of the definition.

Alternatively, under section 1508(a)(2), a state may request designation as an adjacent coastal state and the Secretary shall designate such a state as an adjacent coastal state if, after receiving the recommendations of the Administrator of National Oceanographic and Atmospheric Administration ("NOAA"), it is determined that there is a risk of damage to the

VENABLE LLP

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 2

coastal environment of the state <u>equal to or greater than</u> the risk posed to a state directly connected by pipeline to the proposed deepwater port.  (Emphasis added).

In his letter, Governor Corzine lists several factors that he asserts establish why New Jersey should be designated an adjacent coastal state.  However, the criteria for such designation is very explicit – to be designated an adjacent coastal state, the risk of damage to the coastal environment of New Jersey must be equal to or greater than the risk posed to a state directly connected by pipeline to the Safe Harbor Energy Deepwater Port.  The factors listed by Governor Corzine in his letter do not meet this legal standard.

Initially, New Jersey notes that alternative routes for the pipeline were considered, and that one of the alternative routes would have been within 15 miles of the coast of New Jersey. That New Jersey could have been impacted by a potential alternative to the actual pipeline route is not a valid consideration under the applicable legal standard; the only valid consideration is whether New Jersey is affected by the actual proposed pipeline route.  It is not.

Next, New Jersey argues that the pipeline from the port will connect to the existing Transco pipeline that runs from Morgan, New Jersey to Long Beach, New York, and that this means that New Jersey is directly connected by pipeline to the deepwater port.  However, the Notice of Application defines the project as consisting of three components, one of which is "a subsea pipeline that would transport the natural gas to an offshore connection with the Transcontinental Gas Pipeline Corporation ("Transco") pipeline system."  The pipeline connection from the Safe Harbor Energy Deepwater Port terminal to the existing Transco pipeline system, part of the U.S. interstate natural gas transmission system, occurs in New York State navigable waters at a location that is greater than 15 miles from New Jersey.  Thus, New York is appropriately designated an adjacent coastal state; no such nexus to the Safe Harbor Energy Deepwater Port terminal exists regarding New Jersey or its navigable waters.  To adopt New Jersey's rationale means that any state connected to the existing Transco interstate distribution system would have to be designated an adjacent coastal state – clearly not a result intended by the statute or regulations.

New Jersey then asserts that even if there is no direct pipeline connection to the State, the risk posed by the project to New Jersey's coastal environment is equal to or greater than the risk posed to New York.  The standard adopted for status as an adjacent coastal state in the DWPA is a totality standard, *i.e.*, the total risk posed by the Safe Harbor Energy project to the coastal environment of New Jersey must be equal to or greater than the total risk posed to New York. The Safe Harbor Energy Deepwater Port Application identifies no risks to the coastal

VENABLE®LLP

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 3

environment of the State of New Jersey. However, even if there were one or more risks posed, and even if those one or more risks could be shown to be equal to or greater than the same risk or risks to the State of New York, this in and of itself is not sufficient to meet the totality standard mandated by statute for designation of New Jersey as an adjacent coastal state. Moreover, there are certain potential risks to New York's coastal environment that are not shared by New Jersey, and these must be taken into consideration under the statutory standard when comparing the two states. For instance, actual construction activities, in the form of pipeline laying and connection to the Transco pipeline, will occur within New York State waters, with any attendant risks to New York's coastal environment these construction activities may present. No such risks are faced by New Jersey. New Jersey does not meet, on the face of its request, the totality of risk standard established by the DWPA for designation as an adjacent coastal state.

Further, objective examination of the individual risks identified in the New Jersey letter also militates against its designation as an adjacent coastal state. New Jersey first states that there is a potential risk to commercial and recreational fisheries, alleging that the Safe Harbor Energy facility will destroy a historic prime fishing area, Cholera Bank, that is protected under the State's federally approved coastal zone management plan.

Any impact on commercial and recreational fisheries is a matter that will be considered as part of the application process. The application notes that there would likely be minimal impact on recreational and commercial fishing due to the project. Further, techniques and materials will be used for construction of the Island that will create habitat for fish use and provide surface area for attachment by invertebrates. In addition, New Jersey's claim that the Island could impact recreational or commercial fishing is counter to its own activities creating artificial reefs. New Jersey has developed an artificial reef program that involves depositing large quantities of concrete (construction debris) and other materials (rail cars marine vessels) on the marine bottom that it poses as successful in the creation of habitat for marine organisms (as has New York).

Atlantic Sea Island Group also has committed to create/enhance additional hard bottom habitat on Cholera Bank outside the exclusion zone around the Island if this is determined through studies to be appropriate. Building and enhancing the hard-bottom habitat found on Cholera Bank could benefit the local benthic and pelagic fish communities by providing additional structure and habitat for benthic organisms that form the foundation of the food chain. In the end, it is believed that creation of the habitat on and around the Island structure will benefit recreational and commercial fishing interests. *Safe Harbor Energy Deepwater Port* ("DWP") Application, Volume 3, Part 1, pages 3-53, 3-54.

VENABLE'LLP

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 4

But more specifically as to this issue, potential risk or impact to fisheries in the area of Cholera Bank is not a valid consideration regarding New Jersey's status as an adjacent coastal state because Cholera Bank is not within the coastal environment of New Jersey. Under the DWPA, "coastal environment" means "the navigable waters (including the lands therein and thereunder) and the adjacent shorelines (including waters therein and thereunder). The term includes transitional and intertidal areas, bays, lagoons, salt marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and the recreational and scenic values of such lands, waters and resources." 33 U.S.C. § 1502(5).

Section 1508(a)(2) of the DWPA requires an examination of risk to the <u>coastal environment of the state</u> to determine whether that state is an adjacent coastal state. (Emphasis added). Thus, it is the risk posed to the navigable waters and adjacent shoreline of the state of New Jersey that must be examined in considering New Jersey's request. The navigable waters of the State of New Jersey extend 3 nautical miles from its shore, the extent of the territorial sea of the State. Cholera Bank and the Safe Harbor Energy project are over 15 nautical miles from the New Jersey coast, and well outside New Jersey's coastal environment as that term is defined in the DWPA. Therefore, any impact that the Safe Harbor Energy Deepwater Port may have on commercial and recreational fishing in the Cholera Bank area is irrelevant and inapplicable to the considerations required to be taken into account in determining New Jersey's status as an adjacent coastal state under the DWPA. Further, for these same reasons, the fact that the Cholera Bank area may be protected under New Jersey's coastal management program is also irrelevant and inapplicable.

New Jersey also argues that the project is sited between the approach lanes to the Port of New York and New Jersey, and that any impediments to navigation resulting from the project would adversely affect the commercial interests of New Jersey in a manner equal to or greater than its effects on New York. Arguably, under the definition of coastal environment in the DWPA, commercial interests are not included. However, even if they are, the data provided by New Jersey in support of this contention is not sufficient to determine whether New Jersey should be designated as an adjacent coastal state. It is impossible to know whether the adverse commercial impact on New Jersey is equal to or greater than the impact on New York without an analysis of the specific commercial losses, if any, both would face under various possible scenarios that the project could impact navigation into the port. Merely stating that any adverse impact would impact New Jersey equally or more than New York, as New Jersey does in its letter, is not sufficient to make a reasonable, rational determination under the statutory standard.

# VENABLE LLP

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 5

New Jersey next argues that the predominant current direction around the proposed facility is toward New Jersey, and thus turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as impact fishing grounds around the proposed site, as would any spills during constructions and operation of the facility. While we acknowledge that the prevailing ocean currents in the area of the proposed site are toward New Jersey, this does not mean that turbidity and other water quality impacts of the project necessarily present a risk to the New Jersey coastal environment. As noted above, the farthest extent of New Jersey's coastal environment for purposes of the DWPA is three nautical miles from its shore, which is approximately 12 nautical miles distant from any construction activities associated with the project. The discussion in the Safe Harbor Energy application regarding potential turbidity impacts during project construction indicates turbidity would be of short to moderate term and minor. Safe Harbor Energy DWP Application, Volume 3, Part 1, pages 2-18, 2-19. Thus, there is no evidence turbidity would affect the coastal environment of New Jersey. Further, the impact of any spills from construction or operation of the port is also unlikely to impact the coastal environment of New Jersey. Oil and/or natural gas spills, which would be on the ocean surface, are most affected by wind and wave action in terms of migration rather than ocean currents. The prevailing wind and wave directions are from the west and northwest, away from the New Jersey coastal environment. Safe Harbor Energy DWP Application, Volume 3, Part 1, pages 2-4, 2-5. Finally, any risks to water quality would necessarily be greater for the New York coastal environment because construction activities, in the form of trenching for laying of the pipeline, actually will occur in New York State waters, and under the totality of risk standard, this must be taken into account when comparing this risk to that of New Jersey.

Lastly, New Jersey argues that shore-based facilities to service the port, or from which construction would be staged, are not identified in the application, but that the application notes any such facilities would be within a 40-mile radius of the proposed site, and would thus include facilities in New Jersey. However, this statement is incorrect. The application states that for staging of equipment and supplies, and loading and unloading barges, during construction, five facilities in the metropolitan New York area have been identified. Safe Harbor Energy DWP Application, Volume 3, Part 1, page 1-7. But the location of the shore base to be used during operation of the port to move personnel, supplies, equipment and disposable materials between the shore and the deepwater port facility is identified as the town of Ocean Side, Long Island, New York. Safe Harbor DWP Application, Volume 3, Part 1, page 1-8. Thus, any risk to New Jersey's coastal environment arising from the location of shore facilities to service the project could not be equal to or greater than such risks to the State of New York, where the permanent shore base to service the project would be located.

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 6

        For all of these reasons, New Jersey should not be designated an adjacent coastal state under the DWPA for purposes of the Safe Harbor Energy Deepwater Port Application because it does not meet the statutory criteria for such designation. However, we also acknowledge and recognize that New Jersey has legitimate interests in the project. In recognition of these interests, Safe Harbor Energy project representatives have consulted with officials of the State of New Jersey during the development of the project and the application. Moreover, the denial of the request by the State of New Jersey to be designated as an adjacent coastal state does not mean that there are not avenues for New Jersey's legitimate interests to be considered during the application process. For instance, pursuant to section 1508(b)(2) of the DWPA, any interested State has the opportunity to make its views known to the Coast Guard regarding the location, construction and operation of the Safe Harbor Energy Deepwater Port, and those views are required to be given full consideration.

                                        Sincerely,

                                        James H. Burnley IV
                                        David G. Dickman

cc:    Vice Admiral Conrad C. Lautenbacher (USN Ret.)
       Administrator
       National Oceanographic and Atmospheric Administration
       14th and Constitution Ave., N.W.
       Washington, D.C. 20230

DC2\894467 01

**6**



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

200 New Jersey Avenue, S.E.
Washington, DC 20590

September 28, 2007

The Honorable Jon S. Corzine
Governor of New Jersey
Trenton, NJ 08624-0001

USCG-2007-28535

Re: New Jersey Adjacent Coastal State Designation

Dear Governor Corzine:

Thank you for your letter dated September 6, 2007, requesting the designation of New
Jersey as an Adjacent Coastal State for the proposed Safe Harbor Energy deepwater port
project. In accordance with the Deepwater Port Act of 1974, as amended (Act), the
Maritime Administration recently submitted a request for recommendation on Adjacent
Coastal State status for New Jersey to the Administrator of the National Oceanic and
Atmospheric Administration (NOAA). We are currently awaiting NOAA's response.

Pursuant to Section 1508 (a)(2) of the Act, the Maritime Administrator, by delegated
authority, must make a determination regarding the designation of Adjacent Coastal State
status after receiving a timely request from a State Governor, and after considering the
recommendation of the Administrator of the National Oceanic and Atmospheric
Administration. The Maritime Administrator must grant Adjacent Coastal State status if
the risk of damage to the requesting State's coastal environment is equal to or greater
than the risk posed to a State that would be directly connected by pipeline to the proposed
deepwater port. This determination must be made no later than 45 days after the date of
receipt of the request.

Accordingly, we will provide prompt notification to you upon consideration of the
NOAA Administrator's recommendation and issuance of our final decision in this matter.

Should you require additional information, please contact Keith Lesnick, Director, Office
of Deepwater Ports and Offshore Activities at 202-366-1624 or keith.lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

7



Department of Transportation

1200 New Jersey Avenue, SE
Second Floor, West Building
Room W24-233
Washington, D.C. 20590

**Maritime**
**Administration**
Office of Chief Counsel

Christine S. Gurland, FOIA Officer
202-366-5181
Ann Herchenrider, FOIA Public Liaison
202-366-5165
Jeannette S. Riddick
FOIA Requester Service Center
202-366-2666
FACSIMILE: 202-366-7485
Toll free: 1-800-986-9678 ext. 65181
E-mail address: FOIA.MARAD@dot.gov

February 6, 2008

Jim Burnley, Esq.
Venable LLP
575 7th Street, NW
Washington, DC 20004-1601

Control No.: 08-013

Dear Mr. Burnley:

This letter is in response to your November 19, 2007 Freedom of Information Act (FOIA) request for a copy of the document, dated on or about October 17, 2007, that was prepared and signed by NOAA in response to a request from the U.S. Maritime Administration in accordance with the provisions of the Deepwater Port Act.

The document listed on the enclosed list is being withheld in its entirety pursuant to Exemption (b) (5) of the FOIA. Exemption (b) (5) of the FOIA encompasses "interagency or intra-agency memorandum or letters which would not be available by law to a party...in litigation with the agency." Exemption (b)(5) also incorporates the deliberative process privilege which applies to the nondisclosure of information in order to prevent injury to the quality of agency decisions, as well as the attorney-client privilege which protects from disclosure confidential communications between an attorney and his or her client. Specifically, the withheld material contains privileged information related to the deliberative process.

The withheld document has not been redacted because after redaction of confidential information no reasonably segregable remaining material would have meaning.

Page 2

You may contest the nondisclosure noted above by submitting an appeal, in writing, within 30 days from the date hereof, to the Maritime Administration, 400 Seventh Street, S.W., Washington, D.C.  20590.  The appeal and its envelope should be marked "Freedom of Information Act Appeal

There are no charges incurred in connection with your request.

Sincerely,


CHRISTINE S. GURLAND
Freedom of Information Act Officer

Enclosure

*DOCUMENT WITHHELD IN ITS ENTIRETY*
*PURSUANT TO EXEMPTION (B) (5) OF THE FOIA*

1.  **October 17, 2007** – Letter to H. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities, Maritime Administration, from Conrad C. Lautenbacher, Jr., Department of Commerce. (2 pages)

**8**



575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James H. Burnley IV                    202-344-4054                    JHBurnley@Venable.com

December 3, 2007

The Honorable Mary E. Peters
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

The Honorable Sean T. Connaughton
Administrator
Maritime Administration
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

Re:  Safe Harbor Energy LNG Deepwater Port – Request for
Reconsideration of Designation of New Jersey as an "Adjacent Coastal State"

Dear Secretary Peters and Administrator Connaughton:

I am writing on behalf of our client, Atlantic Sea Island Group, the applicant for a license under the Deepwater Port Act, 33 U.S.C. §1501 et seq. ("DWPA"), for the construction and operation of the Safe Harbor Energy LNG Deepwater Port. I hereby request that you reconsider the decision by the Administrator of the Maritime Administration, set forth in a letter of November 2, 2007 to the Governor of New Jersey, designating New Jersey as an additional "adjacent coastal State" for this project under 33 U.S.C. § 1508(2). (Attachment 1)

ASIG has applied for a federal license under the DWPA to construct and operate the Safe Harbor Energy LNG Deepwater Port, to be located 13.5 miles south of Long Beach, New York and 23 miles southeast of the entrance to New York Harbor. The port is designed to receive liquefied natural gas ("LNG"), regasify it, and transmit through the existing distribution infrastructure up to two billion standard cubic feet per day of natural gas, thereby providing a strategic and critically-needed energy supply to help satisfy the significantly increased energy demands to be presented in the near future by the New York metropolitan area. Natural gas is a clean burning fuel that is environmentally superior to other fossil fuel energy sources, such as coal or fuel oil, in several respects including lesser greenhouse gas emissions. The offshore location of the proposed port will minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, and minimize visual impacts.

The Administrator designated New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy project, which has the effect of giving New Jersey a veto power over the licensing of this port. The Administrator's decision was erroneous as a matter of law in several respects:

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 2

(1) The Administrator did not have legal authority to make this designation. Pursuant to the existing delegations of authority under the DWPA, as codified by the Homeland Security Act of 2002 and set forth in the implementing regulations, an additional State can be designated as an "adjacent coastal State" only by decision of the Commandant of the U.S. Coast Guard, with the concurrence of the Administrator. 33 C.F.R. § 148.217(d). The Administrator does not have legal authority to designate a State as an "adjacent coastal State" by his own, unilateral action. Further, the Commandant has not made such a designation. Moreover, the 45-day period provided by the DWPA within which such a designation may lawfully be made had expired before the Administrator purported to make this decision.

(2) Even assuming that he had legal authority to make a unilateral designation, the Administrator failed to apply the legal standard required by Section 1508(a)(2) of the DWPA, which specifies that an additional State may be designated as an "adjacent coastal State" only if the risk of damage from the port to the coastal environment of the petitioning State is "equal to or greater than" the risk of damage to the coastal environment of the State connected to the port by a pipeline. The Administrator did not apply the statutory standard, but instead applied a test that is not authorized by the statute. Indeed, in enacting the DWPA, Congress considered and expressly rejected the test that the Administrator applied.

(3) In any event, the record does not contain any evidence that would support a factual finding as required by Section 1508(a)(2), that the risk of damage to the coastal environment of New Jersey from the proposed liquefied natural gas ("LNG") port is "equal to or greater than" the risk of damage to the coastal environment of New York.

Accordingly, I request reconsideration of the Administrator's decision. Upon reconsideration, you should conclude that his action was contrary to law and vacate that decision.

If the Department, despite the plain language of the Homeland Security Act (and applicable delegations and regulations), somehow interprets its retained authority to give it the power to designate an "adjacent coastal state," the Secretary should deny New Jersey's request. I note, for example, that in 49 C.F.R. § 1.44(n), the Secretary retained the authority "to issue, transfer, or amend a license for the construction and operation of a deepwater port (33 U.S.C. § 1503(d))." If the Department interprets the reserved authority as not limited to the ultimate decision "to issue, transfer or amend a license" but as extending as well to the designation of an "adjacent coastal State," the Secretary should deny New Jersey's request on the ground that there is no factual evidence in the record on which a rational decision maker could conclude that the risk presented to

# VENABLE LLP

December 3, 2007
Page 3

the coastal environment of New Jersey would be "equal to or greater than" the risk presented to the coastal environment of New York.

After withdrawal of the Administrator's decision, New Jersey will still be able to obtain full review of all concerns it may have with the potential environmental, safety, or other possible effects of the proposed deepwater port. Those issues will be thoroughly considered in the multiple reviews that will be conducted by several federal agencies. Under the DWPA, any State that is not designated as an adjacent coastal State "shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added). The mandatory nature of the "full consideration" requirement assures that New Jersey's views will be reviewed carefully during the review process.

In light of Section 1508(b)(2), the only effect of the invalidation of the Administrator's prior action would be that New Jersey would not be able to impose an absolute veto on the licensing of this urgently needed LNG project, which will be constructed off the coast of the State of New York. Rather, New Jersey would be able to work with the federal agencies that will review the application to develop reasonable license and permit conditions that will protect its coastal environment.

Under the plain language of the DWPA, this outcome is what Congress explicitly intended to occur. The DWPA is structured in this way from concern that giving an absolute veto power to an additional State other than the jurisdiction that will bear the greatest risk of damage to its coastal environment would result in a situation in which badly needed deepwater ports could never be constructed.

<u>Background</u>

The Deepwater Port Act establishes the procedures and substantive criteria by which the federal government may license deepwater LNG ports. As part of the licensing process, the DWPA provides for comprehensive inter-agency review of the environmental, safety, and national security aspects of the proposed deepwater port. Congress vested licensing authority in the Secretary of Transportation. The Secretary in turn has delegated implementing authority to the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration.

The DWPA provides that the final approval or denial of the license must occur within 330 days of publication of a Federal Register notice that the application is complete. The Maritime

# VENABLE LLP

December 3, 2007
Page 4

Administrator published such a notice for the Safe Harbor Energy project on August 27, 2007. 72 Fed. Reg. 49041 (Aug. 27, 2007).

Under the DWPA, the State to which the proposed LNG port will be connected by pipeline is designated as an "adjacent coastal State." In this capacity, the State has authority to veto the licensing of the proposed port or to impose mandatory conditions that must be included in the federal license. New York was designated as an "adjacent coastal State in the Federal Register notice for this project. Id.

The statute also provides that within 14 days after the publication of the Federal Register notice, another State may request designation as an additional "adjacent coastal State." If its application is granted, the second State also obtains authority to veto the licensing of the proposed port or to impose mandatory license conditions.

By a letter dated September 6, 2007 and docketed on September 10, 2007, New Jersey applied for designation as an additional "adjacent coastal State" for the Safe Harbor Energy project. (Attachment 2) Section 1508(a)(2) establishes a 45-day deadline for resolution of such a request. On September 24, 2007, ASIG submitted a letter to the Coast Guard and the Maritime Administration which demonstrated that New Jersey had not satisfied the statutory standard for designation as an "adjacent coastal State." (Attachment 3). The statutory deadline for designation of New Jersey as an "adjacent coastal State" expired no later than October 25, 2007. No decision was made prior to the expiration of the deadline.

On November 2, 2007, the Administrator purported to designate New Jersey as an additional "adjacent coastal State." If valid, his action would give New Jersey, as well as New York, a veto power over federal approval of the project. That decision is inconsistent with the terms of the DWPA and its implementing regulations in several respects. That decision should be reconsidered and overturned.

1. The Administrator Lacked Legal Authority To
   Designate New Jersey as an "Adjacent Coastal State."

The Secretary originally delegated different aspects of the Department's implementation authority to the U.S. Coast Guard and the Maritime Administration, at a time when both agencies were within the Department. Some authorities were vested in the Maritime Administration, subject to an obligation to consult the Coast Guard; other authorities were given to the Coast Guard, with an obligation to consult the Maritime Administration. The remaining authorities were delegated jointly to both agencies, to be exercised concurrently. From the outset, the Coast Guard has

# VENABLE®LLP

December 3, 2007
Page 5

exercised the authority to receive the applications and supporting papers for a proposed deepwater port and to conduct the process by which the necessary studies are conducted. The Coast Guard also has issued the principal implementing rules under which the statute is administered. See 33 C.F.R. parts 148-150.

In 2002, the Coast Guard was transferred to the newly created Department of Homeland Security. Section 888(b) of Public Law No. 107-296, the Homeland Security Act of 2002, 6 U.S.C. § 468(b), provides:

> There are transferred to the Department [of Homeland Security] the authorities, functions, personnel, and assets of the Coast Guard . . . including the authorities    and functions of the Secretary of Transportation relating thereto.

Section 888(b) codified the prior delegations of authority made by the Secretary of Transportation to the Coast Guard and transferred these authorities to the Secretary of Homeland Security. Further, these authorities cannot be redelegated or removed. Section 888(c) of that Act, 6 U.S.C. § 468(c), provides:

> Notwithstanding any other provision of this Act, the authorities, functions, and capabilities of the Coast Guard to permit its missions shall be maintained intact    and without significant reduction after the transfer of the Coast Guard to the    Department    [of Homeland Security], except as specified in subsequent Acts.

The Department of Transportation has publicly taken the position that the Commandant of the Coast Guard continues to possess all the implementing authority under the DWPA that he previously enjoyed while the Coast Guard was part of the Department. In 2003, in revising the delegations of authority to the Maritime Administration under the DWPA, the Secretary noted that "[t]he USCG retained the statutory and delegated authorities upon its transfer to the Department of Homeland Security . . . ." Final Rule, Organization and Delegations of Powers and Duties, Update of Secretarial Delegations, 68 Fed. Reg. 36496 (June 18, 2003).

The governing Coast Guard rule, 33 C.F.R. § 148.217, establishes the process for consideration of requests by a State to be designated as an additional "adjacent coastal State." The request must be submitted to the Commandant. Id., § 148.217(b). Upon receipt of the request, the Commandant must send a copy of the request to the Administrator of the National Oceanic and Atmospheric Administration and ask for his recommendations within an amount of time that will permit the decision on the request to be made within the 45 day period established by the DWPA. Id., § 148.217(c). Section 148.217(d) further provides:

# VENABLE LLP

December 3, 2007
Page 6

> If after receiving NOAA's recommendations <u>the Commandant</u> . . . , in concurrence with MARAD Administrator, <u>determines</u> that the State should be considered an adjacent coastal State, <u>the Commandant</u> . . . in concurrence with the MARAD Administrator, <u>will so designate it</u>. If <u>the Commandant</u> . . ., in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

(Emphasis added). The governing regulation thus explicitly provides that the decision whether to grant "adjacent coastal State" status is to be made by the Commandant of the Coast Guard, not by the Administrator of the Maritime Administration.

Under the DWPA implementing rules, the Commandant is required to obtain the Administrator's concurrence in his determination on "adjacent coastal State" status. But the regulation provides explicitly, in three places, that the decision is to be made by the Commandant. Accordingly, the decision of the Administrator purporting to grant "adjacent coastal State" status to New Jersey usurped powers that belong to the Commandant under existing delegations of authority, as provided by the Homeland Security Act and relevant regulations implementing the statute.

Further, the Administrator acted after the 45-day statutory deadline for making such a designation had already expired.

For these reasons, the Administrator acted without legal authority in purporting to grant "adjacent coastal State" status to New Jersey. "Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner inconsistent with the administrative structure that Congress enacted into law.'" <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 129 (2000) (internal citation omitted). The November 2 designation therefore should be reconsidered and invalidated.

If the Department, despite the plain language of the Homeland Security Act (and applicable delegations and regulations), somehow interprets its retained authority, set forth in 49 C.F.R. § 1.44(n), as not limited to the ultimate decision "to issue, transfer or amend a license" but as extending as well to the designation of an "adjacent coastal State," the Secretary should deny New Jersey's request on the ground that, as set forth in the next two sections, there has been no showing that the risk presented to the coastal environment of New Jersey is "equal to or greater than" the risk to the coastal environment of New York.

    2.  The Administrator Erred, as a Matter of Law, by Failing to Apply the

# VENABLE LLP

December 3, 2007
Page 7

### Standard of Review Set Forth in the DWPA and Purporting to Apply
### Instead a Test that Congress Had Not Authorized but Had Explicitly Rejected.

Section 1508(a) establishes three pathways by which a State may be designated an "adjacent coastal State." Section 1508(a)(1) provides that a State may be designated as an "adjacent coastal State" if it is directly connected by pipeline to the proposed deepwater port or is located within 15 miles of the proposed port. Under these two pathways, New York was designated as an "adjacent coastal State" in the Federal Register notice that initiated the review process. 72 Fed. Reg. 49041 (Aug. 27, 2007).

Section 1508(2) provides a third pathway by which a State not named in the Federal Register notice may request designation as an additional "adjacent coastal State":

> The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port . . . .

(Emphasis added).

Under the governing Coast Guard regulation, to permit conduct of the required comparative evaluation whether the risk of damage to the coastal environment of the requesting State is "equal to or greater than" the risk to the coastal environment of the State named in the Federal Register notice, the Governor of that State requesting such designation must submit to the Coast Guard "the facts and available documentation or analyses concerning the risk of damage to the coastal environment of the State" and must explain why he believes "the risk of damage to its coastal environment is equal to or greater than the risk" to the State originally designated in the Notice. 33 C.F.R. § 148.217(b)(3)-(4).

On September 6, 2007, the Governor of New Jersey submitted a two and one-quarter page letter to the Commandant of the Coast Guard and the Administrator of the Maritime Administration requesting designation of New Jersey as an additional "adjacent coastal State" for this project. The letter submitted no facts, documentation or analyses of the effect of the project on New Jersey, as required by the Coast Guard rule. Rather, it contained four paragraphs of argumentation that specific aspects of the coastal environment of New Jersey arguably would be adversely affected to the same or greater degree than comparable aspects of the coastal

V<small>ENABLE</small>ʹ<sub>LLP</sub>

December 3, 2007
Page 8

environment of New York. The letter did not attempt to quantify the <u>overall</u> impact of the project on the coastal environments of New York and New Jersey or to show on the basis of evidence that the <u>overall</u> risk of the project to New Jersey was "equal to or greater than" the risk to New York.

On September 28, 2007, in an interim response to the Governor of New Jersey, the Maritime Administrator stated that he would review the request under the legal standard established by Section 1508(a)(2) – that after considering the recommendation of the Administrator of NOAA, the "Maritime Administrator must grant Adjacent Coastal State status if the risk of damage to the requesting State's coastal environment <u>is equal to or greater than</u> the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port." (Attachment 4, emphasis added) In response to this letter, New Jersey never submitted any facts or analyses to support its request.

We are informed that on October 17, 2007, NOAA submitted a one and one-quarter page long letter concerning the Safe Harbor Energy project. To date, the Maritime Administration has not responded to our request that this document be placed in the docket. It is our understanding, however, that the letter provided little in the way of meaningful information that could assist the Commandant of the Coast Guard in performing the comparative evaluation of the potential risks to the coastal environments of New Jersey and New York that is required by Section 1508(a)(2).

On November 2, 2007, the Administrator purported to designate New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy application. In articulating the basis for that conclusion, the Administrator stated that he had relied:

upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

The Administrator's decision is invalid, as a matter of law, because he failed to apply the legal standard set forth in Section 1508(a)(2), failed to perform the comparative analysis required by that provision, and failed to make the finding it requires before an additional State may be designated an "adjacent coastal State."

The Administrator instead applied a test that Congress never authorized. His decision relied entirely on the size of the project – its "magnitude and scope" – and its potential environmental impact, which he characterized as "significant." As noted below, there is no evidence in the record to support the Administrator's contention that there exists the potential for "significant" environmental harm to the coastal environment of New Jersey. Even assuming such

# VENABLE LLP

December 3, 2007
Page 9

evidence were in the record, the Administrator's approach failed to comply with Section 1508(a)(2) in two critical respects.

-- The Administrator did not refer to or conduct an assessment of the potential risk the project presents to the coastal environment of New York.

-- The Administrator did not perform the analysis mandated by Section 1508(a)(2), which requires that the determination be based on an assessment whether the potential risk to the coastal environment of New Jersey would be "equal to or greater than the risk posed to" the coastal environment of New York.

The Administrator had articulated the proper standard in his September 28, 2007 interim response to New Jersey and had stated that he would apply the correct standard. He inexplicably failed to follow the law in making the final decision.

The test the Administrator purported to apply, which depends entirely on the size of the project and the potential for "significant" impact on New Jersey, not only violates the express provisions of the DWPA but was expressly rejected by Congress in enacting that law. The Senate version of the bill that became the DWPA would have permitted designation of an additional State as an "adjacent coastal State" under three criteria. The first two approaches were carried forward into Section 1508(a)(1) – whether the State was "connected by pipeline to a deepwater port" or whether it was "located within 15 miles of any component of a deepwater port." The third approach in the Senate bill would have permitted designation of an additional "adjacent coastal State" if the State:

would in the opinion of the Administrator of the National Oceanic and       Atmospheric Administration experience <u>substantial environment risk</u> should an oil or natural gas discharge occur from the deepwater port or from a vessel       operating in the safety zone around the port.

S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7530. The third approach thus would have permitted designation of a second State as an adjacent coastal State based on the size of the potential environmental impact alone, and without consideration of the extent of the relative impacts of the project on the environments of the petitioning State and the State directly connected by pipeline to the port.

The Executive Branch objected strongly to inclusion of any provision that would have allowed designation of a second State as an "adjacent coastal State," and thus the granting of a veto power to a second State, based solely on whether the environmental risk to it could be

# VENABLE LLP

December 3, 2007
Page 10

characterized as "significant" or "substantial." In particular, the Secretary of the Interior raised the concern that:

> the third condition . . . would extend this [the opportunity to prevent construction of a proposed deepwater port] to States that are some distance from the proposed facility and that may be affected by a possible oil spill. The provision is so broad that if it is not deleted, it is questionable whether any deepwater port will be constructed.

1974 U.S.C.C.A.N. at 7591 (emphasis added).

The Conference Committee thereafter deleted the provision to which the Administration objected and replaced it with the current version of Section 1508(a)(2). It creates a third pathway that permits designation of a second State as an "adjacent coastal State" only if the implementing agency determines that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Conf. Rep. No. 93-1605, reprinted in 1974 U.S.C.C.A.N. 7622, 7636.

In sum, the Administrator's designation of New Jersey as an additional "adjacent coastal State" plainly violated the DWPA, because he failed to apply the legal standard that Congress actually adopted in Section 1508(a)(2) and followed instead an approach that Congress considered and explicitly rejected in 1974.

3. The Record Contains No Evidence on Which the Administrator
Could Have Based a Lawful Determination that the Risk of Harm to
the Coastal Environment of New Jersey Was "Equal to or Greater Than"
the Risk of Harm Posed to the Coastal Environment of New York.

The record on which the Administrator based his decision did not contain any factual evidence on he could have found that the risk of harm to the coastal environment of New Jersey was "equal to or greater than the risk posed to" the coastal environment of New York. The Administrator did not purport to make such a factual determination; the illegal test he applied allowed him to avoid making the required comparative analysis. Indeed, the total absence of factual support means that no rational decision maker could have concluded that New Jersey satisfies the statutory criterion for designation as an additional "adjacent coastal State".

It is our understanding that the one and one-quarter page letter submitted by NOAA on October 17, 2007 contained no meaningful analysis of the risk of damage that the Safe Harbor Energy project would have on the coastal environments of either New York or New Jersey. We

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 11

further understand that the NOAA letter did not attempt to perform a comparative analysis of whether the risk to the coastal environmental of New Jersey would be equal to or greater than the risk to the coastal environment of New York.

This is understandable because, as noted above, the request submitted by the Governor of New Jersey slightly exceeded two pages in length. The letter contained no facts, documentation, or analyses to quantify the actual environmental risk presented to the State, as required by the Coast Guard rule. Rather, the letter contained four paragraphs of lawyers' arguments, unsupported by evidence, that specific aspects of the New Jersey coastal environment would be adversely affected by the project. It concluded with an unsubstantiated assertion that the risk to the coastal environment of New Jersey would be equal to or greater than comparable risk to the coastal environment of New York. New Jersey's request did not even attempt to discuss or quantify the environmental risks faced by New York.

Thus, even if New Jersey had provided actual data about the potential adverse effects it might suffer, its letter still could not have provided a valid legal basis for the Administrator's conclusion because it provided no basis for performing the required comparative analysis of the effects on both States. Further, the letter submitted by ASIG on September 24, 2007 demonstrated why the failure of New Jersey to submit actual evidence concerning the risk to its coastal environment did not satisfy Section 1508(a)(2).

This scant submission by New Jersey cannot provide a lawful basis for its designation as an "adjacent coastal State" under the procedures and substantive standards that have been followed beginning shortly after the DWPA was enacted.

In early 1976, Arthur D. Little, Inc. issued a Final Report to the Coast Guard, "Methodology for Designation of Adjacent Coastal States:"

> to define internal Coast Guard procedures to implement Section 9(a)(2) of the Act [33 U.S.C. § 1508(a)(2)] and Section 148.217 of the [Coast Guard] regulations. Specifically, this report identifies data necessary to make adjacent coastal State determinations, presents a risk analysis technique for evaluating such data, and describes a format for comparing risks to the coastal environment on a State-by-State basis.

U.S. Coast Guard Report No. CG-WDWP-1-76 (revised March 12, 1976) ("Methodology Report") at 3. (Attachment 5)

# VENABLE LLP

December 3, 2007
Page 12

The Methodology Report provided that the Coast Guard is (1) to assess, based upon interpretation of the license applicant's data, independent risks to the coastal environments of the States directly connected by pipeline to the port; then (2) evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential environmental damage it submits; and finally (3) make a comparison of the risks to the coast environment of each State on a resource-by-resource basis. In this process, the Coast Guard also considers the recommendation submitted by the Administrator of NOAA. Id. at 6.

The Methodology Report makes clear that the petitioning State must do more than merely assert the potential for environmental harm to its coastal environment. The Report states that "Petitioning States claiming damage potential from deepwater port-related developments should quantify the extent to which these indicators (or other factors) are the basis for their claim." Id. at 22. The Report also provides that the agency officials reviewing the request for designation as an additional "adjacent coastal State":

> will consider evidence in those categories of concern identified by the petitioning State. However, they will also have available (and consider) data on all categories for the "pipeline" State as submitted by the applicant for a deepwater port license. This implies that petitioning States should attempt to present as comprehensive a package of evidence as possible, in order not to foreclose comparative evaluation in categories which will be examined for the "pipeline" State.

Id. at 42. Finally, the Methodology Report states:

> Thus, in order for the resultant decision to be justifiable and open to scrutiny, the individuals involved bear a responsibility to document the value judgments and rationale behind their decisions.

Id. at 7.

The Maritime Administrator's decision in the Safe Harbor Energy matter stands in sharp contrast with the procedures that were followed, the evidence that was assembled, and the record on which the decision was based in prior cases in which a State requested designation as an additional "adjacent coastal State."

For example, in February 1976, the Coast Guard referred to NOAA for comment the request of Florida for designation as an additional "adjacent coastal State" with respect to the proposed Seadock deepwater port. On March 25, 1976, NOAA submitted a 233 page report to the

VENABLE LLP

December 3, 2007
Page 13

Coast Guard, "Analysis of the Risk of Damage to the States of Florida and Texas from the Seadock, Inc. Proposed Deepwater Port." (Attachment 6)  That report analyzed in detail the facts concerning whether the risk of harm to the coastal environment of Florida was equal to or greater than the risk of harm presented to the coastal environment of Texas, the State to which the port would be connected by pipeline.  Importantly, the report refers to a legal opinion by the Chief Counsel of the Coast Guard, which was then within the Department and charged then as now with running the DWPA license application process, concerning the requirements of Section 1508(a)(2). The report states that the opinion concluded that "[t]he Congressional intent behind section [1508(a)(2)] mandated a thorough evaluation of all possible risks to the coastal environment of the respective states" in determining whether an additional "adjacent coastal State" may be designated. Id. at 5.  Florida's application ultimately was denied.

The effort exerted by NOAA in analyzing the facts related to the request for designation as an "adjacent coastal State" in the Seadock project stands in stark contrast to the near total absence of evidence and analysis in its short letter and in the record on which the Administrator based his decision on the Safe Harbor Energy project.  From the State's failure to submit the evidence required by the Coast Guard rule and the scarcity of evidence in the record, it is clear that the Maritime Administrator made no comprehensive analysis of the facts; made no attempt to examine systematically or quantify the relative risks to the coastal environments of New Jersey and New York, as required by the statute; and provided no factual support for the rationale that the Administrator followed in designating New Jersey as an "adjacent coastal State."  For these reasons, the November 2, 2007 decision violates Section 1508(a)(2) and should be overturned.

<u>Conclusion</u>

For the reasons set forth above, the Administrator's November 2, 2007 decision designating New Jersey as an "adjacent coastal State" for the Safe Harbor Energy project is invalid as a matter of law and should be reconsidered and overturned.

After the withdrawal of the prior decision, New Jersey would still be able to have its concerns fully addressed in the comprehensive environmental, safety, and national security reviews that federal agencies will conduct to determine whether the Safe Harbor Energy port should be licensed and, if so, under what terms and conditions.  The DWPA <u>requires</u> that any State which is not designated as an adjacent coastal State "<u>shall have</u> the opportunity to make its views known to, and <u>shall be given full consideration</u> by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added).

Thus, if the Administrator's decision is vacated, the only effect would be that New Jersey would not have the plenary power to veto the project or to impose binding conditions upon the

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 14

licensing of the port. But the State would be able to work with the Coast Guard and the Maritime Administration to develop appropriate environmental protections. This is precisely the outcome that Congress intended when it adopted a law which provided that in order to enjoy the greater authority enjoyed by an "adjacent coastal State," a requesting State must show that the risk of harm to its coastal environment would be equal to or greater than that of the State that is connected to the port by pipeline.

I am most appreciative of the opportunity to present these facts and arguments for your further consideration. I will be pleased to provide any additional information that you may deem useful.

Sincerely,

Jim Burnley

Enclosures

cc: Admiral Thad W. Allen
    Commandant
    United States Coast Guard

**9**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ATLANTIC SEA ISLAND GROUP LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **SEAN T. CONNAUGHTON** | ) | |
| **Administrator** | ) | |
| **Maritime Administration, and** | ) | |
| | ) | |
| **MARY E. PETERS,** | ) | |
| **Secretary** | ) | |
| **Department of Transportation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF DAVID G. DICKMAN

I, David G. Dickman, declare and say as follows:

1. I am an attorney with the Firm of Venable LLP, 575 7th Street, N.W., Washington, D.C. 20004-1601.

2. I represent the Atlantic Sea Island Group ("ASIG") as counsel for purposes of matters related to its application for a federal license to construct and operate the Safe Harbor Energy LNG Deepwater Port.

3. During the course of my representation of ASIG, an issue arose regarding the third party environmental consultant that had been contracted by ASIG to provide support and assistance to the United States Coast Guard to allow them to conduct the environmental analysis required by the National Environmental Policy Act ("NEPA") for processing of the license application. As a consequence of issues arising from a change of the environmental consultant, by letter dated October 24, 2007, the Coast Guard and the Maritime Administration stated that they were suspending the time line for processing of the application until such time as information required to address this issue and issues related to an independent financial review required under the Letter of Completeness issued for the application were resolved. (Attachment).

4. Subsequently, by letter dated November 2, 2007, the Administrator of the Maritime Administration designated the State of New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy LNG Deepwater Port license application. On November 29, 2007, I attended a meeting between representatives of ASIG and representatives of the Coast Guard and the Maritime Administration to address the

issues that had resulted in suspension of the time line. At that meeting, ASIG was informed orally that the time line suspension would not be lifted until such time as the issue of the adjacent coastal State status of New Jersey was resolved, as ASIG had previously indicated that it had planned to appeal the designation.

5. On December 3, 2007, ASIG submitted to the Administrator of the Maritime Administration and the Secretary of Transportation a formal request for reconsideration of the designation of the State of New Jersey as an adjacent coastal State. On December 14, 2007, I attended a meeting between representatives of ASIG and the Maritime Administrator, along with staff members from the Maritime Administration and the Coast Guard, to address issues raised in ASIG's request for reconsideration. At that meeting, ASIG was once again orally informed that the time line suspension would continue until the issue of the adjacent coastal State status of New Jersey was resolved.

David G. Dickman

Sworn to before me this
_____ day of February 2008

Notary Public

Karen A. Jackson
Notary Public, District of Columbia
My Commission Expires 10/31/2010



U.S. Department of
Homeland Security

United States
Coast Guard

October 24, 2007

Atlantic Sea Island Group LLC
Attn: Mr. William VanHerwarde
Executive Vice President
Chrysler Building
405 Lexington Avenue, 26th Floor
New York, NY 10174

Dear Mr. VanHerwarde:

This letter is in regard to Atlantic Sea Island Group LLC's (ASIG) pending application for a license under the Deepwater Port Act of 1974 (DWPA) (33 U.S.C. §§1501 et seq) to own, construct, and operate the Safe Harbor Energy LNG Deepwater Port and associated pipeline off the coast of New York in federal waters. Our letter of August 15, 2007, indicated that based on a review by the US Coast Guard and other federal agencies, ASIG's application for the Safe Harbor Energy project appeared complete for purposes of processing under the DWPA.

In that letter we also indicated that an environmental consultant was necessary to assist the Coast Guard in developing the Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA) and the DWPA. You agreed to provide a Third Party Contractor for that purpose. You also agreed to provide for a contractor to conduct a comprehensive study of the impacts associated with decommissioning of the proposed island after its useful life, including an independent financial review of cost estimates associated with removal of the island. Incorporated into the completeness letter was an agreement made August 6th with Maritime Administration officials that a comprehensive study of the impacts associated with decommissioning, including an independent financial review of cost estimates for removal of the island, would be completed and included in the Draft EIS. In the Coast Guard's letter of August 14, 2007, Mr. Prescott indicated our desire to use the selected third party contractor to perform the project's decommissioning plan and independent financial review of associated costs. He also indicated the likelihood that new requirements arising that may exceed the scope of the existing contract and indicated our desire that you resolve these contract issues promptly.

To date you have executed a contract with the Coast Guard selected environmental consultant, who has begun work under the direction of Coast Guard and Maritime Administration on both the Draft EIS and required decommissioning information. We have been informed by both the environmental consultant and you that differences exist in the interpretation of the contract. The resolution of these differences has resulted in a delay or suspension of work necessary for the Maritime Administration and Coast Guard development of information to fulfil their obligations under DWPA and NEPA. We discussed potential impacts of the delay with you during our meeting at Coast Guard headquarters on October 23, 2007.

Based on the need for additional information, and as allowed under 33 CFR Sec. 148.107, we have determined that in order to complete the EIS for this project within the timeframe required by the DWPA, we must suspend the time line for processing the license application until the required information has been received and found to be sufficient to incorporate into the EIS. The period of this suspension shall not be counted in determining the date prescribed by the time frames set out in the 33 USC §§1504(g) and 1504(i)(1) of the DWPA.

develop a technically sound EIS in accordance with NEPA, and to provide adequate information for the Maritime Administrator to use in making a determination on the license application. We appreciate your efforts in working with us to achieve this goal. If you have any questions you may contact us, or the Coast Guard's project manager for the Sage Harbor Energy project, Mary Kate Jager at 202-372-1454.

Sincerely,

MEA PRESCOTT
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
By direction

H. KEITH LESNICK
Director, Office of Deepwater Ports Licensing
and Offshore Activities
U.S. Maritime Administration

**10**



**State of New Jersey**
Office of Economic Growth
PO Box 001
Trenton, NJ 08625-0001
(609) 292-9000

December 21, 2007

Admiral Thad Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

I am writing to strongly support the decision reached on November 2, 2007 by the Maritime Administration designating New Jersey an adjacent coastal state under the Deepwater Port Act for the proposed Safe Harbor deepwater port project and to strongly object to the applicant's assertion that the designation was erroneous. I urge you to uphold your November 2, 2007 decision. It is my understanding that, as noted in Mr. Connaughton's November 19, 2007 letter to James Burnley, representing Atlantic Sea Island Group, LLC, there is no administrative appeal process set forth in the Deepwater Port Act. Furthermore, New Jersey meets the criteria for designation as an adjacent coastal state. I look forward to working closely with the U. S. Coast Guard, Maritime Administration and State of New York to properly address the region's energy needs while protecting the economy and environment of New Jersey and New York.

Sincerely,

Jon S. Corzine

11



U.S. Department
of Transportation
**Maritime
Administration**

FEB - 8 2008

James H. Burnley IV
Venable LLP
575 7th Street, NW
Washington, D.C. 20004-1601

Re:  Safe Harbor Energy LNG Deepwater Port—Request for Reconsideration of
Designation of New Jersey as an "Adjacent Coastal State"

Dear Mr. Burnley:

This is in response to your letter of December 3, 2007, in which you made certain claims
regarding the Maritime Administration's finding that New Jersey qualifies as an Adjacent
Coastal State as defined by the Deepwater Port Act of 1974, as amended.  We note that,
in response to your earlier request of November 13, 2007 we emphasized that there is no
right to appeal the Adjacent Coastal State (ACS) designation under the Deepwater Port
Act of 1974, as amended (DWPA), and by that letter we accommodated your concerns by
extending to you and your client the opportunity to provide arguments presumably to
explain, in opposition to our finding, why New Jersey's coastal environment is <u>not</u>
subject to risk equal to or greater than that posed to New York's (NY).  You have now
supplied us with your arguments to reconsider the designation of New Jersey (NJ) as an
ACS.

The salient factor distinguishing NY and NJ under the statute is the proximity of the port
to each State.  The proximity requirement of 15 miles was not meant to bar consideration
of the potential of environmental impact to NJ, a State located at the 19-mile mark from
the proposed site.  Likewise, the fact that NY is within 15 miles of the proposed site,
which, as intended by Congress, represents a clear indication of the legitimate interest
and risk posed to NY, does not establish a finding that the proposed DWP's pipeline
poses no environmental risk to any other State.  Rather, as evidenced by Section
1508(a)(2) of the DWPA, Congress recognized the importance of including other States
not meeting the § 1508(a)(1) criteria of proximity or direct connection, and intended for a
State with legitimate and regional interest to be afforded the opportunity to make a case
to the Secretary of Transportation for special consideration.  Accordingly, a review was
made of the available information within the statutory period, and the ACS status was
issued under the discretionary authority of the Secretary of Transportation as delegated to
the Maritime Administrator.  49 C.F.R. § 1(i)(6); § 1.66(aa)(a)(1)-(2).  The Secretary
expressly delegated the authority to the Maritime Administration to process deepwater

port license applications in coordination with the Commandant of the Coast Guard. §
1.66(a)(2).

In our determination letter designating NJ an ACS, the Maritime Administration
concluded that NJ met the definition under Section 1508(a)(2) of the DWPA. Section
1508(a)(2) establishes the standard to be applied, "that there is a risk of damage to the
coastal environment of such State equal to or greater than the risk posed to the State
directly connected by the pipeline to the proposed deepwater port." In crafting this
specific section of the statute, Congress intended to provide regional interests not meeting
the proximity or direct connection requirement a role in the decision-making process if it
could be evidenced that the risk of damage to their coastal environment was equal to or
greater than the risk posed to the 1508(a)(1) designee. Congress was careful to limit
involvement and thus crafted a standard that would narrow the field of interests seeking
to be designated as an Adjacent Coastal State. In crafting Section 1508(a)(2), Congress
provided an alternative to the physical construct of (a)(1) and sought an equitable
approach. There is no better example of legitimate regional interests under the Safe
Harbor proposal than that of NY and NJ. NY and NJ have historically shared
environmental and economic concerns due to their geographic proximity, predominant
ocean currents from NY toward NJ, and common industry. They share the port and its
facilities. The staging areas for the construction and operation of the Safe Harbor DWP
implicate NY and NJ without distinction. Alternate sites required under the National
Environmental Policy Act to be reasonably foreseeable bring the possible final site to
within 9 miles of NJ, and both NY and NJ share equally in the inherent risk of losing the
Cholera Bank fishery.

With regard to the claim that I acted outside my delegated authority in unilaterally
making the designation, I disagree. You argue that the Homeland Security Act of 2002
transferred the authority of the USCG to make an ACS determination to the Department
of Homeland Security; however, the USCG was never delegated the authority to make a
§ 1508(a)(2) ACS determination and therefore the Homeland Security Act of 2002 did
not transfer that authority. In fact, that authority was reserved for the sole discretion of
the Secretary of Transportation, and was exercised only twice before, in 1976 to deny
Mississippi and Florida ACS status. The Secretary reserved that authority until
delegation to the Maritime Administrator in 2003. (68 FR 36496); 49 CFR § 1.66(aa)(2).
Consistent with the view of the USCG, as evidenced by the rulemaking published in 62
FR 11382 (1997), the Secretary first made a partial delegation of his DWPA authority to
the Maritime Administration in coordinated efforts with the USCG. Through the 2003
delegation, the Secretary delegated his remaining authority to the Maritime
Administrator, and both the USCG and the Department of Transportation have correctly
interpreted that delegation to establish the Maritime Administration as the lead decision-
making agency, which encompasses the issuance of § 1508(a)(2) ACS determinations.
The purpose of the 2003 rulemaking was to clarify certain previous delegations and to
delegate remaining authority to the Maritime Administration to implement the DWPA,
which had been recently amended in 2002. In stark contrast to your interpretation, the

2

USCG and the Maritime Administration have agreed that review of the record and the 1997 and the 2003 rulemakings establishes that once-reserved Secretarial authority, historically exercised in making ACS determinations, has been delegated exclusively to the Maritime Administrator.

Contrary to your argument that USCG regulation 33 C.F.R. § 148.217(d) provides clear evidence of delegated authority in the Commandant, a delegation to the Maritime Administrator in determining an ACS is more consistent with the overall allocation of responsibilities under the DWPA. Accordingly, both the Maritime Administration and the USCG have agreed that authority to make substantive decisions not specifically delegated, and those arising above processing decisions, are subject to the Maritime Administration as the lead decision making agency. Furthermore, Part 148 cannot be genuinely argued to evidence a delegation to the Commandant in making ACS determinations because the regulations in their current form are ambiguous. For example, 33 C.F.R. § 148.5(3) provides that only the Maritime Administrator will designate an ACS under 33 U.S.C. § 1508(a)(2) while 33 C.F.R. § 148.217(d) provides that the USCG Commandant will make an ACS designation. Even with the inconsistencies of the current USCG DWPA regulations, both agencies are in agreement as to their respective roles and authority. As my office advised ASIG just after receiving the New Jersey request, both federal agencies agree that the Maritime Administration alone has the authority to designate § 1508(a)(2) ACS status for DWPA projects and that the agencies are working together to address the ambiguities in the regulations.

You also claim that we applied an improper standard and that a factual finding is required to be released. A full and comprehensive reading of our November 2nd determination makes clear that the basis for designating NJ an ACS was in accordance with Section 1508(a)(2) of the statute, which sets forth the "equal to or greater" risk standard:

> "1508(a)(2) The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. This paragraph shall apply only with respect to requests made by a State not later than the 14th day after the date of publication of notice of an application for a proposed deepwater port in the Federal Register in accordance with section 1504(c) of this title. The Secretary shall make the designation required by this paragraph not later than the 45th day after the date he receives such a request from a State."

You argue that we applied an invalid standard of "significant impact." That simply is not the case. As we stated in our determination, "upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have

determined that New Jersey is an Adjacent Coastal State <u>as defined under the Act</u> and is so designated…"(emphasis added)  Our determination clearly incorporates the standard of "equal to or greater than" as defined in the statute and therefore your characterization of the standard that was applied is incorrect.

As to a factual finding, the statute requires nothing further than a decision be made by the Administrator, by delegation from the Secretary, of whether the State meets the requirements of the statute to be designated an ACS.  There is no basis in the statute for your claim that our finding be subject to public scrutiny.  The 1976 Mississippi ACS determination signed by the Secretary of Transportation cited only the sources used to assist in the determination and did not include a detailed finding.  Furthermore, although you have obtained the NOAA recommendation from 1976, it is unclear whether that recommendation was formally released to the general public.  Upon comparing my November determination to that of the Secretary's Mississippi determination from 1976, the bases offered in the determinations are equivalent.  Both offer a basic justification and neither adds details of the rationale itself.

ASIG assails NJ's presentation of its case on, among other bases, its lack of documentation and support, comparing it unfavorably to those of earlier ACS cases. This approach is unpersuasive. When the prior ACS issues were resolved, in 1976, the US, and the world generally, had substantial experience with oil spills. The basic interplay among oil viscosity, water salinity, temperature, currents, and other factors was understood, although not so well as now. By contrast, the world at this time knows very much less about LNG spills, on land or water. When, in 1979 and 1980, DOT established the regulatory framework for LNG plants, the primary concerns were explosion and fire, especially in proximity to population centers. An LNG-fueled explosion or fire at a place as far removed from population centers as is proposed here would likely have some, but less, impact directly on individuals but may have significant impact on the marine environment. Since all interests, including NOAA, agree that the currents there run toward NJ, the risk from such a fire or explosion is at least as great to NJ's coastal environment as to NY's. Note: I do not at this juncture need to decide relative harm between the two States; I need only decide the relative risk of harm, and I see NJ's as at least equal to NY's.

I use this example as just that, an example, because I agree with you that the comparative risk analysis must evaluate the totality of impacts.

You also rely heavily on a methodology report prepared by Arthur Little to argue that our determination could not be properly supported.  However, it is unclear whether the conclusions and guidance offered in the Little report were ever followed since it was published only 13 days before the 1976 NOAA recommendation and the following issuance of the Section 1508(a)(2) ACS determination by the Secretary.  What is clear, however, is the description in the preface to the Little report authored by the then Manager of the Deepwater Ports Project, Captain K.G. Wiman.  He wrote, "The contents

4

of this report do not necessarily reflect the official view or policy of the Coast Guard, and they do not constitute a standard, specification, or regulation." The Little report's preface recognizes that the methodology is not the official view of USCG and reflects the USCG understanding that each case would offer unique challenges in the availability and analysis of data. The Captain's statement also reflects deference to the Secretary as the ultimate decision-maker and to the discretion in his authority to make the ACS determination. The authority to make the designation is clearly at the discretion of the Secretary of Transportation as provided by the statute, with no requirement to concur with NOAA or USCG, or to follow USCG methods or publish a factual finding.

You claim that the time had expired for us to respond to the Governor's request. The official date the Administrator is deemed to have received the Governor's request was September 18, 2007. Because there are so many forms in which to communicate, it is necessary and practical to the proper implementation of the statute that we establish one method as the official method of receipt for the Administrator. The September 18th date is based not on telephone, email, fax, or docket notices but on the date the letter request was posted to the Administrator's controlled correspondence database. The NJ ACS determination was made on the very last day provided under the statute in an effort to grant all due consideration to the issues given the strict timeframe for making the designation.

In conclusion, the determination designating NJ ACS status was made under the authority of the Secretary of Transportation as delegated to the Maritime Administrator pursuant to delegations published in 68 FR 36496 (June 18, 2003) and 62 FR 11382 (March 12, 1997). Both Federal agencies, the Maritime Administration and the United States Coast Guard, interpret the delegations to provide exclusive authority to the Maritime Administrator to make such a decision even when faced with contradictory USCG regulations.

The ACS designation was made following the statutory standard pursuant to Section 1508(a)(2) and the rationale was formed using the data available within the 45 day timeframe. As contemplated by Congress, the statutory authority vested in the Secretary and delegated to the Maritime Administrator is discretionary, and was properly exercised to make an interlocutory decision based on the unique set of facts, procedural requirements, and regional interests of the State of NJ within the strict statutory timeframe for the review and processing of DWP applications.

Thank you for supplying us with your arguments for consideration. As a result of a thorough and comprehensive review, my determination designating the State of New Jersey an Adjacent Coastal State for purposes of the Safe Harbor deepwater port application remains unaltered. It is my hope that we can move forward in the processing of the Safe Harbor application to include the State of New Jersey in its role as an Adjacent Coastal State.

If you have any further questions or concerns please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:     The Honorable Frank R. Lautenberg
        The Honorable Jon S. Corzine
        The Honorable Frank Pallone

6

**12**



ADA024483



One Source.  One Search.  One Solution

# METHODOLOGY FOR DESIGNATION OF ADJACENT COASTAL STATES

LITTLE (ARTHUR D) INC CAMBRIDGE MASS

12 MAR 1976



Downloading...

U.S. Department of Commerce
**National Technical Information Service**

# One Source. One Search. One Solution.



## Providing Permanent, Easy Access to U.S. Government Information

The National Technical Information Service is the Nation's largest repository and disseminator of government-initiated scientific, technical, engineering, and related business information. The NTIS collection includes almost 3 million information products in a variety of formats: electronic download, online access, DVD, CD-ROM, magnetic tape, diskette, multimedia, microfiche and paper.





### Search the NTIS Database from 1990 forward

More than 600,000 government research information products have been added to the NTIS collection since 1990. All bibliographic entries for those products are searchable on the NTIS Web site at www.ntis.gov.

### Download Publications (1997 - Present)

NTIS provides the full text of many reports received since 1997 as downloadable PDF files. When an agency stops maintaining a report on its Web site, NTIS still offers a downloadable version. There is a fee for each download of most publications.

For more information visit our website:

# www.ntis.gov



U.S. DEPARTMENT OF COMMERCE
Technology Administration
National Technical Information Service
Springfield, VA 22161

AD A024483

REPORT NO. CG-WDWP-1-76

METHODOLOGY FOR DESIGNATION OF ADJACENT

COASTAL STATES

C. B. Cooper, M. C. Huston, and A. S. Kalelkar



DECEMBER 1975

FINAL REPORT

REVISION 1, 12 MARCH 1976



Document is available to the public through the
National Technical Information Service,
Springfield, Virginia 22161

# DEPARTMENT OF TRANSPORTATION
# UNITED STATES COAST GUARD
# DEEPWATER PORTS PROJECT
# WASHINGTON, D. C. 20590

This document is disseminated under the sponsorship of the Department of Transportation in the interest of information exchange. The United States Government assumes no liability for its content or use thereof.

The contents of this report do not necessarily reflect the official view or policy of the Coast Guard, and they do not constitute a standard, specification, or regulation.

This report, or portions thereof, may not be used for advertising publications, or promotional purposes. Citation of trade names and manufacturers does not constitute endorsements or approval of such products.

K. G. WIMAN
Captain, U. S. Coast Guard
Manager, Deepwater Ports Project
U. S. Coast Guard Headquarters
Washington, D. C. 20590

Technical Report Documentation Page

| 1. Report No. | 2. Government Accession No. | 3. Recipient's Catalog No. |
|---|---|---|
| CG-WDWP-1-76 | | |

| 4. Title and Subtitle | | 5. Report Date |
|---|---|---|
| Methodology for Designation of Adjacent Coastal States | | December 1975 |
| | | 6. Performing Organization Code |

| 7. Author's | 8. Performing Organization Report No. |
|---|---|
| C. B. Cooper, M. C. Huston, A. S. Kalelkar | C-78784-26-R |

| 9. Performing Organization Name and Address | 10. Work Unit No. (TRAIS) |
|---|---|
| Arthur D. Little, Inc. | |
| Acorn Park | 11. Contract or Grant No. |
| Cambridge MA 02140 | DOT-CG-52269-A |
| | 13. Type of Report and Period Covered |

| 12. Sponsoring Agency Name and Address | |
|---|---|
| Commandant (G-WDWP) | |
| U. S. Coast Guard | Methodology |
| Deepwater Ports Project | 14. Sponsoring Agency Code |
| Washington DC 20590 | G-WDWP |

15. Supplementary Notes

Revised 12 March 1976

16. Abstract

This report sets forth the methodology that will be used to identify environmental considerations in the processing of petitions for Adjacent Coastal State status pursuant to Section 9 of the Deepwater Port Act of 1974 (Public Law 93-627). Additionally, it identifies the types and format of data needed for such considerations.

| 17. Key Words | 18. Distribution Statement |
|---|---|
| Deepwater Ports | |
| Risk Analysis | Unlimited |
| Coastal Zone | |
| Environmental Impact | |

Prices Subject to Change

| 19. Security Classif. (of this report) | 20. Security Classif. (of this page) | 21. No. of Pages | 22. Price |
|---|---|---|---|
| Unclassified | Unclassified | 78 | $5.00 |

METHODOLOGY FOR DESIGNATION OF ADJACENT

COASTAL STATES

FINAL REPORT TO

THE UNITED STATES COAST GUARD

Arthur D. Little, Inc.

Cambridge, Mass. 02140
C-78784-20

December 1975

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| List of Tables | | iii |
| List of Figures | | iv |
| I. | CONCEPTUAL FRAMEWORK | 1 |
| | A. BACKGROUND AND PURPOSE | 1 |
| | B. DEFINITIONS AND ASSUMPTIONS | 4 |
| | C. RATIONALE FOR THE PROPOSED METHODOLOGY | 6 |
| II. | METHODOLOGY FOR DESIGNATION OF ADJACENT COASTAL STATES | 8 |
| | A. DATA REQUIREMENTS | 8 |
| | B. ENVIRONMENTAL RISK METHODOLOGY | 23 |
| | C. FORMAT FOR QUANTIFICATION OF DAMAGE ON A STATE-BY-STATE BASIS | 38 |
| III. | CONSIDERATIONS REGARDING APPLICATION OF THE METHODOLOGY | 42 |
| APPENDIX I – ADDITIONAL SOURCES OF DATA ON CULTURAL RESOURCES IN GULF COAST STATES | | 45 |
| APPENDIX II–DETAILED ASPECTS OF ENVIRONMENTAL RISK METHODOLOGY | | 48 |

LIST OF FIGURES

| Figure No. | | Page |
|---|---|---|
| 1 | Potential Spill Events for Tankers | 24 |
| 2 | Single-Point Mooring Buoy Failure Combinations | 25 |
| 3 | Cumulative Distribution of Spill Sizes | 27 |
| 4 | Volume of Oil Spilled vs. Frequency of Occurrence | 33 |
| 5 | Miles of Shoreline Contaminated vs. Annual Probability of Occurrence | 33 |
| 6 | Display of Spill Risks | 37 |

iv

LIST OF TABLES

| Table No. | | Page |
|-----------|---|------|
| 1 | Physical Resources | 12 |
| 2 | Cultural Resources | 18 |
| 3 | Data Required to Establish Tanker Spill Causes | 20 |

1.  CONCEPTUAL FRAMEWORK

A.  BACKGROUND AND PURPOSE

Section 9 of the Deepwater Port Act of 1974 (P.L.93-627, or "the Act") provides for the designation of "adjacent coastal States"; and for the participation of such States in decisions concerning the licensing of Deepwater Ports.  This Section reads as follows:

ADJACENT COASTAL STATES

Sec.9(a)(1) The Secretary, in issuing notice of application pursuant to Section 5(c) of this Act, shall designate as an "adjacent coastal State" any coastal State which (A) would be directly connected by pipeline to a deepwater port as proposed in an application, or (B) would be located within 15 miles of any such proposed deepwater port.

(2) The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" _if he determines_ _that there is a risk of damage to the coastal environment of_ _such State equal to or greater than the risk posed to a State_ _directly connected by pipeline to the proposed deepwater port._ (Emphasis added.)  This paragraph shall apply only with respect to requests made by a State not later than the 14th day after the date of publication of notice of an application for a proposed deepwater port in the Federal Register in accordance with section 5(c) of this Act.  The Secretary shall make the designation required by this paragraph not later than the 45th day after the date he receives such a request from a State.

(b)(1) Not later than 10 days after the designation of adjacent coastal States pursuant to this Act, the Secretary shall transmit a complete copy of the application to the Governor of each adjacent coastal State.  The Secretary shall not issue a license without the approval of the Governor of each adjacent coastal State.  If the Governor fails to transmit his approval or disapproval to the Secretary not later than 45 days after the last public hearing on applications for a particular applica- tion area, such approval shall be conclusively presumed.  If the Governor notifies the Secretary that an application, which would otherwise be approved pursuant to this paragraph, is inconsistent with State programs relating to environmental protection, land and water use, and coastal zone management, the Secretary shall condition the license granted so as to make it consistent with

1

such State programs.

(2) Any other interested State shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port.

(c) The Secretary shall not issue a license unless the adjacent coastal State to which the deepwater port is to be directly connected by pipeline has developed, or is making, at the time the application is submitted, reasonable progress toward developing an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972 in the area to be directly and primarily impacted by land and water development in the coastal zone resulting from such deepwater port. For the purposes of this Act, a State shall be considered to be making reasonable progress if it is receiving a planning grant pursuant to section 305 of the Coastal Zone Management Act.

(d) The consent of Congress is given to two or more coastal States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the United States, (1) to apply for a license for the ownership, construction, and operation of a deepwater port or for the transfer of such license, and (2) to establish such agencies, joint or otherwise, as are deemed necessary or appropriate for implementing and carrying out the provisions of any such agreement or compact. Such agreement or compact shall be binding and obligatory upon any State or party thereto without further approval by Congress.

The Coast Guard developed a response to Section 9(a)(2) in Section 148.217 of the Department of Transportation regulations governing the licensing of Deepwater Ports (Federal Register, November 10, 1975):

(a) The Chief, Office of Marine Environment and Systems, in issuing a notice of application pursuant to section 5(c)(1) of the Act, designates as an adjacent coastal State each State which would be directly connected by pipeline to the deepwater port proposed in the application or which is within 15 miles of the proposed deepwater port. A State not designated as an adjacent coastal State in the notice of application may request to be so designated on the basis that the risk of damage to its coastal environment is equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port.

(b) Each request submitted under paragraph (a) of this section must:
(1) Be submitted in writing to the application staff within 14 days after the date of publication of the notice of application in

2

the FEDERAL REGISTER;

(2) Be signed by the Governor of the State;

(3) Set forth the facts and any available analyses in support of the request together with any available documentation concerning the risk of damage to the coastal environment of the requesting State that could occur as a result of the establishment of a deepwater port; and

(4) State why the requesting State believes the risk of damage to its coastal environment is equal to or greater than the risk posed to a State connected by a pipeline to the proposed deepwater port.

(c) The application staff transmits a copy of each request submitted in accordance with paragraph (b) of this section to the Administrator of the National Oceanic and Atmospheric Administration and requests his recommendations within a period of time that will allow the Secretary to determine the matter within 45 days after the date the request was received.

(d) If, after having received the recommendation of the Administrator of the National Oceanic and Atmospheric Administration, the Secretary determines that there is a risk of damage to the coastal environment of the requesting State equal to or greater than the risk posed to a State directly connected to the proposed deepwater port, he grants the request and designates the requesting State as an adjacent coastal State. If he determines that there is not such a risk, he denies the request and so notifies the Governor of the requesting State.

These regulations provide general guidance regarding Section 9(a)(2) and implement procedures for the mandatory designation of certain States consistent with Section 9 (a)(1). The purpose of this report is to define internal Coast Guard procedures to implement Section 9 (a)(2) of the Act, and Section 148.217 of the regulations. Specifically, this report identifies data necessary to make adjacent coastal State determinations, presents a risk analysis technique for evaluating such data, and describes a format for comparing risks to the coastal environment on a State-by-State basis.

B. DEFINITIONS AND ASSUMPTIONS

The following operational definitions and assumptions are central to the methodology presented below. "Coastal Environment" is defined in Section 3 of the Act as "the navigable waters (including the lands therein and thereunder) and the adjacent shorelines (including waters therein and thereunder). The term includes transitional and intertidal areas, bays, lagoons, salt marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and the recreational and scenic values of such lands, waters, and resources." Because of the geographic imprecision inherent in the phrase "adjacent shorelines," this definition is too ambiguous to be rigorously applied in the methodology presented below. For example, it is unclear whether such unavoidable port-related secondary development as onshore crude-oil storage facilities (e.g., tank farms) would be within the "coastal environment" as defined above. The geographical constraints of the "coastal environment" of a State as used herein means that portion of the State included within the boundaries of the Coastal Zone delineated by said State pursuant to Section 305 (b)(1) of the Coastal Zone Management Act of 1972 (P.L.92-583).*

Although the Deepwater Port Act defines "coastal State" (Sec. 3(7)) to include States bordering the Atlantic, Pacific, or Arctic Oceans or the Gulf of Mexico, this term is not used in Sec. 9(a)(2) of the Act. Liberal interpretation of this usage therefore permits consideration of States bordering the Great Lakes in this methodology. This has been done, since such States do have coastal zones delineated pursuant to the Coastal Zone Management Act.

In order to analyze the risk of oil-spill related damage to a State's coastal environment, one must specify the geographic boundaries within which ship movements and accident potential are to be evaluated. The options range from "within the designated Safety Zone" to "anywhere in the world." As a reasonable middleground, risks posed by tank vessels enroute to (or from) deepwater ports will be evaluated while

---

* "Sec.305(b) Such management program shall include: (1) an identification of the boundaries of the coastal zone subject to the management program."

4

they are in the Territorial Seas or Contiguous Zone of the United
States, or within fifty miles of the nearest land, or while they are
in waters overlying the Continental Shelf or Slope of the United States,
whichever distance is greatest.

For the purpose of this report, risk is defined by combining the
consequences of a damaging event with its probability of occurrence.
The Deepwater Port Act does not specify the types of environmental risk
to be considered in designating adjacent coastal States.  It is clear
from the legislative history of the Act that risks related to oil spills
were believed important (U.S. Senate, 1974).* It is also clear that
port-related development could create relatively significant damage to
coastal environments.  A good example is the overall air and water
quality impact potential of new refinery/petrochemical development.
Unlike oil spills, once constructed, such development would probably
have measurable impacts over the full operational lifetime of the port.
It is recognized that States could control such development in their
own coastal environments.  However, the environmental risks they would
pose are far less dependent upon the probability of accidents or
abnormal events than thos associated with oil spills.  Thus, the
methodology presented below provides for consideration of secondary
development impacts.

The present policy of the Department of Transportation allows States
the opportunity to show proof of environmental risk to their coastal
environments.  It is therefore assumed that the data requirements described
below would be fulfilled by petitioning States in their own interest.
Much of the data concerning States directly connected by prospective
pipelines to deepwater ports (i.e., "pipeline States") would be available
in the submittal of each applicant for a deepwater port license.  Data
may also be available from other sources, such as the Coast Guard's EIS
contractor.  Insofar as possible, efforts have been made to find "lowest
common denominators" as units of measure in the various resource
categories.  We have also attempted to identify relevant data sources
to assist States in meeting the tight deadlines mandated by Section 9(a)
(2).  (See Appendix I.)

---

*Joint report of the committees on Commerce; Interior and Insular Affairs;
and Public Works, U. S. Senate, together with additional views to accompany
S.4706, October 2, 1974.

5

C. RATIONALE FOR THE PROPOSED METHODOLOGY

In brief summary, the proposed methodology consists of the following steps. Each is discussed further in the balance of this report.

1. Receive State's request to be designated an adjacent coastal State, including all available supporting documentation supplied by the State.

2. Estimate, based upon interpretation of port applicants' data, independent risks to the coastal environment of any State directly connected by pipeline to the proposed deepwater port due to:

    a. Facilities and activities directly associated with the port (focusing on oil spills); and

    b. Port-related (secondary) development.

3. At the same time, evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential port-related damage anticipated by the petitioning State.

4. Compare the damage estimates from (2) and (3) without artificial aggregation to a single unit of measure (e.g., dollars). In other words, the risk of environmental damage to several States would be compared on a resource-by-resource basis.

5. Consider the recommendation submitted by the Administrator of NOAA in accordance with Section 9 (a)(2) of the Act.

6. Grant adjacent coastal State status to any petitioning State that appears to risk equal or greater damage to its coastal environment than would the "pipeline" State from either facilities and activities directly associated with the port or port-related (secondary) development.

Other proposed approaches to the evaluation of environmental damage risks associated with petroleum delivery options have attempted to aggregate risks to different resources by common units of measure, such as dollar damages. Such an approach was rejected in this effort,

principally because the ability to quantify State coastal resource values in dollar equivalents (or any other equivalent) is extremely limited. For example, in their migratory life histories, many commercially or recreationally valued organisms often utilize nursery or feeding habitat in one State's coastal environment while eventually being harvested in another. Knowledge of such factors is too limited to allow accurate apportionment of the dollar value of the habitats used by these resources among various States. In addition, it is rather difficult, if not impractical, to assign dollar damage estimates to the loss of such unique resources as rare or endangered species. This approaches the crux of the issue: i.e., that each individual assigns different value to each resource.

Steps 4 and 6 of this proposed methodology are designed to minimize the difficulties created by the inherently subjective nature of the comparison required to determine adjacent coastal State status. By only calculating estimates of relative risks to like resources in different States, arbitrary assignment of values to these resources is avoided. In reaching the ultimate decision on whether to grant "adjacent" status to a petitioning State, the individuals involved would of course, apply their preferred values to the various resources in the coastal environments of the petitioning and "pipeline" States. Thus, in order for the resultant decision to be justifiable and open to scrutiny, the individuals involved bear a responsibility to document the value judgments and rationale behind their decisions. In this respect, the rationale behind Step 6, in addition to the aforementioned importance of "secondary" development impacts, is that the Department of Transportation policy as of this writing is to adopt a liberal attitude towards considering the impact potentials for those States petitioning for adjacent coastal State status. However, a strict interpretation will be used in determining whether the risk of damage is "equal to or greater than" that posed to the pipeline State.

II. METHODOLOGY FOR DESIGNATION OF
ADJACENT COASTAL STATES

A.  DATA REQUIREMENTS

1.  Resources in the Coastal Environment

In order to obtain maximum value from the proposed spill-related risk analysis discussed below, all information concerning physical or cultural resources with known spatial distribution in the coastal environment should be delineated on one or more maps of identical scale.  The chosen scale should be sufficient to readily permit resolution of the locations of all resources within any 10-mile wide corridor in the State's coastal environment.  Petitioning States should reference the source of all data they submit.

a.  Physical Resources

Although there is no totally comprehensive inventory and delineation of vulnerable physical resources in coastal environments, the following two sources are useful indicators for the purpose of designating adjacent coastal States:

(1)  "Areas of particular concern" identified by States
     pursuant to funding under Section 305 (b)(1) of the
     Coastal Zone Management Act of 1972 (P.L. 92-583); and

(2)  Inventories recently published (or pending publication in the
     immediate future) by the Bureau of Land Management of the
     U.S. Department of Interior in conjunction with the Bureau's
     responsibilities to regulate activities on the Outer
     Continental Shelf.

Some of the data requirements described below may not be retrievable from either of these sources, but all are generally available to coastal States in the units of measure described.

Tidal Wetlands

As used in this report, the term tidal wetlands includes both marsh and mangrove communities.  Tidal wetlands are recognized as an important habitat and source of primary production for a wide variety of commercially

8

and/or recreationally valued living resources. They are also highly
vulnerable to contamination from petroleum developments. For example,
intensive studies in the Wild Harbor marsh near West Falmouth, Mass.
have shown the persistence of limitations on secondary (invertebrate)
productivity for at least four years in the aftermath of a small spill
of No. 2 fuel oil (Michael et. al., 1975).* Displacement of wetlands by
secondary development is another damage potential. The recommended unit
of measure for tidal wetland habitat is acres. Hectares is an acceptable
alternative. Because tidal wetlands of different salinity support
different biotic communities, States may wish to discriminate among them.
It is recommended that the threshhold for discrimination between high
and low salinity areas be in the range of 11-15 $^o/_{oo}$ (parts per thousand)
average salinity in the waters flushing the area.

<u>Estuarine Surface Water Systems</u>

Even the most contaminated estuaries in U.S. coastal waters appear
to retain habitat value for the more mobile members of the food web.
Like tidal wetlands, estuarine embayments, rivers, and tidal creeks
serve as principal habitat for commercially and/or recreationally
valued species, including a variety of shellfish. If spilled oil becomes
incorporated into the sediments of an estuarine water system, persistent,
long-term adverse impacts on species distribution and abundance can
result. Significant impacts due to oil on the surface or in the water
column could include mortality among larval fish (or shellfish) and
wintering waterfowl. Contaminant inputs to estuarine waters from
secondary development can have significant long-term adverse impact
potential. The recommended unit of measure for estuarine water systems
is acres (or hectares). As in the case of tidal wetlands, States may
wish to discriminate between high and low salinity estuarine areas.
The salinity criteria mentioned above are also recommended for estuarine
water systems.

---

* Michael, A.D., Van Raalte, C.R., and Brown, C.S., "Long-Term Effects
  of an Oil Spill at West Falmouth, Massachusetts," in Proceedings of
  the 1975 Conference on Prevention and Control of Oil Pollution,
  sponsored by American Petroleum Institute, Environmental Protection
  Agency, and U.S. Coast Guard.

### Selected Offshore Areas

Unlike estuarine systems, it could be misleading to categorically assign high vulnerability or habitat value to all offshore waters in a State's coastal environment. Certain offshore areas are disproportionately important to the marine ecosystem and/or populations of resources valued by man. These include spawning and feeding grounds, which often vary in location and degree of utilization (and vulnerability to oil spills) on a seasonal basis. Petitioning States should delineate such specific offshore areas and resource concentrations believed vulnerable to deepwater port-related impacts. This data should be presented in terms of surface acres (or hectares), with supporting documentation of the seasonality and abundance of particular resource concentrations believed to utilize or occupy the areas considered vulnerable. If a case can be made supporting vulnerability, mineral resource areas (e.g., sources of "clean" sand and gravel) will be considered along with habitat for living resources.

### Selected Onshore Areas

Certain onshore areas in the coastal environment are disproportionately vulnerable to either direct displacement or pollution loadings due to deepwater port-related development. These include designated (or pending) Air Quality Maintenance Areas (AQMA's) proposed "Class I" non-degradation zones for air quality, areas drained by Water Quality-Limited receiving waters, and habitats for rare and/or endangered species.

The first two types of areas represent regions where refinery or petrochemical development could conflict to a significant degree with State and/or EPA plans for the achievement of National Ambient Air Quality Standards or the prevention of significant air quality degradation. The size, nature (i.e., designated pollutants) and population of AQMA's in the coastal environment should be specified by States presenting claims of adverse air quality impact potential from deepwater port-related development. The area of any Class I non-degradation zones should also be specified.

Surface waters may be classified either "Effluent" or "Water Quality" Limited pursuant to Section 303 of the Federal Water Pollution

Control Act Amendments of 1972 (P.L. 92-500). The former classification implies that for the time being, new source dischargers practicing Best Available Demonstrated Control Technology would have acceptable impacts on surface water quality. In Water Quality-Limited waters, stricter controls (and greater impact potential) are implied. A State petitioning on the basis of adverse water quality impact potentials should delineate and identify any acreage (or hectares) drained by Water Quality Limited surface waters in its Coastal environment.

Habitat for rare and/or endangered species can be vulnerable to displacement or pollution. Procedures for the official designation of such habitat are currently being considered by the Bureau of Sport Fisheries and Wildlife in the Department of Interior. In the interim, States believing such habitats in their coastal environment to be vulnerable to deepwater port-related development should specify the nature, location, and amount (i.e., acres/hectares) considered vulnerable. Habitat for species on either State or Federal lists of rare/endangered/ threatened species will be considered.

States may consider other types of onshore habitats (e.g., floodplains or climax ecosystems) particularly vulnerable. If so, characterization, amount, and location of such acreage should be provided.

Table 1 summarizes the types of data requirements recommended above in support of petitions claiming damage risks to physical resources in the coastal environment. In addition to the listing in this table, a petitioning State should identify the total area of its coastal environment in acres or hectares.

b. Cultural Resources

Beaches

Sandy beaches represent some of the most valuable recreational shoreline along the coasts. The impact of a major oil spill on or near such beaches could range from "objectionable" to "severe recreational loss." If pollution incidents occurred during periods of normal heavy visitor use, loss of recreational enjoyment and use and the loss in economic benefit to the vicinity could be substantial.

Water sports occurring along the beach, such as surfing, swimming,

TABLE 1

PHYSICAL RESOURCES

| Resource | Measurement Unit | Area Delineation |
|---|---|---|
| Tidal Wetlands | Acres or hectares | 10 mile corridors and entire coastal environment |
| Estuarine Surface Waters | Acres or hectares | As above |
| Selected Offshore Areas | Acres or hectares | As above |
| Selected Onshore Areas | | |
| • Air Quality Maintenance Areas | Area (as above), population, designated pollutants | Entire coastal environment |
| • Class I Non-Degradation Zones | Area (as above) | As above |
| • Water Quality-Limited Surface Waters | Area of drainage (as above) | As above |
| • Habitat for Rare/ Endangered Species | Area (as above) | 10 mile corridors and entire coastal environment |

diving, spear fishing, underwater photography, fishing for finfish and shellfish, boating and water skiing would be directly affected by an oil spill reaching shore. Other beach-related activities such as beachcombing, shelling, seascape painting, shoreline nature study, camping and sunbathing would be unattractive or impractical during clean-up operations of affected areas.

If mechanical means are employed in beach clean-up operations (earth moving equipment), then shoreline equilibrium may be upset by such operations. Excessive removal of beach materials can lead to erosional problems unless enough sand and gravel, or other suitable replenishing material is available to replace the removed beach materials.

Recreational activities may be suspended in areas involved in major oil spills until clean-up operations are completed; hence, in addition to environmental damage, oil spills may cause economic loss and damage to amenities. A decline in attendance at public and private beaches fouled by oil represents an economic loss to a community and

12

region. Even a single slump in tourism due to an oil spill can have a severe impact on the economy of a coastal community. If the oil spill risk potential is great (and is realized), resort areas may acquire a bad reputation.

Indicators of potential environmental damage to beach resources in the coastal environment should be measured regarding:

1) Total miles of State continuous coastline;

2) Total miles of marine recreational beach; and

3) Recreational beach days (users).

All three measures should be specified by number according to 10 mile stretches on a map of the coastal environment.

Information on the beach resource category may be obtained from the Bureau of Land Management, State Coastal zone agencies and State tourism departments.

### Accomodations and Restaurants

Coastally-related tourism is a major industry for all coastal States, and for a few States it is one of the largest industries. Nearly 50 percent of the tourism dollar is spent on food and lodging. A major oil spill could have adverse consequences to the restaurant and lodging industries of the coastline. A Maritime Administration study estimated that a "worst-case" oil spill off of Delaware Bay could cause $2.8 billion in identified damages.* An important fraction of this sum was tourist-related.

The category of accommodations includes hotels, motels, resorts and rental condominiums along the shore front. Since information on the number of beds is usually not available, the number of rooms is the next best measure to use.

The category on restaurants should specify the number of establishments along the shore front.

---

* United States Department of Commerce, Final Environmental Impact Statement, Maritime Administration Tanker Construction Program, Maritime Administration, N.T.I.S. Report No. EIS 730725-F, 1973.

Total numerical estimates for each individual category should be delineated for each 10 miles of shore front and sites should be numbered on a coastal zone map.

Information on number of rooms in many accommodations is contained in the Hotel and Motel Red Book, published annually by the American Hotel and Motel Association (AHMA). Information is organized by State, by city, by establishment. Shore front establishments would have to be identified by address.

Information on number of shore front restaurant establishments may be obtainable from the State affiliates of the National Restaurant Association, 1530 North Lake Shore Drive, Chicago. Shore front establishments would have to be identified by address.

Sport Fisheries

Fishing is one of the great national sports. Far more money is spent by anglers in their pursuit than is expended by the crowds who patronize professional "spectator" sports such as football or baseball.* The 1970 Salt-Water Angling Survey of the National Marine Fishery Service reported that for the Eastern Gulf (including the Mississippi Delta) there were 1.5 million fishermen, who caught 189 million fish. An entire fishing equipment and services industry supplies, caters to and depends on the coastal angler.

A major oil spill could adversely affect sport fishing activity. Boat fishermen would not want to soil their boats by fishing in the vicinity of an oil slick and neither boat, pier nor surf fisherman would want to keep fish that had been coated or contaminated with oil.

States should indicate sport-fish catch on a unit-of-effort basis (pounds caught per day fished). Catch-per unit-of-effort should be identified and located by major fishing areas on a map of the coastal environment.

---

* Angler's Bible, Follett Publishing Company, 1975.

14

### Recreational Boating

Recreational boating is a multi-million dollar business on the coast. In 1970, there were over 750,000 motor boats registered in the Gulf Coast States (excluding sailboats, canoes, rice boats, duck boats, sailboards, catamarans/trimarans and houseboats). Recreational boating could be adversely affected by oil spills either by directly damaging equipment or economic loss due to denial of use.

Recreational boating data should be specified in terms of the number of marine recreational boat anchorages for each county or parish adjacent to the State shoreline. If comparative data cannot be developed for this first-choice measure, then the number of boat registrations (excluding commercial fishing boats) for each county or parish adjacent to the State shoreline will suffice. Data and county/parish delineations should be identified on a map of the coastal environment.

### Commercial Fisheries

Fish which are either externally coated or internally contaminated with oil are unmarketable as food. The fishery product may gain a poor reputation and the economic effect may far outlast the period for which the fish are actually tainted.

Commercial fishing resources may be measured and specified for vulnerable shellfish and finfish by catch per unit-of-effort, and value respectively. Catch per unit-of-effort, and value should be identified and located in major harvest areas on a map of the coastal environment.

Commercial catch data are available from the National Marine Fisheries Service.

Finfish landings are available by port by weight and dollar volume. An inherent problem in this data is the count of fish caught outside the State territorial limit, which will require estimation by State fishery agencies.

### Residential Dwellings

Billions of dollars have been invested to secure the atmosphere and recreational climate of seaside living. Oil contamination could

detract from that climate.

Residential dwellings should be indicated in terms of the total number of households in 1960 and 1970 located on the shoreline. Shoreline dimension for the residential dwellings category should be defined in geographical units of one mile inland depth and 10 miles coastal length. Geographical units should be numbered and identified on a coastal environment map.

Petitioning States should also provide an estimate of the total population of their coastal environments.

The number of households is available from decennial census (1960 and 1970) for SMSA's in terms of "block statistics" and for non-SMSA countries along the coastline by "enumeration districts." The latter (the "enumeration district" which is slightly larger than a "block" and slightly smaller than a census tract) is available on tape from the U.S. Bureau of Census.

Historical Sites

Historical sites (National and State parks, monuments, memorials, etc.) provide the underpinning for substantial tourism and recreation along the coastal shorelines and could be damaged by oil contamination. In addition, historic sites represent a cultural trust for future generations.

States should identify all nationally recognized historic sites in the coastal environment which could be threatened by oil spills. Historic sites should be listed by name, acreage and site number. The site number for each historic site location should be indicated on a coastal environmental map, delineated for each 10 miles of shore front.

The National Register of Historic Places, U.S. Department of Interior, may be supplemented with State publication or agency sources in locating each historic site.

Designated Natural Areas

Designated natural areas such as wildlife management areas, bird sanctuaries, wildlife refuges and wilderness areas (including estuarine and marine) reflect cultural recognition of the need for such areas to

16

be preserved in their natural state.  Oil spills could affect those managed areas within the intertidal and offshore coastal environment, impinging on the basic rationale for their creation.

Petitioning States should indicate the nature, acreage and location of each designated natural area in the coastal environment which could be damaged by oil contamination.  The site number for each area should be indicated on a coastal environment map.

### Archeological Sites

States may have sites within the intertidal and offshore coastal environment which contain archeological resources which could experience environmental damage from oil contamination.  Archeological materials soiled by an oil spill may not survive subsequent cleaning and restoration efforts.  Porous materials could be rendered unsuitable for carbon dating techniques.  Most artifacts are quickly destroyed by natural elements; the small amounts of identified archeological remains are valuable and in some cases providing the only clues to antiquity. The significance of damage to these sites (and objects) is that damage or destruction precludes meaningful study of the Nation's and coastal zone's heritage.

States should indicate the number of identified sites in the tidal zone and submerged areas in State waters.  The site number for each archeological location should be indicated on a coastal environment map.

### Scientific and Educational Study Projects

Numerous scientific and educational research projects are conducted within the tidal zones of the Nation on a continuing and spot basis.

States should indicate the nature, and site number of individual research projects presently being conducted in the coastal environment which could be threatened by oil spills.  The site number for each project should be indicated on a coastal environment map.

Ongoing research projects would include, among others, programs and projects funded by the National Oceanic and Atmospheric Administration (NOAA) Sea Grant Program, National Science Foundation (NSF), Environmental Protection Agency (EPA), State Government programs and projects, etc.

Table 2 summarizes the types and form of data required to evaluate
the petitions of States claiming damage risks to cultural resources in
their coastal environments.  Additional information on data sources
for cultural resource categories in Gulf Coast States is presented in
Appendix I.

TABLE 2

CULTURAL RESOURCES

| Resources | Measurement Unit | Area Delineations |
|---|---|---|
| Recreation/Tourism | | |
| • Beaches | • Miles continuous coast-line<br>• Miles marine recreational beach<br>• Recreational beach days (users) | 10 mile lengths |
| • Accommodations<br>• Restaurants<br>• Sport Fisheries<br>• Boating | • Number of rooms<br>• Number of establishments<br>• Catch per unit-of-effort<br>• Marine recreational boat anchorages or recreational boat registrations | 10 miles (shorefront)<br>10 miles (shorefront)<br>Major fishing areas<br>County |
| Commercial Fisheries | • Catch per unit-of-effort<br>• Value of catch | Major harvest areas |
| Residential Dwellings | • Number | One mile inland depth and 10 miles shorefront |
| Historical Sites | • Tidal zone number, individual acreage | 10 miles (shorefront) |
| Designated Natural Areas | • Number, individual acreage, nature | 10 mile grids, entire coastal environment |
| Archeological Sites | • Tidal zone and offshore number, acreage | Tidal zone and submerged areas, 10 mile grids |
| Scientific Study and Education | • Number, nature of projects | 10 mile grids |

Note: Use data for most recent year available.

18

2. Data and Assumptions Supporting Determinations of Environmental
   Risk

   a. Probability of Damaging Events

   In order for a State to estimate the oil release-related impacts
due to a deepwater port project it will be necessary for that State
to understand the probability of chronic and/or accidental oil release,
the expected quantity of oil release, and the probability of the extent
and frequency of shoreline impacted. An evaluation of these factors
is a necessary requirement in the process of determining adjacent
coastal State status based on risks presented by a deepwater port
project. The quantification of oil spill risks will require several
data items as inputs.

   (1) First, it will be necessary to identify the broad types of
failure events that could lead to oil releases. Typically, the off-
shore portion of a deepwater port project consists of tanker approaches,
unloading operations, pipeline to shore operations and tanker departures.
Tankers may potentially release oil if involved in such events as
collision with another ship, grounding, capsizing, foundering, ramming,
explosion or fire, internal structural failures, equipment malfunction
and crew negligence. If any of these events are to be considered
viable spill sources data must be obtained to validate the claim.
For example, if grounding is considered a major source of oil spillage
it will be necessary to identify where groundings could occur in relation
to the tanker approach. Similarly, for rammings to be a spill cause
clear identification of drilling platforms and other such objects
will be required and their location with respect to tanker approach
and distance from shoreline specified. Certain events, such as
collisions, may occur anywhere where other traffic persists, and little
data is needed to establish collision as a potential spill event. The
table below (Table 3) identifies the potential tanker spill causes and
the data needed to ascertain their existence in any specific project.

   Failures resulting in oil spillage in unloading operations and
piping to shore would generally occur as a result of abnormal occurrences
internal to the project and are inherently low in probability in any

19

project. No new data will be needed to establish that failure during these operations is a viable failure mode.

**TABLE 3**

**DATA REQUIRED TO ESTABLISH TANKER SPILL CAUSES**

| Tanker Spill Causes | Required Data |
|---|---|
| Collision | Presence of other traffic |
| Ramming | Location of fixed objects such as delivery platforms |
| Explosion | * |
| Fire | * |
| Structural failure | * |
| Grounding | Location of water depths equal to or less than tanker draft |
| Negligence | * |
| Equipment malfunction | * |

*Failure cause internal to the tanker and inherent (although with very low probability) in any project.

(2) Once the viable failure modes have been identified it will be necessary to evaluate the probability of occurrence of each failure mode and the quantity of oil released in the process. Depending on the failure mode, the failure rate can be estimated from a statistical analysis of data pertaining to failures in similar technologies in other parts of the U.S. or the world at large. Typical sources of historical information include the U.S. Coast Guard (for tanker casualty data) and the Office of Pipeline Safety (for pipeline rupture data). Data may also be available from select industries in related areas of business. The output of the probability analysis should be an annual frequency of failure (or oil release) for each identified mode. Associate with each mode of oil release would be a characteristic spill size. In some cases a wide distribution of spill sizes are possible

20

for a single failure mode. For example, in a tanker collision, if a small wing tank of a tanker is ruptured a spill of about 100,000 gallons may result. If two adjacent tanks in the main portion of the tanker are ruptured several million gallons of oil may be released. Data on typical tanker sizes and tank distribution on the tankers will be required to establish spill size due to tanker casualty. To establish spill sizes for unloading and piping operations data relating to rate of throughput, quality of spill detection alarms, reaction time to activate shutoff, time to shut off and inventory in the lines will be required.

(3) Once the probability and quantity of oil release is quantified oil trajectories and extent of shoreline impacted can be estimated provided data are specified relating to wind speed and direction, sea-state, surface currents and/or tidal current distribution, location of shorelines of interest, and the physical properties of oil and seawater. The specific physical properties of interest are the density and surface tension of oil and the density and viscosity of seawater. For certain types of crudes rapid evaporation in the first few hours after spill is possible and if mass loss (either due to evaporation or sinking) is to be factored in the analysis the rate of mass loss for the oil must be specified. If the oil spill is a relatively slow release over time, the rate of spillage can be an important factor in estimating the oil spill trajectory. Finally, most deepwater port projects will undoubtedly be equipped with oil containment and clean-up equipment. Detailed data on type and quantity of equipment and reliability of the spill response plan will allow a subjective estimate of what quantity of oil can actually be recovered prior to impact with a shoreline.

    b.   Assumptions Concerning Resource Vulnerability and Damage Estimates

The coastal environmental resources discussed above have varying vulnerability to oil spills and port-related development. This is discussed above to a limited extent in conjunction with each resource. Petitioning States should identify and discuss thoroughly the references, assumptions and rationale upon which their estimates of resource vulnerability and damage potential are based. In general, resources which

21

combine low recuperative power and high importance from the standpoint of natural or cultural exploitation are considered most vulnerable by the authors of this report.  States may find these criteria useful in structuring their supporting documentation.

    c.  Assumptions Concerning Port-related Development

    Three principal types of deepwater port-related development can be considered indicators of significant adverse environmental impact potential.  These are:

- Size and configuration of onshore petroleum storage and piping facilities;
- Number and throughput of anticipated refineries built as a result of the port; and
- Number and throughput of anticipated petrochemical plants.

    Petitioning States claiming damage potential from deepwater port-related developments should quantify the extent to which these indicators (or other factors) are the basis for their claim.  It is recognized that the land use and other siting decisions associated with such developments are major determinants of their environmental impact potential.  We believe it unreasonable to expect States (or applicants) to provide sufficient information to fully assess this factor.  However, petitioning States should indicate the extent to which they base their damage estimates upon anticipated port-related development within their own coastal environment; or upon pollution generated by anticipated facilities in a neighboring State (over which they would have little or no control).

B.  ENVIRONMENTAL RISK METHODOLOGY

1.  Oil-spill-related damage.

The overall purpose of the effort is to present a methodology which can be utilized in quantifying the risks of oil impact on shorelines due to oil spills resulting from a deepwater port project.  The methodology is developed here in five parts.  These parts are:

a.  Development of a Spill Event Tree
b.  Probability of Spill
c.  Distribution of Spill Sizes per Spill
d.  Oil Trajectories and Probability of Land Impact
e.  Suggested Display of Spill Probabilities

The methodology for each part is discussed in detail in this section.

a.  Development of a Spill Event Tree

A spill event tree for purposes of this discussion is a diagram identifying the broad events that can occur in a deepwater port project and result in a spill of oil on the sea.  Prior to constructing a spill event tree one must assemble as detailed a picture as possible on the nature of the planned operation and its operational environment.  All deepwater ports may be considered as being composed of two discrete operations: the tanker operation; and the fixed off-shore facility operation.  The tanker operation essentially consists of approach of the tanker, mooring at port, anchoring, bunkering, unloading and departing.  The fixed off-shore facility operation of interest here includes the mooring, oil transfer and pumping and piping to the shore-line.  The potential spill events associated with the tanker portion of the project are shown in Figure 1 and the spill events associated with the fixed off-shore facility are shown in Figure 2.

In Figure 1, the tanker voyage has been segmented into movement in the high seas, approach to the port, movement in the safety zone, anchoring, mooring, oil transfer, unmooring and bunkering. (It is assumed the tankers leave empty of crude but properly ballasted). The potential spill events of concern include collision with other

23



FIGURE 1   POTENTIAL SPILL EVENTS FOR TANKERS



FIGURE 2   SINGLE-POINT MOORING BUOY FAILURE COMBINATIONS

vessels, ramming, explosion, sabotage fire, structural failure, grounding, crew negligence and collision with the deepwater port platform. Figure 1 represents the preliminary spill event tree for the tanker operation portion of a deepwater port project.

Figure 2 identifies spill events associated with the fixed off-shore facility. These include potential failures associated with the single point mooring and the pumping and piping operations. Components, which, should they fail, would lead to oil releases are identified. The cause of failure may be internal to the system (i.e., there is a mean time to failure for most mechanical components even though proper upkeep, inspection and replacement can substantially reduce chances of such events) or it may be external (such as rupture of floating hoses due to surface traffic). Figure 2 represents a preliminary spill event tree for the fixed off-shore portion of a deepwater port project.

Once any specific project is identified and details on the project made available it will be possible to enlarge these preliminary spill event trees still further and develop a more complete picture of the spill potential of the specific deepwater port.

b. Probability of Spill

Tanker Spill Probability

This section addresses the probability of tankers producing oil spills when they are approaching or departing the immediate vicinity of the deepwater port, but nevertheless close enough to land that a spill could result in significant environmental damage. It is generally conceded that tanker accidents are chance events, and for that reason the basis upon which the estimates of probability will rest is historical data.

Accident Data Sources

For data on accidents to maritime traffic, there are a number of sources. In the United States, the U.S. Coast Guard maintains two sets of data related to accidents and their consequences. One is in the Office of Merchant Marine Safety and the other is in the Office of Marine Environment and Systems. The Tanker Advisory Center compiles casualty data on tankers on a worldwide basis. In Appendix II the

26



Standard Ratio = 10

Single Point Mooring Buoy
Durban, South Africa

(1971)

Spill Size in Gallons

Source: Devanney, J., "Environmental and Economic Impacts of Offshore Petroleum," Technischen Universität Berlin (3). 6.Jahrigang, 1974.

FIGURE 3   CUMULATIVE DISTRIBUTION OF SPILL SIZES

27

data and how it is obtained for each are described.  For worldwide casualty statistics, Lloyds Register of Shipping is the best source.

The question of completeness comes up in connection with the accident data maintained by the Office of Merchant Marine Safety as it does for similar compilations of accident statistics.  From the point of view of hazardous materials, all ocean going vessels and tank barges must be certified by the Coast Guard.  This applies not only when they are new but periodically as well.  However, from the point of view of data completeness, if one of these vessels is in an accident and requires repairs at a shipyard, a Coast Guard inspection is required before the vessel can put to sea again.  Therefore, the Coast Guard has a feedback mechanism to insure that accidents of any significance whatsoever, are detected.  Hence it can be assumed that all accidents for which the damage is significant enough to cause a discharge of its cargo will appear in the Coast Guard files.

Once the tanker casualty data has been obtained it may be used to estimate spill frequency for tankers.  The number of accident events may be separated and listed by causes as identified in the spill event tree.  An appropriate measure of exposure must then be specified to determine frequency of casualty by mode.  In some cases tanker exposure may be measured in round trips to port.  In other cases time spent in the vicinity of the port or actual miles traversed may be the appropriate unit.  The actual exposure unit chosen will vary with the class of accident, location of the port and the availability of reliable historical data on casualty.  Upon determining the appropriate exposure variable annual frequencies of tanker casualty by causes may be quantified.

These casualty estimates may not be directly applicable to a specific project.  It will invariably be necessary to modify the probability estimates to reflect any differences in the local environment and conditions under which the historical data was obtained. Modifications in the spill probabilities may arise out of differences in traffic encountered, traffic speed, ramming and/or grounding opportunities, type of tanker construction, availability of navigation aids, and expected weather conditions.

Fixed Off-Shore Facility Spill Probability

The probabilities of various spills associated with oil transfer
pumping and piping operations at a deepwater port are not easily estimated
due to the dearth of reliable historical data. Some data on industry
experience with single point moorings and floating hoses is available
but is difficult to substantiate. Off-shore pipeline experience is
plentiful but since spill reporting outside U.S. territorial waters
is not mandatory the available data is of limited use for a risk analysis.
An approach to synthesizing the failure rates by examining the mean time
to failure for critical system components is now under way at the
Transportation Systems Center of the Department of Transportation and
may prove to be the ideal approach to handling this problem.

Although the probability of spill occurrences from the fixed
off-shore facility are difficult to quantify with any certainty,
historically such spills have been limited in volume. General industry
experience in protected harbors has indicated that on the average
one to two units of oil are spilled for every million units handled.
In the first two years of operation of the SPM at Durban, South Africa,
the largest reported unloading spill was about 4,400 bbls.

It is concluded that the methodology for spill probability estimation
due to transfer, pumping and piping operations is weak due to the lack of
a sound historical base relating to such operations.

c. Distribution of Spill Sizes per Spill

In general, the approach to quantification of probability of spill
is statistical, relying on historical data as a basis for the estimates.
There are no deterministic methods currently available for predicting
exactly when any spill will occur, in what size, and what the precise
nature of the outcome will be. Maintenance, safety measures and
monitoring may lessen the incidents of spills, but the exact time,
place and volume of the next spill can never be known with any certitude
whatsoever.

Despite these reservations about predictability the spill phenomenon
is not completely chaotic. In many classes of commerce, collectively
at least, spill sizes follow a certain well known distribution, namely,

the log-normal. In other words, small spills generally occur more
often than the largest spill. An illustration of this is shown in
Figure 3, in which the 23 data points representing spills during
1971 at a relatively high-risk facility, the SPM at Durban, South
Africa, are plotted cumulatively against spill sizes on a coordinate
system that yields a straight line when the distribution is log-normal.
The straight line indicated was obtained by least square methods and
exhibits a correlation coefficient of 0.8. Observe the wide range
over which the spill sizes occur, namely three orders of magnitude.

The virtue of knowing that spills are log-normally distributed has
the great advantage that only two independent numbers are required
to specify the whole distribution. The average spill size can be one
of these. If this is the case, one only has to estimate the slope.
It may be possible to have enough data (as in the case for Figure 3)
to do this directly. On the other hand, it may be necessary to resort
to data from analogous situations that will allow one to assign a
reasonable number to this slope in cases where one cannot determine
it directly.

Consequently, the basic approach to spill size estimation is through
the log-normal distribution just described. This approach to estimating
spill size distribution applies equally well to tanker spills, where
spill volumes may vary from a few barrels to a few million barrels.
d. Oil Trajectories and Probability of Land Impact

Once the probability and volume of various oil spills associated
with a deepwater port are estimated, one can proceed to an analysis of
the trajectory the oil will follow and determine the probable land
area impacted.

A slick of oil floating on the ocean water moves by the forces
exerted by wind and tidal actions. In addition, the size of the slick
increases due to the spreading phenomenon (which is caused initially
by the buoyancy force and later by the surface tension force). It has
been observed that the slick as a whole moves in the direction of the
wind at about 3% of the wind velocity under reasonably still water
conditions. As for the effect of tidal currents, the slick moves in

the direction of the surface current at the velocity of the current.
The net effect of the two is to move the slick en masse in a direction
and velocity which is given by the vector sum of the tidal velocity
and 3% of wind velocity. The high vapor pressure fractions of crude
oil and petroleum products tend to evaporate with relative rapidity
(one to two days), leaving behind the heavier elements. A part of
the spilled oil may dissolve in sea water, and a part of the heavier
elements may even sink because of increased density. In addition,
when the oil slick thickness becomes very small after the slick has
spread for a long time, the oil may form an emulsion with water ("mulch").
Finally, when the thickness becomes sufficiently small, the oil slick
with break up.

From the above brief description of the various forces and chemical
actions that the oil is subjected to and their effects on the slick,
it is clear that prediction of the movement of oil on the ocean is not
an easy task.

In order to calculate the probability of impact of an oil spill
(occurring at a given location) onto a specified point on the shore,
several important data are needed. These include:

Properties of the Oil

- Quantity and composition of oil spilled;
- The physical properties of the oil such as the density,
  interfacial tension with water, the volatility, and the
  fraction that dissolves in water in a given time.

Environmental Conditions

- Detailed data on the surface currents in the area where the
  spill occurs and the spill is likely to spread to. Data
  should be detailed enough to account for diurnal and
  seasonal changes;
- Qualitative data on the magnitude of the roughness of the sea;
  specifically, the tidal amplitude;
- Detailed wind data giving probability estimates of the velocity
  and direction of surface wind (close to the sea surface).
  These probability data may be in the form of daily, monthly,

or seasonal averages.  The application of each of the
above datum and the various models available are discussed
in Appendix II.

Calculation of Land Impact Probability

The oil that is moved by wind and water currents may impact a
shore area.  In such a case, the length of shore that is affected is
assumed to be equal to the diameter of the oil slick at the time it
impacts the shore.  Also, in the presence of longshore currents, the
oil slick moves parallel to the shore and can pollute large lengths
of the shoreline.  Therefore, in calculating the impact probability,
one can speak of either probability density (per unit shoreline) or
the probability of impact on a given length of shore.

The impact probability is strongly influenced by the probability
of the wind being shorewards from the spill point.  In fact, the
probability of impact on shore is sometimes assumed to be equal to
the probability of the wind.  In other models, the impact probability
is determined taking into account the fluctuating in the wind and current
directions during the sojourn of the slick from release point to
the impact point.

In summary, the models used for calculating the oil impact probability
of a shore area are based primarily on tracking an oil slick movement
from spill point to impact point and using the wind probability data.
The water current is assumed to be known more accurately than the
wind, and its direction and magnitude are assumed to be nonvarying
within the time span of the oil slick movement.

The choice of which model to use in applying this methodology would
be dependent upon the amount of data available.  If all its data
requirements are met, the Devanney model (described in Appendix II) would
be used in preference to the others described.

In considering oil trajectory movement, it has been assumed that no
deliberate action is taken to contain the spread of, or actually recover
the oil from, the slick.  In actual oil spill situations related to
deepwater ports, it is required that some attempt be made to control
or limit the extent of land impact.  It is difficult to quantify the

probability of exposure and degree of success associated with oil clean-up operations. A subjective adjustment of the actual degree of land impact based on the actual contingency plan of the local area and the relevant project will be necessary prior to final quantification of environmental risk.

In exercising the methodology presented here, it should be kept in mind that the primary focus has been on the adverse impact of oil on land. As the oil slick moves, certain fractions may vaporize while other portions may sink or otherwise enter the water column in a fine suspension. The suspension and sinking of emulsions of oil can have deleterious effects on the marine biota. Given physical properties of the crude in question, it may be possible to estimate the rate of oil absorptions (sinking and suspension) by the sea as a function of time. The actual rate of settling of oil emulsions or the dispersion of suspensions in the sea environment are difficult to quantify with accuracy but can be estimated under worst-case assumptions. It will then become more feasible to quantitatively estimate the adverse impact of an oil release on the sea environment. In the interim, risk potential to offshore areas will be assumed proportionate to the amount of oil in the slick overlying the water column and seabed. This information would be combined with data on off-shore resource distribution in evaluating the petitioning State's estimates of damage potential. Likewise, data on the probability of spills impacting a given length of shoreline will be combined with resource distribution data to evaluate damage estimates in the remainder of the State's coastal environment. The general accuracy with which the current and wind data are known are the basic uncertainties in the oil behavior under high-sea conditions preclude an impact evaluation on a scale finer than about a 10 statute mile length. It is expected, therefore, that any viable risk analysis will estimate the risk of oil impact on square grids approximately 10 statute miles in length.

e. *Suggested Display of Spill Probabilities*

Upon successful completion of the work required under the first four parts of the environmental risk methodology it will be possible to list the many ways in which a specific operation could lead to oil releases

33

on water, the expected probability of such release, the spill volume, the oil trajectory under different meteorological conditions, and the probability of land impact. The question may now be asked how can this information best be displayed to facilitate evaluation of actual risk of oil impact faced by a State. The evaluation can be an assessment of absolute risk or it may be a comparative evaluation with respect to another State (i.e., the State with the pipeline). The actual risk display may be in terms of expected or mean miles of shoreline impacted annually with the probability of such occurrence specified.

Although there is no unique method of risk display it is suggested that a specific method be utilized in any risk evaluation for determination of adjacent coastal State status. This method consists of presenting the overall risk in graphical form plotting various spill volumes and miles of shoreline impacted versus the probability of frequency of occurrence. A hypothetical example of such plots is shown in Figures 4 and 5. The plots shown in Figures 4 and 5 have several advantages in terms of decision making on a risk basis over the more conventional approach of dealing with expected values of risk. Oil spills can occur over a range of six orders of magnitude ($10^0$ to $10^6$) and the frequency of such occurrences can vary over at least three or four orders of magnitude. An expected value for spill frequency and volume would essentially "hide" the possibility of large spills. Further, since the degree of environmental damage or the time required for environmental recovery is not a linear function with spill volume it is highly desirable to display all possible spill volumes no matter how unlikely their occurrence may be.

Another advantage of the graphical risk display suggested here lies in the fact that once the data in Figures 4 and 5 is known it is relatively simple to draw in other lines representing the environmental risks from other industries or activities as well as alternate courses of action to the port project. In this way direct comparison with other activities (on an oil impact basis) is facilitated.

Finally, the data in Figures 4 and 5 can be utilized to obtain expected values of risk of spillage (if desirable) or extended to include the specific resources threatened once the impacted shoreline is specified. Examples of this are discussed below.



**FIGURE 4    VOLUME OF OIL SPILLED VS. FREQUENCY OF OCCURRENCE**



**FIGURE 5    MILES OF SHORELINE CONTAMINATED VS.
ANNUAL PROBABILITY OF OCCURRENCE**

35

2.  Damage from Port-related Development

The use of a risk analysis technique based on statistical probability (as discussed above) would not be appropriate for evaluating damage potentials associated with port-related development.  However, the basic assumption of this methodology concerning damage potentials from such development is the same as that applied to oil spill risks.  This assumption is as follows:  The degree of environmental risk to any resource in the coastal environment is determined by combining the extent of the resource with its degree of exposure to port-related damage.

To determine the degree of risk attributable to port-related development, the following information would be combined:

- Size, nature, and population of designated (or pending) Air Quality Maintenance Areas (A.Q.M.A.'s) would be combined with anticipated port-related levels of petroleum storage, refining, and petrochemicals manufacture.  A.Q.M.A.'s for photochemical oxidants would be considered at higher risk than others because of the significant hydrocarbon emissions associated with the three types of port-related development considered.  A.Q.M.A.'s for pollutants other than oxidants would <u>not</u> be considered at risk from petroleum storage facilities.  All A.Q.M.A.'s would be considered at greater risk from refining and petrochemical development than from petroleum storage because o f proportionately greater emissions from the former.  A.Q.M.A.'s with higher populations would be considered at greater risk than those with lower populations because National Ambient Air Quality Standards are set at levels designed to protect human health and welfare; and A.Q.M.A.'s are by definition areas where standards may not be achieved or maintained.

- *Size of any pending Class I non-degradation zones for air quality would be combined with anticipated levels of storage, refinery, and petrochemical development.  Few, if any of these zones would be expected in most States, but development of*

36

these types of port-related facilities within or near such
zones (especially refineries or petrochemical plants) would
be assumed to place them at significant risk.  Because of the
mobility of air contaminants, port-related developments in
neighboring States would often be considered to pose risk
to A.Q.M.A.'s and/or Class I non-degradation zones in a
petitioning State.

- Drainage area of Water-Quality-Limited surface waters would
be combined with anticipated port-related levels of petroleum
storage, refining, and petrochemical manufacture.  Such areas
would be considered at greater risk from refinery and petro-
chemical development than from storage facilities because of
the disproportionately large point-source discharge associated
with refineries and petrochemical plants.  Without specific
information or anticipated facility siting, it would be
extremely difficult to accept arguments that port-related
developments in a neighboring State would adversely impact
surface waters in a petitioning State to an equal or greater
degree.

- The amount, nature, and location of critical habitat identified
by petitioning States (and-equivalent habitat in pipeline States)
would be combined with anticipated levels of port-related transporta-
tion, storage, refinery, and petrochemical development.  The relative
vulnerability of each such habitat would be determined on the
basis of its nature and location.  For example, certain
forest habitats could be quite vulnerable to air contamination
from facilities in a neighboring State, while a critical floodplain
might be vulnerable only to direct displacement.  Habitats
vulnerable to indirect (i.e., pollution) effects would generally
be considered at greater risk than those only vulnerable to
direct displacement, unless sufficient information is available
on facility siting to justify concern over the latter.

## C FORMAT FOR QUANTIFICATION OF DAMAGE ON A

### STATE-BY-STATE BASIS

Having identified the resources in the coastal environment vulnerable to adverse impacts related to deepwater ports, and having quantified the probability of oil release and subsequent movement, and the potential magnitude of port-related development, the next step in this methodology is to assemble the available information in a meaningful fashion to aid in decision making regarding adjacent coastal state status. This section presents several ways in which "risk of damage to the coastal environment" of a state may be assessed in terms of the available data on spill probabilities, port-related developments, and resource distribution. The formats used to display the risk of damage on a state-by-state basis are chosen to facilitate quantitative comparison of certain important elements that comprise the overall risk and are not unique. Ultimately, those charged with decision-making in any adjacent coastal state application would have to interpret the information contained in the displays suggested here in combination with their own judgment to arrive at the final decision.

1. **Oil Spill Related Risk Display**

   (a) **Expected Values**

   One comparison of risks between two states may be in terms of expected value of impact for the resources of concern. This type of comparison can be a useful first cut indicator. For example, a matrix format as shown below may be utilized.

| Type of Resource and Unit of Measure | State 1 | State 2 |
|---|---|---|
| Recreational Beach (miles) | $E_1(R)$ | $E_2(R)$ |
| Recreational Beach (users) | $E_1(r)$ | $E_2(r)$ |
| Tidal Wetlands (acres) | $E_1(w)$ | $E_2(w)$ |
| etc. | etc. | etc. |

In this matrix $E_1(R)$ would represent the expected value of the miles of recreational beach [R] in State 1 impacted annually by oil spills. The equivalent value for State 2 is $E_2(R)$. If $E_1(R)$ is larger than $E_2(R)$ then State 1 faces the greater absolute risk of recreational beach exposure in an expected sense. Similarly $E_i(r)$ may represent the expected annual number of people [r] using beaches exposed to oil impact. $E_i(w)$ would represent the expected annual acres of wetlands [w] exposed to impact by oil. The expected values can be derived from the type of curve displayed in Figure 5 of Section B, and would represent the normalized area under the curve.

It should be noted that the absolute value of a resource may not be the only criteria for risk comparisons. In some cases, especially where unique resources are distributed over small physical distances the normalized or fractional impact on an expected annual basis would need to be considered. For example, State 1 may expect to have only one mile of its beach impacted annually compared with five miles for State 2. However, if the one mile in State 1 represents 80% of State 1's beach resources and the five miles in State 2 represents only 7% of State 2's resources then this relative factor may be important is risk comparison. This point is discussed further in Chapter III.

    (b)    Selected Specific Cases

    Another display that should be developed is a matrix very similar to the one above except that it would be developed in terms of one or more selected cases, $W_i(R)$, etc. in place of the expected values. For example, a worst case display would only look at the probable worst impact normalized with respect to the probability of its occurrence on a resource-by-resource basis. The worst case analysis would utilize the right-most (maximum) value for impact from a curve of the type presented in Figure 5 for a given resource area and normalize it with respect to the associated probability of that occurrence. The larger the function $W_i(R)$ the greater would be the worst case risk

39

for that resource.  Great care must be exercised in this type of
analysis to assure consistency.  The selected case analysis is a
desirable index as it can be an indication of significant damage
potentials associated with single events; rather than overall long-
term exposure.

    (c)  <u>Risk Profile Display</u>

    Finally, a complete risk profile for each State may be developed
for each resource type as shown below.



In the above example, the risks faced by State 2 in terms of spill
impact to the specific resource R are less than that faced by State 1
on an expected value basis or a worst case basis.  The above curves
shed no light on the fractional amounts of resources R impact in
States 1 and 2.  If the curves were plotted in a way that the X-axis
were in terms of "Fractional Magnitude of Select Resource (R) Impacted"
judgments on a fractional basis could be made.

    Note that State 3 faces a greater worst case risk than State 1
for the resource in question but State 1 (larger area under the curve)
faces the greater expected value risk.

2. <u>Port-Related Development Risk Matrix</u>

Several important categories of resources impacted by port-related development have been identified in Section A of this Chapter. Since the nature of the major impacts being considered here are those arising from normal activities they can be estimated on a deterministic basis utilizing past experience with similar activities elsewhere. It is suggested that a display matrix be developed for States 1 and 2 as shown below.

| Type of Resource | Resource Size (Unit of Measure) | Development Potential (bbls) Storage, Refining, & Petrochemicals |
|---|---|---|
| Air Quality Maintenance Area | (acres) | |
| Air Quality Maintenance Area | (population) | |
| Water Quality Limited Drainage | (acres) | |

Etc.

In the above matrix, the columns under State 1 and State 2 may be filled with appropriate indices representing the level of resource impact based on the development potential as a result of the deepwater port project. Indices such as pollution loadings may be easily developed in some cases utilizing well-accepted forecasting techniques for impacts due to industrial development. In other cases, such as predicting the impact of forecast loadings on air or water quality, the indices may well have to be developed on a judgmental basis. Once the columns have been filled, comparisons can be made between the two States on an absolute basis. With minor modifications, comparisons can be made on a fractional basis as well.

Once the available data is quantified and displayed as suggested here, a potential decision maker will have the major pieces of information necessary to the decision process. In some cases the decision regarding adjacent coastal state status may be quite straightforward but in all cases value judgments on the part of the decision maker will be necessary.

41

III.  CONSIDERATIONS REGARDING APPLICATION
OF THE METHODOLOGY

Beyond the quantification and display of data described above, the application of this methodology to reach a final determination would be similar in many ways to the deliberations of a jury.  Just as principles of law influence the manner in which a jury interprets evidence, the considerations discussed below would influence the decision makers who apply this methodology.

First, the decision makers will consider evidence in those categories of concern identified by the petitioning State.  However, they will also have available (and consider) data on all categories for the "pipeline" State as submitted by the applicant for a deepwater port license.  This implies that petitioning States should attempt to present as comprehensive a package of evidence as possible, in order not to foreclose comparative evaluation in categories which will be examined for the "pipeline" State.

Second, the process is not interpreted to include formal cost/benefit analysis.  It is recognized that economic growth might be considered a mitigating influence on environmental damage potentials created by a deepwater port, particularly in the "pipeline" State. However, the highly subjective nature of this type of consideration, its inherently extensive level of analytical effort, and the limited time available to reach a final determination of adjacent coastal State status, combine to preclude its inclusion in this methodology. This is not to imply that such cost/benefit considerations will be absent from the value judgments exercised by those who apply the methodology.  It simply means that the methodology has not been designed to formally incorporate such analysis.

Third, the extended duration of a deepwater port license (i.e., 20 years or more) presents the possibility of estimating damage to projected (as well as existing) resources.  Given the limited time frame for determining adjacent coastal State status, and the inherent uncertainty in resource projections, analysis will be restricted to the

42

damage potential associated with physical and cultural resources assumed
to remain constant in their existing size and distribution.  To do
otherwise would leave determinations vulnerable to serious challenge
over the validity of quantitative predictions that are best questionable.
If a petitioning State makes a convincing presentation of facts
supporting predictions of increasing resource concentrations or
utilization in its coastal environment, this would be weighed as a
qualitative factor in the final decision on that State's request.

Fourth, damage potentials to various coastal environments will
be evaluated on a relative, rather than absolute basis.  This approach
is made feasible by the requirement to present resource data on the
basis of 10-mile wide corridors, as well as specifying the area and
population of the coastal environment and certain parts thereof.  This
enables the decision maker to compare damage potentials in States with
the smallest coastal environments (e.g., New Hampshire) with damage
potentials in proportionate areas of a larger State.  This may be
done by comparing damage potential in selected 10 mile corridors
(or the entire coastal environment) of the smaller State versus the
potential in an equivalent number of corridors divided by the total area
of the coastal environment of the larger State.  Petitioning States
may wish to identify selected corridors in their coastal environment
believed particularly vulnerable in specific resource categories.  If
this is done, damage potential in such selected corridors would be
evaluated in proportion to the overall size of the resource in the
petitioning State; and an equivalent evaluation would be performed on
the most vulnerable corridors for that resource category in the "pipe-
line" State.

The decision to use this type of relative approach is based on
several factors.  First, Section 9 of the Deepwater Port Act appears
directed at the protection of individual States' rights to exercise
control over their own coastal environments, and not towards a national
or global perspective on environmental protection.  A straightforward
comparison of absolute resource values in States of different size
would achieve the latter, but not necessarily the former.  Second, an

absolute mode of comparison might consistently bias results in favor
of States with long shorelines, when in fact States with considerably
less shoreline might place premium value on their limited resources.
Finally, the decision to use a relative approach is consistent with
the policy of the Department of Transportation to adopt a liberal
attitude towards considering the requests of States petitioning for
adjacent coastal State status.

APPENDIX I

ADDITIONAL SOURCES OF DATA ON CULTURAL RESOURCES
IN GULF COAST STATES

Catch-per-unit-of-effort information for sport fisheries will
be available on a collective basis for the entire southeastern United
States from the National Marine Fisheries Service, Market News Division,
in an (as yet) unpublished document on salt-water angling in the south-
east.  Estimates of catch-per unit-of-effort by fishing areas will
require estimates by the National Marine Fisheries Service or the State
fishery agency.

Sources of information on county boat registrations and anchorages
on the Gulf Coast are as follows:

- Alabama — Department of Conservation and Natural Resources, Water Safety Division, Montgomery
- Florida — Department of Natural Resources, Boat Registrations, Tallahassee
- Louisiana — Department of Wild Life and Fisheries, Motor Boat Registrations, Baton Rouge
- Mississippi — Boat and Water Safety Commission, Jackson
- Texas — Parks and Recreation, Boat Registrations, Austin

Shrimp catch data are available in the National Marine Fisheries
Service publication entitled Shrimp Landings in the Gulf.  Therein, shrimp
catch is designated by area in which shrimp were caught, by species and
the number of man-days effort.  This precludes addition of shrimp caught
outside the study area.

Additional data is available from the following sources:

- Alabama, Mississippi and Florida – State University System of Florida Institute of Oceanography, Summary of Knowledge of the Eastern Gulf of Mexico, prepared for American Petroleum Institute
- Lousiana and Texas – National Marine Fisheries Service (only)

45

Additional data on historic sites in Gulf Coast States may be provided by:

- Alabama    —    Alabama Department of Natural Resources, Marine Resources Laboratory, Dauphin Island, Alabama.
- Florida    —    Florida Coastal Zone Commission, Florida Coastal Zone Management Atlas
- Louisiana —    Burk and Associates, Louisiana Coastal Resource Inventory, prepared for the Louisiana State Planning Office, 1975
- Mississippi    Mississippi Agricultural and Industrial Planning Office Board, Mississippi, Your Guide to Travel
- Texas    —    Texas Coastal Zone Management Commission, Natural Resource Inventory (in preparation)

The number and location of designated natural areas can be found in the following State publications. Tidal zone acreage must be estimated by the appropriate State agency.

- Alabama    —    Alabama Department of Natural Resources, Marine Resources Laboratory, Dauphin Island, Alabama.
- Florida    —    Coastal Zone Commission, Florida Coastal Zone Management Atlas.
- Lousiana    —    Burk and Associates, Louisiana Coastal Resource Inventory, prepared for Louisiana State Planning Office, 1975.
- Texas    —    Texas Coastal Zone Management Commission, Natural Resource Inventory (in preparation).

Information pertaining to archeological locations may be obtained from the following publications/universities by State:

- Alabama    —    University of South Alabama
- Louisiana —    Burk and Associates, Louisiana Coastal Resource Inventory, prepared for the Louisiana State Planning Office, 1975.
- Florida    —    State University System (Gainesville).
- Texas    —    Texas Coastal Zone Management Commission, Natural Resource Inventory (in preparation).

46

In addition, supplemental information on Gulf Coast research projects may be obtainable on marine programs conducted by the State universities.

- Alabama – Mississippi/Alabama Sea Grant Consortium, Ocean Springs, Mississippi
- Florida – University of Miami at Coral Gables, Florida, Florida State University System at Gainesville, Florida
- Louisiana – Louisiana State University at Baton Rouge, Louisiana
- Mississippi Joint project with Alabama (see Alabama listing above)
- Texas – Texas A & M at College Station, Texas

47

APPENDIX II

DETAILED ASPECTS OF ENVIRONMENTAL RISK METHODOLOGY

A.    ACCIDENT DATA SOURCES

1.   Office of Merchant Marine Safety

The Coast Guard is required by law to investigate all marine casualties in U.S. waters and worldwide when a U.S. vessel of any kind is involved.  The law requires a report from the owner, master, agent or person involved in a casualty which results in damage in excess of $1,500, material damage affecting the seaworthiness or efficiency of a vessel, groundings, loss of life or an injury, incapacitating more than 72 hours.

The "Report of Vessel Casualty or Accident" (Form CG 2692) contains three categories of information.  Category 1, "Particulars of Vessel," consists of information about the vessel, its owners, inspection status and the identity of the captain and of the pilot.  Category 2, "Particulars of the Casualty," contains the data, location and the nature of the environment in which the accident took place.  Cargo data and losses are given.  This category next includes a description of the accident, first according to class of accident, i.e., collision, explosion or grounding, with narrative descriptions of the events and the circumstances surrounding the accident and of the damage which ensued.  The third category "Assistance and Recommendations" is self-explanatory.

Subsequently, the Coast Guard investigates the accident and files a "Finding of Fact and Conclusions" and recommendations as to whether the case should be closed or investigated further.  The two sets of reports, namely Forms CG 2692 and the Coast Guard narrative report are filed together in the Office of Merchant Marine Safety.  The information on CG 2692 is stored on tape.

2.  Office of Marine Environment and Systems

One of the functions of this office is to maintain records on all incidents which result in the discharge of environmentally hazardous substances into the waters of the United States.  These reports originate

48

in the various Coast Guard Districts and are entered directly into the master file by remote terminals at the District Office. A great many of the items in the report are of interest for accident analysis. Table 1 shows some of these.

TABLE 1

PARTIAL LIST OF DATA ITEMS IN U.S. COAST GUARD
POLLUTION INCIDENT REPORT

Date, Time, Location, State, Type of Waterway, Source, Cause, Type of Operation, Quantity Spilled, Effect on Environment, Weather Conditions, Source of Coast Guard Notification, Data on Response and Clean-up.

These files are cross-checked with the Merchant Marine Safety files to determine the degree to which both cover incidents which should be common to both files. However, there is to date no universally accepted estimate of the completeness of either of these two Coast Guard files.

3. Tanker Advisory Center

The Tanker Advisory Center maintains an up-to-date index on all sea going tankers (ore/oil, bulk/oil and liquid gas) in existence on or after January 1, 1964. Each tanker is represented by its own file which contains in chronological order published details on all casualties, damage and repairs. The casualty data are obtained from Lloyds list, published by "Lloyds of London." The Center publishes quarterly and annually summaries of tanker casualty which give data on the losses total (partial, total or constructive) in terms of numbers of vessels, personnel killed or injured, the number of pollution incidents and the tons of cargo lost. Listings are maintained by the Center on all casualties reported on tankers worldwide, which contain detailed information on the ship and the nature of the accident. The data and an analysis of it for the years 1971-1972 are contained in "An Analysis of Oil Outflow Due to Tanker Accidents, 1971-1972" which

49

was prepared for the U.S. Coast Guard by J.J. Henry, Inc.  There were 1587 tanker casualties in the analysis, of which 376 were polluting incidents.

B.  ANALYSIS OF OIL SPILL MOVEMENT

A review of the literature on the spill movement phenomenon indicates that there are mainly three components to the problem.  The first involves the increase in size of the oil slick, the second involves the movement of the slick on the water (ocean) surface due to wind and surface currents, and finally, the effect of mass loss from the slick. The detailed models describing each one of these physical phenomena are reviewed below.

1.  Oil Size Increase with Time

    a.  Instantaneous Spills

The spread of instantaneously released oil on calm water is a well studied phenomenon.  Fay[1] seems to be one of the earliest investigators to explain in physical terms the phenomenon of oil spread.  According to his model, the spilled oil spreads initially due to gravitational (buoyancy) forces resisted initially by the inertia of the system but later by the viscous friction at the oil-water interface. In the final stages of spread when the oil film thickness is of the order of few millimeters, the surface tension forces dominate the spreading, resisted again by viscous friction.  Fannelop and Waldman[2] have obtained from a rigorous theoretical analysis of the problem of oil spread the expressions for the radius of the oil slick as a function of time in each of the three regimes of spread identified by Fay.[1]  The results obtained by Fannelop and Waldman are tabulated in Table 2.  It is seen that the essential data necessary to predict the size of the slick with the above model are:

- Volume of oil spilled (V);
- Oil properties such as the density and interfacial tension $(\rho_{liq}, \sigma)$;
- Properties of sea water (density and viscosity) $(\rho_w, \mu_w)$.

It is pointed out that the above model is simplistic in its approach to the oil spread problem.  For example, the model has neglected the effects of oil mass loss by evaporation and dissolution, change in

50

the density that results due to the selective evaporation of the light fractions, effects of tides and wind, etc. However, in spite of the above limitations, the model is seen to describe the spread of large accidental spills (Torrey Canyon)[1] with reasonable accuracy.

Fay[3] has observed that the cessation of spread of oil during the surface tension regime is caused by the dissolution in water of some oil fractions which reduce in the spreading coefficient to zero. Based on this assumption, Fay has obtained an expression for the maximum slick area to which oil spreads on the sea. This area A is given by:

$$A = \left[ \frac{\sigma^2 V^6}{\rho^2 \nu D^3 s^6} \right]^{1.8}$$

where

A   =   maximum area to which a given oil spill spreads

$\sigma$   =   surface tension

V   =   volume of oil spilled

$\rho$   =   density of water

D   =   diffusivity in water of that fraction of the oil which dissolves
         in water

$\nu$   =   kinematic viscosity of water

s   =   solubility of the dissolving fractions (expressed in kg/kg of water).

Fay[3] has compared the prediction of the maximum area to which slicks will spread with some observed accidental spills and has found the predictions to be quite accurate.

Therefore, to predict the maximum area of spread, all of the property values occurring in equation 1 have to be known. Although it is not clear from Fay's statements which surface tension value is to be used (whether the value should correspond to that of the initial spill or to that of the oil which has lost the lighter fractions), the

## TABLE 2

### EQUATIONS OF RADIAL SPREAD OF OIL ON WATER

| Spread Regimes ⟶<br>Geometry of Spread ↓ | Gravity − Inertia | Gravity − Viscous | Viscous − Surface Tension |
|---|---|---|---|
| Radial | $0 < t < 0.546 \left[ \dfrac{V}{G t_w} \right]^{1/3}$ | $0.546 \left[ \dfrac{V}{G t_w} \right]^{1/3} < t < 0.375 \dfrac{\rho_w}{\sigma} \left[ \dfrac{G^2 V^4}{t_w^2} \right]^{1/6}$ | $t > 0.375 \dfrac{\rho_w}{\sigma} \left[ G^2 V^4 t_w^2 \right]^{\frac{1}{6}}$ |
| | $r = 1.14 (GV)^{1/4} t^{1/2}$ | $r = 0.98 \left[ \dfrac{G^2 V^4}{t_w^{1/2}} \right]^{1/12} t^{1/4}$ | $r = 1.6 \left[ \dfrac{\sigma^2}{\sqrt{\rho_w t_w}} \right]^{1/2} t^{3/4}$ |

G = $\rho_{liq}/\rho_{water}$ : effective gravity (m/s²)

g = acceleration due to gravity : 9.8 m/s²

r = radius of spread (m)

t = time (s)

V = volume of liquid spilled (m³)

$t_w$ = kinematic viscosity of water (m²/s)

$\sigma$ = surface tension of oil (N/m)

Source: Arthur D. Little, Inc. (Reference 5)

1/4th power dependence of the area on surface tension indicates that the exact value is probably not very crucial; however, the volume of spill and the solubility have to be estimated quite accurately to get reasonable estimates of the maximum area of spread.

A recently developed model by Raj and Kalelkar[4] takes into account the spreading of liquids on the water surface with mass loss being considered.  The spread radius as a function of time is given by this model to be:

$$R = (V_1)^{1/3} \left[ 1.5\tau + \frac{\Delta}{2.26} \ \tau^3 \right]^{1/2} \tag{2}$$

where

$R$ = radius of spread at any time

$\tau$ = dimensionless time = $\dfrac{\text{actual time after spill}}{\sqrt{L/G}}$

$L = (V_1)^{1/3}$ where $V_1$ = initial volume of spill

$\Delta = \dfrac{\dot{y}}{\sqrt{LG}} = \dfrac{\text{linear regression rate by boiloff}}{\sqrt{LG}}$

$G$ = effective gravity = $1 - \dfrac{\text{density of liquid } (\rho_\ell)}{\text{density of water } (\rho_w)}$

The maximum area of spread is given by

$$A = \pi \left[ \frac{V^3 \ G}{\dot{y}^2} \right]^{1/4} \tag{3}$$

and the duration of spread to this area is

$$t_{max} = 0.67 \left[ \frac{V}{G \ \dot{y}^2} \right]^{1/4} \tag{4}$$

53

Raj and Kalelkar's[4] analysis is strictly valid for the spill of
cryogenic liquids on water where the boiloff is rapid. However, the
same analysis can also be used for oil spreads, provided the evaporation
rate of the light fraction is known, and the rate is linear. This may
be a useful approximation for crude oils that possess a large percentage
of light fractions. The above model is valid for spread only in the
gravity inertia regime.

No exact analysis is available in the literature which describes
the spread of instantaneously released liquids in the gravity viscous
regime (on water) with mass loss taken into account. An approximate
analysis has been made recently and is described in reference 5.

In order to use the above model or the model described in
reference 5, the data needed are:

- the rate of mass loss (or the "regresssion" rate);
- volume of oil spilled and its physical properties, such as
  density, surface tension);
- properties of water (density, viscosity).

No model has been developed which takes into account the continuous
change in the properties of the oil (due to fractional evaporation)
such as the density, the effects of currents in the water, effects of
waves on spreading turbulence in the ocean, and the effects of dissolution
and evaporation. Such a general model would be extremely complicated.

b. Continuous Spills

Even though the continuous spill of oil on the ocean is equally
likely to occur compared to the instantaneous spill, there does not
seem to be much attention given in the literature to analyzing and
modeling this problem.

Fay[1] has slightly modified his instantaneous spreading model to
describe the lateral spreading of oil discharged continuously at a
fixed location onto a stream flowing at uniform velocity. The same
gravity, viscous, and surface tension forces are assumed to apply.

Based on this analysis, Fay predicts the spread laws for oil discharged
into a moving stream shown in Table 3.

54

TABLE 3

SPREAD LAWS FOR OIL IN A MOVING STREAM

$\ell = (G \dot{v} x^2)^{1/3} / U$        gravity inertia       (5a)

$\ell = \left[ (G \dot{v}^2 x^{3/2}) / \nu_w^{1/2} U^{7/2} \right]^{1/4}$     gravity viscous      (5b)

$\ell = (\sigma^2 x^3 / \rho_w^2 \nu_w U^3)^{1/4}$       surface tension viscous    (5c)

where

$\ell$ = cross-stream length of spread

$x$ = downstream distance from the source

$U$ = mean stream velocity

$\dot{V}$ = volume rate of spill of oil

$G$, $\sigma$, $\nu_w$, and $\rho_w$ have the same meaning as defined earlier.

Source:  Fay (Reference 1)

55

The above continuous release model by Fay does not consider the possibility of continuous spill in calm water, nor does it take into account the possibility of mass loss by evaporation or by dissolution. Murray[6] has further shown that the Fay theory considerably underestimates the width of spread. He argues that this discrepancy is due to the omission in the Fay model of the effects of turbulent diffusion.

The data necessary to use the Fay model are:

- physical properties of oil and water;
- rate of discharge of oil (volumetric);
- the velocity of the current.

Murray[6] has developed a theory for oil spread when the oil is released continuously on the water surface in a moving current. The principal agency that is responsible for the lateral "dispersion" of oil, according to this model, is the turbulence in the water stream. Based on this concept, and using Fickian diffusion equations, Murray has obtained the following formula for the "concentration" of oil on the water surface. The "concentration" is said to be related to the thickness of oil film on the water. The concentration is given by

$$c = \frac{\dot{V} e^{-\left(\frac{Ur}{2k}\right)(1 - \cos\phi)}}{\sqrt{4\pi k U r}} \tag{6}$$

where

$c$ = concentration in thickness units

$k$ = turbulent diffusion coefficient

$U$ = stream velocity

$r$ = $\sqrt{x^2 + y^2}$ where x and y are respectively streamwise and cross-stream distances

$\dot{V}$ = volumetric spill rate

$\phi$ = $\tan^{-1}\left(\frac{y}{x}\right) 0 < \phi < 2\pi$

56

Murray indicates that oil films are visible up to a concentration of about 1.5 microns (1.5 x 10$^{-6}$ m) and suggests a value of K = 15 m$^2$/s, based on the spread data obtained from the accidental release of an offshore oil rig belonging to Chevron Oil Co.

One of the main limitations of the above model is that in order to use the results, it is necessary to know the value of turbulent diffusion coefficient and the "concentration" (thickness) up to which the slick is visible. It is quite likely that the turbulent diffusion coefficient value is dependent on the location of the spill, the environmental conditions out at sea, and probably on the stream velocity. There is no a priori way of determining the value of K, which is a crucial parameter in Murray's analysis. Similarly, the visibility thickness may depend on the physical properties and the composition of the crude oil itself. Finally, it is not clear how this model could be used in the case of a continuous spill of a finite quantity of oil, as from an oil tanker. It is obvious that this model cannot be used to describe the spread and movement of the slick after all of the oil has been spilled.

The data necessary for using the above model are:

- rate of oil release;
- velocity of stream current;
- turbulent diffusion coefficient for oil dispersion;
- concentration or thickness of the oil film up to which the slick is visible.

The models of Fay[1] and Murray[6] are essentially steady state models and do not describe the process of spread immediately after the start of oil release. For describing the nonsteady spread of oil released continuously on calm water, Abbott and Hayashi[7] developed a theoretical model. The model indicates that the radius of spread of the slick is proportional to the time after release. However, recent experiments conducted at Arthur D. Little, Inc.[8] indicate that the radius of spread is dependent on the square root of time. A theoretical model has been developed by Raj[8] which predicts the experimentally observed behavior. According to this model, the radius of spread (for continuous release on

57

calm water) as a function of time is given by

$$R \simeq a \left[ 1 + \left( \frac{10}{3} \right) x \sqrt{\frac{t}{t_{ch}}} \right] \tag{7}$$

where

R = radius of spread at any time t

a = radius of the jet of liquid just before the jet penetrates the water surface

t = time after release of liquid

$t_{ch} = \dfrac{a}{u_a}$ where $u_a$ is the radial velocity of the liquid at radius "a"

The velocity $u_a$ is obtained from consideration of hydraulic jump that occurs at radius "a" and is given by

$$u_a = \frac{\dot{V}}{2\pi a h_a}$$

where

$$h_a = a \left[ \sqrt{8F + 1} - 1 \right]$$

with

F = Froude number = $\dfrac{2\, U_{jet}^{\,2}}{G\, A}$

$U_{jet}$ = vertical velocity of jet

G = effective gravity = $\left( 1 - \dfrac{\rho_{liq}}{\rho_{water}} \right)$

$\dot{V}$ = volumetric liquid release rate

58

The above model has also been modified[8] to include the effect of mass loss. In this case, the pool spreads to a maximum radius consistent with the release rate and the evaporation rate.

The result given in equation 6 has been derived based on the assumption that the spread of the oil is influenced by the fact that the front spreads at a velocity equal to the small disturbance wave velocity corresponding to the film thickness at the front. This film thickness, of course, varies with time and is estimated based on continuity and similarity considerations. It is also noted that the above model is not applicable to situations where there may be a superimposed current in the water.

The data required to use the above model are:

- the spill rate;
- the size of the jet and the vertical velocity of the liquid in the jet just before the jet enters water;
- physical properties of oil and water.

Several models which describe the spreading and dispersion of oil on the sea (water) have been reviewed. It is seen that each model is applicable under certain restricted conditions based on the type of spill and the environmental conditions. It is therefore essential to consider the restrictions and the applicability to a given spill situation before using any particular model. The data necessary to use each of the models discussed are also indicated.

2. Movement of Oil Slick on the Sea

The dominant physical forces on the sea that are responsible for moving an oil slick on the water are the wind and ocean (surface) currents. It is not clear what the effect of very rough sea (with very large wave heights - of the order of 10 feet) would be on the oil slick. No model exists at the present time to predict either the effect of such waves and turbulence on the dispersion, dissolution, evaporation, or emulsification of the oil or on the breakup of the slick.

All of the models currently used[9, 10, 11] in the literature for predicting the motion of the oil slick assume that the slick as a whole moves in a direction determined by the combined action of wind

and surface current.  The effect of the wind is accounted for by assuming that the oil slick moves in the direction of the wind (in the absence of surface water currents) at 3% of the wind speed.  The current is assumed to move the slick in its direction at the full current velocity.  The actual motion of the slick is therefore in the direction of the resultant vector given by

$$\vec{u}_{slick} = 0.03\,\vec{u}_{wind} + \vec{u}_{current}$$

where

$\vec{u}_{slick}$ = slick velocity

$\vec{u}_{current}$ = water surface velocity

$\vec{u}_{wind}$ = wind velocity

The wind velocity varies from a very low value at the water surface to a high value a few meters above the water surface.  The location at which wind velocity has to be measured (above the surface) to use it in equation 8 is not clearly defined in the models.  Hann[9] uses the wind velocity value at 10 meter height in equation 8.

If the wind velocity and its direction are known at all in time and the water current direction and magnitude are also known for all instants and locations, it is indeed an easy matter to track the theoretical path of an oil slick, using equation 8.  However, in such an analysis, the slick is assumed to move en masse and the effects of dissolution, evaporation, and slick break-up are neglected.  Once the path of slick movement is well established, the shore areas that are impacted can be readily determined.

Unfortunately however, the wind velocity is neither steady nor is its direction predictable with accuracy.  Similarly, surface water current characteristics may not be completely known.  Therefore, only an estimate can be made of the probability with which a shore area is impacted by an oil spill.  The different models available in the literature are all similar in their approach but different in the complexity of the analysis.  In all of the models, the primary agency that determines the probability of impact is the wind.

Before describing briefly each of the models, it is noted that these models are applicable only to an "instantaneous" spill, the slick from which moves around, buffeted by tides and wind. No model exists to describe the movement of an oil slick due to a continuous spill, when the slick is subjected to wind and tidal effects.

A detailed discussion is given in a later section on the wind data and their use in predicting oil slick movement. A similar discussion is also given on the current and tidal data.

Williams et al. model[9] for oil slick movement assumes that the slick far out in the ocean is moved by both onshore and offshore winds and positionally dependent, seasonally varying surface current. When the slick is two miles off coast, the model assumes that the only forces acting are the onshore wind and the long shore current. The Fay[1] model is used to account for the slick size increase.

To calculate the probability of impact of a shoreline, the model simulates (using a computer) the spill of a given quantity of oil at the given area. The most probable wind velocity and direction are obtained from the wind data charts (for the particular season under consideration). For the calculation of oil slick movement, this wind velocity and direction are assumed to be constant. The rest of the calculations are performed essentially using equation 8. Several such runs are made on the computer to get the impact probability distribution on the shoreline.

To use the above model, the following data are needed:

- wind data by month, direction of wind, and velocity category (for a detailed description of wind data, see the next section);
- current data (velocity and direction of surface current) at all points covering the general area of interest (shoreline-offshore and areas where spill is likely to occur);
- physical properties of the oil and water; and
- transfer rates (evaporation coefficients) for the various fractions of the oil which evaporate in large quantities.

61

Devanney Model[10] for predicting oil spill movement is similar to the above-described model by Hann, with one major difference. In this model, wind direction and magnitude are not assumed constant but are obtained at each grid point (points at which the oil slick center is located at equal intervals of time) by the use of random numbers generated by the computer and biasing the selection of the velocity and direction values, taking into account the wind rose data at the site. The current data are handled as indicated earlier. The method uses the Monte Carlo technique to predict the impact probabilities.

The data required to execute this model is also identical to the one above. The model requires a detailed description of the wind and currents at a considerable number of locations.

ADL model[11] is similar to the above two, except that it is graphical and that a very detailed description of the current is not, in general, needed. However, streamline directions at a few locations and the magnitude of currents are needed.

The wind data is also handled in a different way. The 16-direction wind velocity data is reduced in such a way as to get the directions and mean velocity magnitudes of wind in four directions having the highest probability. The detailed methodology is given in reference 11. The slick size increase is considered using Fay[1] and Fannelop and Waldman[2] models. The wind velocity and direction are considered constant during the movement of the slick. The slick center is said to move on a streamline due to the current but is moved off the streamline by the wind. Taking small intervals of time, resultant vectors are drawn graphically to represent the motion of slick center, and slick sizes are also represented.

Impact at a point is said to occur when the center of slick is one radius away from the shoreline. No mass loss of oil is considered for conservative calculations. The impact probability is said to be equal to the probability with which the wind blows in the direction previously calculated. Calculations are repeated with the other three direction winds also, and the combined probability of impact is calculated.

Where insufficient data exists on the direction (and magnitude) of the streamline (and velocity), judicious assumptions are made and streamlines drawn on the map. Such a procedure has been used recently to calculate the probability of impact at various locations near Portland Harbor.

The data required to use the above model are:

- oil and water physical properties;
- wind data;
- current streamlines and magnitudes of velocity.

3. Wind Data and Their Use

The direction and magnitude of the wind on the surface of the earth change continuously with time. They also vary from point to point and are different at different heights above the ground. However, in any given location, certain directions and certain velocities occur more often than others. These preferred directions and velocities do change with seasons but may also exhibit diurnal changes.

The accuracy with which one can predict the wind direction and velocity depends on the extent of the availability of data. The finer the time intervals over which the data are recorded, the better the estimate of the probability prediction. Even though the direction and magnitude probability can be established reasonably accurately (even from course time interval data), it is very difficult to estimate the duration over which a given velocity wind in a given direction would persist. In effect, certain a priori assumptions have to be made in applying available wind data to the prediction of oil slick movement.

The National Climatic Center (NCC) of the National Oceanic and Atmospheric Administration[12] compiles wind data for particular locations within the United States. The wind velocity, direction, cloud cover, temperature, humidity, etc., are recorded hourly, over years, to arrive finally at a wind distribution data sheet. Based on these hourly data, seasonal average or monthly average number of times the wind blows in a particular direction and with velocity within a certain

range are compiled. The NCC data are available in the form of computer printouts, with each page containing a matrix of number of observations in each of 16 compass directions and six categories of wind velocity ranges, and a mean velocity value for each direction. A typical page from such data printout is shown in Table 3.

The wind data that have to be used to predict the oil slick move-ment for several miles on the sea should be representative of the wind conditions over the whole area over which the slick is likely to move. Where such data are not available, it is essential to gather them by measurement for some time and then to extrapolate the data using appropriate statistical techniques to get representative wind data.

It is also possible that the winds on the sea within two to five miles offshore are influenced by both onshore and offshore (over the sea) winds.[9] When dealing with slick movements near shorelines, the onshore winds are to be considered. For predicting the slick movement a few miles offshore, a vectorial linear combination of the onshore and offshore winds should be considered.

There are several types of probabilities that should be considered in using wind data. The first one is the probability of occurrence of a given class of atmosphere. The second type of probability that can be defined is the probability that the wind blows from a certain direction and has velocity in a specified velocity range. When such a direction is specified, it is assumed that the wind can blow with an angular deviation of $\pm 11\ 1/4°$ about the direction considered. This can be obtained directly from wind data charts. Finally, one can define the third kind – a probability density $p(u, \theta)$ – such that

$$\begin{array}{l}\text{the probability of wind velocity}\\\text{being between } u \text{ and } u + du \text{ and}\\\text{the wind direction being in}\\\text{direction } \theta \text{ and } \theta + d\theta\end{array} = p(u, \theta)\, du\ d\theta$$

For the calculations if impact probability for the shorelines, the second and third types of the probabilities are used. The ADL model[11] uses the second type of probability definition. The details of

## TABLE 4

SEASON = DJF

STATION = 14,764 PORTLAND, MAINE/WSO 55-6

FREQUENCY DISTRIBUTION SPEED (KTS)

| Direction | 1 – 3 | 4 – 6 | 7 – 10 | 11 – 16 | 17 – 21 | Greater Than 21 | Average Spd. | Total |
|---|---|---|---|---|---|---|---|---|
| N | 52 | 331 | 877 | 713 | 138 | 51 | 10.3 | 2,162 |
| NNE | 18 | 121 | 350 | 416 | 138 | 41 | 11.7 | 1,084 |
| NE | 9 | 74 | 160 | 109 | 58 | 22 | 11.1 | 432 |
| ENE | 11 | 35 | 71 | 66 | 42 | 33 | 12.9 | 258 |
| E | 10 | 46 | 79 | 49 | 23 | 18 | 11.0 | 225 |
| ESE | 8 | 31 | 44 | 33 | 20 | 8 | 10.9 | 144 |
| SE | 8 | 26 | 35 | 27 | 8 | 11 | 10.9 | 115 |
| SSE | 10 | 41 | 67 | 64 | 16 | 25 | 11.8 | 223 |
| S | 20 | 73 | 166 | 167 | 39 | 19 | 10.7 | 484 |
| SSW | 12 | 97 | 294 | 292 | 28 | 5 | 10.2 | 728 |
| SW | 17 | 97 | 376 | 394 | 41 | 10 | 10.4 | 935 |
| WSW | 25 | 124 | 350 | 585 | 120 | 56 | 11.8 | 1,260 |
| W | 32 | 166 | 274 | 468 | 116 | 46 | 11.5 | 1,102 |
| WNW | 42 | 161 | 266 | 501 | 84 | 8 | 10.8 | 1,062 |
| NW | 39 | 204 | 316 | 515 | 104 | 25 | 10.9 | 1,203 |
| NNW | 37 | 222 | 408 | 636 | 126 | 28 | 11.0 | 1,457 |
| AVG | 2.9 | 5.1 | 8.5 | 13.1 | 18.3 | 24.9 | 10.8 | |
| TOTAL | 350 | 1,849 | 4,133 | 5,035 | 1,101 | 406 | | |

Number of Occurrences of D Stability = 13,151

Number of Calms with D Stability    =    277

Source:   National Climatic Center

TABLE 5

SEASON: DJF

ATMOSPHERIC CLASS: D

| Wind Blowing From Direction | No. of Observations in the Direction* | Probability of Occurrence of Direction % | Mean Wind Velocity Knots | Weighted Vectorial Mean Velocity Knots | Angle from Due North of the Mean Vector Direction Degrees | Overall Probability of Occurrence in the Resultant Direction % | Remarks |
|---|---|---|---|---|---|---|---|
| NNW | 1,457 | 11.08 | 11.0 | | | | |
| N | 2,162 | 16.44 | 10.3 | 10.35 | 180° – 1.03° | 26.1 | The angle is counted in clockwise direction from due North (geographic) |
| NNE | 1,084 | 8.24 | 11.7 | | | | |
| WNW | 1,062 | 8.08 | 10.8 | | | | |
| NW | 1,203 | 9.15 | 10.9 | 10.49 | 135° – 1.93° | 18.73 | |
| NNW | 1,457 | 11.08 | 11.0 | | | | |
| SSW | 728 | 5.54 | 10.2 | | | | |
| SW | 935 | 7.11 | 10.4 | 10.41 | 45° – 4.06° | 14.67 | |
| WSW | 1,260 | 9.58 | 11.8 | | | | |
| ENE | 258 | 1.96 | 12.9 | | | | |
| E | 225 | 1.71 | 11.0 | 11.13 | 270° – 4.08° | 3.24 | |

*Total number of observations in Class D = 13,151

Source: National Climatic Center (op. cit.)

calculation of such a probability are given below.

### Example for Calculating Wind Probabilities

Consider, for example, that we are interested in determining the directions and the wind velocities in those directions having high probabilities of occurrence. It is seen from Table 4 that for the season DJF, directions N, NW, SW, and E have, respectively, the highest probabilities of occurrence. Table 5 shows the reduced data from Table 4 (for the season DJF) for the above principal directions and their neighboring directions. The mean velocities in each direction and their probability of occurrence are shown. The probabilities refer to the direction being within $\pm$ 11 1/4° of the direction shown. However, if the interest is in the probability that the wind is within $\pm$ 22 1/2°, we compute its "mean" direction and mean velocity by a vector addition of the mean wind velocities weighted by the individual probabilities. This is shown in Figure 1 for wind in S direction in the season JJA. The resultant vector OE is given by

$$\vec{OE} = 0.2015 \times \vec{OB} + \frac{0.0663}{2} \times \vec{OA} + \frac{0.095}{2} \vec{OC}$$

where $\vec{OA}$, $\vec{OB}$, and $\vec{OC}$ represent the mean wind velocity vectors from directions SSE, S, and SSW, respectively. The probability of occurrence of OE is given by

$$p(\vec{OE}) = 0.2015 + \frac{(0.0633 + 0.095)}{2} = 0.2822$$

The probability and the mean velocity of the resultant vector is

$$p = (1/2 \, p_1 + p_2 + 1/2 \, p_3)$$

$$\text{and } \vec{u}_{mean} = \frac{|1/2 \, p_1 \vec{u}_1 + p_2 \vec{u}_2 + 1/2 \, p_3 \vec{u}_3|}{p}$$

For calculating the probabilities of oil impact on the shorelines, the ADL model[11] considers four highest probability wind directions (in a manner indicated by the above discussion).

### Calculation of Land Impact Probability

The basic concept in all of the models currently used in the literature to determine the shore impact probability is to allow for the oil slick size increase and slick drift. Only in the description



Season:  JJA                          Atmosphere:  D

OA  =  SSE Wind   – Probability of Occurrence =    6.63%; Mean Velocity =   9.5 Knots
OB  =  S Wind     – Probability of Occurrence = 20.15%; Mean Velocity = 10.8 Knots
OC  =  SSW Wind   – Probability of Occurrence =    9.5%; Mean Velocity = 9.2 Knots
OE  =  Weight Vector – Sum of OS, OB, AND OC = .0663 OA + 0.2015 OB + 0.095 OC

Source:  National Climatic Center (Op. cit)

FIGURE    1    DETERMINATION OF EFFECTIVE WIND DIRECTION AND PROBABILITY

of the tracking of the oil slick are there any differences.

For example, the ADL model[11] does not initially consider the particular shore area whose impact susceptibility is to be calculated; instead, the model tracks the oil slick's motion, and when the impact occurs at a shore point, the impact probability is set equal to the probability of the wind being in the direction considered. The calculations are repeated with different direction winds. By this technique, the impact probability variation along the length of the coastline is determined, from which the susceptibility of a particular spot on the coastline can be obtained by interpolation.

On the other hand, the Devanney model[10] simulates both the variability and the persistence of the wind. The wind is assumed to be constant in velocity and direction for three hours, and at the end of three hours, the direction into which it will turn is determined using a random number generation scheme. Essentially, this procedure uses the Monte Carlo technique. The "tracking" is done on a computer from spill to impact, and the entire tracking is repeated several times to obtain average impact probabilities.

Similarly, there are minor differences in the models in calculating the effect of tidal and mean non-oscillatory current velocities. The idea that oil slick is generally washed inshore with the flood tide and moves outward into the sea with the ebb tide is used in all models.

No considerations are given in any model for the possible breakup of the oil slick when it has spread to a thin film and has been subjected to wave and wind forces. There is a considerable gap in the knowledge on the effects of waves on the oil slick. All models currently used assume that only the mean current velocity is important in moving the oil slick.

REFERENCES

1. Fay, J.A., "The Spread of Oil on a Calm Sea," in Oil on the Sea, D.P. Hoult, ed., Plenum Press, New York, 1969.

2. Fannelop, T.K. and Waldman, G.D., "Dynamics of Oil Slicks," AIAA Journal, Volume 10, No. 4, April 1972.

3. Fay, J.A., "Physical Processes in the Spread of Oil on a Water Surface," "Prevention and Control of Oil Spills, Am.Pet. Inst., Washington, D.C. pp. 463-467, 1970.

4. Raj, P. and Kalelkar, A., "Fire Hazard Presented by a Spreading Burning Pool of LNG on Water," paper presented at the 1973 Fall Meeting of the Western States Section of the Combustion Institute.

5. "Assessment Models in Support of the Hazard Assessment Handbook (CG-446-3)," Report to USCG by Arthur D. Little, Inc., January, 1974, NTIS No. AD 776617.

6. Murray, S.P., "Turbulent Diffusion of Oil in the Ocean," Limnology and Oceanography, Volume 17, No. 5, pp. 651-660, 1972.

7. Abbott, M. and Hayashi, T., "Unsteady Radial Flow of Oil Being Discharged from a Source on the Ocean," Proc. 14th Coastal Eng. Conf., Jap. Soc. Civ. Eng., v 14, nl, pp. 226-229, 1967.

8. Raj, P., "Spreading of Continuously Released Oil on Water," Draft Report to the United States Coast Guard under Contract No. DOT-CG-24-655A.

9. Williams, G., Hann, R., and James, W., "Predicting the Fate of Oil in the Marine Environment," pp. 567-572, 1975.

10. Devanney, J., "Primary Physical Impacts of Offshore Petroleum Developments," MIT Sea Grant Report to Council on Environmental Quality, Report No. MITSG-74-20, April, 1974.

11. Arthur D. Little, Inc., Report to the State of Maine, Department of Environmental Protection, "A Comprehensive System for Oil Pollution Abatement and Control for Portland Inner Harbor," (In Press).

12. "Seasonal and Annual Wind Distribution by Pasquill Stability Classes (Star Program)," National Climatic Center, NOAA, Environmental Data Service, Federal Building, Asheville, N.C., 1972.

# Reproduced by NT**is**

National Technical Information Service
Springfield, VA 22161

*This report was printed specifically for your order
from nearly 3 million titles available in our collection.*

For economy and efficiency, NTIS does not maintain stock of its vast collection of technical reports. Rather, most documents are custom reproduced for each order. Documents that are not in electronic format are reproduced from master archival copies and are the best possible reproductions available.

If you have questions concerning this document or any order you have placed with NTIS, please call our Customer Service Department at 1-888-584-8332 or (703) 605-6050.

## About NTIS

NTIS collects scientific, technical, engineering, and related business information – then organizes, maintains, and disseminates that information in a variety of formats – including electronic download, online access, DVD, CD-ROM, magnetic tape, diskette, multimedia, microfiche and paper.

The NTIS collection of nearly 3 million titles includes reports describing research conducted or sponsored by federal agencies and their contractors; statistical and business information; U.S. military publications; multimedia training products; computer software and electronic databases developed by federal agencies; and technical reports prepared by research organizations worldwide.

For more information about NTIS, visit our Web site at http://www.ntis.gov.



**Ensuring Permanent, Easy Access to
U.S. Government Information Assets**

**ALL SALES ARE FINAL**

NTIS strives to provide quality products, reliable service, and fast delivery. Please contact us for a replacement within 30 days if the item you receive is defective or if we have made an error in filling your order.

▲ **E-mail: customerservice@ntis.gov**
▲ **Phone: 1-888-584-8332 or (703)605-6050**



U.S. DEPARTMENT OF COMMERCE
Technology Administration
National Technical Information Service
Springfield, VA 22161    (703) 605-6000

**13**

-----Original Message-----
From: Adam Zellner <Adam.Zellner@dep.state.nj.us>
To: julrog@aol.com
Sent: Wed, 22 Aug 2007 3:38 pm
Subject: Re: Follow Up - Julie Roginsky


Thanks Julie - per our conversation and meeting, the NJ DEP has reviewed the proposal and based on its current configuration, the Department has no regulatory issues that Atlantic Sea Isle Group must deal with.  Given the distance off NJ's coast and the fact that the current proposal has all of the infrastructure going coast through NYC, New Jersey has no jurisdiction in this matter.  We look forward to
working with you and if anything changes that does bring the project into NJ waters, we would be happy to sit down and discuss any issues that may present. Thanks again. Adam Zellner, Deputy Commissioner.

NJDEP

**14**



**15**

Atlantic Sea Island Group LLC
Safe Harbor Energy

# Exhibit O
# MetOcean Study

# May 2007

# Contents

**Exhibit O MetOcean Study**                                                    **O-1**

O.1   INTRODUCTION.................................................................... O-1
O.2   STUDY OBJECTIVE ............................................................ O-2
O.3   PROJECT LOCATION ......................................................... O-2
O.4   BATHYMETRY.................................................................... O-2
O.5   WATER LEVELS AND CURRENTS ...................................... O-7
      O.5.1   Water levels.............................................................. O-7
      O.5.2   Currents .................................................................. O-8
O.6   WINDS ............................................................................ O-13
      O.6.1   Operational Wind climate ........................................ O-15
      O.6.2   Extreme wind conditions.......................................... O-16
O.7   WAVES ............................................................................ O-18
      O.7.1   Operational wave climate ........................................ O-18
      O.7.2   Extreme wave conditions.......................................... O-20
O.8   POTENTIAL ENVIRONMENTAL IMPACTS OF ISLAND CONSTRUCTION.................... O-26

# Tables

Table 1.    Bathymetry Source Data Characteristics [After Reference 1] .......................... O-4

Table 2.    Water Surface Elevation Frequency Analysis (ft, msl) ...................................... O-8

Table 3.    Selected NOAA Buoy Station and WIS Station Information ............................ O-14

Table 4.    Extreme Offshore Wind Speed at Project Site ................................................ O-16

Table 5.    Design Wind speeds per Direction and Return Period (mph) .......................... O-17

Table 6.    Percent Occurrences of Wave Height by Month (After WIS) .......................... O-19

Table 7.    Percent Occurrences of Wave Peak Period by Month (After WIS) ................. O-19

Table 8     Extreme Wave Height for Different Return Period .......................................... O-20

Table 9.    Maximum Significant Wave Height (meters) ................................................... O-21

Table 10.   Significant Wave Height- West-Northwest ..................................................... O-21

Table 11.   Significant Wave Height- North ....................................................................... O-21

# Figures

Figure 1.    The Location of Proposed Safe Harbor Energy Project Site ........................... O-3

Figure 2.    USC&GS Three-dimensional Representation of the 1927/1997 Bathymetric
Surface ........................................................................................................... O-5

Figure 3.    NGDC Coastal Relief Model 3-D Bathymetry ................................................. O-6

Figure 4.    Water Depth Contour around the Safe Harbor Energy Project Site ................ O-7

Figure 5.    Sea Level Change 1932 – 1999 at Sandy Hook, NJ [After NOAA] ................. O-8

Figure 6.    Current Meter Locations [Modified based on Ref.1] in Relation to the Safe Harbor
Energy Project Site .......................................................................................... O-9

Figure 7.    Joint Probability of Surface Current Speed & Direction at Current Station D [After
Ref.1] ............................................................................................................. O-10

Figure 8.    Joint Probability of Bottom Current Speed & Direction at Current Station D [After
Ref.1] ............................................................................................................. O-11

Figure 9.    Joint Probability of Bottom Speed & Direction at Current Station D [After Ref.1] ............ O-11

Figure 10.   Wind Speed & Direction versus Surface and Bottom Currents at Station D, March
19 to 31, 2000 (data from Butman et al., 2003) ............................................. O-12

Figure 11    Tidal ellipses for major tidal constituents [After Ref.1] ................................. O-13

Figure 12.   NOAA Buoy Station and WIS Station nearby the proposed Safe Harbor Energy
Project Site ..................................................................................................... O-14

Figure 13.   WIS Station #123 Wind Joint Probability Chart for the Safe Harbor Energy
Project ............................................................................................................. O-15

Figure 14.  NOAA Buoy #44025 Wind Joint Probability Chart for the Safe Harbor Energy Project.................................................................................................. O-16

Figure 15.  WIS Station 123 Wave Joint Probability Chart for the Safe Harbor Energy Project........ O-18

Figure 16   NOAA Buoy #440253 Wave Joint Probability Chart Project............................................ O-20

Figure 17.  Example Wave Refraction/Diffraction Diagram (The case corresponds to a Northwest Island Alignment with a 1m, 12 second wave from the Northeast.) ............... O-22

Figure 18.  Example Wave Refraction/Diffraction Diagram (The case corresponds to a Northwest Island Alignment with a 1m, 12 second wave from the Southeast.)............... O-23

Figure 19.  Wave Height Analysis Points. ......................................................................................... O-24

Figure 20.  Wave Height Exceedence Plot for a Northwest Island Orientation ................................ O-25

Figure 21.  Wave Height Exceedence Plot For a North Island Alignment ........................................ O- 26

# Appendices

Appendix A      Sedimentary Environment in the New York Bight

Appendix B      Temperature, Salinity, Archeological/Cultural Resources and Visibility

# EXHIBIT O
# METOCEAN STUDY

## O.1  INTRODUCTION

Atlantic Sea Island Group LLC (ASIG or the Applicant) proposes to construct, own, and operate a liquefied natural gas (LNG) receiving, storage, and regasification facility as a deepwater port that will be capable of delivering up to 1.15 billion standard cubic feet per day (bscfd) of natural gas per day to the New York metropolitan region.  The deepwater port, Safe Harbor Energy (Safe Harbor Energy or the Project) consists of three components: an island to be constructed in federal waters on the Outer Continental Shelf (OCS), approximately 13.5 miles south of the City of Long Beach, New York, on Long Island and 23 miles southeast of the New York Harbor entrance (Island); an LNG receiving, storage, and regasification facility (Terminal); and a subsea pipeline (Pipeline) that will transport the natural gas to a connection with the Transcontinental Gas Pipeline Corporation's Pipeline System's existing Morgan, New Jersey to Long Beach, New York offshore natural gas pipeline (Transco Pipeline).  Safe Harbor Energy will bring to the region a much-needed new and reliable supply of clean-burning, cost-effective, and globally sourced natural gas.  In addition, Safe Harbor Energy will enhance supply flexibility, diversity, and competition in U.S. energy markets.

The Island will be constructed in an open area of the ocean between the Ambrose-to-Nantucket and Hudson Canyon-to-Ambrose international shipping lanes.  This Project location allows LNG carriers to use established shipping lanes to access the facility, while minimizing interference with commercial shipping.  The Project, located at approximately 40° 23' 19"N and 73° 36' 35"W is in a water depth of approximately 60 to 70 feet (18 to 21 meters). The location is shown in Volume 3, Part 1, Topic Report One, General Project Description, Figures 1-1 and 1-2.  The Island will be constructed of natural sand, gravel, and rock materials surrounded by armored breakwaters, consisting of prefabricated caissons, prefabricated armor units, and rock; it will be capable of withstanding major (200-year) storms.

The Island has been located and designed to minimize potential safety, environmental, and socioeconomic impacts while providing an optimal facility for the importation of LNG and the delivery of natural gas to the New York area.

The Terminal will incorporate the following features:

- docking and unloading facilities in a protected harbor for two LNG carriers with capacities of 70,000 to 270,000 cubic meters ($m^3$)

- four identical 180,000 $m^3$ full-containment storage tanks

- ambient air vaporization equipment to convert LNG into natural gas without using seawater

- self-contained, state-of-the art related operational, safety, and communication facilities

- small craft docking facilities for safety and supply vessels

- self-contained Island power supply facilities fueled by natural gas.

The Pipeline, consisting of two parallel 36-inch-diameter pipeline segments, will extend 12.8 miles from the Island to a connection with the existing offshore Transco Pipeline passing to the north and west of the Island.  The Pipeline will be constructed, owned, and operated by one or more third parties, although ASIG may participate in the Pipeline.  Negotiations are underway with potential Pipeline partners.

Construction of the Project will take approximately 63 months for commercial operations to begin and 69 months total to complete.  ASIG anticipates the commencement of operations in 2014.

## O.2  STUDY OBJECTIVE

This objective of this study is to collect/review available site data, to report preliminary MetOcean design parameters at the LNG Terminal location, and to address issues regarding the effects of new LNG Terminal on adjacent federal navigation channels and region coastlines.

The MetOcean conditions have been used to prepare operational analysis, mooring analysis, structural design and fatigue analysis. The following MetOcean design parameters will be assessed:

- Operational and design wind conditions.
- Astronomical and Storm Tide water levels.
- Ocean currents.
- Operational and design wave conditions.


## O.3  PROJECT LOCATION

The proposed LNG terminal is located at Latitude 40°23'19"N and Longitude73°36'35"W (approximately 23 miles southeast of the entrance to the New York Harbor and 13.5 miles south of the coastline of Long Beach, NY). The water depth at project site is in the range from 60 ft to 70 ft. The site is located on the Federal Outer Continental Shelf (OCS), a zone that extends from three miles seaward of State coastline boundaries to 200 miles offshore. The location of the proposed LNG terminal is shown in Figure 1.


## O.4  BATHYMETRY

Historical hydrographic surveys are widely available for the project area and are described in the Section 3.2 (Nearshore Bathymetry Change) of Reference 1. Digital bathymetric data available from the US Coast & Geodetic Survey are listed in the Table 1.  Figures 2 and 3 provide USC&GS and NGDC bathymetric graphics.  Figure 4 comprises a water depth map for the area around the Safe Harbor Energy location.

Additional bathymetric data are available from GEODAS (GEOphysical DAta System) developed by the National Geophysical Data Center (NGDC.)  The GEODAS software incorporates geophysical data, bathymetric survey data, aeromagnetic survey data, multibeam bathymetric data, and gridded bathymetry/topography.



**Figure 1.    The Location of Proposed Safe Harbor Energy Project Site**

**Table 1.  Bathymetry Source Data Characteristics [After Reference 1]**

| Date | Data Source | Comments and Map Numbers |
|---|---|---|
| 1927-37 | USC&GS Hydrographic Sheets | 1927 - H-04797 (1) |
| | | 1932 - H-05204 (1) |
| | | 1933 - H-05300 (1), H-05367 (2), H-05369 (2), H-05370 (1), H-05371 (2), H-05377 (1) |
| | | 1934 - H-05615 (1), H-05732 (1), H-05734 (1), H-05735 (2), H-05616 (1), H-05638 (1), H-05639 (2) |
| | | 1936 - H-06188 (3), H-06189 (3), H-06190 (3), H-06136 (2), H-06026 (3) |
| | | 1937 - H-06223 (3) |
| 1927-97 | USC&GS Hydrographic Sheets | 1927 - H-04797 (1) |
| | | 1933 - H-05300 (1), H-05367 (2), H-05369 (2), H-05370 (1), H-05371 (2), H-05377 (1) |
| | | 1934 - H-05615 (1), H-05732 (1), H-05735 (2), H-05616 (1), H-05638 (1) |
| | | 1936 - H-06188 (3), H-06189 (3), H-06190 (3), H-06136 (2) |
| | | 1950 - H-07870 (2) |
| | | 1951 - H-07947 (2) |
| | | 1975 - H-09546 (3), H-09531 (3), H-09532 (4), H-09550 (3), H-09567 (3), H-09568 (2), H-09577 (3) |
| | | 1979 - H-09820 (1) |
| | | 1982 - H-10035 (1), H-10031 (1) |
| | | 1986 - H-10224 (2) |
| | | 1988 - H-10284 (1), H-10287 (1), H-10290 (1), H-10291 (1), FE0312 (2), H-10286 (1) |
| | | 1996 - H-10683 (1), H-10668 (1), H-10675 (1), H-10686 (1) |
| | | 1997 - H-10750 (1) |

(1) = 1:10,000, (2) = 1:20,000, (3) = 1:40,000, (4) = 1:80,000



**Figure 2.    USC&GS Three-dimensional Representation of the 1927/1997 Bathymetric Surface**



Figure 3.    NGDC Coastal Relief Model 3-D Bathymetry



**Figure 4.    Water Depth Contour around the Safe Harbor Energy Project Site**

## O.5  WATER LEVELS AND CURRENTS

### O.5.1  Water levels

#### O.5.1.1  Tidal levels

There are two tidal stations nearby the proposed ASI LNG Terminal project site. One is Sandy Hook Station, New Jersey, located at 40°28'0"N/74°6'0"W.  The other is Long Beach Station, New York, located at 40°35'0"N/73°39'0"W. The Sandy Hook Station is the reference station of Long Beach Station. The tidal information from Sandy Hook Station has been used for preliminary design purposes.

The related tidal benchmarks information from Sandy Hook Station is summarized as follows [NOAA]:

| | |
|---|---|
| Length of series: | 19 Years |
| Time period: | January 1983 - December 2001 |
| Tidal epoch: | 1983-2001 |

Elevations of tidal datums referred to Mean Lower Low Water (MLLW):

| Tidal Datum | Elevation (ft) |
|---|---|
| Highest Observed Water Level (09/12/1960) | +10.09 |
| Mean Higher High Water (MHHW) | +5.22 |
| Mean High Water (MHW) | +4.90 |
| North American Vertical Datum -1988 (NAVD) | +2.82 |
| Mean Sea Level (MSL) | +2.58 |
| Mean Tide Level (MTL) | +2.54 |
| National Geodetic Vertical Datum (NGVD 29) | +1.72 |
| Mean Low Water (MLW) | +0.19 |
| Mean Lower Low Water (MLLW) | 0.00 |
| Lowest Observed Water Level (02/02/1976) | -4.72 |

The historic sea level change at Sandy Hook, NJ, is shown in the Figure 5.



**Figure 5.    Sea Level Change 1932 – 1999 at Sandy Hook, NJ [After NOAA]**

### O.5.1.2   Storm Tide Elevations

Design water levels for the proposed Island are influenced by storm effects (i.e. storm surge and wave setup) in combination with astronomical tides.  Storm surge is a temporary rise in water level generated either by large-scale extra-tropical storms known as northeasters, or by hurricanes.  The rise in water level results from wind action, the low pressure of the storm disturbance and the Coriolis force.  Wave setup is a term used to describe the rise in water level due to wave breaking.  Specifically, change in momentum which attends the breaking of waves propagating towards shore results in a surf zone force that raises water levels at the shoreline.

An evaluation of storm-induced water surface elevations was conducted by the U.S. Army Corps of Engineers (USACE) in 1998 for a site near the proposed Island.  Results of this study are summarized in Table 2.

**Table 2.        Water Surface Elevation Frequency Analysis (ft, msl)**

| Return Period | Atlantic Ocean Tropical | Atlantic Ocean Extra-Tropical |
|---|---|---|
| 5 | 0.00 | 5.47 |
| 10 | 1.33 | 6.44 |
| 25 | 4.65 | 7.29 |
| 50 | 7.16 | 7.71 |
| 100 | 9.17 | 8.02 |
| 200 | 11.19 | 8.28 |

### O.5.2  Currents

Acoustic Doppler current profiler (ADCP) data were taken by Butman et al. (2003), see Figure 6.  Station D is 6.1 miles from the project site at 40°18.01'N/73°35.99'W in 85 ft of water. Data were obtained over a 5-month period from early December to mid-April and represent a high-energy winter environment.

Figure 6.    Current Meter Locations [Modified based on Ref.1] in Relation to the Safe Harbor Energy Project Site

*Atlantic Sea Island Group LLC*
*Safe Harbor Energy*

Station D surface current speeds/directions are shown in Figure 7, bottom current speeds/directions, Figures 8 and 9.



**Figure 7.    Joint Probability of Surface Current Speed & Direction at Current Station D [After Ref.1]**



**Figure 8.     Joint Probability of Bottom Current Speed & Direction at Current Station D [After Ref.1]**



**Figure 9.     Joint Probability of Bottom Speed & Direction at Current Station D [After Ref.1]**

The maximum recorded surface current at Station D was 135 cm/s (4.4 ft/s) from the southeast.  The corresponding mean surface current speed was 67 cm/s (2.2 ft/s) also from the southeast. After filtering tidal currents (low-pass filtered to remove tidal variations), maximum current speed was reduced to 95 cm/s from the southeast, with a mean speed of 59 cm/s (1.9 ft/s) from the southeast.  Maximum current speed at 25 m (82 ft) below the surface at Station D was 35 cm/s (1.2 ft/s) flowing from the east, with a mean speed of 8 cm/s (0.3 ft/s) flowing from the southeast. Low-passing filtering of these data produced a minimal reduction in maximum current speed to 21 cm/s (0.7 ft/s) from the southeast; the mean current was 6 cm/s (0.2 ft/s) from the south-southeast. Furthermore, monthly variations in mean flow indicate only minor changes in current direction when tidal currents are filtered from the record. These observations suggest that wind-driven currents dominate the total current signal at Station D.

Further observation of currents revealed a relationship between sustained wind direction and current speeds as shown in the Figure 10.



**Figure 10.    Wind Speed & Direction versus Surface and Bottom Currents at Station D, March 19 to 31, 2000 (data from Butman et al., 2003)**

After removing the effects of wind, Butman et al. (2003) computed the amplitude and phase of tidal current constituents. Because tides in the New York Bight are semi-diurnal, the principal tidal constituents are K1, O1, M2, N2, and S2. Butman et al. (2003) analyzed tidal constituents for a depth 15 m below surface for each station as shown in the Figure 11.



**Figure 11    Tidal ellipses for major tidal constituents [After Ref.1]**

## O.6  WINDS

Wind data are available at: (1) NOAA Buoy # 44025, located at Latitude 40°15'01"N/Longitude73°09'59"W (25.3 miles southeast/offshore of the Project site) and (2) U.S. Army Corps of Engineers CHL WIS (Wave Information Study) Station # 123, located at Latitude40°25.2'N /Longitude73°34.8'W (2.7 miles northeast/offshore of the Project site) (see Table 3).  These Station locations are shown in the Figure 12. Long-term historical wind records are also available at LaGuardia Airport.



**Figure 12.**    NOAA Buoy Station and WIS Station nearby the proposed Safe Harbor Energy Project Site

**Table 3.**    Selected NOAA Buoy Station and WIS Station Information

| Station Name | Latitude | Longitude | Water Depth | Wind Record | Directional Wave Record |
|---|---|---|---|---|---|
| NOAA Buoy #44025 | 40°15'01" N | 73°09'59" W | 36.3 m | 10/1975 - 9/1980 4/1991 -12/2004 | 7/1991 - 12/2004 |
| WIS Station #123 | 40°25.2' N | 73°34.8' W | 20 m | 1/1980 - 12/1999 | 1/1980 - 12/1999 |

## O.6.1  Operational Wind climate

WIS Station #123 hourly wind data are summarized in Figure 13 for the 20-year hindcast period.



**Figure 13.    WIS Station #123 Wind Joint Probability Chart for the Safe Harbor Energy Project**

(Note: Wind directions use meteorological convention; A wind direction of 0° corresponds to a wind that is blowing from due North; A wind direction of 90° corresponds to a wind that is blowing from due East; A wind direction of 180° corresponds to a wind blowing from due South; A wind direction of 270° corresponds to a wind blowing from due West. Wind fields in WIS Stations are from Oceanweather, Inc., and include the AES40 wind product with additional analysis for tropical storms and northeasters by Oceanweather.)

Hourly wind data for NOAA Buoy #44025 are summarized in Figure 14.



**Figure 14.    NOAA Buoy #44025 Wind Joint Probability Chart for the Safe Harbor Energy Project**

### O.6.2   Extreme wind conditions

Extreme wind hourly speeds have been estimated from WIS Station #123 data and are summarized in Table 4.

**Table 4.       Extreme Offshore Wind Speed at Project Site**

| Return Period | Wind Speed (ft/sec) |
|---|---|
| (year) | 1-hour |
| 100 | 89.2 |
| 200 | 94.5 |

Design wind speeds were also derived from NOAA wind data for La Guardia International Airport.  These data are fastest mile values that correspond to the highest recorded wind speed having duration sufficient to travel one mile during a 24-hour recording period.  For example, a fastest mile wind speed of 60 miles per hour would have a duration of 60 seconds, 50 miles per hour, 72 seconds.  Yearly extremes indicate that the maximum wind speed recorded at La Guardia was 73 miles per hour and had a northeast direction.  The

*Atlantic Sea Island Group LLC*
*Safe Harbor Energy*

wind data were used to develop wind speed-return period relationships based on a Type I (Gumbel) distribution. Return period is defined as the average time between wind events which equal or exceed a given value. The specific return periods examined were 2, 5, 10, 25, 50, 100, 200 and 500 years. Annual extreme wind speeds were computed for eight directions; namely: North (N), Northeast (NE), East (E), Southeast (SE), South (S), Southwest (SW), West (W) and Northwest (NW). Design wind speeds are shown in Table 5.

**Table 5.   Design Wind speeds per Direction and Return Period (mph)**

| Return Period | Direction | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | NE | E | SE | S | SW | W | WNW | NW |
| 2 | 37 | 46 | 31 | 35 | 33 | 37 | 41 | 44 | 47 |
| 5 | 45 | 57 | 41 | 46 | 40 | 44 | 51 | 52 | 52 |
| 10 | 51 | 64 | 48 | 52 | 44 | 49 | 57 | 56 | 55 |
| 25 | 58 | 73 | 56 | 60 | 50 | 55 | 64 | 62 | 59 |
| 50 | 64 | 80 | 62 | 66 | 54 | 60 | 70 | 67 | 63 |
| 100 | 69 | 86 | 68 | 72 | 58 | 64 | 76 | 71 | 66 |
| 200 | 75 | 94 | 74 | 78 | 63 | 69 | 81 | 75 | 69 |
| 500 | 82 | 102 | 83 | 85 | 68 | 75 | 89 | 81 | 73 |

Excluding ocean directions, the longest fetch distances to the site are from the northwest quadrant. Table 5 shows that the design wind speeds for a 100-year return period storm range from 58 mph from the south direction to 86 mph from the northeast direction. The design wind speeds presented in Table 5 have been used to estimate locally-generated design wave conditions.

## O.7  WAVES

### O.7.1  Operational wave climate

The WIS Station #123 wave data are shown in the following wave rose chart Figure 15.



**Figure 15.    WIS Station 123 Wave Joint Probability Chart for the Safe Harbor Energy Project**

Other wave climate info is listed in Tables 6 and 7.

*Atlantic Sea Island Group LLC*
*Safe Harbor Energy*

**Table 6.      Percent Occurrences of Wave Height by Month (After WIS)**

1980-1999  ATL WIS STATION: 123   LAT: 40.42 N, LON: -73.58 W, DEPTH:  20 M
PERCENT OCCURRENCES OF WAVE HEIGHT BY MONTH

| Hmo(m) | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | CASES | PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.00 - 0.49 | 0.88 | 0.97 | 1.41 | 1.80 | 1.94 | 2.31 | 2.78 | 2.38 | 1.63 | 1.60 | 0.93 | 1.02 | 34451 | 19.7 |
| 0.50 - 0.99 | 2.97 | 2.86 | 3.14 | 3.29 | 4.22 | 4.37 | 4.55 | 4.51 | 3.76 | 3.71 | 2.96 | 3.04 | 76019 | 43.4 |
| 1.00 - 1.49 | 2.56 | 2.28 | 2.37 | 2.02 | 1.74 | 1.22 | 0.88 | 1.16 | 2.02 | 2.05 | 2.49 | 2.60 | 41012 | 23.4 |
| 1.50 - 1.99 | 1.19 | 1.08 | 0.92 | 0.75 | 0.48 | 0.28 | 0.21 | 0.27 | 0.59 | 0.68 | 1.08 | 1.04 | 15045 | 8.6 |
| 2.00 - 2.49 | 0.51 | 0.33 | 0.38 | 0.24 | 0.08 | 0.03 | 0.05 | 0.11 | 0.13 | 0.29 | 0.45 | 0.54 | 5486 | 3.1 |
| 2.50 - 2.99 | 0.21 | 0.14 | 0.17 | 0.08 | 0.02 | 0.01 | 0.01 | 0.05 | 0.05 | 0.09 | 0.19 | 0.13 | 2044 | 1.2 |
| 3.00 - 3.49 | 0.07 | 0.05 | 0.06 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.09 | 0.06 | 727 | 0.4 |
| 3.50 - 3.99 | 0.05 | 0.01 | 0.02 | 0.00 | . | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 0.04 | | 296 | 0.2 |
| 4.00 - 4.49 | 0.03 | 0.01 | 0.01 | . | . | 0.00 | . | 0.00 | 0.01 | 0.00 | 0.01 | | 121 | 0.1 |
| 4.50 - 4.99 | 0.01 | . | 0.01 | . | . | . | . | 0.00 | 0.00 | 0.00 | 0.00 | | 51 | 0.0 |
| 5.00 - GREATER | . | 0.01 | . | . | . | . | . | . | 0.00 | 0.01 | | | 32 | 0.0 |

**Table 7.      Percent Occurrences of Wave Peak Period by Month (After WIS)**

1980-1999  ATL WIS STATION: 123   LAT: 40.42 N, LON: -73.58 W, DEPTH:  20 M
PERCENT OCCURRENCES OF PEAK PERIOD BY MONTH

| Tp(sec) | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | CASES | PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.0 - 3.9 | 2.35 | 2.13 | 2.19 | 1.79 | 1.35 | 1.47 | 1.43 | 1.48 | 1.64 | 2.38 | 2.27 | 2.53 | 40253 | 23.0 |
| 4.0 - 4.9 | 2.03 | 1.53 | 1.41 | 1.25 | 1.07 | 1.36 | 1.37 | 1.20 | 1.20 | 1.47 | 1.94 | 1.96 | 31178 | 17.8 |
| 5.0 - 5.9 | 0.70 | 0.55 | 0.70 | 0.86 | 1.41 | 1.71 | 2.21 | 1.76 | 1.16 | 0.74 | 0.71 | 0.74 | 23207 | 13.2 |
| 6.0 - 6.9 | 0.60 | 0.61 | 0.80 | 1.06 | 1.69 | 1.87 | 2.08 | 1.92 | 0.93 | 0.71 | 0.69 | 0.51 | 23645 | 13.5 |
| 7.0 - 7.9 | 0.55 | 0.73 | 0.71 | 0.95 | 1.50 | 1.07 | 0.93 | 1.10 | 1.01 | 0.89 | 0.67 | 0.62 | 18791 | 10.7 |
| 8.0 - 8.9 | 0.57 | 0.61 | 0.75 | 1.05 | 0.91 | 0.49 | 0.25 | 0.29 | 0.63 | 0.82 | 0.74 | 0.64 | 13773 | 7.9 |
| 9.0 - 9.9 | 0.58 | 0.67 | 0.82 | 0.75 | 0.33 | 0.13 | 0.11 | 0.25 | 0.34 | 0.64 | 0.52 | 0.64 | 10141 | 5.8 |
| 10.0 - 10.9 | 0.48 | 0.45 | 0.58 | 0.29 | 0.12 | 0.07 | 0.05 | 0.09 | 0.22 | 0.33 | 0.24 | 0.39 | 5806 | 3.3 |
| 11.0 - 13.9 | 0.52 | 0.45 | 0.51 | 0.26 | 0.10 | 0.04 | 0.06 | 0.28 | 0.32 | 0.42 | 0.41 | 0.44 | 7527 | 4.3 |
| 14.0 - LONGER | 0.01 | 0.00 | 0.01 | . | . | . | 0.00 | 0.13 | 0.27 | 0.08 | 0.02 | 0.03 | 973 | 0.6 |

The 14-year wave data record for NOAA Buoy #44025 is summarized in Figure 16.



**Figure 16      NOAA Buoy #440253 Wave Joint Probability Chart Project**

### O.7.2  Extreme wave conditions

Extreme wave conditions from WIS Station #123 wave data are shown in Table 8.

**Table 8      Extreme Wave Height for Different Return Period**

| Return Period (year) | NORTH Hs (ft) | NE Hs (ft) | EAST Hs (ft) | SE Hs (ft) | SOUTH Hs (ft) | SW Hs (ft) | WEST Hs (ft) | NW Hs (ft) |
|---|---|---|---|---|---|---|---|---|
| 100 | 8.5 | 13.5 | 23.6 | 24.6 | 20.3 | 14.4 | 10.5 | 10.5 |
| 200 | 9.2 | 14.8 | 25.9 | 26.9 | 22.3 | 15.7 | 11.2 | 11.2 |

Wave loads on structures are mainly determined by the wave height, but it is also dependent on the wave period. Once the design wave height is selected, then the range of wave period for the design condition needs to be fixed. The relation between the storm significant wave height (unit in ft) and significant wave period (unit in sec) can be written as: [Based on Ref.2]

$$T_s = (4.0 \sim 4.6)\sqrt{0.3048 \cdot H_s}$$

In which, the constant 4.0 is for large wave heights and 4.6 for extremely large heights.

USACE has performed a specific design wave hindcast for a site close to the proposed island. The original USACE work was done in connection with the study of a similar offshore island for dredged material placement. Results are presented in Table 9 and have been used for the purposes of preliminary design.

**Table 9.    Maximum Significant Wave Height (feet)**

| Return Period | Atlantic Ocean Tropical | Atlantic Ocean Extra-Tropical |
|---|---|---|
| 5 | 0.16 | 21.29 |
| 10 | 9.68 | 22.93 |
| 25 | 14.99 | 24.64 |
| 50 | 17.62 | 25.72 |
| 100 | 20.01 | 26.87 |
| 200 | 22.31 | 27.92 |

As indicated above, USACE modeling indicates that tropical and extra-tropical waves approach from the northeast to the southwest. A hindcast of waves from the west-northwest direction was performed in order to estimate the wave climate for the "lee" side of the Island. In accordance with procedures recommended by the USACE, a radially averaged fetch distance was computed for this direction. The fetch distance is computed to be 20.2 miles with a mean water depth of 45 ft. Results are presented in Tables 10 and 11.

**Table 10.    Significant Wave Height- West-Northwest**

| Return Period | Height (feet) | Period (second) |
|---|---|---|
| 5 | 7.5 | 5.5 |
| 10 | 8.1 | 5.7 |
| 25 | 8.9 | 5.9 |
| 50 | 9.6 | 6.1 |
| 100 | 10.3 | 6.3 |
| 200 | 10.9 | 6.4 |

**Table 11.    Significant Wave Height- North**

| Return Period | Height (feet) | Period (second) |
|---|---|---|
| 5 | 5.1 | 4.4 |
| 10 | 5.8 | 4.7 |
| 25 | 6.7 | 4.9 |
| 50 | 7.4 | 5.1 |
| 100 | 8.0 | 5.2 |
| 200 | 8.8 | 5.4 |

Some additional wave definitions will aid understanding of the above results. A sea state is normally composed of a spectrum of waves with varying heights and periods which may range from relatively long waves to short ripples. In order to summarize the spectral characteristics of a sea state it is customary to represent that wave spectrum in terms of a distribution of wave energy over a range of wave periods. Having made this distribution, known as a wave spectrum, it is convenient to represent that wave spectrum by a single representative wave height and period. The wave conditions reported above are the significant wave height, $H_s$, and peak spectral wave period, $T_p$. The significant wave height, $H_s$, is defined as the average of the highest one-third of the waves in the spectrum. Depending on the duration of the storm condition represented by the wave spectrum, maximum wave heights may be as high as 1.8 to 2 times the significant wave height. The peak spectral period, $T_p$, is the wave period that corresponds to the maximum wave energy level in the wave spectrum.

An extensive numerical modeling effort was undertaken to evaluate wave conditions in and around the proposed offshore harbor island complex. The MIKE21 PMS model was used to make the numerical computations. The work consisted of refraction/diffraction modeling for a range of offshore wave directions and periods for a unit wave height. The work was directed towards selecting an Island alignment and harbor geometry that would minimize wave heights at the proposed LNG vessel piers. Example results are presented in Figures 17 and 18.



**Figure 17.** **Example Wave Refraction/Diffraction Diagram (The case corresponds to a Northwest Island Alignment with a 1m, 12 second wave from the Northeast.)**



**Figure 18.**    **Example Wave Refraction/Diffraction Diagram (The case corresponds to a Northwest Island Alignment with a 1m, 12 second wave from the Southeast.)**

Numerous model runs were combined with the aforementioned WIS wave statistics to produce estimates of wave height exceedence statistics at selected points in and around the proposed island. The points are shown in Figure 19. Wave height exceedence plots are provided in Figures 20 and 21 for North and Northwest island alignments. These figures show that the waves at the WIS station exceed 1 m about 38% of the time. By virtue of the proposed harbor alignment/geometry, 1m waves within the harbor are estimated to be exceeded less than 5% of the time. An additional wave height exceedence point was located seaward of the harbor basin. This point corresponds to the location where LNG vessels would be turned prior to backing into the harbor basin. Is estimated that a 1m wave height at this location be exceeded no more than 27% of the time depending on harbor alignment. A harbor alignment of West-northwest was selected based on the above analysis.



LEGEND

● INSHORE POINTS
○ OFFSHORE POINT

PLAN
WAVE HEIGHT ANALYSIS POINTS

**Figure 19.    Wave Height Analysis Points.**



**Modeled Wave Heights Comparison - NW Island Orientation**
(based on WIS Station 123 from 1980-1999)

**Figure 20.    Wave Height Exceedence Plot for a Northwest Island Orientation**

**Modeled Wave Heights Comparison - N Island Orientation**
(based on WIS Station 123 from 1980-1999)



Figure 21.    **Wave Height Exceedence Plot For a North Island Alignment**

## O.8  POTENTIAL ENVIRONMENTAL IMPACTS OF ISLAND CONSTRUCTION

The proposed island will impact local current patterns but should be limited in extent.  Similarly, the Island will have a local impact wave conditions. The island is not expected to have a measurable impact on navigation channels or distant coastal areas.

**16**



**ELIOT SPITZER**
GOVERNOR

STATE OF NEW YORK
**EXECUTIVE DEPARTMENT**
**OFFICE OF GENERAL SERVICES**
MAYOR ERASTUS CORNING 2ND TOWER
THE GOVERNOR NELSON A ROCKEFELLER EMPIRE STATE PLAZA
ALBANY NEW YORK 12242

**JOHN C. EGAN**
COMMISSIONER

**WILLIAM L. HILL JR**
DEPUTY COMMISSIONER
REAL PROPERTY MANAGEMENT
& DEVELOPMENT

September 6, 2007

Mr. Howard F. Bovers
Chairman
Atlantic Sea Island Group, LLC
Chrysler Building
405 Lexington Avenue, 26th Floor
New York, New York    10174

Dear Mr. Bovers:

RE:    **Safe Harbor Energy Project**
**Deep Water Port (DWP), Atlantic Ocean**

We are in receipt of a letter from the United States Coast Guard regarding the above captioned along with a CD copy of your DWP license application.

Please be advised that the State of New York claims Sovereign ownership of any previously ungranted submerged lands offshore to the three-mile limit. Per same, you will need to obtain an easement for the proposed crossing. The following enclosed forms must be submitted to this office to obtain approval for your project:

- Petition for Easement
- New York State Standard Vendor Responsibility Questionnaire
- Affirmation of Understanding of and Agreement
- Certification of Compliance with State Finance Law
- Applicant Disclosure of Prior Non-Responsibility Determinations

Mr. Howard F. Bovers                    -2-                    September 6, 2007

    Additionally, an application map must be included with your Petition. Our Survey Requirements are included for your review as well as copies of Nassau County Water Grant Index Maps #24 and #25. Any questions regarding the mapping should be directed to Mr. John Hernick, PLS, of this office at (518) 474-2195.

    If you need additional assistance, please do not hesitate to contact Alan Bauder or myself at (518) 474-2195.

        Sincerely,

        Laura J. Graham
        Real Estate Specialist
        Bureau of Land Management

Enclosures
cc: Mr. Mark Prescott, Chief, Deepwater Ports Standards Division

**17**

# Environmental Report
## in support of the
# Safe Harbor Energy Project
# Deepwater Port License Application

May 2007

Topic Report One — General Project Description

Submitted by:
# Atlantic Sea Island Group LLC
New York City, New York

# Contents

**1.0   Topic Report One — General Project Description and Location**                                      **1-1**

   1.1     PROPOSED ACTION ................................................................................. 1-1
      1.1.1   Project Overview and Introduction ........................................ 1-1
      1.1.2   Purpose and Need ................................................................ 1-2
      1.1.3   Location and Description of Action ........................................ 1-4
   1.2     SURFACE REQUIREMENTS ..................................................................... 1-6
      1.2.1   Permanent Requirements ..................................................... 1-6
      1.2.2   Temporary Requirements ..................................................... 1-7
      1.2.3   Shore Based and Support Facilities ..................................... 1-7
   1.3     CONSTRUCTION PROCEDURES .............................................................. 1-8
      1.3.1   Island Construction .............................................................. 1-8
      1.3.2   Terminal Construction .......................................................... 1-11
      1.3.3   Pipeline Construction ........................................................... 1-13
   1.4     OPERATIONS .......................................................................................... 1-15
      1.4.1   LNG Transportation (Shipping) ............................................ 1-15
      1.4.2   Docking at Terminal / Anchoring .......................................... 1-16
      1.4.3   LNG Transfer to Storage ..................................................... 1-17
      1.4.4   LNG Storage and Maintenance ........................................... 1-18
      1.4.5   Processing Facilities ............................................................ 1-19
      1.4.6   Pipeline Operations ............................................................. 1-22
      1.4.7   Utility Systems ..................................................................... 1-22
      1.4.8   Structures and Buildings ...................................................... 1-28
      1.4.9   Logistics Operations ............................................................ 1-30
      1.4.10  Shore Based Support .......................................................... 1-31
      1.4.11  Tugboat Operations ............................................................ 1-31
   1.5     DECOMMISSIONING ............................................................................... 1-31
      1.5.1   Terminal ............................................................................... 1-31
      1.5.2   Pipeline Facilities ................................................................. 1-32
   1.6     PERMITS AND APPROVALS ..................................................................... 1-32
      1.6.1   Compliance with Statutes and Regulations .......................... 1-32
      1.6.2   Regulatory Consultation ...................................................... 1-32
      1.6.3   Public Outreach ................................................................... 1-33
   1.7     NON-JURISDICTIONAL FACILITIES .......................................................... 1-33
   1.8     AFFECTED LANDOWNERS / LAND MANAGEMENT AGENCIES ............... 1-33
   1.9     ALTERNATIVES ANALYSIS ...................................................................... 1-33
      1.9.1   Alternative Site for the Proposed Island/Terminal ................ 1-33
      1.9.2   Alternative GBS Terminal Design ......................................... 1-34
      1.9.3   Vaporizer Technologies ....................................................... 1-39
      1.9.4   Alternative Pipeline Route .................................................... 1-39
      1.9.5   No Action Alternative ........................................................... 1-40
   1.10    CUMULATIVE IMPACTS ........................................................................... 1-40

# List of Tables

Table 1-1.    Proposed Island/Terminal and Pipeline Data ........................................... 1-42

Table 1-2.    Alternative Island/Terminal and Pipeline Data ......................................... 1-44

Table 1-3.    Alternative GBS and Pipeline Data ......................................................... 1-46

Table 1-4.    Pipelaying Equipment .......................................................................... 1-47

Table 1-5.    Frequency of Operation for Boat Types to be Used During Pipelaying ...... 1-48

Table 1-6.    Orderbook of LNG Ships (as of January 1, 2007) ................................... 1-48

Table 1-7.    Processing Facilities Equipment List ...................................................... 1-52

Table 1-8a.   Safe Harbor Energy Natural Gas Sendout Conditions (128 AAVs Operating)........... 1-57

Table 1-8b.   Safe Harbor Energy Natural Gas Sendout Conditions (80 AAVs Operating).............. 1-57

Table 1-9.    Environmental Consultations, Approvals, and Permitting for the Construction,
Operation, and Maintenance of the Proposed Safe Harbor Project ............... 1-58

Table 1-10.   Permitting Meetings ........................................................................... 1-60

Table 1-11.   Public Outreach Meetings ................................................................... 1-62

# List of Figures

Figure 1-1.    Facility Location ................................................................................ 1-64

Figure 1-2.    Proposed Safe Harbor Energy Project Location ..................................... 1-65

Figure 1-3.    Safe Harbor Energy Construction Schedule .......................................... 1-66

Figure 1-4.    Safe Harbor Island – Plain View ......................................................... 1-68

Figure 1-5.    Proposed and Alternative Pipeline Routes and Terminal Location ........... 1-69

Figure 1-6.    Illustration of Proposed Pearl Crossing GBS ........................................ 1-70

Figure 1-7.    Cross-section of Pearl Cross ms GBS ................................................... 1-71

Figure 1-8.    Plan View of Pearl Crossing GBS and Surrounding Structures ............... 1-72

Figure 1-9.    Diagram of Beacon Port Kiewit Yard Construction Layout ...................... 1-73

Figure 1-10.   Location of Beacon Port Kiewit Site and Disposal Location .................... 1-74

# List of Attachments

Attachment 1-1    Market Area Access for Supply Sendout

# 1.0  Topic Report One — General Project Description and Location

## 1.1  PROPOSED ACTION

### 1.1.1  Project Overview and Introduction

Atlantic Sea Island Group LLC (ASIG or the Applicant) proposes to construct, own, and operate a liquefied natural gas (LNG) receiving, storage, and regasification facility as a deepwater port that will be capable of delivering up to 1.15 billion standard cubic feet per day (bscfd) of natural gas per day to the New York metropolitan region.  The deepwater port, Safe Harbor Energy (Safe Harbor Energy or the Project) consists of three components: an Island to be constructed in federal waters on the Outer Continental Shelf (OCS), approximately 13.5 miles south of the City of Long Beach, New York, on Long Island and 23 miles southeast of the New York Harbor entrance (Island); an LNG receiving, storage, and regasification facility (Terminal); and a subsea pipeline (Pipeline) that will transport the natural gas to a connection with the Transcontinental Gas Pipeline Corporation's Pipeline System's existing Morgan, New Jersey to Long Beach, New York offshore natural gas pipeline (Transco Pipeline).  Safe Harbor Energy will bring to the region a much-needed new and reliable supply of clean-burning, cost-effective, and globally sourced natural gas.  In addition, Safe Harbor Energy will enhance supply flexibility, diversity, and competition in U.S. energy markets.

The Island will be constructed in an open area of the ocean between the Ambrose-to-Nantucket and Hudson Canyon-to-Ambrose international shipping lanes.  This Project location allows LNG carriers to use established shipping lanes to access the facility, while minimizing interference with commercial shipping. The Project, located at approximately 40° 23' 19"N and 73° 36' 35"W is in a water depth of approximately 60 to 70 feet (18 to 21 meters) as shown in Figures 1-1 and 1-2.  The Island will be constructed of natural sand, gravel, and rock materials surrounded by armored breakwaters, consisting of prefabricated caissons, prefabricated armor units, and rock; it will be capable of withstanding major (200-year) storms.

The Island has been located and designed to minimize potential safety, environmental, and socioeconomic impacts while providing an optimal facility for the importation of LNG and the delivery of natural gas to the New York area.

The Terminal will incorporate the following features:

- Docking and unloading facilities in a protected harbor for two LNG carriers with capacities of 70,000 to 270,000 cubic meters (m$^3$);

- Four identical 180,000 m$^3$ full-containment storage tanks;

- Ambient air vaporization equipment to convert LNG into natural gas without using sea water;

- Self-contained, state-of-the art related operational, safety, and communication facilities;

- Small craft docking facilities for safety and supply vessels; and

- Self-contained Island power supply facilities fueled by natural gas.

The Pipeline, consisting of two parallel 36-inch-diameter pipe segments, will extend 12.8 miles from the Island to a connection with the existing offshore Transco Pipeline passing to the north and west of the Island. The Pipeline will be constructed, owned, and operated by one or more third parties, although ASIG may participate in the Pipeline.  Negotiations are underway with potential Pipeline partners.

*Construction of the Project will take approximately 63 months for commercial operations to begin and 69 months total to complete.  ASIG anticipates the commencement of operations in 2014.*

**Safe Harbor Energy is Unique Among Deepwater Ports**
Safe Harbor Energy is unique in several respects. First, it is the only deepwater port facility that has been proposed to be located on a purpose-built Island. This concept enables the use of proven, land-based technology for the Terminal operations, provides a protected harbor for LNG tankers and support vessels and offers the ability to provide significant storage capacity that will enhance the reliability of the region's natural gas supply. The Project will accomplish this while providing the environmental, safety, and security benefits of an offshore location.

The selected location, offshore from the New York metropolitan area, is unique and strategic. New York is a large market area with growing demand for natural gas. Safe Harbor Energy offers the opportunity to service this need with a market area facility, minimize environmental and security impacts, and operate without placing additional burdens on the existing land infrastructure.

Safe Harbor Energy is unique also because it is the first private equity-developed deepwater port project not affiliated with any major energy company. The global growth in demand, with resulting high prices for hydrocarbons, combined with the availability of capital in U.S. markets, has created new sources of funding for energy projects. The availability of new funding sources has made it possible for private investors to participate in deepwater port development without the participation of major energy companies.

Safe Harbor Energy will be designed, constructed, and operated in compliance with all applicable international, federal, state, and local regulations. Initial regulatory consultation for this project began in the fall of 2005 and has continued through the date of this application.

## 1.1.2   Purpose and Need

As set forth below, reasonably priced domestic production of natural gas will not be sufficient to meet increased demand for this clean fuel source in the near future. If adequate domestic supplies are not available to meet demand, additional natural gas must be imported in the form of LNG. To do so, additional LNG terminal capacity must be made available. Safe Harbor Energy, with up to 1.15 bscfd of capacity, when licensed, will be an integral part of the required LNG and natural gas infrastructure.

Safe Harbor Energy will expand the natural gas supply and storage capacity available to an area of the country with high existing demand and growing gas needs, and its location in the market area may help alleviate capacity constraints in existing pipeline infrastructure. Further, Safe Harbor Energy will provide fuel supply diversity through global sourcing of LNG, which may help lower or stabilize natural gas prices in the region. Finally, the offshore location provides for minimal environmental impact while maximizing security of operations, a factor of increasing importance given current political realities.

### 1.1.2.1   Project Benefits
**Increased Natural Gas Supply to the New York Metropolitan Area**: Safe Harbor Energy will provide a strategic energy supply solution for the New York metropolitan region by delivering a reliable, safe, and secure supply of natural gas to an area with increasing demand for natural gas. Also, the Island configuration with four 180,000 $m^3$ storage tanks will result in substantial LNG storage (approximately 15.5 bscf), which will enhance natural gas delivery reliability from the widest range of gas suppliers where it is needed, just 21 miles from New York City.

**Best Available Technology**: The Terminal will incorporate the best available technology, including land-based technology that is not available with other deepwater ports. The use of an Island to house the Terminal enhances reliability, security, and safety.

**Environmental Benefits**: Safe Harbor Energy offers numerous environmental benefits through its use of land-based technology that will minimize environmental impact; its construction from natural sand, gravel, and rock materials; and its offshore location. The Project will:

- Minimize impact on water use and air quality;

- Enable the delivery of LNG without increasing tanker traffic into and out of New York harbor;

- Minimize visual impacts due to its long distance from shore; and

- Create a potential habitat on the surface for migratory birds and below the surface for fish and algae, which will be enhanced further by the creation of a traffic exclusion zone around the Island.

Additionally, the Safe Harbor Energy LNG Terminal will receive and deliver to market natural gas, a clean-burning fuel that is considered environmentally superior to other energy sources, such as coal or fuel oil.

### 1.1.2.2  Demand for Natural Gas Continues to Grow

It is undisputed that the demand for natural gas in the United States continues to grow. Projections from the U.S. Department of Energy's (DOE's) Energy Information Administration (EIA), published in the Annual Energy Outlook 2006, indicate that total domestic consumption of natural gas will increase from 22.4 trillion cubic feet (tcf) in 2004 to 27.0 tcf in 2025. This projected growth results primarily from the increased use of natural gas for electricity generation and industrial applications, which together account for 62 percent of the projected demand growth from 2004 to 2025. During this same time period, EIA projects that 60 percent of the growth in the lower 48-state end-use consumption of natural gas will occur east of the Mississippi River. The Middle Atlantic region, which includes New Jersey, New York, and Pennsylvania, is expected to experience an annual average increase in natural gas consumption of 0.7 percent per year.

The New York City/Long Island area has seen an increase in the use of natural gas for electricity generation. Over the past 3 years, more than 220 MW of gas turbine generators were added on Long Island alone, and The North American Electric Reliability Corporation (NERC) has projected that more than 500 MW of additional new capacity will be required by 2014 to meet projected demand growth. In fact, electric demand in the area has been increasing steadily, with New York City's peak electric load growing at a rate of 2.6 percent annually and Long Island's peak electric load growing at a rate of 3.5 percent annually between 1994 and 2004.

### 1.1.2.3  Domestic Production Cannot Meet Projected Demand Growth

On a national basis, the EIA predicts that even with increased domestic production, additional imports of natural gas will be required to satisfy domestic demand over the next 25 years. Growth in LNG imports is projected to meet much of this demand, increasing from 0.6 tcf in 2004 to 4.1 tcf in 2025, and to 4.4 tcf in 2030. New York State produces a modest quantity of natural gas, but it is not self-sufficient, and the vast majority of natural gas consumed in the state comes from other producing states or Canada.

The federal government has evidenced a national policy to encourage the importation of LNG to meet the nation's energy needs through a variety of federal actions:

- Congress amended the Deepwater Port Act in 2002 to authorize the construction of deepwater ports for the importation of LNG.

- The White House Task Force on Energy Project Streamlining issued a Memorandum of Understanding on Deepwater Port Licensing on May 20, 2004, which provides for interagency coordination among federal agencies to facilitate the processing of deepwater port applications.

- The Federal Energy Regulatory Commission (FERC) has approved a number of onshore LNG terminals over the past 5 years, specifically recognizing the important role that LNG will play in meeting future demand for natural gas in the United States and noting that the public interest is served through encouraging gas-on-gas competition by introducing new imported gas supplies.

- The National Petroleum Council's (NPC) 2003 study, *Balancing Natural Gas Policy: Fueling the Demands of a Growing Economy*, concluded that North America is moving to a period in its history in

which it will no longer be self-reliant in meeting its growing natural gas needs; production from traditional U.S. and Canadian basins has plateaued. The NPC study recommended a balanced energy portfolio that includes all of the following elements: increased energy efficiency and conservation; alternate energy sources for industrial consumers and power generators, including renewables; gas resources from previously inaccessible areas of the United States; LNG imports; and gas from the Arctic.

- In December 2003, at the LNG Ministerial Summit, then-Secretary of Energy Spencer Abraham emphasized the need for new LNG terminals to supply the U.S. market.

- In July 2003 in testimony before the U.S. Senate Committee on Energy and Natural Resources, then-Federal Reserve Chairman Greenspan highlighted the need for the United States to import more LNG and to expand the nation's LNG infrastructure.

All of these actions indicate a national policy favoring the construction and operation of new LNG terminals to meet domestic demands for energy.

### 1.1.3    Location and Description of Action

#### 1.1.3.1    Location

Safe Harbor Energy will be located in federal waters on the OCS of the North Atlantic (Figure 1–1). The Island and Terminal (including the LNG berthing, unloading, storage, and regasification structures, and other associated facilities) will be located within Mineral Management Service (MMS) Block 6655 in a water depth of 60 to 70 feet (18 to 21 meters) mean sea level. MMS Block 6655 is within the MMS's North Atlantic Planning Area (NAPA). The Island coordinates are approximately 40° 23' 19" North latitude, and 73° 36' 35" West Longitude (NAD27), approximately 13.5 miles south of Long Beach, New York.

The proposed location for Safe Harbor Energy is based upon the following factors, which are discussed in greater detail in Topic Report Nine – Alternatives. In short, this location:

- Is a suitable distance from environmentally sensitive areas and population centers;

- Is in an OCS block not subject to an exploration and production program or sand/gravel mining;

- Is adjacent to existing shipping fairways;

- Is greater than 10 miles from shore;

- Is close to the market and existing offshore natural gas transmission systems;

- Is in water depth suitable for Island construction;

- Has water depth to accommodate the largest LNG tankers without the need for dredging; and

- Has substrate conditions suitable for the construction and operation of the Terminal.

The proposed route for the Pipeline from the Terminal to the connection with the Transco Pipeline is described below (refer to Figure 1–2). The Pipeline route extends from the Terminal in MMS Block 6655 in a northerly direction for approximately 12.8 miles to a connection with the existing offshore Transco Pipeline. This distance includes 11.0 miles in federal waters and 1.8 miles in New York State Waters. Adjacent land owners are the United States and the State of New York.

For a more detailed description of the Project location in reference to surrounding features, please refer to Topic Report Seven – Land Use, Recreation, and Aesthetics.

**1.1.3.2    Description**

The Project will consist of the following major components:

- **Constructed Island** – an Island approximately 116 acres at its base on the seafloor, 85.6 acres (at the ocean surface), and 60.5 acres of useable surface area. The Island will be constructed of granular fill material (sand) and will be armored with a rock breakwater structure that surrounds the main body of the Island and provides a protected harbor for the berthing of LNG tankers. A harbor will be created by two jetties extending from the Island toward the northwest.

- **Unloading Docks (two)** – where LNG carriers will connect their mooring lines and LNG unloading system.

- **LNG Storage Tanks (four)** – 180,000 m$^3$ (gross each tank) insulated, full-containment tanks where LNG will be stored until needed for delivery to customers (Volume Three, Part Two, Appendix B – Offshore Construction, Figure C-3).

- **Regasification Facilities** – where LNG will be pumped up to pipeline pressures, vaporized to natural gas and flow into the Pipeline (Volume Three, Part Two, Appendix B – Offshore Construction, Figure C-4).

- **Operations and Maintenance Buildings** – These include the warehouse, maintenance and control building, the compressor building, the high pressure pump building, the gas engine generator building, the auxiliary equipment building, the electrical equipment building, unloading control buildings (two), and various small structures for protecting auxiliary equipment.

- **Personnel Living Quarters** – A building that will provide accommodation for 75 workers. The building will have kitchen and dining facilities, laundry facilities, bedroom suites, a recreation area, an exercise area, medical aid station, administrative and communications facilities, and mechanical equipment rooms. The personnel living quarters will be located as far as possible from the Island's operating and storage areas.

- **Pipeline** – To transport natural gas from the Terminal to an interconnection with the existing offshore Transco Pipeline.

The Project has been designed to accommodate the receipt, storage, regasification, and sendout of up to 2.0 bscfd of natural gas. The configuration of the Island and the Terminal facilities, including the two unloading docks, the four LNG storage tanks, the regasification facilities, and the supporting machinery and equipment, have all been sized to support this design capacity level. ASIG has analyzed the potential effects of the Project, including modeling of air emissions and water use and discharges, assuming construction and operation of the Island and Terminal at the full 2.0 bscfd design capacity level. Consistent with the design of the Project, the U.S. Army Corps of Engineers construction permit application and U.S. Environmental Protection Agency air and water permit applications (all of which are included as part of this application, see Volume Two, Exhibits V, W, and X) request permits based on the full 2.0 bscfd design capacity level for the Island and the Terminal facilities.

Initially, the Project will not be able to operate at the full 2.0 bscfd design capacity. The Project's sendout capability is constrained by the ability of the existing Transco Pipeline to accept gas. The existing Transco Pipeline can only accept deliveries of up to 1.15 bscfd of natural gas (see Attachment 1-1). It is ASIG's understanding that the authorization granted by the deepwater port license cannot exceed the sendout capability of the deepwater port. Therefore, ASIG is requesting a deepwater port license authorizing the construction and operation of a 1.15 bscfd deepwater port, even though the Island and Terminal will hold environmental permits for a 2.0 bscfd facility.

In the future, ASIG may seek to increase the sendout from the Terminal. In that event, the requisite environmental authorizations would be in place, and all facilities and equipment would be installed, such that it would be possible for Safe Harbor Energy to increase its sendout capability up to the 2.0 bscfd design capacity of the Terminal. Although ASIG understands that any future increase in the sendout capacity

beyond 1.15 bscfd would require an amendment to the deepwater port license, ASIG anticipates that the amendment process would be facilitated by the fact that most of the facilities would be in place and the Terminal would hold the permits to deliver 2.0 bscfd.

ASIG understands that any increase in the sendout capacity beyond 1.15 bscfd would be the subject of future environmental review as well as new or amended permits and licenses from applicable agencies, including an amendment to the deepwater port license.

LNG will be transported from sources overseas in vessels not owned or operated by the ASIG. The LNG carrier vessel fleet includes ships with a variety of cargo capacities and will include the latest Q-Max design LNG carriers currently on order that can transport up to 270,000 m$^3$ of LNG. Safe Harbor Energy would be able to accept these vessels due to the deepwater location selected for the project site. Safe Harbor Energy estimates 75 to 291 unloadings per year for the 1.15 bscfd sendout, depending on the carrier size and 125 to 484 unloadings for the 2.0 bscfd sendout. The Project will be designed to unload one LNG carrier at a time, but can have two LNG carriers berthed at the same time. Each LNG carrier will approach the unloading platform with the assistance of two to three tugboats under normal sea conditions. Once the LNG carrier is moored, the Terminal's unloading arms will be connected to the vessel. All lines will be prepared and tested prior to LNG unloading. LNG then will be pumped, using pumps within the vessel cargo tanks, from the LNG carrier into one or more of the Terminal's 180,000 m$^3$ LNG storage tanks. LNG will be pumped from the Terminal's LNG storage tanks using low-pressure (LP) pumps through the tube side of the boiloff gas (BOG) condenser to the HP pump suction drum. The high-pressure pumps will raise the LNG to pipeline-sendout pressure and pump it to the ambient air vaporizers. The ambient air vaporizers will regasify the LNG using heat from the surrounding air. Waste heat from the Terminal's power generators and, during extreme low ambient temperatures, heat from the supplemental gas fired heaters will be used to warm the gas to a minimum of approximately 35°F (1.6°C) prior to sendout. For this process, shell and tube heat exchangers and a glycol heating medium will be used. The natural gas, converted from the LNG, will flow through the natural gas metering station and then into the subsea Pipeline that will carry the natural gas to market. Operating procedures are described in greater detail in Section 1.4.

## 1.2   SURFACE REQUIREMENTS

### 1.2.1   Permanent Requirements

#### 1.2.1.1   Island and Terminal

The generalized dimensions of the Terminal at mean low water (MLW) will be approximately 2,000 feet by 2,700 feet (610 meters by 820 meters) including the harbor area, or approximately 85.6 acres of land area. Not all of this area will support facility structures since a portion includes the seawall and swale system surrounding the Island. Of the 85.6 acres approximately 60.5 will be used for facility structures and operations. The footprint of the Island on the seafloor will be approximately 116 acres. Total permanent disturbance (displacement) of the seafloor will be approximately 116 acres. Table 1-1 contains detailed dimensions of the Island and Terminal.

#### 1.2.1.2   Pipeline Right-of-Way (ROW)

The Pipeline will be located within a permanent 300-foot wide (91-meter) ROW. The 12.8-mile Pipeline will consist of two parallel 36-inch pipe segments, each located 100 feet (30 meters) from the edge of the ROW with a 100-foot-wide (30-meter-wide) separation between the two segments in Federal waters (11.0 miles). The Pipeline will require the same amount of ROW in State Waters (1.8 miles). Table 1-1 contains detailed dimensions of the Pipeline ROW (see also Volume Three, Part Two, Appendix B – Offshore Construction, Figure B-2).

### 1.2.1.3  Safety Zone

For security reasons, Safe Harbor Energy is requesting that the U.S. Coast Guard (USCG) establish a safety zone around the Project. This proposed safety zone will be the area within 1,640 feet (500 meters) from the edge of the Island (and including the Terminal harbor). Navigation to the Island and the proposed safety zone are discussed further and shown in the figures in Volume Two, Exhibit N – Marine Vessel Traffic Patterns. Vessel traffic unrelated to Project operations will be prohibited within this area at all times. Limitations on other vessel traffic will be made in consultation with the USCG. For more information on safety zones, please refer to Topic Report Ten – Safety and Reliability.

## 1.2.2  Temporary Requirements

Terminal construction will require temporary use of the Island surface for construction laydown areas. Since Terminal construction will be staged, contractors will utilize free space as material laydown areas and temporary office facilities until the areas are needed for construction. The free space that will initially be available will include the areas for the construction of LNG storage tank #4, the ambient air vaporizers and the area south of the living quarters. In addition, the construction of some of the permanent structures will be expedited so that they can be used as construction facilities. These will include the Maintenance, Warehouse and Control Building, the Auxiliary Building the Electrical Building, the Living Quarters, and the ambient air vaporizer (AAV) slab foundation.

In addition, during construction of the Island, vessels will be anchored near the site to deposit sand, rock, and concrete materials used to build the Island. The area near the Island likely will experience a temporary increase in vessel traffic and temporary anchoring due to construction activities. Dimensions of this construction area may change during planning of the marine operations to cover anchoring of the vessels during inclement weather.

An approximately 300-foot (91-meter) wide corridor, centered along the Pipeline route, will be used for construction of the Pipeline. Areas within this corridor might experience temporary disturbance related to construction of the Pipeline. Additionally, depending on water depth and construction equipment used, anchors may be set outside this corridor for stability of the lay and postlay dredging barges, although in special areas such as cable crossings dynamic positioning vessels will be employed. For estimated disturbance to the seafloor, please refer to Table 1-1.

## 1.2.3  Shore Based and Support Facilities

Construction of the Terminal will require a land-based area(s) for staging equipment and supplies, and loading and unloading of barges during construction of the Terminal. To date, ASIG has identified five potential areas in the metropolitan New York area, each with an existing bulkhead/pier facility and water depth at least 10 feet (3 meters) at mean lower low water (MLLW) at the pier face. Each area is an existing industrial-based facility with existing marine activities (see additional discussion in Volume Four, Part One, Appendix A – Shore Based Support Facilities). Staging areas will be used for:

- Manufacturing of CORE-LOC armor units;

- Loading of materials to barges (e.g., supplies, fuel, spare parts, etc.);

- Loading materials for processing plant on the Island;

- Loading of equipment and materials for Terminal construction and facilities on the Island;

- Assembling equipment for gasification units;

- Loading of earthmoving equipment for Island construction (e.g., bull dozers, trucks, excavators, etc.); and

- Loading of materials for wharf construction

Caisson construction activities will also take place at a land-based fabrication area. ASIG proposes to construct six caissons to meet the needs of the project. Potential locations for construction of caissons have been identified as:

- U.S. Navy Yard at Philadelphia, Pennsylvania;

- Bethlehem Steel Corporation's shipyard in Baltimore, Maryland; and

- Newport News Shipbuilding and Dry Dock Company's facility in Newport News, Virginia.

Construction of the Pipeline would also require a land-based area for staging equipment, supplies, and pipe, and for loading and unloading pipelay barges during construction of the Pipeline. Staging activities for the Pipeline will take place at the same location(s) used for marine construction staging. A majority of marine construction activities will be completed when the pipeline construction begins so the two activities will not interfere with each other.

During operation, a shore base will be established to move personnel, supplies, equipment, and disposable materials between the shore and the Terminal. The proposed location is in the town of Ocean Side, Long Island. The City has a waterfront industrial area located along Hampton Road. The facilities that are along this waterfront are oil services and commercial fishing services. Upgrades that may be required at the selected site would be security features such as fencing, guard shack, and video surveillance. It is anticipated that a dedicated pier would be required with security features in place to prevent trespass onto crew boats. For delivery of larger repair items (e.g., engines, piping, etc.) during operation, a facility located in the New York Harbor area would be used. These facilities would be used on an as-needed basis (see additional discussion in Volume Four, Part One, Appendix A – Shore Based Support Facilities).

## 1.3 CONSTRUCTION PROCEDURES

Construction of the proposed Safe Harbor Energy Project is expected to begin in 2009 and conclude in 2014. Construction will consist of three phases: the Island, the Terminal, and the Pipeline. The construction of the Island will occur over three construction seasons starting in January 2009 with mobilization and onshore cassion construction and concluding in October 2011. The construction of the Terminal will start in July 2011 overlapping the Island construction by about 3 months. Pipeline construction will start in May 2012 and will be completed in 6 to 8 months. The Pipeline will be charged with natural gas and ready for service supplying fuel to the Island for construction purposes in November 2012. Commercial operations of the Project with one tank in service will begin in March 2014, 63 months after the start of construction. All four tanks will be in service at the completion of the 69-month construction period in October 2014. A construction schedule summary is shown in Figure 1-3.

Marine activities associated with Island construction will take place from the beginning of May to the end of October. The season may be longer or shorter depending on the anticipated construction season. Manufacturing of CORE-LOC units will begin in July of year one and continue until approximately June of year three. The peak construction period for the Island will occur in year two during the months of May to October.

### 1.3.1 Island Construction

#### 1.3.1.1 Description of Island Construction

ASIG will assemble a team of qualified, specialized construction contractors and subcontractors to create the Island and construct the offshore marine unloading facilities, the onshore LNG processing facilities, and other facilities needed to support the operations on the Island.