# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ATLANTIC SEA ISLAND GROUP, LLC,)

       Plaintiff,       )    Civil Action No. 08-00259-RWR

     v.                )

SEAN T. CONNAUGHTON     )
Administrator
Maritime Administration, and  )

MARY E. PETERS,         )
Secretary
Department of Transportation,  )

       Defendants.      )

## MOTION TO INTERVENE OF JON S. CORZINE, GOVERNOR OF NEW JERSEY, AND STATE OF NEW JERSEY, PURSUANT TO FED. RULE CIV. PROC.24(A)(2)

Jon S. Corzine, Governor of New Jersey, and the State of New Jersey, hereby move, pursuant to Federal Rule of Civil Procedure 24(a)(2), to intervene in this matter in support of the decision by the Administrator of the Maritime Administration on December 2, 2007, which designated the State of New Jersey as an additional "adjacent coastal State" under the Deepwater Port Act, pursuant to 33 U.S.C. §1508, and in opposition to plaintiff's motion for a preliminary injunction to enjoin the Administrator's decision.

In support of this Motion, Governor Corzine and the State of New Jersey rely on the attached Memorandum of Points and Authorities, and on the Declarations of Dennis Lombardi, Thomas

McCloy, and Mark Mauriello.

Respectfully submitted,

ANNE MILGRAM
Attorney General of New Jersey
Attorney for Movants-Intervenors
Jon S. Corzine, Governor, and
State of New Jersey

By:_____/s/_____
    Rachel Horowitz
    Deputy Attorney General
    R.J. Hughes Justice Complex
    25 West Market Street
    P.O. Box 093
    Trenton, New Jersey 08625-0093
    (609) 984-6811

March 11, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ATLANTIC SEA ISLAND GROUP LLC, :

          Plaintiff,        :    Civ. No. 08-00259-RWR

     v.                   :

SEAN T. CONNAUGHTON,      :
Administrator, Maritime
Administration, and        :
MARY E. PETERS, Secretary,
Department of Transportation, :

        Defendants.      :

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF
JON S. CORZINE, GOVERNOR OF THE STATE OF NEW JERSEY, AND STATE OF
NEW JERSEY, TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL
PROCEDURE 24(A)(2).

---

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 0093
Trenton, New Jersey 08625
Attorney for Jon S. Corzine,
Governor, State of New Jersey, and
State of New Jersey
(609) 984-6811

Attorney for Movants-Intervenors

Rachel Horowitz
Deputy Attorney General
  On the Memorandum

# TABLE OF CONTENTS

**PAGE**

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

    NEW JERSEY IS ENTITLED TO INTERVENE AS OF RIGHT IN
    THIS MATTER, BECAUSE IT HAS AN INTEREST IN ITS
    DESIGNATION AS AN ADJACENT COASTAL STATE THAT MAY BE
    IMPAIRED AND IS NOT REPRESENTED BY ANY OTHER PARTY. . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 12

## CASES

*Appleton v. Food and Drug Admin.*, 310 F. Supp. 2d 194
(D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . 8

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
386 U.S. 129, 87 S. Ct. 932, 17 L. Ed. 2d 814 (1967) . . . . . 9

*Georgia v. United States Army Corps of Engineers*, 302 F. 3d
1242 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 9

*Hodgson v. United Mine Workers of America*, 473 F. 2d 118
(D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . 0

*In re Discovery Zone Secs. Litig.*, 181 FRD 582
(N.D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . 10

*Lawrence v. Elsea*, 478 F. Supp. 480 (W.D. Wis. 1979), aff'd
657 F. 2d 271 . . . . . . . . . . . . . . . . . . . . . . 9

*Nuesse v. Camp*, 385 F. 2d 694 (D.C. Cir. 1967) . . . . . . 9, 10

*United States v. Siegel*, 168 F. 2d 143
(D.C. Cir. 1948) . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

33 U.S.C. §1501 . . . . . . . . . . . . . . . . . . . . . . 1

i

33 U.S.C. §1503(b) . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. §1503(b)(8) . . . . . . . . . . . . . . . . . . . 1

33 U.S.C. §1508(a)(1) . . . . . . . . . . . . . . . . . . 2-4

33 U.S.C. §1508(a)(2) . . . . . . . . . . . . . . . . . 1, 3

## RULES

Fed. Rule Civ. Proc. 24(a)(2) . . . . . . . . . . . . . . 1, 8

Fed. Rule Civ. Proc. 24(b)(3) . . . . . . . . . . . . . . 10

Fed. Rule Civ. Proc. 19(a)(1)(B) . . . . . . . . . . . . . 9

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO INTERVENE OF JON S.
CORZINE, GOVERNOR, STATE OF NEW JERSEY, AND
STATE OF NEW JERSEY

## BACKGROUND

This is a motion by Jon S. Corzine, Governor of the State of New Jersey and by the State of New Jersey, to intervene in this lawsuit pursuant to Federal Rule of Civil Procedure 24(a)(2), for the purpose of defending New Jersey's designation as an "adjacent coastal state" by the Administrator of the United States Maritime Administration. Plaintiff Atlantic Sea Island Group LLC ("ASIG") has applied for a federal license under the Deepwater Port Act ("DWPA"), 33 U.S.C. §1501 et seq., to construct a liquefied natural gas deepwater port in federal waters outshore of the States of New York and New Jersey. On November 2, 2007, the Administrator of the Maritime Administration, defendant Sean Connaughton, granted Governor Corzine's request that New Jersey be designated an "adjacent coastal state" under the DWPA pursuant to 33 U.S.C. §1508(a)(2). That designation will allow Governor Corzine to approve, disapprove, or approve with conditions the proposed deepwater port. 33 U.S.C. §1503(b)(8).

ASIG filed its complaint and a motion for a preliminary injunction on February 15, 2008. In its complaint, ASIG challenges the designation of New Jersey as an "adjacent coastal state," and

in its motion for a preliminary injunction, ASIG seeks to enjoin that designation. Since ASIG seeks to deprive New Jersey of its designation as an "adjacent coastal state," and to thereby deprive Governor Corzine of his rights under 33 U.S.C. §1503(b), Governor Corzine and the State of New Jersey are entitled to intervene as of right in this matter under Rule 24(a)(2).

ASIG has applied for a federal license under the DWPA to construct the "Safe Harbor Energy deepwater port" to receive and regasify liquefied natural gas. The proposed deepwater port would be located in federal waters 13.5 miles south of the coast of New York and 19 miles east of the coast of New Jersey, and would be connected by pipeline to an existing pipeline running from New Jersey to New York, at a location within New York waters. (Complaint, Attachment 1). An alternative pipeline alignment included in the application would be located nine miles from New Jersey's coastline (Letter of Governor Corzine, dated Sept. 6, 2007, Attachment 2).

Under the DWPA, license applications to construct and operate a deepwater port must be approved by the Secretary of Transportation ("Secretary"), and licenses cannot be issued unless, among other things, the Governors of each "adjacent coastal state" have approved issuance of the license. 33 U.S.C. §1503(b). An "adjacent coastal state" is a State directly connected to the proposed port by pipeline, or located within 15 miles of the

2

proposed deepwater port. 33 U.S.C. §1508(a)(1). In addition, the Secretary must designate a State as an "adjacent coastal state" upon a State's request, if the Secretary determines that there is "a risk of damage to the coastal environmental of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." 33 U.S.C. §1508(a)(2). A State must make such a request to the Secretary not later than the 14th day after publication of notice of an application for a proposed deepwater port in the Federal Register, and the Secretary must make the required designation not later than the 45th day after the date he receives the State's request. 33 U.S.C. §1508(a)(2).

Notice of ASIG's application was published in the Federal Register on August 27, 2007 (Attachment 3). On September 6, 2007, or within nine days of Federal Register publication, New Jersey Governor Jon S. Corzine requested designation as an "adjacent coastal state." (Attachment 2). In requesting such designation, Governor Corzine pointed out that the alternative pipeline alignment, located within nine miles of New Jersey's coastline, made New Jersey an adjacent coastal state under 33 U.S.C. §1508(a)(1), and that New Jersey (like New York) was directly connected to the proposed deepwater port by pipeline. In addition, Governor Corzine explained that the risk to New Jersey's coastal environmental from the proposed deepwater port was at least as great as the risk to the coastal environment of New York for

3

numerous reasons. As Governor Corzine explained, the deepwater port would be located at Cholera Bank, a historic prime fishing area of vital importance to New Jersey's commercial and recreational fisheries, which are a key part of its coastal environment and economy. See Declaration of Thomas McCloy. Further, the deepwater port would be located between the approach lanes to the Port of New York and New Jersey's port facilities in New Jersey, another critical part of New Jersey's coastal environment and economy. See Declaration of Dennis Lombardi. In addition, since the water currents in the area of the proposed deepwater port run towards New Jersey and not towards New York, water quality impacts during construction, as well as any spills during construction and operation of the facility, would be more likely to be experienced within New Jersey waters than in New York waters (Attachment 2; See also Declaration of Mark Mauriello).

On November 1 and December 21, 2007, New Jersey provided additional information in support of its request for "adjacent coastal state" designation (Attachments 4 and 5). Specifically, on November 1, 2007, New Jersey explained again that the alternate pipeline route included in ASIG's application would be within nine miles of New Jersey, thus automatically qualifying New Jersey as an adjacent coastal state under 33 U.S.C. §1508(a)(1). In addition, New Jersey reiterated the importance of Cholera Bank to the fishing industries of both New Jersey and New York, and the importance that

4

New Jersey's coastal zone management plan places on such fisheries resources. New Jersey stressed again that since water currents would run from the proposed deepwater port location towards New Jersey, impacts on water quality in New Jersey would be at least equal to those in New York. Further, New Jersey advised of its understanding that a future pipeline from the proposed deepwater port would be directly connected to Linden, New Jersey, which would entitle New Jersey to automatic designation as an adjacent coastal state. (Attachment 4)

On November 2, 2007, defendant Sean Connaughton, the Administrator of the Maritime Administration within the United States Department of Transportation, granted Governor Corzine's request for adjacent coastal state designation, based on the particular facts and circumstances (Attachment 6). The Administrator's designation afforded Governor Corzine the authority to approve, disapprove, or approve with conditions ASIG's deepwater port license application pursuant to 33 U.S.C. §1503(b)(8)(Attachment 6).

ASIG asked for reconsideration of the Administrator's designation on December 3, 2007. New Jersey then provided supplementary information in support of its adjacent coastal state status on December 21, 2007, addressing once more the proposed port's potential impacts on New Jersey's coastal environment, including its ports, fishing industry, and beach tourism industry.

5

As New Jersey specified on December 21, 2007, the deepwater port would serve the New York metropolitan area which includes New Jersey as an integral part; at least as much natural gas from the deepwater port would be directed to New Jersey as to New York; and ASIG is considering a future pipeline from the port directly to Linden, New Jersey. Further, the proposed ASIG pipeline route would cross two traffic lanes into the Port of New York and New Jersey - the largest port complex on the east coast - and within that Port, the Port Newark and the Elizabeth Port Authority Marine Terminal (located in New Jersey) form the largest and most comprehensive collection of maritime cargo handling facilities on the east coast of North America. See Declaration of Dennis Lombardi. Thus, disruption of port traffic during construction of the port, as well as potentially during operation, is of major concern to both New Jersey and New York. With respect to fisheries, New Jersey emphasized the significance of Cholera Bank as a State and regional resource, and the significance of the fishing industry to New Jersey and its coastal environment. Moreover, New Jersey explained that the deepwater port would be visible from beaches in Monmouth County, where millions of dollars have been invested, and from several historic sites in the State (Attachment 5).

The Administrator reconfirmed his designation of New Jersey as an adjacent coastal state on February 8, 2008 (Attachment 7). The Administrator reasoned that in this instance New Jersey and New

6

York shared legitimate regional interests and environmental and economic concerns, based on the States' geographic proximity and common industry, their shared port, and their shared use of the Cholera Bank fishery. In addition, the Administrator concurred that predominant ocean currents in the area run to New Jersey; that staging areas for facility construction and operation would implicate New York and New Jersey "without distinction;" and that alternative sites "required under the National Environmental Policy Act to be reasonably foreseeable bring the possible final site to within 9 miles of Jersey." (Attachment 7).

In response to the Administrator's letter of February 8, 2008, ASIG filed its complaint and motion for a preliminary injunction on February 15, 2008, seeking to deprive New Jersey of its adjacent coastal state designation. New Jersey now moves to intervene in this matter under Rule 24(a)(2), in support of the Administrator's decision and in opposition to ASIG's motion for a preliminary injunction. Beverly Russell, Esq., United States Attorney's Office, District of Columbia, attorney for defendants Connaughton and Peters, has consented to this motion. John Cooney, Venable LLP, attorney for plaintiff ASIG, has deferred taking a position on the motion prior to service of the motion papers.

7

ARGUMENT

NEW JERSEY IS ENTITLED TO INTERVENE AS OF RIGHT IN THIS MATTER, BECAUSE IT HAS AN INTEREST IN ITS DESIGNATION AS AN ADJACENT COASTAL STATE THAT MAY BE IMPAIRED AND IS NOT REPRESENTED BY ANY OTHER PARTY.

Federal Rule of Civil Procedure 24(a)(2) provides that, on timely motion, the court must permit anyone to intervene who:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. Rule Civ. Proc. 24(a)(2); *Appleton v. Food and Drug Admin.*, 310 F. Supp. 2d 194, 196 (D.D.C. 2004). Governor Jon Corzine and the State of New Jersey squarely meet this standard, and therefore must be permitted to intervene in this matter.

New Jersey's interest in this matter is self-evident. N e w Jersey requested to be an adjacent coastal state and was recognized as entitled to that designation by the United States Maritime Administration. However, ASIG's complaint and preliminary injunction motion place New Jersey at risk of losing that designation. Thus, New Jersey has satisfied the first two prongs of Rule 24(a)(2). New Jersey has a very clear, distinct stake in this controversy, which will determine whether New Jersey will retain its adjacent coastal state designation. In addition, New Jersey cannot be excluded from this controversy without impairing its

8

ability to protect that interest. *Nuesse v. Camp*, 385 F. 2d 694, 699, 703 (D.C. Cir. 1967); *Hodgson v. United Mine Workers of America*, 473 F. 2d 118, 130 (D.C. Cir. 1972).

Moreover, New Jersey's interest differs from that of defendants Connaughton and Peters, since neither defendant risks the loss of an important status previously conferred. Accordingly, while these defendants share with New Jersey an interest in defending New Jersey's designation as an adjacent coastal state, they cannot be expected to protect New Jersey's interest to its fullest extent. In light of those circumstances, Governor Corzine and New Jersey have satisfied the final prong of Rule 24(a)(2) – that no existing party adequately represents movants' interest. See *Georgia v. United States Army Corps of Engineers*, 302 F. 3d 1242, 1255-56 (11th Cir. 2002); *Lawrence v. Elsea*, 478 F. Supp. 480, 482 (W.D. Wis. 1979), aff'd 657 F. 2d 271 (7th Cir. 1981).

Further, since Governor Corzine is at risk of losing a distinct right in this matter, the Governor also is the real party in interest and a required party under Rule 19(a)(1)(B). Disposing of this matter without participation by the Governor will prevent the Governor from protecting New Jersey's core interest in its adjacent coastal state designation in the current proceeding, in conflict with the basic policies underlying intervention. *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135, 87 S. Ct. 932, 937, 17 L. Ed. 2d 814, 817 (1967). In addition,

9

excluding the Governor from this lawsuit could prevent him from appealing any loss of New Jersey's adjacent coastal state designation in subsequent proceedings. *United States v. Siegel*, 168 F. 2d 143, 144-45 (D.C. Cir. 1948); *In re Discovery Zone Secs. Litig.*, 181 FRD 582 (N.D. Ill. 1998). Thus Governor Corzine and New Jersey will be prejudiced unless allowed to intervene. Cf. Fed. Rule Civ. Proc. 24(b)(3). In contrast, ASIG will not suffer any prejudice or delay if intervention is granted. ASIG filed its complaint in mid-February 2008, and defendants' Answer is not due until May, 2008.

Motions for intervention are liberally granted, *Nuesse v. Camp*, *supra*, 385 F. 2d at 702, and Governor Corzine and New Jersey's right to intervene in this matter is beyond dispute. The Governor and the State of New Jersey have an obvious, distinct interest in maintaining authority to approve, disapprove or approve with conditions the ASIG license application, as well as an obvious interest in protecting New Jersey's coastal environment and economy. Port facilities within New Jersey, New Jersey's fishing industry, and New Jersey's tourism industry, are critical components of New Jersey's coastal environment and economy, as well as of the regional economy. Declaration of Dennis Lombardi; Declaration of Thomas McCloy; Declaration of Mark Mauriello. Precluding Governor Corzine and the State of New Jersey from this lawsuit will impair their ability to protect these critical

10

interests.

In light of the Governor's indisputable, strong and distinct interest in this matter, and status as a required party under Rule 19, ASIG's failure to include the Governor in its lawsuit is inexplicable. The motion of Governor Corzine and the State of New Jersey to intervene in this matter must be granted.

11

CONCLUSION

The motion of Governor Jon S. Corzine and the State of New Jersey to intervene should be granted, and the Governor and State of New Jersey should be joined in this lawsuit.

Respectfully submitted,

ANNE MILGRAM
Attorney General of New Jersey

By: _Rachel Horowitz_

Rachel Horowitz
Deputy Attorney General

R.J. Hughes Justice Complex
25 West Market St.
P.O. Box 0093
Trenton, New Jersey 08625-0112
609-984-6811

Dated: March 11, 2008

12

**1**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ATLANTIC SEA ISLAND GROUP LLC**<br>**405 Lexington Avenue**<br>**New York, New York 10174,** | ) <br> ) <br> ) <br> ) | |
| **Plaintiff,** | ) <br> ) | |
| **v.** | ) <br> ) | **Civil Action No. _____** |
| **SEAN T. CONNAUGHTON**<br>**Administrator**<br>**Maritime Administration, and** | ) <br> ) <br> ) <br> ) <br> ) | |
| **MARY E. PETERS,**<br>**Secretary**<br>**Department of Transportation,** | ) <br> ) <br> ) <br> ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Atlantic Sea Island Group LLC ("ASIG") seeks declaratory and injunctive relief from the November 2, 2007 final decision by the Administrator of the Maritime Administration that designated the State of New Jersey as an "adjacent coastal State" for purposes of consideration of ASIG's application under Section 1508(a)(2) of the Deepwater Port Act, 33 U.S.C. §1501 et seq. ("DWPA"), for a license to construct the Safe Harbor Energy LNG Deepwater Port, an urgently needed facility for the unloading of liquefied natural gas to be built off the coast of the State of New York.

## PARTIES

1.    Plaintiff Atlantic Sea Island Group LLC is a Delaware corporation engaged in the business of owning, constructing, and operating a deepwater port, the Safe Harbor Energy port, that will receive, store, and re-vaporize liquefied natural gas ("LNG") and deliver natural gas to the existing infrastructure in the United States.

2.    Defendant Sean T. Connaughton is Administrator of the Maritime Administration.    Defendant Mary E. Peters is Secretary of Transportation.    Mr. Connaughton and Secretary Peters are sued in their official capacities only.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this lawsuit pursuant to 5 U.S.C. §§ 702, 704 and 28 U.S.C. § 1331.    This action arises under the laws of the United States, specifically the Deepwater Port Act and the Administrative Procedure Act.

4.    Venue is proper in this Court because the Maritime Administration and the Department of Transportation reside in this district.  28 U.S.C. § 1391(e)(1).

## STATEMENT OF THE CASE

5.    ASIG has applied for a federal license under the Deepwater Port Act to construct and operate the Safe Harbor Energy Liquefied Natural Gas Deepwater Port, to be located 13.5 miles south of Long Beach, New York and 19 miles from the coast of New Jersey. This lawsuit challenges the decision of the Administrator of the Maritime Administration designating the State of New Jersey as a second "adjacent coastal State" for purposes of the Safe Harbor Energy application.

**Statutory Background**

6.    The Deepwater Port Act, 33 U.S.C. § 1501 et seq., establishes the procedures and substantive criteria for licensing the construction and operation of deepwater ports that will receive shipments of petroleum and petroleum products, natural gas, and liquefied natural gas. A "deepwater port" is defined as a facility located beyond the coastal waters of any State. 33 U.S.C. § 1502(9)(A).

7.    In recognition of the importance of these infrastructure projects to the country's energy supply, the DWPA provides for submission of a single application for consideration by the multiple federal agencies with jurisdiction over aspects of the

2

project. It also establishes an accelerated, mandatory timetable within which the agencies must complete the required analyses of the environmental, safety, and national security aspects of the proposed project. In particular, the law requires that all public hearings on the application must be held within 240 days of the submission of a completed application, and that the federal government's final decision on the application must be issued within 330 days of its submission. 33 U.S.C. §§ 1504(g), (i)(1).

     8.     The DWPA provides that a license to construct and operate a deepwater port shall not be issued "without the approval of the Governor of each adjacent coastal State." Id., § 1508(b)(1). The law also provides that "[i]f the Governor [of an "adjacent coastal State"] notifies the Secretary that an application which would otherwise be approved pursuant to this paragraph, is inconsistent with State programs relating to environmental protection, land and water use, and coastal zone management, the Secretary shall condition the license granted so as to make it consistent with such State programs." Id. In essence, Section 1508(b)(1) gives the Governor of each State designated as an "adjacent coastal State" the ability to veto issuance of the federal license or to impose mandatory conditions that must be included within that license.

     9.     Section 1508(a) establishes three pathways by which a State may be designated an "adjacent coastal State." Section 1508(a)(1) provides that a State may be designated as an "adjacent coastal State" if it is: (a) directly connected by pipeline to the proposed deepwater port; or (b) located within 15 miles of the proposed port.

     10.     Section 1508(a)(2) also provides a third pathway by which a State may petition for designation as an additional "adjacent coastal State":

> The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric

3

Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. . . .

(Emphasis added). Under the DWPA, "coastal environment" is defined as "the navigable waters . . . and the adjacent shorelines . . . ." 33 U.S.C. § 1502(5). Under this definition, the "coastal environments" of New York and New Jersey extend three miles offshore.

11.    In recognition of the extraordinary nature of the power granted to an "adjacent coastal State" to veto or impose conditions on a federal license, Congress deliberately established stringent standards for designation of an additional "adjacent coastal State" under Section 1508(a)(2). These limits are expressed through requirements that: (a) any petition for designation must be submitted within 14 days after publication in the Federal Register of Notice that an application for a deepwater port has been submitted, and the petition must be resolved within 45 days after its receipt; (b) the analysis of the petition is restricted to consideration of the risks to the "coastal environment" of the petitioning State and the State previously designated as an "adjacent coastal State" under Section 1508(a)(1); and (c) the risks to the "coastal environment" of the petitioning State must be shown to be "equal to or greater than" the risks to the "coastal environment" of the State designated under Section 1508(a)(1).    This comparative standard is extremely difficult for a petitioning State to satisfy, in light of the substantial volume of information about the effects on the coastal environment of the State designated under Section 1508(a)(1) that is submitted by the sponsor of the project, which is primarily set forth in the Application.

12.    In establishing the standard that must be satisfied for designation of an additional "adjacent coastal State," Congress expressly considered and rejected an

4

alternative that would have authorized such a designation based on a determination that the project would have a significant impact on the coastal environment of the petitioning State. The Conference Committee adopted the third pathway set forth in Section 1508(a)(2), which permits designation of an additional "adjacent coastal State" only if the petitioning State can carry the burden of showing that that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." H. Conf. Rep. No. 93-1605, 93rd Cong., 2d Sess. (Dec. 16, 1974), reprinted in 1974 U.S.C.C.A.N. 7622, 7636.

13. Under the U.S. Coast Guard regulation that governs the processing of license applications for deepwater LNG ports, to facilitate the comparative evaluation of the risks to the "coastal environments" of the two States that is required by Section 1508(a)(2), the Governor of the petitioning State must submit "the facts and available documentation or analyses concerning the risk of damage to the coastal environment of the State" and must explain why he believes "the risk of damage to its coastal environment is equal to or greater than the risk" to the State directly connected by pipeline to the project. 33 C.F.R. § 148.217(b)(3)-(4).

14. Under the DWPA, any State that is not deemed an "adjacent coastal State" may participate fully in the comprehensive environmental analyses that the federal agencies must conduct in deciding whether to license the proposed port, and the federal agencies are required by law to take the views of such a State into account. The DWPA expressly provides that any such State "shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis

5

added).  Such a State, however, does not have the power to veto or to impose binding conditions upon the federal license for the port that a State designated as an "adjacent coastal State" obtains.

**Delegations of Authority and Implementation of the Deepwater Port Act.**

15.     The Code of Federal Regulations contains only one rule governing designation of an additional "adjacent coastal State." 33 C.F.R. § 148.217(d) (2006). This rule was issued by the Coast Guard pursuant to authority delegated by the Secretary of Transportation.  It explicitly provides that the Coast Guard will exercise the authority to make such designations.  The Maritime Administration has not issued a rule that purports to give it the power to designate an additional "adjacent coastal State."

16.     The DWPA delegated implementing authority to the Secretary of Transportation, the Department in which the Coast Guard was located in 1974. Congress recognized that the Coast Guard had the appropriate experience and expertise regarding navigational safety and marine environmental protection, which were its primary concerns with the construction and operation of deepwater ports.  See S. Rep. No. 93-1217, 93d Cong., 2d Sess. (Oct. 2, 1974), reprinted in 1974 U.S.C.C.A.N. 7529, 7536-37.

17.     Since the DWPA was adopted, the Commandant of the Coast Guard has exercised the authority to receive the application and supporting documents for a proposed port and to conduct the process by which multiple federal agencies conduct the necessary reviews.  The Coast Guard also has issued the principal implementing rules under which the statute is administered.  See 33 C.F.R. parts 148-150 (2006).

18.     On September 24, 1975, the Secretary of Transportation delegated to the Commandant of the Coast Guard the authority to carry out all functions and

6

responsibilities of the Secretary under the DWPA, except for a small number of functions that were expressly reserved to the Secretary. 40 Fed. Reg. 43,901 (Sept. 24, 1975). In this Delegation, the Secretary did not specifically reserve the authority to designate "adjacent coastal States" under either Sections 1508(a)(1) or 1508(a)(2).

19.    The Coast Guard promptly implemented the authority that had been delegated by the Secretary. For example, on March 12, 1976, a Coast Guard contractor issued a final Methodology Report to define the agency procedures for designating an additional "adjacent coastal State" under Section 1508(a)(2). Under this methodology, the Coast Guard would: (1) assess, based upon interpretation of the license applicant's data, independent risks to the coastal environments of the States directly connected by pipeline to the port; then (2) evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential environmental damage it submits; and finally (3) compare the risks to the coastal environment of each State on a resource-by-resource basis. Arthur D. Little, Inc., "Methodology for Designation of Adjacent Coastal States," U.S. Coast Guard Report No. CG-WDWP-1-76, at 6.

20.    The comparative analysis required by Section 1508(a)(2) for designation of an additional "adjacent coastal State" is a complex undertaking that requires assembly and consideration of a substantial amount of evidence concerning various potential impacts on the coastal environments of the two States. For example, in February 1976, the Coast Guard referred to the National Oceanic and Atmospheric Administration ("NOAA") for comment the request of Florida for designation as an additional "adjacent coastal State" for the proposed Seadock deepwater port. On March 25, 1976, NOAA submitted a 233 page report analyzing whether the risk of harm to the coastal

7

environment of Florida was equal to or greater than the risk posed to the coastal environment of Texas, the "adjacent coastal State" connected to the port by pipeline.

21.    As originally enacted in 1974, the DWPA applied only to ports for importation of petroleum and petroleum products. In the 1970s, only one deepwater port was licensed under the DWPA. The law essentially remained dormant for the next 25 years, until Congress amended the law in 2002 to include deepwater LNG ports.

22.    During the dormancy period, in 1981 the Maritime Administration was transferred from the Department of Commerce to the Department of Transportation.

23.    In 1997, the Secretary of Transportation revised the Delegations of Authority under the DWPA to set forth the respective authorities of the Commandant of the Coast Guard and the Administrator of the Maritime Administration. Organizations and Delegations of Powers and Duties; Delegation to the Commandant, United States Coast Guard and Administrator, Maritime Administration, 62 Fed. Reg. 11,383 (Mar. 12, 1997).    At the time of these Delegations, both the Coast Guard and the Maritime Administration resided within the Department of Transportation.    The Secretary delegated the following authority to the Commandant, codified at 49 C.F.R. § 1.46(s):

> (s) Carry out the following powers and duties vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524):
>
> (1) The authority to process applications for the issuance, transfer or amendment of a license for the construction and operation of a deepwater port (33 U.S.C. 1503(b)) in coordination with the Administrator of the Maritime Administration.
>
> (2) Carry out other functions and responsibilities vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524), except as reserved [to the Secretary] . . . and delegated [to the Administrator of the Maritime Administration].

(Emphasis added) Subsection (s)(2) essentially carried forward the original delegation of authority to the Commandant in 1975, i.e., to carry out all other functions vested in the Secretary by the statute unless reserved or delegated to the Administrator of the Maritime Administration. The 1975 Delegation did not expressly reserve to the Secretary the authority to designate an additional "adjacent coastal State" under Section 1508(a)(2).

24.    In 1997, the Secretary also delegated some authority to the Maritime Administrator, codified at 49 C.F.R. § 1.66(aa) which states in relevant part:

> (aa) Carry out the following powers and duties vested in the Secretary by the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501-1524):
>
> (1) The authority to process applications for the issuance, transfer, or amendment of a license for the construction and operation of a deepwater port (33 U.S.C. 1503(bb)) (sic) in coordination with the Commandant of the Coast Guard.
>
> (2) Approval of fees charged by adjacent coastal States for use of a deepwater port and directly related land-based facilities (33 U.S.C. 1504(h)(2)). . . . .

With respect to "adjacent coastal States," the only authority delegated to the Maritime Administration was the power to approve the fees charged by those States for use of the facility under 33 U.S.C. § 1504(h). The Delegation did not purport to vest the Maritime Administration with authority to grant a petition under Section 1508(a)(2) for designation as an additional "adjacent coastal State."

25.    On November 25, 2002, Congress amended the DWPA to include deepwater ports for the handling of LNG. Pub. L. No. 107-295, 116 Stat. 2064, 2086, § 106, amending 33 U.S.C. §§ 1503(9), (13). The Coast Guard has since received a significant number of applications to build deepwater LNG terminals.

9

26.    On November 25, 2002, Congress also adopted the Homeland Security

Act, which transferred the Coast Guard to the Department of Homeland Security.

Section 888(b) of that law, Pub. L. No. 107-296, 116 Stat. 2135, 2249, provides:

> There are transferred to the Department [of Homeland Security] the authorities,
> functions, personnel, and assets of the Coast Guard . . . including the authorities
> and functions of the Secretary of Transportation relating thereto.

This provision of the Homeland Security Act thereby codified the prior delegations of

authority made to the Commandant of the Coast Guard under the DWPA, and transferred

these authorities to the Secretary of Homeland Security. Further, Section 888(c) of that

law provides that the authorities vested in the Commandant at the time of transfer cannot

be redelegated or removed without further action by Congress.

> Notwithstanding any other provision of this Act, the authorities, functions, and
> capabilities of the Coast Guard to permit its missions shall be maintained intact
> and without significant reduction after the transfer of the Coast Guard to the
> Department [of Homeland Security], except as specified in subsequent Acts.

27.    In June 2003, the Secretary of Transportation delegated to the Maritime

Administration the previously reserved authority to issue, transfer, amend, or reinstate a

license for the construction and operation of deepwater ports. Organization and

Delegation of Powers and Duties, Update of Secretarial Delegations, 68 Fed. Reg. 36,496

(June 18, 2003). In granting this additional authority to the Maritime Administration, the

Secretary of Transportation did not purport to revise or limit the prior delegations of

authority to the Coast Guard under the DWPA. The 2003 Delegation specifically stated:

> The USCG retained the statutory and delegated authorities upon its transfer to the
> Department of Homeland Security . . . Pub. L. No. 107-296, section 888. This
> rule does not change the authorities delegated to the USCG and to MARAD nor
> does it change the coordination between the USCG and MARAD for processing
> license applications.

68 Fed. Reg. at 36,496.

**The Coast Guard Rule Governing Designation of an Additional "Adjacent Coastal State."**

28.    On January 6, 2004, the Coast Guard promulgated 33 C.F.R. § 148.217 (2004), the original version of its regulation concerning designation of additional "adjacent coastal States." Deepwater Ports, 69 Fed. Reg. 724 (Jan. 6, 2004). The rule provided that a petition for designation must be submitted to the Commandant and that the Commandant would send a copy of the request to NOAA asking for recommendations so that a decision could be made within the 45 day statutory deadline. 33 C.F.R. §§ 148.217(b)-(c). Section 148.217(d) further provided:

> If after receiving NOAA's recommendations, the Commandant (G-M) determines that the State should be considered as an adjacent coastal State, the Commandant (G-M) designates it as an adjacent coastal State. If the Commandant (G-M) denies the request, the Commandant notifies the Governor of the requesting State of the denial.

33 C.F.R. § 148.217(d) (2004) (emphasis added). Section 148.217(d) thus explicitly provided that the decision whether to grant a petition for designation as an additional "adjacent coastal State" was to be made by the Commandant of the Coast Guard. The rule provided no role for the Maritime Administration in making that designation.

29.    In September 2006, the Commandant of the Coast Guard issued a final rule amending 33 C.F.R. § 148.217 in one respect, concerning consideration of a State's petition for designation as an additional "adjacent coastal State." Deepwater Ports, 71 Fed. Reg. 57,643 (Sept. 29, 2006). As revised, Section 148.217(d) now provides:

> If after receiving NOAA's recommendations the Commandant (G-P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G-P), in concurrence with the MARAD Administrator, will so designate it. If the Commandant (G-P), in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

11

33 C.F.R. § 148.217(d) (2006) (emphasis added).

30.    Section 148.217(d) , as amended, thus currently provides that the decision whether to grant a State's petition for designation as an additional "adjacent coastal State" will be made by the Commandant, not by the Maritime Administrator.  In issuing this rule, the Commandant chose to limit his discretion by providing that he would make this determination "in concurrence with the MARAD Administrator."

**ASIG's Application To Construct the Safe Harbor Energy LNG Deepwater Port.**

31.    On May 8, 2007, ASIG submitted to the Coast Guard and the Maritime Administration an application for all federal authorizations required for a license to construct and operate the Safe Harbor Energy LNG Deepwater Port.  The proposed port would be constructed in federal waters approximately 13.5 miles off the coast of New York and 19 miles off the coast of New Jersey.

32.    The demand for natural gas in the United States is growing rapidly. Department of Energy projections indicate that total domestic consumption of natural gas will increase from 22.4 trillion cubic feet in 2004 to 27.0 trillion cubic feet in 2025.  The Department projects that the Middle Atlantic region, which includes New York and New Jersey, will experience an annual average increase in natural gas consumption of 0.7 percent per year during this time period.  At a national level, the Department predicts that even with increased domestic production, substantial additional imports of natural gas will be required to satisfy domestic demand over the next 25 years.  Deepwater LNG ports are expected to play a crucial role in handling such imports.

33.    The Safe Harbor Energy port is designed to receive LNG, regasify it, and transmit through the existing distribution infrastructure up to two billion cubic feet per

12

day of natural gas to help satisfy demand in the New York metropolitan area. Natural gas is a clean burning fuel that is considered environmentally superior to other fossil fuel energy sources, such as coal or fuel oil. The offshore location of the proposed port will minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, minimize visual impacts, and minimize safety and security issues presented by onshore LNG terminals.

34.    After several years of study and consultations with federal agencies and the State of New York, ASIG submitted an Application of approximately 5,000 pages in length for authorization to construct the Safe Harbor Energy port off the coast of New York State. On August 15, 2007, the Coast Guard and the Maritime Administration notified ASIG that its application was deemed complete.

35.    On August 22, 2007, Adam Zellner, the Deputy Commissioner of the New Jersey Department of Environmental Protection, sent an e-mail to a consultant working for ASIG on the Safe Harbor Energy project which stated that New Jersey did not have a concern with the proposed port. The e-mail provided:

> Thanks Julie - per our conversation and meeting, the NJ DEP has reviewed the proposal and based on its current configuration, the Department has no regulatory issues that Atlantic Sea Isle Group must deal with. Given the distance off NJ's coast and the fact that the current proposal has all of the infrastructure going coast (sic)through NYC, New Jersey has no jurisdiction in this matter. We look forward to working with you and if anything changes that does bring the project into NJ waters, we would be happy to sit down and discuss any issues that may present. Thanks again. Adam Zellner, Deputy Commissioner. NJDEP

(Emphasis added)

36.    On August 27, 2007, the Maritime Administration published in the Federal Register a Notice that the ASIG license application had been submitted and was determined to be complete.  Atlantic Sea Island Group LLC, Safe Harbor Energy

13

Liquefied Natural Gas Deepwater Port License Application, 72 Fed. Reg. 49,041 (Aug. 27, 2007). Publication of this Notice triggered the 330 day statutory timetable for making a final determination on the application.

37.    The Safe Harbor Energy port will connect to the existing natural gas pipeline infrastructure at a point in the coastal waters of New York. The Federal Register Notice designated New York as an "adjacent coastal State" for this application under Section 1508(a)(1). *Id.*

38.    Section 1508(a)(2) provides that a State must petition for designation as an additional "adjacent coastal State" within 14 days after publication of the Federal Register Notice and that the petition must be resolved "not later than the 45th day after the date [the Secretary] receives such a request from a State." On September 6, 2007, within 14 days after publication of the Notice, the Governor of New Jersey submitted a letter to the Commandant of the Coast Guard and the Administrator of the Maritime Administration requesting that New Jersey be designated as an additional "adjacent coast State" for the Safe Harbor Energy project. Under Section 1508(a)(2), the deadline for resolution of New Jersey's petition expired no later than 45 days after the request was received. 33 C.F.R. § 148.217(c).

39.    The letter submitted by the Governor of New Jersey was slightly in excess of two pages in length. The letter contained no facts, documentation or analyses, as required by the Coast Guard rule, but argued in four paragraphs that the potential risk of the project to specific aspects of the New Jersey coastal environment could be equal to or greater than the comparable risks to the New York coastal environment. The Governor's letter also did not attempt to quantify the potential overall risk of the project to the coastal

14

environments of New York and New Jersey, or to show that the potential overall risk to the "coastal environment" of New Jersey was equal to or greater than the overall risk to the "coastal environment" of New York.

40.     On September 28, 2007, the Administrator of the Maritime Administration sent an interim response to the Governor which acknowledged receipt of New Jersey's request for designation as an additional "adjacent coastal State." The letter stated that the Maritime Administration would review New Jersey's request under the legal standard established by Section 1508(a)(2) -- that after considering the recommendation of the Administrator of NOAA, the "Maritime Administrator must grant Adjacent Coastal State status if the risk of damage to the requesting State's coastal environment is <u>equal to or greater than</u> the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port." (Emphasis added).

41.     On October 17, 2007, NOAA submitted a letter to the Maritime Administration in response to its notification that New Jersey had submitted a request for designation as an "adjacent coastal State." On information and belief, the letter submitted by NOAA was one and one-quarter pages long. On information and belief, the NOAA letter contained no meaningful analysis of the potential risks that the Safe Harbor Energy project presented to the "coastal environments" of either New York or New Jersey, and did not present a comparative analysis of whether the risks the project presented to the "coastal environment" of New Jersey would be "equal to or greater than" the risks it presented to the "coastal environment" of New York. This letter stands in stark contrast to the 233 page factual analysis that NOAA submitted in 1975 on the designation of an additional "adjacent coastal State" for the Seadock project.

15

**Final Action by the Administrator Purporting To Designate New Jersey as an Additional "Adjacent Coastal State" for the Safe Harbor Energy Project.**

42.    On November 2, 2007, almost two weeks after expiration of the statutory deadline, the Administrator sent a letter to the Governor of New Jersey which stated that he had "determined that New Jersey is an Adjacent Coastal State as defined under the Act and is so designated for the proposed Safe Harbor deepwater port project." The letter stated that the Administrator had based his decision:

> upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

43.    The Administrator further noted that "[p]ursuant to the requirements set forth at Section 1508(b) of the Act, the Administrator shall not issue a license without the approval of the Governor of an Adjacent Coastal State" and reiterated that "[a]s Governor of an Adjacent Coastal State, you are afforded the authority in accordance with the requirements of the Act to approve, disapprove, or approve with conditions the deepwater port license application for the Safe Harbor project."

44.    The Administrator's purported action to designate New Jersey an "adjacent coastal State" for the Safe Harbor Energy project violated the DWPA and was arbitrary, capricious, or contrary to law in several respects.

a. The Administrator did not have statutory authority to make such a designation. The authority to designate a petitioning State as an additional "adjacent coastal State" was delegated by the Secretary of Transportation to the Commandant of the Coast Guard in 1997. This authority was transferred with the Coast Guard to the Department of Homeland Security in 2002 and may not be redelegated or removed from the Coast Guard except by Act of Congress. Under the governing regulation, 33 C.F.R.

16

§ 148.217(d) (2006), the authority to designate an additional "adjacent coastal State" is exercised by the Commandant of the Coast Guard. In 2006, the Commandant chose to limit his discretion by providing that he will exercise the authority to designate an additional "adjacent coastal State" in concurrence with the Maritime Administrator. But under the express language of Section 148.217(d), as amended in 2006, the Commandant shall make any designation of an "adjacent coastal State.". The Administrator acted unilaterally in purporting to designate New Jersey as an additional "adjacent coastal State." The Commandant of the Coast Guard did not sign the purported designation.2006 amendment did not strip the Commandant of his authority to make such designations. Accordingly, the Administrator's decision of November 2, 2007 is without legal authority and contrary to law.

b. Even assuming that the Administrator was the official authorized to make such a designation, his decision was issued after the expiration of the 45 day statutory deadline for designation of a State as an additional "adjacent coastal State" for this project.

c. As stated in the November 2, 2007 letter, the Administrator based his decision:

upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

In basing his decision on these grounds, the Administrator failed to apply the legal standard that Congress had enacted in Section 1508(a)(2). That provision explicitly states that in order for an additional State to be designated as an "adjacent coastal State," the agency record must show "a risk of damage to the coastal environment of such [petitioning] State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port . . . ." (Emphasis added). The Administrator,

17

however, applied a different criterion not authorized by the statute, which was based on the size of the proposed project – its "magnitude and scope" – and its potential for "significant" environmental impact on New Jersey.

In making this determination, the Administrator did not refer to the potential risk that the Safe Harbor Energy project presented to the "coastal environment" of the State of New York. Further, the Administrator did not perform the analysis or base his decision on the sole standard established by Section 1508(a)(2), whether the risks presented to the "coastal environment" of New Jersey would be "equal to or greater than" the risk posed to the "coastal environment" of New York.

d. In rendering his decision, the Administrator's November 2, 2007 letter did not discuss any evidence in the administrative record that would support a conclusion that the potential risk to the "coastal environment" of New Jersey would be "equal to or greater than" the risk posed to the "coastal environment" of New York, as required by Section 1508(a)(2). The record contains no factual basis on which the Administrator could have based such a decision. Neither the short letter submitted by the Governor of New Jersey nor the one and one-quarter page letter submitted by NOAA contained any facts or analysis upon which a rational decisionmaker could have concluded that the risk presented by this project to the "coastal environment" of New Jersey will be "equal to or greater than" the risk presented to the "coastal environment" of New York.

**The Administrator's Denial of ASIG's Request for Reconsideration of his Decision.**

45.    On December 3, 2007, ASIG submitted to the Secretary of Transportation and the Administrator a request for reconsideration of the Administrator's November 2, 2007 decision designating New Jersey as an "adjacent coastal State." That request

18

discussed in detail, as set forth above, each of the four grounds on which the Administrator's action violated Section 1508(a)(2) and was arbitrary and capricious for lack of evidentiary support in the administrative record.

46.    Employees of the Maritime Administration and the Coast Guard orally informed counsel for ASIG that they had "stopped the clock" on further processing of the Safe Harbor Energy application, for purposes of the statutory deadlines established by the DWPA, until resolution of ASIG's challenge to the legality of the Administrator's action.

47.    On February 8, 2008, the Administrator denied ASIG's request for reconsideration of his November 2, 2007 decision. The Administrator responded on the merits to all four of ASIG's arguments why his determination was arbitrary, capricious, or contrary to law. In particular, the Administrator's explanation of the timing of his decision on the petition showed that he had either violated the statutory deadline or had considered a request that was time-barred, but in either event was illegal. The Administrator also conceded that he had presented no factual basis in support of his decision and denied that he was under a legal obligation to present a rationale. Finally, to cure this error the Administrator attempted but failed to articulate an after-the-fact rationale basis for his prior decision.

48.    The Administrator's designation of New Jersey as an additional "adjacent coastal State" constitutes "final agency action" for which ASIG may obtain judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704. This decision represents the culmination of the agency's decisionmaking process on New Jersey's petition. Further, this decision determines the rights or obligations of ASIG and New Jersey, and legal consequences will flow from it. The Administrator's decision means

that the Governor of New Jersey has the authority "to approve, disapprove, or approve with conditions the deepwater port license application for the Safe Harbor project."

49.    The Administrator's illegal and arbitrary decision has caused and is causing ASIG significant economic harm.  ASIG will be irreparably harmed if the environmental and safety review processes that the federal agencies will perform on its Application are conducted under the overhanging cloud of New Jersey's unlawful power to veto the project or impose mandatory conditions that must be included in the federal license.  By granting New Jersey this unlawful power, the Administrator has irreparably injured ASIG's ability and statutory right to obtain a decision within the time deadlines and under the substantive standards adopted by Congress in the DWPA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE DEEPWATER PORT ACT AND THE APA)

50.    Plaintiff repeats and incorporates all previous allegations of this Complaint.

51.    The Administrator violated the Deepwater Port Act and the Administrative Procedure Act in designating New Jersey as an additional "adjacent coastal State" under 33 U.S.C. §1508(a)(2), because he did not have the legal authority to make this designation.  Under the existing delegations of authority and regulations implementing the Deepwater Port Act, that authority to designate an "adjacent coastal State" is vested in the Commandant of the Coast Guard.  The Administrator's November 2, 2007 decision usurped authority that has been delegated to the Commandant of the Coast Guard.

20

## SECOND CLAIM FOR RELIEF
### (VIOLATION OF THE DEEPWATER PORT ACT AND THE APA)

52.    Plaintiff repeats and incorporates all previous allegations of this Complaint.

53.    The Administrator violated the Deepwater Port Act by designating New Jersey as an additional "adjacent coastal State" on November 2, 2007, more than 45 days after the Maritime Administration received the September 6, 2007 petition from the Governor of New Jersey requesting such designation and more than 45 days after document was placed in the docket of this matter on September 10, 2007. The Administrator's action violated the mandatory deadlines established by the statute and thus was null and void, and without legal effect.

## THIRD CLAIM FOR RELIEF
### (VIOLATION OF THE DEEPWATER PORT ACT AND THE APA)

54.    Plaintiff repeats and incorporates all previous allegations of this Complaint.

55.    The November 2, 2007 decision of the Administrator of the Maritime Administration purporting to designate New Jersey as an additional "adjacent coastal State" was arbitrary, capricious, and violated the Deepwater Port Act and the Administrative Procedure Act, by failing to apply the legal standard established by Congress in Section 1508(a)(2). That standard permits designation of an additional State as an "adjacent coastal State" only upon a finding that the risk of damage posed by the Safe Harbor Energy project to the "coastal environment" of New Jersey would be "equal to or greater than the risk posed to" the "coastal environment" of New York. The Administrator never made the finding required by the statute. Instead, the Administrator

21

based his decision on a different and less stringent standard that Congress never authorized and that conflicts with the terms of the standard that Congress actually adopted in Section 1508(a)(2).

## FOURTH CLAIM FOR RELIEF
### (VIOLATION OF THE DEEPWATER PORT ACT AND THE APA)

56.     Plaintiff repeats and incorporates all previous allegations of this Complaint.

57.     The Administrator's November 2, 2007 decision designating New Jersey as an additional "adjacent coastal State" under Section 1508(a)(2) was arbitrary, capricious, and violated the Deepwater Port Act and the Administrative Procedure Act, because the agency record did not contain factual evidence that supported the conclusion required for designation of New Jersey as an additional "adjacent coastal State," namely that the risk of harm presented by the Safe Harbor Energy project to the "coastal environment" of New Jersey was "equal to or greater than" the risk it posed to the "coastal environment" of New York.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Atlantic Sea Island Group requests the following relief:

1.     For a declaration that the Administrator of the Maritime Administration, acting on behalf of the Secretary of Transportation, violated 33 U.S.C. § 1508(a)(2) and 33 C.F.R. §148.217(d), and acted arbitrarily and capriciously, in designating the State of New Jersey as an additional "adjacent coastal State" for purposes of the Safe Harbor Energy LNG Deepwater Port application.

22

2.    For an Order permanently enjoining the Administrator of the Maritime Administrator and the Secretary of Transportation from designating or treating the State of New Jersey as an additional "adjacent coastal State" with respect to the Safe Harbor Energy LNG Deepwater Port project.

3.    For an Order directing defendants to "restart the clock" for purposes of the statutory deadlines established by the DWPA for consideration of plaintiff's Application for a federal license to construct and operate the Safe Harbor Energy port.

4.    For an Order awarding plaintiffs such other and further relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted,

JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 15, 2008                   Counsel for Plaintiff

**2**



### State of New Jersey
OFFICE OF THE GOVERNOR
PO Box 001
TRENTON NJ 08625-0001

JON S. CORZINE
*Governor*

September 6, 2007

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

Atlantic Sea Island Group LLC has applied to the Coast Guard and the Maritime Administration for a license to own, construct and operate a deepwater LNG port in the Atlantic Ocean off New Jersey and New York. Notice of the application, known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535), was published in the Federal Register on August 27, 2007. The notice indicates that because of the proposed island's proximity to New York, New York has been designated an adjacent coastal state under the Deepwater Port Act. The proposed island would be within 15 miles of New York and is approximately 19 miles from New Jersey. However, the proposed alternative pipeline alignment that is part of the deepwater port application would be well within the 15 mile standard to designate New Jersey an adjacent coastal state. As defined in the Deepwater Port Act, the deepwater port subject to this licensing includes all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys mooring lines, and similar facilities that are approved or proposed for construction and operation as part of the deepwater port. By this definition alone New Jersey should be considered an adjacent coastal state due to the proximity of the alternative alignment.

The Deepwater Port Act also provides for a state to be designated an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the deepwater port. The proposed port will connect to the existing Transco pipeline running from

Morgan, New Jersey to Long Beach, New York. Thus, New Jersey considers that it is directly connected to the deepwater port. Moreover, the alternative pipeline alignment would be less than 9 miles from New Jersey, well within the 15 mile criterion.

Regardless of whether the connection to the Transco pipeline emanating from the New Jersey shore constitutes a direct connection to either state, New Jersey's coastal environment is equally impacted by the proposed facilities as New York's coastal environment. New Jersey has robust commercial and recreational fisheries that are vital to the State's economy, as well as to the history and character of New Jersey's coastal environment. The proposed facility will destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally approved coastal management program. Not only will the creation of an island over this prime fishing area be detrimental to this unique environment but the proposed facility's exclusion zone will prohibit vessels in a 633 acre area, further diminishing this important resource.

The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high... The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Accordingly, any impediments to navigation would adversely affect New Jersey in a manner equal to or greater than its effects on New York.

The predominant current direction in the area of the proposed deepwater port is toward New Jersey. Accordingly, turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as to the important commercial and recreational fishing grounds surrounding the proposed port, as would any spills at the island during construction and operation of the facility.

The application does not specify the exact location of shore based facilities that would service the deepwater port, or from which construction would be staged. However, it does indicate that the facilities would be located within a 40 mile radius of the proposed island. This radius includes shore facilities in New Jersey. Accordingly, the effects on the coastal environment of New Jersey for construction staging and long-term service of the deepwater port would be felt in New Jersey in equal or greater amount than in New York.

New Jersey should be designated an adjacent coastal state under the Deepwater Port Act because the alternative pipeline alignment will be well within 15 miles of New Jersey's Coast, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the

coastal environment of New York. It is imperative that New Jersey be an integral part of the review of this proposal due to the inherent risks associated with a deepwater port within as busy of a port region as the New Jersey/New York Port complex.

Sincerely,

Jon S. Corzine
Governor

c:    Mr. H. Keith Lesnick, MARAD
      Mr. Mark A. Prescott, USCG



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

Coastal Management Office
401 E. State Street, 7th Floor
PO Box 418
Trenton, New Jersey 08625
P: 609-633-2201
F: 609-292-4608

LISA P. JACKSON
*Commissioner*

September 25, 2007

Mr. David M. Kennedy
Director
Office of Ocean and Coastal Resource Management
1305 East-West Highway
SSMC4 N/ORM3 Rm. 11211
Silver Spring, MD 20910

Dear Mr. Kennedy:

RE:    Permit Application by Safe Harbor Energy, LLC for US Coast Guard license to own, construct and operate a deepwater LNG port in the Atlantic Ocean

The New Jersey Coastal Management Program (NJCMP) is notifying the Office of Ocean and Coastal Resource Management (OCRM), the U.S. Coast Guard (USCG), the Maritime Administration (MARAD) and Safe Harbor Energy, LLC (Applicant) of its intent to review the above-referenced activity (project) for consistency with the enforceable policies of the NJCMP. The USCG issued a Public Notice for this project on August 27, 2007. Any activity that is the subject of an application for a federal permit or license may also be subject to the federal consistency requirements of Section 307(c)(3)(A) of the federal Coastal Zone Management Act (CZMA) at 16 USC § 1456(c)(3)(A) and to the regulations promulgated by the National Oceanic and Atmospheric Administration (NOAA) that implement that statutory provision.

The NJCMP believes that the proposed project may reasonably be expected to affect New Jersey's coastal zone. Subject to concurrence by OCRM with this determination, section 307(c)(3(A) and its implementing regulations require the Applicant to prepare and submit to the NJCMP a certification analyzing the consistency of the proposed project with the

enforceable policies of the NJCMP. On August 27, 2007, the Maritime Administration published a Public Notice in the Federal Register, announcing that they received an application for the licensing of a natural gas deepwater port, and that the application appeared to contain the required information. In response to this notice, by letter of September 6, 2007, Governor Jon Corzine notified the USCG and MARAD that New Jersey should be designated an adjacent coastal state under the Deepwater Port Act. In accordance with the regulations under the Deepwater Port Act, the Governor noted that the alternative pipeline alignment will be well within 15 miles of New Jersey, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the coastal environment of the State of New York.

The regulatory standard for OCRM's approval of the NJCMP request is that the proposed activity has reasonably foreseeable effects on uses or resources of the State's coastal zone pursuant to 15 CFR 930.54(c). Based on the initial information provided, the NJCMP concludes that the activity satisfies this requirement.

Although federal permits for construction and operation of deepwater ports under the Deepwater Ports Act beyond New Jersey's coastal zone are not specifically included in New Jersey's Federal Consistency listing, the proposed deepwater port does represent an unlisted activity requiring a federal permit that the NJCMP believes will have a reasonably foreseeable effect on uses or resources of New Jersey's coastal zone. In such cases, the regulations implementing the CZMA require OCRM's approval of the NJCMP's request to review the activity pursuant to 15 CFR § 930.54. If OCRM grants review approval, the CZMA and its implementing regulations delay the USCG authorization of the activity until either the NJCMP concurs with a consistency certification or the NJCMP review period expires, whichever occurs first. If OCRM denies the NJCMP's request for review, the CZMA and implementing regulations, the USCG may proceed to authorize the activity without NJCMP concurrence pursuant to 15 CFR § 930.54(c). This request to review the proposed deepwater port under the CZMA is independent of New Jersey's request to be considered an adjacent coastal state under the Deepwater Port Act.

**Proposed Project**

Based on the information submitted by the applicant to the USCG and contained within the public notice, the project involves the construction of a deepwater LNG port in the Atlantic Ocean. The deepwater port consists of three components: an artificial island to be constructed of natural sand, gravel and rock materials surrounded by armored breakwaters; an LNG receiving, storage and regasification facility; and a submerged pipeline. The proposed artificial island would cover approximately 112 acres of sea floor, be located 13.5 miles offshore of Long Beach, New York and approximately 19 miles from New Jersey on an area depicted as Cholera Bank on NOAA nautical charts. The pipeline would consist of two parallel 36 inch diameter pipelines, extending 12.8 miles from the island to a connection with the existing offshore Transco pipeline. The alternative pipeline route would still connect to the Transco pipeline offshore, but would be a longer route and would also be closer to New Jersey's shore, within 9 miles of Sandy

2

Hook. The Transco pipeline runs from Sayreville, New Jersey, to Long Island, New York. Assessment of the project's potential effect on New Jersey's coastal zone is based on the project information currently available to the NJCMP as Volume Four of the Deepwater Port License Application is not available to the NJCMP due to confidentiality agreements. This poses various problems for the NJCMP to adequately review the proposal as key information is contained within this volume, such as proposed port facilities that will be utilized for the project. There is a strong possibility that ports located within New Jersey's coastal zone will be utilized due to the proximity of the proposed island and the availability of port facilities that may be needed to construct the proposed project.

## Reasonably Foreseeable Effects

Commercial Fishing; Recreational Fishing and Boating. The area of the proposed deepwater port is a productive and historical fishing area known as Cholera Bank, more specifically identified as Anglers Bank and Middle Grounds under NJDEP's Prime Fishing Areas Mapping. Marine fish and fisheries are protected under the NJCMP, and public access to and use of natural resources, such as Cholera Bank, are major components of the CZMA and the NJCMP. The proposed island will have a 500 meter exclusion zone surrounding it, which, when coupled with the island itself, will preclude vessels from over 630 acres of the ocean for the anticipated 40-year life of the project. In addition, during construction of the associated pipeline, a 9,306 acre area would be closed to vessels during the estimated eight month construction period. Thus, the proposed deepwater port would have a foreseeable effect on public access to offshore areas, and would alter commercial and recreational fishing patterns. Not only would there be a permanent exclusion zone surrounding the island prohibiting vessels from over 630 acres of the ocean, but, the creation of the island itself would result in the permanent loss of valuable fish habitat through filling of 112 acres of productive seafloor. Consequently, the NJCMP has concluded that there are reasonably foreseeable effects on New Jersey's commercial fishing industry and recreational boating and fishing industries, which are based in ports, marinas, and other upland facilities located throughout New Jersey's coastal zone.

## Construction Staging Areas

The information provided by the applicant indicates that the staging and laydown area for construction of the proposed deepwater port would be located within a forty mile radius of the proposed site location. The NJCMP has no information concerning the specific location of this staging area and the existing site conditions. The five possible areas chosen by the Applicant were not included with the information the NJCMP received, but it is likely that port facilities located in New Jersey's coastal zone are included in their proposal due to the presence of the criteria outlined in the project proposal. Without this information, NJCMP can not determine the effects of the construction and operation on the uses and resources of New Jersey's coastal zone, including potential impacts on existing ports and shipping traffic, traffic on land, and compatibility with adjacent uses. Therefore, NJCMP believes that the proposed project has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone since staging and construction activities may occur within New Jersey's coastal zone for a period of up to 5-6 years.

3

Navigation and Ports. Major designated navigation corridors converge off New Jersey's coast. These corridors provide shipping access to the Port of New York and New Jersey that is vital to New Jersey's economy. The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high... The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Placement of structures such as a deepwater port, including pipelines, between these approach lanes has the potential to affect vessel navigation to and from New Jersey's coastal zone, thus affecting access to and use of the port facilities located within New Jersey's coastal zone. Accordingly, the NJCMP should be afforded an opportunity to review this proposal for consistency with New Jersey's enforceable policies as the proposed deepwater port has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone.

Marine Fish, Sea Turtles and Marine Mammals. Critical wildlife and endangered or threatened wildlife habitats are areas that serve an essential role in maintaining wildlife throughout their lifecycle. The NJCMP discourages development that would affect critical wildlife habitats. Offshore waters serve as essential habitat for numerous fish species during various stages of their lifecycles. Several species of sea turtles and four species of whale, as well as other marine mammals, frequent this region. Therefore, it is reasonably foreseeable that this project is likely to affect these species.

Submerged Infrastructure. A submerged infrastructure route is the corridor in which a pipe or cable is located on or below the bed of a water body. The ocean floor off the New Jersey coast contains existing and planned submerged infrastructure, particularly an electric transmission cable recently authorized by the NJCMP whose route between the New Jersey mainland and Long Island is in the vicinity of the proposed deepwater port. Placement of structures such as a deepwater port on the ocean floor may damage or hinder future maintenance of this authorized submerged infrastructure. Thus, the proposed activity may have a foreseeable effect on New Jersey's coastal zone.

Water Quality. Maintaining good water quality is an essential element of the NJCMP and critical to the uses and resources of New Jersey's coastal zone. The proposed activity may affect water quality during construction, operation, and maintenance. Due to the nature of offshore currents and waves in the New York Bight, any negative impacts to water quality, either from construction or any spills during construction or operation would most likely affect the New Jersey coastal zone. Therefore, the NJCMP should be afforded an opportunity to review this proposal for consistency with New Jersey's

4

enforceable policies since the proposed deepwater port has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone.

<u>Shipwrecks and Historic and Archaeological Resources</u>. Shipwrecks and artificial reefs are recognized by the NJCMP as a special area. Under the NJCMP's enforceable policies, this special area includes all permanently submerged or abandoned remains of vessels, and other features including, among other things, artificial reefs, anchors, quarry rocks or lost cargo, that serve as a special marine habitat or are historic and cultural resources. These offshore features are the frequent destination of New Jersey's recreational fishermen, as well as the State's sport divers. The proposed project is reasonably likely to affect the accessibility of shipwrecks and historic and archaeological resources.

<u>Conclusion</u>

A foreseeable effect pursuant to 15 CFR 930.11(g) includes "both direct effects which result from the activity and occur at the same time and place as the activity, and indirect (cumulative and secondary) effects which result from the activity and are later in time or farther removed in distance, but are still reasonably foreseeable." In accordance with this definition, the proposed deepwater port, including the pipelines, has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone. Based on the information available to the NJCMP, the NJCMP believes that the proposed project will have reasonably foreseeable direct effects on New Jersey's coastal zone since the proposed port area used during construction and operation may be located within New Jersey's coastal zone. Further, for the reasons described above, the NJCMP believes that the proposed deepwater port, including pipelines, will have both direct and indirect reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone relating to commercial fishing, recreational fishing and boating; ports, marine fish, sea turtles and marine mammals; submerged infrastructure; navigation; water quality; and, shipwrecks and historic and archaeological resources.

In conclusion, the activities that are subject of the application to the USCG are reasonably likely to affect natural resources, land uses, or water uses of New Jersey's coastal zone and thus the activities are subject to the consistency review requirements of Section 307(c)(3)(A) of the CZMA. By this letter, and pursuant to the regulations implementing the CZMA at 15 CFR § 930.54, the NJCMP requests approval of OCRM to review this proposed activity. In addition, by this letter, the NJCMP is informing the Applicant of its right to submit to OCRM within 15 days from the Applicant's receipt of this letter, comments on New Jersey's request to review this activity. The USCG is now preparing an Environmental Impact Statement (EIS) for this project. The information that will be contained in the EIS is necessary for a comprehensive review of the proposed project. Therefore, NJCMP requests that federal consistency review timeframes commence at the time of publication of the Final EIS.

5

If you have any questions concerning this letter, please contact Kim Springer or Kevin Hassell of my staff at (609) 633-2201.

Sincerely,

Ruth Ehinger
Coastal Program Manager

C: Mr. David Kaiser, NOAA
Ms. Kris Wall, NOAA
Admiral Thad W. Allen, USCG
Mr. Mark A. Prescott, USCG
Mr. Sean T. Connaughton, MARAD
Mr. H. Keith Lesnick, MARAD
Atlantic Sea Island Group LLC, Applicant
Jeanne Herb, NJDEP, Policy, Planning & Science
Mark Mauriello, NJDEP, Land Use Management
Tom Micai, NJDEP, Land Use Management
Suzanne Dietrick, NJDEP, Site Remediation

6

**3**

comments. Comments should also state the commenter's interest in the waiver application, and address the waiver criteria given in § 388.4 of MARAD's regulations at 46 CFR Part 388.

**DATES:** Submit comments on or before September 26, 2007.

**ADDRESSES:** Comments should refer to docket number MARAD–2007–29041. Written comments may be submitted by hand or by mail to the Docket Clerk, U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590. You may also send comments electronically via the Internet at http://dmses.dot.gov/submit/. All comments will become part of this docket and will be available for inspection and copying at the above address between 10 a.m. and 5 p.m., E.T., Monday through Friday, except federal holidays. An electronic version of this document and all documents entered into this docket is available on the World Wide Web at http://dms.dot.gov.

**FOR FURTHER INFORMATION CONTACT:** Joann Spittle, U.S. Department of Transportation, Maritime Administration, 1200 New Jersey Avenue, SE., Room W21–203, Washington, DC 20590. Telephone 202–366–5979.

**SUPPLEMENTARY INFORMATION:** As described by the applicant the intended service of the vessel TIN TIN is:

*Intended Use:* "Slipstream Maritime Services, LLC will operate Tin Tin as a chartered vessel for up to 6 passengers. Trips will range from one to five days and are specifically designed as therapeutic experiential sailing trips with sailing instruction included."

*Geographic Region:* "Puget Sound, WA."

## Privacy Act

Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000 (Volume 65, Number 70; Pages 19477–78) or you may visit http://dms.dot.gov.

Dated: August 16, 2007.

By order of the Maritime Administrator.

**Daron T. Threet,**

*Secretary, Maritime Administration.*

[FR Doc. E7–16857 Filed 8–24–07; 8:45 am]

**BILLING CODE 4910-81-P**

## DEPARTMENT OF TRANSPORTATION

### Maritime Administration

[USCG–2007–28535]

### Atlantic Sea Island Group LLC, Safe Harbor Energy Liquefied Natural Gas Deepwater Port License Application

**AGENCY:** Maritime Administration, DOT.

**ACTION:** Notice of application.

**SUMMARY:** The Coast Guard and the Maritime Administration announce that they have received an application for the licensing of a natural gas deepwater port, and that the application appears to contain the required information. This notice summarizes the applicant's plans and the procedures that will be followed in considering the application.

**DATES:** The Deepwater Port Act of 1974, as amended, requires any public hearing on this application to be held not later than 240 days after this notice, and requires a decision on the application to be made not later than 90 days after the final public hearing.

**ADDRESSES:** The public docket for USCG–2007–28535 is maintained by the: Docket Management Facility, U.S. Department of Transportation, 1200 New Jersey Ave., SE., West Building Ground Floor Room W12–140, Washington, DC 20590–0001.

Docket contents are available for public inspection and copying, at this address, in room W12–140, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Facility's telephone is 202–366–9329, its fax is 202–493–2251, and its website for electronic submissions or for electronic access to docket contents is http://dms.dot.gov.

**FOR FURTHER INFORMATION CONTACT:** Mary K. Jager, U.S. Coast Guard, telephone: 202–372–1454, e-mail: Mary.K.Jager@uscg.mil or Andrew Tibbetts, U.S. Maritime Administration, telephone: 202–366–5473, e-mail: andrew.tibbetts@dot.gov. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone: 202–493–0402.

**SUPPLEMENTARY INFORMATION:**

#### Receipt of Application

On May 8, 2007, the Coast Guard and the Maritime Administration received an application from Atlantic Sea Island Group LLC (ASIG), Chrysler Building, 405 Lexington Avenue, 26th Floor, New York, NY 10174; for all Federal authorizations required for a license to own, construct, and operate a deepwater port governed by the Deepwater Port

Act of 1974, as amended, 33 U.S.C. 1501 et seq. (the Act). On August 15, 2007, we determined that the application appears to contain all information required by the Act.

#### Background

According to the Act, a deepwater port is a fixed or floating manmade structure other than a vessel, or a group of structures, located beyond State seaward boundaries and used or intended for use as a port or terminal for the transportation, storage, and further handling of oil or natural gas for transportation to any State.

A deepwater port must be licensed by the Maritime Administrator (by delegated authority of the Secretary of Transportation, published on June 18, 2003 (68 FR 36496)). Statutory and regulatory requirements for licensing appear in 33 U.S.C. 1501 et seq. and in 33 CFR part 148. Under delegations from and agreements between the Secretary of Transportation and the Secretary of Homeland Security, applications are processed by the Coast Guard and the Maritime Administration. Each application is considered on its merits.

The Act requires adherence to a strict timeline for processing an application. Once we determine that an application contains the required information, we must hold public hearings on the application within 240 days, and the Maritime Administrator must render a decision on the application within 330 days. We will publish additional **Federal Register** notices to inform you of these public hearings and other procedural milestones, including environmental review. The Maritime Administrator's decision, and other key documents, will be filed in the public docket.

At least one public hearing must take place in each adjacent coastal State. For purposes of the Act, New York is the adjacent coastal State for this application. Other States can apply for adjacent coastal State status in accordance with 33 U.S.C. 1508(a)(2).

#### Summary of the Application

Atlantic Sea Island Group LLC (ASIG), proposes to own, construct, and operate a deepwater port, named Safe Harbor Energy, in the Federal waters of the Atlantic Outer Continental Shelf in the area known as the New York Bight region in MMS lease area NK18–12 block 6655. The proposed location is approximately 13.5 miles south of the City of Long Beach on Long Island and 23 miles southeast of New York Harbor entrance, in an area between the Ambrose-to-Nantucket and Hudson

Canyon-to-Ambrose shipping lanes, located at approximately 40°23′ N and 73°36′ E, in water depth of between 60 and 70 feet.

The deepwater port, Safe Harbor Energy, consists of three components: An island to be constructed of natural sand, gravel, and rock materials surrounded by armored breakwaters, consisting of prefabricated caissons, armor units, and rock; an LNG receiving, storage, and regasification facility; and a subsea pipeline that would transport the natural gas to an offshore connection with the Transcontinental Gas Pipeline Corporation's pipeline system. The pipeline would consist of two parallel 36-inch-diameter pipe segments extending 12.8 miles from the island. Safe Harbor Energy will include berthing and offloading space for two conventional LNG vessels with capacity of 70,000 m³ to 270,000 m³. Additionally, it would accommodate support vessels including docking/firefighting tugs and crew support launches. The storage portion would include four (4) 180,000 m³ full-containment storage tanks. The regasification equipment would be an ambient air heat exchange type. Safe Harbor Energy would have an average throughput capacity of approximately 1.15 billion standard cubic feet per day (bscfd).

A shore based facility will be used to facilitate movement of personnel, equipment, supplies, and disposable materials between the port and shore.

Construction of the deepwater port would be expected to take approximately five (5) years; with startup of commercial operations following construction, should a license be issued. The deepwater port would be designed, constructed, and operated in accordance with applicable codes and standards and would have an expected operating life of approximately 25 years.

## Privacy Act

Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000, (Volume 65, Number 70; Pages 19477–78) or you may visit *http://dms.dot.gov.*

**Authority:** 49 CFR 1.66.

By Order of the Maritime Administrator.

Dated: August 17, 2007.

**Daron T. Threet,**

*Secretary, Maritime Administration.*

[FR Doc. E7–16875 Filed 8–24–07; 8:45 am]

**BILLING CODE 4910–81–P**

## DEPARTMENT OF TRANSPORTATION

### Surface Transportation Board

**[STB Docket No. AB–55 (Sub-No. 680X)]**

### CSX Transportation, Inc.— Abandonment Exemption—In Portsmouth County, VA

CSX Transportation, Inc. (CSXT), has filed a notice of exemption under 49 CFR part 1152 subpart F—*Exempt Abandonments* to abandon a 0.50-mile rail line on its Southern Region, Florence Division, Portsmouth Subdivision, from railroad milepost SA 0.28 to railroad milepost SA 0.78, in Portsmouth, Portsmouth County, VA. The line traverses United States Postal Service Zip Code 23704.

CSXT has certified that: (1) No local traffic has moved over the line for at least 2 years; (2) any overhead traffic on the line can be rerouted over other lines; (3) no formal complaint filed by a user of rail service on the line (or by a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or with any U.S. District Court or has been decided in favor of complainant within the 2-year period; and (4) the requirements at 49 CFR 1105.7 (environmental report), 49 CFR 1105.8 (historic report), 49 CFR 1105.11 (transmittal letter), 49 CFR 1105.12 (newspaper publication), and 49 CFR 1152.50(d)(1) (notice to governmental agencies) have been met.

As a condition to this exemption, any employee adversely affected by the abandonment shall be protected under *Oregon Short Line R. Co.— Abandonment—Goshen,* 360 I.C.C. 91 (1979). To address whether this condition adequately protects affected employees, a petition for partial revocation under 49 U.S.C. 10502(d) must be filed.

Provided no formal expression of intent to file an offer of financial assistance (OFA) has been received, this exemption will be effective on September 26, 2007, unless stayed pending reconsideration. Petitions to stay that do not involve environmental issues,[1] formal expressions of intent to

file an OFA under 49 CFR 1152.27(c)(2),[2] and trail use/rail banking requests under 49 CFR 1152.29 must be filed by September 6, 2007. Petitions to reopen or requests for public use conditions under 49 CFR 1152.28 must be filed by September 17, 2007, with the Surface Transportation Board, 395 E. Street, SW., Washington, DC 20423–0001.

A copy of any petition filed with the Board should be sent to CSXT's representative: Steven C. Armbrust, 500 Water Street, J–150, Jacksonville, FL 32202.

If the verified notice contains false or misleading information, the exemption is void *ab initio.*

CSXT has filed environmental and historic reports addressing the effects, if any, of the abandonment on the environment and historic resources. SEA will issue an environmental assessment (EA) by August 31, 2007. Interested persons may obtain a copy of the EA by writing to SEA (Room 1100, Surface Transportation Board, Washington, DC 20423–0001) or by calling SEA, at (202) 245–0305. [Assistance for the hearing impaired is available through the Federal Information Relay Service (FIRS) at 1–800–877–8339.] Comments on environmental and historic preservation matters must be filed within 15 days after the EA becomes available to the public.

Environmental, historic preservation, public use, or trail use/rail banking conditions will be imposed, where appropriate, in a subsequent decision.

Pursuant to the provisions of 49 CFR 1152.29(e)(2), CSXT shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line. If consummation has not been effected by CSXT's filing of a notice of consummation by August 27, 2008, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire.

Board decisions and notices are available on our Web site at *http://www.stb.dot.gov.*

Decided: August 20, 2007.

---

[1] The Board will grant a stay if an informed decision on environmental issues (whether raised by a party or by the Board's Section of Environmental Analysis (SEA) in its independent

investigation) cannot be made before the exemption's effective date. *See Exemption of Out-of-Service Rail Lines,* 5 I.C.C.2d 377 (1989). Any request for a stay should be filed as soon as possible so that the Board may take appropriate action before the exemption's effective date.

[2] Each OFA must be accompanied by the filing fee, which currently is set at $1,300. *See* 49 CFR 1002.2(f)(25).

**4**



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

ION S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Coastal Management Office
401 E. State Street, 7th Floor, West
P.O. Box 418
Trenton, New Jersey 08625
Phone: 609-633-2201
Fax: 609-292-4608

November 1, 2007

H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick,

Thank you for discussing the current status of New Jersey's request for adjacent coastal state status under the Deepwater Port Act with reference to the Safe Harbor/Atlantic Sea Island Group application. This letter serves to address issues raised by NOAA in its October 17, 2007 letter to the Maritime Administration, as you requested in our conference call on October 24, 2007. NOAA's letter addresses Cholera Bank and fishing, the coastal environment and water quality.

The NOAA letter indicates that New Jersey should provide additional information demonstrating that the risk to New Jersey is equal to or greater than the risk posed to "...New York, the State that is directly connected by pipeline to the proposed deepwater port." The proposed pipeline will tie into the existing Transco pipeline that runs from Sayreville, New Jersey to Long Beach, New York. Therefore, if New York is directly connected by pipeline to the proposed deepwater port, as NOAA states, then New Jersey is also directly connected by pipeline to the proposed deepwater port, in the identical manner. Furthermore, an alternative pipeline route is included in the deepwater port application. Since a deepwater port includes all pipelines and structures associated with the project, if the alternative pipeline route is used, New Jersey would be within the necessary 15 miles to be an adjacent coastal state based on the alternative route alone.

The deepwater port is proposed on Cholera Bank. Cholera Bank is heavily used by recreational and commercial fishermen. Prime fishing areas are designated a special area and marine fisheries are protected under New Jersey's Coastal Zone Management rules,

which are enforceable policies under New Jersey's federally approved coastal management program. Cholera Bank is, and has historically been, an important productive fishing ground for the New Jersey commercial ground fishing fleet and for recreational fishing. The area was mapped as an important recreational and commercial fishing ground in New Jersey's Recreational and Commercial Ocean Fishing Grounds (1982) and important for recreational fishing in the NOAA Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey (1974). Recent surveys of recreational party and charter boat captains confirmed the importance to recreational fishing in 2003. The proposed location of the project is specifically known as Anglers Bank and Middle Grounds. Through personal communication this year with the commercial fishing dock managers from Belford, New Jersey (Belford Fishermen's Cooperative) and Point Pleasant, New Jersey (Fishermen's Dock Cooperative), and several New York based companies at Fulton Fish Market, this area remains of economic importance to New Jersey's commercial fishermen, and is of importance to New York's commercial fishermen as well.

Clearly the Cholera Bank fishing ground would be affected by the construction of an island occupying 112 acres of ocean bottom, eliminating that habitat. Fisheries would also be affected as fishing boats would be excluded from the area around the island. Since fishermen from both New York and New Jersey are fishing these fishing grounds, impacts would be comparable. Further, the application indicates that sand and rock to build the island will be obtained from the New York channel deepening. In meetings with New Jersey in 2006, the applicant proposed mining sand from the ocean floor to obtain material to create the island. If logistical problems preclude obtaining all necessary material from the channel deepening, and mining were again proposed, it too would affect the fish habitat.

Coastal environment as defined in the statute includes navigable waters (including lands therein and thereunder). The definition contains a list of resources that are included in the coastal environment, including fish, wildlife, and recreational values of lands, waters and resources. The list is not exhaustive. New Jersey considers its commercial and recreational fisheries to be part of its coastal environment. Fish and wildlife, such as avian species, are highly mobile living resources that are also part of New Jersey's coastal environment. As these living resources do not distinguish between New York and New Jersey, the risk to New Jersey is comparable to that of New York.

Good water quality is critical to these living resources. Water quality will be affected during construction, operation, and maintenance of the proposed deepwater port. Any adverse affect on water quality could affect living resources of the coastal environment. The figure "Dominant Winds, Waves and Currents of the New York Bight," (Figure 2-2 Volume Three, Part One: Deepwater Port License Application) indicates that the prevailing direction of the currents is toward New Jersey and the direction of waves is into the New York/New Jersey Harbor. Accordingly, it is likely that water quality impacts to the coastal environment would be equal for New York and New Jersey.

In 2006, the applicant indicated that a future pipeline from the deepwater port would come ashore in the area of Linden, New Jersey. The application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The maximum takeaway capacity of the Long Beach Meter Station, Long Beach, New York, is approximately 530 million cubic feet per day. The Milltown Regulator Station, Milltown, New Jersey, has an estimated maximum capacity of 619 million cubic feet per day. Therefore, New Jersey is equally affected by the operation of the deepwater port.

Contrary to the applicant's October 10, 2007 objection letter to the director of NOAA's Office of Ocean and Coastal Resource Management regarding New Jersey's request for federal consistency review, the documentation that New Jersey received does not include information providing the location of the five facilities in the metropolitan New York area that may be used for staging of construction. These locations are discussed in Section 4 of the application, to which New Jersey has not been granted access. The application indicates that staging will be from facilities in the metropolitan New York area, which includes New Jersey waters, ports and waterfront facilities.

It is not a requirement and would be difficult to determine the full nature and magnitude of the extent of the impacts to either New Jersey's or New York's coastal environment prior to completion of an EIS. The standard is whether "there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Based on the above, the damage to the coastal environments would be equal for New York and New Jersey.

Sincerely,

Ruth Ehinger
Coastal Program Manager


c.    Mitch Hudson, MARAD

**5**



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Policy, Planning and Science
401 East State Street, 7th Floor
P. O. Box 402
Trenton, NJ 08625-0402
Tel: (609) 341-5311
Fax: (609) 292-3268

December 21, 2007

Mr. H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick:

I am writing to supplement the information provided in Governor Corzine's letter of September 6, 2007 requesting that New Jersey be designated an adjacent coastal state under the Deepwater Port Act for the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License, as well as the information supplied in my letters of September 25 and November 1, 2007.

## Project Purpose and Benefits

Throughout the documents submitted by the Atlantic Sea Island Group LLC, there are numerous references to the goal of the project as serving the New York Metropolitan area or New York region. New Jersey is an integral component of the New York Metropolitan area/New York region. The descriptions of the project include statements such as "the Atlantic Sea Island Group LLC … proposes to construct, own, and operate a liquefied natural gas (LNG) receiving, storage, and regasification facility as a deepwater port that will be capable of delivering up to 1.15 billion standard cubic feet per day (bscfd) of natural gas per day to the New York metropolitan region" and "Safe Harbor Energy will bring to the region a much-needed new and reliable supply of clean-burning, cost-effective, and globally sourced natural gas." (Volume 2 Exhibit S Navigation and Safety Equipment S.1 Project Overview and Introduction)

Similarly, the Environmental Report in support of the Safe Harbor Energy Project Deepwater Port License Application May 2007 (Environmental Report) Topic Report One — General Project Description describes the purpose, need and benefits of the project as applying to the New York Metropolitan area, of which New Jersey is part, as follows:

**Purpose:** To increase available supply of Natural Gas to the metropolitan New York City area, Safe Harbor Energy will provide a strategically placed LNG importation terminal to augment existing regional pipeline delivery and to have storage capacity exceeding 15 bscf of natural gas (720,000 cubic meters of LNG).
**Need:** Safe Harbor Energy will expand the natural gas supply and storage capacity available to an area of the country with high existing energy demand and growing gas needs. Its strategic location in the market area alleviates capacity constraints in existing pipeline infrastructure, thereby minimizing the need for expansion of existing land based pipelines. Further, Safe Harbor Energy will provide fuel supply diversity through global sourcing of LNG, which will help stabilize or lower natural gas prices in the region by minimizing price spikes caused by supply constraints or other system delivery disruptions.
**Benefits:** Increased Natural Gas Supply to the New York Metropolitan Area. Safe Harbor Energy will provide a strategic energy supply solution for the New York metropolitan region by delivering a reliable, safe, and secure supply of natural gas to an area with increasing demand for natural gas.

This comports with the representations made to representatives of Governor Corzine's Office this year, indicating that because of capacity issues in the existing pipeline (that connects to both New Jersey and New York) there would, by necessity, be natural gas flowing to New Jersey. At that time, the applicant indicated that there were no "Letters of Intent" signed with any New Jersey entities, but requested assistance in identifying those entities whom they should approach. These capacity issues are also described in the Attachment 1-1 of the Environmental Report Topic Report One — General Project Description, Market Area Access for Supply Sendout. As noted above, the application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The Long Beach Meter Station, Long Beach, New York has a maximum takeaway capacity of approximately 530 million cubic feet per day to accommodate gas transported eastward from the connection point into the Transco Pipeline. For gas transported westward from the connection point into the Transco Pipeline, the maximum capacity of the Milltown Regulator Station in New Jersey is approximately 619 million cubic feet per day. The analysis concludes the Transco pipeline is capable of receiving the full 1.15 billion cubic feet per day of natural gas through transport both eastward to New York and westward to New Jersey.

In a letter to the editor of the *Two River Times* November 30, 2007, Howard Bovers, Chairman Atlantic Sea Island Group LLC, states the following: "It has become apparent that we need access to cheaper and more environmentally sound energy sources. That is where Atlantic Sea Island Group's project comes in. More than 50 percent of the LNG in the form of natural gas in Phase One of the project will be delivered to New Jersey."

In Environmental Report Topic Report One – General Project Description, the applicant indicates that the project has been designed to accommodate the receipt, storage, regasification, and distribution of up to 2 billion standard cubic feet per day of natural gas, although it will not initially be able to operate at this level due to the ability

2

of the existing Transco Pipeline to accept gas. In 2006, the applicant indicated to representatives of NJDEP that a future pipeline to the Linden, New Jersey area was under consideration. According to the Deepwater Port Act 33 U.S.C. §1504(c)(2)(F), each application shall include a detailed description of each phase of the project. Thus, the future line should be included in the application, which would in and of itself result in New Jersey being an adjacent coastal state.

There are precedents for designating New Jersey as an adjacent coastal state. In a 2003 notice of application, the State of Louisiana was designated an adjacent coastal state for the proposed El Paso Energy Bridge Gulf of Mexico, LLC Deepwater Port License. In that case, the deepwater port pipeline was proposed to connect into an existing pipeline more than 100 miles offshore. In a 2006 notice of application, the State of Alabama was designated an adjacent coastal state for the proposed TORP Terminal LP, Bienville Offshore Energy Terminal Liquefied Natural Gas Deepwater Port, proposed 63 miles offshore and connecting into an existing pipeline approximately 60 miles offshore. In the current Atlantic Sea Island Group proposal, the deepwater port island would be located approximately 19 miles from New Jersey and the pipeline would connect into the existing Transco pipeline at a point approximately 16 miles from the New Jersey coast.

Furthermore, the December 3, 2007 letter from James Burnley, Venable LLP, representing Atlantic Sea Island Group, to US Department of Transportation Secretary Mary Peters and Maritime Administration Administrator Sean Connaughton indicates that New York was designated as an adjacent coastal state under "two pathways," both as a state located within 15 miles of the proposed port and as a state directly connected by pipeline to the proposed deepwater pipe. The pipeline directly connecting the proposed port to New York is the Transco pipeline mentioned above, which runs from New Jersey to New York. Based on the above, New Jersey would also be an adjacent coastal state by this pathway.

## Ports

The proposed island will be constructed in an open area of the ocean between the Ambrose-to-Nantucket and Hudson Canyon-to-Ambrose international shipping lanes. These shipping lanes are the lanes to and from the Port of New York/New Jersey, the largest port complex on the east coast. The proposed pipeline route would cross two traffic lanes, necessitating disruption during construction within these lanes. The report indicates that the LNG tankers traveling to the island will "sail to the New York Bight area and receive harbor pilots onboard for final vessel maneuvering to the Island. The vessels may remain offshore prior to maneuvering to the Island or may use designated or existing New York Harbor anchorage areas. The maneuvering procedure will involve vessels sailing to the northwest side of the Island under pilot control."

According to The Port of New York and New Jersey web site, "The Port of New York and New Jersey is the gateway to the most concentrated and affluent consumer market in the world. Each year, more than 25 million tons of oceanborne general cargo moves through our port, including 4.5 million TEUs (twenty-foot equivalent units) of containerized cargo. The Port Newark/Elizabeth-Port Authority Marine Terminal

complex (NJ), the PA Auto Marine Terminal (NJ), Brooklyn Piers and Red Hook Container Terminal (NY) and Howland Hook Marine Terminal (NY) handle most of the cargo and these facilities are managed by the Port Authority of New York and New Jersey. In addition, there are private operators such as Global Marine Terminal and a number of marine terminals operated by private bulk cargo operators." Furthermore, "Port Newark and the Elizabeth-Port Authority Marine Terminal operate as one fully integrated marine terminal, forming the largest and most comprehensive collection of maritime cargo handling facilities on the East Coast of North America." The New York/New Jersey Harbor is critical to the economy of both New York and New Jersey, and any disruption of traffic is of equal concern to both.

## Staging and Construction

The application indicates that five sites are under consideration for staging and laydown area for construction of the port, all within a 40 mile radius of the proposed island. New Jersey has not been provided with the location of any of these five sites, but is well within the 40 mile radius, and thus the sites are as likely to be in New Jersey as in New York.

The Environmental Report Topic Report 9—Alternatives indicates that the applicant intends to obtain fill to construct the island from dredging of the harbor. However, another option identified is "to obtain fill from upland projects generating suitable material or to purchase the fill from mining operations such as Amboy Aggregates in New Jersey, Arundal Quarry in Maryland, Trapp Rock in New York, or bringing materials from Canada. This could involve one (barging), if not two (trucking), methods of transit to the proposed Island site. Materials would be trucked to a central staging location from an onshore project/borrow source. The material would be dumped into a hopper system that conveys materials onto the barge. Two types of barges would be needed, flat deck barges and/or bottom-dump scows." If an upland site in New Jersey or the Amboy Aggregates facility were selected for the material, it would impact the state.

## Fisheries

In the Environmental Report Topic Report Five — Socioeconomics, the applicant describes the regional economy, including commercial and recreational fisheries. This section of the Environmental Report states that a 2001 U. S. Fish and Wildlife survey indicates that 806,000 state residents and non-residents 16 years and older fished in New Jersey, 572,000 of them in saltwater fishing. The survey numbers reported for New York are 1.55 million participants, 406,000 of them in saltwater fishing. It should be noted that the Marine Recreational Fisheries Statistics Survey by the National Marine Fisheries Service, a survey geared toward marine fishing, ranks New Jersey third in the number of saltwater anglers with a 5 year average (2002-2006) of 1 million anglers, as compared to New York, which is ranked 7th with three-quarter million anglers. In terms of trips made for marine species in this period, the five year average is 6.5 million trips per year for New Jersey and 5.1 million trips per year for New York.

The applicant contacted fishing charter boat companies to determine the extent to which Cholera Bank and the surrounding areas are used for recreational fishing and searched the internet. The applicant concluded that it is generally too far for many of the charter boats. Although the applicant's survey found little recreational fishing in the area, and little from New York fishermen, in a 2003 survey by New Jersey of recreational charter and party boat captains, the proposed island location and the adjacent area were identified as important recreational fishing areas, confirming the identification of these areas as recreationally important in *New Jersey's Recreational and Commercial Ocean Fishing Grounds* (1982) and in the NOAA *Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey* (1974). The Environmental Report — Topic Report 7 Land Use, Recreation, and Aesthetics states that the project "excludes only a small fraction of a very large area available for recreational fishing." However, this "small fraction" has been documented as important to New Jersey's recreational fishing community.

The Environmental Report indicates that New York's commercial fish landings in 2004 were nearly 34 million pounds valued at over $46 million, and primarily taken in State waters. In contrast, New Jersey landed approximately 187 million pounds valued at nearly $146 million and nearly all catches occurred in federal waters. The area of the proposed project was identified as important in *New Jersey's Recreational and Commercial Ocean Fishing Grounds* (1982) by DEP and this was confirmed in recent contact with commercial fishing dock managers from Belford, New Jersey; Point Pleasant, New Jersey; and Fulton Fish Market. In discussing the effect of the project on commercial fishing, the Environmental Report states that "The 663 acres excluded represents an insignificant area in relation to the 8,100 square mile area of the New York Bight or the New York Bright Apex, which comprises 727 square miles that the Project is located within," concluding the effect would not be great. This method does not take into account the characteristics of the site, which make it a productive fishing area, or the data described above regarding New Jersey's commercial fisheries.

The application indicates that the pipeline would be buried to a depth of 3 feet in Federal waters that are less than 200 feet deep and buried a depth of 4 feet in State waters. It furthers indicates that the pipeline would cross over the top of seven cables. It also states "In the event that the installation results in less than 3 feet of cover for portions of the Pipeline in water depths less than 200 feet as mandated by 30 CFR 250.1003(a)(1) for federal waters or 4 feet cover for State Waters, concrete mats will be used to provide an equivalent degree of protection." (Volume 1) Because certain commercial fishing gear routinely penetrates the bottom, conflict with the pipeline/concrete mats may occur.

## Viewshed

The viewshed analysis in the Environmental Report indicates that the terminal will be visible from the entire 20 miles of New Jersey coastline located within the 24-mile study radius. This includes the beaches of Monmouth County, where New Jersey

has spent millions in beach nourishment, and the Sandy Hook unit of Gateway National Recreation Area. The island will also be visible from the Twin Lights Historic Site, which is on the National Register of Historic Places, and the Mount Mitchell Overlook (identified as the highest point along the eastern seaboard). Accordingly, both New Jersey's beaches and this historic site would be affected.

## Conclusion

The Environmental Report discusses existing conditions of and environmental consequences to the New York Bight. The New York Bight is generally described as the area of the Atlantic Ocean south of Long Island, New York and east of New Jersey, from Montauk Point, New York to Cape May Point, New Jersey. The ecosystem of the New York Bight is critical to both states, and impacts would be shared by both. In fact, both New York and New Jersey each enacted laws in the 1990s to work together "to provide for the maximum enhancement, enjoyment and conservation of the marine resources of the Hudson-Raritan Estuary and the New York Bight" and established a committee "to make specific recommendations concerning the maintenance, protection and restoration of such marine resources."

Clearly, a project of this magnitude, with the creation of an artificial island by the filling of 116 acres of sea floor with wide ranging impacts beyond the immediate project area, including shipping and navigation, fisheries disruptions, onshore port utilization, and the need for massive volumes of fill material, has equal effects, if not greater in certain circumstances, on the coastal environment of New Jersey as it does on New York's coastal environment. Therefore, the Maritime Administration made the correct decision in granting adjacent coastal state status to New Jersey. In conclusion, New Jersey is an adjacent coastal state under the Deepwater Port Act for the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License and looks forward to working closely with the U. S. Coast Guard, Maritime Administration and State of New York to properly address the needs of the region, while protecting the economies and environments of both states.

Sincerely,

Jeanne Herb
Director

6

**6**



U.S. Department
of Transportation
**Maritime**
**Administration**



Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

**NOV  2 2007**

The Honorable Jon S. Corzine
Governor of New Jersey
Trenton, New Jersey 08624-0001

Re:  New Jersey Adjacent Coastal State Designation

Dear Governor Corzine:

This letter is in response to your request for the designation of New Jersey as an Adjacent
Coastal State for the proposed Safe Harbor Energy deepwater port project (Safe Harbor).
As indicated in my letter of September 28, 2007, the Maritime Administrator, by
delegated authority, and in accordance with Section 1508(a)(2) of the Deepwater Port Act
of 1974 (the Act), shall make such a designation only after receiving the recommendation
of the Administrator of the National Oceanic and Atmospheric Administration (NOAA).
On October 17, 2007, my office received the NOAA recommendation.

Accordingly, upon consideration of the NOAA recommendation, as well as the
magnitude and scope of the proposed project and its potential for significant
environmental impact to the State of New Jersey, I have determined that New Jersey is an
Adjacent Coastal State as defined under the Act and is so designated for the proposed
Safe Harbor deepwater port project.  This determination has been made consistent with
the particular set of facts and circumstances underlying the request.  Pursuant to the
requirements set forth at Section 1508(b) of the Act, the Administrator shall not issue a
license without the approval of the Governor of an Adjacent Coastal State.  Therefore, we
look forward to forging a strong working relationship with your office to successfully
address your concerns and requirements of Safe Harbor in securing a safe and effective
means of importing natural gas into the United States.

As the Governor of an Adjacent Coastal State, you are afforded the authority in
accordance with the requirements of the Act to approve, disapprove, or approve with
conditions the deepwater port license application for the Safe Harbor project.  Such
license conditions may include, but are not limited to:  1) requiring environmental
monitoring and mitigation measures; 2) the collection of fees to offset any economic,
environmental, and administrative costs that may be incurred by your state associated
with the construction and operation of the proposed deepwater port; and 3) other
conditions to ensure that the proposed port will conform with New Jersey's
environmental programs.

RECEIVED
NOV 1 5 2007
Management and Policy

To this end, we would like to arrange a meeting in the near future with you and your immediate staff to further discuss your concerns regarding the proposed Safe Harbor project. Please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov to arrange the most convenient meeting time.

We look forward to working with you and your staff, and I appreciate the time and attention you have given to this important matter.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:    The Honorable Eliot Spitzer
       The Honorable Frank R. Lautenberg
       Vice Admiral Conrad C. Lautenbacher, Jr., NOAA
       Admiral Thad W. Allen, USCG

**7**



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

James H. Burnley IV
Venable LLP
575 7th Street, NW
Washington, D.C. 20004-1601

FEB - 8 2008

Re: Safe Harbor Energy LNG Deepwater Port—Request for Reconsideration of
Designation of New Jersey as an "Adjacent Coastal State"

Dear Mr. Burnley:

This is in response to your letter of December 3, 2007, in which you made certain claims
regarding the Maritime Administration's finding that New Jersey qualifies as an Adjacent
Coastal State as defined by the Deepwater Port Act of 1974, as amended. We note that,
in response to your earlier request of November 13, 2007 we emphasized that there is no
right to appeal the Adjacent Coastal State (ACS) designation under the Deepwater Port
Act of 1974, as amended (DWPA), and by that letter we accommodated your concerns by
extending to you and your client the opportunity to provide arguments presumably to
explain, in opposition to our finding, why New Jersey's coastal environment is <u>not</u>
subject to risk equal to or greater than that posed to New York's (NY). You have now
supplied us with your arguments to reconsider the designation of New Jersey (NJ) as an
ACS.

The salient factor distinguishing NY and NJ under the statute is the proximity of the port
to each State. The proximity requirement of 15 miles was not meant to bar consideration
of the potential of environmental impact to NJ, a State located at the 19-mile mark from
the proposed site. Likewise, the fact that NY is within 15 miles of the proposed site,
which, as intended by Congress, represents a clear indication of the legitimate interest
and risk posed to NY, does not establish a finding that the proposed DWP's pipeline
poses no environmental risk to any other State. Rather, as evidenced by Section
1508(a)(2) of the DWPA, Congress recognized the importance of including other States
not meeting the § 1508(a)(1) criteria of proximity or direct connection, and intended for a
State with legitimate and regional interest to be afforded the opportunity to make a case
to the Secretary of Transportation for special consideration. Accordingly, a review was
made of the available information within the statutory period, and the ACS status was
issued under the discretionary authority of the Secretary of Transportation as delegated to
the Maritime Administrator. 49 C.F.R. § 1(i)(6); § 1.66(aa)(a)(1)-(2). The Secretary
expressly delegated the authority to the Maritime Administration to process deepwater

port license applications in coordination with the Commandant of the Coast Guard. §
1.66(a)(2).

In our determination letter designating NJ an ACS, the Maritime Administration
concluded that NJ met the definition under Section 1508(a)(2) of the DWPA. Section
1508(a)(2) establishes the standard to be applied, "that there is a risk of damage to the
coastal environment of such State equal to or greater than the risk posed to the State
directly connected by the pipeline to the proposed deepwater port." In crafting this
specific section of the statute, Congress intended to provide regional interests not meeting
the proximity or direct connection requirement a role in the decision-making process if it
could be evidenced that the risk of damage to their coastal environment was equal to or
greater than the risk posed to the 1508(a)(1) designee. Congress was careful to limit
involvement and thus crafted a standard that would narrow the field of interests seeking
to be designated as an Adjacent Coastal State. In crafting Section 1508(a)(2), Congress
provided an alternative to the physical construct of (a)(1) and sought an equitable
approach. There is no better example of legitimate regional interests under the Safe
Harbor proposal than that of NY and NJ. NY and NJ have historically shared
environmental and economic concerns due to their geographic proximity, predominant
ocean currents from NY toward NJ, and common industry. They share the port and its
facilities. The staging areas for the construction and operation of the Safe Harbor DWP
implicate NY and NJ without distinction. Alternate sites required under the National
Environmental Policy Act to be reasonably foreseeable bring the possible final site to
within 9 miles of NJ, and both NY and NJ share equally in the inherent risk of losing the
Cholera Bank fishery.

With regard to the claim that I acted outside my delegated authority in unilaterally
making the designation, I disagree. You argue that the Homeland Security Act of 2002
transferred the authority of the USCG to make an ACS determination to the Department
of Homeland Security; however, the USCG was never delegated the authority to make a
§ 1508(a)(2) ACS determination and therefore the Homeland Security Act of 2002 did
not transfer that authority. In fact, that authority was reserved for the sole discretion of
the Secretary of Transportation, and was exercised only twice before, in 1976 to deny
Mississippi and Florida ACS status. The Secretary reserved that authority until
delegation to the Maritime Administrator in 2003. (68 FR 36496); 49 CFR § 1.66(aa)(2).
Consistent with the view of the USCG, as evidenced by the rulemaking published in 62
FR 11382 (1997), the Secretary first made a partial delegation of his DWPA authority to
the Maritime Administration in coordinated efforts with the USCG. Through the 2003
delegation, the Secretary delegated his remaining authority to the Maritime
Administrator, and both the USCG and the Department of Transportation have correctly
interpreted that delegation to establish the Maritime Administration as the lead decision-
making agency, which encompasses the issuance of § 1508(a)(2) ACS determinations.
The purpose of the 2003 rulemaking was to clarify certain previous delegations and to
delegate remaining authority to the Maritime Administration to implement the DWPA,
which had been recently amended in 2002. In stark contrast to your interpretation, the

USCG and the Maritime Administration have agreed that review of the record and the 1997 and the 2003 rulemakings establishes that once-reserved Secretarial authority, historically exercised in making ACS determinations, has been delegated exclusively to the Maritime Administrator.

Contrary to your argument that USCG regulation 33 C.F.R. § 148.217(d) provides clear evidence of delegated authority in the Commandant, a delegation to the Maritime Administrator in determining an ACS is more consistent with the overall allocation of responsibilities under the DWPA. Accordingly, both the Maritime Administration and the USCG have agreed that authority to make substantive decisions not specifically delegated, and those arising above processing decisions, are subject to the Maritime Administration as the lead decision making agency. Furthermore, Part 148 cannot be genuinely argued to evidence a delegation to the Commandant in making ACS determinations because the regulations in their current form are ambiguous. For example, 33 C.F.R. § 148.5(3) provides that only the Maritime Administrator will designate an ACS under 33 U.S.C. § 1508(a)(2) while 33 C.F.R. § 148.217(d) provides that the USCG Commandant will make an ACS designation. Even with the inconsistencies of the current USCG DWPA regulations, both agencies are in agreement as to their respective roles and authority. As my office advised ASIG just after receiving the New Jersey request, both federal agencies agree that the Maritime Administration alone has the authority to designate § 1508(a)(2) ACS status for DWPA projects and that the agencies are working together to address the ambiguities in the regulations.

You also claim that we applied an improper standard and that a factual finding is required to be released. A full and comprehensive reading of our November 2nd determination makes clear that the basis for designating NJ an ACS was in accordance with Section 1508(a)(2) of the statute, which sets forth the "equal to or greater" risk standard:

> "1508(a)(2)  The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. This paragraph shall apply only with respect to requests made by a State not later than the 14th day after the date of publication of notice of an application for a proposed deepwater port in the Federal Register in accordance with section 1504(c) of this title. The Secretary shall make the designation required by this paragraph not later than the 45th day after the date he receives such a request from a State."

You argue that we applied an invalid standard of "significant impact." That simply is not the case. As we stated in our determination, "upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have

determined that New Jersey is an Adjacent Coastal State <u>as defined under the Act</u> and is so designated…"(emphasis added)  Our determination clearly incorporates the standard of "equal to or greater than" as defined in the statute and therefore your characterization of the standard that was applied is incorrect.

As to a factual finding, the statute requires nothing further than a decision be made by the Administrator, by delegation from the Secretary, of whether the State meets the requirements of the statute to be designated an ACS.  There is no basis in the statute for your claim that our finding be subject to public scrutiny.  The 1976 Mississippi ACS determination signed by the Secretary of Transportation cited only the sources used to assist in the determination and did not include a detailed finding.  Furthermore, although you have obtained the NOAA recommendation from 1976, it is unclear whether that recommendation was formally released to the general public.  Upon comparing my November determination to that of the Secretary's Mississippi determination from 1976, the bases offered in the determinations are equivalent.  Both offer a basic justification and neither adds details of the rationale itself.

ASIG assails NJ's presentation of its case on, among other bases, its lack of documentation and support, comparing it unfavorably to those of earlier ACS cases. This approach is unpersuasive. When the prior ACS issues were resolved, in 1976, the US, and the world generally, had substantial experience with oil spills. The basic interplay among oil viscosity, water salinity, temperature, currents, and other factors was understood, although not so well as now. By contrast, the world at this time knows very much less about LNG spills, on land or water. When, in 1979 and 1980, DOT established the regulatory framework for LNG plants, the primary concerns were explosion and fire, especially in proximity to population centers. An LNG-fueled explosion or fire at a place as far removed from population centers as is proposed here would likely have some, but less, impact directly on individuals but may have significant impact on the marine environment. Since all interests, including NOAA, agree that the currents there run toward NJ, the risk from such a fire or explosion is at least as great to NJ's coastal environment as to NY's. Note: I do not at this juncture need to decide relative harm between the two States; I need only decide the relative risk of harm, and I see NJ's as at least equal to NY's.

I use this example as just that, an example, because I agree with you that the comparative risk analysis must evaluate the totality of impacts.

You also rely heavily on a methodology report prepared by Arthur Little to argue that our determination could not be properly supported.  However, it is unclear whether the conclusions and guidance offered in the Little report were ever followed since it was published only 13 days before the 1976 NOAA recommendation and the following issuance of the Section 1508(a)(2) ACS determination by the Secretary.  What is clear, however, is the description in the preface to the Little report authored by the then Manager of the Deepwater Ports Project, Captain K.G. Wiman.  He wrote, "The contents

4

of this report do not necessarily reflect the official view or policy of the Coast Guard, and they do not constitute a standard, specification, or regulation." The Little report's preface recognizes that the methodology is not the official view of USCG and reflects the USCG understanding that each case would offer unique challenges in the availability and analysis of data. The Captain's statement also reflects deference to the Secretary as the ultimate decision-maker and to the discretion in his authority to make the ACS determination. The authority to make the designation is clearly at the discretion of the Secretary of Transportation as provided by the statute, with no requirement to concur with NOAA or USCG, or to follow USCG methods or publish a factual finding.

You claim that the time had expired for us to respond to the Governor's request. The official date the Administrator is deemed to have received the Governor's request was September 18, 2007. Because there are so many forms in which to communicate, it is necessary and practical to the proper implementation of the statute that we establish one method as the official method of receipt for the Administrator. The September 18th date is based not on telephone, email, fax, or docket notices but on the date the letter request was posted to the Administrator's controlled correspondence database. The NJ ACS determination was made on the very last day provided under the statute in an effort to grant all due consideration to the issues given the strict timeframe for making the designation.

In conclusion, the determination designating NJ ACS status was made under the authority of the Secretary of Transportation as delegated to the Maritime Administrator pursuant to delegations published in 68 FR 36496 (June 18, 2003) and 62 FR 11382 (March 12, 1997). Both Federal agencies, the Maritime Administration and the United States Coast Guard, interpret the delegations to provide exclusive authority to the Maritime Administrator to make such a decision even when faced with contradictory USCG regulations.

The ACS designation was made following the statutory standard pursuant to Section 1508(a)(2) and the rationale was formed using the data available within the 45 day timeframe. As contemplated by Congress, the statutory authority vested in the Secretary and delegated to the Maritime Administrator is discretionary, and was properly exercised to make an interlocutory decision based on the unique set of facts, procedural requirements, and regional interests of the State of NJ within the strict statutory timeframe for the review and processing of DWP applications.

Thank you for supplying us with your arguments for consideration. As a result of a thorough and comprehensive review, my determination designating the State of New Jersey an Adjacent Coastal State for purposes of the Safe Harbor deepwater port application remains unaltered. It is my hope that we can move forward in the processing of the Safe Harbor application to include the State of New Jersey in its role as an Adjacent Coastal State.

If you have any further questions or concerns please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:     The Honorable Frank R. Lautenberg
        The Honorable Jon S. Corzine
        The Honorable Frank Pallone

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ATLANTIC SEA ISLAND GROUP, LLC,    )

      Plaintiff,    )    Civil Action
                               No. 08-00259-RWR
    v.    )

SEAN T. CONNAUGHTON    )
Administrator
Maritime Administration, and    )

MARY E. PETERS,    )
Secretary
Department of Transportation,    )

      Defendants.    )

---

**MEMORANDUM OF POINTS AND AUTHORITIES ON BEHALF OF
MOVANTS-INTERVENORS JON S. CORZINE, GOVERNOR, STATE OF NEW
JERSEY, AND STATE OF NEW JERSEY IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

ANNE MILGRAM
Attorney General of New Jersey

By:  Rachel Horowitz
Deputy Attorney General
R.J. Hughes Justice Complex
25 West Market St.
P.O. Box 093
Trenton, New Jersey 08625-093
609-984-6811

Counsel for Movants-Intervenors
Jon S. Corzine, Governor, State of
New Jersey, and State of New
Jersey

Dated: March 11, 2008

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................. 1

BACKGROUND ......................................... 3

ARGUMENT ........................................... 11

    PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE
    ADMINISTRATOR'S DESIGNATION OF NEW JERSEY AS AN
    "ADJACENT COASTAL STATE" SHOULD BE REVERSED
    AND ENJOINED ................................... 11

  I.    PLAINTIFF HAS NOT SHOWN THAT AN INJUNCTION IS
       NECESSARY TO PREVENT IRREPARABLE INJURY ....... 13

  II.   PLAINTIFF HAS NOT SHOWN THAT IT IS LIKELY TO
       PREVAIL ON ITS CLAIM THAT NEW JERSEY SHOULD
       NOT BE AN "ADJACENT COASTAL STATE" .......... 17

  III. PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION
       IGNORES THE SUBSTANTIAL HARM TO NEW JERSEY THAT
       WOULD RESULT ................................. 28

  IV.  THE PUBLIC INTEREST DOES NOT SUPPORT PLAINTIFF'S
       REQUEST FOR A PRELIMINARY INJUNCTION .......... 31

CONCLUSION ......................................... 34

## TABLE OF AUTHORITIES

### CASES

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ....................... 12, 13, 14

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
58 F.3d 738 (D.C. Cir. 1995) .......................... 11, 12

*Cobell v. Norton,* 391 F.3d 251 (D.C. Cir. 2004) .......... 11

*Community Nutrition Institute v. Butz,* 420 F. Supp. 751
(D.D.C. 1976) ........................................... 29

*Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060
(D.C. Cir. 1998) ........................ 11, 13, 17, 28, 31

*Population Inst. v. McPherson,* 797 F.2d 1062
(D.C. Cir. 1986) ........................................ 12

*Power Mobility Coalition v. Leavitt,* 404 F. Supp. 2d 190
(D.D.C. 2005) ........................................... 15

*Sampson v. Murray,* 415 U.S. 61, 94 S. Ct. 937,
39 L. Ed. 2d 166 (1974) ................................ 12

*Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205
(D.C. Cir. 1989) ....................................... 12

*Shays v. FEC,* 340 F. Supp. 2d 39 (D.D.C. 2004) ........... 15

*Trudeau v. FTC,* 384 F. Supp. 2d 281 (D.D.C. 2005) ........ 15

*Univ. of Tex. v. Camenisch,* 451 U.S. 390, 101 S. Ct. 1830,
68 L. Ed. 2d (1981) .................................... 11

*Virginia Petroleum Jobbers Asso. v. Federal Power Com.,*
259 F.2d 921 (D.C. Cir. 1958) ...................... 14, 15

*Wisc. Gas. Co. v. FERC,* 758 F.2d 669 (D.C. Cir. 1985) ... 14, 15

## STATUTES AND RULES

Deepwater Port Act, 33 U.S.C. § 1501 *et seq.* .............    1

33 U.S.C. §1508(a)(1)  .......................    4, 5, 6, 18, 19

33 U.S.C. §1508(a)(2)  ...........................    1, 4, 25, 26

33 U.S.C. §1503(b)  ...................................    1, 2, 4

Rule 24(a)(2)  ........................................    2, 9

## SUMMARY OF ARGUMENT

Jon S. Corzine, Governor of the State of New Jersey, and the State of New Jersey submit this brief in opposition to Plaintiff Atlantic Sea Island Group LLC's ("ASIG") motion for a preliminary injunction, and in conjunction with New Jersey's motion to intervene as defendants in this lawsuit. ASIG has applied for a federal license under the Deepwater Port Act ("DWPA"), 33 U.S.C. § 1501 et seq., to construct a liquefied natural gas deepwater port in federal waters outshore of the States of New York and New Jersey. On November 2, 2007, the Administrator of the Maritime Administration, defendant Sean Connaughton, granted Governor Corzine's request that New Jersey be designated an "adjacent coastal state" under the DWPA pursuant to 33 U.S.C. §1508(a)(2). That designation will allow Governor Corzine to approve, disapprove, or approve with conditions the proposed deepwater port. 33 U.S.C. §1503(b).

ASIG filed its complaint and a motion for a preliminary injunction on February 15, 2008. In its complaint, ASIG challenges the designation of New Jersey as an "adjacent coastal state," and in its motion for a preliminary injunction, ASIG seeks to enjoin that designation. Since ASIG seeks to deprive New Jersey of its designation as an "adjacent coastal state," and to thereby

1

deprive Governor Corzine of his rights under 33 U.S.C. §1503(b), Governor Corzine and the State of New Jersey are entitled to intervene as of right in this matter under Rule 24(a)(2).

In addition, Governor Corzine and the State of New Jersey oppose ASIG's request for a preliminary injunction because ASIG fails to meet its burden necessary to reverse and enjoin the Administrator's designation of New Jersey as an "adjacent coastal state." Most importantly, ASIG fails to meet its burden because it has not demonstrated that irreparable injury will result without the injunction. First, ASIG alleges irreparable injury from the types of harms that are not generally recognized as irreparable. In addition, ASIG relies on broad, conclusory allegations of such injuries that amount to little more than speculation as to potential injury. ASIG also fails to show a likelihood of prevailing on its claim that the Administrator erred by designating New Jersey as an "adjacent coastal state" by failing to recognize the significant risk to New Jersey's coastal environmental posed by the proposed project and ignoring the substantial information that New Jersey presented to the Administrator supporting his determination that the risks to New Jersey were at least as great as those to New York. Finally, ASIG

2

fails to show that an injunction will not harm New Jersey
or the public interest, because ASIG ignores the potential
risk to New Jersey's coastal environment and, thus, the
significant harm to New Jersey and to the administrative
process that would result from New Jersey losing its
opportunity to participate in the administrative process as
an "adjacent coastal state," in accordance with its
statutory rights under the DWPA.

<div align="center">

**BACKGROUND**

</div>

ASIG has applied for a federal license under the DWPA
to construct the "Safe Harbor Energy deepwater port" to
receive and re-gasify liquefied natural gas.  The proposed
deepwater port would be located in federal waters 13.5
miles south of the coast of New York and 19 miles east of
the coast of New Jersey, and would be connected by pipeline
to an existing pipeline running from New Jersey to New
York, at a location within New York waters. (Complaint,
Attachment 1.) An alternative pipeline alignment included
in the application would be located nine miles from New
Jersey's coastline (Letter of Governor Corzine, dated Sept.
6, 2007, Attachment 2.)

Under the DWPA, license applications to construct and
operate a deepwater port must be approved by the Secretary

<div align="center">3</div>

of Transportation ("Secretary"), and licenses cannot be issued unless, among other things, the Governors of each "adjacent coastal state" have approved issuance of the license. 33 U.S.C. §1503(b). An "adjacent coastal state" is a State directly connected to the proposed port by pipeline, or located within 15 miles of the proposed deepwater port. 33 U.S.C. §1508(a)(1). In addition, the Secretary must designate a State as an "adjacent coastal state" upon a State's request, if the Secretary determines that there is "a risk of damage to the coastal environmental of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." 33 U.S.C. §1508(a)(2).

A State must make such a request to the Secretary not later than the 14th day after publication of notice of an application for a proposed deepwater port in the Federal Register, and the Secretary must make the required designation not later than the 45th day after the date he receives the State's request. 33 U.S.C. §1508(a)(2).

Notice of ASIG's application was published in the Federal Register on August 27, 2007. (Attachment 3.) On September 6, 2007, or within nine days of Federal Register publication, New Jersey Governor Jon S. Corzine requested designation as an "adjacent coastal state." (Attachment

4

2.)  In  requesting  such  designation,  Governor  Corzine
pointed  out  that  the  alternative  pipeline  alignment,
located  within  nine  miles  of  New  Jersey's  coastline,  made
New  Jersey  an  adjacent  coastal  state  under  33  U.S.C.
§1508(a)(1),  and  that  New  Jersey  (like  New  York)  was
directly  connected  to  the  proposed  deepwater  port  by
pipeline.   In  addition,  Governor  Corzine  explained  that  the
risk  to  New  Jersey's  coastal  environmental  from  the
proposed  deepwater  port  was  at  least  as  great  as  the  risk
to  the  coastal  environment  of  New  York  for  numerous
reasons. As  Governor  Corzine  explained,  the  deepwater  port
would  be  located  at  Cholera  Bank,  a  historic  prime  fishing
area  of  vital  importance  to  New  Jersey's  commercial  and
recreational  fisheries,  which  are  a  key  part  of  its  coastal
environment  and  economy.  Further,  the  deepwater  port  would
be  located  between  the  approach  lanes  to  the  Port  of  New
York  and  New  Jersey's  port  facilities  in  New  Jersey,
another  critical  part  of  New  Jersey's  coastal  environment
and  economy.  In  addition,  since  the  water  currents  in  the
area  of  the  proposed  deepwater  port  run  towards  New  Jersey
and  not  towards  New  York,  water  quality  impacts  during
construction,  as  well  as  any  spills  during  construction  and
operation  of  the  facility,  would  be  more  likely  to  be

5

experienced within New Jersey waters than within New York waters (Attachment 2.)

On November 1 and December 21, 2007, New Jersey provided additional information in support of its request for "adjacent coastal state" designation (Attachments 4 and 5.) Specifically, on November 1, 2007, New Jersey explained again that the alternate pipeline route included in ASIG's application would be within nine miles of New Jersey, thus automatically qualifying New Jersey as an adjacent coastal state under 33 U.S.C. §1508(a)(1). In addition, New Jersey reiterated the importance of Cholera Bank to the fishing industries of both New Jersey and New York, and the importance that New Jersey's coastal zone management plan places on such fisheries resources. New Jersey stressed again that since water currents would run from the proposed deepwater port location towards New Jersey, impacts on water quality in New Jersey would be at least equal to those in New York. Further, New Jersey advised of its understanding that a future pipeline from the proposed deepwater port would be directly connected to Linden, New Jersey, which would entitle New Jersey to automatic designation as an adjacent coastal state. (Attachment 4.)

6

On November 2, 2007, defendant Sean Connaughton, the
Administrator of the Maritime Administration within the
United States Department of Transportation, granted
Governor Corzine's request for adjacent coastal state
designation, based on the particular facts and
circumstances (Attachment 6.) The Administrator's
designation afforded Governor Corzine the authority to
approve, disapprove, or approve with conditions ASIG's
deepwater port license application (Attachment 6.)

ASIG asked for reconsideration of the Administrator's
designation on December 3, 2007. New Jersey then provided
supplementary information in support of its adjacent
coastal state status on December 21, 2007, addressing once
more the proposed port's potential impacts on New Jersey's
coastal environment, including its ports, fishing industry,
and beach tourist industry. (Attachment 5.) As New Jersey
explained, the deepwater port would serve the New York
metropolitan area which includes New Jersey as an integral
part; at least as much natural gas from the deepwater port
would be directed to New Jersey as to New York; and ASIG is
considering a future pipeline from the port directly to
Linden, New Jersey. Further, the proposed ASIG pipeline
route would cross two traffic lanes into the Port of New
York and New Jersey - the largest port complex on the east

coast - and within that Port, the Port Newark and the Elizabeth Port Authority Marine Terminal (located in New Jersey) form the largest and most comprehensive collection of maritime cargo handling facilities on the east coast of North America. Thus, disruption of port traffic during construction of the port, as well as potentially during operation, is of major concern to both New Jersey and New York. With respect to fisheries, New Jersey emphasized the significance of Cholera Bank as a State and regional resource, and the significance of the fishing industry to New Jersey and its coastal environment. Moreover, New Jersey explained that the deepwater port would be visible from beaches in Monmouth County, New Jersey, where millions of dollars have been invested, and from several historic sites in the State.

The Administrator reconfirmed his designation of New Jersey as an adjacent coastal state on February 8, 2008 (Attachment 7.) The Administrator reasoned that in this instance New Jersey and New York shared legitimate regional interests and environmental and economic concerns, based on the States' geographic proximity and common industry, their shared port, and their shared use of the Cholera Bank fishery. In addition, the Administrator concurred that predominant ocean currents in the area run to New Jersey;

that staging areas for facility construction and operation
would implicate New York and New Jersey "without
distinction;" and that alternative sites "required under
the National Environmental Policy Act to be reasonably
foreseeable bring the possible final site to within 9 miles
of Jersey." (Attachment 7.)

In response to the Administrator's letter of February
8, 2008, ASIG filed its complaint and motion for a
preliminary injunction on February 15, 2008, seeking to
deprive New Jersey of its adjacent coastal state
designation. New Jersey now moves to intervene in this
matter under Rule 24(a)(2). Beverly Russell, of the Office
of the United States Attorney for the District of Columbia
and counsel for defendants Connaughton and Peters, has
consented to this motion. John Cooney, Venable LLP,
attorney for plaintiff ASIG, has deferred taking a position
on the motion prior to service of the motion papers.

With its motion to intervene, New Jersey also files
this brief in opposition to ASIG's motion for a preliminary
injunction to reverse and stay the Administrator's
designation of New Jersey as an "adjacent coastal state."[1]

---

[1]    ASIG also requests injunctive relief directing the
Administrator to "restart the clock" on consideration of
its Application. It is New Jersey's understanding that the
U.S. Coast Guard and the U.S. Maritime Administrator

As explained below, ASIG fails to meet its burden to enjoin the Administrator's designation of New Jersey as an "adjacent coastal state." First, ASIG fails to demonstrate that irreparable injury will result without the injunction, because it relies on the types of injuries (e.g., wasted time, money, and effort) that are not generally recognized as irreparable. In addition, ASIG relies on broad, conclusory allegations of such injuries that amount to little more than speculation as to potential injury, rather than demonstrating actual injuries that are certain to occur. Next, ASIG fails to show a likelihood of prevailing on its claim that the Administrator erred by designating New Jersey as an "adjacent coastal state" by failing to recognize the significant risk to New Jersey's coastal environmental posed by the proposed project. Finally, ASIG fails to show that an injunction will not harm New Jersey or the public interest, because ASIG ignores the potential risks to New Jersey's coastal environment and, thus, the significant harm to New Jersey and to the administrative process that would result from New Jersey losing its

---

suspended the timeline for processing ASIG's license application (or "stopped the clock") because of issues arising between ASIG and the environmental consultant needed to assist in preparation of an Environmental Impact Statement. New Jersey takes no position on whether it would now be appropriate to restart the clock on ASIG's application.

10

opportunity to participate in the administrative process as an "adjacent coastal state."

## ARGUMENT

### PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE ADMINISTRATOR'S DESIGNATION OF NEW JERSEY AS AN "ADJACENT COASTAL STATE" SHOULD BE REVERSED AND ENJOINED

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d (1981). It is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004).

To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995)).

11

A district court must "balance the strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *CityFed*, 58 F.3d at 747). If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak. *Id*. "Despite this flexibility, though, a movant must demonstrate 'at least some injury' for a preliminary injunction to issue, *id*. (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)), "for 'the basis of injunctive relief in the federal courts has always been irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989)).

12

I.  **PLAINTIFF HAS NOT SHOWN THAT AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE INJURY.**

As a threshold showing, then, ASIG must show that it will suffer irreparable injury if the injunction were not granted. *Mova Pharm. Corp.*, 140 F.3d at 1066. ASIG attempts to make this showing by contending that it will be irreparably harmed if New Jersey's designation as an "adjacent coastal state" is not stayed because of the "threat" that New Jersey's status "will cloud the review of its Application," thus requiring ASIG to expend additional resources and time as part of the Application process. (Plaintiff's Brief at 44-48).

ASIG fails to meet its burden on this prong because its allegations of irreparable injury are based on the types of injuries (e.g., wasted time, money, and effort) that are not the types of harms generally recognized as irreparable. In addition, ASIG relies on broad, conclusory allegations of such injuries that amount to little more than speculation as to potential injury, rather than demonstrating actual injuries that are certain to occur.

The Court of Appeals for the District of Columbia has set a high standard for irreparable injury. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. First, the injury "must be both certain and great; it must be actual and not

13

theoretical." *Id.* (quoting *Wisc. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The moving party must show "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.*

Second, the injury must be beyond remediation. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. As the Circuit Court has explained:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Virginia Petroleum Jobbers Asso. v. Federal Power Com.*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Further, simply identifying potential harm is not sufficient:

> Implicit in each of these principles is the further requirement that the movant substantiate the claim that irreparable injury is "likely" to occur. Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.

*Wisc. Gas. Co.*, 758 F.2d at 674 (citation omitted).

ASIG's assertions of irreparable harm do not meet the high standard required for the issuance of a preliminary injunction. First, ASIG's concerns about the potential expenditure of additional time and resources that may result from New Jersey's participation in the administrative process simply do not amount to irreparable harm. *See Virginia Petroleum*, 259 F.2d at 925 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."); *see also Shays v. FEC*, 340 F. Supp. 2d 39, 48 (D.D.C. 2004) (rejecting the FEC's argument that it would suffer irreparable injury from the lost time and resources expended complying with a court's remand order during the pendency of the FEC's appeal of the court's decision).

Further, ASIG's claims of irreparable harm are too remote and speculative to meet the strict standards for irreparable harm. *See Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005); *Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005). ASIG speculates about the additional time and expense it might have to expend, or the possible impact on the administrative process that would result from New Jersey's involvement as an "adjacent

15

coastal state." ASIG also speculates about potential harm that could result from New Jersey's exercise of its rights under the DWPA at the end of the administrative process.

ASIG's reliance on such speculation about a broad range of potential harms, beginning immediately upon New Jersey's designation as an adjacent coastal state and extending all the way to the end of the process, does not amount to a showing of a concrete injury of the type necessary for injunctive relief. ASIG's broad claims about the harms it faces are contradicted by the fact that ASIG itself has identified the term of the preliminary injunctive relief it seeks as a "short interim period required for final disposition on cross-motions for summary judgment." (Plaintiff's Brief at 49.) Thus, ASIG cannot reasonably claim to face irreparable injury during this "short interim period," when much more time will be required for the preparation of draft and final Environmental Impact Statements and the completion of the administrative process. Moreover, the fact that ASIG may obtain corrective relief after this "short interim period," or may obtain corrective relief (should such relief be necessary) at the end of the administrative process further undercuts its claims of irreparable harm.

16

In short, ASIG has not met its burden of showing that the likelihood of irreparable harm from New Jersey's designation as an adjacent coastal state is "certain and great." For this reason alone, ASIG's motion for a preliminary injunction should fail.

## II. PLAINTIFF HAS NOT SHOWN THAT IT IS LIKELY TO PREVAIL ON ITS CLAIM THAT NEW JERSEY SHOULD NOT BE AN "ADJACENT COASTAL STATE."

To obtain a preliminary injunction, ASIG also must show a substantial likelihood of success on the merits. *Mova Pharm. Corp.*, 140 F.3d at 1066. ASIG attempts to meet its burden on this prong by contending that it has shown a likelihood of prevailing on its argument that the Administrator's designation of New Jersey as an "adjacent coastal state" was arbitrary and capricious, arguing that the Administrator failed to perform a comparative assessment of the risks to New Jersey's coastal environment as compared to that of New York. ASIG also contends that the record does not support a finding that the risk to New Jersey is equal or greater than the risk to New York. (Plaintiff's Brief at 29-41.)[2]

---

[2]    ASIG also challenges the Administrator's authority to make the decision on New Jersey's request for "adjacent coastal state" status. (Plaintiff's Brief at 14-28). New Jersey anticipates that ASIG's arguments on this issue will

17

Contrary to ASIG's arguments, the Administrator properly concluded that New Jersey has made this showing and is entitled to "adjacent coastal state" status based on the considerable information New Jersey provided in support of its request for "adjacent coastal state" status showing that the risks to its coastal environment are at least equal to New York's. In requesting this designation on September 6, 2007, Governor Corzine pointed out that the alternative pipeline alignment, located within nine miles of New Jersey's coastline, made New Jersey an adjacent coastal state under 33 U.S.C. §1508(a)(1), and that New Jersey (like New York) was directly connected to the proposed deepwater port by pipeline. In addition, Governor Corzine explained that the risk to New Jersey's coastal environmental from the proposed deepwater port was at least as great as the risk to the coastal environment of New York for numerous reasons. As Governor Corzine explained, the deepwater port would be located at Cholera Bank, a historic prime fishing area of vital importance to New Jersey's commercial and recreational fisheries, which are a key part

---

be addressed in the Federal Defendants' brief in opposition to ASIG's request for a preliminary injunction.   In New Jersey's view, these arguments were fully addressed in the Administrator's February 8, 2008 letter, and New Jersey's request for "adjacent coastal state" status, which was submitted to both the Administrator and the Commandant of the U.S. Coast Guard, was properly decided.

of its coastal environment and economy. Further, the deepwater port would be located between the approach lanes to the Port of New York and New Jersey's port facilities in New Jersey, another critical part of New Jersey's coastal environment and economy. In addition, since the water currents in the area of the proposed deepwater port run towards New Jersey and not towards New York, water quality impacts during construction, as well as any spills during construction and operation of the facility, would be more likely to be experienced within New Jersey waters than within New York waters (Attachment 2.)

New Jersey subsequently provided additional information in support of its request for "adjacent coastal state" designation (Attachments 4 and 5.) Specifically, on November 1, 2007, New Jersey explained again that the alternate pipeline route included in ASIG's application would be within nine miles of New Jersey, thus automatically qualifying New Jersey as an adjacent coastal state under 33 U.S.C. §1508(a)(1). In addition, New Jersey reiterated the importance of Cholera Bank to the fishing industries of both New Jersey and New York, and the importance that New Jersey's coastal zone management plan places on such fisheries resources. New Jersey stressed again that since water currents would run from the proposed

19

deepwater port location towards New Jersey, impacts on water quality impacts on New Jersey would be equal to those on New York. Further, New Jersey advised of its understanding that a future pipeline from the proposed deepwater port would be directly connected to Linden, New Jersey, which would entitle New Jersey to automatic designation as an adjacent coastal state. (Attachment 4.)

In its supplemental submission on December 21, 2007, New Jersey addressed once more the proposed port's potential impacts on New Jersey's coastal environment, including its ports, fishing industry, and beach tourism industry. As New Jersey explained, the deepwater port would serve the New York metropolitan area which includes New Jersey as an integral part; at least as much natural gas from the deepwater port would be directed to New Jersey as to New York; and ASIG is considering a future pipeline from the deep water port directly to Linden, New Jersey. Further, the proposed ASIG pipeline route would cross two traffic lanes into the Port of New York and New Jersey - the largest port complex on the east coast - and within that Port, the Port Newark and the Elizabeth Port Authority Marine Terminal (located in New Jersey) form the largest and most comprehensive collection of maritime cargo handling facilities on the east coast of North America.

20

Thus, disruption of port traffic during construction of the
port, as well as potentially during operation, is of major
concern to New Jersey. With respect to fisheries, New
Jersey emphasized the significance of Cholera Bank as a
State and regional resource, and the significance of the
fishing industry to New Jersey and its coastal environment.
Moreover, New Jersey explained that the deepwater port
would be visible from beaches in Monmouth County, where
millions of dollars have been invested, and from several
historic sites in the State.

These risks to New Jersey's coastal environment are
further emphasized by the Declarations of Dennis Lombardi,
Deputy Director, Port Authority of New York and New Jersey,
who describes the risks posed by ASIG's proposed LNG
facility to the Ports of New York and New Jersey; Thomas
McCloy, Administrator of the New Jersey Marine Fisheries
Administration, who describes the potential risks to New
Jersey's recreational and commercial fishing industry; and
Mark Mauriello, Assistant Commissioner, who describes the
potential risks posed by the facility's construction and
operations to New Jersey's water quality and to its marine
resources.

In his declaration, Mr. Lombardi explains the vital
economic importance, both regionally and nationally, of the

21

Ports of New York and New Jersey, noting that they account for 13% of all ocean-borne cargo entering and leaving the United States.    (Lombardi Decl. ¶ 3.)    Mr. Lombardi also states that the value of cargo loaded and unloaded at these facilities during 2006 was $149 billion and that the New Jersey side of port operations represents more than 80 percent of the region's total cargo.    (*Id.* ¶ 5.)    Mr. Lombardi also explains the potential risks that ASIG's proposal LNG facility poses to Port Authority operations. (*Id.* ¶¶ 8-11.)    Specifically, Mr. Lombardi explains that the facility is proposed to be constructed between two of the three main shipping channels to the Port of New York/New Jersey and that the proposed pipeline would cross two shipping lanes. (*Id.* ¶¶ 10-11.)    Thus, as Mr. Lombardi states, shipping traffic may be disrupted during pipeline construction, and an incident during operations of the proposed LNG facility potentially could cause a serious disruption to traffic in an out of the Port of New York/New Jersey.    (*Id.*)    Mr. Lombardi concludes that such an occurrence has the potential to cause severe economic hardship to the State of New Jersey, the region, and the nation.    (*Id.* ¶ 11.)

    Mr. McCloy, Administrator of the New Jersey Marine Fisheries Administration, explains the risk posed by the

22

siting of the proposed LNG facility in the "Cholera Bank,"
a historically important fishing grounds for New Jersey
commercial and recreational fishermen.   Mr. McCloy explains
that  the  water  depths  of  the  Cholera  Bank  create  a
confluence of currents, which produce essential habitat for
bait fish and numerous species of finfish and shellfish
including  summer  flounder,  black  sea  bass,  striped  bass,
menhaden, scallops, and lobster. (McCloy Decl. ¶ 6.)   Mr.
McCloy notes that, in addition to the direct effects of
construction of the proposed LNG facility on this essential
marine habitat, a proposed safety zone around the facility
would result in exclusion of fishing vessels from over 660
acres of the ocean.   (*Id.* ¶ 3.)   Mr. McCloy concludes that
"closure of this area would cause a large negative economic
impact to not only the fishermen of New Jersey but also to
several thousand individuals who depend on the vast level
of diversity that is harvested from this area, including
the communities that support the fishing fleets harvesting
the natural resources found on the Cholera Bank."   (*Id.* ¶
8.)

Mr. Mauriello, an Assistant Commissioner in the New
Jersey Department of Environmental Protection who oversees
the  Department's  land  use  regulation  and  water  quality
programs, explains that the general southwesterly flow in

23

the ocean offshore the New Jersey coast could carry pollutants and other materials from the island and pipeline sites toward New Jersey and affect water quality in New Jersey waters and along its shore. (Mauriello Decl. ¶¶ 3-4.)   Mr. Mauriello also explains that the need to obtain raw materials for construction of the proposed LNG facility could divert dredged materials from a site that New Jersey has been using to remediate a site that was historically used for dumping of contaminated dredged material, thus delaying this remediation and potentially causing adverse effects on New Jersey marine resources.   (*Id.* ¶ 6.)   Mr. Mauriello further explains that if the raw materials are to be obtained from upland sites, the materials may be transported through New Jersey, with attendant impacts to air quality, traffic, and infrastructure, including roads and bridges.  (*Id.* ¶ 7.)

Recognizing these risks to New Jersey's coastal environment, the Administrator found on November 2, 2007 that New Jersey should be designated as an "adjacent coastal state" under the standards set forth in the DWPA and affirmed this decision on February 8, 2008. (Attachments 1, 7.)   The Administrator explained that his decision was based his consideration on the "particular facts and circumstances underlying [New Jersey's] request."

24

(Attachment 7.)    In his February 8, 2008 letter, the
Administrator emphasized that this determination was based
on his evaluation of the totality of the risks posed to New
Jersey's coastal environment by the ASIG Project and his
comparison to the risks to New York's coastal environment.
(Attachment 7.)

ASIG's response to the information provided by New
Jersey concerning the risks to its coastal environment is
essentially to minimize its significance or simply dismiss
it as conclusory and unsupported.    (Plaintiff's Brief at
28-41.)    However, ASIG's unwillingness to recognize New
Jersey's important interests in the proposed project does
not mean that these interests do not exist. New Jersey's
Governor identified them in his September 6, 2007 letter,
and subsequent submissions by New Jersey officials further
demonstrate the potential risks to New Jersey's coastal
environment and its interest in having these risks
evaluated as part of the federal administrative process.
Moreover, ASIG's suggestion that New Jersey's submissions
were insufficiently detailed improperly sets an
unreasonably high standard for the amount of information
that Congress expected would be presented to the Secretary
for purposes of an "adjacent coastal state" determination.
See 33 U.S.C. §1508(a)(2) (requiring that a state make a

25

request for "adjacent coastal state" status not later than the 14th day after publication of notice of an application for a proposed deepwater port in the Federal Register). ASIG's arguments also incorrectly imply that there is some absolute, quantifiable minimum amount of risk that is required of a state seeking "adjacent coastal state" status. To the contrary, Congress required only that such risk be "equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port," 33 U.S.C. §1508(a)(2). Thus, Congress contemplated that any showing of risk may be sufficient if a "directly connected" state also faced the same or lesser risk from a proposed project.

Ultimately, it was the Administrator's obligation to consider the risks to New Jersey's coastal environment and weigh them against the risks to New York, and the Administrator properly viewed the risks to New Jersey as valid and important concerns justifying New Jersey's designation as an "adjacent coastal state." ASIG argues that, regardless of New Jersey's asserted interests, such interests do not present a risk equal or greater than the risk to New York. Yet, despite its reference to a 5,000 page application, ASIG identifies only a few potential risks to New York (Plaintiff's Brief at 34-35), even while

its own application seeks to minimize the significance of any potential risks to New York or to any other state. Thus, the record before the Administrator supports his determination that the risks to New Jersey's coastal environmental were at least equal to those facing New York, and that New Jersey's designation as an "adjacent coastal state" was proper.

ASIG also places considerable reliance on a 75-page Methodology Report prepared by a Coast Guard contractor in December 1975. (Plaintiff's Brief at 30, Plaintiff's Attachment 12.) However, as the Administrator recognized in his February 8, 2008 letter, the Methodology Report itself explains that it is not the official view of the USCG, nor does it constitute a standard, specification, or regulation. (Attachment 7.) The Administrator also noted that the Methodology Report reflects an understanding that "each case would offer unique challenges in the availability and analysis of data." (Id.) It is also important to note that the Methodology Report was prepared primarily to address potential impacts of oil spills, and thus, consistent with the Administrator's view, is of little value in evaluating the risks presented in this matter by a proposed deepwater port that will handle liquefied natural gas.

27

III. **PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION IGNORES THE SUBSTANTIAL HARM TO NEW JERSEY THAT WOULD RESULT.**

To obtain a preliminary injunction, ASIG also must show that an injunction would not substantially injure other interested parties. *Mova Pharm. Corp.*, 140 F.3d at 1066. ASIG attempts to meet its burden on this prong by contending that New Jersey will not suffer any harm "during the interim period necessary for resolution of this lawsuit on the merits." (Plaintiff's Brief at 48.)

Contrary to ASIG's assertions, New Jersey will be significantly harmed by being prevented from having an opportunity to participate in the administrative process as an "adjacent coastal state," in accordance with its statutory rights under the DWPA. For example, in the Administrator's November 2, 2007 decision granting New Jersey's request for "adjacent coastal state" status, he noted the "magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey . . . ." (Attachment 6.) The Administrator also noted that, based on New Jersey's status, he anticipated "forging a strong relationship with [Governor Corzine's] office to successfully address your concerns and requirement of Safe Harbor in securing a safe

28

and effective means of importing natural gas into the United States."

As the Governor and the Administrator recognized, it is clearly in New Jersey's interest, as well as in the interest of the federal agencies' consideration of ASIG's application, to have New Jersey's views represented. It is also in New Jersey's and the federal agencies' interests to have any New Jersey concerns raised and addressed sooner in the process, rather than later. Thus, ASIG's attempt to deprive New Jersey of the opportunity to have its role as an "adjacent coastal state" reflected in the administrative process will harm New Jersey. In fact, the harm caused by such a deprivation of New Jersey's rights may be considered irreparable. *See Community Nutrition Institute v. Butz*, 420 F. Supp. 751, 757 (D.D.C. 1976) ("[I]t is well established that the harm suffered by those who would otherwise participate in agency rulemaking under the APA is to be considered irreparable when the agency fails to afford them their rights to such participation.").

ASIG argues that New Jersey will not be harmed because it can still participate in the review of ASIG's application and present its concerns to the federal agencies reviewing ASIG's application, even as a non-adjacent coastal state. (Plaintiff's Brief at 49.) As

29

ASIG recognizes, however, such a reduced role in this matter would have serious consequences to New Jersey by reducing its power over any final agency determination and thus reducing its power to have any New Jersey concerns addressed during the federal administrative review of ASIG's application.    In fact, the significance of these rights is the very reason that ASIG is challenging New Jersey's designation as an adjacent coastal state and is seeking    to    exclude    New    Jersey    from    the    federal administrative process.    Thus, any ruling that reduced New Jersey's role in the process undoubtedly would cause substantial injury to New Jersey.    Moreover, the harm to New Jersey from such a diminished role is a concrete and specific harm, unlike the generalized, speculative harms that ASIG offers in support of its claim of irreparably injury.

Finally, ASIG relies on an e-mail communication from New Jersey's Department of Environmental Protection that was    sent    two    weeks    before    the    Governor's    request    for "adjacent coastal state" status, in an effort to minimize New Jersey's interests in this matter.    (Plaintiff's Brief at    48.)    This    informal    e-mail,    however,    is    of    no significance, as it clearly does not represent New Jersey's official    and    considered    views    on    the    importance    of    being

designated as an "adjacent coastal state" - views that are reflected in the Governor's request and in detailed information provided by the New Jersey Department of Environmental Protection in support of the Governor's request.

## IV.   THE PUBLIC INTEREST DOES NOT SUPPORT PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, ASIG also must show that the public interest would be furthered by the injunction. *Mova Pharm. Corp.*, 140 F.3d at 1066. ASIG attempts to make the required showing on this prong by contending that the public interest in affirming Congressional intent under the DWPA supports granting its request for a preliminary injunction. (Plaintiff's Brief at 49-53.)

As with ASIG's arguments on the prior prong, however, ASIG ignores the potential risks to New Jersey's coastal environment and, thus, the significant harm to New Jersey and to the administrative process that would result from New Jersey losing its opportunity to participate as an "adjacent coastal state," in accordance with its statutory rights under the DWPA.

31

ASIG also relies on generalized claims about the importance of agencies acting within their authority and broad claims about the urgent need to increase the nation's supply of natural gas. (Plaintiff's Brief at 50-53.) Such interests, while certainly significant, are not the only significant interests to be incorporated into the administrative review process established by Congress under the DWPA. For example, Congress guaranteed that states most directly impacted by proposed projects would have the most involvement in the review and approval of such projects. The public interest thus supports a federal administrative process that guarantees that New Jersey's (as well as New York's) interests are fully protected throughout the process, as required by the DWPA. The public interest also supports the development of a complete administrative record that properly reflects all interests that Congress sought to include under the DWPA.

Moreover, New Jersey's interest in assuring that the federal agencies fully consider the potential risks to its port facilities also reflects broader implications for the regional and national economies. As the Port Authority's Deputy Director explains, an incident during operations of the proposed LNG facility potentially could cause a serious disruption to traffic in an out of the Port of New York/New

Jersey, potentially causing severe economic hardship not just to the State of New Jersey, but to the region and the nation. (Lombardi Decl. ¶ 11.)

Thus, ASIG cannot show that the public interest is furthered by the reversal and stay of the Administrator's designation of New Jersey as an "adjacent coastal state."

## CONCLUSION

For the reasons stated above, the motion by Plaintiff ASIG for a preliminary injunction to reverse and stay the Administrator's designation of New Jersey as an "adjacent coastal state" should be denied.


Respectfully submitted,

ANNE MILGRAM
Attorney General of New Jersey

By:     *Rachel Horowitz*
Rachel Horowitz
Deputy Attorney General
R.J. Hughes Justice Complex
25 West Market St.
P.O. Box 093
Trenton, New Jersey 08625
609-984-6811

Dated:  March 11, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------------------------X
ATLANTIC SEA ISLAND GROUP, LLC.,

                             Plaintiff,         *Civil Action No.: 08-00259-RWR*

        — against —

SEAN T. CONNAUGHTON
Administrator
Maritime Administration, and

MARY E. PETERS
Secretary
Department of Transportation,

                           Defendants
-------------------------------------------------------------X

## DECLARATION OF DENNIS LOMBARDI

I, Dennis Lombardi, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.     I am currently employed by the Port Authority of New York and New Jersey, (the "Port Authority") as Deputy Director of the Port Commerce Department. The Port Authority is a bi-state agency created in 1921 by compact between the State of New York and the State of New Jersey with the approval of the United States Congress. The Port Authority is empowered to purchase, lease, build and operate terminals or transportation facilities within the Port district, which is an area within an approximately 25 mile radius from the Statue of Liberty.

2.     I am a graduate of the U. S. Merchant Marine Academy in Kings Point, New York and I have a Masters Degree in Public Administration from Baruch College.

I have spent 22 of my 24 years at the Port Authority working in the Port Commerce Department.

3.    The maritime facilities of the Port Authority consist of Port Newark, Elizabeth-Port Authority Marine Terminal, Howland Hook Marine Terminal, the Auto Marine Terminal, Brooklyn-Port Authority Marine Terminal and the Red Hook Container Terminal. The combined maritime facilities of the Ports of New York and New Jersey account for 13% of all ocean-borne cargo entering and leaving the United States.

4.    Port Newark and the Elizabeth Marine Terminal are located in New Jersey and operate as one fully integrated marine terminal, forming the largest and most comprehensive collection of maritime cargo handling facilities on the East Coast of North America and the third largest in the United States. The entire complex is the principal container ship facility for goods entering and leaving the metropolitan New York City region. Port Newark is located within the City of Newark, New Jersey and the Elizabeth Marine Terminal is located in the City of Elizabeth, New Jersey.

5.    In 2006, more than 30 million tons of oceanborne general cargo moved through the Port of New York and New Jersey. During this period, the Port also handled 5.1 million TEUs (twenty-foot equivalent units) of loaded and unloaded cargo. The New Jersey side of port operations represents more than 80 percent of the region's cargo. The value of that cargo in the entire New York-New Jersey region during 2006 was $149 billion.

6.    According to a 2004 Rutgers University study undertaken for the New York Shipping Associates entitled *Economic Impact of the New York/New Jersey Port Industry*, it estimated that the Port industry supported 232,910 jobs in the region. The

Rutgers report also estimated that the industry generated $12.6 billion in personal income and was the source of $15.8 billion in federal, state and local taxes.

7.  In addition to the Port Authority's maritime facilities, there are in excess of one hundred marine terminals located in New Jersey which are operated by private entities.

8.  Atlantic Sea Island Group, LLC's ("ASIG") has filed an application to construct and operate a liquefied natural gas receiving, storage, and regassification facility on the Outer Continental shelf approximately 13.5 miles south of the City of Long Beach, New York and 19 miles from New Jersey. As part of this facility, ASIG proposes to construct an island in federal waters and a subsea pipeline that will transport natural gas to a connection with the Transcontinental Gas Pipeline Corporation's Pipeline System's existing pipeline from New Jersey to New York.

9.  It is proposed that the ASIG island be constructed between the Ambrose-to-Nantucket and Hudson Canyon-to-Ambrose international shipping lanes. These shipping lanes are two of the three main shipping channels to and from the Port of New York/New Jersey. In 2006, more than 5,570 commercial ships traveled these shipping lanes to use the Port of New York and New Jersey.

10.  The proposed pipeline associated with ASIG's application would cross two shipping lanes, potentially disrupting traffic during construction.

11.  Because of its location, an incident or occurrence associated with the operations at the ASIG island would have the potential to seriously disrupt marine traffic in and out of the Port of New York/New Jersey. Any such occurrence has the potential to cause severe economic impact to the State of New Jersey, the region and the nation.

I declare under penalty of perjury that the foregoing facts are true to the best of my knowledge, information and belief.

Dated: New York, New York
       March 11, 2008

Dennis Lombardi

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
R. J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625
Attorney for Movant-Intervenor

By:   Rachel Horowitz
      Deputy Attorney General
      (609) 984-6811

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ATLANTIC SEA ISLAND GROUP, LLC, )

        Plaintiff,          )   Civil Action No. 08-00259-RWR

     v.                   )

SEAN T. CONNAUGHTON      )
Administrator
Maritime Administration, and  )

MARY E. PETERS,          )
Secretary
Department of Transportation,  )

       Defendants.       )

### DECLARATION OF MARK MAURIELLO

I, Mark Mauriello, declare that the following facts are true to the best of my knowledge, information and belief:

1.   I am employed by the State of New Jersey in the capacity of Assistant Commissioner for Land Use Management, in the Department of Environmental Protection ("Department"). In my capacity as Assistant Commissioner, I oversee and supervise the Department's Land Use Regulation Program, New Jersey Geological Survey, Water Monitoring and Standards, Watershed Management and Water Supply Administration.

2.    Safe Harbor Energy has submitted a construction proposal for
      a Liquefied Natural Gas Terminal to be located within the
      New York Bight. As part of its proposal, Safe Harbor Energy
      seeks to construct an offshore island, that will be
      approximately 116 acres at its base on the seafloor and 85.6
      acres at the ocean surface, and two 36" gas pipelines to be
      buried in the ocean floor. According to Volume 2, section
      I, Figure I-1 of Safe Harbor Energy Construction Schedule,
      construction of the island and pipelines will take place
      over three to four years.

3.    It is well established that there is a general southwesterly
      flow in the ocean offshore the New Jersey coast. While this
      flow can be temporarily reversed for periods of 1-3 months,
      typically during the summer and due to persistent winds out
      of the southwest, there is a mean longshore flow on the
      order of 5 centimeters per second ("cm/s") from Cape Cod to
      Cape Hatteras, and the predominant current direction is
      southwest.

4.    During the three to four years the island and pipeline will
      be under construction, materials, including pollutants, will
      be suspended in the water, and sediment plumes may be
      created. Accordingly, a southwest flow has the potential to
      carry these pollutants and other materials from the island
      and pipeline sites toward the New Jersey waters and shore.
      Similarly, any materials spilled during operation of the
      deepwater ports would be carried toward New Jersey waters
      and shore. As a result, materials suspended during
      construction or operation of the port, including both the
      pipelines and the island could affect water quality in New
      Jersey.

5.    According to Volume 2 Exhibit I.4.4 of the Safe Harbor
      Island application, the proposed deepwater port includes two
      36" gas pipelines, to be buried in the ocean floor to a
      depth of 4 feet below the surrounding undisturbed seafloor.
      The method of installation is a towed pipeline plow.
      However, the details of installation were not provided to
      the State of New Jersey. New Jersey is concerned about the
      potential adverse water quality impacts associated with the
      installation of these pipelines.

6.    According to Volume 2, Exhibit 1 of the application, the
      creation of the proposed island would require approximately
      14.8 million cubic yards of material, including stone,
      quarry run, and sand. The application indicates that the 8.4
      million cubic yards of sand will come from ongoing dredging

projects located within the New York Harbor area or onshore
commercial sources.  However, the total projected amount of
materials to be dredged from the Harbor through 2013 is less
than 8.4 million cubic yards.  Moreover, dredged materials
from the Ambrose Channel are currently being used to help
remediate the Historic Area Remediation Site ("HARS"), a
site that was historically used for dumping of contaminated
dredged material.  If these dredged materials are diverted
from remediating the HARS site to create the proposed
island, remediation of the HARS site would be delayed,
potentially causing adverse effects on New Jersey marine
resources.

7.   If Safe Harbor Energy proposes to use sand from an upland
     source to construct its island, the sand would have to be
     trucked to be barged to the island.  The source of the sand
     has not been specified in the application.  However,
     assuming a truck holds 12 - 15 cubic yards of sand, this
     would require 560,000 - 700,000 truck trips.  Additional
     trucking would be required to transport the stone used to
     build the island.  Depending on the upland source of
     material and the staging location for construction of the
     deepwater port, these truck trips may be through New Jersey,
     with attendant impacts to air quality, traffic, and
     infrastructure, including roads and bridges.

8.   According to Volume 3, Part 1, Topic Report 7 of the
     application, the terminal will be visible from the beaches
     of Monmouth County, where New Jersey has spent millions in
     beach nourishment, and the Sandy Hook unit of Gateway
     National Recreation Area.  The island will also be visible
     from the Twin Lights Historic Site, which is on the National
     Register of Historic Places, and the Mount Mitchell Overlook
     (identified as the highest point along the eastern
     seaboard).  Accordingly, both New Jersey's beaches and this
     historic site would be affected by the project.

I declare under penalty of perjury of the laws of the United States that the foregoing facts are true and correct.

Executed on: 3/11/08

Mark Mauriello

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
R. J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey  08625
Attorney for Movant-Intervenor

By:  Rachel Horowitz
     Deputy Attorney General
     (609) 984-6811

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ATLANTIC SEA ISLAND GROUP, LLC, )

        Plaintiff,         )   Civil Action No. 08-00259-RWR

   v.                           )

SEAN T. CONNAUGHTON      )
Administrator
Maritime Administration, and  )

MARY E. PETERS,           )
Secretary
Department of Transportation,  )

      Defendants.        )

### DECLARATION OF THOMAS McCLOY

I, Thomas McCloy, declare that the following facts are true to
the best of my knowledge, information and belief:

1.  I am the Administrator of the New Jersey Marine Fisheries
    Administration.

2.  Safe Harbor Energy has submitted a construction proposal for
    a  Liquefied Natural Gas Terminal to be located on the
    fishing grounds commonly referred to as the ACholera Bank.@
    This general area is located in the National Marine
    Fisheries Statistical Area of 612.  This statistical area is
    bordered by the land masses of New Jersey to the west and
    New York=s Long Island to the North and situated within the
    New York Bight.

3.   As part of its proposal, Safe Harbor Energy seeks to construct an offshore island that will be approximately 116 acres at its base on the seafloor, and 85.6 acres at the ocean surface. The specific location of the proposed island falls between the commerce shipping lanes of the Nantucket/Ambrose Traffic Channel and The Hudson/Ambrose Traffic Channel at approximately 40 degrees, 23 minutes, 19 seconds North Latitude by 73 degrees, 36 minutes, 35 seconds West·Longitude, placing it approximately 17 nautical miles east of the Sandy Hook Gateway National Recreation Area. Safe Harbor Energy also seeks to exclude vessels unrelated to the project from a 500 meter safety zone surrounding it, which when coupled with the island itself, will preclude vessels from over 660 acres of the ocean.

4.   New Jersey=s role in the harvest of saltwater resources is substantial relative to adjoining coastal states.  These saltwater fisheries resources support activities resulting in an impact to the state economy in excess of $2 billion dollars.  Commercially, 590.7 million dollars and recreationally 1.5 billion dollars of revenue for New Jersey are created annually in the form of landings value, salaries and wages, and state taxes.  Furthermore, according to National Marine Fisheries Service data, on average New Jersey has ranked no lower than seventh from 1950 to 2006 on the eastern seaboard in terms of commercial landings and sixth in terms of value of those landings.

5.   In response to the plaintiff=s pending motion for preliminary injunction, staff within my office contacted several industry representatives to inquire into the real-world implications of the closure of the approximately 660 acres of the ocean in Cholera Bank.

6.   New Jersey commercial and recreational fishermen have historically used the Cholera Bank as a Prime Fishing ground since the early 1900=s.  As per conversations with both fishing captains and dock managers of the top 6 facilities in northern and central New Jersey all have said that this area provides their respective docks with a substantial amount of landings and subsequent revenue throughout the entire year.  The bathymetry of this area creates a 60 foot deep bank which is surrounded by deeper water ranging from 80-110 feet and thus a confluence of currents which produce essential fish habitat for bait and the predators that feed on them.  This area is utilized by several species of finfish and shellfish including summer flounder, black sea bass, scup, scallops, bluefish, monkfish, ocean quahog, surf clams, mackerel, striped bass, cod, pollock, whiting, hake,

false albacore, bonito, skipjacks, tautog, yellowtail flounder, menhaden, and lobster.  A loss of essential fish habitat on the Cholera bank would adversely affect all species mentioned above.

7.    In addition, the Division of Fish and Wildlife defined the Cholera Bank as belonging to New Jersey=s only natural reef system which extends from the Shrewsbury River to East Rockaway Inlet on Long Island, New York.  Fishing grounds included in this natural reef system include the Shrewsbury Rocks, 17 Fathom Bank, Cholera Bank, and the Southeast Ground (NJDFW, Artificial Reef Management Plan, 2005). Further, the NJDFW classifies this area as a APrime Fishing Ground@.  Prime fishing areas include tidal water areas and water=s edge areas which have a demonstrable history of supporting significant local quantity for recreational or commercial fishing activity.  The Department first classified the Cholera Bank as a prime fishing area over 25 years ago, and has proposed to maintain the designation of Cholera Bank as a prime fishing area in pending amendments to its Coastal Permit Program and Coastal Zone Management rules, N.J.A.C. 7:7 and 7:7E.

8.    A closure of this area would cause a large negative economic impact to not only the fishermen of New Jersey but also to several thousand individuals who depend on the vast level of diversity that is harvested from this area, including the communities that support the fishing fleets harvesting the natural resources found on the Cholera Bank.

9.    Water quality will be impacted during the construction of the project through the release of suspended solids or creation of sediment plumes.  These will likely cause negative impacts to the marine life in and around the affected area.

I declare under penalty of perjury of the laws of the United States that the foregoing facts are true and correct.

Thomas McCloy

Executed on: 3/11/08

ANNE MILGRAM
Attorney General of New Jersey
Attorney for Movants-Intervenors
Jon S. Corzine, Governor, State of
New Jersey, and State of New Jersey
R.J. Hughes Justice Complex
25 West Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
By: Rachel Horowitz
    Deputy Attorney General
    (609)984-6811

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLANTIC SEA ISLAND GROUP, LLC,) | |
| Plaintiff, ) | Civil Action No. 08-00259-RWR |
| v. ) | |
| SEAN T. CONNAUGHTON ) | DECLARATION OF RACHEL HOROWITZ |
| Administrator | |
| Maritime Administration, and ) | |
| MARY E. PETERS, ) | |
| Secretary | |
| Department of Transportation, ) | |
| Defendants. ) | |

### DECLARATION OF RACHEL HOROWITZ

I, Rachel Horowitz, hereby declare:

1.  I am a Deputy Attorney General of the State of New Jersey and
    have been assigned to represent Jon S. Corzine, Governor of
    the State of New Jersey, and the State of New Jersey, in this
    matter.

2.  Before moving to intervene on behalf of Governor Corzine and
    the State of New Jersey, I conferred with Beverly Russell,

Esq. of the United States Attorney's Office for the District

of Columbia, counsel for defendants Sean Connaughton and Mary

Peters, and with John F. Cooney, Esq., Venable LLC, counsel

for plaintiff Atlantic Sea Island Group LLC.

3.    Beverly Russell, counsel for defendants Connaughton and

Peters, advised me that defendants consent to intervention by

Governor Jon Corzine and the State of New Jersey.    John F.

Cooney, counsel for plaintiff, advised me that plaintiff will

take no position on intervention, prior to the filing of

papers in support of intervention.

4.    I have examined and am familiar with the local court rules of

this District Court.

I declare under penalty of perjury of the laws of the United States

that the foregoing facts are true and correct.

_____
Rachel Horowitz

Executed on: March 11, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
ATLANTIC SEA ISLAND GROUP, LLC,)

       Plaintiff,          )    Civil Action No. 08-00259-RWR

     v.                  )

SEAN T. CONNAUGHTON      )
Administrator             [PROPOSED] ORDER
Maritime Administration, and  )

MARY E. PETERS,         )
Secretary
Department of Transportation,  )

       Defendants.       )

<u>**ORDER**</u>

Upon consideration of the Motion of Jon S. Corzine, Governor, State of New Jersey, and State of New Jersey, to intervene in this matter pursuant to Federal Rule of Civil Procedure 24(a)(2), for the purpose of defending the decision of the Administrator of the Maritime Administration, designating New Jersey as an adjacent coastal state, and of opposing plaintiff's motion for a preliminary injunction to enjoin that designation, and upon consideration of the responses thereto, and for good cause shown, it is:

ORDERED that the motion of Jon S. Corzine, Governor of the State of New Jersey, and State of New Jersey is granted, and Jon S. Corzine, Governor and the State of New Jersey are parties in this matter.

_____
Richard W. Roberts, United States District Judge

ANNE MILGRAM
Attorney General Of New Jersey
Attorney for Movants-Intervenors
Jon S. Corzine, Governor, State
of New Jersey, and State of
New Jersey
R.J. Hughes Justice Complex
25 West Market St.
P.O. Box 093
Trenton, New Jersey 08625-0093

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
ATLANTIC SEA ISLAND GROUP, LLC,)

       Plaintiff,       )  Civil Action No. 08-00259-RWR

    v.               )

SEAN T. CONNAUGHTON     )
Administrator            CERTIFICATE OF SERVICE
Maritime Administration, and )

MARY E. PETERS,        )
Secretary
Department of Transportation, )

       Defendants.     )


    I hereby certify that on March 11, 2008, copies of the Motion of Jon S. Corzine, Governor, State of New Jersey and State of New Jersey, to intervene pursuant to Fed. Rule Civ. Proc. 24(a)(2), along with the Declarations of Dennis Lombardi, Thomas McCloy, Mark Mauriello, and Rachel Horowitz, movants-intervenors' Memorandum of Points and Authorities in Support of Motion to Intervene and all attachments, the proposed order granting intervention, and movants-intervenors' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary

Injunction, were served on the following counsel by electronic mail

and by overnight mail:

<div style="display:flex;">

Beverly Russell
U.S Attorney's Office
for the District of
Columbia, Civil Division
555 Fourth St. NW, Rm. E-4915
Washington, DC 20530
beverly.russell@usdoj.gov

John F. Cooney
Venable LLP
575 7th Street NW
Washington, DC 20004
JFCooney@Venable.com

</div>

$\qquad\qquad$ /s/ $\qquad\qquad$
Rachel Horowitz

March 11, 2008