# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLANTIC SEA ISLAND GROUP LLC, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SEAN T. CONNAUGHTON, | ) |
| Administrator, Maritime Administration, | ) Civil Action No. 08-00259(RWR) |
| | ) |
| and | ) |
| | ) |
| MARY E. PETERS, | ) |
| Secretary, U.S. Department of Transportation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants, Sean T. Connaughton, Administrator, Maritime Administration, and Mary E. Peters, Secretary, U.S. Department of Transportation, by and through their undersigned counsel, move to dismiss the above-captioned complaint. Defendants additionally oppose Plaintiff's Motion for a Preliminary Injunction, and request that the Court deny Plaintiff that relief.

In support of this motion and opposition, the Court is respectfully referred to the accompanying *Memorandum of Points and Authorities*. Additionally, a proposed order consistent with Defendants' motion and opposition memorandum is attached hereto.

Respectfully Submitted,


/s/ Jeffrey A. Taylor /mj
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


/s/ Beverly M. Russell
_____
Of Counsel:                         BEVERLY M. RUSSELL, D.C. Bar #454257
PAUL M. GEIER.                      Assistant United States Attorney
Assistant General Counsel for       U.S. Attorney's Office for the District of Columbia
  Litigation                        555 4th Street, N.W., Rm. E-4915
DALE C. ANDREWS                     Washington, D.C. 20530
Deputy Assistant General Counsel    Ph:  (202) 307-0492
  for Litigation                    Fax: (202) 514-8780
PETER J. PLOCKI                     E-mail: beverly.russell@usdoj.gov
Senior Trial Attorney
U.S. Department of Transportation

LANE H. NEMIROW
Trial Attorney
T.MITCHELL HUDSON
Attorney Advisor
Maritime Administration
U.S. Department of Transportation
Washington, D.C.  20590

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLANTIC SEA ISLAND GROUP LLC, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SEAN T. CONNAUGHTON, | ) |
| Administrator, Maritime Administration, | ) Civil Action No. 08-00259(RWR) |
| | ) |
| and | ) |
| | ) |
| MARY E. PETERS, | ) |
| Secretary, U.S. Department of Transportation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendants, Sean T. Connaughton, Administrator, Maritime Administration, and Mary E. Peters, Secretary, U.S. Department of Transportation, by and through their undersigned attorneys, herein oppose Plaintiff's Motion for a Preliminary Injunction in this suit brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. Plaintiff has submitted an application to the Maritime Administration and the Coast Guard for a license to construct the Safe Harbor Energy Liquefied Natural Gas Deepwater Port.   The Deepwater Port Act ("DWPA" or "Act"), 33 U.S.C. § 1501 et seq., contains the federal statutory provisions governing the issuance of licenses for ownership, operation and construction of deepwater ports and provides the Secretary of Transportation ("Secretary") with authority over the various aspects of licensing. As part of this authority, and pursuant to the standard set forth in the Act, the Secretary may designate a State as an "adjacent coastal State." As further discussed below, this designation

provides a State that might be subjected to adverse risks from the construction and operation of the deepwater port with the authority to approve, approve with conditions, or disapprove the license. In this suit, Plaintiff challenges the Maritime Administrator's designation of New Jersey as an adjacent coastal State.

At the outset, however, Defendants note that a preliminary injunction is not the appropriate vehicle to consider the merits of a substantive APA claim. See Emily's List v. Federal Election Comm'n, 362 F.Supp.2d 43, 52 (D.D.C. 2005). The remedy is particularly inappropriate here because Plaintiff lacks standing to bring this suit, there has been no final agency action, and accordingly, the suit should be dismissed on these grounds. Even assuming arguendo that standing exists and the agency determination at issue is deemed by the Court to be "final," Plaintiff fails to meet any of the four requirements for the granting of a preliminary injunction. Accordingly, Plaintiff's request for this extraordinary remedy should be denied.

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Deepwater Port Act

The Deepwater Port Act establishes a licensing system for ownership, construction, and operation of deepwater ports, that is, manmade structures in waters located beyond the territorial limits of the United States. 33 U.S.C. §§ 1501(a), 1502(9) and 1503. For purposes of the DWPA, deepwater ports are used to transport, store, or otherwise handle oil or natural gas for transportation to any State. 33 U.S.C. § 1502(9). The Secretary of Transportation is responsible for the issuance of licenses under the DWPA. 33 U.S.C. §§ 1502(17) and 1503(b).

The DWPA includes the specific objectives of "protecting (1) the marine and coastal environment to prevent or minimize any adverse impact resulting from the development of

deepwater ports, (2) the interests of the United States and adjacent coastal States in the location,

construction, and operation of deepwater ports, and (3) the rights and responsibilities of States

and communities to regulate growth, determine land use, and otherwise protect the environment

in accordance with law."  H.R. Conf. Rpt. 93-1605 (Dec. 16, 1974)(reprinted in 1974

U.S.C.C.A.N. 7622, 7624); see also 33 U.S.C. § 1501(a).  For purposes of the DWPA, a "coastal

State" is defined as "any State of the United States in or bordering on the Atlantic, Pacific, or

Arctic Oceans, or the Gulf of Mexico."  33 U.S.C. § 1502(6).  An "adjacent coastal State" is a

coastal State which meets one of three standards.  The State (1)  would be directly connected by

pipeline to a deepwater port as proposed in the deepwater port application, (2) would be located

within 15 miles of any such proposed deepwater port, or (3) upon request by a State, is

designated as such by the Secretary of Transportation (or more specifically the Maritime

Administrator to whom the Secretary has delegated such function, see, e.g., 33 C.F.R. § 148.5[1])

after receiving the recommendation of the Administrator, National Oceanic and Atmospheric

Administration ("NOAA"), if the Secretary "determines that there is a risk of damage to the

coastal environment of [the petitioning] State equal to or greater than the risk posed to a State

directly connected by pipeline to the proposed deepwater port."  33 U.S.C. § 1508(a)(1) and (2).

---

[1]33 C.F.R. § 148.5 states in part that an "adjacent coastal State" means any coastal State that:

(1) Would be directly connected by pipeline to a deepwater port, as proposed in an application;

(2) Would be located within 15 miles of any such proposed deepwater port; or

(3) Is designated as an adjacent coastal State by the Administrator of the Maritime Administration under 33 U.S.C. § 1508(a)(2).

The DWPA defines "coastal environment" as "the navigable waters (including the lands therein and thereunder) and the adjacent shorelines including waters therein and thereunder." 33 U.S.C. § 1502(5). The term includes "transitional and intertidal areas, bays, lagoons, salt marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and the recreational and scenic values of such lands, waters and resources." Id.

The Secretary may issue a license for a deepwater port only if she determines that (1) the applicant is financially responsible, (2) the applicant can and will comply with applicable laws, regulations, and licensing conditions, (3) the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality, (4) the deepwater port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, and (5) the applicant has demonstrated that the deepwater port will be constructed and operated using the best available technology, so as to prevent or minimize adverse impact on the marine environment. 33 U.S.C. § 1503(c)(1)-(5).

Additionally, the Secretary may not issue a license if informed by the Administrator, Environmental Protection Agency, that the deepwater port will not conform to applicable environmental laws. 33 U.S.C. § 1503(c)(6). The Secretary must also consult with the Secretary of the Army, the Secretary of State, and the Secretary of Defense to determine their views on the adequacy of the application and its effect on programs within their respective jurisdictions. 33 U.S.C. § 1503(c)(7).

The Secretary may also not issue a license unless the Governor of an adjacent coastal State approves or is presumed to approve issuance of the license. 33 U.S.C. § 1508(c)(8). An

4

application is presumed to be approved if the Governor of an adjacent coastal State does not

transmit his or her approval or disapproval to the Secretary within 45 days after the last public

hearing on the application.  33 U.S.C. § 1508(b)(1).  If, however, the Governor of an adjacent

coastal State notifies the Secretary that an application "which would otherwise be approved, is

inconsistent with State programs relating to environmental protection, land and water use, and

coastal zone management, the Secretary shall condition the license granted so as to make it

consistent with such State programs."  Id.  Another condition that must be in place prior to the

issuance of a license by the Secretary is a showing by the adjacent coastal State to which the

deepwater port is directly connected that it has developed, or is making, at the time the

application is submitted, reasonable progress toward developing, an approved coastal zone

management program pursuant to the Coastal Zone Management Act of 1972.[2]  33 U.S.C. §

1508(c).

---

[2]Moreover, actions taken by the Secretary of Transportation under the DWPA are subject to the requirements and conditions generally applicable to all major federal actions most significant of which in this context is compliance with the National Environmental Policy Act of 1969, ("NEPA") 42 U.S.C. § 4321 et seq.  In Gulf Restoration Network v. U.S. Department of Transp., the U.S. Court of Appeals for the Fifth Circuit specifically recognized the extensive amount of licensing contingencies, including those associated with NEPA, that the Secretary must address before issuing a license under the Act.  452 F.3d 362 (5th Cir. 2006).  "[T]he Secretary was entitled to conclude that the occurrence of any one of a number of contingencies could cause the plans to build the ports to be cancelled or drastically altered.  For example, one or  more of the applicants may decide for a number of reasons to withdraw its application before the Secretary's approval, such as ExxonMobil did with its application for the Pearl Crossing GBS platform.  The Secretary, after receiving input from other agencies, may deny an application or make changes to the application's construction specifications such as demanding that the port be closed loop rather than open loop.  The technology in this area is also advancing rapidly and may change the effects of the planned ports."  Gulf Restoration Network, 452 F.3d at 370 (internal citation omitted).

B.    **DWPA Regulations**

The Secretary's authority to issue, transfer, amend, or reinstate a license for the construction and operation of a deepwater port was delegated to the Maritime Administrator on June 18, 2003.  49 C.F.R. § 1.66(aa)(1), 68 Fed. Reg. 36496 (June 18, 2003)("The Secretary is delegating to the Maritime Administrator his authority to issue, transfer, amend, or reinstate a license for the construction and operation of a deepwater oil or natural gas port as provided for in the Deepwater Port Act of 1974, as amended, 33 U.S.C. § 1501-1524 (DWPA)").[3]

As suggested above, prior to issuing a DWPA license, the Secretary, or more specifically, the Maritime Administrator by delegation, is required to designate one or more States as an "adjacent coastal State."  33 U.S.C. § 1508(a)(1) and (2); 33 C.F.R. § 148.217; see also Pl.'s Compl. p. 2, ¶ 9.  The State specified in the DWPA application that will be directly connected by pipeline to the deepwater port is deemed by law to be an adjacent coastal State.  33 U.S.C. § 1508(a)(1); see also Pl.'s Compl. p. 2, ¶ 9.  States within fifteen miles of the proposed deepwater port are also deemed adjacent coastal States.  Id.  In addition to the foregoing instances, and as

---

[3]The original reservations and delegations associated with the DWPA were published in September 1975. 40 Fed. Reg. 43901 (Sept. 24, 1975).  Two months later, the first DWPA implementing regulations were published. 40 Fed. Reg. 52540 (Nov. 10, 1975).  From that time until January of 2004 (for 28 years), the DWPA implementing regulations at 33 C.F.R. § 148.217(d) required that the Secretary make adjacent coastal State determinations pursuant to 33 U.S.C. § 1508(a)(2). Notably, this designation was in effect well after the U.S. Coast Guard transferred to the Department of Homeland Security in February of 2003.  Thus, the effect of the Homeland Security Act ("HSA") of 2002 which provided that the Coast Guard was authorized upon transfer to the Department of Homeland Security to take with it all the authority delegated prior to the HSA, could not have included Coast Guard authority to make adjacent coastal State designations since the Coast Guard did not have such authority at the time of its transfer.  The Secretary of Transportation had always reserved this authority until the most recent delegation to the Maritime Administrator in June of 2003, post-Coast Guard transition.  68 Fed. Reg. 36496 (June 18, 2003).

indicated above, the Secretary is required to designate a State as an adjacent coastal State if she: a) receives a timely request from a State; b) receives a recommendation from the Administrator of the National Oceanic and Atmospheric Administration; and c) determines that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." 33 U.S.C. § 1508(a)(2); see also Pl.'s Compl. p. 2, ¶ 9. A State is required to submit its request for designation no later than 14 days after the date of publication of the notice of an application for a proposed deepwater port in the Federal Register, and the Secretary is required to act on that request no later than the 45th day after the date she receives the State's request. 33 U.S.C. § 1508(a)(2). The designation of a State as an adjacent coastal State is part of the licensing process under the Act. 33 U.S.C. § 1508(b)(1)("If the Governor notifies the Secretary that an application, which would otherwise be approved pursuant to this paragraph, is inconsistent with State programs relating to environmental protection, land and water use, and coastal zone management, the Secretary shall condition the license granted so as to make it consistent with such State programs.").

## II.    FACTUAL BACKGROUND

By letter dated September 6, 2007 to Admiral Thad W. Allen, Coast Guard Commandant and Sean T. Connaughton, the Maritime Administrator, the Honorable Jon S. Corzine, Governor of New Jersey, requested that New Jersey be designated as an adjacent coastal State for purposes of the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License application. Ex. 1, Letter from Joe S. Corzine, Governor, State of New Jersey, to Admiral Thad W. Allen and Sean T. Connaughton, Sept. 6, 2007 ("Corzine letter"). In the letter, Governor Corzine provided specific reasons for his request. He noted, for example, that Plaintiff's Notice of the application

indicated that the proposed port would be within 15 miles of New York and approximately 19 miles from New Jersey but that the proposed alternative pipeline alignment that is part of the deepwater port application would be well within the 15 miles to designate New Jersey as an adjacent coastal state. Id. at 1.

Governor Corzine also noted that the DWPA "provides for a state to be designated as an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the deepwater port." Id. He explained that,

> New Jersey has robust commercial and recreational fisheries that are vital to the State's economy, as well as to the history and character of New Jersey's coastal environment. The proposed facility will destroy a historic prime fishing area, known as the Cholera Bank, which is protected under New Jersey's federally approved coastal management program. Not only will the creation of an island over this prime fishing area be detrimental to this unique environment but the proposed facility's exclusion zone will prohibit vessels in a 633 acre area, further diminishing this important resource.

Id. at 2.

Governor Corzine also expressed the view that the "predominant current direction in the area of the proposed deepwater port is toward New Jersey." Id. Thus, "turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as to the important commercial and recreational fishing grounds surrounding the proposed port. . ." Id. Additionally, "any spills at the island during construction and operation of the facility" would also affect New Jersey's waters. Id.

On September 24, 2007, representatives of Plaintiff forwarded a letter to Admiral Allen and Administrator Connaughton opposing New Jersey's request expressing the view that New

8

Jersey, in its request for designation as an adjacent coastal State, failed to meet the "totality of risk standard" mandated by the DWPA and that any impact on commercial and recreational fisheries "is a matter that will be considered as part of the application process." Ex. 2, Letter from James H. Burnley, IV and David G. Dickman to Admiral Thad W. Allen, Commandant, U.S. Coast Guard and Sean T. Connaughton, Administrator, U.S. Maritime Administration (Sept. 24, 2007). Plaintiff also argued that because the Cholera Bank and the Safe Harbor Energy project "are over 15 nautical miles from the New Jersey coast, and well outside New Jersey's coastal environment as that term is defined in the DWPA[,]" any impact on the Cholera Bank is irrelevant and inapplicable for purposes of consideration of New Jersey as an adjacent coastal state. Id. at 4. Plaintiff additionally appears to argue that an analysis of specific commercial losses is required to assess whether the commercial impact on New Jersey is equal to or greater than the impact on New York. Id.

Although conceding that the predominant current direction around the proposed facility is toward New Jersey, Plaintiff nevertheless argued that this does not mean that "turbidity and other water quality impacts of [its] project will necessarily present a risk to the New Jersey coastal environment[,]" and further, "the impact of any spills from construction or operation of the port is. . .unlikely to impact the coastal environment of New Jersey." Id. at 5. Plaintiff also argued that, because the location of the "shore base to be used during operation of the port to move personnel, supplies, equipment and disposable materials between the shore and the deepwater port facility is identified" as the town of Ocean Side, Long Island, New York, the risk to New Jersey from the location of the shore base cannot be greater to or equal than the risks to New York. Id.

9

On October 24, 2007, the Maritime Administration and the U.S. Coast Guard suspended the statutory timeline associated with the DWPA because of Plaintiff's failure to provide material information. Ex. 10, Suspension Declaration of Mark A. Prescott, ¶ 4 (March 7, 2008); Ex. 11, Suspension Declaration of H. Keith Lesnick, ¶ 3 (March 9, 2008).

By letter dated November 2, 2007, the Maritime Administrator informed New Jersey Governor Corzine of his determination designating New Jersey as an adjacent coastal State for the proposed Safe Harbor deepwater port project. Ex. 3, Letter from Sean T. Connaughton to the Honorable Jon S. Corzine, Nov. 2, 2007. The determination was made "consistent with the particular facts and circumstances underlying the request." Id.

Although the DWPA does not provide any express provision for agency review of the Secretary's designation determination, by letter dated November 13, 2007, Plaintiff notified the Maritime Administrator of its intent to file a petition for reconsideration of the Administrator's designation of New Jersey as an adjacent coastal State. Ex. 4, Letter from James H. Burnley IV to the Honorable Sean T. Connaughton, Nov. 13, 2007. In response to Plaintiff's letter, and by letter dated November 19, 2007, Administrator Connaughton noted that the DWPA does not set forth a formal appeals process. Ex. 5, Letter from Sean T. Connaughton to James H. Burnley IV, Nov. 19, 2007. Nevertheless, Administrator Connaughton stated his willingness to continue "review [of Plaintiff's] request" for reconsideration. Id.

By letter dated December 3, 2007, Plaintiff, through its representatives, provided its request for reconsideration to both the Secretary of Transportation and the Maritime Administrator. Ex. 6, Letter from Jim Burnley to the Honorable Mary E. Peters, Secretary, U.S. Department of Transportation and the Honorable Sean T. Connaughton, Administrator, Maritime

Administration, Dec. 3, 2007.  In the letter, Plaintiff made three arguments in support of its

request for reconsideration:  (1) the Administrator did not have the legal authority to make the

designation because by implementing rule, the Commandant was delegated such authority by the

Secretary, see 33 C.F.R. § 148.217; (2) even if the Administrator had the legal authority, he

failed to apply the appropriate legal standard for designating an adjacent coastal State, i.e., that

the risk of damage from the port to the coastal environment of the petitioning State be "equal to

or greater than" the risk of damage to the coastal environment of the State connected to the port

by pipeline; and (3) the record does not contain evidence that which would support such a factual

finding.[4] Id.

By letter dated December 21, 2007, Jeanne Herb, Director, Department of Environmental

Protection, State of New Jersey, provided supplemental information urging that the

Administrator's designation of New Jersey as an adjacent coastal State was appropriate.  Ex. 7,

Letter from Jeanne Herb, Director, Department of Environmental Protection, State of New

Jersey, to Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities, Maritime

Administration, Dec. 21, 2007.  In the letter, Ms. Herb notes that Plaintiff's application

references the capability of the deepwater port to deliver up to 1.15 billion standard cubic feet per

day of natural gas to the New York metropolitan region, and that New Jersey is part of that

region.  Id. at 1.  In her December 21, 2007 letter, Ms. Herb also references a letter written by

Howard Bovers, Chairman, Atlantic Sea Island Group, in which he states that "[m]ore than 50

---

[4]As explained below, Plaintiff's complaint and motion for a preliminary injunction also
include an additional claim that the Administrator's designation of New Jersey as an adjacent
coastal State was untimely.  See Pl.'s Compl. ¶ 42; Plaintiff's Mem. P.&.A. in Support of Pl.'s
Mot. Prelim. Inj. at 23.

percent of the LNG in the form of natural gas in Phase One of the project will be delivered to New Jersey." Id. at 2.  Ms. Herb notes that Mr. Bovers' representations in this regard comport with those of Governor Corzine "indicating that because of capacity issues in the existing pipeline. . . there would, by necessity, be natural gas flowing to New Jersey." Id.  (emphasis added).

Ms. Herb also argued that there were precedents for designating New Jersey as an adjacent coastal State – referencing Louisiana's designation as an adjacent coastal State for the El Paso Energy Bridge in the Gulf of Mexico although this proposed deepwater port pipeline was to connect to an existing pipeline more than 100 miles offshore and Alabama's approval as an adjacent coastal State under the TORP Terminal, LP Beinville Offshore Energy Terminal although the connection of the deepwater port to the existing pipeline was approximately 60 miles offshore.  Id.  at 3.  Here, Ms. Herb points out, the deepwater port island proposed by Plaintiff "would be located approximately 19 miles from New Jersey . .." Id.

In her December 21, 2007 letter, Ms. Herb also discusses the disruption that the proposed deepwater port would impose on New Jersey's international shipping lane traffic to and from the Port of New York/New Jersey, and the impact of the port on the recreational fishing community noting that the proposed island location and the adjacent areas have been identified as a recreational fishing area.  Id. at 5.  Ms. Herb further notes that the manmade structure or island will be visible from the entire 20 mile span of New Jersey coastline including from a historic site. Id. at 5-6.    Thus, both New Jersey's beaches and an historic site will be impacted by the proposed deepwater port.  Id. at 6.  Ms. Herb concludes by stating,

12

> Clearly, a project of this magnitude, with the creation of an artificial island by the filling of 116 acres of sea floor with wide ranging impacts beyond the immediate project area, including shipping and navigation, fisheries disruptions, onshore port utilization, and the need for massive volumes of fill material, has equal effects, if not greater in certain circumstances, on the coastal environment of New Jersey as it does on New York's coastal environment. Therefore, the Maritime Administration made the correct decision in granting adjacent coastal state status to New Jersey.

Id. at 6.

On February 8, 2008, the Maritime Administrator responded to Plaintiff's December 3, 2007 letter objecting to the designation of New Jersey as an adjacent coastal State. Ex. 8, Letter from Sean T. Connaughton, Maritime Administrator to James H. Burnley IV, at 1, Feb 8, 2008. In the February 8th letter, the Administrator reiterated both that there was no right to appeal such a designation under the DWPA and that New Jersey met the standard for designation as an adjacent coastal State, specifically, that the risk of damage to New Jersey's coastal environment of the proposed port was greater than or equal to that of New York. Id. at 2. The Administrator explained,

> There is no better example of legitimate regional interests under the Safe Harbor proposal than that of [New York and New Jersey. New York and New Jersey] have historically shared environmental and economic concerns due to their geographic proximity, predominant ocean currents from [New York toward New Jersey], and common industry. They share the port and its facilities. The staging area for the construction and operation of the Safe Harbor DWP implicate [New York and New Jersey] without distinction.

Id.

The Administrator stated that, contrary to Plaintiff's argument, the DWPA does not require a detailed factual finding, only that the determination be made consistent with the standard set out in the statute. Id. at 4. The Administrator noted that the impact of a liquefied

natural gas fire from a port located as far removed from population centers "as proposed here would likely have some, but less, impact directly on individuals but may have significant impact on the marine environment...[and] the risk from such a fire or explosion is at least as great to" New Jersey's coastal environment as to New York's.  Id.

The Administrator additionally noted that Plaintiff's argument that he lacked the authority to issue the delegation to New Jersey is without merit, pointing to 33 C.F.R. § 148.5(3) which expressly states that the Maritime Administrator shall make determinations regarding adjacent coastal State designations pursuant to 33 U.S.C. § 1508(a)(2).  Id. at 3.  Although 33 C.F.R. § 148.217 states that the Commandant of the Coast Guard will make such designations, even that provision states that the Commandant will only do so with the concurrence of the MARAD Administrator.  Id.  More importantly, notwithstanding the inconsistency between 33 C.F.R. § 148.5(3) and 33 C.F.R. § 148.217, both the Maritime Administration and the Coast Guard agree that the Maritime Administration alone has the authority to designate adjacent coastal State status for DWPA projects, see 33 C.F.R. § 148.5(3),  and that the agencies are working together to address the ambiguities in the regulations.  The U.S. Coast Guard has long held this as its view of the its authority under the DWPA.  A recent example of this position is contained in a February 14, 2008 letter responding to an inquiry from Senator James M. Inhofe in which Admiral Thad W. Allen, Commandant, U.S. Coast Guards stated as follows:

 The Deepwater Port Act of 1974 (33 U.S.C. § 1501 et seq.) specifically names the Secretary of Transportation as the authority to permissively designate[] [adjacent Coastal State] status under 33 U.S.C. § 1508(a)(2); **the Coast Guard does not possess such statutory authority.**

. . . .

Current Coast Guard regulations in 33 CFR Part 148.217 state that: "If after receiving NOAA's recommendations the Commandant. . ., in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant. . ., in concurrence with the MARAD

14

Administrator, will so designate it." The Coast Guard and Maritime Administration agree, that based on the Secretary of Transportation's delegation in 2003 reserving licensing decisions within the Department of Transportation, and the past history of the Secretary of Transportation issuing [adjacent coastal State] designations, an examination of the Deepwater Port Act implementing regulations is warranted and appropriate clarifications need to be considered.

Ex. 9 (emphasis added).[5]

On February 15, 2008, Plaintiff filed this suit and a Motion for a Preliminary Injunction. In support of the latter, Plaintiff averred that it had a substantial likelihood of prevailing because (1) the Maritime Administrator did not have the authority to make the designation which had been given to the Coast Guard, (2) New Jersey's request was time-barred or the Administrator acted after the statutory deadline for making the designation expired, and (3) the Administrator failed to apply the stringent legal standard enacted by Congress in 33 U.S.C. § 1508(a)(2) for designation of an adjacent coastal State.

As demonstrated below, the Court lacks jurisdiction over this suit because Plaintiff does not have standing to bring it. Plaintiff has failed to state a claim upon which relief can be granted because there has been no final agency action by the Maritime Administration, and in any event, Plaintiff has not satisfied any of the four requirements for the granting of a preliminary injunction.

---

[5]See also p. 6, n.3 supra.

III.    **ARGUMENT**

    A.    **This Case Should Be Dismissed.**

        1.    **Dismissal of this Case is Warranted on Jurisdictional Grounds.**

           a.    **Standard of Review for Dismissal Pursuant to Rules 12(b)(1) of the Federal Rules of Civil Procedure**.

"A motion under 12(b)(1) 'presents a threshold challenge to the court's jurisdiction.'" Gardner v. U.S., No. CIV. A. 96-1467EGS, 1999 WL 164412, *2 (D.D.C. Jan. 29, 1999), aff'd, 213 F.3d 735 (D.C. Cir. 2000) and cert. denied, 531 U.S. 1153 (2001), quoting, Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir.1987). Specifically, "subject matter jurisdiction deals with the power of the court to hear [a] plaintiff's claims in the first place, and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power." 4 Wright & Miller: Federal Prac. & Proc. § 1350 (R12)(2002 Supplement)

A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) in two ways. First, the court may determine the motion based solely on the complaint. Herbert v. National Academy of Science, 974 F.2d 192, 197 (D.C. Cir. 1992). Alternatively, to determine the existence of jurisdiction, or lack thereof, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See id.

           b.    **Plaintiff Lacks Standing to Bring This Suit.**

Plaintiff argues that the Maritime Administrator's November 2, 2007 designation of New Jersey as an adjacent coastal State and his February 8, 2008 confirmation of this designation

16

present justiciable issues to the Court.  See Pl.'s Compl. ¶¶45, 47, 48, 49, 51, 53 and 57.

However, Plaintiff fails to establish standing for three reasons: 1) Plaintiff has not suffered an

"injury in fact"; 2) the complained of injury is not causally connected to agency action; and 3) it

is speculative, and not likely, that the complained of injury could be redressed by a decision in

favor of Plaintiff.

    In Lujan v. Defenders of Wildlife the Supreme Court held that "the irreducible

constitutional minimum of standing contains three elements."  504 U.S. 555, 560 (1992); see also

Massachusetts v. E.P.A., 127 S.Ct. 1438, 1453 (2007).  To establish standing, a plaintiff must

have suffered an "injury in fact" – an invasion of a legally protected interest that is (a) concrete

and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Id.

(citations and internal quotations omitted).  Second, there must also be a "causal connection

between the injury and the conduct complained of– the injury has to be fairly . . . trace [able] to

the challenged action of defendant, and not . . . th[e] result [of] the independent action of some

third party not before the court."  Id. (citations and internal quotations omitted).  Finally, it must

be "likely" as opposed to "speculative" that the injury can be redressed by a favorable decision.

Id.  "This triad of injury in fact, causation, and redressability constitutes the core of Article III's

case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of

establishing its existence."  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103

(1998).

    Plaintiff states that the Administrator's decision regarding adjacent coastal State status

"has caused and is causing [Plaintiff] significant economic harm."  See Pl.'s Compl. ¶49.  This

conclusory claim by Plaintiff does not establish a concrete and particularized harm.  The record is

devoid of any indication that Plaintiff has incurred any economic harm as a result of the adjacent coastal State designation. Plaintiff has borne no expense, suffered no damage, nor undertaken any additional activity associated with the Maritime Administration's designation. See Cent. for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1161 (D.C. Cir. 2005).

Plaintiff also claims that the Maritime Administration "has irreparably injured [its] ability and statutory right to obtain a decision within the time deadlines . . . in the DWPA." See Pl.'s Compl. ¶ 49. Plaintiff argues that the decision to suspend the statutory deadline was predicated on its "challenge to the Administrator's decision." See Plaintiff's Mem. P.&.A. in Support of Pl.'s Mot. Prelim. Inj. at 42, and Ex. 9, Aff. of David G. Dickman ¶ 4("ASIG was informed orally that the time line suspension would not be lifted until such time as [New Jersey's adjacent coastal State status] was resolved . . .") and ¶5 ("ASIG was once again orally informed that the time line suspension would continue until the issue of the adjacent coastal State status of New Jersey was resolved.").

These claims are inaccurate, contradicted by all indicia of written evidence, and without legal consequence. This suspension was granted on October 24, 2007 because of Plaintiff's failure to provide the Maritime Administration and the U.S. Coast Guard with material information. Ex. 10, Suspension Declaration of Mark A. Prescott, ¶ 4 (March 7, 2008); Ex. 11, Suspension Declaration of H. Keith Lesnick, ¶ 3 (March 9, 2008). A significant aspect of these information deficiencies relate to Plaintiff's failure to provide information necessary for the NEPA evaluation. Id. The record therefore makes clear that the suspension was not related at all to the designation of New Jersey as an adjacent coastal State. Id. The allegations of injury are, at best, related to an indeterminate future harm. "Allegations of possible future injury do not satisfy

18

the requirements of Art. III.  A threatened injury must be certainly impending to constitute injury in fact."  Massachusetts v. E.P.A., 127 S.Ct. 1438, 1468 (2007) (internal citation omitted).

Plaintiff states that: "The Administrator's decision means that the Governor of New Jersey has the authority 'to approve, disapprove, or approve with conditions the deepwater port license application . . .."  Pl.'s Compl. ¶ 48.  The prospect that New Jersey might impose conditions or disapprove the license in the future is not a direct, real injury.  Accordingly, Plaintiff fails to show a concrete harm that is sufficient to establish standing.  See City of Los Angeles v. Lyons, 461 U.S. 95, 129 n. 20 (1983) (internal citation and quotation omitted); see also Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279, 1292 (D.C. Cir. 2007) (Plaintiff must establish an injury that is "direct, real, and palpable-not abstract.")

Even assuming arguendo that there was an injury in fact, there is still no causal connection between any putative injury and the Administrator's conduct.  Any hypothetical injury conjured by the Plaintiff would be associated with the Governor's disapproval or imposition of conditions.  Under this scenario, such an injury is not fairly traceable to the Maritime Administration; it would be caused by the State of New Jersey.  Plaintiff also argues that "[e]very day the clock is stopped increases the cost [of the] project."  Plaintiff's Mem. P.&.A. in Support of Pl.'s Mot. Prelim. Inj., at 43.  As established above, the clock is stopped only because of Plaintiff's failure to provide material information about its proposal to the Maritime Administration.  Any harm associated with the stopped clock is caused by Plaintiff's own inability to substantiate its proposal with adequate documentation.  See Ex. 10 and 11.  The costs such as those for consultants that Plaintiff is incurring because of Plaintiff's own delays do not constitute a legal harm caused by the Maritime Administration.  These expenses are not

19

properly characterized as legal harms, and are not fairly traceable to action by the Maritime Administration.

Besides the fact that Plaintiff's current economic injuries are due to Plaintiff's failures to provide certain necessary information in support of its application, Plaintiff's argument also fails to establish that a favorable decision by this Court is likely to redress the alleged injury. Assuming arguendo that Plaintiff establishes that its economic harm is caused by the adjacent coastal State designation, striking the adjacent coastal State designation and enjoining the Maritime Administration from engaging in such a designation  in the future[6] is not likely to redress the economic harm.  Even if New Jersey were not entitled to adjacent coastal State status, Section 1508(b)(2) requires that the Secretary consider the views of any interested State.  See Pl.'s Compl. ¶ 14; Ex. 12, Letter frm M.A. Prescott to the Honorable Jon S. Corzine, Jan. 8, 2008 ("New Jersey will have a role in the processing of the application and we look forward to working with the State of New Jersey.")  Additionally, the licensing of a deepwater port is a major federal action and requires the participation of New Jersey in accordance with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. And removing the possibility that New Jersey will disapprove or place conditions on the project does not ensure that the project will be approved or be approved without conditions.  The Maritime Administrator or the Governor of New York could disapprove the project or place conditions on it.  Based on the foregoing, the relief requested by Plaintiff is not likely to redress the hypothetical harm. Accordingly, Plaintiff has failed to establish the third prong of the Supreme Court's standing test.

---

[6] See Pl.'s Compl. ¶ 2.

It is not clear what the final views of the State of New Jersey will be with respect to this application for a license or how these views will affect the Plaintiff.  What New Jersey's position will be on the license is purely a matter of speculation by the Plaintiff.   However, it is not speculation that, as a matter of law, regardless of whether New Jersey is designated as an adjacent coastal State" the views of the State of New Jersey must be considered by the Secretary of Transportation as part of the DWPA licencing process.  As the court in Gulf Restoration Network held, the Governor's decision with regard to a license is not known until the end of the entire administrative process.  452 F.3d at 371.  Accordingly, Plaintiff has failed to establish the third prong of the Supreme Court's standing test.

.      In contravention of standing requirements established by Lujan supra and its progeny, Plaintiff fails to establish an "injury in fact," fails to show a causal connection between the Maritime Administration and the injury complained of, and fails to show how a favorable judgment by the Court would redress the injury alleged.

**2.      This Suit Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted.**

**a.      Standard of Review for Dismissal for Failure to State a Claim**.

On separate grounds, this suit should be dismissed for failure to state a claim upon which relief can be granted pursuant to Fed. R. C. P. 12(b)(6).  On a motion for such relief, the Court will dismiss a claim if plaintiff's complaint fails to plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (clarifying the standard from Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also In re Sealed Case, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing Twombly).  Hence, the focus is on the language

in the complaint, and whether that language sets forth sufficient factual allegations to support plaintiff's claims for relief.

The court must construe the factual allegations in the complaint in the light most favorable to Plaintiff and must grant Plaintiff the benefit of all inferences that can be derived from the facts as they are alleged in the complaint. Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). However, the Court need not accept any inferences or conclusory allegations that are unsupported by the facts pleaded in the complaint. Kowal, 16 F.3d at 1276. Moreover, the Court need not "accept legal conclusions cast in the form of factual allegations." Id.

### b.    There Has Been No Final Agency Action for Purposes of APA Review.

Judicial review under the APA is limited to final agency action. 5 U.S.C. § 704. Judicial intervention prior to final agency action "'leads to piecemeal review which. . .is inefficient and upon completion of the agency process might prove to have been unnecessary.'" DRG Funding Corp. v. Secretary of Housing and Urban Development, 76 F.3d 1212, 1214 (D.C. Cir. 1996)(quoting FTC v. Standard Oil Co. Of California, 449 U.S. 232, 242 (1980)). For agency action to be "final" and reviewable under the APA, it must generally "mark the consummation of the agency's decisionmaking process" and either determine "rights or obligations" or result in "legal consequences." Bennett v. Spear, 520 U.S. 154, 178 (1997) (citations and internal quotation marks omitted).

The designation of New Jersey as an adjacent coastal State does not mark the "consummation" of the Maritime Administration's decisionmaking process. The Agency

22

decisionmaking process is finalized only after the Secretary reaches a licensing decision under Section 1504 of the Act. The designation of New Jersey as an adjacent coastal State is merely an interlocutory decision. The Secretary's decision with regard to the issuance of a license to own, construct, and operate a deepwater port represents a consummation of the Maritime Administrations's administrative action, not the incremental step of designating adjacent coastal States. The designation of New Jersey as an adjacent coastal State is not finally determinative of the issue as to whether Plaintiff is entitled to a license under the Act. In any event, if Plaintiff disagrees with the final decision on the project, it may challenge the adjacent State component of that decision at that time.

Further, an application of the three factor test set out in CropLife Am. v. E.P.A., 329 F.3d 876, 883 (D.C. Cir. 2003) compels the conclusion that the designation of New Jersey as an adjacent coastal State is not a final agency action under the APA. First, the Maritime Administration has characterized the designation as interlocutory. See Ex. 8, Connaughton Ltr. at 5 (the designation is "an interlocutory decision based on a unique set of facts . . ."). Second, the designation was not published in the Federal Register or the Code of Federal Regulations.

Third, Plaintiff will have an opportunity to challenge the designation of New Jersey as an adjacent coastal State when the licensing process is completed and the decision as to the DWPA license is made. At that time, the factual circumstances and injuries, if any, caused by that the designation of the State of New Jersey as an adjacent coastal State will be clear. At present, it is pure speculation as to what terms and conditions the State of New Jersey will request be imposed on the license. If for example, the conditions sought by the State of New Jersey are the same as those sought by the State of New York, then the entire issue of New Jersey's status as an adjacent

23

coastal State would be moot.  This Court lacks jurisdiction to hear cases based on hypothetical

future injuries.  Similar to the facts at issue in the <u>Gulf Restoration Network</u> case, the ultimate

input from the Governors of the adjacent coastal States is simply not known until the end of the

licensing process.  452 F.3d at 371.

Accordingly, for reasons stated above, Plaintiff's Complaint should be dismissed.

### B.    Plaintiff Is Not Entitled to a Preliminary Injunction.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion."  <u>National Head</u>

<u>Start Ass'n v. Department of Health and Human Services</u>, 297 F.Supp.2d 242, 246 (D.D.C.

2004), <u>quoting</u>, <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997)(other citations omitted); <u>see</u>

<u>also</u> <u>Emily's List v. Federal Election Com'n</u>, 362 F.Supp.2d 43, 51 (D.D.C. 2005);  <u>Varicon Int'l</u>

<u>v. Office of Personnel Management</u>, 934 F.Supp. 440 (D.D.C. 1996).  Issuance of a preliminary

injunction is appropriate only if the movant clearly demonstrates that:

> (1) [it] has a substantial likelihood of succeeding on the merits; (2) [it] would
> suffer irreparable harm if the injunction is not granted; (3) other interested parties
> will not suffer substantial harm if the injunction is granted; and (4) the public
> interest will be furthered by the injunction.

<u>Emily's List</u>, 362 F.Supp.2d at 51; <u>Sea Containers, Ltd. v. Stena AB</u>, 890 F.2d 1205, 1208

(D.C.Cir. 1989); <u>see also</u> <u>Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n</u>, 259 F.2d

921, 925 (D.C.Cir. 1958).  The Court balances the strengths of the requesting party's arguments

in each of these required areas.  <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738,

747 (D.C.Cir. 1995).  It is particularly important, however, for the movant to demonstrate a

substantial likelihood of success on the merits.  <u>Emily's List</u>, 362 F.Supp.2d at 51, citing, <u>Barton</u>

v. Dist. of Columbia, 131 F.Supp.2d 236, 242 (D.D.C. 2001), citing Benton v. Kessler, 505 U.S.

1084, 1085 (1992).  If the movant is unable to do so, the movant must then present a "very strong

showing" with respect to the other preliminary injunction factors.  Emily's List, 362 F.Supp.2d at

51-52, quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 366 (D.C. Cir.

1999)(emphasis added).

 As indicated above, a preliminary injunction "is not the appropriate time to consider the

merits" of a substantive APA claim.  Emily's List, 362 F.Supp.2d at 53.  "Although a motion for

a preliminary injunction against an agency is not always inappropriate, the better course is [for

the Court] to rule on the merits of the substantive issues at a later date particularly where

allegations of irrepable injury are lacking at this stage."  Id. citing Am. Bioscience, Inc. v.

Thompson, 269 F.3d 1077, 1083-84 & nn. 7-8 (D.C. Cir. 2001)).  The District of Columbia

Circuit cautioned that the district court should be careful in considering the remedy of a

preliminary injunction since the "granting or denying" of such a remedy can serve as "the basis

for an expedited appeal."  Am. Bioscience, Inc., 269 F.3d at 1084, n. 8.  Here, Plaintiff satisfies

none of the requirements for a preliminary injunction.

  **1.**  **Plaintiff Fails to Establish a Substantial Likelihood of Prevailing on the Merits.**

 Under Rule 65(a) of the Federal Rules, and as noted supra, a plaintiff must demonstrate

that it has a "substantial likelihood" of succeeding on the merits of its underlying case.  Absent a

"substantial indication" of likely success on the merits, there would be "no justification for the

court's intrusion into the ordinary processes of administrative and judicial review."  American

<u>Bankers Ass'n v. National Credit Union Admin.</u>, 38 F. Supp. 2d 114, 140 (D.D.C.1999).  Here, such intrusion is not justified.

a.      **Plaintiff's Allegation that the Maritime Administrator Lacks the Authority to Designate Adjacent Coastal States Is Devoid of Merit.**

Plaintiff alleges that the Maritime Administrator's designation of New Jersey as an adjacent coastal State "usurped" the Coast Guard's authority in this regard given 33 C.F.R. § 148.217 which states, in part, that the Coast Guard Commandant, in concurrence with the Maritime Administration, shall make such designations.  Pl.'s Mot. Prelim. Inj., p. 14.  However, the argument is without merit for the Coast Guard regulations also state the Maritime Administrator shall make determinations regarding adjacent coastal State designations.  33 C.F.R. § 148.5(3).  Further, Plaintiff's reliance on <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 384-85 (1992) is misplaced.  In <u>Morales</u>, the Supreme Court concluded that a general savings clause broadly preserving remedies existing at common law or by statute cannot supersede a "specific substantive pre-emption" provision. <u>Id.</u>  A regulatory provision, however, that expressly states that an adjacent coastal State means any coastal state so designated by the Maritime Administrator pursuant to 33 U.S.C. § 1508(a)(2) is very specific, not comparable to a broadly prescribed savings clause.  Accordingly, Plaintiff's argument that only the Coast Guard Commandant has the authority to make designations pursuant to 33 U.S.C. § 1508(a)(2) is without merit.

Additionally, when, as here, Congress has delegated authority to an agency generally to make rules carrying the force of law, and where the agency's statutory interpretation was articulated in the exercise of that authority, a reviewing court must show "great deference to the

26

interpretation given the statute by the officers or agency charged with its administration." EPA v.
National Crushed Stone Ass'n, 449 U.S. 64, 83 (1980) (citation omitted); United States v. Mead
Corp., 533 U.S. 218, 226 (2001). Such review takes place under the familiar, two-step standard
of Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 842 (1984). During the first step of the
Chevron analysis, the Court is to determine whether Congress has "directly spoken to the precise
question at issue[.]" Id.  If Congress has, "that is the end of the matter," and Congress' intent must
be given effect. Id. at 842-43. However, "if the statute is silent or ambiguous with respect to the
specific issue," the Court is to proceed to the second stage of the inquiry, in which the question
becomes "whether the agency's answer is based on a permissible construction of the statute." Id.
at 843. To uphold the agency's interpretation, the Court "need not find that [the agency's] is the
only permissible construction that [the agency] might have adopted but only that [the agency's]
understanding of [the] 'complex statute' is a sufficiently rational one to preclude a court from
substituting its judgment for that of [the agency]." Chemical Mfrs. Ass'n v. NRDC, 470 U.S. 116,
125 (1985) (citation omitted).  Pertinent here, in reviewing an agency's interpretation of its own
regulations, the Court is to give "controlling weight" to the agency's interpretation, "unless it is
plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512
U.S. 504, 512 (1994). This heightened degree of deference stems from the fact that it is the
agency that is the source of the regulations, and it is the agency that has the power to change
them. North Am. Fund Mgmt. Corp. v. FDIC, 991 F.2d 873, 875 (D.C. Cir. 1993).

      Here, the plain language of the DWPA states that the Secretary of Transportation shall
make adjacent coastal state designations, see 33 U.S.C. §§ 1502(17) and 1508(a)(2).  As
indicated above, the original reservations and delegations associated with the DWPA were

published in September 1975. 40 Fed. Reg. 43901 (Sept. 24, 1975). Two months later, the first

DWPA implementing regulations were published. 40 Fed. Reg. 52540 (Nov. 10, 1975). From

that time until January 2004, the DWPA implementing regulations at 33 C.F.R. § 148.217(d)

required that the Secretary make adjacent coastal State determinations pursuant to 33 U.S.C. §

1508(a)(2). It is important to note that the regulations remained consistent *well after the United

States Coast Guard* transitioned to the Department of Homeland Security in February 2003.

Further, on two separate occasions in 1976, the Secretary of Transportation issued 1508(a)(2)

determinations on behalf of Mississippi and Florida. Ex. 13. The Commandant has never issued

such a determination.

Therefore, contrary to Plaintiff's argument, the effect of the Homeland Security Act

("HSA") of 2002 which provided that the Coast Guard was authorized upon transition to the

Department of Homeland Security ("DHS") to take with it all the authority delegated prior to the

HSA, is not inconsistent with the Government's view. The Coast Guard never had 1508(a)(2)

adjacent coastal State determination authority, the Secretary maintained such authority up to

2004 after the Coast Guard's transition, and therefore such authority could not have been

transitioned to DHS. The Secretary of Transportation has reserved this authority until its final

delegation to the Maritime Administrator in June of 2003, post-Coast Guard transition. 68 Fed.

Reg. 36496 (June 18, 2003). Accordingly, the U.S. Coast Guard and the Maritime

Administration have properly interpreted the statute, subsequent delegations, and the historical

record to conclude that the Maritime Administrator alone is the person with the authority to make

adjacent coastal State determinations under 1508(a)(2).[7]

Notwithstanding Plaintiff's argument to the contrary, the Government's interpretation of the regulatory provisions prevail.  See Chevron, U.S.A., 467 U.S. at 842-43.  Deference to an agency's interpretation of its regulatory framework is particularly mandated, as here, where there is a need to reconcile conflicting policies.  See Wayside Farm, Inc. v. U.S. Dept. of Health & Human Services, 863 F.2d 447, 451(6th Cir. 1988).  Accordingly, given that the Secretary of Transportation has concluded that the Maritime Administrator is responsible for designations pursuant to 33 U.S.C. § 1508(a)(2), that the United States Coast Guard agrees with that interpretation of law, and such interpretation is certainly not inconsistent with the DWPA, Plaintiff's argument that the Maritime Administrator exceeded his authority in this regard is clearly without merit.  Thus, Plaintiff fails to demonstrate a substantial likelihood of prevailing on the merits based on this argument.

> **b.    Plaintiff's Argument that the Administrator's Designation Decision is Time-Barred Lacks Merit.**

Plaintiff argues that the Administrator violated the DWPA by approving New Jersey's request for an adjacent coastal State designation outside of applicable statutory deadlines.  Pl.'s Mem. P.&A. in Support of Pl.'s Mot. Prelim. Inj., at 24.   Plaintiff references 33 U.S.C. § 1508(a)(2) which states that the Secretary shall make designations "not later than the 45th day

---

[7]Coast Guard regulations expressly state that adjacent coastal State designations are to be made by the Maritime Administrator, 33 C.F.R. § 148.5(3).  Although 33 C.F.R. § 148.217 stating that the Commandant of the Coast Guard shall make such designations with the concurrence of the Maritime Administrator is in seeming conflict with 33 C.F.R. § 148.5(3), as indicated herein, both the Maritime Administration and the Coast Guard agree that the Maritime Administration is the agency which has the authority to make designations pursuant to 33 U.S.C. § 1508(a)(2).  See Ex 9, Letter from Thad W. Allen, Admiral, U.S. Coast Guard Commandant to the Honorable James M. Inhofe, Feb. 14, 2008.

after the date he receives such a request from a state." New Jersey's petition was docketed on

September 10, 2007. Pl.'s Mem. P.&A. in Support of Pl.'s Mot. Prelim. Inj., at 24. The

Administrator made his determination on or around November 2, 2007. Id. Plaintiff thus

concludes that the Administrator's action is void on its face for violation of the statutory

deadline. Id. Plaintiff's argument in this regard is devoid of merit.

"It is well settled that. . .where Congress has placed an agency under a legal obligation to

render a decision within a stated time period but has not set forth the consequences of exceeding

that period, ordinarily the time period is directory rather than mandatory, and an agency will not

lose jurisdiction over the matter upon expiration of that period." Gottlieb v. Peña, 41 F.3d 730,

733 (D.C. Cir. 1994). In this regard, the District of Columbia Circuit "has repeatedly concluded

that missing a statutory deadline does not divest an agency of authority over a case or issue." Id.

at 734. Thus, even assuming arguendo that the Maritime Administrator acted beyond the

statutory deadline, consistent with the case law of this Circuit, such delay did not "divest" him of

his authority to designate New Jersey as an adjacent coastal State. Plaintiff's argument to the

contrary clearly lacks merit, and thus, is an insubstantial basis upon which to obtain a preliminary

injunction.

> c.   **Plaintiff's Argument that the Administrator Failed to Apply
> the Appropriate Standard for "Adjacent Coastal State"
> Designation Lacks Merit.**

Plaintiff inaccurately states that the Administrator's designation was unlawful because he

failed to apply the statutory standard set out in 33 U.S.C. § 1508(a)(2), relying instead on

"magnitude and scope" of the proposed project, criteria not authorized by the DWPA. Pl.'s

Mem. P.&A. in Support of Pl.'s Mot. Prelim. Inj., at 25 - 26. Plaintiff also avers that the

Administrator failed to undertake a "comparative risk assessment." Id. at 26. Plaintiff further argues that the Administrator's designation was unlawful because the record does not contain evidence that the risk of damage to the coastal environment on New Jersey would be greater than or equal to the damage to the coastal environment of New York.[8] Id. at 29.

The Administrator did in fact provide a sufficient explanation of his designation determination. Although Plaintiff clearly disagrees with the determination, the record evidences that the Administrator based his designation decision on the standard set out in the DWPA – specifically, the Administrator determined that there is a risk to the coastal environment of New Jersey, located 19 miles from the proposed site greater than or equal to New York, located within 15 miles of the proposed project. See, e.g. Ex. 8, Connaughton Ltr. at 1. In reaching this determination, the Administrator noted that "[t]here is no better example of legitimate regional interests under the Safe Harbor proposal than that of" New York and New Jersey, that the two States are closely intertwined by both environmental and economic interest, that the two States share the port and its facilities, and that the staging area for the construction and operation of the Safe Harbor deepwater port implicate New York and New Jersey without distinction. Id. Further, the Administrator noted that the risk of a fire from the proposed liquefied natural gas port, given that the currents from the location run to New Jersey, will impact the marine environment of New York and New Jersey at least equally. Id.

_____

[8]It should be noted that the DWPA does not require the Maritime Administrator to issue a written decision explaining his designation determination to include a "comprehensive risk assessment" See 33 U.S.C. § 1501 et seq. Indeed, the APA contemplates that decisions being challenged pursuant to the statute will not always be memorialized, and in such circumstances, allows courts to "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." Camp v. Pitts, 411 U.S. 138, 142-143 (1973).

Plaintiff's objections to this decision are without merit.  For example, Plaintiff notes that the New Jersey Governor's letter discusses the potential for adverse impacts on the area of Cholera Bank, where the proposed port is to be built, and then goes on to state that the Governor's concerns in this regard should be rejected given that Cholera Bank is approximately 19 miles from New Jersey and thus does not fall within the definition of that State's "coastal environment."  Plaintiff's Mem. P.&A. in Support of Pl.'s Mot. Prelim. Inj., at 35.   However, as pointed out by the Governor, Cholera Bank, the only naturally-occurring reef system off the coast of New Jersey and New York and a historic prime fishing area, is protected by New Jersey's coastal zone management program.  Ex. 1, Corzine Ltr. at 2.  Contrary to Plaintiff's argument, it was eminently reasonable for the Administrator to consider this factor particularly given that "coastal environment" under the DWPA encompasses "navigable waters (including the lands therein and thereunder) and "transitional and intertidal areas, bays, lagoons, salt marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and *the recreational and scenic values of such lands, waters and resources*."  33 U.S.C. § 1502(5)(emphasis added). The analysis and discussion of issues as these underscore why New Jersey in fact has adjacent coastal State concerns that should be addressed in the licensing proceeding.  The statute is intended to encourage that participation and not, as Plaintiff would have it, become a device to bar New Jersey from proceeding.

Second, Plaintiff disputes the Administrator's conclusion that the "construction and operation affect New York and New Jersey equally" stating that the "factor is neutral, at best." Plaintiff's Mem. P.&A. in Support of Pl.'s Mot. Prelim. Inj., at 39.  However, Plaintiff's characterization of this factor as "neutral" certainly does not undermine - and perhaps

underscores - the propriety of the Administrator's conclusion that the factor evidences that the

risk of the  proposed deepwater port would likely impact New Jersey and New York equally.[9]

Finally, Plaintiff's claim that the Administrator "shifted the burden of proof on the

comparative analysis from New Jersey to [Plaintiff]" is disingenuous and incorrect.  Plaintiff's

Mem. P.&.A. in Support of Pl.'s Mot. Prelim. Inj., at 35.  Indeed, Plaintiff sua sponte interjected

itself in the process although, as pointed out by the Administrator, the DWPA does not set forth a

formal appeals process.  Ex. 5, Connaughton Ltr. at 1.  Given the absence of an appeals process,

the Administrator was clearly not establishing any burden of proof.  Instead, as part of the

ongoing administrative process, the Administrator simply expressed a willingness to "review

[Plaintiff's] request" for reconsideration to which, clearly as a matter of courtesy, the

Administrator provided a written response.  Id.

In reviewing an agency's explanation under the APA, a court "consider[s] whether the

decision was based on a consideration of the relevant factors and *whether there has been a clear

error of judgment*."  Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285

(1974)(emphasis added). As long as the agency's decision was based on a consideration of

relevant factors, the reviewing court will likely "uphold a decision of less than ideal clarity if the

agency's path may reasonably be discerned," id. at 286, even though the court might otherwise

disagree, United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749 (1972).  Here, the

record demonstrates that the Maritime Administrator applied the pertinent standard under

33 U.S.C. § 1508(a)(2), considered the evidence presented to him, and based on these

---

[9]Besides, Plaintiff's application includes a 40 mile radius encompassing New Jersey in which to base staging for construction and operations in general.  Further, the application does not limit consideration to one town in New Jersey.

considerations, approved New Jersey's request for designation as an adjacent coastal State. Plaintiff has not demonstrated that the Administrator's determination was arbitrary, capricious or contrary to law, and thus, for purposes here, that it has a substantial likelihood on the merits on its claim. Accordingly, on this basis, Plaintiff's Motion for a Preliminary Injunction should be denied.

**2.    Plaintiff Has Made No Showing of Irreparable Harm.**

The crux of injunctive relief in the federal courts has always been a showing of irreparable harm. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959); Sampson v. Murray, 415 U.S. 61, 88 (1974); CityFed Financial Corp. v. Office of Thrift Supervision, 58 F. 3d 738, 747-48 (D.C. Cir. 1995). Further, it is uncontested that evidence of irreparable harm must be "certain and great." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674-675 (D.C. Cir. 1985). It must be "actual" harm, not merely speculative or theoretical. Id. Implicit in each of these descriptions is the requirement that the movant substantiate that the irreparable injury is "likely" to occur. Wisconsin Gas Co., 758 F.2d at 674-75. Bare allegations of what is likely to occur is not enough: the plaintiff must "provide proof that the harm has occurred in the past, and is likely to occur again," or must introduce "proof indicating that the harm is certain to occur in the near future " and that the harm will directly result from the action sought to be enjoined. Id.

Here, Plaintiff has not demonstrated irreparable harm. Plaintiff's ultimate concern is based on the possibility of New Jersey using its status as an adjacent coastal State to disapprove or place conditions on its project, but, as indicated above, the mere possibility of an action occurring is insufficient for purposes of meeting the standard for the grant of a preliminary

34

injunction.  Besides, to the extent that Plaintiff might be aggrieved at some point in the future[10]

by a decision of New Jersey with regard to Plaintiff's deepwater port application, Plaintiff could

seek judicial review of that decision at that time.  See, e.g. Worthington v. Fauver, 440 A.2d

1128 (N.J. 1982)("It is firmly settled that arbitrary and capricious action by an administrative or

executive agency should be overturned.").  And finally, the involvement of New Jersey that

Plaintiff seeks to preclude is precisely the State involvement that the statute provides for.

Application of the statute's terms is no basis for arguing irreparable harm.

      Plaintiff also incorrectly states that the Maritime Administration has "stopped the clock,"

i.e., suspended the running of the statutory timetable for consideration of Plaintiff's application,

pending resolution of this suit. Plaintiff's Mem. P.&.A. in Support of Pl.'s Mot. Prelim. Inj., at

42.  Plaintiff then avers that "[t]his regulatory delay has caused and will continue to inflict

substantial injuries" on Plaintiff.  Id.

      As an initial matter, and as indicated above, Plaintiff's suspended status is not pending

resolution of this suit. Ex. 10, Prescott Suspension Decl.. ¶ 7; Ex. 11, Lesnick Suspension Decl.

¶ 6.  Instead, the suspension was entirely due to the failure of Plaintiff to supply information

needed to continue the processing of Plaintiff's application. Ex. 10, Prescott Suspension Decl. ¶

9; Ex. 11, Lesnick Suspension Decl. ¶ 3.  Further, and contrary to Plaintiff's argument, the

suspension has in fact been beneficial to Plaintiff by supplying Plaintiff more time to address its

deficiencies.  Ex. 10, Prescott Suspension Decl. ¶ 9; Ex. 11, Lesnick Suspension Decl. ¶ 9. It is

---

[10]Of a similar nature is Plaintiff's statement that it is injured because costs are increasing
with time.  Plaintiff's Mem. P.&.A. in Support of Pl.'s Mot. Prelim. Inj., at 43. This allegation
does not establish sufficient injury because the delays here are not caused by the "adjacent
coastal State" determination issue.

anticipated that once Plaintiff provides the requested information and enters into a contract with an approved third party contractor for purposes of environmental review that at least 30 days of familiarization will be required before application processing and environmental review can be resumed.  Ex. 10, Prescott Suspension Decl. ¶ 10; Ex. 11, Lesnick Suspension Decl. ¶ 10. Notably, the average time from the date an application is deemed completed to publication in the Federal Register of the Notice of Availability ("NOA") of a Draft Environmental Impact Statement is 276 days, and the average time from the date an application is deemed completed to publication of a Final Environmental Impact Statement is 547 days.  Ex. 14, Processing Timeline Declaration of Mark A. Prescott, ¶¶ 4-5, March 7, 2008.  Given the considerable time period required for the environmental review process, the necessity of a preliminary injunction even under Plaintiff's view of the case is wanting.  Notwithstanding this point, Plaintiff's argument with regard to the clock being stopped pending resolution of this suit is incorrect, and therefore, an inadequate basis upon which to evidence harm for purposes of a preliminary injunction.

Further, Plaintiff's arguments regarding "irreparable harm" are essentially financial in nature.  In this regard, Plaintiff stresses investments made in the project and the effort expended in advancing the project.   Plaintiff's Mem. P.&A. in Support of Pl.'s Mot. Prelim. Inj., at 43. However, Plaintiff's arguments in this regard lack merit because time, money, and energy expended generally do not suffice for purposes of evidencing "irreparable harm," particularly where adequate compensatory or corrective relief will be available at a later date in the course of litigation.  Wisconsin Gas Co., 758 F.2d at 674-675; see also Taylor v. Resolution TrustCorporation, 56 F.3d 1497, 1508 (D.C. Cir. 1995).  Plaintiff will be able to obtain judicial relief in the event that the Court finds that Plaintiff is entitled to such.  See, e.g. 33 U.S.C. § 1515.

Indeed, this case is readily distinguishable from Population Institute v. McPherson, 797F.2d 1062, 1081 (D.C. Cir. 1986), in which the plaintiff sought to have the Court enjoin disbursement of appropriated funds. In that case, the Court recognized that, if the funds at issue were disbursed in the absence of a preliminary injunction, no funds would be available to the plaintiff if it ultimately prevailed in the suit. This case is also distinguishable from Brendsel v. OFHEO, 339 F.Supp.2d 52, 66 (D.D.C. 2004) also cited by Plaintiff. In Brendsel, the plaintiff would have lost portions of his compensation represented by stock options which would have been unrecoverable absent a preliminary injunction. In Population Institute and Brensdel, the basis for the plaintiff's irreparable harm argument was the certainty of otherwise unrecoverable compensation in the absence of a preliminary injunction. In this case, Plaintiff seeks relief from the Administrator's designation of New Jersey as an adjacent coastal state – relief that can be otherwise provided by this Court after disposition on the merits. Unlike Population Institute and Brensdel, the relief requested here will not be irrevocably lost if a preliminary injunction is not granted. Thus, Plaintiff's argument for a preliminary injunction based essentially on resource and money expended is wholly unpersuasive, and inconsistent with law. See, e.g. Sociedad Anonima Vina Santa Rita v. U.S. Dept. of Treasury, 193 F.Supp.2d 6, 14 (D.D.C. 2001)("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.") On this basis as well, Plaintiff's motion should be denied.

### 3.    Others Will Be Harmed by Granting the Relief Requested by Plaintiffs.

As noted above, the DWPA includes the objectives of "protecting (1) the marine and coastal environment to prevent or minimize any adverse impact resulting from the development of deepwater ports, (2) the interests of the United States and adjacent coastal States in the

location, construction, and operation of deepwater ports, and (3) the rights and responsibilities of States and communities to regulate growth, determine land use, and otherwise protect the environment in accordance with law." H.R. Conf. Rpt. 93-1605 (Dec. 16, 1974)(reprinted in 1974 U.S.C.C.A.N. 7622, 7624); see also 33 U.S.C. § 1501(a).  The Secretary of Transportation is responsible for ensuring that these objectives are met by enforcing the provisions of the DWPA, including the provision related to adjacent coastal State designations under 33 U.S.C. § 1508.  Plaintiff essentially seeks to impede the Secretary's efforts in this regard.  However, courts, including this one, recognize "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce." National Propane Gas Ass'n v. U.S. Dept. of Homeland Security, - - - F.Supp.2d -- --,  2008 WL 274890, *2 (D.D.C. Jan. 20, 2008); accord Cornish v. Dudas, - - - F.Supp.2d ----, 2008 WL 577068, *2 (D.D.C. Feb. 28, 2008).  Thus, because of the harm that will inure to the U.S. Department of Transportation and the Maritime Administration by a preliminary injunction, Plaintiff's request for relief of this nature should be denied.

Additionally, New Jersey made the case that it should be designated as an adjacent coastal State consistent with the core objectives of the DWPA, 33 U.S.C. § 1501, and the standard for such designation, see 33 U.S.C. § 1508(a)(1) and (a)(2).  In this regard, the State will be denied the full force of the protection afforded by this designation in protecting its coastal environment if Plaintiff is granted the relief requested. Clearly, the citizens of the State will be harmed by such a result and on this basis as well, Plaintiff's request for a preliminary injunction should be denied.

4.    **The Public Interest Will Not Be Advanced by the Injunction.**

When injunctive relief would harm the public interest, the Court may withhold the relief, even if doing so would burden or cause irreparable injury to the movant. <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312-13 (1982); <u>Endangered Species Comm. v. Babbitt</u>, 852 F. Supp. 32, 42 (D.D.C. 1994). Plaintiff's true interest here is financial, not conservation. However, the pertinent statutory provision at issue, 33 U.S.C. § 1508, is an inherently public interest provision. There can be no dispute that the Administrator's designation decision which fully comports with the DWPA is grounded in the public interest protections - environmental, safety, land use - afforded by the statute. Indeed, the public interest is particularly heightened in this instance given the scope of the proposed project and its potential impacts. The Governor of New Jersey made a persuasive case that the citizens of the state, through his office, should have a role in the approval process as related to Plaintiff's application consistent with the interest of its citizens. That public interest will be undermined if Plaintiff has its way. For this reason, its request for a preliminary injunction should be denied.

IV.    <u>**CONCLUSION**</u>

For reasons stated herein, Defendants respectfully request the Court dismiss this suit and deny Plaintiff's Motion for a Preliminary Injunction.

Respectfully Submitted,


/s/ Jeffrey A. Taylor /mj
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


/s/ Beverly M. Russell
_____
Of Counsel:                                BEVERLY M. RUSSELL, D.C. Bar #454257
PAUL M. GEIER.                             Assistant United States Attorney
Assistant General Counsel for              U.S. Attorney's Office for the District of Columbia
  Litigation                               555 4th Street, N.W., Rm. E-4915
DALE C. ANDREWS                            Washington, D.C. 20530
Deputy Assistant General Counsel           Ph:  (202) 307-0492
  for Litigation                           Fax: (202) 514-8780
PETER J. PLOCKI                            E-mail: beverly.russell@usdoj.gov
Senior Trial Attorney
Department of Transportation

LANE H. NEMIROW
Trial Attorney
T.MITCHELL HUDSON
Attorney Advisor
Maritime Administration
Department of Transportation
Washington, D.C.  20590

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of *Defendants' Motion to Dismiss and Opposition to*

*Plaintiff's Motion for a Preliminary Injunction* was made by the Court's Electronic Case Filing

System, this <u>17th</u> day of March, 2008 to:

John F. Cooney
Venable, LLP
575 Seventh Street, N.W.
Washington, D.C.  20004
jfcooney@venable.com


/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL
Assistant United States Attorney

Defs.' Ex. 1



**State of New Jersey**
OFFICE OF THE GOVERNOR
PO Box 001
TRENTON NJ 08625-0001

JON S. CORZINE
*Governor*

2007 NOV 14  A II: 17

September 6, 2007

*USCG - 2007 - 28535*

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

Atlantic Sea Island Group LLC has applied to the Coast Guard and the Maritime Administration for a license to own, construct and operate a deepwater LNG port in the Atlantic Ocean off New Jersey and New York. Notice of the application, known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535), was published in the Federal Register on August 27, 2007. The notice indicates that because of the proposed island's proximity to New York, New York has been designated an adjacent coastal state under the Deepwater Port Act. The proposed island would be within 15 miles of New York and is approximately 19 miles from New Jersey. However, the proposed alternative pipeline alignment that is part of the deepwater port application would be well within the 15 mile standard to designate New Jersey an adjacent coastal state. As defined in the Deepwater Port Act, the deepwater port subject to this licensing includes all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys mooring lines, and similar facilities that are approved or proposed for construction and operation as part of the deepwater port. By this definition alone New Jersey should be considered an adjacent coastal state due to the proximity of the alternative alignment.

The Deepwater Port Act also provides for a state to be designated an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the deepwater port. The proposed port will connect to the existing Transco pipeline running from

Morgan, New Jersey to Long Beach, New York. Thus, New Jersey considers that it is directly connected to the deepwater port. Moreover, the alternative pipeline alignment would be less than 9 miles from New Jersey, well within the 15 mile criterion.

Regardless of whether the connection to the Transco pipeline emanating from the New Jersey shore constitutes a direct connection to either state, New Jersey's coastal environment is equally impacted by the proposed facilities as New York's coastal environment. New Jersey has robust commercial and recreational fisheries that are vital to the State's economy, as well as to the history and character of New Jersey's coastal environment. The proposed facility will destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally approved coastal management program. Not only will the creation of an island over this prime fishing area be detrimental to this unique environment but the proposed facility's exclusion zone will prohibit vessels in a 633 acre area, further diminishing this important resource.

The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high... The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Accordingly, any impediments to navigation would adversely affect New Jersey in a manner equal to or greater than its effects on New York.

The predominant current direction in the area of the proposed deepwater port is toward New Jersey. Accordingly, turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as to the important commercial and recreational fishing grounds surrounding the proposed port, as would any spills at the island during construction and operation of the facility.

The application does not specify the exact location of shore based facilities that would service the deepwater port, or from which construction would be staged. However, it does indicate that the facilities would be located within a 40 mile radius of the proposed island. This radius includes shore facilities in New Jersey. Accordingly, the effects on the coastal environment of New Jersey for construction staging and long-term service of the deepwater port would be felt in New Jersey in equal or greater amount than in New York.

New Jersey should be designated an adjacent coastal state under the Deepwater Port Act because the alternative pipeline alignment will be well within 15 miles of New Jersey's Coast, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the

coastal environment of New York. It is imperative that New Jersey be an integral part of the review of this proposal due to the inherent risks associated with a deepwater port within as busy of a port region as the New Jersey/New York Port complex.

Sincerely,

Jon S. Corzine
Governor

c:     Mr. H. Keith Lesnick, MARAD
       Mr. Mark A. Prescott, USCG

Defs.' Ex. 2

# VENABLE LLP

*575 7th Street, NW*

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James R. Burnley IV                    (202) 344-4054                    jhburnley a venable.com

September 24, 2007

**VIA HAND DELIVERY**
Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second Street SW
Washington, D.C. 20593

**VIA HAND DELIVERY**
Sean T. Connaughton
Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

RE:  Safe Harbor Energy Deepwater Port Application

Dear Admiral Allen and Administrator Connaughton:

On September 6, 2007, the Honorable Jon S. Corzine, Governor of the State of New Jersey, requested that State be designated as an "adjacent coastal state" for purposes of consideration by your agencies of the Deepwater Port License application submitted by the Atlantic Sea Island Group for the project known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535). Pursuant to the Notice of Application published by the Maritime Administration ("MarAd") in the Federal Register on August 27, 2007, the State of New York was designated as the adjacent coastal state for purposes of the Safe Harbor Energy project.

On behalf of the Atlantic Sea Island Group, we are writing in opposition to the New Jersey request for designation as an adjacent coastal state because New Jersey does not meet the requirements under the Deepwater Port Act ("DWPA") for such designation. The DWPA defines an "adjacent coastal state" as "any coastal state which (A) would be directly connected by pipeline to a deepwater port, as proposed in an application; (B) would be located within 15 miles of any such proposed deepwater port; or (C) is designated by the Secretary in accordance with section 1508(a)(2) of this title." 33 U.S.C. § 1502(1). Pursuant to section 1508(a)(1) of the Act, the Secretary is required to, upon issuing notice of the application in the Federal Register, designate an adjacent coastal state if it meets the criteria in (A) or (B) of the definition.

Alternatively, under section 1508(a)(2), a state may request designation as an adjacent coastal state and the Secretary shall designate such a state as an adjacent coastal state if, after receiving the recommendations of the Administrator of National Oceanographic and Atmospheric Administration ("NOAA"), it is determined that there is a risk of damage to the

WASHINGTON, DC    MARYLAND    VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 2

coastal environment of the state equal to or greater than the risk posed to a state directly connected by pipeline to the proposed deepwater port. (Emphasis added).

In his letter, Governor Corzine lists several factors that he asserts establish why New Jersey should be designated an adjacent coastal state. However, the criteria for such designation is very explicit -- to be designated an adjacent coastal state, the risk of damage to the coastal environment of New Jersey must be equal to or greater than the risk posed to a state directly connected by pipeline to the Safe Harbor Energy Deepwater Port. The factors listed by Governor Corzine in his letter do not meet this legal standard.

Initially, New Jersey notes that alternative routes for the pipeline were considered, and that one of the alternative routes would have been within 15 miles of the coast of New Jersey. That New Jersey could have been impacted by a potential alternative to the actual pipeline route is not a valid consideration under the applicable legal standard; the only valid consideration is whether New Jersey is affected by the actual proposed pipeline route. It is not.

Next, New Jersey argues that the pipeline from the port will connect to the existing Transco pipeline that runs from Morgan, New Jersey to Long Beach, New York, and that this means that New Jersey is directly connected by pipeline to the deepwater port. However, the Notice of Application defines the project as consisting of three components, one of which is "a subsea pipeline that would transport the natural gas to an offshore connection with the Transcontinental Gas Pipeline Corporation ("Transco") pipeline system." The pipeline connection from the Safe Harbor Energy Deepwater Port terminal to the existing Transco pipeline system, part of the U.S. interstate natural gas transmission system, occurs in New York State navigable waters at a location that is greater than 15 miles from New Jersey. Thus, New York is appropriately designated an adjacent coastal state; no such nexus to the Safe Harbor Energy Deepwater Port terminal exists regarding New Jersey or its navigable waters. To adopt New Jersey's rationale means that any state connected to the existing Transco interstate distribution system would have to be designated an adjacent coastal state – clearly not a result intended by the statute or regulations.

New Jersey then asserts that even if there is no direct pipeline connection to the State, the risk posed by the project to New Jersey's coastal environment is equal to or greater than the risk posed to New York. The standard adopted for status as an adjacent coastal state in the DWPA is a totality standard, i.e., the total risk posed by the Safe Harbor Energy project to the coastal environment of New Jersey must be equal to or greater than the total risk posed to New York. The Safe Harbor Energy Deepwater Port Application identifies no risks to the coastal

WASHINGTON, DC   MARYLAND   VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8100

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 3

environment of the State of New Jersey. However, even if there were one or more risks posed, and even if those one or more risks could be shown to be equal to or greater than the same risk or risks to the State of New York, this in and of itself is not sufficient to meet the totality standard mandated by statute for designation of New Jersey as an adjacent coastal state. Moreover, there are certain potential risks to New York's coastal environment that are not shared by New Jersey, and these must be taken into consideration under the statutory standard when comparing the two states. For instance, actual construction activities, in the form of pipeline laying and connection to the Transco pipeline, will occur within New York State waters, with any attendant risks to New York's coastal environment these construction activities may present. No such risks are faced by New Jersey. New Jersey does not meet, on the face of its request, the totality of risk standard established by the DWPA for designation as an adjacent coastal state.

Further, objective examination of the individual risks identified in the New Jersey letter also militates against its designation as an adjacent coastal state. New Jersey first states that there is a potential risk to commercial and recreational fisheries, alleging that the Safe Harbor Energy facility will destroy a historic prime fishing area, Cholera Bank, that is protected under the State's federally approved coastal zone management plan.

Any impact on commercial and recreational fisheries is a matter that will be considered as part of the application process. The application notes that there would likely be minimal impact on recreational and commercial fishing due to the project. Further, techniques and materials will be used for construction of the Island that will create habitat for fish use and provide surface area for attachment by invertebrates. In addition, New Jersey's claim that the Island could impact recreational or commercial fishing is counter to its own activities creating artificial reefs. New Jersey has developed an artificial reef program that involves depositing large quantities of concrete (construction debris) and other materials (rail cars marine vessels) on the marine bottom that it poses as successful in the creation of habitat for marine organisms (as has New York).

Atlantic Sea Island Group also has committed to create/enhance additional hard bottom habitat on Cholera Bank outside the exclusion zone around the Island if this is determined through studies to be appropriate. Building and enhancing the hard-bottom habitat found on Cholera Bank could benefit the local benthic and pelagic fish communities by providing additional structure and habitat for benthic organisms that form the foundation of the food chain. In the end, it is believed that creation of the habitat on and around the Island structure will benefit recreational and commercial fishing interests. Safe Harbor Energy Deepwater Port ("DWP") Application, Volume 3, Part 1, pages 3-53, 3-54.

WASHINGTON, DC    MARYLAND    VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 10004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 4

But more specifically as to this issue, potential risk or impact to fisheries in the area of Cholera Bank is not a valid consideration regarding New Jersey's status as an adjacent coastal state because Cholera Bank is not within the coastal environment of New Jersey. Under the DWPA, "coastal environment" means "the navigable waters (including the lands therein and thereunder) and the adjacent shorelines (including waters therein and thereunder). The term includes transitional and intertidal areas, bays, lagoons, salt marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and the recreational and scenic values of such lands, waters and resources." 33 U.S.C. § 1502(5).

Section 1508(a)(2) of the DWPA requires an examination of risk to the coastal environment of the state to determine whether that state is an adjacent coastal state. (Emphasis added). Thus, it is the risk posed to the navigable waters and adjacent shoreline of the state of New Jersey that must be examined in considering New Jersey's request. The navigable waters of the State of New Jersey extend 3 nautical miles from its shore, the extent of the territorial sea of the State. Cholera Bank and the Safe Harbor Energy project are over 15 nautical miles from the New Jersey coast, and well outside New Jersey's coastal environment as that term is defined in the DWPA. Therefore, any impact that the Safe Harbor Energy Deepwater Port may have on commercial and recreational fishing in the Cholera Bank area is irrelevant and inapplicable to the considerations required to be taken into account in determining New Jersey's status as an adjacent coastal state under the DWPA. Further, for these same reasons, the fact that the Cholera Bank area may be protected under New Jersey's coastal management program is also irrelevant and inapplicable.

New Jersey also argues that the project is sited between the approach lanes to the Port of New York and New Jersey, and that any impediments to navigation resulting from the project would adversely affect the commercial interests of New Jersey in a manner equal to or greater than its effects on New York. Arguably, under the definition of coastal environment in the DWPA, commercial interests are not included. However, even if they are, the data provided by New Jersey in support of this contention is not sufficient to determine whether New Jersey should be designated as an adjacent coastal state. It is impossible to know whether the adverse commercial impact on New Jersey is equal to or greater than the impact on New York without an analysis of the specific commercial losses, if any, both would face under various possible scenarios that the project could impact navigation into the port. Merely stating that any adverse impact would impact New Jersey equally or more than New York, as New Jersey does in its letter, is not sufficient to make a reasonable, rational determination under the statutory standard.

WASHINGTON, DC    MARYLAND    VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004 1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 5

New Jersey next argues that the predominant current direction around the proposed facility is toward New Jersey, and thus turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as impact fishing grounds around the proposed site, as would any spills during constructions and operation of the facility. While we acknowledge that the prevailing ocean currents in the area of the proposed site are toward New Jersey, this does not mean that turbidity and other water quality impacts of the project necessarily present a risk to the New Jersey coastal environment. As noted above, the farthest extent of New Jersey's coastal environment for purposes of the DWPA is three nautical miles from its shore, which is approximately 12 nautical miles distant from any construction activities associated with the project. The discussion in the Safe Harbor Energy application regarding potential turbidity impacts during project construction indicates turbidity would be of short to moderate term and minor. Safe Harbor Energy DWP Application, Volume 3, Part 1, pages 2-18, 2-19. Thus, there is no evidence turbidity would affect the coastal environment of New Jersey. Further, the impact of any spills from construction or operation of the port is also unlikely to impact the coastal environment of New Jersey. Oil and/or natural gas spills, which would be on the ocean surface, are most affected by wind and wave action in terms of migration rather than ocean currents. The prevailing wind and wave directions are from the west and northwest, away from the New Jersey coastal environment. Safe Harbor Energy DWP Application, Volume 3, Part 1, pages 2-4, 2-5. Finally, any risks to water quality would necessarily be greater for the New York coastal environment because construction activities, in the form of trenching for laying of the pipeline, actually will occur in New York State waters, and under the totality of risk standard, this must be taken into account when comparing this risk to that of New Jersey.

Lastly, New Jersey argues that shore-based facilities to service the port, or from which construction would be staged, are not identified in the application, but that the application notes any such facilities would be within a 40-mile radius of the proposed site, and would thus include facilities in New Jersey. However, this statement is incorrect. The application states that for staging of equipment and supplies, and loading and unloading barges, during construction, five facilities in the metropolitan New York area have been identified. Safe Harbor Energy DWP Application, Volume 3, Part 1, page 1-7. But the location of the shore base to be used during operation of the port to move personnel, supplies, equipment and disposable materials between the shore and the deepwater port facility is identified as the town of Ocean Side, Long Island, New York. Safe Harbor DWP Application, Volume 3, Part 1, page 1-8. Thus, any risk to New Jersey's coastal environment arising from the location of shore facilities to service the project could not be equal to or greater than such risks to the State of New York, where the permanent shore base to service the project would be located.

WASHINGTON, DC    MARYLAND    VIRGINIA

 575 7th Street, NW
Washington, DC 20004-1601        Telephone 202-344-4000
Facsimile 202-344-8300        www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 6


      For all of these reasons, New Jersey should not be designated an adjacent coastal state under the DWPA for purposes of the Safe Harbor Energy Deepwater Port Application because it does not meet the statutory criteria for such designation. However, we also acknowledge and recognize that New Jersey has legitimate interests in the project. In recognition of these interests, Safe Harbor Energy project representatives have consulted with officials of the State of New Jersey during the development of the project and the application. Moreover, the denial of the request by the State of New Jersey to be designated as an adjacent coastal state does not mean that there are not avenues for New Jersey's legitimate interests to be considered during the application process. For instance, pursuant to section 1508(b)(2) of the DWPA, any interested State has the opportunity to make its views known to the Coast Guard regarding the location, construction and operation of the Safe Harbor Energy Deepwater Port, and those views are required to be given full consideration.

                           Sincerely,

                           James H. Burnley IV
                           David G. Dickman

cc:   Vice Admiral Conrad C. Lautenbacher (USN Ret.)
     Administrator
     National Oceanographic and Atmospheric Administration
     14th and Constitution Ave., N.W.
     Washington, D.C. 20230

DC2\894467.01

Defs.' Ex. 3



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S E
Washington, DC 20590

**NOV  2 2007**

The Honorable Jon S. Corzine
Governor of New Jersey
Trenton, New Jersey 08624-0001

Re: New Jersey Adjacent Coastal State Designation

Dear Governor Corzine:

This letter is in response to your request for the designation of New Jersey as an Adjacent
Coastal State for the proposed Safe Harbor Energy deepwater port project (Safe Harbor).
As indicated in my letter of September 28, 2007, the Maritime Administrator, by
delegated authority, and in accordance with Section 1508(a)(2) of the Deepwater Port Act
of 1974 (the Act), shall make such a designation only after receiving the recommendation
of the Administrator of the National Oceanic and Atmospheric Administration (NOAA).
On October 17, 2007, my office received the NOAA recommendation.

Accordingly, upon consideration of the NOAA recommendation, as well as the
magnitude and scope of the proposed project and its potential for significant
environmental impact to the State of New Jersey. I have determined that New Jersey is an
Adjacent Coastal State as defined under the Act and is so designated for the proposed
Safe Harbor deepwater port project. This determination has been made consistent with
the particular set of facts and circumstances underlying the request. Pursuant to the
requirements set forth at Section 1508(b) of the Act, the Administrator shall not issue a
license without the approval of the Governor of an Adjacent Coastal State. Therefore, we
look forward to forging a strong working relationship with your office to successfully
address your concerns and requirements of Safe Harbor in securing a safe and effective
means of importing natural gas into the United States.

As the Governor of an Adjacent Coastal State, you are afforded the authority in
accordance with the requirements of the Act to approve, disapprove, or approve with
conditions the deepwater port license application for the Safe Harbor project. Such
license conditions may include, but are not limited to: 1) requiring environmental
monitoring and mitigation measures; 2) the collection of fees to offset any economic,
environmental, and administrative costs that may be incurred by your state associated
with the construction and operation of the proposed deepwater port; and 3) other
conditions to ensure that the proposed port will conform with New Jersey's
environmental programs.

To this end, we would like to arrange a meeting in the near future with you and your immediate staff to further discuss your concerns regarding the proposed Safe Harbor project. Please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov to arrange the most convenient meeting time.

We look forward to working with you and your staff, and I appreciate the time and attention you have given to this important matter.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:     The Honorable Eliot Spitzer
        The Honorable Frank R. Lautenberg
        Vice Admiral Conrad C. Lautenbacher, Jr., NOAA
        Admiral Thad W. Allen, USCG

Defs.' Ex. 4

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James H. Burnley IV

202-344-4054

JHBurnley@Venable.com

November 13, 2007

<u>VIA ELECTRONIC DELIVERY & HAND DELIVERY</u>

The Honorable Sean T. Connaughton
Administrator
U.S. Maritime Administration . (MAR-530)
Second Floor, West Wing
1200 New Jersey Avenue, S.E
Washington, D.C. 20590

Re: Safe Harbor Energy LNG Deepwater Port – New Jersey Adjacent Coastal State
Designation

Dear Administrator Connaughton:

I am writing on behalf of my client, Atlantic Sea Island Group, the applicant for a license under the Deepwater Port Act for the construction and operation of the Safe Harbor Energy LNG Deepwater Port. On November 2, 2007, in response to a request from the Governor of the State of New Jersey, you designated that State as an adjacent coastal state for purposes of the Safe Harbor Energy project pursuant to the requirements of section 1508(a)(2) of the Deepwater Port Act. 33 U.S.C. § 1508(a)(2).

We are anticipating filing a petition for reconsideration of that designation pursuant to regulations of the Maritime Administration, specifically 46 C.F.R. § 201.174. However, we are unable to do so at this time because critical information that would allow us to analyze the validity of the designation has not yet been made available in the rulemaking docket. We therefore request an extension of the 20 day period for filing a petition for reconsideration based on good cause, as is provided for in 46 C.F.R. § 201.172.

As you are aware, section 1508 (a)(2) of the Deepwater Port Act requires that a recommendation be received from the Administrator of the National Oceanic and Atmospheric Administration (NOAA) before a requesting state can be designated an adjacent coastal state. In your letter to Governor Corzine dated November 2, 2007, you state that you received the NOAA recommendation on October 17, 2007, and that you considered that recommendation in making your decision regarding New Jersey's designation. You further refer to your letter of September 28, 2007, to Governor Corzine concerning his request for adjacent coastal state designation. As

WASHINGTON, DC    MARYLAND    VIRGINIA

# VENABLE LLP

The Honorable Sean T. Connaughton
November 13, 2007
Page 2

of the date of this letter, neither of these documents, or any other information considered in making your determination, has been posted to the electronic docket.

It is our belief that both of these documents, at a minimum, are required to be posted to the docket. To the best of our knowledge and belief, all official correspondence with other federal agencies and state officials have customarily been posted on the docket. Further, as the recommendation by NOAA is statutorily required to be obtained before the designation can be made under section 1508 (a)(2), this document in particular should be posted to the electronic docket as soon as possible.

Until such information and documentation can be reviewed and analyzed, it is not possible to fully state any errors that would serve as the basis for reconsideration, as is required by 46 C.F.R. § 201.174. For this reason, we assert that good cause exists to extend the deadline for filing of a petition for reconsideration, and request that the deadline be extended to allow for 20 days for filing after the documents are posted on the electronic docket or otherwise made available to the applicant.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

James H. Burnley IV

Cc:  K. Lesnick, MARAD
     M. Prescott, USCG
     H. Bovers, ASIG
     D. Dickman, Venable LLP
     E. Megginson, MARAD

Defs.' Ex. 5



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E
Washington DC 20590

November 19, 2007

James H. Burnley IV
Venable LLP
575 7th Street, NW
Washington, D.C. 20004-1601

> Re: Safe Harbor Energy LNG Deepwater Port and the New Jersey Adjacent Coastal
> State Designation

Dear Mr. Burnley:

This is in response to your letter of November 13, 2007, requesting that the Maritime
Administration extend the time for filing a petition to appeal the designation of New
Jersey as an Adjacent Coastal State (ACS), in the matter of the Atlantic Sea Island Group
LLC Deepwater Port license application for the Safe Harbor project. You further
requested a formal appeals process under 46 C.F.R Part 201 and that we delay this
process until certain documents, you deem relevant to this request, are posted to the
Federal docket.

It should be noted that Part 201 does not provide a right to a formal appeals process
unless provided for by statute. The relevant statute in this matter, the Deepwater Port Act
of 1974, as amended, (DWPA) does not set forth a formal appeals process to a 33 U.S.C.
§ 1508(a)(2) determination. As such, Part 201 is not applicable to the appeal of an ACS
determination, made pursuant to the discretionary authority of the Secretary of
Transportation, as delegated to the Maritime Administrator, and thus no formal 20 day
period for filing an appeal petition exists.

However, I would be more than willing to review your request to reconsider the Safe
Harbor ACS determination. Please submit any written documentation supporting your
position to me by close of business on December 17, 2007, and I assure you that I will
give this matter my full consideration.

Additionally, you requested that the Maritime Administration post on the Federal docket
the recommendation made pursuant to § 1508(a)(2) by the Administrator of the National
Oceanic and Atmospheric Administration (NOAA), as well as correspondence between
the Maritime Administration and New Jersey Governor Corzine. With regard to the
NOAA recommendation, you may submit a Freedom of Information Act (FOIA) request
to Ms. Christine Gurland, FOIA Officer, Office of the Chief Counsel, for review and
consideration under the FOIA process.

Finally, I have been informed by my staff that Governor Corzine's formal request for ACS status, my interim reply of September 28, 2007, and the Maritime Administration's final determination letter of November 2, 2007, have been directed to the Federal Docket Management System at www.regulations.gov, project docket number USCG-2007-28535.

If you have any further questions or concerns please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:    The Honorable Frank R. Lautenberg
       The Honorable Jon S. Corzine
       The Honorable Frank Pallone

Defs.' Ex. 6

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James H. Burnley IV

202-344-4054

JHBurnley@Venable.com

December 3, 2007

The Honorable Mary E. Peters
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

The Honorable Sean T. Connaughton
Administrator
Maritime Administration
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

Re:  Safe Harbor Energy LNG Deepwater Port – Request for
Reconsideration of Designation of New Jersey as an "Adjacent Coastal State"

Dear Secretary Peters and Administrator Connaughton:

I am writing on behalf of our client, Atlantic Sea Island Group, the applicant for a license under the Deepwater Port Act, 33 U.S.C. §1501 et seq. ("DWPA"), for the construction and operation of the Safe Harbor Energy Liquefied Natural Gas Deepwater Port. I hereby request that you reconsider the decision by the Administrator of the Maritime Administration, set forth in a letter of November 2, 2007 to the Governor of New Jersey, designating New Jersey as an additional "adjacent coastal State" for this project under 33 U.S.C. § 1508(2). (Attachment 1)

ASIG has applied for a federal license under the DWPA to construct and operate the Safe Harbor Energy LNG Deepwater Port, to be located 13.5 miles south of Long Beach, New York and 23 miles southeast of the entrance to New York Harbor. The port is designed to receive liquefied natural gas ("LNG"), regasify it, and transmit through the existing distribution infrastructure up to two billion standard cubic feet per day of natural gas, thereby providing a strategic and critically-needed energy supply to help satisfy the significantly increased energy demands to be presented in the near future by the New York metropolitan area. Natural gas is a clean burning fuel that is environmentally superior to other fossil fuel energy sources, such as coal or fuel oil, in several respects including lesser greenhouse gas emissions. The offshore location of the proposed port will minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, and minimize visual impacts.

The Administrator designated New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy project, which has the effect of giving New Jersey a veto power over the licensing of this port. The Administrator's decision was erroneous as a matter of law in several respects:

# VENABLE LLP

December 3, 2007
Page 2

(1) The Administrator did not have legal authority to make this designation. Pursuant to the existing delegations of authority under the DWPA, as codified by the Homeland Security Act of 2002 and set forth in the implementing regulations, an additional State can be designated as an "adjacent coastal State" only by decision of the Commandant of the U.S. Coast Guard, with the concurrence of the Administrator. 33 C.F.R. § 148.217(d). The Administrator does not have legal authority to designate a State as an "adjacent coastal State" by his own, unilateral action. Further, the Commandant has not made such a designation. Moreover, the 45-day period provided by the DWPA within which such a designation may lawfully be made had expired before the Administrator purported to make this decision.

(2) Even assuming that he had legal authority to make a unilateral designation, the Administrator failed to apply the legal standard required by Section 1508(a)(2) of the DWPA, which specifies that an additional State may be designated as an "adjacent coastal State" only if the risk of damage from the port to the coastal environment of the petitioning State is "equal to or greater than" the risk of damage to the coastal environment of the State connected to the port by a pipeline. The Administrator did not apply the statutory standard, but instead applied a test that is not authorized by the statute. Indeed, in enacting the DWPA, Congress considered and expressly rejected the test that the Administrator applied.

(3) In any event, the record does not contain any evidence that would support a factual finding as required by Section 1508(a)(2), that the risk of damage to the coastal environment of New Jersey from the proposed liquefied natural gas ("LNG") port is "equal to or greater than" the risk of damage to the coastal environment of New York.

Accordingly, I request reconsideration of the Administrator's decision. Upon reconsideration, you should conclude that his action was contrary to law and vacate that decision.

If the Department, despite the plain language of the Homeland Security Act (and applicable delegations and regulations), somehow interprets its retained authority to give it the power to designate an "adjacent coastal state," the Secretary should deny New Jersey's request. I note, for example, that in 49 C.F.R. § 1.44(n), the Secretary retained the authority "to issue, transfer, or amend a license for the construction and operation of a deepwater port (33 U.S.C. § 1503(d))." If the Department interprets the reserved authority as not limited to the ultimate decision "to issue, transfer or amend a license" but as extending as well to the designation of an "adjacent coastal State," the Secretary should deny New Jersey's request on the ground that there is no factual evidence in the record on which a rational decision maker could conclude that the risk presented to

Defs.' Ex. 6

# VENABLE᛫LLP

December 3, 2007
Page 3

the coastal environment of New Jersey would be "equal to or greater than" the risk presented to the coastal environment of New York.

After withdrawal of the Administrator's decision, New Jersey will still be able to obtain full review of all concerns it may have with the potential environmental, safety, or other possible effects of the proposed deepwater port. Those issues will be thoroughly considered in the multiple reviews that will be conducted by several federal agencies. Under the DWPA, any State that is not designated as an adjacent coastal State "shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added). The mandatory nature of the "full consideration" requirement assures that New Jersey's views will be reviewed carefully during the review process.

In light of Section 1508(b)(2), the only effect of the invalidation of the Administrator's prior action would be that New Jersey would not be able to impose an absolute veto on the licensing of this urgently needed LNG project, which will be constructed off the coast of the State of New York. Rather, New Jersey would be able to work with the federal agencies that will review the application to develop reasonable license and permit conditions that will protect its coastal environment.

Under the plain language of the DWPA, this outcome is what Congress explicitly intended to occur. The DWPA is structured in this way from concern that giving an absolute veto power to an additional State other than the jurisdiction that will bear the greatest risk of damage to its coastal environment would result in a situation in which badly needed deepwater ports could never be constructed.

## Background

The Deepwater Port Act establishes the procedures and substantive criteria by which the federal government may license deepwater LNG ports. As part of the licensing process, the DWPA provides for comprehensive inter-agency review of the environmental, safety, and national security aspects of the proposed deepwater port. Congress vested licensing authority in the Secretary of Transportation. The Secretary in turn has delegated implementing authority to the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration.

The DWPA provides that the final approval or denial of the license must occur within 330 days of publication of a Federal Register notice that the application is complete. The Maritime

Defs.' Ex. 6

# VENABLE<sup>®</sup>LLP

December 3, 2007
Page 4

Administrator published such a notice for the Safe Harbor Energy project on August 27, 2007. 72 Fed. Reg. 49041 (Aug. 27, 2007).

Under the DWPA, the State to which the proposed LNG port will be connected by pipeline is designated as an "adjacent coastal State." In this capacity, the State has authority to veto the licensing of the proposed port or to impose mandatory conditions that must be included in the federal license. New York was designated as an "adjacent coastal State in the Federal Register notice for this project. Id.

The statute also provides that within 14 days after the publication of the Federal Register notice, another State may request designation as an additional "adjacent coastal State." If its application is granted, the second State also obtains authority to veto the licensing of the proposed port or to impose mandatory license conditions.

By a letter dated September 6, 2007 and docketed on September 10, 2007, New Jersey applied for designation as an additional "adjacent coastal State" for the Safe Harbor Energy project. (Attachment 2) Section 1508(a)(2) establishes a 45-day deadline for resolution of such a request. On September 24, 2007, ASIG submitted a letter to the Coast Guard and the Maritime Administration which demonstrated that New Jersey had not satisfied the statutory standard for designation as an "adjacent coastal State." (Attachment 3). The statutory deadline for designation of New Jersey as an "adjacent coastal State" expired no later than October 25, 2007. No decision was made prior to the expiration of the deadline.

On November 2, 2007, the Administrator purported to designate New Jersey as an additional "adjacent coastal State." If valid, his action would give New Jersey, as well as New York, a veto power over federal approval of the project. That decision is inconsistent with the terms of the DWPA and its implementing regulations in several respects. That decision should be reconsidered and overturned.

## 1. The Administrator Lacked Legal Authority To Designate New Jersey as an "Adjacent Coastal State."

The Secretary originally delegated different aspects of the Department's implementation authority to the U.S. Coast Guard and the Maritime Administration, at a time when both agencies were within the Department. Some authorities were vested in the Maritime Administration, subject to an obligation to consult the Coast Guard; other authorities were given to the Coast Guard, with an obligation to consult the Maritime Administration. The remaining authorities were delegated jointly to both agencies, to be exercised concurrently. From the outset, the Coast Guard has

Defs.' Ex. 6

# VENABLE LLP

December 3, 2007
Page 5

exercised the authority to receive the applications and supporting papers for a proposed deepwater port and to conduct the process by which the necessary studies are conducted. The Coast Guard also has issued the principal implementing rules under which the statute is administered. See 33 C.F.R. parts 148-150.

In 2002, the Coast Guard was transferred to the newly created Department of Homeland Security. Section 888(b) of Public Law No. 107-296, the Homeland Security Act of 2002, 6 U.S.C. § 468(b), provides:

> There are transferred to the Department [of Homeland Security] the authorities, functions, personnel, and assets of the Coast Guard . . . including the authorities and functions of the Secretary of Transportation relating thereto.

Section 888(b) codified the prior delegations of authority made by the Secretary of Transportation to the Coast Guard and transferred these authorities to the Secretary of Homeland Security. Further, these authorities cannot be redelegated or removed. Section 888(c) of that Act, 6 U.S.C. § 468(c), provides:

> Notwithstanding any other provision of this Act, the authorities, functions, and capabilities of the Coast Guard to permit its missions shall be maintained intact and without significant reduction after the transfer of the Coast Guard to the Department [of Homeland Security], except as specified in subsequent Acts.

The Department of Transportation has publicly taken the position that the Commandant of the Coast Guard continues to possess all the implementing authority under the DWPA that he previously enjoyed while the Coast Guard was part of the Department. In 2003, in revising the delegations of authority to the Maritime Administration under the DWPA, the Secretary noted that "[t]he USCG retained the statutory and delegated authorities upon its transfer to the Department of Homeland Security . . . ." Final Rule, Organization and Delegations of Powers and Duties, Update of Secretarial Delegations, 68 Fed. Reg. 36496 (June 18, 2003).

The governing Coast Guard rule, 33 C.F.R. § 148.217, establishes the process for consideration of requests by a State to be designated as an additional "adjacent coastal State." The request must be submitted to the Commandant. Id., § 148.217(b). Upon receipt of the request, the Commandant must send a copy of the request to the Administrator of the National Oceanic and Atmospheric Administration and ask for his recommendations within an amount of time that will permit the decision on the request to be made within the 45 day period established by the DWPA. Id., § 148.217(c). Section 148.217(d) further provides:

Defs.' Ex. 6

# VENABLE LLP

December 3, 2007
Page 6

If after receiving NOAA's recommendations the Commandant . . . , in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant . . . in concurrence with the MARAD Administrator, designate it. If the Commandant . . ., in concurrence with the MARAD Administrator, will so denies the request, he or she will notify the   requesting State's Governor of the denial.

(Emphasis added). The governing regulation thus explicitly provides that the decision whether to grant "adjacent coastal State" status is to be made by the Commandant of the Coast Guard, not by the Administrator of the Maritime Administration.

Under the DWPA implementing rules, the Commandant is required to obtain the Administrator's concurrence in his determination on "adjacent coastal State" status.  But the regulation provides explicitly, in three places, that the decision is to be made by the Commandant. Accordingly, the decision of the Administrator purporting to grant "adjacent coastal State" status to New Jersey usurped powers that belong to the Commandant under existing delegations of authority, as provided by the Homeland Security Act and relevant regulations implementing the statute.

Further, the Administrator acted after the 45-day statutory deadline for making such a designation had already expired.

For these reasons, the Administrator acted without legal authority in purporting to grant "adjacent coastal State" status to New Jersey.   "Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner inconsistent with the administrative structure that Congress enacted into law.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 129 (2000) (internal citation omitted). The November 2 designation therefore should be reconsidered and invalidated.

If the Department, despite the plain language of the Homeland Security Act (and applicable delegations and regulations), somehow interprets its retained authority, set forth in 49 C.F.R. § 1.44(n), as not limited to the ultimate decision "to issue, transfer or amend a license" but as extending as well to the designation of an "adjacent coastal State," the Secretary should deny New Jersey's request on the ground that, as set forth in the next two sections, there has been no showing that the risk presented to the coastal environment of New Jersey is "equal to or greater than" the risk to the coastal environment of New York.

2.  The Administrator Erred, as a Matter of Law, by Failing to Apply the

VENABLE<sup>®</sup>LLP

December 3, 2007
Page 7

Standard of Review Set Forth in the DWPA and Purporting to Apply
Instead a Test that Congress Had Not Authorized but Had Explicitly Rejected.

Section 1508(a) establishes three pathways by which a State may be designated an "adjacent coastal State." Section 1508(a)(1) provides that a State may be designated as an "adjacent coastal State" if it is directly connected by pipeline to the proposed deepwater port or is located within 15 miles of the proposed port. Under these two pathways, New York was designated as an "adjacent coastal State" in the Federal Register notice that initiated the review process. 72 Fed. Reg. 49041 (Aug. 27, 2007).

Section 1508(2) provides a third pathway by which a State not named in the Federal Register notice may request designation as an additional "adjacent coastal State":

The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port . . . .

(Emphasis added).

Under the governing Coast Guard regulation, to permit conduct of the required comparative evaluation whether the risk of damage to the coastal environment of the requesting State is "equal to or greater than" the risk to the coastal environment of the State named in the Federal Register notice, the Governor of that State requesting such designation must submit to the Coast Guard "the facts and available documentation or analyses concerning the risk of damage to the coastal environment of the State" and must explain why he believes "the risk of damage to its coastal environment is equal to or greater than the risk" to the State originally designated in the Notice. 33 C.F.R. § 148.217(b)(3)-(4).

On September 6, 2007, the Governor of New Jersey submitted a two and one-quarter page letter to the Commandant of the Coast Guard and the Administrator of the Maritime Administration requesting designation of New Jersey as an additional "adjacent coastal State" for this project. The letter submitted no facts, documentation or analyses of the effect of the project on New Jersey, as required by the Coast Guard rule. Rather, it contained four paragraphs of argumentation that specific aspects of the coastal environment of New Jersey arguably would be adversely affected to the same or greater degree than comparable aspects of the coastal

Defs.' Ex. 6

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 8

environment of New York. The letter did not attempt to quantify the <u>overall</u> impact of the project on the coastal environments of New York and New Jersey or to show on the basis of evidence that the <u>overall</u> risk of the project to New Jersey was "equal to or greater than" the risk to New York.

On September 28, 2007, in an interim response to the Governor of New Jersey, the Maritime Administrator stated that he would review the request under the legal standard established by Section 1508(a)(2) – that after considering the recommendation of the Administrator of NOAA, the "Maritime Administrator must grant Adjacent Coastal State status if the risk of damage to the requesting State's coastal environment <u>is equal to or greater than</u> the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port." (Attachment 4, emphasis added) In response to this letter, New Jersey never submitted any facts or analyses to support its request.

We are informed that on October 17, 2007, NOAA submitted a one and one-quarter page long letter concerning the Safe Harbor Energy project. To date, the Maritime Administration has not responded to our request that this document be placed in the docket. It is our understanding, however, that the letter provided little in the way of meaningful information that could assist the Commandant of the Coast Guard in performing the comparative evaluation of the potential risks to the coastal environments of New Jersey and New York that is required by Section 1508(a)(2).

On November 2, 2007, the Administrator purported to designate New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy application. In articulating the basis for that conclusion, the Administrator stated that he had relied:

upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

The Administrator's decision is invalid, as a matter of law, because he failed to apply the legal standard set forth in Section 1508(a)(2), failed to perform the comparative analysis required by that provision, and failed to make the finding it requires before an additional State may be designated an "adjacent coastal State."

The Administrator instead applied a test that Congress never authorized. His decision relied entirely on the size of the project – its "magnitude and scope" – and its potential environmental impact, which he characterized as "significant." As noted below, there is no evidence in the record to support the Administrator's contention that there exists the potential for "significant" environmental harm to the coastal environment of New Jersey. Even assuming such

Defs.' Ex. 6

# VENABLE LLP

December 3, 2007
Page 9

evidence were in the record, the Administrator's approach failed to comply with Section 1508(a)(2) in two critical respects.

-- The Administrator did not refer to or conduct an assessment of the potential risk the project presents to the coastal environment of New York.

-- The Administrator did not perform the analysis mandated by Section 1508(a)(2), which requires that the determination be based on an assessment whether the potential risk to the coastal environment of New Jersey would be "equal to or greater than the risk posed to" the coastal environment of New York.

The Administrator had articulated the proper standard in his September 28, 2007 interim response to New Jersey and had stated that he would apply the correct standard. He inexplicably failed to follow the law in making the final decision.

The test the Administrator purported to apply, which depends entirely on the size of the project and the potential for "significant" impact on New Jersey, not only violates the express provisions of the DWPA but was expressly rejected by Congress in enacting that law. The Senate version of the bill that became the DWPA would have permitted designation of an additional State as an "adjacent coastal State" under three criteria. The first two approaches were carried forward into Section 1508(a)(1) -- whether the State was "connected by pipeline to a deepwater port" or whether it was "located within 15 miles of any component of a deepwater port." The third approach in the Senate bill would have permitted designation of an additional "adjacent coastal State" if the State:

would in the opinion of the Administrator of the National Oceanic and        Atmospheric Administration experience <u>substantial environment risk</u> should an oil or natural gas discharge occur from the deepwater port or from a vessel        operating in the safety zone around the port.

S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7530. The third approach thus would have permitted designation of a second State as an adjacent coastal State based on the size of the potential environmental impact alone, and without consideration of the extent of the relative impacts of the project on the environments of the petitioning State and the State directly connected by pipeline to the port.

The Executive Branch objected strongly to inclusion of any provision that would have allowed designation of a second State as an "adjacent coastal State," and thus the granting of a veto power to a second State, based solely on whether the environmental risk to it could be

# VENABLE LLP

December 3, 2007
Page 10

characterized as "significant" or "substantial." In particular, the Secretary of the Interior raised the concern that:

> the third condition . . . would extend this [the opportunity to prevent construction of a proposed deepwater port] to States that are some distance from the proposed facility and that may be affected by a possible oil spill. <u>The provision is so broad that if it is not deleted, it is questionable whether any deepwater port will be constructed.</u>

1974 U.S.C.C.A.N. at 7591 (emphasis added).

The Conference Committee thereafter deleted the provision to which the Administration objected and replaced it with the current version of Section 1508(a)(2). It creates a third pathway that permits designation of a second State as an "adjacent coastal State" only if the implementing agency determines that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Conf. Rep. No. 93-1605, reprinted in 1974 U.S.C.C.A.N. 7622, 7636.

In sum, the Administrator's designation of New Jersey as an additional "adjacent coastal State" plainly violated the DWPA, because he failed to apply the legal standard that Congress actually adopted in Section 1508(a)(2) and followed instead an approach that Congress considered and explicitly rejected in 1974.

3. The Record Contains No Evidence on Which the Administrator
Could Have Based a Lawful Determination that the Risk of Harm to
the Coastal Environment of New Jersey Was "Equal to or Greater Than"
<u>the Risk of Harm Posed to the Coastal Environment of New York.</u>

The record on which the Administrator based his decision did not contain any factual evidence on he could have found that the risk of harm to the coastal environment of New Jersey was "equal to or greater than the risk posed to" the coastal environment of New York. The Administrator did not purport to make such a factual determination; the illegal test he applied allowed him to avoid making the required comparative analysis. Indeed, the total absence of factual support means that no rational decision maker could have concluded that New Jersey satisfies the statutory criterion for designation as an additional "adjacent coastal State".

It is our understanding that the one and one-quarter page letter submitted by NOAA on October 17, 2007 contained no meaningful analysis of the risk of damage that the Safe Harbor Energy project would have on the coastal environments of either New York or New Jersey. We

Defs.' Ex. 6

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 11

further understand that the NOAA letter did not attempt to perform a comparative analysis of whether the risk to the coastal environmental of New Jersey would be equal to or greater than the risk to the coastal environment of New York.

This is understandable because, as noted above, the request submitted by the Governor of New Jersey slightly exceeded two pages in length. The letter contained no facts, documentation, or analyses to quantify the actual environmental risk presented to the State, as required by the Coast Guard rule. Rather, the letter contained four paragraphs of lawyers' arguments, unsupported by evidence, that specific aspects of the New Jersey coastal environment would be adversely affected by the project. It concluded with an unsubstantiated assertion that the risk to the coastal environment of New Jersey would be equal to or greater than comparable risk to the coastal environment of New York. New Jersey's request did not even attempt to discuss or quantify the environmental risks faced by New York.

Thus, even if New Jersey had provided actual data about the potential adverse effects it might suffer, its letter still could not have provided a valid legal basis for the Administrator's conclusion because it provided no basis for performing the required comparative analysis of the effects on both States. Further, the letter submitted by ASIG on September 24, 2007 demonstrated why the failure of New Jersey to submit actual evidence concerning the risk to its coastal environment did not satisfy Section 1508(a)(2).

This scant submission by New Jersey cannot provide a lawful basis for its designation as an "adjacent coastal State" under the procedures and substantive standards that have been followed beginning shortly after the DWPA was enacted.

In early 1976, Arthur D. Little, Inc. issued a Final Report to the Coast Guard, "Methodology for Designation of Adjacent Coastal States:"

to define internal Coast Guard procedures to implement Section 9(a)(2) of the Act [33 U.S.C. § 1508(a)(2)] and Section 148.217 of the [Coast Guard] regulations. Specifically, this report identifies data necessary to make adjacent coastal State determinations, presents a risk analysis technique for evaluating such data, and describes a format for comparing risks to the coastal environment on a State-by-State basis.

U.S. Coast Guard Report No. CG-WDWP-1-76 (revised March 12, 1976) ("Methodology Report") at 3. (Attachment 5)

# VENABLE®LLP

December 3, 2007
Page 12

The Methodology Report provided that the Coast Guard is (1) to assess, based upon interpretation of the license applicant's data, independent risks to the coastal environments of the States directly connected by pipeline to the port; then (2) evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential environmental damage it submits; and finally (3) make a comparison of the risks to the coast environment of each State on a resource-by-resource basis. In this process, the Coast Guard also considers the recommendation submitted by the Administrator of NOAA. Id. at 6.

The Methodology Report makes clear that the petitioning State must do more than merely assert the potential for environmental harm to its coastal environment. The Report states that "Petitioning States claiming damage potential from deepwater port-related developments should quantify the extent to which these indicators (or other factors) are the basis for their claim." Id. at 22. The Report also provides that the agency officials reviewing the request for designation as an additional "adjacent coastal State":

> will consider evidence in those categories of concern identified by the petitioning State. However, they will also have available (and consider) data on all categories for the "pipeline" State as submitted by the applicant for a deepwater port license. This implies that petitioning States should attempt to present as comprehensive a package of evidence as possible, in order not to foreclose comparative evaluation in categories which will be examined for the "pipeline" State.

Id. at 42. Finally, the Methodology Report states:

> Thus, in order for the resultant decision to be justifiable and open to scrutiny, the individuals involved bear a responsibility to document the value judgments and rationale behind their decisions.

Id. at 7.

The Maritime Administrator's decision in the Safe Harbor Energy matter stands in sharp contrast with the procedures that were followed, the evidence that was assembled, and the record on which the decision was based in prior cases in which a State requested designation as an additional "adjacent coastal State."

For example, in February 1976, the Coast Guard referred to NOAA for comment the request of Florida for designation as an additional "adjacent coastal State" with respect to the proposed Seadock deepwater port. On March 25, 1976, NOAA submitted a 233 page report to the

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 13

Coast Guard, "Analysis of the Risk of Damage to the States of Florida and Texas from the Seadock, Inc. Proposed Deepwater Port." (Attachment 6) That report analyzed in detail the facts concerning whether the risk of harm to the coastal environment of Florida was equal to or greater than the risk of harm presented to the coastal environment of Texas, the State to which the port would be connected by pipeline. Importantly, the report refers to a legal opinion by the Chief Counsel of the Coast Guard, which was then within the Department and charged then as now with running the DWPA license application process, concerning the requirements of Section 1508(a)(2). The report states that the opinion concluded that "[t]he Congressional intent behind section [1508(a)(2)] mandated a thorough evaluation of all possible risks to the coastal environment of the respective states" in determining whether an additional "adjacent coastal State" may be designated. Id. at 5. Florida's application ultimately was denied.

The effort exerted by NOAA in analyzing the facts related to the request for designation as an "adjacent coastal State" in the Seadock project stands in stark contrast to the near total absence of evidence and analysis in its short letter and in the record on which the Administrator based his decision on the Safe Harbor Energy project. From the State's failure to submit the evidence required by the Coast Guard rule and the scarcity of evidence in the record, it is clear that the Maritime Administrator made no comprehensive analysis of the facts; made no attempt to examine systematically or quantify the relative risks to the coastal environments of New Jersey and New York, as required by the statute; and provided no factual support for the rationale that the Administrator followed in designating New Jersey as an "adjacent coastal State." For these reasons, the November 2, 2007 decision violates Section 1508(a)(2) and should be overturned.

## Conclusion

For the reasons set forth above, the Administrator's November 2, 2007 decision designating New Jersey as an "adjacent coastal State" for the Safe Harbor Energy project is invalid as a matter of law and should be reconsidered and overturned.

After the withdrawal of the prior decision, New Jersey would still be able to have its concerns fully addressed in the comprehensive environmental, safety, and national security reviews that federal agencies will conduct to determine whether the Safe Harbor Energy port should be licensed and, if so, under what terms and conditions. The DWPA requires that any State which is not designated as an adjacent coastal State "shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added).

Thus, if the Administrator's decision is vacated, the only effect would be that New Jersey would not have the plenary power to veto the project or to impose binding conditions upon the

# VENABLE.LLP

December 3, 2007
Page 14

licensing of the port. But the State would be able to work with the Coast Guard and the Maritime Administration to develop appropriate environmental protections. This is precisely the outcome that Congress intended when it adopted a law which provided that in order to enjoy the greater authority enjoyed by an "adjacent coastal State," a requesting State must show that the risk of harm to its coastal environment would be equal to or greater than that of the State that is connected to the port by pipeline.

I am most appreciative of the opportunity to present these facts and arguments for your further consideration. I will be pleased to provide any additional information that you may deem useful.

Sincerely,

Jim Burnley

Enclosures

cc: Admiral Thad W. Allen
    Commandant
    United States Coast Guard

Defs.' Ex. 7



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Policy, Planning and Science
401 East State Street, 7ᵗʰ Floor
P. O. Box 402
Trenton, NJ 08625-0402
Tel: (609) 341-5311
Fax: (609) 292-3268

December 21, 2007

Mr. H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick:

I am writing to supplement the information provided in Governor Corzine's letter of September 6, 2007 requesting that New Jersey be designated an adjacent coastal state under the Deepwater Port Act for the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License, as well as the information supplied in my letters of September 25 and November 1, 2007.

### Project Purpose and Benefits

Throughout the documents submitted by the Atlantic Sea Island Group LLC, there are numerous references to the goal of the project as serving the New York Metropolitan area or New York region. New Jersey is an integral component of the New York Metropolitan area/New York region. The descriptions of the project include statements such as "the Atlantic Sea Island Group LLC ... proposes to construct, own, and operate a liquefied natural gas (LNG) receiving, storage, and regasification facility as a deepwater port that will be capable of delivering up to 1.15 billion standard cubic feet per day (bscfd) of natural gas per day to the New York metropolitan region" and "Safe Harbor Energy will bring to the region a much-needed new and reliable supply of clean-burning, cost-effective, and globally sourced natural gas." (Volume 2 Exhibit S Navigation and Safety Equipment S.1 Project Overview and Introduction)

Similarly, the Environmental Report in support of the Safe Harbor Energy Project Deepwater Port License Application May 2007 (Environmental Report) Topic Report One — General Project Description describes the purpose, need and benefits of the project as applying to the New York Metropolitan area, of which New Jersey is part, as follows:

*New Jersey Is An Equal Opportunity Employer*  ●  *Printed on Recycled Paper and Recyclable*

**Purpose:** To increase available supply of Natural Gas to the metropolitan New York City area, Safe Harbor Energy will provide a strategically placed LNG importation terminal to augment existing regional pipeline delivery and to have storage capacity exceeding 15 bscf of natural gas (720,000 cubic meters of LNG).
**Need:** Safe Harbor Energy will expand the natural gas supply and storage capacity available to an area of the country with high existing energy demand and growing gas needs. Its strategic location in the market area alleviates capacity constraints in existing pipeline infrastructure, thereby minimizing the need for expansion of existing land based pipelines. Further, Safe Harbor Energy will provide fuel supply diversity through global sourcing of LNG, which will help stabilize or lower natural gas prices in the region by minimizing price spikes caused by supply constraints or other system delivery disruptions.
**Benefits:** Increased Natural Gas Supply to the New York Metropolitan Area. Safe Harbor Energy will provide a strategic energy supply solution for the New York metropolitan region by delivering a reliable, safe, and secure supply of natural gas to an area with increasing demand for natural gas.

This comports with the representations made to representatives of Governor Corzine's Office this year, indicating that because of capacity issues in the existing pipeline (that connects to both New Jersey and New York) there would, by necessity, be natural gas flowing to New Jersey. At that time, the applicant indicated that there were no "Letters of Intent" signed with any New Jersey entities, but requested assistance in identifying those entities whom they should approach. These capacity issues are also described in the Attachment 1-1 of the Environmental Report Topic Report One — General Project Description, Market Area Access for Supply Sendout. As noted above, the application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The Long Beach Meter Station, Long Beach, New York has a maximum takeaway capacity of approximately 530 million cubic feet per day to accommodate gas transported eastward from the connection point into the Transco Pipeline. For gas transported westward from the connection point into the Transco Pipeline, the maximum capacity of the Milltown Regulator Station in New Jersey is approximately 619 million cubic feet per day. The analysis concludes the Transco pipeline is capable of receiving the full 1.15 billion cubic feet per day of natural gas through transport both eastward to New York and westward to New Jersey.

In a letter to the editor of the *Two River Times* November 30, 2007, Howard Bovers, Chairman Atlantic Sea Island Group LLC, states the following: "It has become apparent that we need access to cheaper and more environmentally sound energy sources. That is where Atlantic Sea Island Group's project comes in. More than 50 percent of the LNG in the form of natural gas in Phase One of the project will be delivered to New Jersey."

In Environmental Report Topic Report One – General Project Description, the applicant indicates that the project has been designed to accommodate the receipt, storage, regasification, and distribution of up to 2 billion standard cubic feet per day of natural gas, although it will not initially be able to operate at this level due to the ability

of the existing Transco Pipeline to accept gas.  In 2006, the applicant indicated to representatives of NJDEP that a future pipeline to the Linden, New Jersey area was under consideration.  According to the Deepwater Port Act 33 U.S.C. §1504(c)(2)(F), each application shall include a detailed description of each phase of the project.  Thus, the future line should be included in the application, which would in and of itself result in New Jersey being an adjacent coastal state.

There are precedents for designating New Jersey as an adjacent coastal state.  In a 2003 notice of application, the State of Louisiana was designated an adjacent coastal state for the proposed El Paso Energy Bridge Gulf of Mexico, LLC Deepwater Port License.  In that case, the deepwater port pipeline was proposed to connect into an existing pipeline more than 100 miles offshore.  In a 2006 notice of application, the State of Alabama was designated an adjacent coastal state for the proposed TORP Terminal LP, Bienville Offshore Energy Terminal Liquefied Natural Gas Deepwater Port, proposed 63 miles offshore and connecting into an existing pipeline approximately 60 miles offshore.  In the current Atlantic Sea Island Group proposal, the deepwater port island would be located approximately 19 miles from New Jersey and the pipeline would connect into the existing Transco pipeline at a point approximately 16 miles from the New Jersey coast.

Furthermore, the December 3, 2007 letter from James Burnley, Venable LLP, representing Atlantic Sea Island Group, to US Department of Transportation Secretary Mary Peters and Maritime Administration Administrator Sean Connaughton indicates that New York was designated as an adjacent coastal state under "two pathways," both as a state located within 15 miles of the proposed port and as a state directly connected by pipeline to the proposed deepwater pipe.  The pipeline directly connecting the proposed port to New York is the Transco pipeline mentioned above, which runs from New Jersey to New York.  Based on the above, New Jersey would also be an adjacent coastal state by this pathway.

## Ports

The proposed island will be constructed in an open area of the ocean between the Ambrose-to-Nantucket and Hudson Canyon-to-Ambrose international shipping lanes.  These shipping lanes are the lanes to and from the Port of New York/New Jersey, the largest port complex on the east coast.  The proposed pipeline route would cross two traffic lanes, necessitating disruption during construction within these lanes.  The report indicates that the LNG tankers traveling to the island will "sail to the New York Bight area and receive harbor pilots onboard for final vessel maneuvering to the Island.  The vessels may remain offshore prior to maneuvering to the Island or may use designated or existing New York Harbor anchorage areas.  The maneuvering procedure will involve vessels sailing to the northwest side of the Island under pilot control."

According to The Port of New York and New Jersey web site, "The Port of New York and New Jersey is the gateway to the most concentrated and affluent consumer market in the world.  Each year, more than 25 million tons of oceanborne general cargo moves through our port, including 4.5 million TEUs (twenty-foot equivalent units) of containerized cargo.  The Port Newark/Elizabeth-Port Authority Marine Terminal

complex (NJ), the PA Auto Marine Terminal (NJ), Brooklyn Piers and Red Hook Container Terminal (NY) and Howland Hook Marine Terminal (NY) handle most of the cargo and these facilities are managed by the Port Authority of New York and New Jersey. In addition, there are private operators such as Global Marine Terminal and a number of marine terminals operated by private bulk cargo operators." Furthermore, "Port Newark and the Elizabeth-Port Authority Marine Terminal operate as one fully integrated marine terminal, forming the largest and most comprehensive collection of maritime cargo handling facilities on the East Coast of North America." The New York/New Jersey Harbor is critical to the economy of both New York and New Jersey, and any disruption of traffic is of equal concern to both.

## Staging and Construction

The application indicates that five sites are under consideration for staging and laydown area for construction of the port, all within a 40 mile radius of the proposed island. New Jersey has not been provided with the location of any of these five sites, but is well within the 40 mile radius, and thus the sites are as likely to be in New Jersey as in New York.

The Environmental Report Topic Report 9—Alternatives indicates that the applicant intends to obtain fill to construct the island from dredging of the harbor. However, another option identified is "to obtain fill from upland projects generating suitable material or to purchase the fill from mining operations such as Amboy Aggregates in New Jersey, Arundal Quarry in Maryland, Trapp Rock in New York, or bringing materials from Canada. This could involve one (barging), if not two (trucking), methods of transit to the proposed Island site. Materials would be trucked to a central staging location from an onshore project/borrow source. The material would be dumped into a hopper system that conveys materials onto the barge. Two types of barges would be needed, flat deck barges and/or bottom-dump scows." If an upland site in New Jersey or the Amboy Aggregates facility were selected for the material, it would impact the state.

## Fisheries

In the Environmental Report Topic Report Five — Socioeconomics, the applicant describes the regional economy, including commercial and recreational fisheries. This section of the Environmental Report states that a 2001 U. S. Fish and Wildlife survey indicates that 806,000 state residents and non-residents 16 years and older fished in New Jersey, 572,000 of them in saltwater fishing. The survey numbers reported for New York are 1.55 million participants, 406,000 of them in saltwater fishing. It should be noted that the Marine Recreational Fisheries Statistics Survey by the National Marine Fisheries Service, a survey geared toward marine fishing, ranks New Jersey third in the number of saltwater anglers with a 5 year average (2002-2006) of 1 million anglers, as compared to New York, which is ranked 7th with three-quarter million anglers. In terms of trips made for marine species in this period, the five year average is 6.5 million trips per year for New Jersey and 5.1 million trips per year for New York.

4

The applicant contacted fishing charter boat companies to determine the extent to which Cholera Bank and the surrounding areas are used for recreational fishing and searched the internet. The applicant concluded that it is generally too far for many of the charter boats. Although the applicant's survey found little recreational fishing in the area, and little from New York fishermen, in a 2003 survey by New Jersey of recreational charter and party boat captains, the proposed island location and the adjacent area were identified as important recreational fishing areas, confirming the identification of these areas as recreationally important in *New Jersey's Recreational and Commercial Ocean Fishing Grounds* (1982) and in the NOAA *Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey* (1974). The Environmental Report — Topic Report 7 Land Use, Recreation, and Aesthetics states that the project "excludes only a small fraction of a very large area available for recreational fishing." However, this "small fraction" has been documented as important to New Jersey's recreational fishing community.

The Environmental Report indicates that New York's commercial fish landings in 2004 were nearly 34 million pounds valued at over $46 million, and primarily taken in State waters. In contrast, New Jersey landed approximately 187 million pounds valued at nearly $146 million and nearly all catches occurred in federal waters. The area of the proposed project was identified as important in *New Jersey's Recreational and Commercial Ocean Fishing Grounds* (1982) by DEP and this was confirmed in recent contact with commercial fishing dock managers from Belford, New Jersey; Point Pleasant, New Jersey; and Fulton Fish Market. In discussing the effect of the project on commercial fishing, the Environmental Report states that "The 663 acres excluded represents an insignificant area in relation to the 8,100 square mile area of the New York Bight or the New York Bright Apex, which comprises 727 square miles that the Project is located within," concluding the effect would not be great. This method does not take into account the characteristics of the site, which make it a productive fishing area, or the data described above regarding New Jersey's commercial fisheries.

The application indicates that the pipeline would be buried to a depth of 3 feet in Federal waters that are less than 200 feet deep and buried a depth of 4 feet in State waters. It furthers indicates that the pipeline would cross over the top of seven cables. It also states "In the event that the installation results in less than 3 feet of cover for portions of the Pipeline in water depths less than 200 feet as mandated by 30 CFR 250.1003(a)(1) for federal waters or 4 feet cover for State Waters, concrete mats will be used to provide an equivalent degree of protection." (Volume 1) Because certain commercial fishing gear routinely penetrates the bottom, conflict with the pipeline/concrete mats may occur.

## Viewshed

The viewshed analysis in the Environmental Report indicates that the terminal will be visible from the entire 20 miles of New Jersey coastline located within the 24-mile study radius. This includes the beaches of Monmouth County, where New Jersey

has spent millions in beach nourishment, and the Sandy Hook unit of Gateway National Recreation Area. The island will also be visible from the Twin Lights Historic Site, which is on the National Register of Historic Places, and the Mount Mitchell Overlook (identified as the highest point along the eastern seaboard). Accordingly, both New Jersey's beaches and this historic site would be affected.

## Conclusion

The Environmental Report discusses existing conditions of and environmental consequences to the New York Bight. The New York Bight is generally described as the area of the Atlantic Ocean south of Long Island, New York and east of New Jersey, from Montauk Point, New York to Cape May Point, New Jersey. The ecosystem of the New York Bight is critical to both states, and impacts would be shared by both. In fact, both New York and New Jersey each enacted laws in the 1990s to work together "to provide for the maximum enhancement, enjoyment and conservation of the marine resources of the Hudson-Raritan Estuary and the New York Bight" and established a committee "to make specific recommendations concerning the maintenance, protection and restoration of such marine resources."

Clearly, a project of this magnitude, with the creation of an artificial island by the filling of 116 acres of sea floor with wide ranging impacts beyond the immediate project area, including shipping and navigation, fisheries disruptions, onshore port utilization, and the need for massive volumes of fill material, has equal effects, if not greater in certain circumstances, on the coastal environment of New Jersey as it does on New York's coastal environment. Therefore, the Maritime Administration made the correct decision in granting adjacent coastal state status to New Jersey. In conclusion, New Jersey is an adjacent coastal state under the Deepwater Port Act for the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License and looks forward to working closely with the U. S. Coast Guard, Maritime Administration and State of New York to properly address the needs of the region, while protecting the economies and environments of both states.

Sincerely,

Jeanne Herb
Director

6



Defs.' Ex. 8



U.S Department
of Transportation
**Maritime
Administration**

James H. Burnley IV                                    FEB - 8 2008
Venable LLP
575 7th Street, NW
Washington, D.C. 20004-1601

Re: Safe Harbor Energy LNG Deepwater Port—Request for Reconsideration of
Designation of New Jersey as an "Adjacent Coastal State"

Dear Mr. Burnley:

This is in response to your letter of December 3, 2007, in which you made certain claims
regarding the Maritime Administration's finding that New Jersey qualifies as an Adjacent
Coastal State as defined by the Deepwater Port Act of 1974, as amended. We note that,
in response to your earlier request of November 13, 2007 we emphasized that there is no
right to appeal the Adjacent Coastal State (ACS) designation under the Deepwater Port
Act of 1974, as amended (DWPA), and by that letter we accommodated your concerns by
extending to you and your client the opportunity to provide arguments presumably to
explain, in opposition to our finding, why New Jersey's coastal environment is <u>not</u>
subject to risk equal to or greater than that posed to New York's (NY). You have now
supplied us with your arguments to reconsider the designation of New Jersey (NJ) as an
ACS.

The salient factor distinguishing NY and NJ under the statute is the proximity of the port
to each State. The proximity requirement of 15 miles was not meant to bar consideration
of the potential of environmental impact to NJ, a State located at the 19-mile mark from
the proposed site. Likewise, the fact that NY is within 15 miles of the proposed site,
which, as intended by Congress, represents a clear indication of the legitimate interest
and risk posed to NY, does not establish a finding that the proposed DWP's pipeline
poses no environmental risk to any other State. Rather, as evidenced by Section
1508(a)(2) of the DWPA, Congress recognized the importance of including other States
not meeting the § 1508(a)(1) criteria of proximity or direct connection, and intended for a
State with legitimate and regional interest to be afforded the opportunity to make a case
to the Secretary of Transportation for special consideration. Accordingly, a review was
made of the available information within the statutory period, and the ACS status was
issued under the discretionary authority of the Secretary of Transportation as delegated to
the Maritime Administrator, 49 C.F.R. § 1(i)(6); § 1.66(aa)(a)(1)-(2). The Secretary
expressly delegated the authority to the Maritime Administration to process deepwater

port license applications in coordination with the Commandant of the Coast Guard. §
1.66(a)(2).

In our determination letter designating NJ an ACS, the Maritime Administration
concluded that NJ met the definition under Section 1508(a)(2) of the DWPA. Section
1508(a)(2) establishes the standard to be applied, "that there is a risk of damage to the
coastal environment of such State equal to or greater than the risk posed to the State
directly connected by the pipeline to the proposed deepwater port." In crafting this
specific section of the statute, Congress intended to provide regional interests not meeting
the proximity or direct connection requirement a role in the decision-making process if it
could be evidenced that the risk of damage to their coastal environment was equal to or
greater than the risk posed to the 1508(a)(1) designee. Congress was careful to limit
involvement and thus crafted a standard that would narrow the field of interests seeking
to be designated as an Adjacent Coastal State. In crafting Section 1508(a)(2), Congress
provided an alternative to the physical construct of (a)(1) and sought an equitable
approach. There is no better example of legitimate regional interests under the Safe
Harbor proposal than that of NY and NJ. NY and NJ have historically shared
environmental and economic concerns due to their geographic proximity, predominant
ocean currents from NY toward NJ, and common industry. They share the port and its
facilities. The staging areas for the construction and operation of the Safe Harbor DWP
implicate NY and NJ without distinction. Alternate sites required under the National
Environmental Policy Act to be reasonably foreseeable bring the possible final site to
within 9 miles of NJ, and both NY and NJ share equally in the inherent risk of losing the
Cholera Bank fishery.

With regard to the claim that I acted outside my delegated authority in unilaterally
making the designation, I disagree. You argue that the Homeland Security Act of 2002
transferred the authority of the USCG to make an ACS determination to the Department
of Homeland Security; however, the USCG was never delegated the authority to make a
§ 1508(a)(2) ACS determination and therefore the Homeland Security Act of 2002 did
not transfer that authority. In fact, that authority was reserved for the sole discretion of
the Secretary of Transportation, and was exercised only twice before, in 1976 to deny
Mississippi and Florida ACS status. The Secretary reserved that authority until
delegation to the Maritime Administrator in 2003. (68 FR 36496); 49 CFR § 1.66(aa)(2).
Consistent with the view of the USCG, as evidenced by the rulemaking published in 62
FR 11382 (1997), the Secretary first made a partial delegation of his DWPA authority to
the Maritime Administration in coordinated efforts with the USCG. Through the 2003
delegation, the Secretary delegated his remaining authority to the Maritime
Administrator, and both the USCG and the Department of Transportation have correctly
interpreted that delegation to establish the Maritime Administration as the lead decision-
making agency, which encompasses the issuance of § 1508(a)(2) ACS determinations.
The purpose of the 2003 rulemaking was to clarify certain previous delegations and to
delegate remaining authority to the Maritime Administration to implement the DWPA,
which had been recently amended in 2002. In stark contrast to your interpretation, the

USCG and the Maritime Administration have agreed that review of the record and the 1997 and the 2003 rulemakings establishes that once-reserved Secretarial authority, historically exercised in making ACS determinations, has been delegated exclusively to the Maritime Administrator.

Contrary to your argument that USCG regulation 33 C.F.R. § 148.217(d) provides clear evidence of delegated authority in the Commandant, a delegation to the Maritime Administrator in determining an ACS is more consistent with the overall allocation of responsibilities under the DWPA. Accordingly, both the Maritime Administration and the USCG have agreed that authority to make substantive decisions not specifically delegated, and those arising above processing decisions, are subject to the Maritime Administration as the lead decision making agency. Furthermore, Part 148 cannot be genuinely argued to evidence a delegation to the Commandant in making ACS determinations because the regulations in their current form are ambiguous. For example, 33 C.F.R. § 148.5(3) provides that only the Maritime Administrator will designate an ACS under 33 U.S.C. § 1508(a)(2) while 33 C.F.R. § 148.217(d) provides that the USCG Commandant will make an ACS designation. Even with the inconsistencies of the current USCG DWPA regulations, both agencies are in agreement as to their respective roles and authority. As my office advised ASIG just after receiving the New Jersey request, both federal agencies agree that the Maritime Administration alone has the authority to designate § 1508(a)(2) ACS status for DWPA projects and that the agencies are working together to address the ambiguities in the regulations.

You also claim that we applied an improper standard and that a factual finding is required to be released. A full and comprehensive reading of our November 2nd determination makes clear that the basis for designating NJ an ACS was in accordance with Section 1508(a)(2) of the statute, which sets forth the "equal to or greater" risk standard:

> "1508(a)(2)  The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. This paragraph shall apply only with respect to requests made by a State not later than the 14th day after the date of publication of notice of an application for a proposed deepwater port in the Federal Register in accordance with section 1504(c) of this title. The Secretary shall make the designation required by this paragraph not later than the 45th day after the date he receives such a request from a State."

You argue that we applied an invalid standard of "significant impact." That simply is not the case. As we stated in our determination, "upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have

determined that New Jersey is an Adjacent Coastal State <u>as defined under the Act</u> and is so designated…"(emphasis added) Our determination clearly incorporates the standard of "equal to or greater than" as defined in the statute and therefore your characterization of the standard that was applied is incorrect.

As to a factual finding, the statute requires nothing further than a decision be made by the Administrator, by delegation from the Secretary, of whether the State meets the requirements of the statute to be designated an ACS. There is no basis in the statute for your claim that our finding be subject to public scrutiny. The 1976 Mississippi ACS determination signed by the Secretary of Transportation cited only the sources used to assist in the determination and did not include a detailed finding. Furthermore, although you have obtained the NOAA recommendation from 1976, it is unclear whether that recommendation was formally released to the general public. Upon comparing my November determination to that of the Secretary's Mississippi determination from 1976, the bases offered in the determinations are equivalent. Both offer a basic justification and neither adds details of the rationale itself.

ASIG assails NJ's presentation of its case on, among other bases, its lack of documentation and support, comparing it unfavorably to those of earlier ACS cases. This approach is unpersuasive. When the prior ACS issues were resolved, in 1976, the US, and the world generally, had substantial experience with oil spills. The basic interplay among oil viscosity, water salinity, temperature, currents, and other factors was understood, although not so well as now. By contrast, the world at this time knows very much less about LNG spills, on land or water. When, in 1979 and 1980, DOT established the regulatory framework for LNG plants, the primary concerns were explosion and fire, especially in proximity to population centers. An LNG-fueled explosion or fire at a place as far removed from population centers as is proposed here would likely have some, but less, impact directly on individuals but may have significant impact on the marine environment. Since all interests, including NOAA, agree that the currents there run toward NJ, the risk from such a fire or explosion is at least as great to NJ's coastal environment as to NY's. Note: I do not at this juncture need to decide relative harm between the two States; I need only decide the relative risk of harm, and I see NJ's as at least equal to NY's.

I use this example as just that, an example, because I agree with you that the comparative risk analysis must evaluate the totality of impacts.

You also rely heavily on a methodology report prepared by Arthur Little to argue that our determination could not be properly supported. However, it is unclear whether the conclusions and guidance offered in the Little report were ever followed since it was published only 13 days before the 1976 NOAA recommendation and the following issuance of the Section 1508(a)(2) ACS determination by the Secretary. What is clear, however, is the description in the preface to the Little report authored by the then Manager of the Deepwater Ports Project, Captain K.G. Wiman. He wrote, "The contents

4

of this report do not necessarily reflect the official view or policy of the Coast Guard, and they do not constitute a standard, specification, or regulation." The Little report's preface recognizes that the methodology is not the official view of USCG and reflects the USCG understanding that each case would offer unique challenges in the availability and analysis of data. The Captain's statement also reflects deference to the Secretary as the ultimate decision-maker and to the discretion in his authority to make the ACS determination. The authority to make the designation is clearly at the discretion of the Secretary of Transportation as provided by the statute, with no requirement to concur with NOAA or USCG, or to follow USCG methods or publish a factual finding.

You claim that the time had expired for us to respond to the Governor's request. The official date the Administrator is deemed to have received the Governor's request was September 18, 2007. Because there are so many forms in which to communicate, it is necessary and practical to the proper implementation of the statute that we establish one method as the official method of receipt for the Administrator. The September 18th date is based not on telephone, email, fax, or docket notices but on the date the letter request was posted to the Administrator's controlled correspondence database. The NJ ACS determination was made on the very last day provided under the statute in an effort to grant all due consideration to the issues given the strict timeframe for making the designation.

In conclusion, the determination designating NJ ACS status was made under the authority of the Secretary of Transportation as delegated to the Maritime Administrator pursuant to delegations published in 68 FR 36496 (June 18, 2003) and 62 FR 11382 (March 12, 1997). Both Federal agencies, the Maritime Administration and the United States Coast Guard, interpret the delegations to provide exclusive authority to the Maritime Administrator to make such a decision even when faced with contradictory USCG regulations.

The ACS designation was made following the statutory standard pursuant to Section 1508(a)(2) and the rationale was formed using the data available within the 45 day timeframe. As contemplated by Congress, the statutory authority vested in the Secretary and delegated to the Maritime Administrator is discretionary, and was properly exercised to make an interlocutory decision based on the unique set of facts, procedural requirements, and regional interests of the State of NJ within the strict statutory timeframe for the review and processing of DWP applications.

Thank you for supplying us with your arguments for consideration. As a result of a thorough and comprehensive review, my determination designating the State of New Jersey an Adjacent Coastal State for purposes of the Safe Harbor deepwater port application remains unaltered. It is my hope that we can move forward in the processing of the Safe Harbor application to include the State of New Jersey in its role as an Adjacent Coastal State.

If you have any further questions or concerns please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:    The Honorable Frank R. Lautenberg
       The Honorable Jon S. Corzine
       The Honorable Frank Pallone

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second St. SW
Washington, DC 20593-001
Staff Symbol: CG-00
Phone: (202) 372-4400
Fax: (202) 372-4960

Defs.' Ex. 9

5730
C746283
FEB 14 2008

The Honorable James M. Inhofe
United States Senator
Washington, DC  20510-3603

Dear Senator Inhofe:

This is in response to your letter dated December 14, 2007, regarding the authority,
responsibility and criteria for designating an adjacent coastal State (ACS) for purposes of
licensing a deepwater port, and whether there have been any changes in Coast Guard
authority under the Deepwater Port Act (DWPA), especially regarding adjacent coastal
State designations.

To clarify, when the Coast Guard transferred to the Department of Homeland Security
(DHS) in 2003, the Coast Guard took all existing delegated authorities, including those
involving processing license applications for deepwater ports.  At that time, the Coast
Guard and the Maritime Administration operated under delegated authority from the
Secretary of Transportation to jointly process deepwater port applications.  That
relationship has remained relatively unchanged.  Authority to *process* applications is
shared between the Maritime Administration and the Coast Guard who work jointly to
complete the administrative process.  The Coast Guard has never held licensing authority
for deepwater ports.  Licensing authority was statutorily placed with the Secretary of
Transportation and delegated to the Maritime Administrator in June of 2003.  The
Deepwater Port Act of 1974 (33 U.S.C. 1501 et seq.) specifically names the Secretary of
Transportation as the authority to permissively designated ACS status under 33 U.S.C.
1508(a)(2); the Coast Guard does not possess such statutory authority.

There are two mechanisms for designating adjacent coastal States under the Deepwater
Port Act.  The first procedure is automatic and is described in 33 U.S.C. 1508(a)(1) as:
"any coastal State which (A) would be directly connected by pipeline to a deepwater port
as proposed in an application, or (B) would be located within 15 miles of any such
proposed deepwater port."  The second procedure is described in 33 U.S.C. 1508(a)(2):
"The Secretary shall, upon request of a State, and after having received the
recommendations of the Administrator of the National Oceanic and Atmospheric
Administration (NOAA), designate such State as an "adjacent coastal State" if he
determines that there is a risk of damage to the coastal environment of such State equal to
or greater than the risk posed to a State directly connected by pipeline to the proposed
deepwater port."

A statement in your letter says that: "Historically, the Coast Guard has been the lead agency in processing applications for licenses for deepwater ports. This includes designations of states as "adjacent coastal States" for purposes of particular projects." Actually, prior to a recent request by the State of New Jersey, there have been two instances of States requesting ACS based on 33 U.S.C. 1508(a)(2). In 1976, Florida and Mississippi petitioned for ACS status for two proposed deepwater ports: Seadock, Inc. and the Louisiana Offshore Oil Port. In both instances, a determination was made by the Secretary of Transportation, consistent with Coast Guard regulations and the delegations in place at the time.

Coast Guard regulations for ACS designation under 33 CFR, Part 148.217, originally stated that the Coast Guard would make ACS designations under 33 U.S.C. 1508(a)(1), and that the Secretary of Transportation would make designations under 33 U.S.C. 1508(a)(2) of the DWPA. This regulation remained in place from 1976 through the Coast Guard's transition to the Department of Homeland Security in 2003.

Current Coast Guard regulations in 33 CFR, Part 148.217 state that: "If after receiving NOAA's recommendations the Commandant (G–P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G–P), in concurrence with the MARAD Administrator, will so designate it." The Coast Guard and Maritime Administration agree, that based on the Secretary of Transportation's delegation in 2003 reserving licensing decisions within the Department of Transportation, and the past history of the Secretary of Transportation issuing ACS designations, an examination of the Deepwater Port Act implementing regulations is warranted and appropriate clarifications need to be considered.

We hope this information assists you in responding to your constituent. My Senate Liaison Office at (202) 224-2913 would be pleased to respond to any further questions you or your staff may have.

Sincerely,

THAD W. ALLEN
Admiral, U.S. Coast Guard
Commandant

Defs.' Ex. 11

# SUSPENSION DECLARATION

## OF

## H. KEITH LESNICK

I, H. Keith Lesnick, declare as follows:

    1.  I am the Director of the Office of Deepwater Ports Licensing, Maritime Administration, United States Department of Transportation.  I have been employed in this capacity since 2003.  The principal focus of my duties, responsibilities and goals as Director of the Office of Deepwater Ports Licensing is to supervise the implementation of the Maritime Administration's Deepwater Ports Program in accordance with statutory authority to issue amend, or transfer deepwater port licenses and to process Deepwater Port applications in coordination with the United States Coast Guard (Coast Guard).  I am involved, along with my staff, in the Maritime Administration's efforts in coordination with the Coast Guard to process applications including but not limited to the selection and direction of work of third party contractors to assist the Coast Guard in developing the Environmental Impact Statement in accordance with the National Environmental Policy Act (NEPA) and the Deepwater Port Act of 1974, as amended, (DWPA).  I have personal knowledge of the facts in this declaration or have received such information in the course of my official duties.

2.  I am submitting this declaration to describe the events resulting in the suspension of the statutory time period and subsequent processing of the Atlantic Sea Island Group, LLC's Safe Harbor application that was effectuated by letter dated October 24, 2007.

1

3. The suspension, based upon a deficiency in the information needed to process the application, has remained in place since that time to assist the applicant who has failed to obtain a new third party contractor and failed to provide necessary information for further application processing and environmental review pursuant to the requirements of 33 U.S.C. § 1505 and 33 C.F.R. § 148.107.

4. By letter dated October 24, 2007, the Maritime Administration and the Coast Guard noticed applicant Atlantic Sea Island Group, LLC that the 330 day time line prescribed by the Deepwater Port Act for processing the license application was suspended due to the applicant's failure to provide certain environmental and financial information necessary to complete the processing of the Deepwater Port application and preparation of the Draft and Final NEPA documents.

5. Following the suspension notice, applicant terminated its contract with the approved third party contractor originally selected by the Maritime Administration and the Coast Guard. Even though the Maritime Administration and the Coast Guard subsequently met with Atlantic Sea Island Group and the prospective environmental contractor and approved the attending alternate contractor, Atlantic Sea Island Group has since failed to enter into a contract with the alternate contractor to assist with the application review process and preparation of the Draft and Final Environmental Impact Statement.

6. Applicant's suspended status is not pending resolution of the applicant's legal challenge to the Administrator's action designating New Jersey an adjacent coastal state.

7. The suspension of the statutory time period can be lifted at any time and pursuant to 33 C.F.R. § 148.107(c), the Commandant may set a deadline for receiving the necessary information. If that deadline is not met, the Commandant may recommend to the Maritime Administrator to either not approve the application or suspend the application indefinitely.

8. By letter dated October 24, 2007, the Coast Guard and the Maritime Administration advised the applicant of the need to suspend the timeline in order to acquire the needed information and complete the processing in accordance with the statutory time period. In anticipation that the necessary information would be provided by the applicant in a reasonable time a deadline for receiving the necessary information was not established.

9. The applicant's suspended status has been in effect from October 24, 2007 until the time of this writing, entirely due to the failure of applicant to supply information needed to continue the processing of the application and such suspension acts only to benefit the applicant by supplying more time to address its deficiencies.

10. It is anticipated that once the applicant provides the requested information and enters into a contract with the approved third party contractor that at least 30 days of familiarization will be required before application processing and environmental review can be resumed.

11. I have been authorized to state on behalf of the Maritime Administration that unless the Commandant recommends a deadline for receiving the necessary information, until an alternative third party contractor approved by the Maritime Administration and the

3

Coast Guard Deepwater Ports Standards Division is obtained by the applicant, and all the necessary information is provided to assist with the application processing and production of the Draft and Final NEPA documents, that in accordance with the DWPA and its implementing regulations at Section 148.107, the suspension of the statutory time line will remain in effect.

I declare under penalty of perjury that the information stated herein is true and correct to the best of my knowledge, information, and belief.

Executed this 9th day of March, 2008. _____

H. Keith Lesnick

Defs.' Ex. 10

## SUSPENSION DECLARATION OF MARK A. PRESCOTT

I, Mark A. Prescott, declare as follows:

1. I am the Chief of the Deepwater Ports Standards Division at U.S. Coast Guard, Department of Homeland Security. I have been employed in this capacity since 2003. The principal focus of my duties, responsibilities and goals as Chief of the Deepwater Ports Standards Division is to supervise the implementation of the Coast Guard Deepwater Ports Program in accordance with statutory and delegated authority to process Deepwater Port applications in coordination with the Maritime Administration. I am involved, along with my staff, in the Coast Guard's efforts to process applications including but not limited to the selection and direction of work of third party contractors to assist the Coast Guard and Maritime Administration in developing the Environmental Impact Statements (EISs) in accordance with the National Environmental Policy Act (NEPA) and the Deepwater Port Act of 1974, as amended, (DWPA). I have personal knowledge of the facts in this declaration or have received such information in the course of my official duties.

2. I am submitting this declaration to describe the events resulting in the suspension of the statutory time period and subsequent processing of the Atlantic Sea Island Group, LLC's Safe Harbor application that was effectuated by letter dated October 24, 2007.

3. The suspension, based upon a deficiency in the information needed to process the application, has remained in place since that time to assist the applicant who has failed to obtain a new third party contractor and failed to provide necessary information for further application processing and environmental review pursuant to the requirements of 33 U.S.C. § 1505 and 33 C.F.R. § 148.107.

4. By letter dated October 24, 2007, the Maritime Administration and the Coast Guard noticed applicant Atlantic Sea Island Group, LLC that the 330 day time line prescribed by the Deepwater Port Act for processing the license application was suspended due to the applicant's failure to provide certain environmental and financial information necessary to complete the processing of the Deepwater Port application and preparation of the Draft and Final NEPA documents.

5. Following the suspension notice, applicant terminated its contract with the approved third party contractor originally selected by the Maritime Administration and the Coast Guard. Even though the Maritime Administration and the Coast Guard subsequently met with Atlantic Sea Island Group and the prospective environmental contractor and approved the attending alternate contractor, Atlantic Sea Island Group has since failed to enter into a contract with the alternate contractor to assist with the application review process and preparation of the Draft and Final Environmental Impact Statement.

6. Applicant's suspended status is not pending resolution of the applicant's legal challenge to the Administrator's action designating New Jersey an adjacent coastal state.

7. The suspension of the statutory time period can be lifted at any time and pursuant to 33 C.F.R. § 148.107(c), the Commandant may set a deadline for receiving the necessary information. If that deadline is not met, the Commandant may recommend to the Maritime Administrator to either not approve the application or suspend the application indefinitely.

8. By letter dated October 24, 2007, the Coast Guard and MarAd advised the applicant of the need to suspend the timeline in order to acquire the needed information and complete the processing in accordance with the statutory time period. In anticipation that the necessary information would be provided by the applicant in a reasonable time a deadline for receiving the necessary information was not established.

9. The applicant's suspended status has been in effect from October 24, 2007 until the time of this writing, entirely due to the failure of applicant to supply information needed to continue the processing of the application and such suspension acts only to benefit the applicant by supplying more time to address its deficiencies.

10. It is anticipated that once the applicant provides the requested information and enters into a contract with the approved third party contractor that at least 30 days of familiarization will be required before application processing and environmental review can be resumed.

11. I have been authorized to state on behalf of the Coast Guard, barring action taken by the Maritime Administrator to restart the clock, that unless or until an alternative qualified third party contractor approved by the Maritime Administration and the Coast Guard Deepwater Ports Standards Division is obtained by the applicant, and all the necessary information is provided to assist with the application processing and production of the Draft and Final NEPA documents, that in accordance with the DWPA (33 U.S.C. § 1505), that I will recommend that the suspension of processing should remain in effect.

I declare under penalty of perjury that the information stated herein is true and correct to the best of my knowledge, information, and belief.

Executed this 7th day of March, 2008.    _Mary A. Prescott_ _____

Mark A. Prescott

4

Defs.' Ex. 12

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: G-PSO-5
Phone: (202) 372-1440
Fax: (202) 372-1926
Email: Mark.A.Prescott@uscg.mil

16613
January 8, 2008

The Honorable Jon S. Corzine
Governor of New Jersey
Office of Economic Growth
P.O. Box 001
Trenton, NJ 08625-0001

Dear Governor Corzine:

On behalf of Admiral Allen, this is in response to your letter dated December 21, 2007 regarding your support of the Maritime Administrator's November 2, 2007 decision to designate New Jersey as an adjacent coastal state under the Deepwater Port Act for the proposed deepwater port application submitted by Atlantic Sea Island Group LLC (Safe Harbor Energy). At this time, the Maritime Administrator is reviewing the request for reconsideration received from Atlantic Sea Island Group LLC regarding New Jersey's designation as an adjacent coastal state. The U.S. Coast Guard has been in communication with the Maritime Administration regarding this issue; however, we believe the final decision rests with the Maritime Administrator.

Regardless of any action by the Maritime Administration on the matter, New Jersey will have a role in the processing of the application and we look forward to working with the State of New Jersey. My staff works closely with the Maritime Administration in processing this application and we are primarily responsible for the preparation of the Environmental Impact Statement.

If you have questions about the proposed Safe Harbor Energy deepwater port license application, you may contact me at (202) 372-1440 or by email at Mark.A.Prescott@uscg.mil.

Sincerely,

M. A. PRESCOTT
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
By direction

Defs.' Ex. 13

# UNITED STATES DEPARTMENT OF TRANSPORTATION

## SECRETARY'S DECISION RESPECTING THE REQUEST BY THE STATE OF MISSISSIPPI FOR STATUS AS "ADJACENT COASTAL STATE" UNDER THE DEEPWATER PORT ACT OF 1974 IN RESPECT OF THE APPLICATIONS THEREUNDER OF LOOP, INC. AND SEADOCK, INC.

Under the Deepwater Port Act of 1974 (the Act), the Secretary of Transportation is authorized "to issue, transfer, amend or renew a license for the ownership, construction and operation of a deepwater port." 33 U.S.C. § 1503(b). Without such a license, no person may engage in the ownership, construction or operation of a deepwater port, which is defined as a structure or group of structures "located beyond the territorial sea which are used or intended for use as a port or terminal for loading or unloading or further handling of oil." 33 U.S.C. § 1502(10). These facilities will be located in water of sufficient depth to permit transfer of oil from Very Large Crude Carriers (VLCC's) which draw too much water to use the terminal facilities of existing ports on the Eastern and Gulf Coasts of the United States.

The Act conditions the issuance of a license for a deepwater port on the approval (or presumption of approval) of the Governors of certain States designated as "adjacent coastal States" pursuant to Section 9(a) of the Act. 33 U.S.C. § 1508(a). Status as an adjacent coastal State must be conferred upon "any coastal State which (A) would be directly connected by pipeline to a deepwater port as proposed in an application or (B) would be located within 15 miles of any such proposed deepwater port." [1] In addition, Section 9(a)(2) of the Act requires that I shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration (NOAA), designate such State as an "adjacent coastal State" if I determine "that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." 33 U.S.C. § 1508(a)(2).

The Department of Transportation has received applications from LOOP, Inc. and Seadock, Inc. for licenses to construct and operate deepwater

---

[1] Thus Louisiana has been designated an "adjacent coastal State" in respect of the LOOP, Inc., application, and Texas has been so designated in respect of the Seadock, Inc., application.

- 2 -

ports off the coasts of Louisiana and Texas, respectively. The Department has also received a request from the Governor of the State of Mississippi for designation of that State as an "adjacent coastal State" with respect to both applications. Since the issues appear to be identical, and the facts similar, I will treat both situations herein.

I find that the State of Mississippi should not be designated as an adjacent coastal State in respect of either application.

The record presented to the Department for this determination includes, among other things:

1.  The aforementioned applications of LOOP, Inc. and Seadock, Inc.;

2.  The aforementioned request of the State of Mississippi;

3.  The recommendations of NOAA set forth in a letter to me from Robert M. White, Administrator, dated March 24, 1976; and

4.  A memorandum from the Commandant of the U.S. Coast Guard in respect of said NOAA recommendations.

My primary source of advice is NOAA, as mandated by the Act. The recommendation of the Administrator of NOAA is that the State of Mississippi should not be granted status as an adjacent coastal State. NOAA has concluded, after thorough study of the relative risk of exposure to oil spill incidents and the relative value of vulnerable resources, that the risk of damage to the coastal environment of the State of Mississippi is not equal to or greater than the risk of damage to the coastal environment of the State of Louisiana, the State directly connected by pipeline to the deepwater port proposed by LOOP, Inc., or the risk of damage to the coastal environment of the State of Texas, the State directly connected by pipeline to the deepwater port proposed by Seadock, Inc.

The Coast Guard concurs in this recommendation, and I have been offered no evidence or argument to the contrary.

I do not intend by this determination to leave the State of Mississippi without recourse. I am required by Section 9(b)(2) of the Act to give any interested State the opportunity to make its views known and to be

-3-

given full consideration in the c cisions of this Department regarding the location, construction and operation of deepwater ports. To the extent we are permitted by the authority granted the Department of Transportation under the Act, this Department will give the fullest consideration to suggestions by the State of Mississippi in the evaluation of the license appl . ations in questi n, and in the framing o conditions for the issuance of a license for a deepwater port, should such a license be issued. During the course of the application review, this Department will provide the State of Mississippi with all informat on (except such information which is to be treated as confidential under Section 14(b) of the Act, 33 U.S.C. § 1513(b)) provided the States of Louisiana and Texas, and will afford equivalent opportunity for comme nt. Also I hereby instruct the applicants to provide the State of Mississippi with all documents, legal briefs, letters and memoranda filed with the States of Louisiana or Texas, as the case may be (except such information that is confidential, as aforesaid).

Issued in Washington, D.C., on March 25, 1976.

William T. Coleman, Jr.
Secretary of Transportation

*File*

UNITED STATES DEPARTMENT OF TRANSPORTATION

SECRETARY'S DECISION RESPECTING THE REQUEST BY THE STATE
OF FLORIDA FOR STATUS AS AN "ADJACENT COASTAL STATE" UNDER
THE DEEPWATER PORTS ACT OF 1974 IN RESPECT OF THE APPLICA-
TIONS THEREUNDER OF LOOP, INC. AND SEADOCK, INC.

Under the Deepwater Port Act of 1974 (the Act), the Secretary of
Transportation is authorized "to issue, transfer, amend or renew
a license for the ownership, construction and operation of a deepwater
port." 33 U.S.C. § 1503(b). Without such a license, no person may
engage in the ownership, construction or operation of a deepwater port,
which is defined as a structure or group of structures "located beyond
the territorial sea which are used or intended for use as a port or
terminal for loading or unloading or further handling of oil." 33 U.S.C.
§ 1502(10). These facilities will be located in water of sufficient depth
to permit transfer of oil from Very Large Crude Carriers (VLCC's)
which draw too much water to use the terminal facilities of existing
ports on the Eastern and Gulf Coasts of the United States.

The Act conditions the issuance of a license for a deepwater port on
the approval (or presumption of approval) of the Governors of certain
States designated as "adjacent coastal States" pursuant to Section 9(a)
of the Act. 33 U.S.C. § 1508(a). Status as an adjacent coastal State
must be conferred upon "any coastal State which (A) would be directly
connected by pipeline to a deepwater port as proposed in an application,
or (B) would be located within 15 miles of any such proposed deepwater
port." 1/ In addition, Section 9(a)(2) of the Act requires that I shall,
upon request of a State, and after having received the recommendations
of the Administrator of the National Oceanic and Atmospheric Adminis-
tration (NOAA), designate such State as an "adjacent coastal State" if
I determine "that there is a risk of damage to the coastal environment
of such State equal to or greater than the risk posed to a State directly
connected by pipeline to the proposed deepwater port." 33 U.S.C.
§ 1508(a)(2).

The Department of Transportation has received applications from
LOOP, Inc. and Seadock, Inc. for licenses to construct and operate

_____

1/ Thus Louisiana has been designated an "adjacent coastal State" in
respect of the LOOP, Inc. application, and Texas has been so
designated in respect of the Seadock, Inc. application.

-2-

deepwater ports off the coasts of Louisiana and Texas, respectively. The Department has also received a request by the Governor of the State of Florida for designation of that State as an "adjacent coastal State" with respect to both applications. Since the issues appear to be identical, and the facts similar, I will treat both situations herein.

I find that the State of Florida should not be designated as an adjacent coastal State with respect to either application.

The record presented to the Department for this determination includes, among other things:

1.  The aforementioned applications of LOOP, Inc., and Seadock, Inc.;

2.  The aforementioned request of the State of Florida together with supporting documentation;

3.  The recommendations of NOAA set forth in a letter to me from Robert M. White, Administrator, dated March 11, 1976;

4.  A memorandum from the Commandant of the U.S. Coast Guard with respect to said NOAA recommendations;

5.  The transcript of an on-the-record conference held on March 16, 1976, at which oral testimony was presented by the States of Florida, Texas and Louisiana and by each applicant.

The State of Florida has furnished written and oral testimony urging the Department to consider, among other things, certain environmental risks posed by tankers in transit. Florida's argument is centered on the extreme vulnerability of that State's coastline to oil spills which may occur as a result of the passage of tankers through the Florida Straits enroute to and from the proposed deepwater ports. In a well documented case, Florida has outlined for us the extent of the potentially affected coastline and the nature of the damage that could occur to recreational areas, commercial and sport fishing and environmentally valuable wildlife preserves and parks. Florida also urges on the Department the proposition that deepwater ports off the Gulf Coast may

-3-

result in a shift of refining capacity from the East Coast to the Gulf States, thus increasing the proportion of refined products shipped to Florida from the Gulf Coast and using the Florida Straits to reach ports on the east Coast of Florida. That State further suggests that a high proportion of tankers returning to oil producing countries from the deepwater ports will be transiting the Florida Straits in ballast, presenting no little hazard of spills from tank cleaning operations and discharge of oily ballast.

Our primary source of advice is NOAA, as mandated by the Act. The recommendation of the Administrator of NOAA is that the State of Florida should be granted status as an adjacent coastal State. This recommendation is not, however, advanced unequivocally. The Administrator notes that "if tankers in transit were not to be considered, I would not recommend that Florida be designated an adjacent coastal State with respect to either of the deepwater port applications presently under consideration." The administrative record shows that NOAA had received advice of its counsel that tankers in transit should not be included within the scope of inquiry required by the Act, such advice relying on legislative history for the proposition that the risks to be considered should be confined to the results of oil spills originating from the deepwater port or vessel within the proposed safety zone (a zone of appropriate size around and including a deepwater port for the purpose of navigational safety). However, the Chief Counsel of the Coast Guard disagreed with this legal conclusion and opined that risks other than those resulting from such spills must be considered under the Act. It was in deference to Coast Guard counsel, and in response to the specific request of the State of Florida, that the Administrator of NOAA agreed to include consideration of tankers in transit in his analysis and thereby felt obliged to recommend that Florida be granted adjacent coastal State status.

In reviewing the recommendations of NOAA, the Coast Guard concluded that the manner in which NOAA went about giving consideration to the risks created by tankers in transit was inappropriate to the situation at hand in that NOAA failed to show that those risks would be attributable to the creation of deepwater ports. The Coast Guard, marshalling data on ship traffic with its customary resourcefulness, pointed out that deepwater ports will not themselves increase the volume of oil imported and arriving at Gulf ports, and that the volume that is (and will be) shipped will in fact be shipped in fewer tankers of larger size. The

-4-

Coast Guard concluded that the existence of the proposed deepwater ports would not result in any additional risk to the coastal environment of the State of Florida and consequently recommended that the State of Florida not be designated as an adjacent coastal State in the case of either application.

The factual questions can be resolved rather easily by an examination of the sensitivity of NOAA's analysis to the facts in issue. The relatively straightforward method of this analysis involves an assessment of both the risk of oil spill for each State in question and the relative vulnerability of those States' coastal environments. The NOAA analysis of risk concludes that the risk of spills to each of the States in question is of the same order of magnitude. Its analysis of vulnerability, however, indicates that Florida has at risk five times as great a total value of recreational fisheries resources and 15 times the value in major environmental amenities as the State of Texas--and five times and six times, respectively, in the case of Louisiana. It is thus clear that NOAA's conclusions are relatively insensitive to measures of risk and to minor factual differences as to vulnerability; the substantially greater vulnerability of the Florida coastline forecloses other conclusions, assuming the correctness of the approach. 2/

The question before me thus reduces itself to a question of statutory interpretation. If I take into account the environmental risks posed by tankers in transit to and from the proposed deepwater ports, all are

---

2/ The applicants have taken issue with one factor of the NOAA analysis that could affect the outcome and the recommendations. They contend that NOAA has improperly taken into account in its risk calculations the presence of oil spill containment and clean-up capability in the proximity of the proposed deepwater ports specifically and on the Texas and Louisiana coasts generally. Investigation by NOAA disclosed that the absence of offshore oil related activity on the Florida coast results in an absence there of similar oil spill containment and clean-up capability. Since this capability of mitigation of oil spill damage is either present on the Texas and Louisiana Gulf coasts, or proposed as an essential part of each deepwater port, it is an integral part of the circumstances and setting of the NOAA analysis, and I conclude that NOAA is correct in including such considerations. I am, of course, obliged to give the factual determinations of NOAA, a disinterested party and the congressionally appointed expert in these matters, substantial weight barring clear error.

-5-

agreed that the risk of damage to Florida is greater than the risk
to either Louisiana or Texas. If, on the other hand, I exclude from
my calculations the risks posed by such tankers, NOAA and the Coast
Guard have excluded, and I accept the conclusion, that the risk to
Florida is not sufficient to qualify Florida for designation as an
adjacent coastal State.

The bare language of the statute obviously does not answer the question
whether the risks posed by tankers in transit should be considered.
The question is thus one of whether the Congressional purposes that
underlay the Act in general, and Section 9(a)(1) in particular, suggest
that such risks should be part of my calculation.

Obviously there was no intention that the entire universe of environ-
mental risks to the various states involved be considered: the relevant
risks must be risks that are in some sense associated with the proposed
ports. But even that formulation seems somehow too broad, and in any
event too ambiguous. For there is a sense in which every movement
of oil anywhere in the world is "associated with" every other through
some mutual ripple effect. On the other hand, it seems to me that
another test that has been suggested, namely that I consider only risks
that are within the safety zone or some other geographically defined area
immediately surrounding the proposed port, is too narrow.

Common sense suggests, I think, that the Congressional purpose must
point to an answer lying between these two extremes. In rightly
concerning itself with environmental hazards, Congress must, in the
Deepwater Ports Act, have been concerning itself with those environ-
mental hazards that were to be generated by the program it was
authorizing--that is, with these risks that would be created by the
construction of the ports in question. It would have been senseless
to give an environmental veto over the construction of a port to a State
simply because it could demonstrate the existence of environmental
hazards, without a further showing that the hazards relied on grew out
of the construction or existence of the port in question.

This conclusion is supported by the legislative history of the Act.
The Joint Report of the Committees on Commerce, Internal and Insular
Affairs, and Public Works of the United States Senate that accompanied
the Senate version of the Act discussed the designation of adjacent
Coastal states. That Report states that:

-6-

. . . such an evaluation must not be made in a vacuum.
Rather the Committees believe that NOAA should compare
the volume of spills now occurring from offshore lightering
and other methods of oil transfer with the potential risk from
a deepwater port before specifying what states qualify as
"adjacent coastal States."

S. Rep. No. 1217, 93d Cong., 2d Sess. 13 (1974)

The limits of the issue thus narrowed, the answer rather clearly
emerges. Since the threat to the Florida coast posed by tankers in
transit would exist irrespective of the construction of the ports in
issue--indeed, construction of the ports will reduce the risk somewhat--
that seems to me a class of risks that Congress cannot have intended to
be included in my calculations. There are, it is true, greater environ-
mental risks to Florida than to either Louisiana or Texas, but those
greater risks are risks that would exist irrespective of the existence
of the deepwater port program. I therefore conclude that I should not
consider them, and that Florida should not be declared an adjacent
coastal state in either case.

I do not intend by this determination to leave the State of Florida with-
out recourse. I am required by Section 9(b)(2) of the Act to give any
interested State the opportunity to make its views known and to be given
full consideration in the decisions of this Department regarding the
location, construction and operation of deepwater ports. 33 U.S.C.
§ 1508(b)(2). Even without such a requirement, the extreme vulnerability
of the coastal environment of the State of Florida would require extra-
ordinary sensitivity to the potential for oil spills. To the extent we are
permitted by the authority granted under the Act, this Department will
give the fullest consideration to suggestions by the State of Florida in
the evaluation of the license applications in question, and in the framing
of conditions for the issuance of a license for a deepwater port, should
such a license be issued. During the course of the application review,
this Department will provide the State of Florida with all information
(except such information which is to be treated as confidential under
Section 14(b) of the Act, 33 U.S.C. § 1513(b)) provided the States of
Louisiana and Texas, and will afford equivalent opportunity for comment.

-7-

Also I hereby instruct the applicants to provide the State of Florida with all documents, legal briefs, letters and memoranda filed with the States of Louisiana or Texas, as the case may be (except such information that is confidential, as aforesaid). The environmental consequences of tanker traffic through the Florida Straits will be given emphasis in the preparation of the Environmental Impact Statement, and should that statement suggest that the conclusions reached herein should be reconsidered, I will do so.

Issued in Washington, D.C., on March 25, 1976.

William T. Coleman, Jr.
Secretary of Transportation

Defs.' Ex. 14

## PROCESSING TIMELINE DECLARATION OF MARK A. PRESCOTT

I, Mark A. Prescott, declare as follows:

1. I am the Chief of the Deepwater Ports Standards Division at U.S. Coast Guard, Department of Homeland Security. I have been employed in this capacity since 2003. The principal focus of my duties, responsibilities and goals as Chief of the Deepwater Ports Standards Division is to supervise the implementation of the Coast Guard Deepwater Ports Program in accordance with statutory and delegated authority to process Deepwater Port applications in coordination with the Maritime Administration. I am involved, along with my staff, in the Coast Guard's efforts to process applications including but not limited to the selection and direction of work of third party contractors to assist the Coast Guard and Maritime Administration in developing the Environmental Impact Statements in accordance with the National Environmental Policy Act (NEPA) and the Deepwater Port Act of 1974, as amended, (DWPA). I have personal knowledge of the facts in this declaration or have received such information in the course of my official duties.

2. I am writing this declaration to describe the process and timeline associated with processing a Deepwater Port Act application including the review required for compliance with the National Environmental Policy Act (NEPA), specifically the time one can anticipate as necessary to complete a Draft and Final environmental impact statement (DEIS and FEIS).

3. Since 2002 when Congress Amended the Deepwater Port Act to allow natural gas deepwater ports, the Maritime Administration and the Coast Guard have received 16 applications for deepwater ports that have been deemed "complete" which initiates processing as allowed by the DWPA.

4. Twelve of those applications (as of this date) have reached a Draft Environmental Impact Statement (DEIS). The average time from the date that these applications were deemed complete to the time of Federal Register publication of the Notice of Availability (NOA) of the DEIS was 276 days.

5. Eight of the applications (as of this date) have reached a Final Environmental Impact Statement (FEIS). The average time from the date that these applications were deemed complete to the time of Federal Register publication of the NOA of the FEIS was 547 days.

6. Each of the 16 applications received since 2002, except for one (Port Pelican, early in the modern Deepwater Port program) has had the DWPA time clock stopped so that the Coast Guard and Maritime Administration could receive the required information prescribed by the DWPA and NEPA to complete the application review process. The stop clock time periods for the 15 most recent applications ranged from several months to over one year and in some cases project time clocks were stopped on multiple occasions

to satisfy the information requirements for the processing and licensing of any Deepwater port.

I declare under penalty of perjury that the information stated herein is true and correct to the best of my knowledge, information, and belief.

Executed this 7th day of March, 2008.    _Mark A. Prescott_

Mark A. Prescott

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ATLANTIC SEA ISLAND GROUP LLC,    )
    )
    Plaintiff    )
    )
    v.    )
    )
SEAN T. CONNAUGHTON,    )
  Administrator, Maritime Administration,    )  Civil Action No. 08-00259(RWR)
    )
 and    )
    )
MARY E. PETERS,    )
 Secretary, U.S. Department of Transportation,    )
    )
    Defendants.    )
_____)

## ORDER

UPON CONSIDERATION OF Plaintiff's Motion for a Preliminary Injunction,

Defendants' Motion to Dismiss and Opposition thereto, any responses accepted by the Court

filed by other interested Parties, and the entire record herein, it is this _____ day of

_____, 2008,

    ORDERED that Plaintiff's Complaint is DISMISSED; and it is further

    ORDERED that Plaintiff's Motion for a Preliminary Injunction is DENIED;

    SO ORDERED.

_____
United States District Judge

Copies of this order to:
John F. Cooney
Venable, LLP
575 Seventh Street, N.W.
Washington, D.C.  20004

Beverly M. Russell
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530