UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ATLANTIC SEA ISLAND GROUP LLC,           )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Civil Action No.
                                          )        08-00259 (RWR)
SEAN T. CONNAUGHTON                        )
Administrator                             )
Maritime Administration, and             )
                                          )
MARY E. PETERS,                           )
Secretary                                 )
Department of Transportation,            )
                                          )
                    Defendants.           )

REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

March 24, 2008                     Counsel for Plaintiff

**Introduction**

The Maritime Administrator has taken inconsistent positions on important aspects of this case to prevent detection of his violations of the Deepwater Port Act ("DWPA"). ASIG will summarize this information and then show how it helps refute Defendants' arguments.

<u>Multiple Positions on the Statutory Deadline for Resolving New Jersey's Petition</u>. On September 17, 2007 the agency submitted New Jersey's September 6, 2007 petition for additional "adjacent coastal State" status to the National Oceanic and Atmospheric Administration ("NOAA") for its recommendation, as required by 33 U.S.C. § 1508(a)(2). The agency informed NOAA that "the letter. . . was received by the Maritime Administration and the U.S. Coast Guard by facsimile on September 6, 2007" and that "the Administrator must render a decision on Adjacent Coastal State status for the State of New Jersey by October 22, 2007," which was 45 days after September 6th. ASIG Reply Attachment 1.

In denying ASIG's request for reconsideration, the Administrator stated that the designation of New Jersey was made "within <u>the strict statutory timeframe</u> for review and processing" of deepwater port applications and that his decision was based on "the available information within the statutory period." ASIG Attachment 8 at 1, 5 (emphasis added). He claimed that the "official date the Administrator is deemed to have received the Governor's request was September 18, 2007," the date the letter was posted to his controlled correspondence database; and that his decision had been rendered on November 2, 2007, 45 days thereafter. *Id*. at 5. However, the Maritime Administration had forwarded the petition to NOAA on September 17th, the day before the alleged date of receipt, and had informed NOAA that the Administrator had to resolve the petition by October 22, 2007." ASIG Reply Attachment 1. The own agency's actions thus refute its prior positions.

In this Court, Defendants have abandoned both prior positions and now assert that the 45 day period started on September 10, 2007, the date New Jersey's letter was placed in the docket. Def. Mem. at 29-30. Even based on that date, the Administrator violated the statutory deadline.

Denial of Access to the NOAA Letter. On October 17, 2007, NOAA submitted its comments on the New Jersey petition to the Maritime Administration. According to a subsequent letter written by New Jersey on November 1, 2007 that quoted from this document, NOAA concluded that the showing in the State's submission was inadequate. ASIG Reply Attachment 2.

Although the Administrator granted New Jersey immediate access to NOAA's October 17 letter and explicitly relied upon it in his November 2, 2007 decision, he has refused to submit that document to the Court. He also has repeatedly declined ASIG's requests for the document under the Freedom of Information Act by invoking Exemption 5 for pre-decisional documents, 5 U.S.C. § 552(b)(5), even though its prior disclosure to New Jersey vitiated that claim.

The excerpt from the NOAA document in the State's November 1st letter shows why the Administrator has refused to release the NOAA letter. NOAA stated that the State's submission was inadequate and did not provide information necessary to make the Section 1508(a) decision.

## Summary of Argument

ASIG has a strong likelihood of success on the merits because the Administrator violated the procedural and substantive requirements of the DWPA in his November 2, 2007 decision.

1. Delegations published in the Federal Register vest the authority to make the designation in the Coast Guard. The Code of Federal Regulations provides that this power resides with the Coast Guard. Defendants assert that the Secretary of Transportation never delegated this authority to the Commandant. But they have submitted no document that expressly withholds this power from the Coast Guard, nor one that expressly grants it to the Maritime Administrator, in contrast to the Federal Register documents that explicitly grant the authority to the Commandant.

2.  The Administrator exceeded the statutory time limit for making his decision, even though he has acknowledged that the time deadline is binding upon him and that he is required to make his decision based on the evidence available to him within the deadline.  The text and legislative history of the statute show that strict compliance with the deadline is required.

3.  The Administrator did not apply the strict "equal to or greater than" standard adopted in Section 1508(a)(2).  Instead, he applied a less demanding standard -- whether the port might have a substantial impact on New Jersey's environment -- that Congress had expressly rejected.

4.  The Record before the Administrator as of the expiration of the 45 day deadline was plainly inadequate to support New Jersey's designation, including the deficiencies NOAA identified in its October 17, 2007 letter.  After the deadline, New Jersey submitted a second letter to the Administrator that apparently was not submitted to NOAA for its recommendation and that merely restated, but did not cure, the deficiencies in its prior submission.  The Administrator did not rely upon the second State letter in his November 2, 2007 decision.  In this Court, Defendants attempt to defend the Administrator's decision based on *post hoc* rationales on which he did not rely when he made his decision on November 2, 2007.  Many of these rationales are impermissible under the DWPA, and the remaining claims are refuted by the evidence in the Record, notably in ASIG's Application.

The equitable factors strongly support ASIG's claim for a preliminary injunction.  Defendants argue that ASIG is not currently suffering any injury and that any claim of harm will be premature before the end of the review process, when it will be known whether New Jersey will exercise its power to veto or condition the license.  That assertion is meritless.  Through his decision, the Administrator has given New Jersey a figurative gun that is aimed at ASIG's head.  If a criminal were holding a gun to a person's head and requiring him to write checks and make concessions, no rational person would argue that the individual would not suffer harm until the end

3

of the process, when it will be known whether the gunman shoots his victim or walks away. Yet that is precisely the argument Defendants make here.

Unless the Administrator's unlawful decision is enjoined, ASIG will suffer irreparable injuries during the interim. It will have to expend large amounts of money and suffer long delays while its consultants and a third-party consultant, paid by ASIG but directed by the Coast Guard, conducts whatever environmental studies New Jersey may demand. ASIG also will be obliged to make whatever concessions the State may demand, for fear of exercise of its veto. Those commitments will be irreversible even if the Administrator's decision ultimately is overturned.

ASIG does not seek to prevent consideration of New Jersey's environmental concerns in the consideration of its Application, as Defendants repeatedly suggest. Def. Mem. at 19, 20, 35, 39. ASIG submits only that New Jersey did not satisfy the demanding standard that Congress established for designation as an "adjacent coastal State" with veto power. Congress intended that the concerns of a State that cannot make the required showing should be addressed through the environmental review process, where "[the] State shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added).

## I. THE COURT HAS JURISDICTION OVER ASIG'S CLAIM.

### A. ASIG Has Constitutional Standing To Challenge the Agency Action.

Defendants contend that ASIG has not met the Article III requirements for standing, because it is has not suffered an injury-in-fact, its injury is not causally connected to the agency action, and the injury is unlikely to be redressed by a decision in its favor. Def. Mem. at 17. Under the case law, however, ASIG has satisfied the constitutional standing requirements by alleging that the Administrator failed to follow the procedures required by the DWPA, thus creating a reasonably increased risk of harm to its particularized interest. Complaint ¶¶ 44-47, 50-57.

In defining Article III standing, the Supreme Court has recognized that "'procedural rights' are special" and that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). In *Massachusetts v. EPA*, 529 U.S. ___, 127 S. Ct. 1428, 1453 (2007), the Court stated that "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Defendants' claim that ASIG has not alleged a "direct, real injury" from the decision, Def. Mem. at 19, ignored ASIG's allegations of violation of its procedural rights.

As the license applicant, ASIG has a concrete interest protected by the procedures established by Congress in the DWPA and that the agencies must follow in evaluating its Application for a license, including the procedures and standards governing whether a petitioning State qualifies as an additional "adjacent coastal State." Congress deliberately adopted narrow standards for designation of a petitioning State to assure that construction of deepwater ports would not be unduly restricted. ASIG Mem. at 5-6. ASIG has a direct entitlement to have its Application evaluated under the criteria Congress enacted, and the Administrator's failure to follow those procedures inflicted a "direct, real injury" on its interest in receiving a fair evaluation. *Cf. Elect. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004) (finding standing where EPSA was "seeking to enforce procedural requirements designed to protect EPSA's concrete interest in the outcome of hearings to which EPSA is a party."); *Lujan*, 540 U.S. at 572-73.

As the D.C. Circuit explained in *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996), the injury in fact requirement in procedural rights cases requires only that "the plaintiff . . . show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *See Wyoming Outdoor Council*

*v. U.S. Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999). The Administrator's unlawful decision to designate New Jersey as an "adjacent coastal State" unquestionably has caused "a distinct risk" to ASIG's interest in receiving a license by granting New Jersey the unilateral right to veto or impose conditions on the project. That decision dramatically increased the risk that ASIG will not receive a license. It thus meets the standing requirements with regard to this procedural injury. *See Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 12-13 (D.D.C. 2002) ( a party asserting a procedural violation satisfies the standing requirement by showing "'a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest,'" *quoting Fla. Audubon Society* at 665.)

Defendants also argue that ASIG cannot satisfy the causality or redressability requirements of Article III because "removing the possibility that New Jersey will disapprove or place conditions on the project does not ensure that the project will be approved" and "[w]hat New Jersey's position will be on the license is purely a matter of speculation." Def. Mem. at 20-21. This objection ignores extensive contrary precedents, which hold that a plaintiff alleging a procedural violation need not show that the agency will grant its request at the end of the process.

To show causation and redressability in a procedural-rights case, "Appellants need not demonstrate that, but for the procedural defect, the final outcome of the rulemaking process would have been different, and that this Court's ordering the action to remedy the procedural defect *will* alter the final effect on Appellants' interests." *Center for Law and Education v. Dept. of Education*, 396 F.3d 1152, 1160 (D.C. Cir. 2005).[1]

---

[1] *See Lujan*, 504 U.S. at 572 n.7 ("[O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.")

Defendants further assert that ASIG lacks constitutional standing because there is "no causal connection" between its injury and the Administrator's decision to grant New Jersey "adjacent coastal State" status. Def. Mem. at 19. They contend that since any injury inflicted upon ASIG through a veto or conditioning of its license would be the direct result of actions by New Jersey and not the Administrator, his action is insulated from judicial review. *Id.* In the D.C. Circuit, the central question in cases in which injury depends in part on the actions of a third party is whether the challenged agency action is directly responsible for the third party's actions or whether the plaintiff presents "unadorned speculation as to the existence of a relationship between the challenged action and the third party conduct." *Nat'l Wrestling Coaches Ass'n v. Dept. of Education*, 366 F.3d 930, 938 (D.C. Cir. 2004). Here, the causal chain is direct and unambiguous. The Administrator granted New Jersey "adjacent coastal State" status, and New Jersey can now exercise the powers conferred by that designation to ASIG's detriment. New Jersey would have <u>no</u> authority to veto or condition the license absent the designation by the Administrator. Accordingly, ASIG has standing to seek redress for the Administrator's failure to follow statutory procedures designed to protect its interests as an applicant.

In any event, ASIG has established constitutional standing even under the standards applied in cases not involving procedural rights. ASIG has alleged that it has suffered economic injury as a result of the Administrator's decision, which would, for example, cause it to spend substantial sums of money and endure substantial delays by requiring it to conduct additional environmental analyses of possible effects in New Jersey. *See, e.g.,* Complaint ¶¶ 46-49; ASIG Mem. at 41-48 and Attachment 9; VanHerwarde Dec. at ¶¶ 3-5 (ASIG Reply Attachment 3). These outlays and delays are directly traceable to the agency's November 2, 2007 decision, and its reversal would redress those injuries by eliminating the need for such studies and the delays. While Defendants assert in their standing argument that ASIG has "borne no expense, suffered

no damage, nor undertaken any additional activity" due to the agency action (Def. Mem. at 18), in the irreparable injury argument they concede that ASIG has alleged such harm (*id.* at 35-36).

## B. **The November 2, 2007 Decision Constitutes "Final Agency Action."**

In *Bennett v. Spear*, 520 U.S. 154, 178 (1997), the Supreme Court held:

> two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

Under *Bennett*, the decision to designate New Jersey as an "adjacent coastal State" constituted "final agency action." First, the Administrator's decision is not "tentative" or "interlocutory," but was the "consummation" of the agency decisionmaking process, as he will not revisit his November 2, 2007 decision. *See* ASIG Attachment 1. Second, his decision has determined the rights and obligations of ASIG and New Jersey and has resulted in legal consequences. Prior to his decision, New Jersey did not have the right to unilaterally veto or impose conditions on the ASIG license; now it does. The Administrator's decision conclusively altered the legal regime under which ASIG's Application will be evaluated and its rights determined. The decision "afforded [the State] the authority . . . to approve, disapprove, or approve with conditions the deepwater port license" for this project. ASIG Attachment 1. It thus constituted "final agency action" under the APA. *See Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2004).

Defendants seek to confuse the issue by arguing that the Administrator's decisionmaking process will be consummated only when "the Secretary reaches a licensing decision under Section 1504 of the Act." Def. Mem. at 23. However, ASIG does not seek an injunction ordering the Administrator to issue it a license. It seeks only to overturn his unlawful decision conclusively (and adversely) determining its legal rights and those of the State. This decision is entirely distinct from the ultimate decision on issuance of a license. While an intermediate step in

the overall Section 1504 process, the Administrator's decision under Section 1508 constitutes "final agency action" within the meaning of *Bennett*. Section 702 of the APA gives ASIG a cause of action to challenge that consummated decision immediately in court. In sum, Defendants seek, without legal authority, to substitute a "last agency action" standard for the actual "final agency action" standard of the APA.

As authority for their position, Defendants offer *Crop Life Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003), which allegedly "compels the conclusion" that the designation of New Jersey as an "adjacent coastal State" is not "final agency action" subject to judicial review. Def. Mem. at 23. However, *Crop Life* did not discuss or apply the "final agency action" standard. It involved the separate question whether an agency announcement was a non-binding policy statement or a rule that must be promulgated through notice and comment procedures. The case therefore provides no support for Defendants' position.

## II. ASIG HAS A STRONG PROBABILITY OF SUCCESS ON THE MERITS.

### A. The Administrator Lacked Authority to Designate an "Adjacent Coastal State."

Defendants acknowledge that the rules currently in force provide that the Coast Guard will determine whether to designate an additional "adjacent coastal State." Def. Mem. at 29 n.2. They can point to no rule that expressly grants the Administrator this power. Instead, they make two arguments why the Court should not apply the clear language of 33 C.F.R. § 148.217(d).

First, Defendants argue that their disavowal of the governing rule is entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Def. Mem. at 26-27. There are several problems with this claim. The rule to be interpreted is a Coast Guard rule, and not a rule issued by either Defendant. Accordingly, their views are not entitled to deference. Moreover, *Chevron* applies to agency interpretations of a statute; the deference doctrine applicable here was established in *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), under which a court

must give "controlling weight" to an agency's interpretation of its own rule unless the interpretation is "plainly erroneous or inconsistent with the regulation." *Id.* at 414. The court must defer to the agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation omitted).

Second, there is no ambiguity in the governing rule. Section 148.217(d) plainly states that it is the Commandant, "in concurrence with the MARAD Administrator," who will make the "adjacent coastal State" determination.

**1. Plain Language of the 1975 Delegation.** ASIG has provided a careful analysis of the delegations preceding publication of the Coast Guard's rule. ASIG Mem. at 14-23. In particular, ASIG showed that in 1975 the Secretary delegated to the Coast Guard all authorities under the Deepwater Port Act except those expressly retained by the Secretary and that the authority to designate adjacent coastal states under Section 1508 was not expressly retained by the Secretary. ASIG Mem. at 17-18; 40 Fed. Reg. 43,901 (Sept. 24, 1975). That delegation was logical, because Congress intended the Coast Guard to be the lead agency for licensing and regulating deepwater ports, based on its expertise in examining impacts on the coastal zone and the marine environment. S. Rep. No. 93-1217, reprinted in 1974 U.S.C.C.A.N. 7529, 7236-37.

Defendants have identified no rule in which the Secretary expressly granted this authority to the Maritime Administration after it joined the Department in 1981. They assert that the Secretary "always reserved this authority until the most recent delegation to the Maritime Administrator in June of 2003, post-Coast Guard transition. 68 Fed. Reg. 36496 (June 18, 2003)." Def. Mem. at 6 n.3. This is contrary to the clear language of the delegations. The 1997 and 2003 delegations simply delegated to the Administrator certain powers that the Secretary had ex-

pressly retained in the 1975 delegation.  As noted above, those expressly retained powers did not include the authority to designate additional "adjacent coastal States" under Section 1508.

Finally, Defendants argue that there is an ambiguity in the definitional section of the Coast Guard rule, 33 C.F.R. § 148.5(3), that trumps the clear language of Section 148.217(d). Def. Mem. at 26.  However, they have no answer to ASIG's showing that under *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2348-49 (2007), when a general definitional provision conflicts with a specific regulatory provision, "the specific governs the general."

**2.  The 1976 Orders.**  The only other authority Defendants offer are two decisions signed by Secretary of Transportation Coleman in 1976 denying petitions for "adjacent coastal State" status.  Def. Ex. 13.  These documents do not cure Defendants' failure to identify any document in which the Secretary expressly withheld from the Coast Guard the authority to designate "adjacent coastal States" or gave that power to the Administrator.  Presumably, if such documents existed, they would have been produced to refute the delegations ASIG identified.

The Secretary's action is unremarkable and does not undermine the standing general delegation of this authority to the Coast Guard.  "It is well established that the head of an agency retains the authority to make final decisions for the agency even if he or she delegates the authority to make these decisions to his or her subordinates." *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 9-10 (D.D.C. 2000) (citations omitted).  The Secretary's choice in 1976 to exercise his inherent authority regarding the designation of "adjacent coastal States" in the SEADOCK and LOOP matters did not divest the Commandant of his general delegated authority to make such decisions, as Defendants suggest.  It shows only that the Secretary preferred to take action himself in those matters, for whatever reason.

**3.  The Coast Guard's Position.**  Defendants assert that the Coast Guard agrees that the Administrator possesses the authority to designate additional "adjacent coastal States."  Def.

Mem. at 29 n. 2.  The sole authority for this assertion is a letter from the Commandant to Senator Inhofe.  Def. Ex. 9.  But that letter does not state that the Administrator has this authority,  It simply acknowledges that 33 C.F.R. § 148.217 specifically provides that the Coast Guard will designate additional "adjacent coastal States" and notes that "an examination of the Deepwater Port Act implementing regulations is warranted and appropriate clarifications need to be considered."  Def. Ex. 9 at 2.  This comment provides no basis for ignoring the language of the rule.

Further, Defendants ignore the Homeland Security Act, which transferred the Coast Guard and all of its authorities to the Department of Homeland Security, and further provided that none of those authorities could be removed or reduced except by Act of Congress.  See ASIG Mem. at 20-21.  An agreement between the Commandant and the Administrator that the Administrator should designate additional "adjacent coastal States" has no legal effect.  Under the Homeland Security Act, what matters is that the Coast Guard had this authority when it was transferred in 2003.  That allocation of authority has now been codified, and the agencies cannot modify it to suit their administrative convenience.

**B.  The Agency Exceeded the Statutory Deadline for Action on the Petition.**

The Maritime Administrator has taken three positions on when the statutory 45 day period for resolving New Jersey's petition commenced.  These inconsistencies show that he acted with total disdain for his statutory responsibilities under Section 1508.

The Administrator received New Jersey's petition for "adjacent coastal State" status by fax on September 6, 2007.  On September 17, 2007, the agency requested NOAA's recommendation on the petition and informed NOAA that "the Maritime Administrator must render a decision on Adjacent Coastal State status for the State of New Jersey by October 22, 2007," 45 days later.  ASIG Reply Att. 1.  The agency correctly calculated the deadline but failed to meet it.

In its request for reconsideration, ASIG showed that the Administrator had violated the 45 day deadline. In rejecting that argument, the Administrator claimed that the "official date the Administrator is deemed to have received the Governor's request was September 18, 2007," the date the letter was posted to his controlled correspondence database. *Id.* at 5. This claim was clearly specious because the agency had forwarded the petition to NOAA the previous day. Nonetheless, the Administrator claimed that he had not violated the statute because his November 2, 2007 decision "was made on the very last day provided under the statute in an effort to grant all due consideration to the issues given the strict timeframe for making the designation." *Id.* (emphasis added).[2] This statement clearly contradicts the agency's contemporaneous statement to NOAA that the clock had started on September 6th.

Defendants have now abandoned both prior dates and assert that the petition was received on September 10, 2007, the date it was placed in the formal docket. Def. Mem. at 29-30.

New Jersey's Motion to Intervene revealed why the Administrator had manipulated his calculation of the date of receipt of New Jersey's petition. On November 1, 2007, the State submitted a letter to the Maritime Administration that quoted from the October 17, 2007 NOAA letter and attempted to respond to its criticisms of the State's original submission by providing further information about the risks posed by the port to its coastal environment. ASIG Reply Attachment 2. The November 1, 2007 letter also showed that on October 24, 2007, two days after the expiration of the 45 day deadline, the Maritime Administration had conducted a conference call with New Jersey to discuss the shortfalls in its submission identified by NOAA.

These undisputed facts demonstrate that the Administrator violated the DWPA in two respects. First, he acted well after the statutory deadline, which expired on October 22nd, by his

---

[2] As stated in ASIG's Opening Memorandum (at 24), if the State's letter is deemed to have been received on September 18, 2007, as the Administrator asserted in denying reconsideration, then New Jersey did not meet the statutory 14 day time period for submission of its petition, and the agency's determination is statutorily time-barred. Defendants have no response to this argument but have simply abandoned the September 18 starting date.

contemporaneous calculation; or on October 26th, by Defendants' litigating position.  Second, at the time the 45 day deadline expired, the Record did not contain sufficient evidence to support a determination that New Jersey met the statutory criterion for designation as an "adjacent coastal State," as evidenced by the NOAA letter.  The Administrator violated the statutory deadline precisely to allow New Jersey to submit additional information that might satisfy its burden of showing that the risk to its "coastal environment" was "equal to or greater than" the risk to New York.  The material in the November 1st letter did little more than restate New Jersey's prior points; in any event, there is no indication that this out-of-time letter was referred to NOAA for its recommendation as required by Section 1508.  Indeed, there was no time for NOAA to review the submission because the Administrator already had exceeded the statutory deadline.  Instead, he designated New Jersey as an "adjacent coastal State" the next day, on November 2, 2007, without disclosing the existence of the November 1st letter or explicitly relying on its contents.

Defendants' only argument why the Administrator's decision should not be overturned for his violation of the statutory deadline is the citation of one case for the proposition that, as a general matter, exceeding a deadline does not preclude an agency from acting after the fact, unless the language or legislative history of the law suggests that Congress intended there would be significant consequences if it failed to act in a timely manner.  Def. Mem. at 30.  That decision is inapplicable to the Administrator's violations of the statutory time limits established by the DWPA, however, because of its unique, multi-tier deadline structure.  Congress created a series of interlocking deadlines for the express purpose of requiring resolution of an Application for a deepwater port within 356 days of its submission.  Congress expressly noted that the final deadline could not be satisfied if the government arbitrarily extended the mandated preliminary deadlines, including importantly the deadline for designation of an "adjacent coastal State."  *See* S.

Rep. No. 93-1217 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7532-33. During the House debate on the Conference Committee version of the DWPA, one of the floor managers stated:

> The schedule of events for the period of time from the submittal of an application for a license to the Secretary's decision has been carefully developed to assure that adequate time is available to evaluate thoroughly all ramifications of any application and to provide that there will be no delays in the evaluation steps leading to the Secretary's decision. Sufficient time is provided for each of the necessary steps and there is no reason why decision cannot be made in less than 1 year. This means that <u>such determinations as those regarding adjacent coastal States pursuant to section [1508](a)(2) . . . must all be completed in a timely manner</u>.

Statement of Rep. Clausen, Cong. Rec. H 12148, H 12149 (Dec. 17, 1974) (emphasis added). The Administrator acknowledged this requirement in his own statements recognizing "the strict timeframe for making the [adjacent coastal state] designation" and his duty to make the decision based on "the available information within that statutory period." ASIG Attachment 1 at 1, 5.

In sum, the Administrator's decision was arbitrary, capricious, and contrary to law because under his own calculation, he failed to comply with the statutory deadline for resolving New Jersey's petition. Further, the Record at the time of the expiration of the deadline was plainly inadequate to support New Jersey's designation as an additional "adjacent coastal State."[3]

### C. The Administrator Failed To Apply the Statutory Standard and To Perform the Required Comparative Assessment of Risks.

Defendants spend only four pages discussing the heart of the case – whether the Administrator applied the substantive standard required by the DWPA and whether his action was arbitrary and capricious based on the evidence before him on November 2, 2007. Def. Mem. at 30-34. This cursory treatment was necessary because his decision is indefensible on both grounds.

---

[3] The agency's disdain for the deadlines Congress imposed is shown by Defendants' Ex. 14 (¶ 5), which notes that for the applications submitted since the DWPA was amended in 2002 to cover deepwater natural gas ports, the average time from the date the application was deemed complete until the time of publication of the Notice of Availability of the Final Environmental Impact Statement has been 547 days, well beyond the 356 days authorized for the entire process.

His action is plainly arbitrary and capricious when compared to the approach taken by the Secretary of Transportation on the only two prior petitions for "adjacent coastal State" status.

**1. The Administrator Did Not Apply the Statutory Standard.**  The plain language of the November 2, 2007 decision demonstrates that the Administrator did not apply the statutory standard – whether the risk posed to the "coastal environment" of New Jersey was "equal to or greater than"  the risk posed to New York.  He based his decision instead on the "magnitude and scope" of the project and its potential for "significant environmental impact" on New Jersey. ASIG Mem. at 25-28.  Defendants do not challenge ASIG's showing.

Rather, Defendants claim that the Administrator did apply "the standard set out in the DWPA," citing not to the November 2, 2007 decision, but instead to "Ex. 8, Connaughton Ltr. at 1" – his February 8, 2008 letter denying ASIG's request for reconsideration.  Def. Mem. at 31. On its face, this is an improper *post hoc* rationalization that cannot sustain the designation.  If the grounds set forth by the agency in its decision "are inadequate or improper," the court is powerless to affirm its action on a basis the agency did not give at the time.  *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943).

In any event, the only basis the Administrator offered in his February 8, 2008 letter to support his assertion that he had applied the statutory standard was a statement that "New Jersey is an Adjacent Coastal State <u>as defined under the Act</u>" and that this *ipse dixit* incorporated the rest of the law and immunized his action from being overturned.  Def. Ex. 8, Connaughton Ltr. at 3-4.  In this Court, Defendants do not attempt to justify the Administrator's decision on that ground; they do not cite to pages 3-4 of his February 8, 2008 letter, but to page 1.  As the D.C. Circuit held in *Int'l Union, UAW v. OSHA*, 37 F.3d 665, 669 (D.C. Cir. 1994), the Administrator's *post hoc* assertion cannot, as a matter of law, provide a proper basis for his action:

If an agency could claim to be applying a statutory constraint merely by *asserting* the existence of some fact, or without connecting the facts to the congressionally specified standards in a reasoned decision, it would be free to defeat the underlying purpose of the constitutional limits on delegation: to make sure that the regulatory principles as actually applied have their origin in a judgment of the legislature.

**2.   The Administrator Failed to Conduct the Comparative Assessment Required by the DWPA.** The November 2, 2007 decision did not perform a comparative assessment of the risks posed to the coastal environments of New York and New Jersey.  ASIG Mem. at 29-32. Defendants simply deny that the DWPA requires "the Maritime Administration to issue a written decision explaining his designation determination to include a 'comprehensive risk assessment.'" Def. Mem. at 31 n. 8.  However, an agency's decision can be defended only on the grounds it offered at the time it made its decision. *Chenery*, 318 U.S. at 87-88.  Section 1508(a)(2) expressly requires a comparative assessment of risks – that is, whether the risk posed to the "coastal environment" of New Jersey is "equal to or greater than" the comparable risk to New York.  Accordingly, the agency's decision is plainly arbitrary and capricious.[4]

The Administrator's failure to conduct the required comparative analysis is demonstrated by his dealings with NOAA, which Defendants have tried to keep from the Court.  As former Secretary Coleman stated in his 1976 decision on Mississippi's petition for "adjacent coastal State" status, "[m]y primary source of advice is NOAA, as mandated by the Act."  Def. Ex. 13 at 2.  The Administrator requested that NOAA review New Jersey's submission and submit its recommendation.  On October 17, 2007, five days before the expiration of the deadline for the Ad-

---

[4] Defendants assert that "the APA contemplates that decisions . . . will not always be memorialized."  Def. Mem. at 31 n.8. *citing Camp v. Pitts*, 411 U.S. 138 (1973).  That claim is refuted by *Chenery* and *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Life Ins. Co.*, 463 U.S. 29, 43(1983).  The quotation from *Camp* addresses the consequences of the court's finding that "there was such failure to explain administrative action as to frustrate judicial review." 411 U.S. at 142-43.  It does not sustain the rationality of an agency decision that did not consider required factors.

Defendants ' claim that the Administrator's decision was based on recognition of "legitimate regional interests" fares no better.  Def. Mem. at 31.  Section 1508(a)(2) does not permit consideration of that factor in the "adjacent coastal State" decision, but mandates a comparative assessment of the harm to the "coastal environments" of the two States.  These regional factors are properly reviewed in the general review process for the Application.

ministrator's decision, NOAA responded that there were substantial deficiencies in the State's submission. In their Opposition, Defendants never refer to this letter from the "primary source of advice," even though the Administrator expressly stated that he relied upon it in his decision. They also did not produce the letter to the Court and have blocked ASIG's efforts to obtain it. [5]

Based on the part of NOAA's October 17, 2007 letter that New Jersey quoted, it is clear that the Administrator could not have performed a comparative risk assessment based on the data available to him "within the 45 day timeframe." Given the deficiencies in the State's submission identified by NOAA, the statutorily required analysis would not have supported the Administrator's predetermined outcome, which was to designate New Jersey as an additional "adjacent coastal State" and give it a veto power over ASIG's project. This explains why the November 2, 2007 decision did not include any discussion of the comparative facts affecting the two States and why the Administrator applied a standard not authorized by Section 1508(a)(2), despite his interim response to New Jersey that articulated the correct statutory standard. The Record before him at the deadline showed only that this was a large project that might have environmental effects on New Jersey, but did not show that the risks to the "coastal environment" of New Jersey would be "equal to or greater than" the risks to the "coastal environment" of New York.

The clearest proof that the Administrator acted arbitrarily and capriciously is presented by contrasting his actions with Secretary Coleman's handling of the only two decisions on requests for designation as an additional "adjacent coastal State." As set forth in Defendants' Exhibit 13, when applications for the SEADOCK and LOOP projects were received in 1976:

- NOAA conducted "a thorough study of the relative risk of exposure to [pollution] incidents and the relative value of vulnerable resources" and made recommendations to the

---

[5] The quotation from the NOAA letter in the November 1st New Jersey letter shows that the Administrator either provided the NOAA letter to New Jersey or disclosed its contents to the State. Selective disclosure of a previously privileged document to one interested party is offensive to FOIA and vitiates any protection to which it may have been entitled under Exemption (b)(5). *See, e.g., Nat. Res. Def. Council v. Dept. of Defense*, 442 F. Supp. 2d 857, 865-66 (C.D. Cal. 2006); *North Dakota ex rel. Olson v. Andrus*, 581 F.2d 177 182 (8th Cir. 1978).

decisionmaker. *Id.* at 2.  In response to the petition submitted by Florida, NOAA pre-
pared a 233 page report on the relative harm to Florida and the States to which the termi-
nals would be connected.[6]

- The government conducted an "on-the-record conference," at which oral testimony was
  presented by the three States that requested designation and the applicants. *Id.* at 5.

- The Secretary of Transportation issued a written decision that explicitly weighed the
  harms and sensitivity of the environmental resources in the petitioning States and the
  pipeline States.  He concluded that the impacts in the petitioning States were not equal to
  or greater than the effects in the States previously designated as "adjacent coastal States."

The 1976 decisions show that the Administrator failed to follow the law here because:

- He did not conduct a comparative analysis of the risks posed to New York and New Jer-
  sey and thus had no rational basis for his decision..

- NOAA apparently was unable to make a recommendation because of the inadequacy of
  New Jersey's submission.  The Administrator also apparently did not submit the Novem-
  ber 1st letter to NOAA for its recommendation.

- He did not consider the risks posed to New York.  The November 2, 2007 decision did
  not analyze the environmental impacts on New York or reference the extensive environ-
  mental analysis in ASIG's Application.

- The agency held secret discussions with New Jersey to assist it in bolstering its showing,
  rather than running a public and balanced process.

### C. The Administrator Acted in an Arbitrary and Capricious Manner.

Contrary to Defendants' argument that the Administrator was not required to explain his

designation determination, Def. Mem. at 31 n.8, the APA requires the agency to articulate a ra-

tional basis for its decision, and the determination may be sustained only on its stated rationale.

*Williams Gas*, 475 F.3d at 326; *AT&T, Inc. v. FCC*, 452 F.3d 830, 837 (D.C. Cir. 2006).  The

November 2, 2007 decision offered no justification for the Administrator's action.  Assuming he

had applied the proper statutory standard (which he did not), his decision nonetheless could not

be sustained for his failure to provide the rational basis required by the APA.

---

[6] NOAA, Analysis of the Risk of Damage to the States of Florida and Texas from the Seadock, Inc. Proposed
Deepwater Port (Mar. 25, 1976), available at http://unicorn.csc
noaa.gov/docs/czic/TD224.F6_A63_1976/4590.pdf (last visited Feb. 14, 2008).

The few rationales for the Administrator's decision offered in this Court are *post hoc* rationalizations and thus do not provide a basis on which the Court can uphold that decision. In any event, they are plainly arbitrary and capricious.

The Administrator ignored several risk factors that affect only New York.

- New York is 13.5 miles from the port, while New Jersey is 19 miles away, or almost 50% farther. All other things being equal, the risks posed by the port will be significantly greater for New York than New Jersey based solely on geographic location.

- The Application discussed many different environmental factors that might adversely affect New York, including effects on air quality; water use and quality, including impacts on the ocean and groundwater; effects on biological resources; effects on cultural resources; effects on geological resources; effects on land use and aesthetics; and effects on noise quality. The Administrator's *post hoc* arguments focus almost exclusively on water pollution. There are entire categories of environmental risks the Application discussed for New York that the Administrator did not consider or discuss in his November 2, 2007 decision.

- The Application also showed that some important water pollution factors present risks to New York while presenting no risk to New Jersey. In particular, the pipeline from the port that will run through and connect to the existing pipeline in New York waters. The pipelaying presents a risk of disturbing the sea floor and causing sediment discharges in New York waters, but not in New Jersey waters.

Defendants mention in the Factual Background section of their Opposition, but do not actually argue as a basis for the Administrator's decision, that one of the possible alternative pipeline alignments studied during ASIG's preliminary environmental scoping would have come within nine miles of New Jersey. The Application does not seek approval for that alignment, but seeks authorization for a more direct connection in New York waters that would not come within 15 miles of New Jersey. While the State argued that this factor automatically entitled it to "adjacent coastal State" status, the Coast Guard and the Administrator did not adopt this claim in designating New York as the only "adjacent coastal State" pursuant to the criteria in Section

1508(a)(1).[7]  The Administrator also did not rely upon this argument in his November 2, 2007

decision.  In any event, under the case law, this rejected alternative pipeline alignment is not

properly considered as part of the project.[8]

　　The two *post hoc* water pollution rationales upon which Defendants rely are defective on

their face and could not demonstrate the rationality of the Administrator's action in the face of

the contrary showing set forth in ASIG's Application.[9]  ASIG previously had discussed the envi-

ronment implications with New Jersey.  On August 22, 2007, only two weeks before the State's

letter was submitted, the then Deputy Commissioner of the New Jersey Department of Environ-

mental Protection (and the current Director of Policy for the Governor) sent an e-mail to an

ASIG contractor that stated:

> the NJ DEP has reviewed the proposal and based on its current configuration, the
> Department has no regulatory issues that Atlantic Sea Isle Group must deal with.
> Given the distance off NJ's coast and the fact that the current proposal has all of
> the infrastructure going coast (*sic*)through NYC, New Jersey has no jurisdiction
> in this matter. . . .

---

[7] New Jersey also suggested that it is automatically entitled to "adjacent coastal State" status because the port will connect to a pipeline that provides natural gas to New Jersey. The agencies properly rejected this argument, which would entitle all States connected to a pipeline, even inland States, to claim that status.

[8] The requirement that an Environmental Impact Statement assess "reasonable alternatives" arises from a rule issued by the Council on Environmental Quality, 40 C.F.R. § 1502.14. Given the infinite number of possible alternatives to any project, courts do not require studies of every conceivable alternative, but only an appropriate range of reasonable alternatives. *E.g., West Branch Valley Flood Prot. Ass'n v. Stone*, 820 F. Supp. 1, 9 (D.D.C. 1993), *citing Headwaters, Inc. v. Bureau of Land Mgm't*, 914 F.2d 1174, 1181 (9th Cir. 1990). An alternative may properly be eliminated from further study if it would not meet the needs of the project. *See City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); *Audubon Naturalist Soc'y of the Central Atlantic States v. U.S. Dep't of Trans.*, 524 F. Supp. 2d 642, 671 (D. Md. 2007).

[9] Defendants argue that the Administrator noted – in denying rehearing, not in his November 2, 2007 decision – that "the risk of a fire from the proposed [LNG] port . . . will impact the 'marine environment' of New York and New Jersey at least equally." Def. Mem. at 31. New Jersey never raised the "risk of fire" in its petition. The scientific studies cited by ASIG (ASIG Mem. at 39-40) show that a fire at a deepwater port would have limited geographic effects and in the worst case would not extend the 16 miles to New Jersey's "coastal environment."

Defendants also noted that New Jersey cited the potential for adverse effects on fishing at Cholera Bank, "19 miles from New Jersey," and argue that it was "eminently reasonable for the Administrator to consider this factor." Def. Mem. at 32. However, Defendants did not challenge ASIG's showing that under the DWPA, the term "coastal environment" extends only to the three nautical mile limit. ASIG Mem. at 35. While effects beyond that limit may be considered in the general environmental review process, they may not be considered under Section 1508 in determining whether the risk to New Jersey is "equal to or greater than" the risk to New York.

ASIG Attachment 13 (emphasis added).

### III. ASIG IS SUFFERING IRREPARABLE HARM, AND THE EQUITIES STRONGLY FAVOR A PRELIMINARY INJUNCTION.

#### A. The Harm ASIG Is Suffering Is Immediate and Concrete, Not Hypothetical and Speculative

Defendants' principal equitable argument is that ASIG is not currently suffering irreparable harm; that ASIG's concern is with the mere "possibility of New Jersey using its status as an adjacent coastal State to disapprove or place conditions on its project"; and thus that any allegation of harm is premature before New Jersey actually exercises its power to veto or impose conditions on the port. Def. Mem. at 34-35. However, ASIG is currently suffering irreparable injury. Unless a preliminary injunction is issued, it will continue to suffer irreparable injury throughout the review process. The Administrator has given New Jersey a gun that is aimed at ASIG, and the company is currently subject to duress from that power.

As ASIG has demonstrated and Defendants have not contested, the legislative history of the DWPA shows that Congress adopted stringent conditions on designation as an "adjacent coastal State" from concern that a lesser standard, including specifically the one that the Administrator applied in his November 2, 2007 decision, would prevent critically needed energy infrastructure projects from being constructed. ASIG Mem. at 5-6.

#### B  ASIG Will Suffer Irreparable Harm in the Interim if a Preliminary Injunction Is Not Issued.

Defendants claim that the relief ASIG seeks "will not be irrevocably lost if a preliminary injunction is not granted" but can be provided by the Court at the conclusion of the case. Def. Mem. at 36. This assertion is unfounded. First, Defendants have informed ASIG that, unless the designation of New Jersey as an "adjacent coastal State" is overturned in court, the next step in the environmental review process will be to have the third-party environmental contractor, paid

for by ASIG but directed by the Coast Guard, perform the environmental scoping, conduct the agency consultations, and prepare for the public meeting in New Jersey that the DWPA requires to be held in each "adjacent coastal State."  VanHerwarde Dec. ¶¶ 2, 4, ASIG Reply Attachment 3.  *See* 33 U.S.C. § 1504(g).  The unlawful designation of New Jersey thus threatens to expand greatly the scope and cost of the required environmental analysis.  Based on the prior work with New York, the estimated delay will be at least six months, the increase in costs for the environmental contractor will be between $500,000 and $1 million, plus legal fees, and approximately $4.5 million for an estimated six months delay necessary to meet requirements resulting from New Jersey's status as an "adjacent coastal State."  VanHerwarde Dec. ¶ 5.

More importantly, unless a preliminary injunction is granted, any negotiations among New Jersey, the federal agencies and ASIG about how to address environmental risks would occur with the threat of the State's exercising its veto power overhanging the process.  Defendants have not challenged ASIG's showing that, even if the State's designation were overturned after the final license decision, in a practical sense it would not be possible to reverse engineer the consultation process and remove the concerns, conditions and restrictions that were initially included in an attempt to persuade the State to withhold its veto.  ASIG Mem. at 46-48.  This is particularly true because New Jersey would have the unilateral ability to create public expectations that would lock any concessions into the ultimate federal decision by, for example, making public announcements of any interim concessions or agreements and by setting the agenda for the public meeting in the State.

Finally, Defendants argue at length that the delay in further consideration of ASIG's Application is not due to the dispute over the legality of New Jersey's designation but to ASIG's failure to provide certain information. Def. Mem. at 35-36.  There is a factual dispute on that issue, as set forth in the Declarations of ASIG's representatives VanHerwarde (¶ 4) and Dickman

(ASIG Attachment 9), concerning statements made by the agencies at that November 29, 2007 meeting. However, the Court need not and should attempt to resolve that issue in order to grant ASIG a preliminary injunction. Even under Defendants' theory, the designation of New Jersey will cause a major delay in the consideration of ASIG's proposal. Unless a preliminary injunction is issued, as soon as the clock is restarted the agencies would have to direct the third-party environmental contractor to begin the tasks of scoping of environmental effects, development of data, agency consultations, and preparation for a public hearing in New Jersey, as required by the DWPA for every "adjacent coastal State." *See* VanHerwarde Dec. ¶ 4..

### C. The Public Interest Will Be Served by Issuance of a Preliminary Injunction.

Defendants' "public interest" argument focuses exclusively on the environmental considerations. Def. Mem. at 39. These interests will be fully protected by the federal agencies during the environmental assessment process.

Defendants also ignore the strong public interest in having the Administrator comply with the DWPA, which established procedures and substantive standards that Congress deemed appropriate to protect both the environment and the strong national interest in having deepwater ports to permit imports of critical supplies of energy.

### D. The Interests of New Jersey and Its Residents Will Not Be Harmed if a Preliminary Injunction Is Granted.

Defendants repeatedly argue that the interests of New Jersey and its residents will be irreparably harmed if it is not granted "adjacent coastal State" status, with its accompanying veto power, and accuse ASIG of seeking to prevent the State from "hav[ing] a role in the approval process" and seeking to protect its coastal environment. Def. Mem. at 19, 20, 35, 38, 39. ASIG agrees that New Jersey does have important interests that should be given full consideration and does not seek to obstruct its full participation in the environmental review process that the federal agencies will conduct. ASIG's point is that Congress believed and intended that the appro-

priate way for those interests to be protected would be by giving interested States an important role in the environmental review process. It did so by directing that the States' views must give must be given "full consideration" by the reviewing agencies. 33 U.S.C. § 1508(b)(2).[10] Congress conditioned grant of "adjacent coastal State" status, and its accompanying veto power only upon an extraordinary showing by a State that the risks to its "coastal environment" would be "equal to or greater than" those posed to the pipeline State.

In this case, New Jersey failed to make the required showing; the Administrator failed to make the required comparative analysis; and the Record (even absent the full text of the NOAA letter) does not support a conclusion that the risk to New Jersey is "equal to or greater than" the risk to New York, especially the Record that existed as of the expiration of the 45 day deadline.

<u>**Conclusion**</u>

For the reasons set forth above and in ASIG's Opening Memorandum, a preliminary injunction should be issued enjoining the November 2, 2007 decision.

/s/ John F. Cooney
JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
March 24, 2008          Washington, D.C. 20004

---

[10] As Secretary Coleman stated in his 1976 decisions (Def. Ex. 13 at 3, 9), a State that does not have "adjacent coastal State" status still enjoys extraordinary protection under the Act: "I am required . . . to give any interested State the opportunity to make its views known and to be given full consideration in the decisions of this Department regarding the location, construction and operation of the deepwater ports. . . . [T]his Department will give the fullest consideration to suggestions by the State . . . in the evaluation of the license applications in question . . . . "

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of March 2008, the Reply Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction was served by the Court's ECF filing system on the following:

> Beverly Russell, Esq.
> U.S. Attorney's Office
> 555 4th Street, N.W.
> 4th Floor
> Washington, D.C.  20530

and by overnight delivery service to:

> Hon. Anne Milgram
> Attorney General of New Jersey
> R.J. Hughes Justice Complex
> 25 West Market Street
> P.O. Box 093
> Trenton, New Jersey 08625

>     */s/ John F. Cooney*
> John F. Cooney

U.S. Department
of Transportation

**Maritime**
**Administration**

September 17, 2007

VADM Conrad C. Lautenbacher, Jr.
Under Secretary of Commerce for Oceans and Atmosphere and
Administrator of the National Oceanic and Atmospheric Administration
14th and Constitution Avenue, NW
Suite 5128
Washington, DC  20230

Dear Vice Admiral Lautenbacher:

The Maritime Administration and the U.S. Coast Guard have received an application
from Atlantic Sea Island Group, LLC to own, construct, and operate a Liquefied Natural
Gas (LNG) Deepwater Port authorized under the provisions of the Deepwater Port Act
(33 U.S.C. § 1501 *et seq.* (the Act)).  The proposed port, known as Safe Harbor Energy,
would be located approximately 13.5 miles south of Long Beach, New York, and 23
miles southeast of the New York Harbor entrance in the Atlantic Ocean.  The notice of
application was published in the Federal Register on August 27, 2007.  According to the
requirements of Sections 1502 (1) and 1508 (a)(1) of the Act, the Maritime
Administration and the U.S. Coast Guard designated the State of New York as an
Adjacent Coastal State.

By letter dated September 6, 2007, New Jersey Governor Jon S. Corzine, acting in
accordance with Section 1508 (a)(2) of the Act, requested designation of Adjacent
Coastal State status, citing potential impacts to the State of New Jersey from the proposed
Safe Harbor Energy project.  Pursuant to Section 1508 (a)(2) of the Act, the Maritime
Administrator, by delegated authority, must make a  determination regarding the
designation of Adjacent Coastal State status after receiving a timely request from a State
Governor and after considering the recommendation of the Administrator of the National
Oceanic and Atmospheric Administration.  The Maritime Administrator must grant
Adjacent Coastal State status if the risk of damage to the requesting State's coastal
environment is equal to or greater than the risk posed to a State that would be directly
connected by pipeline to the proposed deepwater port (in this instance, New York).  The
Maritime Administrator must make the designation no later than 45 days after the date of
receipt of the request.

The letter from Governor Corzine was received by the Maritime Administration and the
U.S. Coast Guard by facsimile on September 6, 2007.  As such, the Maritime
Administrator must render a decision on Adjacent Coastal State status for the State of
New Jersey by October 22, 2007.  To this end, we request your recommendation on the



designation of New Jersey as an Adjacent Coastal State for the Safe Harbor Energy project.

Should you require additional information, please contact me at 202-366-1624 or keith.lesnick@dot.gov.  Please note that the application and other project data and correspondence may be accessed electronically by visiting the Department of Transportation Docket Management System at http://dms.dot.gov.  Please reference the Safe Harbor Energy project docket number USCG-2007-28535.

To allow timely consideration of your comments, we request that you provide your recommendation to us no later than October 10, 2007.

We appreciate your attention in this matter and look forward to receiving your comments.

Sincerely,

H. Keith Lesnick,
Director, Office of Deepwater
Ports and Offshore Activities

Attachment:  September 6, 2007, Letter from New Jersey Governor Jon S. Corzine.



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

ON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Coastal Management Office
401 E. State Street, 7th Floor, West
P.O. Box 418
Trenton, New Jersey 08625
Phone: 609-633-2201
Fax: 609-292-4608

November 1, 2007

H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick,

Thank you for discussing the current status of New Jersey's request for adjacent coastal state status under the Deepwater Port Act with reference to the Safe Harbor/Atlantic Sea Island Group application. This letter serves to address issues raised by NOAA in its October 17, 2007 letter to the Maritime Administration, as you requested in our conference call on October 24, 2007. NOAA's letter addresses Cholera Bank and fishing, the coastal environment and water quality.

The NOAA letter indicates that New Jersey should provide additional information demonstrating that the risk to New Jersey is equal to or greater than the risk posed to "...New York, the State that is directly connected by pipeline to the proposed deepwater port." The proposed pipeline will tie into the existing Transco pipeline that runs from Sayreville, New Jersey to Long Beach, New York. Therefore, if New York is directly connected by pipeline to the proposed deepwater port, as NOAA states, then New Jersey is also directly connected by pipeline to the proposed deepwater port, in the identical manner. Furthermore, an alternative pipeline route is included in the deepwater port application. Since a deepwater port includes all pipelines and structures associated with the project, if the alternative pipeline route is used, New Jersey would be within the necessary 15 miles to be an adjacent coastal state based on the alternative route alone.

The deepwater port is proposed on Cholera Bank. Cholera Bank is heavily used by recreational and commercial fishermen. Prime fishing areas are designated a special area and marine fisheries are protected under New Jersey's Coastal Zone Management rules,

which are enforceable policies under New Jersey's federally approved coastal management program. Cholera Bank is, and has historically been, an important productive fishing ground for the New Jersey commercial ground fishing fleet and for recreational fishing. The area was mapped as an important recreational and commercial fishing ground in New Jersey's Recreational and Commercial Ocean Fishing Grounds (1982) and important for recreational fishing in the NOAA Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey (1974). Recent surveys of recreational party and charter boat captains confirmed the importance to recreational fishing in 2003. The proposed location of the project is specifically known as Anglers Bank and Middle Grounds. Through personal communication this year with the commercial fishing dock managers from Belford, New Jersey (Belford Fishermen's Cooperative) and Point Pleasant, New Jersey (Fishermen's Dock Cooperative), and several New York based companies at Fulton Fish Market, this area remains of economic importance to New Jersey 's commercial fishermen, and is of importance to New York's commercial fishermen as well.

Clearly the Cholera Bank fishing ground would be affected by the construction of an island occupying 112 acres of ocean bottom, eliminating that habitat. Fisheries would also be affected as fishing boats would be excluded from the area around the island. Since fishermen from both New York and New Jersey are fishing these fishing grounds, impacts would be comparable. Further, the application indicates that sand and rock to build the island will be obtained from the New York channel deepening. In meetings with New Jersey in 2006, the applicant proposed mining sand from the ocean floor to obtain material to create the island. If logistical problems preclude obtaining all necessary material from the channel deepening, and mining were again proposed, it too would affect the fish habitat.

Coastal environment as defined in the statute includes navigable waters (including lands therein and thereunder). The definition contains a list of resources that are included in the coastal environment, including fish, wildlife, and recreational values of lands, waters and resources. The list is not exhaustive. New Jersey considers its commercial and recreational fisheries to be part of its coastal environment. Fish and wildlife, such as avian species, are highly mobile living resources that are also part of New Jersey's coastal environment. As these living resources do not distinguish between New York and New Jersey, the risk to New Jersey is comparable to that of New York.

Good water quality is critical to these living resources. Water quality will be affected during construction, operation, and maintenance of the proposed deepwater port. Any adverse affect on water quality could affect living resources of the coastal environment. The figure "Dominant Winds, Waves and Currents of the New York Bight," (Figure 2-2 Volume Three, Part One: Deepwater Port License Application) indicates that the prevailing direction of the currents is toward New Jersey and the direction of waves is into the New York/New Jersey Harbor. Accordingly, it is likely that water quality impacts to the coastal environment would be equal for New York and New Jersey.

In 2006, the applicant indicated that a future pipeline from the deepwater port would come ashore in the area of Linden, New Jersey. The application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The maximum takeaway capacity of the Long Beach Meter Station, Long Beach, New York, is approximately 530 million cubic feet per day. The Milltown Regulator Station, Milltown, New Jersey, has an estimated maximum capacity of 619 million cubic feet per day. Therefore, New Jersey is equally affected by the operation of the deepwater port.

Contrary to the applicant's October 10, 2007 objection letter to the director of NOAA's Office of Ocean and Coastal Resource Management regarding New Jersey's request for federal consistency review, the documentation that New Jersey received does not include information providing the location of the five facilities in the metropolitan New York area that may be used for staging of construction. These locations are discussed in Section 4 of the application, to which New Jersey has not been granted access. The application indicates that staging will be from facilities in the metropolitan New York area, which includes New Jersey waters, ports and waterfront facilities.

It is not a requirement and would be difficult to determine the full nature and magnitude of the extent of the impacts to either New Jersey's or New York's coastal environment prior to completion of an EIS. The standard is whether "there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Based on the above, the damage to the coastal environments would be equal for New York and New Jersey.

Sincerely,

Ruth Ehinger
Coastal Program Manager

c.     Mitch Hudson, MARAD

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLANTIC SEA ISLAND GROUP LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| SEAN T. CONNAUGHTON | ) Civil Action No. 08-00259(RWR) |
| Administrator | ) |
| Maritime Administration, and | ) |
| | ) |
| MARY E. PETERS, | ) |
| Secretary | ) |
| Department of Transportation, | ) |
| | ) |
| Defendants. | ) |

AFFIDAVIT OF WILLIAM VANHERWARDE

I, William VanHerwarde, declare and say as follows:

1.  I am the Executive Vice President of the Atlantic Sea Island Group LLC ("ASIG"),

    Chrysler Building, 26th Floor, 405 Lexington Avenue, New York, New York 10174.

    As part of my responsibilities, I have attended meetings, and have spoken by

    telephone, with representatives of the Maritime Administration and the United States

    Coast Guard regarding the application by ASIG for a license under the Deepwater

    Port Act to construct and operate a deepwater port 13.5 miles off the coast of New

    York that is known as the Safe Harbor Energy LNG Deepwater Port.  I also am

    responsible for coordinating the efforts of various consultants working on behalf of

    ASIG to obtain a license for the Safe Harbor Energy LNG project.  This includes the

    third party consultant hired by ASIG, but working at the direction of the Coast Guard,

to assist in the development of Environmental Impact Statements required by the National Environmental Policy Act ("NEPA") and the Deepwater Port Act.

2.  Under procedures developed by the Coast Guard, in order to be more efficient and alleviate the time lag between contractor selection and hiring related to the NEPA requirements, an applicant for a license under the Deepwater Port Act may voluntarily directly hire a contractor, utilizing a third party contract, to assist the Coast Guard.  The contractor is selected by, and works under the technical direction of the Coast Guard; is responsible for conducting environmental analyses and preparing documentation, including environmental assessments and environmental impact statements; and is paid directly by the license applicant.

3.  After the Coast Guard, with the concurrence of the Maritime Administration, found that ASIG's application was complete, an issue arose concerning the original third party environmental consultant contracted by ASIG to provide support and assistance to the Coast Guard.  As a consequence of issues arising in part from the termination of the contract with this environmental consultant by ASIG, by letter dated October 24, 2007, the Coast Guard, with the concurrence of the Maritime Administration, stated that they were suspending the time line for processing of the application until such time as information required to address this issue was submitted and issues related to an independent financial review required under the Letter of Completeness issued for the application were resolved.

4. On November 29, 2007, I attended a meeting with representatives of the Coast Guard and the Maritime Administration to address the issues that had resulted in suspension of the time line. At that meeting, ASIG was informed orally that the suspension could not be lifted until such time as the issue of the adjacent coastal State status of New Jersey was resolved because the necessary public meetings required to be held in adjacent coastal states under the Deepwater Port Act could not be held until it was determined whether New Jersey was an adjacent coastal State. ASIG representatives were also informed that if the clock was started before the issue was resolved, New Jersey would be treated as if it were an adjacent coastal state and the first item that the third party consultant working with the government would be tasked with doing would be to develop data gaps and plans for future public meetings in New Jersey.

5. Based on my experience in negotiating with contractors to comply with NEPA, including the third party consultant for the Coast Guard, and after consultation with consultants working for ASIG, ASIG will incur significant additional costs as a result of New Jersey's designation as an adjacent coastal state. For instance, public hearings in New Jersey are required, and issues unique to New Jersey will need to be addressed under the EIS that will result in further delays to the processing of the application. It is estimated that it will cost ASIG an additional $500,000 - $1 million to provide the necessary environmental consulting services to the ASIG and the Coast Guard, an additional $300,000 in legal fees for review of the application additions, and approximately $4.5 million for an estimated additional six-month delay to meet statutory requirements resulting from New Jersey's status as an adjacent coastal state.

I declare under penalty of perjury that the information stated herein is true and correct to the best of my knowledge, information and belief.

Executed this __24th__ day of March, 2008.

William VanHerwarde