UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
ATLANTIC SEA ISLAND GROUP LLC,    )
                                   )
                    Plaintiff,     )
        v.                         )    Civil Action No.
                                   )    08-00259 (RWR)
SEAN T. CONNAUGHTON               )
Administrator                      )
Maritime Administration, and       )
                                   )
MARY E. PETERS,                    )
Secretary                          )
Department of Transportation,      )
                                   )
                    Defendants.    )
_____)

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO SUBMIT THE RECENTLY RELEASED NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION LETTER

Plaintiff Atlantic Sea Island Group ("ASIG") hereby submits this Memorandum in support of its Motion for Leave to supplement the record before the Court by submitting a copy of the October 17, 2007 letter from the National Oceanic and Atmospheric Administration to the Maritime Administration concerning the petition by New Jersey for designation as an additional "adjacent coastal State" under the Deepwater Port Act ("DWPA") for purposes of the Safe Harbor Energy LNG project.  Exhibit 1.

This Memorandum also briefly explains why the concerns expressed by NOAA in that letter about the sufficiency of the information submitted by New Jersey in support of its petition strengthen ASIG's showing that it is likely to succeed on the merits of its challenge to the Maritime Administrator's action.  ASIG has argued that the Administrator's action is illegal on four grounds:  (1) he did not have authority to make

the designation; (2) he exceeded the statutory deadline for making it; (3) he did not apply the substantive standard established by Section 1508(a)(2) of the DWPA; and (4) the evidence in record did not and could not have supported his conclusion that New Jersey had satisfied the statutory standard by showing that the risk presented to its "coastal environment" was equal to or greater than the risk to the "coastal environment" of New York.

The NOAA letter strengthens significantly ASIG's position that the record did not contain sufficient evidence to satisfy the statutory standard. It also shows why the Administrator was forced to apply a different, less stringent standard to designate New Jersey as an "adjacent coastal State," rather than the demanding, objective test established by Congress in the DWPA. Finally, it confirms that the Administrator's action was subject to a binding statutory deadline, which he exceeded.

Granting the Motion will not delay resolution of the Motion for a Preliminary Injunction, which has been briefed but for which no hearing date has yet been established. ASIG submits that, with the submission of this document, the matter is ripe for the Court's consideration and that a hearing on the Motion for a Preliminary Injunction should be scheduled as soon as possible.

## Argument

Fed. R. Civ. P. 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The Court has broad discretion under Rule 15 to grant such a motion, and leave may liberally be allowed in the absence of a reason, such as undue delay, bad

faith, or undue prejudice to the other party by allowing supplementation of the pleading to reflect subsequent events. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

ASIG satisfies the standard for granting leave to submit the October 17, 2007 NOAA letter, so that the Court may have this critical document before it in considering the pending Motion for a Preliminary Injunction. The NOAA letter was improperly withheld from ASIG until after completion of the briefing on the Motion for a Preliminary Injunction on March 24, 2008, and this Motion is filed promptly upon the public release of this letter. As stated in the FOIA Officer's Document Release Notice of April 3, 2008 that accompanied public disclosure, the NOAA letter is being released at this time "in light of the disclosure to New Jersey, a fact not previously known to the FOIA officer . . . ." Exhibit 2

**1. The NOAA Letter Confirms that the Record before the Administrator Did Not Justify New Jersey's Designation.** The NOAA letter stated that after reviewing New Jersey's request and the response submitted by ASIG, "NOAA has concerns with the sufficiency of the information submitted by New Jersey in support of its request." Exhibit 1 at 1. NOAA recommended that the Maritime Administration "solicit from New Jersey additional information supporting its claim that the proposed project presents a risk to its coastal environment 'equal to or greater than the risk' to New York." *Id*. NOAA questioned the three major bases advanced by New Jersey for why it should be designated an "adjacent coastal State." NOAA advised the Maritime Administration that further information was necessary before New Jersey's petition could be properly evaluated. NOAA posed the following questions:

- "New Jersey alleges the project would 'destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally

3

approved coastal management program.' What is New Jersey's interest in Cholera Bank and how is this area protected under the State's coastal management program? What are the impacts to New Jersey's coastal environment (in both nature and magnitude) and how do they compare with comparable impacts that likely will be experienced by other affected states?

- "Does New Jersey allege that any waters within the facility's proposed exclusion zone include the 'coastal environment' of New Jersey, as defined by statute?

- "New Jersey alleges potential impacts due to turbidity, since the predominant current in the area of the proposed deepwater port is in the direction of New Jersey. What impacts to New Jersey's coastal environment are projected, both in nature and magnitude? How do these impacts compare with impacts that likely will occur within the coastal environment of New York?"

Exhibit 1 at 1-2.

The Maritime Administration then provided the NOAA letter to New Jersey. After expiration of the statutory deadline for its decision regarding the State's petition, the agency held a follow-up teleconference with New Jersey representatives seeking further information to respond to NOAA's concerns. On November 1, 2007, after the expiration of the statutory deadline established by the Maritime Administration in its letter to NOAA for a decision on its petition, the State provided the Maritime Administration with a brief response to NOAA's questions. Exhibit 3. New Jersey, however, essentially restated the arguments from its prior submission and failed to provide any actual supplemental information in response to NOAA's concerns about the sufficiency of the showing set forth in its petition.

> -- With respect to NOAA's question about its interest in Cholera Bank, New Jersey did not describe the "nature and magnitude" of possible impacts on its coastal environment. It did not try to show that this fishing area was located within three nautical miles of its coast, the jurisdictional limit of the "coastal environment" as defined in the DWPA, or any other impacts from fishing in the area of Cholera Bank on its "coastal environment." Rather, it described the potential economic effects of the proposed port on its commercial and recreational fisherman and attempted to tie these factors back to NOAA's question by relying on a factor not authorized by the statute " that it "considers its commercial and

4

recreational fisheries to be part of its coastal environment." Exhibit 3 at 2. The State also did not respond to NOAA's request that it provide information about the potential impact on New York. It simply asserted that "[s]ince fishermen from both New York and New Jersey are fishing these fishing grounds, impacts would be comparable." *Id.*

-- New Jersey failed entirely to respond to NOAA's question whether the State claimed that any waters within the facility's proposed exclusion zone fell within "the 'coastal environment' of New Jersey, as defined by statute." The State noted only that "fishing boats would be excluded from the area around the island [the proposed port]," which will be 19 miles from the New Jersey coast and thus nearly 16 miles from the outer reach of its "coastal environment." *Id.*

-- New Jersey also failed entirely to provide information in response to NOAA's question about the "nature and magnitude" of the potential impacts of turbidity on its "coastal environment." It asserted that the "prevailing directions of currents is toward New Jersey," without attempting to show that turbidity effects actually would be experienced within its "coastal environment," as defined by the DWPA, much less attempting to describe their magnitude or potential impact. *Id.* Similarly, the State simply asserted that "it is likely that water quality impacts to the coastal environment would be equal for New York and New Jersey." *Id.*

In sum, New Jersey did not submit any meaningful information in response to NOAA's expressions of concern about the sufficiency of the State's prior factual showing. New Jersey utterly failed to provide information about possible effects or possible impacts on its "coastal environment" as that term is defined by statute, despite the fact that the Maritime Administration had specifically called this deficiency to its attention by providing it with the NOAA letter that raised the statutory issue. And New Jersey provided no information about possible effects on the "coastal environment" of New York, which is 50 percent closer (13.5 miles versus 19 miles) to the proposed port, and thus presumably more significantly impacted by any environmental risks from the port.

As a matter of law, a State may not be designated as an additional "adjacent coastal State" under Section 1508(a)(2) simply by asserting that "it is likely" that impacts on its coastal environment would be equal to those on the State connected by pipeline to

the project. If this were the case, the rigorous test that Congress actually adopted would be reduced to a nullity. Instead, Congress made an explicit judgment that a stringent, science-based test was required to prevent the awarding of a veto power over the license in a manner that would prevent critically-needed energy infrastructure projects from being constructed.

**2. The NOAA Letter Confirms that the Administrator Violated a Statutory Deadline and the Statutory Criteria for Designation of New Jersey as an "Adjacent Coastal State."** The NOAA letter confirms that the Administrator violated the statutory deadline in granting New Jersey's petition. On September 17, 2007, the Maritime Administration submitted the New Jersey request to NOAA and informed NOAA that the Administrator was required by law to make a determination regarding the petition by October 22, 2007. ASIG Reply Attachment 1 in Support of Motion for Preliminary Injunction. In its October 17, 2007 letter, NOAA recognized that "MARAD is under a statutory deadline to make a decision on New Jersey's request" and for that reason "does not expect that MARAD will provide additional information to NOAA for further review . . . ." Exhibit 1 at 3. Thus, it is apparent that both the Maritime Administration and NOAA recognized the importance of the statutory deadline in the DWPA, and both recognized that the deadline expired on October 22, 2007. Nevertheless, the Administrator did not make his determination on the petition until November 2, 2007, well after the deadline expired.

The October 17, 2007 NOAA letter also demonstrates why the Administrator violated the statutory deadline. At the time the deadline expired, there was insufficient information in the Record to justify designation of New Jersey as an "adjacent coastal

6

State," but the Record did contain a letter from NOAA that explicitly identified those deficiencies. The Administrator improperly sought to give New Jersey an opportunity, outside the statutory timeframe, to attempt to supplement its submission. Thereafter, he sought to prevent detection of the evidence of the NOAA criticism and the post-expiration effort by New Jersey to cure the many deficiencies in its submission.

The NOAA letter, by identifying the lack of sufficient evidence of risk to its "coastal environment" in New Jersey's submission and the lack of any comparison of that risk to the risk to the "coastal environment" of New York, also establishes why the Administrator did not apply the statutory "equal to or greater than" standard in his November 2, 2007 decision, and why he concocted and applied a lesser standard. Based on the criticism of the State's submission by NOAA, the Record before the Administrator – even taking into account the information provided by New Jersey after the statutory deadline – could not and did not satisfy the test established by Section 1508(a)(2).

**3. The NOAA Letter Is Directly Relevant to the Court's Resolution of the Motion for a Preliminary Injunction.** In their Opposition to Plaintiff's Motion to Compel Production of the NOAA letter, Defendants argued that consideration of the NOAA letter by the Court is improper, because the decision under review is not the NOAA recommendation but the Maritime Administration's final decision. Def. Opp. at 3-4. However, the Administrator was required by Section 1508(a)(2) to review the NOAA recommendation, and he explicitly stated in his November 2, 2007 determination that he had in fact based his decision in part on the NOAA letter. Accordingly, this document is directly relevant to the Court's consideration of the likelihood of success on the merits prong of the Motion for a Preliminary Injunction. Defendants note that the

7

DWPA is silent as to the precise weight to be given the NOAA recommendation, but this does not, as they suggest, make that letter irrelevant. To the contrary, by law and in fact the NOAA letter was part of the Administrator's decision making process. It therefore is properly reviewed by the Court as part of the Record on which the determination was made, particularly now that the letter has been belatedly docketed..

Under the DWPA and the APA, the Court ultimately will determine whether the Administrator applied the legal standard required by the statute and whether his decision can be upheld on the rationales he set forth in articulating his decision based on the evidence in the Record at that time. The NOAA letter is directly relevant to these issues, particularly since the Administrator relied upon it in his decision. The letter clearly establishes that (1) the Administrator did not have sufficient evidence in the Record on which to justify designation of New Jersey under the statutory criteria; (2) he violated the statutory deadline for making the designation; and (3) the Maritime Administration consciously ignored the deadline in order to provide New Jersey an unlawful opportunity to cure the defects in its submission and respond to the NOAA criticism. The agency then tried to cover up its violation of the procedures established by the DWPA by suppressing the NOAA letter and its criticism of the New Jersey submission. The NOAA letter also shows why the Maritime Administration solicited New Jersey's November 1, 2007 letter after the statutory deadline, in an unsuccessful effort to cure the deficiencies NOAA identified in its submission.

These issues are directly relevant to the Court's consideration of ASIG's likelihood of success on the merits, and it therefore is appropriate for the Court to consider the NOAA letter on these issues.

## Conclusion

For the reasons set forth above, the Court should grant Plaintiff's Motion for Leave to Submit the Recently Released NOAA Letter.

Respectfully submitted,

/s/ John F. Cooney
JOHN F. COONEY
(D.C. Bar No. 936336)
JAMES H. BURNLEY IV
(D.C. Bar No. 426299)
DAVID G. DICKMAN
(D.C. Bar No. 465010)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004

April 11, 2008



UNITED STATES DEPARTMENT OF COMMERCE
The Under Secretary of Commerce
for Oceans and Atmosphere
Washington, D.C. 20230

OCT 17 2007

H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick:

Thank you for your letter requesting the National Oceanic and Atmospheric Administration's (NOAA) recommendation on whether to recognize the State of New Jersey as an "adjacent coastal state" under the Deepwater Port Act (DPA), for the purpose of reviewing a liquefied natural gas facility proposed by the Atlantic Sea Island Group, LLC.

Under the DPA, the Secretary of Transportation (Secretary) is authorized to designate a state as an "adjacent coastal state" for purposes of reviewing deepwater port applications filed pursuant to the DPA. Specifically, the Secretary shall, after receiving a recommendation from the NOAA Administrator, designate a state as an adjacent coastal state, if the Secretary determines that there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the proposed deepwater port.

After reviewing New Jersey's request and the response submitted by the Atlantic Sea Island Group, NOAA has concerns with the sufficiency of the information submitted by New Jersey in support of its request. Given these concerns, NOAA recommends MARAD solicit from New Jersey additional information supporting its claim that the proposed project poses a risk of damage to the coastal environment of New Jersey "equal to or greater than the risk" to New York, the State that is directly connected by pipeline to the proposed deepwater port. Useful information might include the following:

- New Jersey alleges the project would "destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally approved coastal management program." What is New Jersey's interest in Cholera Bank and how is this area protected under the State's coastal management program? What are the impacts to New Jersey's coastal environment (in both nature and magnitude) and how do they compare with comparable impacts that likely will be experienced by other affected states?

- Does New Jersey allege that any waters within the facility's proposed exclusion zone include the "coastal environment" of New Jersey, as defined by statute?

- New Jersey alleges potential impacts due to turbidity, since the predominant current in the area of the proposed deepwater port is in the direction of New Jersey. What impacts to New Jersey's coastal environment are projected, in both nature and

THE ADMINISTRATOR



magnitude? How do these impacts compare with impacts that likely will occur within the coastal environment of New York?

NOAA understands that MARAD is under a statutory deadline to make a decision on New Jersey's request. Accordingly, NOAA does not expect that MARAD will provide additional information to NOAA for further review, but rather that MARAD make a final determination based on its record and the requirements of the DPA.

Please note the State of New Jersey has made a separate request to the NOAA Office of Ocean and Coastal Resource Management (OCRM) to review the proposed facility pursuant to the Coastal Zone Management Act (CZMA). OCRM is reviewing the State's request to determine if the State made a timely request, and whether the State has met the CZMA standard that the proposed activity may have a reasonably foreseeable effect on New Jersey's coastal uses or resources. OCRM's decision is expected by October 25, 2007.

Please contact David Kaiser, Senior Policy Analyst with OCRM, with any questions you may have in regards to this matter. Mr. Kaiser can be reached at (603) 862-2719.

Sincerely,

Conrad C. Lautenbacher, Jr.
Vice Admiral, U.S. Navy (Ret.)
Under Secretary of Commerce for
  Oceans and Atmosphere



Department of Transportation

**Maritime Administration**
Office of the Chief Counsel

1200 New Jersey Avenue, S.E.
Washington, D. C. 20590

Christine S. Gurland, FOIA Officer
202-366-5181
Ann Herchenrider, FOIA Public Liaison
202-366-5165
Jeannette S. Riddick
FOIA Requester Service Center
202-366-2666
FACSIMILE: 202-366-7485
Toll free: 1-800-986-9678 ext. 65181
E-mail address: FOIA.MARAD@dot.gov

April 3, 2008

## DOCUMENT RELEASE NOTICE

Re: National Oceanic and Atmospheric Administration Letter of Recommendation dated October 17, 2007.

It has come to the attention of the Maritime Administration that the October 17, 2007 inter-agency letter from the National Oceanic and Atmospheric Administration (NOAA) to the Maritime Administration was provided to the State of New Jersey. The NOAA recommendation letter was originally designated exempt from disclosure by the Maritime Administration's Freedom of Information Act Officer, pursuant to FOIA exemption (b)(5) because it contains information that is normally privileged in the civil discovery context and in order to prevent injury to the quality of agency decisions. However, in light of the disclosure to New Jersey, a fact not previously known to the FOIA officer, the balance of the equities weighs in favor of full disclosure of the recommendation letter to the public domain. Therefore, by this posting to our public Deepwater Port docket, the October 17, 2007 letter of recommendation from the NOAA to the Maritime Administrator is attached and made public.

The release of this NOAA recommendation letter is limited to the particular set of facts and circumstances associated with its disclosure and is not intended to serve as an administrative precedent. The Maritime Administration expressly reserves its legal authority to exempt from disclosure all past, present and future inter-agency memorandums or letters in accordance with the Freedom of Information Act.

Sincerely,

Christine S. Gurland
Freedom of Information Act Officer

Attachment



# State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Coastal Management Office
401 E. State Street, 7th Floor, West
P.O. Box 418
Trenton, New Jersey 08625
Phone: 609-633-2201
Fax: 609-292-4608

November 1, 2007

H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick,

Thank you for discussing the current status of New Jersey's request for adjacent coastal state status under the Deepwater Port Act with reference to the Safe Harbor/Atlantic Sea Island Group application. This letter serves to address issues raised by NOAA in its October 17, 2007 letter to the Maritime Administration, as you requested in our conference call on October 24, 2007. NOAA's letter addresses Cholera Bank and fishing, the coastal environment and water quality.

The NOAA letter indicates that New Jersey should provide additional information demonstrating that the risk to New Jersey is equal to or greater than the risk posed to "...New York, the State that is directly connected by pipeline to the proposed deepwater port." The proposed pipeline will tie into the existing Transco pipeline that runs from Sayreville, New Jersey to Long Beach, New York. Therefore, if New York is directly connected by pipeline to the proposed deepwater port, as NOAA states, then New Jersey is also directly connected by pipeline to the proposed deepwater port, in the identical manner. Furthermore, an alternative pipeline route is included in the deepwater port application. Since a deepwater port includes all pipelines and structures associated with the project, if the alternative pipeline route is used, New Jersey would be within the necessary 15 miles to be an adjacent coastal state based on the alternative route alone.

The deepwater port is proposed on Cholera Bank. Cholera Bank is heavily used by recreational and commercial fishermen. Prime fishing areas are designated a special area and marine fisheries are protected under New Jersey's Coastal Zone Management rules,

which are enforceable policies under New Jersey's federally approved coastal management program. Cholera Bank is, and has historically been, an important productive fishing ground for the New Jersey commercial ground fishing fleet and for recreational fishing. The area was mapped as an important recreational and commercial fishing ground in <u>New Jersey's Recreational and Commercial Ocean Fishing Grounds</u> (1982) and important for recreational fishing in the NOAA <u>Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey</u> (1974). Recent surveys of recreational party and charter boat captains confirmed the importance to recreational fishing in 2003. The proposed location of the project is specifically known as Anglers Bank and Middle Grounds. Through personal communication this year with the commercial fishing dock managers from Belford, New Jersey (Belford Fishermen's Cooperative) and Point Pleasant, New Jersey (Fishermen's Dock Cooperative), and several New York based companies at Fulton Fish Market, this area remains of economic importance to New Jersey's commercial fishermen, and is of importance to New York's commercial fishermen as well.

Clearly the Cholera Bank fishing ground would be affected by the construction of an island occupying 112 acres of ocean bottom, eliminating that habitat. Fisheries would also be affected as fishing boats would be excluded from the area around the island. Since fishermen from both New York and New Jersey are fishing these fishing grounds, impacts would be comparable. Further, the application indicates that sand and rock to build the island will be obtained from the New York channel deepening. In meetings with New Jersey in 2006, the applicant proposed mining sand from the ocean floor to obtain material to create the island. If logistical problems preclude obtaining all necessary material from the channel deepening, and mining were again proposed, it too would affect the fish habitat.

Coastal environment as defined in the statute includes navigable waters (including lands therein and thereunder). The definition contains a list of resources that are included in the coastal environment, including fish, wildlife, and recreational values of lands, waters and resources. The list is not exhaustive. New Jersey considers its commercial and recreational fisheries to be part of its coastal environment. Fish and wildlife, such as avian species, are highly mobile living resources that are also part of New Jersey's coastal environment. As these living resources do not distinguish between New York and New Jersey, the risk to New Jersey is comparable to that of New York.

Good water quality is critical to these living resources. Water quality will be affected during construction, operation, and maintenance of the proposed deepwater port. Any adverse affect on water quality could affect living resources of the coastal environment. The figure "Dominant Winds, Waves and Currents of the New York Bight," (Figure 2-2 Volume Three, Part One: Deepwater Port License Application) indicates that the prevailing direction of the currents is toward New Jersey and the direction of waves is into the New York/New Jersey Harbor. Accordingly, it is likely that water quality impacts to the coastal environment would be equal for New York and New Jersey.

In 2006, the applicant indicated that a future pipeline from the deepwater port would come ashore in the area of Linden, New Jersey. The application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The maximum takeaway capacity of the Long Beach Meter Station, Long Beach, New York, is approximately 530 million cubic feet per day. The Milltown Regulator Station, Milltown, New Jersey, has an estimated maximum capacity of 619 million cubic feet per day. Therefore, New Jersey is equally affected by the operation of the deepwater port.

Contrary to the applicant's October 10, 2007 objection letter to the director of NOAA's Office of Ocean and Coastal Resource Management regarding New Jersey's request for federal consistency review, the documentation that New Jersey received does not include information providing the location of the five facilities in the metropolitan New York area that may be used for staging of construction. These locations are discussed in Section 4 of the application, to which New Jersey has not been granted access. The application indicates that staging will be from facilities in the metropolitan New York area, which includes New Jersey waters, ports and waterfront facilities.

It is not a requirement and would be difficult to determine the full nature and magnitude of the extent of the impacts to either New Jersey's or New York's coastal environment prior to completion of an EIS. The standard is whether "there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Based on the above, the damage to the coastal environments would be equal for New York and New Jersey.

Sincerely,

Ruth Ehinger
Coastal Program Manager


c.   Mitch Hudson, MARAD