# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLANTIC SEA ISLAND GROUP LLC, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SEAN T. CONNAUGHTON, | ) |
| Administrator, Maritime Administration, | ) Civil Action No. 08-00259(RWR) |
| | ) |
| and | ) |
| | ) |
| MARY E. PETERS, | ) |
| Secretary, U.S. Department of Transportation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' NOTICE OF FILING THE ADMINISTRATIVE RECORD

Defendants, Sean T. Connaughton, Administrator, Maritime Administration, and Mary E. Peters, Secretary, U.S. Department of Transportation,, hereby notify the Court of their filing of the Administrative Record in this matter.[1]

Date: June 9, 2008

---

[1]Defendants are not filing Atlantic Sea Island Group's deepwater port application today, June 9, 2008, although the application is part of the administrative record. Instead, Defendants are moving to file the application under seal because it contains information which might be protected from disclosure pursuant to Exemption 4 of the Freedom of Information Act. 5 U.S.C. § 552(b)(4). The exemption covers two categories of information in federal agency records: (1) trade secrets; and (2) information that is (a) commercial or financial, and (b) obtained from a person, and (c) privileged or confidential. Id. Defendants will file the full application under seal although the parties intend to file a public version on the docket after having the opportunity to review the application and make the appropriate redactions.

Respectfully Submitted,

JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
   Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C.  20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-Mail: beverly.russell@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the ***Defendants' Notice of Filing the***

***Administrative Record*** was made by the Court's Electronic Case Filing System, to:

John F. Cooney
Venable, LLP
575 Seventh Street, N.W.
Washington, D.C.  20004
jfcooney@venable.com

and by electronic and first class mail to:

Rachel Horowitz
Office of the Attorney General of New Jersey
24 West Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093

on this 9th day of June, 2008.


/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL
Assistant United States Attorney

I, H. Keith Lesnick do hereby declare as follows:

1.  I am currently employed by the Maritime Administration as the Director of the Office of Deepwater Ports and Offshore Activities. The Maritime Administration is a modal administration of the U.S. Department of Transportation and is headquartered in Washington, D.C. As part of my duties, I analyzed records related to the matter being challenged in the lawsuit filed by Atlantic Sea Island Group LLC against the Maritime Administrator and the Secretary of the U.S. Department of Transportation in their official capacities on or about February 15, 2008 (Docket No. 08-00259).

2.  Attached hereto are records the Maritime Administrator reviewed, referred to and relied on with regard to the subject matter of the instant litigation. These records comprise the Administrative Record.

3.  To the best of my knowledge, information and belief, I certify that this Administrative Record is accurate and complete.

I declare under penalty of perjury that the foregoing is true and correct. Dated this 9th day of June, 2008.

H. Keith Lesnick
Maritime Administration
Office of Deepwater Ports and
        Offshore Activities

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLANTIC SEA ISLAND GROUP LLC, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SEAN T. CONNAUGHTON, | ) |
| Administrator, Maritime Administration, | ) Civil Action No. 08-00259(RWR) |
| | ) |
| and | ) |
| | ) |
| MARY E. PETERS, | ) |
| Secretary, U.S. Department of Transportation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ADMINISTRATIVE RECORD**
**TABLE OF CONTENTS**

Letter from Senators Long, Johnston and Bentson to William T. Coleman,
 Secretary, Department of Transportation, March 16, 1976

U.S. Department of Transportation, Secretary's Decision Respecting
 the Request by the State of Florida for Status as an "Adjacent Coastal State" Under
 the Deepwater Ports Act of 1974 in Respect of the Applications Thereunder of
 LOOP, Inc. and Seadock, Inc., Issued March 25, 1976

U.S. Department of Transportation, Secretary's Decision Respecting the
 Request by the State of Mississippi for Status as "Adjacent Coastal State"
 Under the Deepwater Port Act of 1974 in Respect of the Applications Thereunder
 of LOOP, Inc. And Seadock, Inc., Issued March 25, 1976

Atlantic Sea Island Group LLC - Proposed Safe Harbor Energy Project Location. . . . . . . . . . . . 1

Letter from H. Keith Lesnick, Director, Office of Deepwater Port Licensing and
 Offshore Activities, U.S. Maritime Administration and M.A. Prescott,
 Chief, Deepwater Ports Standards Division, U.S. Coast Guard to William VanHerwarde,
 Executive Vice President, Atlantic Sea Island Group, LLC, June 27, 2007. . . . . . . . . . . . . . . . 3

Letter from William VanHerwarde to Yvette M. Fields,
  U.S. Department of Transportation, Maritime Administration,
  Office of Deepwater Ports and Offshore Activities, July 3, 2007. . . . . . . . . . . . . . . . . . . . . . . . 5

Letter from M.A. Prescott and H. Keith Lesnick to William VanHerwarde, Aug. 15, 2007. . . . . 7

Atlantic Sea Island Group LLC, Safe Harbor Energy Liquified Natural Gas
  Deepwater Port License Application, Notice of Application, 72 Fed. Reg. 49041,
  Aug. 27, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Letter from New Jersey Governor Jon S. Corzine to Admiral Thad W. Allen, Commadant,
  U.S. Coast Guard and  Sean T. Connaughton, Maritime Administrator, Sept. 6, 2007. . . . . . . 12

Letter from the Honorable Frank Pallone, Jr., Member of Congress, to
  Admiral Thad W. Allen and Sean T. Connaughton, Sept. 7, 2007. . . . . . . . . . . . . . . . . . . . . . . 15

Letter from Jacqueline Ostherg to Mary K. Jager, U.S. Coast Guard, Sept. 13, 2007.. . . . . . . . . 17

Letter from Margaret and Dennis Nitka to M.A. Prescott, H. Keith Lesnick,
  and Mary K. Jager, Oct. 30, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Page 19 is a duplicate*

Letter from Janet Babbitt [sp] to Ms. Jager, Nov. 17, 2007.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Letters Regarding New Jersey as an Adjacent Coastal State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Letter from H. Keith Lesnick to VADM Conrad C. Lautenbacher, Jr.,
  Under Secretary of Commerce for Oceans and Atmosphere and
  Administrator of the National Oceanic and Atmospheric Administration,
  Sept. 17, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Letter from the New Jersey Governor Jon S. Corzine to Admiral Thad W. Allen and
  Sean T. Connaughton, Sept. 6, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*No documents numbered 28-33; administrative record resumes at page 34*

Letter from James H. Burnley IV and David G. Dickman to Admiral Thad W. Allen and
  Sean T. Connaughton, Sept. 24, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Letter from Cindy Zipf, Executive Director, Clean Ocean Action to M.A. Prescott,
  H. Keith Lesnick, and Mary K. Jager, Sept. 25, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Letter from Ruth Ehinger, Coastal Program Manager, State of New Jersey, to
 David M. Kennedy, Director, Office of Ocean and Coastal Resource Management,
 Sept. 25, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Letter from Sean T. Connaughton to the Honorable Jon S. Corzine, Sept. 28, 2007. . . . . . . . . . 49

Letter from Sean T. Connaughton to the Honorable Frank R. Lautenberg, Oct. 16, 2007. . . . . . 50

Concurrence Record re Letter to the Honorable Frank R. Lautenberg, United States Senate,
 Re: Designation of Adjacent Coastal State Status for the State of New Jersey,
 Oct. 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Letter from the Honorable Frank R. Lautenberg to Admiral Thad Allen and
 Sean Connaughton, Sept. 21, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Letter from Sean T. Connaughton to the Honorable Frank R. Lautenberg, Oct. 16, 2007. . . . . . 57

Letter from Conrad C. Lautenbacher, Jr. to H. Keith Lesnick, Oct. 17, 2007. . . . . . . . . . . . . . . 59

Letter from Edward St. Pierre, Commander, U.S. Coast Guard,
 Congressional and Governmental Affairs Staff to the Honorable Frank R. Lautenberg,
 Oct. 17, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Letter from M. A. Prescott and H. Keith Lesnick to Atlantic Sea Island Group LLC,
 Attn: William VanHerwarde, Oct. 24, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Letter from Cindy Zipf and David Byer, Clean Ocean Action to
 M.A. Prescott, H. Keith Lesnick, and Mary K. Jager, Oct. 25, 2007. . . . . . . . . . . . . . . . . . 64

Letter from David Kennedy to Ruth Ehinger, Oct. 25, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . 68

Letter from Ruth Ehinger to H. Keith Lesnick, Nov. 1, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . 70

Letter from Sean T. Connaughton to the Honorable Jon S. Corzine, Nov. 2, 2007. . . . . . . . . . . 74

Letter from Sean T. Connaughton to James H. Burnley IV, Nov. 5, 2007. . . . . . . . . . . . . . . . . 76

Letter from James H. Burnley IV to Sean T. Connaughton, Nov. 13, 2007. . . . . . . . . . . . . . . . 77

Letter from Sean T. Connaughton to James H. Burnley IV, Nov. 19, 2007. . . . . . . . . . . . . . . . 79

Letter from Jim Burnley to the Honorable Mary E. Peters, Secretary,
 U.S. Department of Transportation and Sean T. Connaughton, Dec. 3, 2007. . . . . . . . . . . . . 81

Letter from the Honorable Howard Coble to Admiral Thad Allen, Dec. 11, 2007. . . . . . . . . . . . 95

Letter from Admiral Thad W. Allen to the Honorable Howard Coble, Feb. 14, 2008. . . . . . . . . 96

Letter from Senator James M. Inhofe to Admiral Thad W. Allen, Dec. 14, 2007. . . . . . . . . . . . 98

Letter from Admiral Thad. W. Allen to the Honorable James M. Inhofe, Feb. 14, 2008. . . . . . . 99

Letter from John J. Ferguson, Project Review Coordinator,
  New York State Department of Environmental Conservation, to
  M. A. Prescott, Dec. 14, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100b (13 pages)

Letter from Cindy Zipf and David Byer, Clean Ocean Action to
  Sean T. Connaughton, H. Keith Lesnick, and M.A. Prescott, Dec. 18, 2007. . . . . . . . . . . . . . 101

Letter from New Jersey Governor Jon S. Corzine to Admiral Thad Allen and
  Sean T. Connaughton, Dec. 21, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Letter from Jeanne Herb, Director, Department of Environmental Protection,
  State of New Jersey, to H. Keith Lesnick, Dec. 21, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Letter from M. A. Prescott to New Jersey Governor Jon S. Corzine,
  Jan. 8, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Letter from Sean T. Connaughton to James H. Burnley IV, Feb. 8, 2008. . . . . . . . . . . . . . . . . 112

J. BENNETT JOHNSTON
LOUISIANA

# United States Senate

WASHINGTON, D.C. 20510

March 16, 1976

The Honorable William T. Coleman
Secretary
Department of Transportation
Washington, D. C.

Dear Mr. Secretary:

As Senators who were members of the conference committee on the
"Deepwater Port Act of 1974", we believe it timely to comment
concerning the risks to be considered in making an "adjacent coastal
state" designation pursuant to Sec. 3(1)(c) and Sec. 9(a)(2) of the Act.
We believe the intent of the legislation was that the "risk of damage" to
be considered by the Secretary in granting a state veto power pursuant to
Sec. 9(a)(2) of the Act be limited to the risk of damage originating from
the deepwater port facility or originating within the designated safety zone
surrounding the facility and did not encompass the risk of damage from
tankers in transit outside the safety zone.

On June 6, 1974, the House adopted the "High Seas Oil Port Act",
H.R. 10701 of the 93rd Congress, which provided in pertinent part that an
"adjacent coastal state means, as to high seas oil ports (either existing
or proposed), a coastal State any point of which lies within ten miles of
the high seas oil port, as that term is used in either a structural or
geographical sense." (Sec. (3)(e)). The Report of the Merchant Marine
and Fisheries Committee on the "High Seas Oil Port Act," Rep. No. 93-1012,
states at p. 26, in the section by section analysis of the bill, that:

> This subsection defines "adjacent coastal State
> to mean, as to any high seas oil port either
> existing or proposed a coastal State, as defined
> above, any point of which lies within ten miles
> of any component of the high seas oil port. This
> definition is designed to include, therefore, the
> coastal State nearest to the high seas oil port
> in its geographical sense, such as any State
> which lies within ten miles of any component, and

The Honorable William T. Coleman        —2—        March 16, 1976

       in particular, a pipeline segment which connects
the high seas oil port to the land.  This definition
relates only to the actual territorial limits of the
State involved, and is not intended to refer in any
way to an extension of lines of demarcation beyond
the territorial limits of that State.

    The House passed version of the "Deep Water Port Act" very narrowly
defined an "adjacent coastal state" in strictly geographical terms.

    On October 9, 1974, the Senate passed S.4706, the Deepwater Port Act
of 1974, which provided, in pertinent part:

       Sec. 3.  As used in this Act, unless the context otherwise
requires, the term—
(1) "adjacent coastal State" means any coastal
State which (A) would be directly connected by
pipeline to a deepwater port as proposed in an appli-
cation; (B) would be located within 15 miles of any
such proposed deepwater port; or (C) is designated by
the Administrator of the National Oceanic and Atmospheric
Administration pursuant to section 9(a)(2) of this Act
as a State to which there is a substantial risk of
serious damage to its coastal environment because of
such factors as prevailing winds and currents as a result
of oil spill incidents which originate from any
proposed deepwater port or from any vessel located within
a safety zone around such deepwater port:
and;
Sec. 9. (a) Designation—(1) The Secretary, in issuing
notice of application pursuant to section 5(c) of this
Act, shall designate as an "adjacent coastal State" any
coastal State which, (A) would be directly connected by
pipeline to a deepwater port as proposed in an application,
or (B) would be located within 15 miles of any such pro-
posed deepwater port.

       (2)  The Administrator of the National Oceanic and
Atmospheric Administration shall, no later than 60 days
after publication of notice pursuant to section 5(c) of
this Act, (A) designate as an "adjacent coastal State"
any coastal State as to which there is substantial risk
of serious damage, because of such factors as prevailing
winds and currents, to its coastal environment as a result
of oil spill incidents that originate from the proposed
deepwater port or from any vessel located within a safety
zone around such deepwater port, and (B) notify the Secretary
and publish notice of such designation.

The Honorable William T. Coleman          -3-          March 16, 1976

The Joint Report of the Senate Committee on Commerce, Interior and Insular Affairs and Public Works on S.4706, the "Deepwater Port Act of 1974", Senate Report No. 93-1217, provides a section-by-section analysis of the bill, which contains the following comment concerning the third element of the Senate definition of an "adjacent coastal state":

> By incorporating this third category in the Act, the Committee intends to protect the interest of a State whose coastal environment bears a risk of damage from deepwater port associated discharges comparable to that of a State directly connected by pipeline to the deepwater port or within 15 miles of the facility. The Committees believe that this situation might, in particular, arise on the east coast where a number of States border the coastline in close proximity to one another and each of them would be equally or close to equally vulnerable to serious damage as a result of oil spills incidents originating from the proposed deepwater port.          (p. 35)

During the October 9, 1974 Senate floor debate on S.4076, Senator Hollings of South Caroline declared:

> "I would now briefly like to explain the key features of S.4076." "An adjacent coastal state is broadly defined and includes: First, a state which is directly connected to the port by pipeline; second, a state located within 15 miles of the proposed port; and third, a state threatened with a possible oil spill from the proposed port. It would be in the discretion of the Administrator of the National Oceanic and Atmospheric Administration to determine which states would face substantial risk of oil spill damage from a deepwater port or from a vessel operating in a safety zone around the port."

Congressional Record, Oct. 9, 1974, S.18654

The "adjacent coastal state" concept adopted by the Senate was much broader than the House passed version, but was still limited to states which would face "substantial risk of oil spill damage" which originated at the deepwater port or from a vessel operating within the safety zone surrounding the deepwater port. The Senate passed concept would not have extended adjacent state status with its accompanying veto power to a state on the basis of a possible risk of damage from tankers in transit outside the safety zone of the facility.

After conference between the two Houses, Congress passed the Deepwater Port Act of 1974 which provides:

The Honorable William T. Coleman          -4-          March 16, 1976

Sec. 3.  As used in this Act, unless the context otherwise requires, the term--
(1)  "adjacent coastal State" means any coastal State which (A) would be directly connected by pipeline to a deepwater port, as proposed in an application; (B) would be located within 15 miles of any such proposed deepwater port; or (C) is designated by the Secretary in accordance with section 9(a) (2) of this Act;

Sec. 9. (a)(1) The Secretary in issuing notice of application pursuant to section 5(c) of this Act, shall designate as an "adjacent coastal State" any coastal State which (A) would be directly connected by pipeline to a deepwater port as proposed in an application, or (B) would be located within 15 miles of any such proposed deepwater port.
(2)  The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. This paragraph shall apply only with respect to requests made by a State not later than the 14th day after the date of publication of notice of an application for a proposed deepwater port in the Federal Register in accordance with section 5(c) of this Act.  The Secretary shall make the designation required by this paragraph not later than the 45th day after the date he receives such a request from a State.

In discussing the Conference Report on the floor of the Senate on December 17, 1974, Senator Hollings, the manager of the legislation in the Senate stated:

The conference report adopts a version of the deepwater port bill which is quite similar to that approved by the Senate on October 9 of this year.  I will not elaborate at any great length on all the changes made by the conference committee but would like to point out a few which merit some explanation.

First of all, the conference adopted a compromise definition of what are "adjacent coastal States."  This definition is important because it in essence defines what--and how many

The Honorable William T. Coleman                    -5-                    March 16, 1976

States have a veto over a proposed deepwater port. It was the Senate's intention to make the determination of whether a deepwater port ought to be sited in a particular place, a regional one involving all States which might be affected by its location and, in particular, affected by an oil spill which could originate from a deepwater port. Therefore, the Senate bill provided that an adjacent coastal State would be: First, a State which is directly connected by pipeline to the deepwater port; second, a State which would be located within 15 miles of any deepwater port; or third, a State which faces a substantial risk of serious damage to its coastal environment as a result of an oil spill incident which might originate from a deepwater port. Subsequently, we were informed by the National Weather Service in the Commerce Department that this definition could, literally interpreted, encompass an entire coastal seaboard. In effect, we were told Georgia might have the ability to veto a deepwater port to be located off Massachusetts. In any event, it was clear that our definition of an adjacent coastal State needed tightening and that this should be one of the chores undertaken by the committee on conference. The compromised achieved, I believe, substantially comports with the original intent of the Senate bill. It was agreed that an adjacent coastal State would be one, first, which is directly connected by pipeline; second, which is within 15 miles of a deepwater port; and third, which is designated by the Secretary of Transportation as a State as to which there is a risk of oil pollution damage equal to or greater than that faced by the State which receives the pipeline. In essence, this compromise language restricts the number of States possessing a veto to the immediate few which would be most directly impacted. I believe this change is acceptable and should be approved by the Senate.

(emphasis added) Congressional Record, Dec.17, 1974, S.21773

Clearly, the compromise on the definition of "adjacent coastal states" reached by the conferees lie somewhere between the definition adopted by the House and that adopted by the Senate, neither of which would have contemplated granting veto power to states which did not face damage from a spill originating from the port or within the surrounding safety zone. Therefore, we are convinced that Congress did not intend that the remedy of veto be extended to a state based on the possible risk of damage to that state from tankers in transit outside the safety zone of the designated port.

The Honorable William T. Coleman                    -6-                    March 16, 1976

With kindest personal regards,

Russell B. Long
United States Senator

Sincerely,

J. Bennett Johnston
United States Senator

Lloyd Bentsen
United States Senator

*File*

# UNITED STATES DEPARTMENT OF TRANSPORTATION

SECRETARY'S DECISION RESPECTING THE REQUEST BY THE STATE
OF FLORIDA FOR STATUS AS AN "ADJACENT COASTAL STATE" UNDER
THE DEEPWATER PORTS ACT OF 1974 IN RESPECT OF THE APPLICA-
TIONS THEREUNDER OF LOOP, INC. AND SEADOCK, INC.

Under the Deepwater Port Act of 1974 (the Act), the Secretary of
Transportation is authorized "to issue, transfer, amend or renew
a license for the ownership, construction and operation of a deepwater
port." 33 U.S.C. § 1503(b). Without such a license, no person may
engage in the ownership, construction or operation of a deepwater port,
which is defined as a structure or group of structures "located beyond
the territorial sea which are used or intended for use as a port or
terminal for loading or unloading or further handling of oil." 33 U.S.C.
§ 1502(10). These facilities will be located in water of sufficient depth
to permit transfer of oil from Very Large Crude Carriers (VLCC's)
which draw too much water to use the terminal facilities of existing
ports on the Eastern and Gulf Coasts of the United States.

The Act conditions the issuance of a license for a deepwater port on
the approval (or presumption of approval) of the Governors of certain
States designated as "adjacent coastal States" pursuant to Section 9(a)
of the Act. 33 U.S.C. § 1508(a). Status as an adjacent coastal State
must be conferred upon "any coastal State which (A) would be directly
connected by pipeline to a deepwater port as proposed in an application,
or (B) would be located within 15 miles of any such proposed deepwater
port." 1/ In addition, Section 9(a)(2) of the Act requires that I shall,
upon request of a State, and after having received the recommendations
of the Administrator of the National Oceanic and Atmospheric Adminis-
tration (NOAA), designate such State as an "adjacent coastal State" if
I determine "that there is a risk of damage to the coastal environment
of such State equal to or greater than the risk posed to a State directly
connected by pipeline to the proposed deepwater port." 33 U.S.C.
§ 1508(a)(2).

The Department of Transportation has received applications from
LOOP, Inc. and Seadock, Inc. for licenses to construct and operate

---

1/ Thus Louisiana has been designated an "adjacent coastal State" in
respect of the LOOP, Inc. application, and Texas has been so
designated in respect of the Seadock, Inc. application.

-2-

deepwater ports off the coasts of Louisiana and Texas, respectively.
The Department has also received a request by the Governor of the
State of Florida for designation of that State as an "adjacent coastal
State" with respect to both applications. Since the issues appear to
be identical, and the facts similar, I will treat both situations herein.

I find that the State of Florida should not be designated as an adjacent
coastal State with respect to either application.

The record presented to the Department for this determination includes,
among other things:

1.   The aforementioned applications of LOOP, Inc., and Seadock,
     Inc.;

2.   The aforementioned request of the State of Florida together
     with supporting documentation;

3.   The recommendations of NOAA set forth in a letter to me from
     Robert M. White, Administrator, dated March 11, 1976;

4.   A memorandum from the Commandant of the U.S. Coast Guard
     with respect to said NOAA recommendations;

5.   The transcript of an on-the-record conference held on March 16,
     1976, at which oral testimony was presented by the States of
     Florida, Texas and Louisiana and by each applicant.

The State of Florida has furnished written and oral testimony urging the
Department to consider, among other things, certain environmental
risks posed by tankers in transit. Florida's argument is centered on
the extreme vulnerability of that State's coastline to oil spills which
may occur as a result of the passage of tankers through the Florida
Straits enroute to and from the proposed deepwater ports. In a well
documented case, Florida has outlined for us the extent of the potentially
affected coastline and the nature of the damage that could occur to
recreational areas, commercial and sport fishing and environmentally
valuable wildlife preserves and parks. Florida also urges on the
Department the proposition that deepwater ports off the Gulf Coast may

-3-

result in a shift of refining capacity from the East Coast to the Gulf States, thus increasing the proportion of refined products shipped to Florida from the Gulf Coast and using the Florida Straits to reach ports on the east Coast of Florida. That State further suggests that a high proportion of tankers returning to oil producing countries from the deepwater ports will be transiting the Florida Straits in ballast, presenting no little hazard of spills from tank cleaning operations and discharge of oily ballast.

Our primary source of advice is NOAA, as mandated by the Act. The recommendation of the Administrator of NOAA is that the State of Florida should be granted status as an adjacent coastal State. This recommendation is not, however, advanced unequivocally. The Administrator notes that "if tankers in transit were not to be considered, I would not recommend that Florida be designated an adjacent coastal State with respect to either of the deepwater port applications presently under consideration." The administrative record shows that NOAA had received advice of its counsel that tankers in transit should not be included within the scope of inquiry required by the Act, such advice relying on legislative history for the proposition that the risks to be considered should be confined to the results of oil spills originating from the deepwater port or vessel within the proposed safety zone (a zone of appropriate size around and including a deepwater port for the purpose of navigational safety). However, the Chief Counsel of the Coast Guard disagreed with this legal conclusion and opined that risks other than those resulting from such spills must be considered under the Act. It was in deference to Coast Guard counsel, and in response to the specific request of the State of Florida, that the Administrator of NOAA agreed to include consideration of tankers in transit in his analysis and thereby felt obliged to recommend that Florida be granted adjacent coastal State status.

In reviewing the recommendations of NOAA, the Coast Guard concluded that the manner in which NOAA went about giving consideration to the risks created by tankers in transit was inappropriate to the situation at hand in that NOAA failed to show that those risks would be attributable to the creation of deepwater ports. The Coast Guard, marshalling data on ship traffic with its customary resourcefulness, pointed out that deepwater ports will not themselves increase the volume of oil imported and arriving at Gulf ports, and that the volume that is (and will be) shipped will in fact be shipped in fewer tankers of larger size. The

-4-

Coast Guard concluded that the existence of the proposed deepwater ports would not result in any additional risk to the coastal environment of the State of Florida and consequently recommended that the State of Florida not be designated as an adjacent coastal State in the case of either application.

The factual questions can be resolved rather easily by an examination of the sensitivity of NOAA's analysis to the facts in issue. The relatively straightforward method of this analysis involves an assessment of both the risk of oil spill for each State in question and the relative vulnerability of those States' coastal environments. The NOAA analysis of risk concludes that the risk of spills to each of the States in question is of the same order of magnitude. Its analysis of vulnerability, however, indicates that Florida has at risk five times as great a total value of recreational/fisheries resources and 15 times the value in major environmental amenities as the State of Texas--and five times and six times, respectively, in the case of Louisiana. It is thus clear that NOAA's conclusions are relatively insensitive to measures of risk and to minor factual differences as to vulnerability; the substantially greater vulnerability of the Florida coastline forecloses other conclusions, assuming the correctness of the approach. 2/

The question before me thus reduces itself to a question of statutory interpretation. If I take into account the environmental risks posed by tankers in transit to and from the proposed deepwater ports, all are

---

2/ The applicants have taken issue with one factor of the NOAA analysis that could affect the outcome and the recommendations. They contend that NOAA has improperly taken into account in its risk calculations the presence of oil spill containment and clean-up capability in the proximity of the proposed deepwater ports specifically and on the Texas and Louisiana coasts generally. Investigation by NOAA disclosed that the absence of offshore oil related activity on the Florida coast results in an absence there of similar oil spill containment and clean-up capability. Since this capability of mitigation of oil spill damage is either present on the Texas and Louisiana Gulf coasts, or proposed as an essential part of each deepwater port, it is an integral part of the circumstances and setting of the NOAA analysis, and I conclude that NOAA is correct in including such considerations. I am, of course, obliged to give the factual determinations of NOAA, a disinterested party and the congressionally appointed expert in these matters, substantial weight barring clear error.

-5-

agreed that the risk of damage to Florida is greater than the risk to either Louisiana or Texas. If, on the other hand, I exclude from my calculations the risks posed by such tankers, NOAA and the Coast Guard have concluded, and I accept the conclusion, that the risk to Florida is not sufficient to qualify Florida for designation as an adjacent coastal State.

The bare language of the statute obviously does not answer the question whether the risks posed by tankers in transit should be considered. The question is thus one of whether the Congressional purposes that underlay the Act in general, and Section 9(a)(1) in particular, suggest that such risks should be part of my calculation.

Obviously there was no intention that the entire universe of environmental risks to the various states involved be considered: the relevant risks must be risks that are in some sense associated with the proposed ports. But even that formulation seems somehow too broad, and in any event too ambiguous. For there is a sense in which every movement of oil anywhere in the world is "associated with" every other through some mutual ripple effect. On the other hand, it seems to me that another test that has been suggested, namely that I consider only risks that are within the safety zone or some other geographically defined area immediately surrounding the proposed port, is too narrow.

Common sense suggests, I think, that the Congressional purpose must point to an answer lying between these two extremes. In rightly concerning itself with environmental hazards, Congress must, in the Deepwater Ports Act, have been concerning itself with those environ- mental hazards that were to be generated by the program it was authorizing--that is, with those risks that would be created by the construction of the ports in question. It would have been senseless to give an environmental veto over the construction of a port to a State simply because it could demonstrate the existence of environmental hazards, without a further showing that the hazards relied on grew out of the construction or existence of the port in question.

This conclusion is supported by the legislative history of the Act. The Joint Report of the Committees on Commerce, Internal and Insular Affairs, and Public Works of the United States Senate that accompanied the Senate version of the Act discussed the designation of adjacent Coastal states. That Report states that:

-6-

. . . such an evaluation must not be made in a vacuum.
Rather the Committees believe that NOAA should compare
the volume of spills now occurring from offshore lightering
and other methods of oil transfer with the potential risk from
a deepwater port before specifying what states qualify as
"adjacent coastal States."

S. Rep. No. 1217, 93d Cong., 2d Sess. 13 (1974)

The limits of the issue thus narrowed, the answer rather clearly
emerges. Since the threat to the Florida coast posed by tankers in
transit would exist irrespective of the construction of the ports in
issue--indeed, construction of the ports will reduce the risk somewhat--
that seems to me a class of risks that Congress cannot have intended to
be included in my calculations. There are, it is true, greater environ-
mental risks to Florida than to either Louisiana or Texas, but those
greater risks are risks that would exist irrespective of the existence
of the deepwater port program. I therefore conclude that I should not
consider them, and that Florida should not be declared an adjacent
coastal state in either case.

I do not intend by this determination to leave the State of Florida with-
out recourse. I am required by Section 9(b)(2) of the Act to give any
interested State the opportunity to make its views known and to be given
full consideration in the decisions of this Department regarding the
location, construction and operation of deepwater ports. 33 U.S.C.
§ 1508(b)(2). Even without such a requirement, the extreme vulnerability
of the coastal environment of the State of Florida would require extra-
ordinary sensitivity to the potential for oil spills. To the extent we are
permitted by the authority granted under the Act, this Department will
give the fullest consideration to suggestions by the State of Florida in
the evaluation of the license applications in question, and in the framing
of conditions for the issuance of a license for a deepwater port, should
such a license be issued. During the course of the application review,
this Department will provide the State of Florida with all information
(except such information which is to be treated as confidential under
Section 14(b) of the Act, 33 U.S.C. § 1513(b)) provided the States of
Louisiana and Texas, and will afford equivalent opportunity for comment.

-7-

Also I hereby instruct the applicants to provide the State of Florida with all documents, legal briefs, letters and memoranda filed with the States of Louisiana or Texas, as the case may be (except such information that is confidential, as aforesaid). The environmental consequences of tanker traffic through the Florida Straits will be given emphasis in the preparation of the Environmental Impact Statement, and should that statement suggest that the conclusions reached herein should be reconsidered, I will do so.

Issued in Washington, D.C., on March 25, 1976.

William T. Coleman, Jr.
Secretary of Transportation

UNITED STATES DEPARTMENT OF TRANSPORTATION

SECRETARY'S DECISION RESPECTING THE REQUEST BY THE STATE
OF MISSISSIPPI FOR STATUS AS "ADJACENT COASTAL STATE" UNDER
THE DEEPWATER PORT ACT OF 1974 IN RESPECT OF THE APPLICA-
TIONS THEREUNDER OF LOOP, INC. AND SEADOCK, INC.

Under the Deepwater Port Act of 1974 (the Act), the Secretary of
Transportation is authorized "to issue, transfer, amend or renew a
license for the ownership, construction and operation of a deepwater
port." 33 U.S.C. § 1503(b). Without such a license, no person may
engage in the ownership, construction or operation of a deepwater port,
which is defined as a structure or group of structures "located beyond
the territorial sea which are used or intended for use as a port or
terminal for loading or unloading or further handling of oil." 33 U.S.C.
§ 1502(10). These facilities will be located in water of sufficient depth
to permit transfer of oil from Very Large Crude Carriers (VLCC's)
which draw too much water to use the terminal facilities of existing
ports on the Eastern and Gulf Coasts of the United States.

The Act conditions the issuance of a license for a deepwater port on
the approval (or presumption of approval) of the Governors of certain
States designated as "adjacent coastal States" pursuant to Section 9(a)
of the Act. 33 U.S.C. § 1508(a). Status as an adjacent coastal State
must be conferred upon "any coastal State which (A) would be directly
connected by pipeline to a deepwater port as proposed in an application,
or (B) would be located within 15 miles of any such proposed deepwater
port." 1/ In addition, Section 9(a)(2) of the Act requires that I shall,
upon request of a State, and after having received the recommendations
of the Administrator of the National Oceanic and Atmospheric Adminis-
tration (NOAA), designate such State as an "adjacent coastal State" if
I determine "that there is a risk of damage to the coastal environment
of such State equal to or greater than the risk posed to a State directly
connected by pipeline to the proposed deepwater port." 33 U.S.C.
§ 1508(a)(2).

The Department of Transportation has received applications from LOOP,
Inc. and Seadock, Inc. for licenses to construct and operate deepwater

---

1/ Thus Louisiana has been designated an "adjacent coastal State" in
respect of the LOOP, Inc., application, and Texas has been so
designated in respect of the Seadock, Inc., application.

- 2 -

ports off the coasts of Louisiana and Texas, respectively. The Department has also received a request from the Governor of the State of Mississippi for designation of that State as an "adjacent coastal State" with respect to both applications. Since the issues appear to be identical, and the facts similar, I will treat both situations herein.

I find that the State of Mississippi should not be designated as an adjacent coastal State in respect of either application.

The record presented to the Department for this determination includes, among other things:

1.  The aforementioned applications of LOOP, Inc. and Seadock, Inc.;

2.  The aforementioned request of the State of Mississippi;

3.  The recommendations of NOAA set forth in a letter to me from Robert M. White, Administrator, dated March 24, 1976; and

4.  A memorandum from the Commandant of the U.S. Coast Guard in respect of said NOAA recommendations.

My primary source of advice is NOAA, as mandated by the Act. The recommendation of the Administrator of NOAA is that the State of Mississippi should not be granted status as an adjacent coastal State. NOAA has concluded, after thorough study of the relative risk of exposure to oil spill incidents and the relative value of vulnerable resources, that the risk of damage to the coastal environment of the State of Mississippi is not equal to or greater than the risk of damage to the coastal environment of the State of Louisiana, the State directly connected by pipeline to the deepwater port proposed by LOOP, Inc., or the risk of damage to the coastal environment of the State of Texas, the State directly connected by pipeline to the deepwater port proposed by Seadock, Inc.

The Coast Guard concurs in this recommendation, and I have been offered no evidence or argument to the contrary.

I do not intend by this determination to leave the State of Mississippi without recourse. I am required by Section 9(b)(2) of the Act to give any interested State the opportunity to make its views known and to be

-3-

given full consideration in the decisions of this Department regarding the location, construction and operation of deepwater ports.  To the extent we are permitted by the authority granted the Department of Transportation under the Act, this Department will give the fullest consideration to suggestions by the State of Mississippi in the evaluation of the license applications in question, and in the framing of conditions for the issuance of a license for a deepwater port, should such a license be issued.  During the course of the application review, this Department will provide the State of Mississippi with all information (except such information which is to be treated as confidential under Section 14(b) of the Act, 33 U.S.C. § 1513(b)) ) provided the States of Louisiana and Texas, and will afford equivalent opportunity for comment. Also I hereby instruct the applicants to provide the State of Mississippi with all documents, legal briefs, letters and memoranda filed with the States of Louisiana or Texas, as the case may be (except such information that is confidential, as aforesaid).

Issued in Washington, D.C., on March 25, 1976.

William T. Coleman, Jr.
Secretary of Transportation

Atlantic Sea Island Group LLC
Safe Harbor Energy



Figure 1-2
Proposed Safe Harbor
Energy Project Location

May 2007

MAR530 000001 May 2007



Atlantic Sea Island Group LLC
Safe Harbor Energy



U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-3PSO-5
Phone: (202) 372-1454
Fax: (202) 372-1926
Email: mary.k.jager@uscg.mil

16613
27 June 2007

Mr. William VanHerwarde
Executive Vice President
Atlantic Sea Island Group, LLC
Chrysler Bldg, 26th floor
405 Lexington Avenue
New York, NY 10174

Dear Mr. VanHerwarde:

This letter is to inform you of the results of the U.S. Coast Guard and Maritime Administration review of supplemental information submitted on May 8, 2007, in support of Atlantic Sea Island Group LLC's deepwater port license application. The review was performed to determine application completeness for processing in accordance with the Deepwater Port Act of 1974 (DWPA), as amended. As discussed with you on June 11, 2007, we have determined that the application remains incomplete. The following issues must be addressed before the application can be deemed complete:

The project proposed in your application must include decommissioning in accordance with the DWPA. Specifically required is a proposal to completely remove the deepwater port including disposal of the island at the end of its service life and the potential environmental impacts of complete removal. As we discussed, the information previously provided regarding decommissioning can be used as an alternative to complete removal.

As stated, the Maritime Administration completed its review of the most recent information provided by your company regarding financing of the proposed Safe Harbor deepwater port, and determined that more detailed information regarding the financial arrangements for construction, operation, and decommissioning of the deepwater port facility is still required. In particular, the Maritime Administration is concerned about the cost of decommissioning all components of the facility, including the island.

Accordingly, the Maritime Administration will require a separate detailed decommissioning plan and a corresponding cost estimate for the facility, including complete removal of the island and all other structures related to the deepwater port. The plan must include the cost of any environmental remediation, physical removal of all parts of the island, disposal of such materials, and any other action necessary to return the area to its original condition. The company and/or its investor(s) will be required to demonstrate its financial ability to decommission the facility.

Subj: ATLANTIC SEA ISLAND GROUP INCOMPLETE APPLICATION          16613
                                                                27 June 2007

Further, the Maritime Administration wishes to advise that the information provided regarding the construction and operation of the facility was inadequate for the purposes of determining financial responsibility. While we appreciate your company's efforts in attempting to arrange financing for the project, the Maritime Administration still requires complete financial statements from all parties that will provide funding for the proposed project. We note that at this stage of the review process, the proposed investors can not be considered acceptable until detailed information concerning their individual ability to finance the Safe Harbor project is provided. We also note that no information was provided regarding the amount of debt financing to be arranged or the availability of a guarantor(s) for the project. As such, please provide details regarding the amount and sources of debt financing, with supporting documentation, your company plans to obtain and the availability of a guarantor(s) for the project.

Finally, the application must include complete discussions about a range of reasonable alternatives, including your proposed project. The discussion of alternatives must include objective evaluation and be equally and rigorously analyzed to enable a reviewer to evaluate and compare alternatives, including the proposed project. In order for us to complete the required evaluation of your project under NEPA, we require your application to include a range of reasonable alternatives to the proposed project. Generally this means other site location(s), alternative regasification technology or technologies, and alternative port design(s) as appropriate. As discussed, we recommend you include the pipeline routing directly to shore that you had previously submitted as an alternative to the offshore interconnect currently proposed.

Despite the request for additional information above, you and your staff have done a commendable job in the preparation of your deepwater port application.

If you have any questions or concerns regarding these matters, please don't hesitate to contact Ms. Mary Jager, USCG project manager for your application at (202) 372-1454 or for questions related to project financing, please contact Mr. Greg Sparkman of the Maritime Administration at 202-366-1908.

                                        Sincerely,


H. Keith Lesnick                          M. A. PRESCOTT
Director, Office of Deepwater Port Licensing   Chief, Deepwater Ports Standards Division
and Offshore Activities                    U.S. Coast Guard
U. S. Maritime Administration              By direction

                                        2


**Atlantic
Sea Island Group** LLC

July 3, 2007

Ms. Yvette M. Fields
U.S. Department of Transportation
Maritime Administration
Office of Deepwater Ports and Offshore Activities
1200 New Jersey Avenue, S.E. #W21-201
Washington, DC 20590

      Re:    Atlantic Sea Island Group LLC Application for a License to Construct,
               Own and Operate the Safe Harbor Energy LNG Deepwater Port

Dear Ms. Fields:

Pursuant to the Deepwater Port Act of 1974, as amended, and the U.S. Coast Guard's ("USCG")
Regulations at 33 C.F.R. Parts 148, 149, and 150, Atlantic Sea Island Group LLC ("ASIG") has
filed today with the USCG certain additional information to supplement ASIG's May 8, 2007
application for a license to construct, own and operate a liquefied natural gas ("LNG") deepwater
port ("Port") offshore Long Island, New York ("Application"). The Port, to be called Safe
Harbor Energy, would receive, store, and regasify LNG and would be capable of delivering
natural gas to the New York metropolitan region, all as more fully described in the Application.

ASIG is sending the Maritime Administration ("MARAD") two (2) electronic copies of the
Application, including the additional information filed today with the USCG (Volumes One,
Two, Three, and Volume Four, Part One and Volume Four, Maps and Figures), under separate
cover. Included in the additional information as Exhibit K is a detailed discussion of ASIG's
plan to decommission the Port by removing all topside Terminal facilities and dismantling the
supporting Island structure in its entirety.

Enclosed herewith are two (2) electronic copies of the cost detail for ASIG's decommissioning
plan for Safe Harbor Energy. This information is being submitted only to MARAD. ASIG
considers the decommissioning cost information to be confidential and/or privileged and
therefore exempt from disclosure under the Freedom of Information Act, 5 U.S.C. Section 552.
Each page of the cost information has been marked with a Confidential and/or Privileged header,
and the two discs have also been marked as containing confidential information. ASIG

*Chrysler Building / 405 Lexington Avenue / 26th Floor / New York, NY / 10174 / Phone: 212-907-6565 / Fax: 917-368-8005*

MAR530 000005

Ms. Yvette M. Fields
July 3, 2007
Page 2

respectfully requests that MARAD treat the material so marked as confidential and privileged
information and that MARAD not disclose such information to the public.

Please note that the itemized decommissioning cost information provided herewith includes
credits for the expected market value of the island components (sand, rock, gravel, and metal,
such as steel, copper and aluminum) at the time of decommissioning. We will be happy to
discuss our methods for determining such value with you, if needed. We realize that MARAD
has not previously adjusted decommissioning costs for the potential value of future uses due, at
least in part, to the speculative nature of the estimated values. In this case, however, the credits
are based on the expected market value for very basic construction materials for which there is
considerable demand and for which there is a robust reuse market, and we believe that on this
basis, it is appropriate to recognize an adjustment to the overall decommissioning costs.

We would appreciate the opportunity to discuss this approach with you, at your convenience.

Thank you for your consideration.

Respectfully submitted,

William VanHerwarde
Executive Vice President
Atlantic Sea Island Group LLC

Receipt of itemized decommissioning cost data acknowledged on this ____ day of July, 2007:

Ms. Yvette Fields
U.S. Department of Transportation
Maritime Administration

MAR530 000006

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-3PSO-5
Phone: (202) 372 - 1454
Fax: (202) 372-1926
Email: mary.k.jager@uscg.mil

16613
August 15, 2007

Mr. William VanHerwarde
Executive Vice President
Atlantic Sea Island Group LLC
Chrysler Building 26th Floor
405 Lexington Avenue
New York, NY 10174

Dear Mr. VanHerwarde:

In accordance with the Deepwater Port Act, Title 33, United States Code 1504(c)(1), we have completed our review of the Atlantic Sea Island Group LLC (ASIG) deepwater port license application to own, construct, and operate a liquefied natural gas deepwater port submitted on September 13, 2006, the supplemental information submitted on May 8, 2007, and your responses to our June 27, 2007 letter of incompleteness Based on our review we have determined that the application appears to contain sufficient information to begin processing. This project will be known as Safe Harbor Energy.

While we have received sufficient information to initiate the processing of the application, there are still outstanding items that will need to be provided in order for incorporation into the draft Environmental Impact Statement (EIS). The Coast Guard has identified, by separate letter, the environmental consultant selected by them for assisting in the development of the EIS. ASIG will need to execute a contract quickly to facilitate the timely processing of your application and the development of an Environmental Impact Statement in accordance with the National Environmental Policy Act (NEPA). As agreed to in your August 6 meeting with Maritime Administration officials, this may include an additional contractor to conduct a comprehensive study of the impacts associated with decommissioning of the proposed island after its useful life, including an independent financial review of cost estimates provided for removal of the island. We have agreed to accept this information at a later date but it will need to be completed and/or included in the Draft EIS. You should also expect to receive periodic requests for additional information or clarification of existing information already in your submission from us to satisfy requirements under NEPA and DWPA.

We will be publishing a Notice of Application in the Federal Register that will designate New York as the adjacent coastal state for the proposed deepwater port. Additional coastal states may be designated in the future as well. Throughout this process, we will consult with the State of New York and several other federal agencies to ensure timely processing of your application in order for the Maritime Administrator, on behalf of the Secretary of Transportation, to render an informed licensing decision.

If you have any questions, please don't hesitate to contact Ms. Mary Jager of my staff at (202) 372-1454, or Mr. Keith Lesnick of the Maritime Administration at (202) 366-1624. We look forward to working with you in the future.

Sincerely,

M.A. PRESCOTT
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
By direction

H. KEITH LESNICK
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration

MAR530 000007



72 FR 49041-01
72 FR 49041-01, 2007 WL 2408356 (F.R.)
**(Cite as: 72 FR 49041)**

Page 1

NOTICES

DEPARTMENT OF TRANSPORTATION

Maritime Administration

[USCG-2007-**28535**]

Atlantic Sea Island Group LLC, Safe Harbor Energy Liquefied Natural Gas Deepwater Port License Application

Monday, August 27, 2007

AGENCY: Maritime Administration, DOT.

**\*49041** ACTION: Notice of application.

SUMMARY: The Coast Guard and the Maritime Administration announce that they have received an application for the licensing of a natural gas deepwater port, and that the application appears to contain the required information. This notice summarizes the applicant's plans and the procedures that will be followed in considering the application.

DATES: The Deepwater Port Act of 1974, as amended, requires any public hearing on this application to be held not later than 240 days after this notice, and requires a decision on the application to be made not later than 90 days after the final public hearing.

ADDRESSES: The public docket for USCG-2007-**28535** is maintained by the: Docket Management Facility, U.S. Department of Transportation, 1200 New Jersey Ave., SE., West Building Ground Floor W12-140, Washington, DC 20590-0001.

Docket contents are available for public inspection and copying, at this address, in room W12-140, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Facility's telephone is 202-366-9329, its fax is 202-493-2251, and its website for electronic submissions or for electronic access to docket contents is http://dms.dot.gov.

FOR FURTHER INFORMATION CONTACT: Mary K. Jager, U.S. Coast Guard, telephone: 202-372-1454, e-mail: Mary.K.Jager@uscg.mil or Andrew Tibbetts, U.S. Maritime Administration, telephone: 202-366-5473, e-mail: andrew.tibbetts@dot.gov. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone: 202-493-0402.

SUPPLEMENTARY INFORMATION:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 FR 49041-01
72 FR 49041-01, 2007 WL 2408356 (F.R.)
(Cite as: 72 FR 49041)

Receipt of Application

 On May 8, 2007, the Coast Guard and the Maritime Administration received an ap-
plication from Atlantic Sea Island Group LLC (ASIG), Chrysler Building, 405 Lex-
ington Avenue, 26th Floor, New York, NY 10174; for all Federal authorizations re-
quired for a license to own, construct, and operate a deepwater port governed by
the Deepwater Port Act of 1974, as amended, 33 U.S.C. 1501 et seq. (the Act). On
August 15, 2007, we determined that the application appears to contain all inform-
ation required by the Act.

Background

 According to the Act, a deepwater port is a fixed or floating manmade structure
other than a vessel, or a group of structures, located beyond State seaward bound-
aries and used or intended for use as a port or terminal for the transportation,
storage, and further handling of oil or natural gas for transportation to any
State.

 A deepwater port must be licensed by the Maritime Administrator (by delegated au-
thority of the Secretary of Transportation, published on June 18, 2003 (68 FR
36496)). Statutory and regulatory requirements for licensing appear in 33 U.S.C.
1501 et seq. and in 33 CFR part 148. Under delegations from and agreements between
the Secretary of Transportation and the Secretary of Homeland Security, applica-
tions are processed by the Coast Guard and the Maritime Administration. Each ap-
plication is considered on its merits.

 The Act requires adherence to a strict timeline for processing an application.
Once we determine that an application contains the required information, we must
hold public hearings on the application within 240 days, and the Maritime Adminis-
trator must render a decision on the application within 330 days. We will publish
additional Federal Register notices to inform you of these public hearings and
other procedural milestones, including environmental review. The Maritime Adminis-
trator's decision, and other key documents, will be filed in the public docket.

 At least one public hearing must take place in each adjacent coastal State. For
purposes of the Act, New York is the adjacent coastal State for this application.
Other States can apply for adjacent coastal State status in accordance with 33
U.S.C. 1508(a)(2).

Summary of the Application

 Atlantic Sea Island Group LLC (ASIG), proposes to own, construct, and operate a
deepwater port, named Safe Harbor Energy, in the Federal waters of the Atlantic
Outer Continental Shelf in the area known as the New York Bight region in MMS
lease area NK18-12 block 6655. The proposed location is approximately 13.5 miles
south of the City of Long Beach on Long Island and 23 miles southeast of New York
Harbor entrance, in an area between the Ambrose-to-Nantucket and Hudson *49042

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 FR 49041-01
72 FR 49041-01, 2007 WL 2408356 (F.R.)
(Cite as: 72 FR 49041)

Page 3

Canyon-to-Ambrose shipping lanes, located at approximately 40° 23' N and 73° 36' E, in water depth of between 60 and 70 feet.

The deepwater port, Safe Harbor Energy, consists of three components: An island to be constructed of natural sand, gravel, and rock materials surrounded by armored breakwaters, consisting of prefabricated caissons, armor units, and rock; an LNG receiving, storage, and regasification facility; and a subsea pipeline that would transport the natural gas to an offshore connection with the Transcontinental Gas Pipeline Corporation's pipeline system. The pipeline would consist of two parallel 36-inch-diameter pipe segments extending 12.8 miles from the island. Safe Harbor Energy will include berthing and offloading space for two conventional LNG vessels with capacity of 70,000 m [FN3] to 270,000 m [FN3]. Additionally, it would accommodate support vessels including docking/firefighting tugs and crew support launches. The storage portion would include four (4) 180,000 m [FN3] full-containment storage tanks. The regasification equipment would be an ambient air heat exchange type. Safe Harbor Energy would have an average throughput capacity of approximately 1.15 billion standard cubic feet per day (bscfd).

A shore based facility will be used to facilitate movement of personnel, equipment, supplies, and disposable materials between the port and shore.

Construction of the deepwater port would be expected to take approximately five (5) years; with startup of commercial operations following construction, should a license be issued. The deepwater port would be designed, constructed, and operated in accordance with applicable codes and standards and would have an expected operating life of approximately 25 years.

Privacy Act

Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the Federal Register published on April 11, 2000, (Volume 65, Number 70; Pages 19477-78) or you may visit http://dms.dot.gov.

Authority: 49 CFR 1.66.

By Order of the Maritime Administrator.

Dated: August 17, 2007.

Daron T. Threet,

Secretary, Maritime Administration.

[FR Doc. E7-16875 Filed 8-24-07; 8:45 am]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 FR 49041-01
72 FR 49041-01, 2007 WL 2408356 (F.R.)
**(Cite as: 72 FR 49041)**

BILLING CODE 4910-81-P

 72 FR 49041-01, 2007 WL 2408356 (F.R.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works



**State of New Jersey**

OFFICE OF THE GOVERNOR
PO BOX 001
TRENTON NJ 08625-0001

DEPARTMENT OF TRANSPORTATION
DOCKETS

2007 NOV 14  A 11: 17

JON S. CORZINE
*Governor*

September 6, 2007

USCG - 2007 - 28535

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

Atlantic Sea Island Group LLC has applied to the Coast Guard and the Maritime Administration for a license to own, construct and operate a deepwater LNG port in the Atlantic Ocean off New Jersey and New York. Notice of the application, known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535), was published in the Federal Register on August 27, 2007. The notice indicates that because of the proposed island's proximity to New York, New York has been designated an adjacent coastal state under the Deepwater Port Act. The proposed island would be within 15 miles of New York and is approximately 19 miles from New Jersey. However, the proposed alternative pipeline alignment that is part of the deepwater port application would be well within the 15 mile standard to designate New Jersey an adjacent coastal state. As defined in the Deepwater Port Act, the deepwater port subject to this licensing includes all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys mooring lines, and similar facilities that are approved or proposed for construction and operation as part of the deepwater port. By this definition alone New Jersey should be considered an adjacent coastal state due to the proximity of the alternative alignment.

The Deepwater Port Act also provides for a state to be designated an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the deepwater port. The proposed port will connect to the existing Transco pipeline running from

*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

Morgan, New Jersey to Long Beach, New York. Thus, New Jersey considers that it is directly connected to the deepwater port. Moreover, the alternative pipeline alignment would be less than 9 miles from New Jersey, well within the 15 mile criterion.

Regardless of whether the connection to the Transco pipeline emanating from the New Jersey shore constitutes a direct connection to either state, New Jersey's coastal environment is equally impacted by the proposed facilities as New York's coastal environment. New Jersey has robust commercial and recreational fisheries that are vital to the State's economy, as well as to the history and character of New Jersey's coastal environment. The proposed facility will destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally approved coastal management program. Not only will the creation of an island over this prime fishing area be detrimental to this unique environment but the proposed facility's exclusion zone will prohibit vessels in a 633 acre area, further diminishing this important resource.

The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high... The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Accordingly, any impediments to navigation would adversely affect New Jersey in a manner equal to or greater than its effects on New York.

The predominant current direction in the area of the proposed deepwater port is toward New Jersey. Accordingly, turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as to the important commercial and recreational fishing grounds surrounding the proposed port, as would any spills at the island during construction and operation of the facility.

The application does not specify the exact location of shore based facilities that would service the deepwater port, or from which construction would be staged. However, it does indicate that the facilities would be located within a 40 mile radius of the proposed island. This radius includes shore facilities in New Jersey. Accordingly, the effects on the coastal environment of New Jersey for construction staging and long-term service of the deepwater port would be felt in New Jersey in equal or greater amount than in New York.

New Jersey should be designated an adjacent coastal state under the Deepwater Port Act because the alternative pipeline alignment will be well within 15 miles of New Jersey's Coast, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the

coastal environment of New York.  It is imperative that New Jersey be an integral part of the review of this proposal due to the inherent risks associated with a deepwater port within as busy of a port region as the New Jersey/ New York Port complex.

Sincerely,

Jon S. Corzine
Governor

c:      Mr. H. Keith Lesnick, MARAD
        Mr. Mark A. Prescott, USCG

ENERGY AND COMMERCE COMMITTEE:
  HEALTH SUBCOMMITTEE
    CHAIRMAN
  ENVIRONMENT AND HAZARDOUS
    MATERIALS SUBCOMMITTEE
  TELECOMMUNICATIONS AND THE
    INTERNET SUBCOMMITTEE

NATURAL RESOURCES COMMITTEE:
  FISHERIES, WILDLIFE AND
    OCEANS SUBCOMMITTEE

DEMOCRATIC POLICY COMMITTEE:
  COMMUNICATIONS CHAIR

  http://www.house.gov/pallone

### FRANK PALLONE, JR.
6TH DISTRICT, NEW JERSEY

## Congress of the United States
## House of Representatives
### Washington, DC 20515–3006

REPLY TO:
  WASHINGTON OFFICE:
☐ 237 CANNON HOUSE OFFICE BUILDING
    WASHINGTON, DC 20515–3006
    TELEPHONE: (202) 225–4671

  DISTRICT OFFICES:
    TOLL-FREE NUMBER:
      (888) 423–1140

☐   504 BROADWAY
    LONG BRANCH, NJ 07740
      (732) 571–1140

☐   67/69 CHURCH STREET
      KILMER SQUARE
    NEW BRUNSWICK, NJ 08901
      (732) 249–8892

September 7, 2007

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
U.S. Maritime Administrator
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Administrator Connaughton:

On Monday, August 27, 2007, the Federal Register published an application submitted by Atlantic Sea Island Group LLC to build and operate a deepwater Liquid Natural Gas port in the Atlantic Ocean off the coast of New York and New Jersey. The proposed industrial island would create a territory for a liquefied natural gas facility, named, "Safe Harbor Energy".

The notice in the Federal Register indicates that that due to the island's proximity to New York, New York has been designated an adjacent coastal state under the Deepwater Port Act. With adjacent coastal state status New York will have right of review in addition to, public hearings for citizens to voice their concerns. The notice did not designate New Jersey as an adjacent coastal state.

It has come to my attention that New Jersey Governor Jon S. Corzine has requested that New Jersey be granted adjacent coastal state status under the consistency provisions of the Deepwater Port Act. I believe it is imperative that New Jersey be granted adjacent coastal state status due to the detrimental effects this facility could have on New Jersey's coastal environment.

Under the Deepwater Port Act a could be designated an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected to the pipeline of the deepwater port. New York and New Jersey share equal risk to their coastal environments.

The construction of the facility will mean millions of tons of material will have to be dumped into the ocean. The building, staging, and maintenance of this deepwater port facility would be a tremendous environmental burden to New Jersey and therefore New Jersey should be granted adjacent state status under the Deepwater Port Act.

The proposed facility would also devastate a premier fishing ground and endangered species habitat. Specifically, an area that is protected under New Jersey's federally approved coastal management program known as Cholera Bank will be destroyed by the proposed facility. The proposed facility will not only impede this historic fishing area but it will severely undercut the environmental integrity of the coastal region.

I encourage the Coast Guard and U.S. Maritime Administration grant New Jersey adjacent state status under the consistency provisions of the Deepwater Port Act as requested by Governor Jon S. Corzine, NJ. The people of New Jersey must have a voice in the review process.

Thank you for your attention to this matter. We look forward to continuing to work together.

Sincerely,

FRANK PALLONE, JR.
Member of Congress

September 13, 2007

Ms Mary K Jager
U, S, Coast Guard
2100 Second St. SW
Washington, DC 20593

Dear Ms. Jager

I am writing a letter in support of the State of New Jersey's request to be designated an "adjacent coastal State for the Atlantic Sea Island Groups's Safe Harbor Energy Liquefied Natural Gas (LNG) Deepwater Port License Application. Governor Corzine recently requested such status on behalf of the State and I commend his action

Pursuant to section 1508(a) of the Deepwater Port Act, a State can be considered an "adjacent coastal State" if it would be directly connected by pipeline to the deepwater port, it is within 15 miles of the port, or the risk of damage to its costal environment is equal to or greater than such risk posed to a State directly connected by pipeline to the proposed port. Currently, only New York is considered an adjacent coastal State.

Because the natural ocean currents move from north to south in this zone, the impact from any problem with this LNG Island would be far greater for the State of New Jersey than it would be for New York State. This in itself is more than enough reason to consider New Jersey an "adjacent coastal State". We, in New Jersey love our beautiful marine environment and are willing to fight for it.

Please inform Mr. M.A. Prescott and Mr. H Keith Lesnick of this correspondence. And please be sure that these comments are included in Docket 28535.

Thank you

_Jacqueline Mathews_
_10910 North Beach, N.J._

14 Warren Street
Rumson, NJ 07760
October 30, 2007

RE: New Jersey's Status as an Adjacent Coastal State in Atlantic Sea Island Group Application

M.A. Prescott
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

H. Keith Lesnick
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration
1200 New Jersey Ave., SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Mary K. Jager
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Dear Mr. Prescott, Mr. Lesnick, and Ms. Jager,

I am writing a letter in support of the State of New Jersey's request to be designated an "adjacent coastal State" for the Atlantic Sea Island Group's Safe Harbor Energy Liquefied Natural Gas (LNG) Deepwater Port License Application. Governor Corzine recently requested such status on behalf of the State and I commend his action.

Pursuant to section 1508(a) of the Deepwater Port Act, a State can be considered an "adjacent coastal State" if it would be directly connected by pipeline to the deepwater port, it is located within 15 miles of the port, or the risk of damage to its coastal environment is equal to or greater than such risk posed to a State directly connected by pipeline to the proposed port. Currently, only New York is considered an "adjacent coastal State."

There is no doubt that New Jersey will be directly affected by this project. Due to the very nature of the ocean environment which is proposed as the site of this project, no mere measure of miles can predict its impact on the entire surrounding coastal area. It would be negligent on your part to refuse to consider the input of New Jersey's officials and citizens.

Sincerely,

Margaret and Dennis Nitka
Margaret and Dennis Nitka
cc: The Honorable Jon S. Corzine, Governor, New Jersey
    Clean Ocean Action

14 Warren Street
Rumson, NJ  07760
October 30, 2007

RE: New Jersey's Status as an Adjacent Coastal State in Atlantic Sea Island Group Application

M.A. Prescott
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
2100 Second St. SW
Washington, DC  20593

H. Keith Lesnick
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration
1200 New Jersey Ave., SE (MAR-530)
Second Floor, West Wing
Washington, DC  20590

Mary K. Jager
U.S. Coast Guard
2100 Second St. SW
Washington, DC  20593

Dear Mr. Prescott, Mr. Lesnick, and Ms. Jager,

I am writing a letter in support of the State of New Jersey's request to be designated an "adjacent coastal State" for the Atlantic Sea Island Group's Safe Harbor Energy Liquefied Natural Gas (LNG) Deepwater Port License Application. Governor Corzine recently requested such status on behalf of the State and I commend his action.

Pursuant to section 1508(a) of the Deepwater Port Act, a State can be considered an "adjacent coastal State" if it would be directly connected by pipeline to the deepwater port, it is located within 15 miles of the port, or the risk of damage to its coastal environment is equal to or greater than such risk posed to a State directly connected by pipeline to the proposed port. Currently, only New York is considered an "adjacent coastal State."

There is no doubt that New Jersey will be directly affected by this project. Due to the very nature of the ocean environment which is proposed as the site of this project, no mere measure of miles can predict its impact on the entire surrounding coastal area. It would be negligent on your part to refuse to consider the input of New Jersey's officials and citizens.

Sincerely,

Margaret and Dennis Nitka
cc: The Honorable Jon S. Corzine, Governor, New Jersey
    Clean Ocean Action

11/17/2007

Dear Mr. Soper,

Please know that I consider New Jersey an "adjacent coastal state".

I am very much opposed to the building of a gannonde island 19 miles off the coast of New Jersey and 13 miles off the coast of New York

-2-

For the purpose of storing liquefied natural gas.

The threat to our environment is real and we need to stop this firm opening this assault.

Thank you -
Sincerely,
[signature]

MAR530 000020

I Consider N.J. to be
an adjacent Coastal State
o the proposed building of
n LPG. Island. I want
ie opportunity to be heard
opposition to this dangerous
tuation    Elly Roessner N.C., NJ oscc

consider N.J. to be an
djacent Coastal State to the
roposed building of an LPG
sland. I want the
pportunity to be heard
n opposition to this dangerous
situation

DEAR MARY

I CONSIDER N.J. TO BE
AN ADJACENT COSTAL STATE
AND WANT N.J. TO BE HEARD
ON THE CITING OF LPG.
ISLAND OFF COAST OF N.J + N.Y

Carl Ccccccc
H.C. N.J. 08005

l consider N.J. to be an adjacent
stal state to the proposed euilding of
- LPG. Island. I want the opportunity
be heard in opposition to this
ngurous situation.

Nancy G. Winkel
Surf City / Marlton
N. J.

MAR530 000022



U.S. Department
of Transportation

**Maritime
Administration**

September 17, 2007

VADM Conrad C. Lautenbacher, Jr.
Under Secretary of Commerce for Oceans and Atmosphere and
Administrator of the National Oceanic and Atmospheric Administration
14th and Constitution Avenue, NW
Suite 5128
Washington, DC 20230

Dear Vice Admiral Lautenbacher:

The Maritime Administration and the U.S. Coast Guard have received an application
from Atlantic Sea Island Group, LLC to own, construct, and operate a Liquefied Natural
Gas (LNG) Deepwater Port authorized under the provisions of the Deepwater Port Act
(33 U.S.C. § 1501 *et seq.* (the Act)). The proposed port, known as Safe Harbor Energy,
would be located approximately 13.5 miles south of Long Beach, New York, and 23
miles southeast of the New York Harbor entrance in the Atlantic Ocean. The notice of
application was published in the Federal Register on August 27, 2007. According to the
requirements of Sections 1502 (1) and 1508 (a)(1) of the Act, the Maritime
Administration and the U.S. Coast Guard designated the State of New York as an
Adjacent Coastal State.

By letter dated September 6, 2007, New Jersey Governor Jon S. Corzine, acting in
accordance with Section 1508 (a)(2) of the Act, requested designation of Adjacent
Coastal State status, citing potential impacts to the State of New Jersey from the proposed
Safe Harbor Energy project. Pursuant to Section 1508 (a)(2) of the Act, the Maritime
Administrator, by delegated authority, must make a determination regarding the
designation of Adjacent Coastal State status after receiving a timely request from a State
Governor and after considering the recommendation of the Administrator of the National
Oceanic and Atmospheric Administration. The Maritime Administrator must grant
Adjacent Coastal State status if the risk of damage to the requesting State's coastal
environment is equal to or greater than the risk posed to a State that would be directly
connected by pipeline to the proposed deepwater port (in this instance, New York). The
Maritime Administrator must make the designation no later than 45 days after the date of
receipt of the request.

The letter from Governor Corzine was received by the Maritime Administration and the
U.S. Coast Guard by facsimile on September 6, 2007. As such, the Maritime
Administrator must render a decision on Adjacent Coastal State status for the State of
New Jersey by October 22, 2007. To this end, we request your recommendation on the

 Recycled
Recyclable

designation of New Jersey as an Adjacent Coastal State for the Safe Harbor Energy project.

Should you require additional information, please contact me at 202-366-1624 or keith.lesnick@dot.gov. Please note that the application and other project data and correspondence may be accessed electronically by visiting the Department of Transportation Docket Management System at http://dms.dot.gov. Please reference the Safe Harbor Energy project docket number USCG-2007-28535.

To allow timely consideration of your comments, we request that you provide your recommendation to us no later than October 10, 2007.

We appreciate your attention in this matter and look forward to receiving your comments.

Sincerely,

H. Keith Lesnick,
Director, Office of Deepwater
Ports and Offshore Activities

Attachment: September 6, 2007, Letter from New Jersey Governor Jon S. Corzine.



**State of New Jersey**
OFFICE OF THE GOVERNOR
PO BOX 001
TRENTON NJ 08625-0001

JON S. CORZINE
*Governor*

September 6, 2007

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

Atlantic Sea Island Group LLC has applied to the Coast Guard and the Maritime Administration for a license to own, construct and operate a deepwater LNG port in the Atlantic Ocean off New Jersey and New York. Notice of the application, known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535), was published in the Federal Register on August 27, 2007. The notice indicates that because of the proposed island's proximity to New York, New York has been designated an adjacent coastal state under the Deepwater Port Act. The proposed island would be within 15 miles of New York and is approximately 19 miles from New Jersey. However, the proposed alternative pipeline alignment that is part of the deepwater port application would be well within the 15 mile standard to designate New Jersey an adjacent coastal state. As defined in the Deepwater Port Act, the deepwater port subject to this licensing includes all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys mooring lines, and similar facilities that are approved or proposed for construction and operation as part of the deepwater port. By this definition alone New Jersey should be considered an adjacent coastal state due to the proximity of the alternative alignment.

The Deepwater Port Act also provides for a state to be designated an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the deepwater port. The proposed port will connect to the existing Transco pipeline running from

Morgan, New Jersey to Long Beach, New York. Thus, New Jersey considers that it is directly connected to the deepwater port. Moreover, the alternative pipeline alignment would be less than 9 miles from New Jersey, well within the 15 mile criterion.

Regardless of whether the connection to the Transco pipeline emanating from the New Jersey shore constitutes a direct connection to either state, New Jersey's coastal environment is equally impacted by the proposed facilities as New York's coastal environment. New Jersey has robust commercial and recreational fisheries that are vital to the State's economy, as well as to the history and character of New Jersey's coastal environment. The proposed facility will destroy a historic prime fishing area, known as Cholera Bank, which is protected under New Jersey's federally approved coastal management program. Not only will the creation of an island over this prime fishing area be detrimental to this unique environment but the proposed facility's exclusion zone will prohibit vessels in a 633 acre area, further diminishing this important resource.

The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high… The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Accordingly, any impediments to navigation would adversely affect New Jersey in a manner equal to or greater than its effects on New York.

The predominant current direction in the area of the proposed deepwater port is toward New Jersey. Accordingly, turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as to the important commercial and recreational fishing grounds surrounding the proposed port, as would any spills at the island during construction and operation of the facility.

The application does not specify the exact location of shore based facilities that would service the deepwater port, or from which construction would be staged. However, it does indicate that the facilities would be located within a 40 mile radius of the proposed island. This radius includes shore facilities in New Jersey. Accordingly, the effects on the coastal environment of New Jersey for construction staging and long-term service of the deepwater port would be felt in New Jersey in equal or greater amount than in New York.

New Jersey should be designated an adjacent coastal state under the Deepwater Port Act because the alternative pipeline alignment will be well within 15 miles of New Jersey's Coast, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the

coastal environment of New York.  It is imperative that New Jersey be an integral part of the review of this proposal due to the inherent risks associated with a deepwater port within as busy of a port region as the New Jersey/ New York Port complex.

Sincerely,

Jon S. Corzine
Governor

c:      Mr. H. Keith Lesnick, MARAD
        Mr. Mark A. Prescott, USCG

MAR530 000027
POLICY



VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300                    www.venable.com

James H. Burnley IV

(202) 344-4054

jhburnley@venable.com

September 24, 2007



OCT 2 3 REC'D

<u>VIA HAND DELIVERY</u>
Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second Street SW
Washington, D.C. 20593

<u>VIA HAND DELIVERY</u>
Sean T. Connaughton
Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

RE:  Safe Harbor Energy Deepwater Port Application

Dear Admiral Allen and Administrator Connaughton:

On September 6, 2007, the Honorable Jon S. Corzine, Governor of the State of New Jersey, requested that State be designated an "adjacent coastal state" for purposes of consideration by your agencies of the Deepwater Port License application submitted by the Atlantic Sea Island Group for the project known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535). Pursuant to the Notice of Application published by the Maritime Administration ("MarAd") in the Federal Register on August 27, 2007, the State of New York was designated as the adjacent coastal state for purposes of the Safe Harbor Energy project.

On behalf of the Atlantic Sea Island Group, we are writing in opposition to the New Jersey request for designation as an adjacent coastal state because New Jersey does not meet the requirements under the Deepwater Port Act ("DWPA") for such designation. The DWPA defines an "adjacent coastal state" as "any coastal state which (A) would be directly connected by pipeline to a deepwater port, as proposed in an application; (B) would be located within 15 miles of any such proposed deepwater port; or (C) is designated by the Secretary in accordance with section 1508(a)(2) of this title." 33 U.S.C. § 1502(1). Pursuant to section 1508(a)(1) of the Act, the Secretary is required to, upon issuing notice of the application in the Federal Register, designate an adjacent coastal state if it meets the criteria in (A) or (B) of the definition.

Alternatively, under section 1508(a)(2), a state may request designation as an adjacent coastal state and the Secretary shall designate such a state as an adjacent coastal state if, after receiving the recommendations of the Administrator of National Oceanographic and Atmospheric Administration ("NOAA"), it is determined that there is a risk of damage to the

WASHINGTON, DC    MARYLAND    VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 2

coastal environment of the state <u>equal to or greater than</u> the risk posed to a state directly connected by pipeline to the proposed deepwater port. (Emphasis added).

In his letter, Governor Corzine lists several factors that he asserts establish why New Jersey should be designated an adjacent coastal state. However, the criteria for such designation is very explicit – to be designated an adjacent coastal state, the risk of damage to the coastal environment of New Jersey must be equal to or greater than the risk posed to a state directly connected by pipeline to the Safe Harbor Energy Deepwater Port. The factors listed by Governor Corzine in his letter do not meet this legal standard.

Initially, New Jersey notes that alternative routes for the pipeline were considered, and that one of the alternative routes would have been within 15 miles of the coast of New Jersey. That New Jersey could have been impacted by a potential alternative to the actual pipeline route is not a valid consideration under the applicable legal standard; the only valid consideration is whether New Jersey is affected by the actual proposed pipeline route. It is not.

Next, New Jersey argues that the pipeline from the port will connect to the existing Transco pipeline that runs from Morgan, New Jersey to Long Beach, New York, and that this means that New Jersey is directly connected by pipeline to the deepwater port. However, the Notice of Application defines the project as consisting of three components, one of which is "a subsea pipeline that would transport the natural gas to an offshore connection with the Transcontinental Gas Pipeline Corporation ("Transco") pipeline system." The pipeline connection from the Safe Harbor Energy Deepwater Port terminal to the existing Transco pipeline system, part of the U.S. interstate natural gas transmission system, occurs in New York State navigable waters at a location that is greater than 15 miles from New Jersey. Thus, New York is appropriately designated an adjacent coastal state; no such nexus to the Safe Harbor Energy Deepwater Port terminal exists regarding New Jersey or its navigable waters. To adopt New Jersey's rationale means that any state connected to the existing Transco interstate distribution system would have to be designated an adjacent coastal state – clearly not a result intended by the statute or regulations.

New Jersey then asserts that even if there is no direct pipeline connection to the State, the risk posed by the project to New Jersey's coastal environment is equal to or greater than the risk posed to New York. The standard adopted for status as an adjacent coastal state in the DWPA is a totality standard, <i>i.e.</i>, the total risk posed by the Safe Harbor Energy project to the coastal environment of New Jersey must be equal to or greater than the total risk posed to New York. The Safe Harbor Energy Deepwater Port Application identifies no risks to the coastal

MAR530 000035



VENABLE LLP    575 7th Street, NW    Telephone 202-344-4000    www.venable.com
Washington, DC 20004-1601    Facsimile 202-344-8100

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 3

environment of the State of New Jersey. However, even if there were one or more risks posed, and even if those one or more risks could be shown to be equal to or greater than the same risk or risks to the State of New York, this in and of itself is not sufficient to meet the totality standard mandated by statute for designation of New Jersey as an adjacent coastal state. Moreover, there are certain potential risks to New York's coastal environment that are not shared by New Jersey, and these must be taken into consideration under the statutory standard when comparing the two states. For instance, actual construction activities, in the form of pipeline laying and connection to the Transco pipeline, will occur within New York State waters, with any attendant risks to New York's coastal environment these construction activities may present. No such risks are faced by New Jersey. New Jersey does not meet, on the face of its request, the totality of risk standard established by the DWPA for designation as an adjacent coastal state.

Further, objective examination of the individual risks identified in the New Jersey letter also militates against its designation as an adjacent coastal state. New Jersey first states that there is a potential risk to commercial and recreational fisheries. New Jersey first states that Energy facility will destroy a historic prime fishing area, Cholera Bank, that is protected under the State's federally approved coastal zone management plan.

Any impact on commercial and recreational fisheries is a matter that will be considered as part of the application process. The application notes that there would likely be minimal impact on recreational and commercial fishing due to the project. Further, techniques and materials will be used for construction of the Island that will create habitat for fish use and provide surface area for attachment by invertebrates. In addition, New Jersey's claim that the Island could impact recreational or commercial fishing is counter to its own activities creating artificial reefs. New Jersey has developed an artificial reef program that involves depositing large quantities of concrete (construction debris) and other materials (rail cars marine vessels) on the marine bottom that it poses as successful in the creation of habitat for marine organisms (as has New York).

Atlantic Sea Island Group also has committed to create/enhance additional hard bottom habitat on Cholera Bank outside the exclusion zone around the Island if this is determined through studies to be appropriate. Building and enhancing the hard-bottom habitat found on Cholera Bank could benefit the local benthic and pelagic fish communities by providing additional structure and habitat for benthic organisms that form the foundation of the food chain. In the end, it is believed that creation of the habitat on and around the Island structure will benefit recreational and commercial fishing interests. Safe Harbor Energy Deepwater Port ("DWP") Application, Volume 3, Part 1, pages 3-53, 3-54.

WASHINGTON, DC    MARYLAND    VIRGINIA

MAR530 000036

VENABLELLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 4

But more specifically as to this issue, potential risk or impact to fisheries in the area of Cholera Bank is not a valid consideration regarding New Jersey's status as an adjacent coastal state because Cholera Bank is not within the coastal environment of New Jersey. Under the DWPA, "coastal environment" means "the navigable waters (including the lands therein and thereunder) and the adjacent shorelines (including waters therein and thereunder). The term includes transitional and intertidal areas, bays, lagoons, salt marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and the recreational and scenic values of such lands, waters and resources." 33 U.S.C. § 1502(5).

Section 1508(a)(2) of the DWPA requires an examination of risk to the coastal environment of the state to determine whether that state is an adjacent coastal state. (Emphasis added). Thus, it is the risk posed to the navigable waters and adjacent shoreline of the state of New Jersey that must be examined in considering New Jersey's request. The navigable waters of the State of New Jersey extend 3 nautical miles from its shore, the extent of the territorial sea of the State. Cholera Bank and the Safe Harbor Energy project are over 15 nautical miles from the New Jersey coast, and well outside New Jersey's coastal environment as that term is defined in the DWPA. Therefore, any impact that the Safe Harbor Energy Deepwater Port may have on commercial and recreational fishing in the Cholera Bank area is irrelevant and inapplicable to the considerations required to be taken into account in determining New Jersey's status as an adjacent coastal state under the DWPA. Further, for these same reasons, the fact that the Cholera Bank area may be protected under New Jersey's coastal management program is also irrelevant and inapplicable.

New Jersey also argues that the project is sited between the approach lanes to the Port of New York and New Jersey, and that any impediments to navigation resulting from the project would adversely affect the commercial interests of New Jersey in a manner equal to or greater than its effects on New York. Arguably, under the definition of coastal environment in DWPA, commercial interests are not included. However, even if they are, the data provided by New Jersey in support of this contention is not sufficient to determine whether New Jersey should be designated as an adjacent coastal state. It is impossible to know whether the adverse commercial impact on New Jersey is equal to or greater than the impact on New York without an analysis of the specific commercial losses, if any, both would face under various possible scenarios that the project could impact navigation into the port. Merely stating that any adverse impact would impact New Jersey equally or more than New York, as New Jersey does in its letter, is not sufficient to make a reasonable, rational determination under the statutory standard.

WASHINGTON, DC   MARYLAND   VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004 1601

Telephone 202-344-4000
Facsimile 202-344-8100

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 5

New Jersey next argues that the predominant current direction around the proposed facility is toward New Jersey, and thus turbidity and other water quality impacts during construction would move toward New Jersey's waters, as well as impact fishing grounds around the proposed site, as would any spills during constructions and operation of the facility. While we acknowledge that the prevailing ocean currents in the area of the proposed site are toward New Jersey, this does not mean that turbidity and other water quality impacts of the project necessarily present a risk to the New Jersey coastal environment. As noted above, the farthest extent of New Jersey's coastal environment for purposes of the DWPA is three nautical miles from its shore, which is approximately 12 nautical miles distant from any construction activities associated with the project. The discussion in the Safe Harbor Energy application regarding potential turbidity impacts during project construction indicates turbidity would be of short to moderate term and minor. Safe Harbor Energy DWP Application, Volume 3, Part 1, pages 2-18, 2-19. Thus, there is no evidence turbidity would affect the coastal environment of New Jersey. Further, the impact of any spills from construction or operation of the port is also unlikely to impact the coastal environment of New Jersey. Oil and/or natural gas spills, which would be on the ocean surface, are most affected by wind and wave action in terms of migration rather than ocean currents. The prevailing wind and wave directions are from the west and northwest, away from the New Jersey coastal environment. Safe Harbor Energy DWP Application, Volume 3, Part 1, pages 2-4, 2-5. Finally, any risks to water quality would necessarily be greater for the New York coastal environment because construction activities, in the form of trenching for the laying of the pipeline, actually will occur in New York State waters, and under the totality of risk standard, this must be taken into account when comparing this risk to that of New Jersey.

Lastly, New Jersey argues that shore-based facilities to service the port, or from which construction would be staged, are not identified in the application, but that the application notes any such facilities would be within a 40-mile radius of the proposed site, and would thus include facilities in New Jersey. However, this statement is incorrect. The application states that for staging of equipment and supplies, and loading and unloading barges, during construction, five facilities in the metropolitan New York area have been identified. Safe Harbor Energy DWP Application, Volume 3, Part 1, page 1-7. But the location of the shore base to be used during operation of the port to move personnel, supplies, equipment and disposable materials between the shore and the deepwater port facility is identified as the town of Ocean Side, Long Island, New York. Safe Harbor DWP Application, Volume 3, Part 1, page 1-8. Thus, any risk to New Jersey's coastal environment arising from the location of shore facilities to service the project could not be equal to or greater than such risks to the State of New York, where the permanent shore base to service the project would be located.

WASHINGTON, DC    MARYLAND    VIRGINIA

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

Admiral Thad W. Allen
Administrator Sean T. Connaughton
September 24, 2007
Page 6

      For all of these reasons, New Jersey should not be designated an adjacent coastal state under the DWPA for purposes of the Safe Harbor Energy Deepwater Port Application because it does not meet the statutory criteria for such designation. However, we also acknowledge and recognize that New Jersey has legitimate interests in the project. In recognition of these interests, Safe Harbor Energy project representatives have consulted with officials of the State of New Jersey during the development of the project and the application. Moreover, the denial of the request by the State of New Jersey to be designated as an adjacent coastal state does not mean that there are not avenues for New Jersey's legitimate interests to be considered during the application process. For instance, pursuant to section 1508(b)(2) of the DWPA, any interested State has the opportunity to make its views known to the Coast Guard regarding the location, construction and operation of the Safe Harbor Energy Deepwater Port, and those views are required to be given full consideration.

Sincerely,

James H. Burnley IV
David G. Dickman

cc:  Vice Admiral Conrad C. Lautenbacher (USN Ret.)
     Administrator
     National Oceanographic and Atmospheric Administration
     14th and Constitution Ave., N.W.
     Washington, D.C. 20230

DC2:894467 01

MAR530 000039

*Participating Organizations*

[list of participating organizations, illegible]

# Clean Ocean Action



*Ocean Advocacy Since 1984*

■ **Main Office**
18 Hartshorne Drive
P.O. Box 505, Sandy Hook
Highlands, NJ 07732-0505
Voice: 732-872-0111
Fax: 732-872-8041
SandyHook@CleanOceanAction.org

**www.CleanOceanAction.org**

September 25, 2007

M.A. Prescott
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
2100 Second St. SW
Washington, DC  20593

H. Keith Lesnick
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration
1200 New Jersey Ave., SE (MAR-530)
Second Floor, West Wing
Washington, DC  20590

Mary K. Jager
U.S. Coast Guard
2100 Second St. SW
Washington, DC  20593

**RE:  Letter in Support of Governor Corzine's Request for New Jersey's Status as an Adjacent Coastal State in the Atlantic Sea Island Group Application**

Dear Mr. Prescott, Mr. Lesnick, and Ms. Jager,

Clean Ocean Action is a regional, broad-based coalition of 125 conservation, environmental, fishing, boating, diving, student, surfing, women's, business, service, and community groups with a mission to improve the degraded water quality of the marine waters off the New Jersey/New York coast.

In the August 27, 2007 Federal Register, the U.S. Maritime Administration and the U.S. Coast Guard published a notice that it was considering a Deepwater Port application from the Atlantic Sea Island Group ("ASIG"). The application seeks a license to build and operate an industrial island in the ocean that would serve as a liquefied natural gas ("LNG") facility.  The name for the project is "Safe Harbor Energy."

The Maritime Administration and the Coast Guard has designated New York as an "adjacent coastal State" pursuant to the Deepwater Port Act ("DPA").  However, these agencies have not designated New Jersey as an adjacent coastal state.  On

1

MAR530 000040

September 6, 2007, and pursuant to the DPA, New Jersey Governor Jon Corzine wrote a letter to both agencies requesting adjacent coastal State status. The Coast Guard acknowledged receipt the following day, making the request timely for consideration under DPA § 1508(a)(2). Clean Ocean Action ("COA") strongly supports Governor Corzine's request for the reasons explained both in his letter and below.

COA believes New Jersey should have been designated an adjacent coastal State, without the need for a request, under DPA §§ 1508(a)(1)(A) and (B). First, New Jersey would be directly connected by pipeline to the proposed deepwater port, satisfying § 1508(a)(1)(A). The port will connect to the Transco pipeline, part of which exists from Morgan, New Jersey to Long Beach, New York.

Second, the proposed deepwater port will be located within 15 miles of New Jersey, meeting § 1508(a)(1)(B). Pursuant to § 1502(9)(C) of the DPA, a "deepwater port" used for natural gas is defined to include "pipelines." The proposed alternative alignment for the port's pipeline will be within nine (9) miles of New Jersey. Therefore, the "deepwater port," by definition, is within 15 miles of New Jersey.

Regardless, the Maritime Administration and the Coast Guard should designate New Jersey an adjacent coastal State pursuant to § 1508(a)(2) because the coastal environment of New Jersey is at a risk of damage equal to or greater than such risk posed to New York. Several reasons support this conclusion.

First, the predominant water current direction in the area of the island is toward New Jersey. These currents put New Jersey's coast and fishing areas at the greatest risk of harm from any spills that result from the construction and operation of the industrial island. Spills are a serious concern at this proposed location for reasons beyond standard safety concerns. Offshore wave heights during storms in this region can reach between 30 and 50 feet. Rogue waves have been observed to be between 40 and 50 feet. These wave heights exceed the height of the proposed project, which is 25 feet.

Second, New Jersey also faces a greater risk than New York arising from accidents due to Nor'easter winds, which primarily blow toward New Jersey. In addition to wave patterns, these winds could detrimentally influence the direction in which an LNG vapor cloud travels after a spill.

Third, this proposed island poses a threat to New Jersey marine life, including endangered species. The proposed industrial island will cover a minimum of 60.5 acres of open ocean. This is the size of almost six (6) Giants Stadiums. With a 60.5 acre island at the surface, it's inevitable that a larger area would be impacted at the ocean floor. Further, the location will destroy large areas of Cholera Bank, a historic prime fishing area of recreational and commercial importance.

Fourth, approval of ASIG's application could lead to secondary impacts on New Jersey's coastal environment. This project would necessitate construction of shore-based service facilities. New Jersey's coastal environment would be a primary candidate.

2

MAR530 000041

Fifth, the quantity of material necessary to build the island will undoubtedly impact New Jersey. Construction of an island will rely on significant amounts of dredged materials and, since most dredging projects occur in New Jersey, as compared to New York, New Jersey will see a greater environmental impact. Construction of the industrial island would divert the use of this material currently used in environmentally beneficial projects in the region.

Finally, the security measures involved in an LNG operation would interfere with and slow ship traffic in an extremely busy port environment. Comparing New York and New Jersey, New Jersey retains the majority of ports in the affected area. Security measures for LNG operations could delay traffic, leaving large ships idling in New Jersey ports, contributing to air pollution and other environmental hazards.

These are just some of the potential harms that put New Jersey's coastal environment at an equal, and in some cases greater, risk than the coastal environment of New York. For all of these reasons, the Maritime Administration and the Coast Guard must designate New Jersey an adjacent coastal State. We thank the Maritime Administration and Coast Guard for their consideration of these issues and of Governor Corzine's request.

Sincerely,

Cindy Zipf
Executive Director

cc:    The Honorable Jon S. Corzine, Governor, New Jersey

3



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

Coastal Management Office
401 E. State Street, 7th Floor
PO Box 418
Trenton, New Jersey 08625
P: 609-633-2201
F: 609-292-4608

LISA P. JACKSON
*Commissioner*

September 25, 2007

Mr. David M. Kennedy
Director
Office of Ocean and Coastal Resource Management
1305 East-West Highway
SSMC4 N/ORM3 Rm. 11211
Silver Spring, MD 20910

Dear Mr. Kennedy:

RE:     Permit Application by Safe Harbor Energy, LLC for US Coast Guard license to
        own, construct and operate a deepwater LNG port in the Atlantic Ocean

The New Jersey Coastal Management Program (NJCMP) is notifying the Office of Ocean
and Coastal Resource Management (OCRM), the U.S. Coast Guard (USCG), the
Maritime Administration (MARAD) and Safe Harbor Energy, LLC (Applicant) of its
intent to review the above-referenced activity (project) for consistency with the
enforceable policies of the NJCMP.  The USCG issued a Public Notice for this project on
August 27, 2007. Any activity that is the subject of an application for a federal permit or
license may also be subject to the federal consistency requirements of Section
307(c)(3)(A) of the federal Coastal Zone Management Act (CZMA) at 16 USC §
1456(c)(3)(A) and to the regulations promulgated by the National Oceanic and
Atmospheric Administration (NOAA) that implement that statutory provision.

The NJCMP believes that the proposed project may reasonably be expected to affect New
Jersey's coastal zone.  Subject to concurrence by OCRM with this determination, section
307(c)(3(A) and its implementing regulations require the Applicant to prepare and submit
to the NJCMP a certification analyzing the consistency of the proposed project with the

MAR530 000043

enforceable policies of the NJCMP. On August 27, 2007, the Maritime Administration published a Public Notice in the Federal Register, announcing that they received an application for the licensing of a natural gas deepwater port, and that the application appeared to contain the required information. In response to this notice, by letter of September 6, 2007, Governor Jon Corzine notified the USCG and MARAD that New Jersey should be designated an adjacent coastal state under the Deepwater Port Act. In accordance with the regulations under the Deepwater Port Act, the Governor noted that the alternative pipeline alignment will be well within 15 miles of New Jersey, New Jersey will be directly connected to the deepwater port by the Transco pipeline, and there is equal risk to New Jersey's coastal environment as to the coastal environment of the State of New York.

The regulatory standard for OCRM's approval of the NJCMP request is that the proposed activity has reasonably foreseeable effects on uses or resources of the State's coastal zone pursuant to 15 CFR 930.54(c). Based on the initial information provided, the NJCMP concludes that the activity satisfies this requirement.

Although federal permits for construction and operation of deepwater ports under the Deepwater Ports Act beyond New Jersey's coastal zone are not specifically included in New Jersey's Federal Consistency listing, the proposed deepwater port does represent an unlisted activity requiring a federal permit that the NJCMP believes will have a reasonably foreseeable effect on uses or resources of New Jersey's coastal zone. In such cases, the regulations implementing the CZMA require OCRM's approval of the NJCMP's request to review the activity pursuant to 15 CFR § 930.54. If OCRM grants review approval, the CZMA and its implementing regulations delay the USCG authorization of the activity until either the NJCMP concurs with a consistency certification or the NJCMP review period expires, whichever occurs first. If OCRM denies the NJCMP's request for review, the CZMA and implementing regulations, the USCG may proceed to authorize the activity without NJCMP concurrence pursuant to 15 CFR § 930.54(c). This request to review the proposed deepwater port under the CZMA is independent of New Jersey's request to be considered an adjacent coastal state under the Deepwater Port Act.

## Proposed Project

Based on the information submitted by the applicant to the USCG and contained within the public notice, the project involves the construction of a deepwater LNG port in the Atlantic Ocean. The deepwater port consists of three components: an artificial island to be constructed of natural sand, gravel and rock materials surrounded by armored breakwaters; an LNG receiving, storage and regasification facility; and a submerged pipeline. The proposed artificial island would cover approximately 112 acres of sea floor, be located 13.5 miles offshore of Long Beach, New York and approximately 19 miles from New Jersey on an area depicted as Cholera Bank on NOAA nautical charts. The pipeline would consist of two parallel 36 inch diameter pipelines, extending 12.8 miles from the island to a connection with the existing offshore Transco pipeline. The alternative pipeline route would still connect to the Transco pipeline offshore, but would be a longer route and would also be closer to New Jersey's shore, within 9 miles of Sandy

2

Hook. The Transco pipeline runs from Sayreville, New Jersey, to Long Island, New York. Assessment of the project's potential effect on New Jersey's coastal zone is based on the project information currently available to the NJCMP as Volume Four of the Deepwater Port License Application is not available to the NJCMP due to confidentiality agreements. This poses various problems for the NJCMP to adequately review the proposal as key information is contained within this volume, such as proposed port facilities that will be utilized for the project. There is a strong possibility that ports located within New Jersey's coastal zone will be utilized due to the proximity of the proposed island and the availability of port facilities that may be needed to construct the proposed project.

## Reasonably Foreseeable Effects

Commercial Fishing; Recreational Fishing and Boating.  The area of the proposed deepwater port is a productive and historical fishing area known as Chólera Bank, more specifically identified as Anglers Bank and Middle Grounds under NJDEP's Prime Fishing Areas Mapping. Marine fish and fisheries are protected under the NJCMP, and public access to and use of natural resources, such as Cholera Bank, are major components of the CZMA and the NJCMP. The proposed island will have a 500 meter exclusion zone surrounding it, which, when coupled with the island itself, will preclude vessels from over 630 acres of the ocean for the anticipated 40-year life of the project. In addition, during construction of the associated pipeline, a 9,306 acre area would be closed to vessels during the estimated eight month construction period. Thus, the proposed deepwater port would have a foreseeable effect on public access to offshore areas, and would alter commercial and recreational fishing patterns. Not only would there be a permanent exclusion zone surrounding the island prohibiting vessels from over 630 acres of the ocean, but, the creation of the island itself would result in the permanent loss of valuable fish habitat through filling of 112 acres of productive seafloor. Consequently, the NJCMP has concluded that there are reasonably foreseeable effects on New Jersey's commercial fishing industry and recreational boating and fishing industries, which are based in ports, marinas, and other upland facilities located throughout New Jersey's coastal zone.

## Construction Staging Areas

The information provided by the applicant indicates that the staging and laydown area for construction of the proposed deepwater port would be located within a forty mile radius of the proposed site location. The NJCMP has no information concerning the specific location of this staging area and the existing site conditions. The five possible areas chosen by the Applicant were not included with the information the NJCMP received, but it is likely that port facilities located in New Jersey's coastal zone are included in their proposal due to the presence of the criteria outlined in the project proposal. Without this information, NJCMP can not determine the effects of the construction and operation on the uses and resources of New Jersey's coastal zone, including potential impacts on existing ports and shipping traffic, traffic on land, and compatibility with adjacent uses. Therefore, NJCMP believes that the proposed project has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone since staging and construction activities may occur within New Jersey's coastal zone for a period of up to 5-6 years.

3

Navigation and Ports. Major designated navigation corridors converge off New Jersey's coast. These corridors provide shipping access to the Port of New York and New Jersey that is vital to New Jersey's economy. The island is proposed between the approach lanes to the Port of New York and New Jersey. The Port is a critical element of New Jersey's economy. According to the Summer 2007 issue of *PortViews* (Volume 6, No. 7), published by the Port of New York and New Jersey, "containerized cargo volumes in the Port of New York and New Jersey rose nearly 8 percent in 2006 to a new record high... The dollar value of all cargo moving through the port in 2006 exceeded $149 billion for the first time, up 13 percent from 2005. The number of loaded and empty TEUs (20-foot equivalent units) handled in the port exceeded 5 million for the first time." In addition, "ExpressRail, the Port Authority's on-dock rail terminals in New Jersey, set a new record in 2006, handling 338,882 containers, 11.8 percent more than in 2005." Placement of structures such as a deepwater port, including pipelines, between these approach lanes has the potential to affect vessel navigation to and from New Jersey's coastal zone, thus affecting access to and use of the port facilities located within New Jersey's coastal zone. Accordingly, the NJCMP should be afforded an opportunity to review this proposal for consistency with New Jersey's enforceable policies as the proposed deepwater port has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone.

Marine Fish, Sea Turtles and Marine Mammals. Critical wildlife and endangered or threatened wildlife habitats are areas that serve an essential role in maintaining wildlife throughout their lifecycle. The NJCMP discourages development that would affect critical wildlife habitats. Offshore waters serve as essential habitat for numerous fish species during various stages of their lifecycles. Several species of sea turtles and four species of whale, as well as other marine mammals, frequent this region. Therefore, it is reasonably foreseeable that this project is likely to affect these species.

Submerged Infrastructure. A submerged infrastructure route is the corridor in which a pipe or cable is located on or below the bed of a water body. The ocean floor off the New Jersey coast contains existing and planned submerged infrastructure, particularly an electric transmission cable recently authorized by the NJCMP whose route between the New Jersey mainland and Long Island is in the vicinity of the proposed deepwater port. Placement of structures such as a deepwater port on the ocean floor may damage or hinder future maintenance of this authorized submerged infrastructure. Thus, the proposed activity may have a foreseeable effect on New Jersey's coastal zone.

Water Quality. Maintaining good water quality is an essential element of the NJCMP and critical to the uses and resources of New Jersey's coastal zone. The proposed activity may affect water quality during construction, operation, and maintenance. Due to the nature of offshore currents and waves in the New York Bight, any negative impacts to water quality, either from construction or any spills during construction or operation would most likely affect the New Jersey coastal zone. Therefore, the NJCMP should be afforded an opportunity to review this proposal for consistency with New Jersey's

4

enforceable policies since the proposed deepwater port has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone.

Shipwrecks and Historic and Archaeological Resources. Shipwrecks and artificial reefs are recognized by the NJCMP as a special area. Under the NJCMP's enforceable policies, this special area includes all permanently submerged or abandoned remains of vessels, and other features including, among other things, artificial reefs, anchors, quarry rocks or lost cargo, that serve as a special marine habitat or are historic and cultural resources. These offshore features are the frequent destination of New Jersey's recreational fishermen, as well as the State's sport divers. The proposed project is reasonably likely to affect the accessibility of shipwrecks and historic and archaeological resources.

Conclusion

A foreseeable effect pursuant to 15 CFR 930.11(g) includes "both direct effects which result from the activity and occur at the same time and place as the activity, and indirect (cumulative and secondary) effects which result from the activity and are later in time or farther removed in distance, but are still reasonably foreseeable." In accordance with this definition, the proposed deepwater port, including the pipelines, has reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone. Based on the information available to the NJCMP, the NJCMP believes that the proposed project will have reasonably foreseeable direct effects on New Jersey's coastal zone since the proposed port area used during construction and operation may be located within New Jersey's coastal zone. Further, for the reasons described above, the NJCMP believes that the proposed deepwater port, including pipelines, will have both direct and indirect reasonably foreseeable effects on the uses and resources of New Jersey's coastal zone relating to commercial fishing, recreational fishing and boating; ports, marine fish, sea turtles and marine mammals; submerged infrastructure; navigation; water quality; and, shipwrecks and historic and archaeological resources.

In conclusion, the activities that are subject of the application to the USCG are reasonably likely to affect natural resources, land uses, or water uses of New Jersey's coastal zone and thus the activities are subject to the consistency review requirements of Section 307(c)(3)(A) of the CZMA. By this letter, and pursuant to the regulations implementing the CZMA at 15 CFR § 930.54, the NJCMP requests approval of OCRM to review this proposed activity. In addition, by this letter, the NJCMP is informing the Applicant of its right to submit to OCRM within 15 days from the Applicant's receipt of this letter, comments on New Jersey's request to review this activity. The USCG is now preparing an Environmental Impact Statement (EIS) for this project. The information that will be contained in the EIS is necessary for a comprehensive review of the proposed project. Therefore, NJCMP requests that federal consistency review timeframes commence at the time of publication of the Final EIS.

5

If you have any questions concerning this letter, please contact Kim Springer or Kevin Hassell of my staff at (609) 633-2201.

Sincerely,

Ruth Ehinger
Coastal Program Manager

C: Mr. David Kaiser, NOAA
Ms. Kris Wall, NOAA
Admiral Thad W. Allen, USCG
Mr. Mark A. Prescott, USCG
Mr. Sean T. Connaughton, MARAD
Mr. H. Keith Lesnick, MARAD
Atlantic Sea Island Group LLC, Applicant
Jeanne Herb, NJDEP, Policy, Planning & Science
Mark Mauriello, NJDEP, Land Use Management
Tom Micai, NJDEP, Land Use Management
Suzanne Dietrick, NJDEP, Site Remediation

6



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S E
Washington, DC 20590

September 28, 2007

The Honorable Jon S. Corzine
Governor of New Jersey
Trenton, NJ 08624-0001

USCG - 2007 - 28535

Re: New Jersey Adjacent Coastal State Designation

Dear Governor Corzine:

Thank you for your letter dated September 6, 2007, requesting the designation of New Jersey as an Adjacent Coastal State for the proposed Safe Harbor Energy deepwater port project. In accordance with the Deepwater Port Act of 1974, as amended (Act), the Maritime Administration recently submitted a request for recommendation on Adjacent Coastal State status for New Jersey to the Administrator of the National Oceanic and Atmospheric Administration (NOAA). We are currently awaiting NOAA's response.

Pursuant to Section 1508 (a)(2) of the Act, the Maritime Administrator, by delegated authority, must make a determination regarding the designation of Adjacent Coastal State status after receiving a timely request from a State Governor, and after considering the recommendation of the Administrator of the National Oceanic and Atmospheric Administration. The Maritime Administrator must grant Adjacent Coastal State status if the risk of damage to the requesting State's coastal environment is equal to or greater than the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port. This determination must be made no later than 45 days after the date of receipt of the request.

Accordingly, we will provide prompt notification to you upon consideration of the NOAA Administrator's recommendation and issuance of our final decision in this matter.

Should you require additional information, please contact Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or keith.lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

October 16, 2007

The Honorable Frank R. Lautenberg
United States Senate
Hart Senate Office Building, Suite 324
Washington, DC 20510

Re:    New Jersey Adjacent Coastal State Designation

Dear Senator Lautenberg:

Thank you for your letter dated September 21, 2007, expressing support of Governor
Jon S. Corzine's request for the designation of New Jersey as an Adjacent Coastal State
for the proposed Safe Harbor Energy deepwater port project.

Pursuant to Section 1508(a)(2) of the Deepwater Port Act of 1974, as amended, the
Maritime Administration, by delegated authority, must make a determination regarding
the designation of Adjacent Coastal State status after receiving a timely request from a
State Governor and after considering the recommendation of the Administrator of the
National Oceanic and Atmospheric Administration (NOAA).  As you may know, the
Maritime Administration must grant Adjacent Coastal State status if the risk of damage
to the requesting State's coastal environment is equal to or greater than the risk posed
to a State that would be directly connected by pipeline to the proposed deepwater port.

As such, we are currently conducting a thorough review of this matter and consulting
with NOAA and other affected Federal agencies.  We note that your concerns are
important to us and will be given full consideration during our decision-making process.

Finally, the Maritime Administration will render its decision on Adjacent Coastal State
status for the State of New Jersey no later than October 22, 2007.  We will provide
prompt notification to you at that time.  Should you require additional information,
please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore
Activities at 202-366-1624 or keith.lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

MAR530 000050



**U.S. Department of Transportation**
**Maritime Administration**

# CONCURRENCE RECORD

10/16/07

| ORIGINATING OFFICE | SUBJECT: Letter to the Honorable Frank R. Lautenberg, United States Senate, Re: Designation of Adjacent Coastal State Status for the State of New Jersey |
|---|---|
| MAR_530 | |

| SEQUENCE | CODE NO. | ORGANIZATIONAL UNIT | INITIALS WITHIN OFFICE | INITIALS OFFICE HEAD | DATE |
|---|---|---|---|---|---|
| 5 | 100 | MARITIME ADMINISTRATOR | AT 10/16 | on | 10/1 |
| 4 | 110 | DEPUTY MARITIME ADMINISTRATOR | RM 6/12/07 | JN 10/16/07 | |
| | 130 | OFFICE OF CIVIL RIGHTS | | | |
| 3 | 220 | OFFICE OF CHIEF COUNSEL | Ason | | 10/12/07 |
| | 230 | ASSISTANT ADMINISTRATOR | | | |
| | 231 | OFFICE OF INTERNATIONAL ACTIVITIES | | | |
| | 232 | OFFICE OF POLICY AND PLANS | | | |
| | 240 | OFFICE OF CONGRESSIONAL AND PUBLIC AFFAIRS | | | |
| | 250 | OFFICE OF CHIEF FINANCIAL OFFICER | | | |
| | 300 | ASSOCIATE ADMINISTRATOR FOR ADMINISTRATION | | | |
| | 340 | OFFICE OF CHIEF INFORMATION OFFICER | | | |
| | 360 | OFFICE OF HUMAN RESOURCES | | | |
| | 380 | OFFICE OF ACQUISITION | | | |
| | 390 | OFFICE OF MANAGEMENT AND ADMINISTRATIVE SERVICES | | | |
| | 400 | ASSOCIATE ADMINISTRATOR FOR ENVIRONMENT AND COMPLIANCE | | | |
| | 410 | OFFICE OF ENVIRONMENT | | | |
| | 420 | OFFICE OF SECURITY | | | |
| | 430 | OFFICE OF SAFETY | | | |
| 2 | 500 | ASSOCIATE ADMINISTRATOR FOR INTERMODAL SYSTEM DEVELOPMENT | | | |
| | 510 | OFFICE OF INFRASTRUCTURE DEVELOPMENT AND CONGESTION MITIGATION | | | |
| | 520 | OFFICE OF MARINE HIGHWAYS AND PASSENGER SERVICES | | | |
| 1 | 530 | OFFICE OF DEEPWATER PORTS AND OFFSHORE ACTIVITIES | | JRL | 1204 07 |
| | 540 | OFFICE OF SHIPPER AND CARRIER OUTREACH | | | |
| | 550 | OFFICE OF GATEWAYS | | | |
| | 600 | ASSOCIATE ADMINISTRATOR FOR NATIONAL SECURITY | | | |
| | 610 | OFFICE OF SHIP OPERATIONS | | | |
| | 620 | OFFICE OF EMERGENCY PREPAREDNESS | | | |
| | 630 | OFFICE OF SEALIFT SUPPORT | | | |
| | 640 | OFFICE OF SHIP DISPOSAL | | | |
| | 700 | ASSOCIATE ADMINISTRATOR FOR BUSINESS AND WORKFORCE DEVELOPMENT | | | |
| | 710 | OFFICE OF FINANCIAL APPROVALS AND MARINE INSURANCE | | | |
| | 720 | OFFICE OF SHIPYARDS AND MARINE FINANCE | | | |
| | 730 | OFFICE OF CARGO PREFERENCE AND DOMESTIC TRADE | | | |
| | 740 | OFFICE OF MARITIME WORKFORCE DEVELOPMENT | | | |
| | 5100 | U.S. MERCHANT MARINE ACADEMY | | | |

SUMMARY OF DOCUMENT:

Actions ▾          Report    Loop ▾    Discussions    Home    Back

Information  |  Attachments  |  Assignments  |  **Miscellaneous**  |

## Recipients of Info Copies                                    Send Info Copies
|  Name  |  Date & Time  |
|---|---|
|  No Info Copies found. |  |

## Parent Folder
| Folder ID | Action Type | Action Office | Open Folder(G) | Report(M) |
|---|---|---|---|---|
|  |  |  | Folder Owner | Status |
|  | No Parent folders found. |  |  |  |

## Linked Folders
| Folder ID | Action Type | Action Office | Open Folder | Report |
|---|---|---|---|---|
|  |  |  | Folder Owner | Status |
|  | No Linked folders found. |  |  |  |

## Journal Entries                                             Add Journal
| Date & Time | User | Comments | Event |
|---|---|---|---|
| 09/18/2007 09:54:46 AM | Roston, Donna | Assigned to Yvette Fields. |  |
| 09/18/2007 09:22:11 AM | Brown, Curtis | send to 500 for action | Start Workflow. |

MAR530 000052

FRANK R. LAUTENBERG
NEW JERSEY

COMMITTEES:
APPROPRIATIONS
BUDGET
COMMERCE, SCIENCE, AND
TRANSPORTATION
ENVIRONMENT AND
PUBLIC WORKS

# United States Senate
WASHINGTON, DC 20510

September 21, 2007

Admiral Thad Allen
Commandant
US Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean Connaughton
Maritime Administrator
US Maritime Administration
1200 New Jersey Ave., SE
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Administrator Connaughton:

I am contacting you regarding the application filed by Atlantic Sea Island Group for a license to construct and operate a Liquefied Natural Gas (LNG) Deepwater Port in the Atlantic Ocean, off the coast of New Jersey and New York.   Specifically, I am writing in support of the State of New Jersey's recent request to be designated an adjacent coastal state under the Deepwater Port Act.

As you know, this proposed LNG facility would be located within 15 miles of New York and within 19 miles of New Jersey, and the potential impact of the construction and operation of this 62.5 acre facility upon our state could be enormous.  For example, the current proposal will destroy an important prime fishing area and may have a serious impact on endangered species in the vicinity.  It also calls for millions of tons of materials to be dumped into the ocean to construct this man-made island off of our coastline.

A facility of this type and magnitude certainly raises safety and security concerns which could impact New Jersey.  This island would be located at the entrance to the New York Harbor, between the vessel approach lanes to the Port of New York and New Jersey. Any negative impact on the functioning of this facility could be devastating to the economy of New Jersey and the entire region.

Given such potentially devastating impacts to New Jersey it is imperative that our state be granted the same rights and authorities as New York during the federal application review process.  In particular, New Jersey should have the ability to review this project,

ONE GATEWAY CENTER, 23RD FLOOR
NEWARK, NJ 07102
(973) 639-8700  FAX: (973) 639-8723

HART SENATE OFFICE BUILDING, SUITE 324
WASHINGTON, DC 20510
(202) 224-3224  Fax: (202) 228-4054

2 RIVERSIDE DRIVE
ONE PORT CENTER, SUITE 505
CAMDEN, NJ 08101
(856) 338-8922  FAX: (856) 338-8936

MAR530 000053

request public hearings and take other necessary actions so that its citizens can be heard regarding federal consideration of this project.

It is important that we continue to explore all viable options for a national energy policy to reduce our dependence on foreign oil. LNG facilities may certainly play a role in this future. However, a large-scale, man-made offshore LNG facility has never been constructed before and it is critical that during this application process we ensure the health and safety of our environment and our citizens.

Given these important considerations, I urge you to support New Jersey's request for status as an adjacent coastal state, so that our citizens can participate in the decision-making process for a major project affecting our State's environment and economy.

Sincerely,

Frank R. Lautenberg



### State of New Jersey
OFFICE OF THE GOVERNOR
PO Box 001
TRENTON NJ 08625-0001

JON S. CORZINE
*Governor*

September 6, 2007

Admiral Thad W. Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

Atlantic Sea Island Group LLC has applied to the Coast Guard and the Maritime Administration for a license to own, construct and operate a deepwater LNG port in the Atlantic Ocean off New Jersey and New York. Notice of the application, known as Safe Harbor Energy Liquefied Natural Gas Deepwater Port License (USCG-2007-28535) was published in the Federal Register on August 27, 2007. The notice indicates that because of the proposed island's proximity to New York, New York has been designated an adjacent coastal state under the Deepwater Port Act. The proposed island would be within 15 miles of New York and is approximately 19 miles from New Jersey. However, the proposed alternative pipeline alignment that is part of the deepwater port application would be well within the 15 mile standard to designate New Jersey an adjacent coastal state. As defined in the Deepwater Port Act, the deepwater port subject to this licensing includes all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys mooring lines, and similar facilities that are approved or proposed for construction and operation as part of the deepwater port. By this definition alone New Jersey should be considered an adjacent coastal state due to the proximity of the alternative alignment.

The Deepwater Port Act also provides for a state to be designated an adjacent coastal state if there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a state directly connected by pipeline to the deepwater port. The proposed port will connect to the existing Transco pipeline running from

*New Jersey Is An Equal Opportunity Employer  •  Printed on Recycled Paper and Recyclable*

coastal environment of New York. It is imperative that New Jersey be an integral part of the review of this proposal due to the inherent risks associated with a deepwater port within as busy of a port region as the New Jersey/ New York Port complex.

Sincerely,

Jon S. Corzine
Governor

c:    Mr. H. Keith Lesnick, MARAD
      Mr. Mark A. Prescott, USCG

MAR530 000056

# Transmission Report

Date/Time    08-26-2006    08 29 20 p m    Transmit Header Text
Local ID 1    2023669580    Local Name 1    Line 1
Local ID 2    Local Name 2

### This document : Confirmed
### (reduced sample and details below)
### Document size : 8.5"x11"





FAX TRANSMITTAL    # of pages ►

U.S. Department
of Transportation
Maritime
Administration

October 16, 2007

The Honorable Frank R. Lautenberg
United States Senate
Hart Senate Office Building, Suite 324
Washington, DC 20510

Re:    New Jersey Adjacent Coastal State Designation

Dear Senator Lautenberg:

Thank you for your letter dated September 21, 2007, expressing support of Governor
Jon S. Corzine's request for the designation of New Jersey as an Adjacent Coastal State
for the proposed Safe Harbor Energy deepwater port project.

Pursuant to Section 1508(a)(2) of the Deepwater Port Act of 1974, as amended, the
Maritime Administration, by delegated authority, must make a determination regarding
the designation of Adjacent Coastal State status after receiving a timely request from a
State Governor and after considering the recommendation of the Administrator of the
National Oceanic and Atmospheric Administration (NOAA). As you may know, the
Maritime Administration must grant Adjacent Coastal State status if the risk of damage
to the requesting State's coastal environment is equal to or greater than the risk posed
to a State that would be directly connected by pipeline to the proposed deepwater port.

As such, we are currently conducting a thorough review of this matter and consulting
with NOAA and other affected Federal agencies. We note that your concerns are
important to us and will be given full consideration during our decision-making process.

Finally, the Maritime Administration will render its decision on Adjacent Coastal State
status for the State of New Jersey no later than October 22, 2007. We will provide
prompt notification to you at that time. Should you require additional information,
please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore
Activities at 202-366-1624 or keith.lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

Total Pages Scanned . 1        Total Pages Confirmed . 1

| No. | Job | Remote Station | Start Time | Duration | Pages | Line | Mode | Job Type | Results |
|-----|-----|----------------|------------|----------|-------|------|------|----------|---------|
| 001 | 396 | US SENATE | 08.28:25 p.m. 08-26-2006 | 00:00:33 | 1/1 | 1 | EC | HS | CP14400 |

Abbreviations.
HS. Host send        PL  Polled local        MP  Mailbox print        TU: Terminated by user
HR. Host receive     PR· Polled remote       CP: Completed            TS· Terminated by system    G3: Group 3
WS: Waiting send     MS. Mailbox save        FA  Fail                 RP· Report

MAR530 000057

**FedEx Express** US Airbill

FedEx Tracking Number: 8634 3009 1303

Sender's Copy

**From** (Please print and press hard.)

Date 10-18-07    Sender's FedEx Account Number 1272-8675-2

Sender's Name L. Horton    Phone (202) 366 4839

Company DOT/MARITIME ADMIN/OFC SVCS

Address 1200 NEW JERSEY AVE SE (W24-234)

City WASHINGTON    State DC    ZIP 20590

Your Internal Billing Reference

**To**

Recipient's Name Senator Frank Lautenberg    Phone (202) 224 3224

Company United States Senate

Recipient's Address Hart Senate Office Building

Address Suite 324

City Washington    State DC    ZIP 20510

0369176433

**4a Express Package Service** *Packages up to 150 lbs.*
- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx First Overnight

**4b Express Freight Service** *Packages over 150 lbs.*
- FedEx 1Day Freight
- FedEx 2Day Freight
- FedEx 3Day Freight

**5 Packaging**
- ☑ FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling**
- SATURDAY Delivery
- HOLD Weekday
- HOLD Saturday
- ☑ No
- Yes
- Yes
- Dry Ice
- Cargo Aircraft Only

**7 Payment** Bill to
- ☑ Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages    Total Weight    Total Declared Value $

**8 Residential Delivery Signature Options**
- No Signature Required
- Direct Signature
- Indirect Signature

519

MAR530 000058



UNITED STATES DEPARTMENT OF COMMERCE
The Under Secretary of Commerce
for Oceans and Atmosphere
Washington, D.C. 20230

OCT 1 7 2007

H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick:

Thank you for your letter requesting the National Oceanic and Atmospheric Administration's
(NOAA) recommendation on whether to recognize the State of New Jersey as an "adjacent
coastal state" under the Deepwater Port Act (DPA), for the purpose of reviewing a liquefied
natural gas facility proposed by the Atlantic Sea Island Group, LLC.

Under the DPA, the Secretary of Transportation (Secretary) is authorized to designate a state as
an "adjacent coastal state" for purposes of reviewing deepwater port applications filed pursuant
to the DPA. Specifically, the Secretary shall, after receiving a recommendation from the NOAA
Administrator, designate a state as an adjacent coastal state, if the Secretary determines that there
is a risk of damage to the coastal environment of such state equal to or greater than the risk posed
to a state directly connected by pipeline to the proposed deepwater port.

After reviewing New Jersey's request and the response submitted by the Atlantic Sea Island
Group, NOAA has concerns with the sufficiency of the information submitted by New Jersey
in support of its request. Given these concerns, NOAA recommends MARAD solicit from
New Jersey additional information supporting its claim that the proposed project poses a risk
of damage to the coastal environment of New Jersey "equal to or greater than the risk" to
New York, the State that is directly connected by pipeline to the proposed deepwater port.
Useful information might include the following:

- New Jersey alleges the project would "destroy a historic prime fishing area, known as
  Cholera Bank, which is protected under New Jersey's federally approved coastal
  management program." What is New Jersey's interest in Cholera Bank and how is
  this area protected under the State's coastal management program? What are the
  impacts to New Jersey's coastal environment (in both nature and magnitude) and how
  do they compare with comparable impacts that likely will be experienced by other
  affected states?

- Does New Jersey allege that any waters within the facility's proposed exclusion zone
  include the "coastal environment" of New Jersey, as defined by statute?

- New Jersey alleges potential impacts due to turbidity, since the predominant current
  in the area of the proposed deepwater port is in the direction of New Jersey. What
  impacts to New Jersey's coastal environment are projected, in both nature and

THE ADMINISTRATOR



magnitude? How do these impacts compare with impacts that likely will occur within the coastal environment of New York?

NOAA understands that MARAD is under a statutory deadline to make a decision on New Jersey's request. Accordingly, NOAA does not expect that MARAD will provide additional information to NOAA for further review, but rather that MARAD make a final determination based on its record and the requirements of the DPA.

Please note the State of New Jersey has made a separate request to the NOAA Office of Ocean and Coastal Resource Management (OCRM) to review the proposed facility pursuant to the Coastal Zone Management Act (CZMA). OCRM is reviewing the State's request to determine if the State made a timely request, and whether the State has met the CZMA standard that the proposed activity may have a reasonably foreseeable effect on New Jersey's coastal uses or resources. OCRM's decision is expected by October 25, 2007.

Please contact David Kaiser, Senior Policy Analyst with OCRM, with any questions you may have in regards to this matter. Mr. Kaiser can be reached at (603) 862-2719.

Sincerely,

Conrad C. Lautenbacher, Jr.
Vice Admiral, U.S. Navy (Ret.)
Under Secretary of Commerce for
    Oceans and Atmosphere

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

470 L'Enfant Plaza East, SW
Room 7110
Washington, DC 20024-2135
Staff Symbol: CG-0921
Phone: (202) 245-0520
Fax: (202) 245-0529

5730
C728705

The Honorable Frank R. Lautenberg
United States Senate
324 Hart Senate Office Building
Washington, DC 20510-0001

OCT 1 7 2007

Dear Senator Lautenberg:

This is in response to your letter dated September 21, 2007 regarding the designation of
New Jersey as an Adjacent Coastal State for the proposed Atlantic Sea Island Group,
LLC deepwater port license application for the Safe Harbor Energy project. In
accordance with the Deepwater Port Act of 1974, as amended (Act) (33 U.S. Code
[U.S.C.] 1501 et seq.), the Maritime Administration has requested that the Administrator
of the National Oceanic and Atmospheric Administration (NOAA) provide a
recommendation on coastal impacts to assist in this determination. The Maritime
Administration is currently awaiting NOAA's response.

Pursuant to Section 1508 (a)(2) of the Act, the Maritime Administrator, by delegated
authority, must make a determination regarding the designation of Adjacent Coastal State
status after receiving a timely request from a State Governor, and after considering the
recommendation of the Administrator of the National Oceanic and Atmospheric
Administration. The Maritime Administrator must grant Adjacent Coastal State status if
the risk of damage to the requesting State's coastal environment is equal to or greater
than the risk posed to a State that would be directly connected by pipeline to the proposed
deepwater port. This determination must be made no later than 45 days after the date of
the receipt of the request.

My Senate Liaison Office at (202) 224-2913 would be pleased to respond to any further
questions you or your staff may have.

Sincerely,

Edward St. Pierre
Commander, U.S. Coast Guard
Congressional and Governmental
Affairs Staff
By Direction

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-5225
Phone: (202) 372-1454
Fax: (202) 372-1926
Email: mary.k.jager@uscg.mil

16613
October 24, 2007

Atlantic Sea Island Group LLC
Attn: Mr. William VanHerwarde
Executive Vice President
Chrysler Building
405 Lexington Avenue, 26th Floor
New York, NY 10174

Dear Mr. VanHerwarde,

This letter is in regard to Atlantic Sea Island Group LLC's (ASIG) pending application for a license under the Deepwater Port Act of 1974 (DWPA) (33 U.S.C. §§1501 et seq) to own, construct, and operate the Safe Harbor Energy LNG Deepwater Port and associated pipeline off the coast of New York in federal waters. Our letter of August 15, 2007, indicated that based on a review by the US Coast Guard and other federal agencies, ASIG's application for the Safe Harbor Energy project appeared complete for purposes of processing under the DWPA.

In that letter we also indicated that an environmental consultant was necessary to assist the Coast Guard in developing the Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA) and the DWPA. You agreed to provide a Third Party Contractor for that purpose. You also agreed to provide for a contractor to conduct a comprehensive study of the impacts associated with decommissioning of the proposed island after its useful life, including an independent financial review of cost estimates associated with removal of the island. Incorporated into the completeness letter was an agreement made August 6th with Maritime Administration officials that a comprehensive study of the impacts associated with decommissioning, including an independent financial review of cost estimates for removal of the island, would be completed and included in the Draft EIS. In the Coast Guard's letter of August 14, 2007, Mr. Prescott indicated our desire to use the selected third party contractor to perform the project's decommissioning plan and independent financial review of associated costs. He also indicated the likelihood of new requirements arising that may exceed the scope of the existing contract and indicated our desire that you resolve these contract issues promptly.

To date you have executed a contract with the Coast Guard selected environmental consultant, who has begun work under the direction of Coast Guard and Maritime Administration on both the Draft EIS and required decommissioning information. We have been informed by both the environmental consultant and you that differences exist in the interpretation of the contract. The resolution of these differences has resulted in a delay or suspension of work necessary for the Maritime Administration and Coast Guard development of information to fulfill their obligations under DWPA and NEPA. We discussed potential impacts of the delay with you during a meeting at Coast Guard headquarters on October 23, 2007.

Based on the need for additional information, and as allowed under 33 CFR Sec 148.107, we have determined that in order to complete the EIS for this project within the timeframe required by the DWPA, we must suspend the time line for processing the license application until the required information has been received and found to be sufficient to incorporate into the EIS. The period of this suspension shall not be counted in determining the date prescribed by the time limits set forth in 33 USC §§1504(g) and 1504(i)(4) of the DWPA.

Subj: Safe Harbor Energy LNG Deepwater Port Timeline Suspension          16613
October 24, 2007

Our goal is to develop a technically sound EIS in accordance with NEPA, and to provide adequate information for the Maritime Administrator to use in making a determination on the license application. We appreciate your efforts in working with us to achieve this goal. If you have any questions you may contact us, or the Coast Guard's project manager for the Safe Harbor Energy project, Mary Kate Jager at 202-372-1454.

Sincerely,

M.A. PRESCOTT
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
By direction

H. KEITH LESNICK
Director, Office of Deepwater Ports Licensing and Offshore Activities
U.S. Maritime Administration

2

*Participating Organizations*

[list of participating organizations, illegible]

# Clean Ocean Action



www.CleanOceanAction.org

■ **Main Office**
18 Hartshorne Drive
P.O. Box 505, Sandy Hook
Highlands, NJ 07732-0505
Voice: 732-872-0111
Fax: 732-872-8041
SandyHook@CleanOceanAction.org

*Ocean Advocacy
Since 1984*

October 25, 2007

M.A. Prescott
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

H. Keith Lesnick
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration
1200 New Jersey Ave., SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Mary K. Jager
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

**RE: Docket # USCG-2007-28535; Reply to Atlantic Sea Island Group's Letter in Opposition to Governor Corzine's Request for New Jersey's Status as an Adjacent Coastal State in the Atlantic Sea Island Group Application**

Dear Mr. Prescott, Mr. Lesnick, and Ms. Jager,

Clean Ocean Action ("COA") is a regional, broad-based coalition of 125 conservation, environmental, fishing, boating, diving, student, surfing, women's, business, service, and community groups with a mission to improve the degraded water quality of the marine waters off the New Jersey/New York coast. We recently commented in support of the Honorable Jon S. Corzine's, Governor of the State of New Jersey, request to have New Jersey designated an "adjacent coastal state" for the Atlantic Sea Island Group's ("ASIG") Safe Harbor Energy Deepwater Port application. The ASIG also commented, opposing Governor Corzine's request. This letter is in response to ASIG's opposition.

As argued before, the U.S. Maritime Administration ("MARAD") and the U.S. Coast Guard ("USCG") should have originally designated New Jersey as an adjacent coastal state, without the need for a request, under Deepwater Port

1

("DPA") §§ 1508(a)(1)(A) and (B). These sections represent two of the three ways a state can be designated an adjacent coastal state. We believe New Jersey qualifies under all three options.

**Directly Connected**

First, New Jersey will be directly connected by pipeline to the proposed deepwater port, satisfying § 1508(a)(1)(A). The ASIG argues that the only connection that should be considered direct is the connection of their proposed pipeline to the Transco Pipeline. However, the language of § 1508(a)(1)(A) focuses on "coastal State[s]" that "would be directly connected by pipeline." The language is clear. There is no indication that the direct connection ends where the proposed pipeline meets an existing pipeline. Instead, the consideration is on what coastal states the pipes connect to from the deepwater port.

The ASIG argues that "[t]o adopt New Jersey's rationale means that any state connected to the existing Transco interstate distribution system would have to be designated an adjacent coastal state – clearly not a result intended by the statute or regulations." This argument has two flaws. First, § 1508(a)(1)(A) only allows for consideration of "coastal State[s]," not "any state," as ASIG projects. Second, a simple example demonstrates that the intent of the DPA is to consider connections at the actual coastal states, not in their state navigable waters, as ASIG argues. What would happen if a deepwater port proposed connecting to a pipeline in federal waters? Would no states be "directly connected"? Of course not. At least one state will be on the receiving end of a port piping in natural gas or other sources of energy. The DPA clearly intends that at least one state be designated an adjacent coastal state. Therefore, the only logical conclusion is that direct connection occurs where the pipelines that the port relies upon reach the shores of a coastal state. The Transco Pipeline reaches the shores of New York and New Jersey. This clear intent does not allow for other states connected to the Transco interstate distribution system to be considered adjacent coastal states, as feared by ASIG.

**Within 15 Miles**

Additionally, MARAD and USCG should have designated New Jersey an adjacent coastal state without the need for a request because there is an equally strong likelihood, when compared to New York, the proposed deepwater port will be located within 15 miles of New Jersey, satisfying § 1508(a)(1)(B). The ASIG does not dispute that the island's proposed pipelines are, by definition, part of the deepwater port, pursuant to § 1502(9)(C). Therefore, if the pipeline is within 15 miles of New Jersey, the port is within 15 miles of New Jersey, satisfying § 1508(a)(1)(B).

The ASIG also acknowledges that alternative routes considered for the pipeline fall within 15 miles of New Jersey. The ASIG argues that MARAD and USCG should only consider the "actual proposed pipeline route." This rationale presumes that the project has already been approved as drafted. This is not the case. Governor Corzine certainly understands the viability of New Jersey waters being an option as ASIG, to our understanding, has discussed this option with New Jersey State officials. Further, the Environmental Impact Statement ("EIS") will require ASIG to assess alternatives to the proposed action. The likelihood of New Jersey meeting § 1508(a)(1)(B) during the EIS process is great and therefore merits designation from

2

the outset. Determination of New Jersey's adjacent coastal state status at a later time would require beginning the 240-day public process anew.

Further necessitating the need to consider the alternative routes is the likelihood that the "actual" proposed route is unrealistic to meet the volume expectations without additional pipeline support. The proposed route will lead to a connection that will limit delivery to 1.15 billion standard cubic feet per day ("bscfd"). However, ASIG is clear in its plans to ultimately deliver 2.0 bscfd and ASIG is seeking to build an island that will accommodate such plans. How does the applicant propose to manage nearly twice as much gas as can be transported through the Transco pipeline? Without such disclosure, it must be presumed that New Jersey is as likely a candidate as New York to host pipelines that will transport the nearly one (1) billion extra cubic feet per day. Thus, New Jersey meets the adjacent coastal state status.

## Equal or Greater Risk

Moreover, as argued in our previous letter, MARAD and USCG should designate New Jersey an adjacent coastal State pursuant to § 1508(a)(2) because the coastal environment of New Jersey is at a risk of damage equal to or greater than such risk posed to New York. We now expand our discussion on certain risks in response to ASIG's letter. However, we reference MARAD and USCG to our previous letter, instead of reproducing the information here, for additional explanations of all of the risks New Jersey's coastal environment faces, threatening it more than New York's coastal environment.

The ASIG argues that, in the totality, New York faces a greater risk of harm to its coastal environment. But ASIG fails to argue, to any reasonable extent, the risks to New York's coastal environment. Governor Corzine, COA, and numerous organizations and individuals have all written on the threats New Jersey faces, addressing the totality of risks to New Jersey's coastal environment. The ASIG has failed to raise potential risks to New York that outweigh the risks to New Jersey.

Instead, the ASIG tries to minimize the risks of harm to New Jersey's coastal environment. However, ASIG relies on an improper source to state there are no risks – its own application. In its letter opposing Governor Corzine's request, ASIG states "[t]he Safe Harbor Energy Deepwater Port Application identifies no risks to the coastal environment of the State of New Jersey." This statement is self-serving, unfounded, and must be soundly rejected. The fact that ASIG relies on a *no-risks-at-all* argument is disingenuous.

Indeed, quite to the contrary, ASIG admits New Jersey is in harms way. In their opposition letter, ASIG "acknowledge[s] that the prevailing ocean currents in the area of the proposed site are toward New Jersey." As history demonstrates, the prevailing ocean currents result in New Jersey suffering far more than New York from the consequences of pollution from and off of both New York and New Jersey. The ASIG tries to minimize the issue of prevailing ocean currents. However, as demonstrated by a massive garbage slick wash up over Labor Day Weekend, pollution can travel a considerable distance in these ocean currents, greatly affecting New Jersey's coast. The Labor Day garbage slick originated from the New York/New Jersey Harbor and washed along New Jersey's entire 127 miles of shoreline. The slick came ashore on

3

MAR530 000066

beaches from the most northern, Monmouth County, to the most southern, Cape May County. Pollution or construction debris and materials at the deepwater port, only 19 miles away, will certainly impact New Jersey, and it will have a greater impact on New Jersey's coastal environment than New York because of the currents. It's a simple reality with years of evidence and documentation.

The only evidence of harm to New York's coastal environment provided by ASIG is the brief mention of the pipeline construction activities proposed in New York State waters. However, risks to New Jersey are equal to or greater than the risks to New York even from pipeline construction and operation in New York State waters. This is true since the coastline currents flow westerly toward New Jersey bringing any harms also to New Jersey's shore.

What is indisputable is that New Jersey faces risks greater than New York from the construction and operation in federal waters of the island and industrial complex. Disposal of material, pollution, accidents, construction debris, among other adverse harms, will all flow toward New Jersey. Thus the magnitude and extent of constructing and operating the 110 acre based island will far exceed the risks posed by the construction and operation of the portions of the pipeline in New York State waters. The resulting impacts will put New Jersey's coastal environment at greater risk of harm.

In sum, given the ocean currents and the combination of harms from the magnitude, extent, and location of the proposed industrial complex, New Jersey's coastal environment is at a far greater risk.

Once again, COA also refers to its previous letter for further discussion of the risks to New Jersey's coastal environment. What is important to understand is that while both New York and New Jersey are subject to great risks, history and a basic understanding of the ocean demonstrates that New Jersey's coastal environment bears the greater risk. The ASIG provides no evidence to the contrary. Mentioning that some pipeline construction is proposed in New York State waters does not mean New York is subject to a greater risk. For these reasons, we ask that you grant Governor Corzine's request so that New Jersey can join New York in the deepwater port application process.

We thank the Maritime Administration and Coast Guard for their consideration of these issues and of Governor Corzine's request.

Sincerely,

Cindy Zipf
Executive Director

David Byer, Esq.
Water Policy Attorney

cc:    The Honorable Jon S. Corzine, Governor, New Jersey

4



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL OCEAN SERVICE
OFFICE OF OCEAN AND COASTAL RESOURCE MANAGEMENT
Silver Spring, Maryland 20910

OCT 25 2007

Ms. Ruth Ehinger
Coastal Program Manager
Coastal Management Office
Department of Environmental Protection
401 East Street, 7th Floor / PO Box 418
Trenton, NJ 08625-0418

Re: Unlisted Activity Request for Review of Atlantic Sea Island Project

Dear Ms. Ehinger:

Thank you for your September 25, 2007, letter requesting Office of Ocean and Coastal Resource Management (OCRM) authorization for the New Jersey Coastal Management Program (NJCMP) to review the Deepwater Port Act (DPA) permit application by the Atlantic Sea Island Group, LLC for the construction of the Safe Harbor liquefied natural gas deepwater port pursuant to the Coastal Zone Management Act (CZMA). The NJCMP requested to review the project as an "unlisted activity" under 15 C.F.R. § 930.54 of the CZMA federal consistency regulations.

**OCRM FINDING**

OCRM finds that the NJCMP failed to meet the 30-day notification requirements in accordance with 15 C.F.R. § 930.54(a)(1). Therefore, the NJCMP's request to review the Atlantic Sea Island Group, LLC DPA application to the Maritime Administration (MARAD) is denied and review by the NJCMP under the CZMA is not authorized.

**DISCUSSION**

The CZMA consistency regulations at 15 C.F.R. § 930.54 specifically require that

> State agencies shall notify Federal agencies, applicants, and the Director of unlisted activities affecting any coastal use or resource which require State agency review within 30 days from notice of the license or permit application, that has been submitted to the approving Federal agency, otherwise the State agency waives its right to review the unlisted activity.

Notice of the Atlantic Sea Island Group, LLC DPA application to MARAD, a determination of the apparent completeness, and a summary of the application were published in the *Federal Register* on August 27, 2007, 72 Fed. Reg. 49041-49042 (Aug. 27, 2007). The Atlantic Sea Island Group, LLC, MARAD and OCRM would have had to receive the NJCMP's unlisted activity notification no later than September 26, 2007, 30 days after the *Federal Register* notice.




Printed on Recycled Paper

The NJCMP's request to review the Atlantic Sea Island project was received via fax by OCRM on September 25, 2007, within the 30-day timeframe. However, counsel for the applicant Atlantic Sea Island Group, LLC, Wilentz, Goldman & Spitzer, P.A., objected to the approval of the NJCMP request alleging that the notice to the applicant was not received until September 28, 2007, two days after the 30-day notification period required by 15 C.F.R. § 930.54(a)(1). This fact has been undisputed by the NJCMP and the NJCMP has failed to provide any proof of delivery by September 26, 2007. Therefore, pursuant to 15 C.F.R. §§ 930.54(a)(1) and (d), OCRM must deny the NJCMP's request and MARAD may approve the license or permit application and Atlantic Sea Island, LLC need not comply with the CZMA requirements at 16 U.S.C. § 1456(c)(3)(A) and 15 C.F.R. part 930, subpart D as to New Jersey.

Please contact David Kaiser, Senior Policy Analyst, OCRM, if you have any questions. Mr. Kaiser can be reached at 603-862-2719.

Sincerely,

David Kennedy
Director

cc:    Atlantic Sea Island, LLC
       MARAD

OCT 29 2007

2



### State of New Jersey
#### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

Coastal Management Office
401 E. State Street, 7ᵗʰ Floor, West
P.O. Box 418
Trenton, New Jersey 08625
Phone: 609-633-2201
Fax: 609-292-4608

LISA P. JACKSON
*Commissioner*

November 1, 2007

H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick,

Thank you for discussing the current status of New Jersey's request for adjacent coastal state status under the Deepwater Port Act with reference to the Safe Harbor/Atlantic Sea Island Group application. This letter serves to address issues raised by NOAA in its October 17, 2007 letter to the Maritime Administration, as you requested in our conference call on October 24, 2007. NOAA's letter addresses Cholera Bank and fishing, the coastal environment and water quality.

The NOAA letter indicates that New Jersey should provide additional information demonstrating that the risk to New Jersey is equal to or greater than the risk posed to "...New York, the State that is directly connected by pipeline to the proposed deepwater port." The proposed pipeline will tie into the existing Transco pipeline that runs from Sayreville, New Jersey to Long Beach, New York. Therefore, if New York is directly connected by pipeline to the proposed deepwater port, as NOAA states, then New Jersey is also directly connected by pipeline to the proposed deepwater port, in the identical manner. Furthermore, an alternative pipeline route is included in the deepwater port application. Since a deepwater port includes all pipelines and structures associated with the project, if the alternative pipeline route is used, New Jersey would be within the necessary 15 miles to be an adjacent coastal state based on the alternative route alone.

The deepwater port is proposed on Cholera Bank. Cholera Bank is heavily used by recreational and commercial fishermen. Prime fishing areas are designated a special area and marine fisheries are protected under New Jersey's Coastal Zone Management rules,

which are enforceable policies under New Jersey's federally approved coastal management program. Cholera Bank is, and has historically been, an important productive fishing ground for the New Jersey commercial ground fishing fleet and for recreational fishing. The area was mapped as an important recreational and commercial fishing ground in <u>New Jersey's Recreational and Commercial Ocean Fishing Grounds</u> (1982) and important for recreational fishing in the NOAA <u>Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey</u> (1974). Recent surveys of recreational party and charter boat captains confirmed the importance to recreational fishing in 2003. The proposed location of the project is specifically known as Anglers Bank and Middle Grounds. Through personal communication this year with the commercial fishing dock managers from Belford, New Jersey (Belford Fishermen's Cooperative) and Point Pleasant, New Jersey (Fishermen's Dock Cooperative), and several New York based companies at Fulton Fish Market, this area remains of economic importance to New Jersey's commercial fishermen, and is of importance to New York's commercial fishermen as well.

Clearly the Cholera Bank fishing ground would be affected by the construction of an island occupying 112 acres of ocean bottom, eliminating that habitat. Fisheries would also be affected as fishing boats would be excluded from the area around the island. Since fishermen from both New York and New Jersey are fishing these fishing grounds, impacts would be comparable. Further, the application indicates that sand and rock to build the island will be obtained from the New York channel deepening. In meetings with New Jersey in 2006, the applicant proposed mining sand from the ocean floor to obtain material to create the island. If logistical problems preclude obtaining all necessary material from the channel deepening, and mining were again proposed, it too would affect the fish habitat.

Coastal environment as defined in the statute includes navigable waters (including lands therein and thereunder). The definition contains a list of resources that are included in the coastal environment, including fish, wildlife, and recreational values of lands, waters and resources. The list is not exhaustive. New Jersey considers its commercial and recreational fisheries to be part of its coastal environment. Fish and wildlife, such as avian species, are highly mobile living resources that are also part of New Jersey's coastal environment. As these living resources do not distinguish between New York and New Jersey, the risk to New Jersey is comparable to that of New York.

Good water quality is critical to these living resources. Water quality will be affected during construction, operation, and maintenance of the proposed deepwater port. Any adverse affect on water quality could affect living resources of the coastal environment. The figure "Dominant Winds, Waves and Currents of the New York Bight," (Figure 2-2 Volume Three, Part One: Deepwater Port License Application) indicates that the prevailing direction of the currents is toward New Jersey and the direction of waves is into the New York/New Jersey Harbor. Accordingly, it is likely that water quality impacts to the coastal environment would be equal for New York and New Jersey.

In 2006, the applicant indicated that a future pipeline from the deepwater port would come ashore in the area of Linden, New Jersey. The application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The maximum takeaway capacity of the Long Beach Meter Station, Long Beach, New York, is approximately 530 million cubic feet per day. The Milltown Regulator Station, Milltown, New Jersey, has an estimated maximum capacity of 619 million cubic feet per day. Therefore, New Jersey is equally affected by the operation of the deepwater port.

Contrary to the applicant's October 10, 2007 objection letter to the director of NOAA's Office of Ocean and Coastal Resource Management regarding New Jersey's request for federal consistency review, the documentation that New Jersey received does not include information providing the location of the five facilities in the metropolitan New York area that may be used for staging of construction. These locations are discussed in Section 4 of the application, to which New Jersey has not been granted access. The application indicates that staging will be from facilities in the metropolitan New York area, which includes New Jersey waters, ports and waterfront facilities.

It is not a requirement and would be difficult to determine the full nature and magnitude of the extent of the impacts to either New Jersey's or New York's coastal environment prior to completion of an EIS. The standard is whether "there is a risk of damage to the coastal environment of such state equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Based on the above, the damage to the coastal environments would be equal for New York and New Jersey.

Sincerely,

Ruth Ehinger
Coastal Program Manager


c.    Mitch Hudson, MARAD

# FAX

## State of New Jersey
### Office of Coastal Management
401 E. State Street 7th Floor
P.O. Box 418
Trenton, New Jersey 08625
Phone: 609-633-2201
Fax: 609-292-4608

Date: October 31, 2007

Number of Pages Including Cover Sheet: 4

TO: H. Keith Lesnick, office of Deepwater Ports + offshore Activities
Phone: 202-366-1624
Fax: 202-366-5123

FROM: Ruth Ehinger
Phone: 609-633-2201
Fax: 609-292-4608

REMARKS:

MAR530 000073



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

**NOV 2 2007**

The Honorable Jon S. Corzine
Governor of New Jersey
Trenton, New Jersey 08624-0001

Re:  New Jersey Adjacent Coastal State Designation

Dear Governor Corzine:

This letter is in response to your request for the designation of New Jersey as an Adjacent Coastal State for the proposed Safe Harbor Energy deepwater port project (Safe Harbor). As indicated in my letter of September 28, 2007, the Maritime Administrator, by delegated authority, and in accordance with Section 1508(a)(2) of the Deepwater Port Act of 1974 (the Act), shall make such a designation only after receiving the recommendation of the Administrator of the National Oceanic and Atmospheric Administration (NOAA). On October 17, 2007, my office received the NOAA recommendation.

Accordingly, upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have determined that New Jersey is an Adjacent Coastal State as defined under the Act and is so designated for the proposed Safe Harbor deepwater port project. This determination has been made consistent with the particular set of facts and circumstances underlying the request. Pursuant to the requirements set forth at Section 1508(b) of the Act, the Administrator shall not issue a license without the approval of the Governor of an Adjacent Coastal State. Therefore, we look forward to forging a strong working relationship with your office to successfully address your concerns and requirements of Safe Harbor in securing a safe and effective means of importing natural gas into the United States.

As the Governor of an Adjacent Coastal State, you are afforded the authority in accordance with the requirements of the Act to approve, disapprove, or approve with conditions the deepwater port license application for the Safe Harbor project. Such license conditions may include, but are not limited to:  1) requiring environmental monitoring and mitigation measures; 2) the collection of fees to offset any economic, environmental, and administrative costs that may be incurred by your state associated with the construction and operation of the proposed deepwater port; and 3) other conditions to ensure that the proposed port will conform with New Jersey's environmental programs.

To this end, we would like to arrange a meeting in the near future with you and your immediate staff to further discuss your concerns regarding the proposed Safe Harbor project. Please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov to arrange the most convenient meeting time.

We look forward to working with you and your staff, and I appreciate the time and attention you have given to this important matter.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:    The Honorable Eliot Spitzer
       The Honorable Frank R. Lautenberg
       Vice Admiral Conrad C. Lautenbacher, Jr., NOAA
       Admiral Thad W. Allen, USCG



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

November 5, 2007

Mr. James H. Burnley IV
Partner
Venable LLP
575 7ᵗʰ Street, NW
Washington, DC 20004-1601

Dear Mr. Burnley

Thank you for your letter dated September 24, 2007, regarding Governor Jon S. Corzine's request for the designation of New Jersey as an Adjacent Coastal State (ACS) for the proposed Safe Harbor Energy (Safe Harbor) deepwater port project.

Pursuant to Section 1508(a)(2) of the deepwater Port Act of 1974, as amended, the Maritime Administration, by delegated authority, must make a determination regarding the designation of Adjacent Coastal State status after receiving a timely request from a State Governor and after considering the recommendation of the Administrator of the National Oceanic and Atmospheric Administration (NOAA).

As such, I have considered the recommendation of NOAA and given the magnitude and scope of the proposed Safe Harbor project as well as its potential for significant environmental impact to the State of New Jersey, I have determined that New Jersey is an Adjacent Coastal State, as defined under the Act, and is so designated for the proposed Safe Harbor deepwater port project. Enclosed for your information is my letter of determination granting ACS status to the State of New Jersey.

Further, please be advised that a copy of your letter has been directed to the Federal Docket Management System. To view your letter and other documents related to the Safe Harbor Energy project, please link to www.regulation.gov and reference the project docket number USCG-2007-28535. Should you have questions or concerns, you may contact Mr. Keith Lesnick, Director of the Office of Deepwater Ports and Offshore Activities at (202) 366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc: David G. Dickman, Venable LLP

MAR530 000076

# VENABLE LLP

575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James H. Burnley IV

202-344-4054

JHBurnley@Venable.com

November 13, 2007

<u>VIA ELECTRONIC DELIVERY & HAND DELIVERY</u>

The Honorable Sean T. Connaughton
Administrator
U.S. Maritime Administration . (MAR-530)
Second Floor, West Wing
1200 New Jersey Avenue, S.E
Washington, D.C. 20590

Re:  Safe Harbor Energy LNG Deepwater Port – New Jersey Adjacent Coastal State
Designation

Dear Administrator Connaughton:

I am writing on behalf of my client, Atlantic Sea Island Group, the applicant for a license under the Deepwater Port Act for the construction and operation of the Safe Harbor Energy LNG Deepwater Port.  On November 2, 2007, in response to a request from the Governor of the State of New Jersey, you designated that State as an adjacent coastal state for purposes of the Safe Harbor Energy project pursuant to the requirements of section 1508(a)(2) of the Deepwater Port Act.  33 U.S.C. § 1508(a)(2).

We are anticipating filing a petition for reconsideration of that designation pursuant to regulations of the Maritime Administration, specifically 46 C.F.R. § 201.174.  However, we are unable to do so at this time because critical information that would allow us to analyze the validity of the designation has not yet been made available in the rulemaking docket.  We therefore request an extension of the 20 day period for filing a petition for reconsideration based on good cause, as is provided for in 46 C.F.R. § 201.172.

As you are aware, section 1508 (a)(2) of the Deepwater Port Act requires that a recommendation be received from the Administrator of the National Oceanic and Atmospheric Administration (NOAA) before a requesting state can be designated an adjacent coastal state.  In your letter to Governor Corzine dated November 2, 2007, you state that you received the NOAA recommendation on October 17, 2007, and that you considered that recommendation in making your decision regarding New Jersey's designation.  You further refer to your letter of September 28, 2007, to Governor Corzine concerning his request for adjacent coastal state designation.  As

MAR530 000077

# VENABLE.LLP

---

The Honorable Sean T. Connaughton
November 13, 2007
Page 2

of the date of this letter, neither of these documents, or any other information considered in making your determination, has been posted to the electronic docket.

It is our belief that both of these documents, at a minimum, are required to be posted to the docket. To the best of our knowledge and belief, all official correspondence with other federal agencies and state officials have customarily been posted on the docket. Further, as the recommendation by NOAA is statutorily required to be obtained before the designation can be made under section 1508 (a)(2), this document in particular should be posted to the electronic docket as soon as possible.

Until such information and documentation can be reviewed and analyzed, it is not possible to fully state any errors that would serve as the basis for reconsideration, as is required by 46 C.F.R. § 201.174. For this reason, we assert that good cause exists to extend the deadline for filing of a petition for reconsideration, and request that the deadline be extended to allow for 20 days for filing after the documents are posted on the electronic docket or otherwise made available to the applicant.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

James H. Burnley IV

Cc:  K. Lesnick, MARAD
     M. Prescott, USCG
     H. Bovers, ASIG
     D. Dickman, Venable LLP
     E. Megginson, MARAD



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S E.
Washington, DC 20590

November 19, 2007

James H. Burnley IV
Venable LLP
575 7th Street, NW
Washington, D.C. 20004-1601

Re:  Safe Harbor Energy LNG Deepwater Port and the New Jersey Adjacent Coastal
State Designation

Dear Mr. Burnley:

This is in response to your letter of November 13, 2007, requesting that the Maritime
Administration extend the time for filing a petition to appeal the designation of New
Jersey as an Adjacent Coastal State (ACS), in the matter of the Atlantic Sea Island Group
LLC Deepwater Port license application for the Safe Harbor project. You further
requested a formal appeals process under 46 C.F.R Part 201 and that we delay this
process until certain documents, you deem relevant to this request, are posted to the
Federal docket.

It should be noted that Part 201 does not provide a right to a formal appeals process
unless provided for by statute. The relevant statute in this matter, the Deepwater Port Act
of 1974, as amended, (DWPA) does not set forth a formal appeals process to a 33 U.S.C.
§ 1508(a)(2) determination. As such, Part 201 is not applicable to the appeal of an ACS
determination, made pursuant to the discretionary authority of the Secretary of
Transportation, as delegated to the Maritime Administrator, and thus no formal 20 day
period for filing an appeal petition exists.

However, I would be more than willing to review your request to reconsider the Safe
Harbor ACS determination. Please submit any written documentation supporting your
position to me by close of business on December 17, 2007, and I assure you that I will
give this matter my full consideration.

Additionally, you requested  that the Maritime Administration post on the Federal docket
the recommendation made pursuant to § 1508(a)(2) by the Administrator of the National
Oceanic and Atmospheric Administration (NOAA), as well as correspondence between
the Maritime Administration and New Jersey Governor Corzine. With regard to the
NOAA recommendation, you may submit a Freedom of Information Act (FOIA) request
to Ms. Christine Gurland, FOIA Officer, Office of the Chief Counsel, for review and
consideration under the FOIA process.

Finally, I have been informed by my staff that Governor Corzine's formal request for ACS status, my interim reply of September 28, 2007, and the Maritime Administration's final determination letter of November 2, 2007, have been directed to the Federal Docket Management System at www.regulations.gov, project docket number USCG-2007-28535.

If you have any further questions or concerns please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:    The Honorable Frank R. Lautenberg
       The Honorable Jon S. Corzine
       The Honorable Frank Pallone

MAR530 000080



575 7th Street, NW
Washington, DC 20004-1601

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

James H. Burnley IV

202-344-4054

JHBurnley@Venable.com

December 3, 2007

The Honorable Mary E. Peters
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

The Honorable Sean T. Connaughton
Administrator
Maritime Administration
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

Re: Safe Harbor Energy LNG Deepwater Port – Request for
Reconsideration of Designation of New Jersey as an "Adjacent Coastal State"

Dear Secretary Peters and Administrator Connaughton:

I am writing on behalf of our client, Atlantic Sea Island Group, the applicant for a license under the Deepwater Port Act, 33 U.S.C. §1501 et seq. ("DWPA"), for the construction and operation of the Safe Harbor Energy Liquefied Natural Gas Deepwater Port. I hereby request that you reconsider the decision by the Administrator of the Maritime Administration, set forth in a letter of November 2, 2007, to the Governor of New Jersey, designating New Jersey as an additional "adjacent coastal State" for this project under 33 U.S.C. § 1508(2). (Attachment 1)

ASIG has applied for a federal license under the DWPA to construct and operate the Safe Harbor Energy LNG Deepwater Port, to be located 13.5 miles south of Long Beach, New York and 23 miles southeast of the entrance to New York Harbor. The port is designed to receive liquefied natural gas ("LNG"), regasify it, and transmit through the existing distribution infrastructure up to two billion standard cubic feet per day of natural gas, thereby providing a strategic and critically-needed energy supply to help satisfy the significantly increased energy demands to be presented in the near future by the New York metropolitan area. Natural gas is a clean burning fuel that is environmentally superior to other fossil fuel energy sources, such as coal or fuel oil, in several respects including lesser greenhouse gas emissions. The offshore location of the proposed port will minimize adverse impacts on water and air quality, enable delivery of LNG without increasing vessel traffic through New York harbor, and minimize visual impacts.

The Administrator designated New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy project, which has the effect of giving New Jersey a veto power over the licensing of this port. The Administrator's decision was erroneous as a matter of law in several respects:

VENABLE·LLP

December 3, 2007
Page 2

(1) The Administrator did not have legal authority to make this designation. Pursuant to the existing delegations of authority under the DWPA, as codified by the Homeland Security Act of 2002 and set forth in the implementing regulations, an additional State can be designated as an "adjacent coastal State" only by decision of the Commandant of the U.S. Coast Guard, with the concurrence of the Administrator. 33 C.F.R. § 148.217(d). The Administrator does not have legal authority to designate a State as an "adjacent coastal State" by his own, unilateral action. Further, the Commandant has not made such a designation. Moreover, the 45-day period provided by the DWPA within which such a designation may lawfully be made had expired before the Administrator purported to make this decision.

(2) Even assuming that he had legal authority to make a unilateral designation, the Administrator failed to apply the legal standard required by Section 1508(a)(2) of the DWPA, which specifies that an additional State may be designated as an "adjacent coastal State" only if the risk of damage from the port to the coastal environment of the petitioning State is "equal to or greater than" the risk of damage to the coastal environment of the State connected to the port by a pipeline. The Administrator did not apply the statutory standard, but instead applied a test that is not authorized by the statute. Indeed, in enacting the DWPA, Congress considered and expressly rejected the test that the Administrator applied.

(3) In any event, the record does not contain any evidence that would support a factual finding as required by Section 1508(a)(2), that the risk of damage to the coastal environment of New Jersey from the proposed liquefied natural gas ("LNG") port is "equal to or greater than" the risk of damage to the coastal environment of New York.

Accordingly, I request reconsideration of the Administrator's decision. Upon reconsideration, you should conclude that his action was contrary to law and vacate that decision.

If the Department, despite the plain language of the Homeland Security Act (and applicable delegations and regulations), somehow interprets its retained authority to give it the power to designate an "adjacent coastal state," the Secretary should deny New Jersey's request. I note, for example, that in 49 C.F.R. § 1.44(n), the Secretary retained the authority "to issue, transfer, or amend a license for the construction and operation of a deepwater port (33 U.S.C. § 1503(d))." If the Department interprets the reserved authority as not limited to the ultimate decision "to issue, transfer or amend a license" but as extending as well to the designation of an "adjacent coastal State," the Secretary should deny New Jersey's request on the ground that there is no factual evidence in the record on which a rational decision maker could conclude that the risk presented to

# VENABLE<sub>LLP</sub>

December 3, 2007
Page 3

the coastal environment of New Jersey would be "equal to or greater than" the risk presented to the coastal environment of New York.

After withdrawal of the Administrator's decision, New Jersey will still be able to obtain full review of all concerns it may have with the potential environmental, safety, or other possible effects of the proposed deepwater port. Those issues will be thoroughly considered in the multiple reviews that will be conducted by several federal agencies. Under the DWPA, any State that is not designated as an adjacent coastal State "shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added). The mandatory nature of the "full consideration" requirement assures that New Jersey's views will be reviewed carefully during the review process.

In light of Section 1508(b)(2), the only effect of the invalidation of the Administrator's prior action would be that New Jersey would not be able to impose an absolute veto on the licensing of this urgently needed LNG project, which will be constructed off the coast of the State of New York. Rather, New Jersey would be able to work with the federal agencies that will review the application to develop reasonable license and permit conditions that will protect its coastal environment.

Under the plain language of the DWPA, this outcome is what Congress explicitly intended to occur. The DWPA is structured in this way from concern that giving an absolute veto power to an additional State other than the jurisdiction that will bear the greatest risk of damage to its coastal environment would result in a situation in which badly needed deepwater ports could never be constructed.

## Background

The Deepwater Port Act establishes the procedures and substantive criteria by which the federal government may license deepwater LNG ports. As part of the licensing process, the DWPA provides for comprehensive inter-agency review of the environmental, safety, and national security aspects of the proposed deepwater port. Congress vested licensing authority in the Secretary of Transportation. The Secretary in turn has delegated implementing authority to the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration.

The DWPA provides that the final approval or denial of the license must occur within 330 days of publication of a Federal Register notice that the application is complete. The Maritime

# VENABLE LLP

December 3, 2007
Page 4

Administrator published such a notice for the Safe Harbor Energy project on August 27, 2007. 72 Fed. Reg. 49041 (Aug. 27, 2007).

Under the DWPA, the State to which the proposed LNG port will be connected by pipeline is designated as an "adjacent coastal State." In this capacity, the State has authority to veto the licensing of the proposed port or to impose mandatory conditions that must be included in the federal license. New York was designated as an "adjacent coastal State in the Federal Register notice for this project. Id.

The statute also provides that within 14 days after the publication of the Federal Register notice, another State may request designation as an additional "adjacent coastal State." If its application is granted, the second State also obtains authority to veto the licensing of the proposed port or to impose mandatory license conditions.

By a letter dated September 6, 2007 and docketed on September 10, 2007, New Jersey applied for designation as an additional "adjacent coastal State" for the Safe Harbor Energy project. (Attachment 2) Section 1508(a)(2) establishes a 45-day deadline for resolution of such a request. On September 24, 2007, ASIG submitted a letter to the Coast Guard and the Maritime Administration which demonstrated that New Jersey had not satisfied the statutory standard for designation as an "adjacent coastal State." (Attachment 3). The statutory deadline for designation of New Jersey as an "adjacent coastal State" expired no later than October 25, 2007. No decision was made prior to the expiration of the deadline.

On November 2, 2007, the Administrator purported to designate New Jersey as an additional "adjacent coastal State." If valid, his action would give New Jersey, as well as New York, a veto power over federal approval of the project. That decision is inconsistent with the terms of the DWPA and its implementing regulations in several respects. That decision should be reconsidered and overturned.

## 1. The Administrator Lacked Legal Authority To Designate New Jersey as an "Adjacent Coastal State."

The Secretary originally delegated different aspects of the Department's implementation authority to the U.S. Coast Guard and the Maritime Administration, at a time when both agencies were within the Department. Some authorities were vested in the Maritime Administration, subject to an obligation to consult the Coast Guard; other authorities were given to the Coast Guard, with an obligation to consult the Maritime Administration. The remaining authorities were delegated jointly to both agencies, to be exercised concurrently. From the outset, the Coast Guard has

MAR530 000084

# VENABLE‘LLP

December 3, 2007
Page 5

exercised the authority to receive the applications and supporting papers for a proposed deepwater port and to conduct the process by which the necessary studies are conducted. The Coast Guard also has issued the principal implementing rules under which the statute is administered. See 33 C.F.R. parts 148-150.

In 2002, the Coast Guard was transferred to the newly created Department of Homeland Security. Section 888(b) of Public Law No. 107-296, the Homeland Security Act of 2002, 6 U.S.C. § 468(b), provides:

> There are transferred to the Department [of Homeland Security] the authorities, functions, personnel, and assets of the Coast Guard . . . including the authorities and functions of the Secretary of Transportation relating thereto.

Section 888(b) codified the prior delegations of authority made by the Secretary of Transportation to the Coast Guard and transferred these authorities to the Secretary of Homeland Security. Further, these authorities cannot be redelegated or removed. Section 888(c) of that Act, 6 U.S.C. § 468(c), provides:

> Notwithstanding any other provision of this Act, the authorities, functions, and capabilities of the Coast Guard to permit its missions shall be maintained intact and without significant reduction after the transfer of the Coast Guard to the Department [of Homeland Security], except as specified in subsequent Acts.

The Department of Transportation has publicly taken the position that the Commandant of the Coast Guard continues to possess all the implementing authority under the DWPA that he previously enjoyed while the Coast Guard was part of the Department. In 2003, in revising the delegations of authority to the Maritime Administration under the DWPA, the Secretary noted that "[t]he USCG retained the statutory and delegated authorities upon its transfer to the Department of Homeland Security . . . ." Final Rule, Organization and Delegations of Powers and Duties, Update of Secretarial Delegations, 68 Fed. Reg. 36496 (June 18, 2003).

The governing Coast Guard rule, 33 C.F.R. § 148.217, establishes the process for consideration of requests by a State to be designated as an additional "adjacent coastal State." The request must be submitted to the Commandant. Id., § 148.217(b). Upon receipt of the request, the Commandant must send a copy of the request to the Administrator of the National Oceanic and Atmospheric Administration and ask for his recommendations within an amount of time that will permit the decision on the request to be made within the 45 day period established by the DWPA. Id., § 148.217(c). Section 148.217(d) further provides:

# VENABLE®LLP

December 3, 2007
Page 6

> If after receiving NOAA's recommendations the Commandant . . . , in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant . . . in concurrence with the MARAD Administrator, will so designate it. If the Commandant . . ., in concurrence with the MARAD Administrator, denies the request, he or she will notify the requesting State's Governor of the denial.

(Emphasis added). The governing regulation thus explicitly provides that the decision whether to grant "adjacent coastal State" status is to be made by the Commandant of the Coast Guard, not by the Administrator of the Maritime Administration.

Under the DWPA implementing rules, the Commandant is required to obtain the Administrator's concurrence in his determination on "adjacent coastal State" status. But the regulation provides explicitly, in three places, that the decision is to be made by the Commandant. Accordingly, the decision of the Administrator purporting to grant "adjacent coastal State" status to New Jersey usurped powers that belong to the Commandant under existing delegations of authority, as provided by the Homeland Security Act and relevant regulations implementing the statute.

Further, the Administrator acted after the 45-day statutory deadline for making such a designation had already expired.

For these reasons, the Administrator acted without legal authority in purporting to grant "adjacent coastal State" status to New Jersey. "Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner inconsistent with the administrative structure that Congress enacted into law.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 129 (2000) (internal citation omitted). The November 2 designation therefore should be reconsidered and invalidated.

If the Department, despite the plain language of the Homeland Security Act (and applicable delegations and regulations), somehow interprets its retained authority, set forth in 49 C.F.R. § 1.44(n), as not limited to the ultimate decision "to issue, transfer or amend a license" but as extending as well to the designation of an "adjacent coastal State," the Secretary should deny New Jersey's request on the ground that, as set forth in the next two sections, there has been no showing that the risk presented to the coastal environment of New Jersey is "equal to or greater than" the risk to the coastal environment of New York.

2. The Administrator Erred, as a Matter of Law, by Failing to Apply the

# VENABLE.LLP

December 3, 2007
Page 7

### Standard of Review Set Forth in the DWPA and Purporting to Apply
### Instead a Test that Congress Had Not Authorized but Had Explicitly Rejected.

Section 1508(a) establishes three pathways by which a State may be designated an "adjacent coastal State." Section 1508(a)(1) provides that a State may be designated as an "adjacent coastal State" if it is directly connected by pipeline to the proposed deepwater port or is located within 15 miles of the proposed port. Under these two pathways, New York was designated as an "adjacent coastal State" in the Federal Register notice that initiated the review process. 72 Fed. Reg. 49041 (Aug. 27, 2007).

Section 1508(2) provides a third pathway by which a State not named in the Federal Register notice may request designation as an additional "adjacent coastal State":

> The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State <u>equal to or greater than the risk posed to a State directly connected by pipeline</u> to the proposed deepwater port . . . .

(Emphasis added).

Under the governing Coast Guard regulation, to permit conduct of the required comparative evaluation whether the risk of damage to the coastal environment of the requesting State is "equal to or greater than" the risk to the coastal environment of the State named in the Federal Register notice, the Governor of that State requesting such designation must submit to the Coast Guard "the facts and available documentation or analyses concerning the risk of damage to the coastal environment of the State" and must explain why he believes "the risk of damage to its coastal environment is equal to or greater than the risk" to the State originally designated in the Notice. 33 C.F.R. § 148.217(b)(3)-(4).

On September 6, 2007, the Governor of New Jersey submitted a two and one-quarter page letter to the Commandant of the Coast Guard and the Administrator of the Maritime Administration requesting designation of New Jersey as an additional "adjacent coastal State" for this project. The letter submitted no facts, documentation or analyses of the effect of the project on New Jersey, as required by the Coast Guard rule. Rather, it contained four paragraphs of argumentation that specific aspects of the coastal environment of New Jersey arguably would be adversely affected to the same or greater degree than comparable aspects of the coastal

VENABLE LLP

December 3, 2007
Page 8

environment of New York. The letter did not attempt to quantify the overall impact of the project on the coastal environments of New York and New Jersey or to show on the basis of evidence that the overall risk of the project to New Jersey was "equal to or greater than" the risk to New York.

On September 28, 2007, in an interim response to the Governor of New Jersey, the Maritime Administrator stated that he would review the request under the legal standard established by Section 1508(a)(2) – that after considering the recommendation of the Administrator of NOAA, the "Maritime Administrator must grant Adjacent Coastal State status if the risk of damage to the requesting State's coastal environment is equal to or greater than the risk posed to a State that would be directly connected by pipeline to the proposed deepwater port." (Attachment 4, emphasis added) In response to this letter, New Jersey never submitted any facts or analyses to support its request.

We are informed that on October 17, 2007, NOAA submitted a one and one-quarter page long letter concerning the Safe Harbor Energy project. To date, the Maritime Administration has not responded to our request that this document be placed in the docket. It is our understanding, however, that the letter provided little in the way of meaningful information that could assist the Commandant of the Coast Guard in performing the comparative evaluation of the potential risks to the coastal environments of New Jersey and New York that is required by Section 1508(a)(2).

On November 2, 2007, the Administrator purported to designate New Jersey as an "adjacent coastal State" for purposes of the Safe Harbor Energy application. In articulating the basis for that conclusion, the Administrator stated that he had relied:

upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey.

The Administrator's decision is invalid, as a matter of law, because he failed to apply the legal standard set forth in Section 1508(a)(2), failed to perform the comparative analysis required by that provision, and failed to make the finding it requires before an additional State may be designated an "adjacent coastal State."

The Administrator instead applied a test that Congress never authorized. His decision relied entirely on the size of the project – its "magnitude and scope" – and its potential environmental impact, which he characterized as "significant." As noted below, there is no evidence in the record to support the Administrator's contention that there exists the potential for "significant" environmental harm to the coastal environment of New Jersey. Even assuming such

# VENABLE LLP

December 3, 2007
Page 9

evidence were in the record, the Administrator's approach failed to comply with Section 1508(a)(2) in two critical respects.

> -- The Administrator did not refer to or conduct an assessment of the potential risk the project presents to the coastal environment of New York.

> -- The Administrator did not perform the analysis mandated by Section 1508(a)(2), which requires that the determination be based on an assessment whether the potential risk to the coastal environment of New Jersey would be "equal to or greater than the risk posed to" the coastal environment of New York.

The Administrator had articulated the proper standard in his September 28, 2007 interim response to New Jersey and had stated that he would apply the correct standard. He inexplicably failed to follow the law in making the final decision.

The test the Administrator purported to apply, which depends entirely on the size of the project and the potential for "significant" impact on New Jersey, not only violates the express provisions of the DWPA but was expressly rejected by Congress in enacting that law. The Senate version of the bill that became the DWPA would have permitted designation of an additional State as an "adjacent coastal State" under three criteria. The first two approaches were carried forward into Section 1508(a)(1) -- whether the State was "connected by pipeline to a deepwater port" or whether it was "located within 15 miles of any component of a deepwater port." The third approach in the Senate bill would have permitted designation of an additional "adjacent coastal State" if the State:

> would in the opinion of the Administrator of the National Oceanic and      Atmospheric Administration experience <u>substantial environment risk</u> should an oil or natural gas discharge occur from the deepwater port or from a vessel      operating in the safety zone around the port.

S. Rep. No. 93-127 (1974), reprinted at 1974 U.S.C.C.A.N. 7529, 7530. The third approach thus would have permitted designation of a second State as an adjacent coastal State based on the size of the potential environmental impact alone, and without consideration of the extent of the relative impacts of the project on the environments of the petitioning State and the State directly connected by pipeline to the port.

The Executive Branch objected strongly to inclusion of any provision that would have allowed designation of a second State as an "adjacent coastal State," and thus the granting of a veto power to a second State, based solely on whether the environmental risk to it could be

MAR530 000089

## VENABLE<sub>LLP</sub>

December 3, 2007
Page 10

characterized as "significant" or "substantial." In particular, the Secretary of the Interior raised the concern that:

> the third condition . . . would extend this [the opportunity to prevent construction of a proposed deepwater port] to States that are some distance from the proposed facility and that may be affected by a possible oil spill. The provision is so broad that if it is not deleted, it is questionable whether any deepwater port will be constructed.

1974 U.S.C.C.A.N. at 7591 (emphasis added).

The Conference Committee thereafter deleted the provision to which the Administration objected and replaced it with the current version of Section 1508(a)(2). It creates a third pathway that permits designation of a second State as an "adjacent coastal State" only if the implementing agency determines that "there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port." Conf. Rep. No. 93-1605, reprinted in 1974 U.S.C.C.A.N. 7622, 7636.

In sum, the Administrator's designation of New Jersey as an additional "adjacent coastal State" plainly violated the DWPA, because he failed to apply the legal standard that Congress actually adopted in Section 1508(a)(2) and followed instead an approach that Congress considered and explicitly rejected in 1974.

> 3. The Record Contains No Evidence on Which the Administrator
>    Could Have Based a Lawful Determination that the Risk of Harm to
>    the Coastal Environment of New Jersey Was "Equal to or Greater Than"
>    the Risk of Harm Posed to the Coastal Environment of New York.

The record on which the Administrator based his decision did not contain any factual evidence on he could have found that the risk of harm to the coastal environment of New Jersey was "equal to or greater than the risk posed to" the coastal environment of New York. The Administrator did not purport to make such a factual determination; the illegal test he applied allowed him to avoid making the required comparative analysis. Indeed, the total absence of factual support means that no rational decision maker could have concluded that New Jersey satisfies the statutory criterion for designation as an additional "adjacent coastal State".

It is our understanding that the one and one-quarter page letter submitted by NOAA on October 17, 2007 contained no meaningful analysis of the risk of damage that the Safe Harbor Energy project would have on the coastal environments of either New York or New Jersey. We

# VENABLE LLP

December 3, 2007
Page 11

further understand that the NOAA letter did not attempt to perform a comparative analysis of whether the risk to the coastal environmental of New Jersey would be equal to or greater than the risk to the coastal environment of New York.

This is understandable because, as noted above, the request submitted by the Governor of New Jersey slightly exceeded two pages in length. The letter contained no facts, documentation, or analyses to quantify the actual environmental risk presented to the State, as required by the Coast Guard rule. Rather, the letter contained four paragraphs of lawyers' arguments, unsupported by evidence, that specific aspects of the New Jersey coastal environment would be adversely affected by the project. It concluded with an unsubstantiated assertion that the risk to the coastal environment of New Jersey would be equal to or greater than comparable risk to the coastal environment of New York. New Jersey's request did not even attempt to discuss or quantify the environmental risks faced by New York.

Thus, even if New Jersey had provided actual data about the potential adverse effects it might suffer, its letter still could not have provided a valid legal basis for the Administrator's conclusion because it provided no basis for performing the required comparative analysis of the effects on both States. Further, the letter submitted by ASIG on September 24, 2007 demonstrated why the failure of New Jersey to submit actual evidence concerning the risk to its coastal environment did not satisfy Section 1508(a)(2).

This scant submission by New Jersey cannot provide a lawful basis for its designation as an "adjacent coastal State" under the procedures and substantive standards that have been followed beginning shortly after the DWPA was enacted.

In early 1976, Arthur D. Little, Inc. issued a Final Report to the Coast Guard, "Methodology for Designation of Adjacent Coastal States:"

to define internal Coast Guard procedures to implement Section 9(a)(2) of the Act [33 U.S.C. § 1508(a)(2)] and Section 148.217 of the [Coast Guard] regulations. Specifically, this report identifies data necessary to make adjacent coastal State determinations, presents a risk analysis technique for evaluating such data, and describes a format for comparing risks to the coastal environment on a State-by-State basis.

U.S. Coast Guard Report No. CG-WDWP-1-76 (revised March 12, 1976) ("Methodology Report") at 3. (Attachment 5)

# VENABLE LLP

December 3, 2007
Page 12

The Methodology Report provided that the Coast Guard is (1) to assess, based upon interpretation of the license applicant's data, independent risks to the coastal environments of the States directly connected by pipeline to the port; then (2) evaluate, based upon interpretation of data presented by the petitioning State, the validity of estimates of potential environmental damage it submits; and finally (3) make a comparison of the risks to the coast environment of each State on a resource-by-resource basis. In this process, the Coast Guard also considers the recommendation submitted by the Administrator of NOAA. Id. at 6.

The Methodology Report makes clear that the petitioning State must do more than merely assert the potential for environmental harm to its coastal environment. The Report states that "Petitioning States claiming damage potential from deepwater port-related developments should quantify the extent to which these indicators (or other factors) are the basis for their claim." Id. at 22. The Report also provides that the agency officials reviewing the request for designation as an additional "adjacent coastal State":

> will consider evidence in those categories of concern identified by the petitioning State. However, they will also have available (and consider) data on all categories for the "pipeline" State as submitted by the applicant for a deepwater port license. This implies that petitioning States should attempt to present as comprehensive a package of evidence as possible, in order not to foreclose comparative evaluation in categories which will be examined for the "pipeline" State.

Id. at 42. Finally, the Methodology Report states:

> Thus, in order for the resultant decision to be justifiable and open to scrutiny, the individuals involved bear a responsibility to document the value judgments and rationale behind their decisions.

Id. at 7.

The Maritime Administrator's decision in the Safe Harbor Energy matter stands in sharp contrast with the procedures that were followed, the evidence that was assembled, and the record on which the decision was based in prior cases in which a State requested designation as an additional "adjacent coastal State."

For example, in February 1976, the Coast Guard referred to NOAA for comment the request of Florida for designation as an additional "adjacent coastal State" with respect to the proposed Seadock deepwater port. On March 25, 1976, NOAA submitted a 233 page report to the

# VENABLE LLP

December 3, 2007
Page 13

Coast Guard, "Analysis of the Risk of Damage to the States of Florida and Texas from the Seadock, Inc. Proposed Deepwater Port." (Attachment 6) That report analyzed in detail the facts concerning whether the risk of harm to the coastal environment of Florida was equal to or greater than the risk of harm presented to the coastal environment of Texas, the State to which the port would be connected by pipeline. Importantly, the report refers to a legal opinion by the Chief Counsel of the Coast Guard, which was then within the Department and charged then as now with running the DWPA license application process, concerning the requirements of Section 1508(a)(2). The report states that the opinion concluded that "[t]he Congressional intent behind section [1508(a)(2)] mandated a thorough evaluation of all possible risks to the coastal environment of the respective states" in determining whether an additional "adjacent coastal State" may be designated. Id. at 5. Florida's application ultimately was denied.

The effort exerted by NOAA in analyzing the facts related to the request for designation as an "adjacent coastal State" in the Seadock project stands in stark contrast to the near total absence of evidence and analysis in its short letter and in the record on which the Administrator based his decision on the Safe Harbor Energy project. From the State's failure to submit the evidence required by the Coast Guard rule and the scarcity of evidence in the record, it is clear that the Maritime Administrator made no comprehensive analysis of the facts; made no attempt to examine systematically or quantify the relative risks to the coastal environments of New Jersey and New York, as required by the statute; and provided no factual support for the rationale that the Administrator followed in designating New Jersey as an "adjacent coastal State." For these reasons, the November 2, 2007 decision violates Section 1508(a)(2) and should be overturned.

## Conclusion

For the reasons set forth above, the Administrator's November 2, 2007 decision designating New Jersey as an "adjacent coastal State" for the Safe Harbor Energy project is invalid as a matter of law and should be reconsidered and overturned.

After the withdrawal of the prior decision, New Jersey would still be able to have its concerns fully addressed in the comprehensive environmental, safety, and national security reviews that federal agencies will conduct to determine whether the Safe Harbor Energy port should be licensed and, if so, under what terms and conditions. The DWPA requires that any State which is not designated as an adjacent coastal State "shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of a deepwater port." 33 U.S.C. § 1508(b)(2) (emphasis added).

Thus, if the Administrator's decision is vacated, the only effect would be that New Jersey would not have the plenary power to veto the project or to impose binding conditions upon the

# VENABLE LLP

December 3, 2007
Page 14

licensing of the port. But the State would be able to work with the Coast Guard and the Maritime Administration to develop appropriate environmental protections. This is precisely the outcome that Congress intended when it adopted a law which provided that in order to enjoy the greater authority enjoyed by an "adjacent coastal State," a requesting State must show that the risk of harm to its coastal environment would be equal to or greater than that of the State that is connected to the port by pipeline.

I am most appreciative of the opportunity to present these facts and arguments for your further consideration. I will be pleased to provide any additional information that you may deem useful.

Sincerely,

Jim Burnley

Jim Burnley

Enclosures

cc:  Admiral Thad W. Allen
     Commandant
     United States Coast Guard

**HOWARD COBLE**
SIXTH DISTRICT
NORTH CAROLINA

2468 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-3306
PHONE: (202) 225-3066
FAX: (202) 225-8611
e-mail: howard.coble@mail.house.gov
www.coble.house.gov



# Congress of the United States
## House of Representatives
### Washington, DC 20515-3306
December 11, 2007

COMMITTEES:
**TRANSPORTATION AND INFRASTRUCTURE**

**JUDICIARY**
RANKING MEMBER,
SUBCOMMITTEE ON COURTS,
THE INTERNET, AND INTELLECTUAL
PROPERTY

PRINTED ON RECYCLED PAPER

Admiral Thad Allen
Commandant
United States Coast Guard
2100 Second Street SW
Washington, D.C. 20593

Dear Admiral Allen:

Since the enactment of the Deepwater Port Act in 1974, the Coast Guard has shared responsibility for regulating and licensing our deepwater ports with the Maritime Administration. It is our understanding that when the Coast Guard was transferred to the Department of Homeland Security in 2002 all of its responsibilities and authorities were also explicitly transferred and the agency mission was granted autonomy within the new department.

With respect to the designation of "adjacent coastal states" in the Liquefied Natural Gas Permitting process, I understand these designations have historically been made by the Coast Guard in concurrence with the Maritime Administration. I am very interested to know if in fact this description of the designation process is correct and if the designations are still made by the Coast Guard in concurrence with the Maritime Administration? In addition, I am interested to know what criteria are used to make these designations or if any of the Coast Guard's responsibility to regulate and license deepwater ports has been transferred to any other government agency?

As always, I am grateful for your service to our nation and the Coast Guard. If you have any questions, or if my office may be of assistance in any way, please feel free to contact Amanda Joyner in my office at (202) 225-3065.

Sincerely,

HOWARD COBLE
Member of Congress

HC:ah

SUITE 101
222 SUNSET AVENUE
ASHEBORO, NC 27203-5668
PHONE: (336) 626-3060
FAX: (336) 626-7819

124 WEST ELM STREET
POST OFFICE BOX 812
GRAHAM, NC 27253-0812
PHONE: (336) 229-0159
FAX: (336) 228-7974

805 SOUTH SALISBURY AVENUE
POST OFFICE BOX 807
GRANITE QUARRY, NC 28072-0807
PHONE: (704) 209-0426
FAX: (704) 209-0428

SUITE B
2102 NORTH ELM STREET
GREENSBORO, NC 27408-5100
PHONE: (336) 333-5005
FAX: (336) 333-5048

SUITE 200-B
155 NORTHPOINT AVENUE
HIGH POINT, NC 27262-7723
(336) 886-5106
FAX: (336) 886-8740

MAR530 000995

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commandant
United States Coast Guard

2100 2nd Street SW
Washington DC 20593
Staff Symbol: CG-00
Phone: (202) 372-4400
Fax: (202) 372-4960

5730
C743904

FEB 14 2008

The Honorable Howard Coble
House of Representatives
Washington, DC 20515

Dear Representative Coble:

This is in response to your letter dated December 11, 2007, regarding the process authority and responsibility for designating an adjacent coastal State (ACS) for purposes of licensing a deepwater port, and which, if any Coast Guard responsibilities to regulate and license deepwater ports have been transferred to any other government agency.

To clarify, when the Coast Guard transferred to the Department of Homeland Security (DHS) in 2003, the Coast Guard took all existing delegated authorities, including those involving processing license applications for deepwater ports. At that time, the Coast Guard and the Maritime Administration operated under delegated authority from the Secretary of Transportation to jointly process deepwater port applications. That relationship has remained relatively unchanged. Authority to *process* applications is still shared between the Maritime Administration and the Coast Guard who work jointly to complete the administrative process. In reference to your question, Coast Guard responsibilities to regulate deepwater ports have not transferred to another government agency. In addition, the Coast Guard has never held licensing authority for deepwater ports. Licensing authority was statutorily placed with the Secretary of Transportation and delegated to the Maritime Administrator in June of 2003. The Deepwater Port Act of 1974 (33 U.S.C. 1501 et seq.) specifically names the Secretary of Transportation as the authority to permissively designate ACS status under 33 U.S.C. 1508(a)(2); the Coast Guard does not possess such statutory authority.

There are two mechanisms for designating adjacent coastal States under the Deepwater Port Act (DWPA). The first procedure is automatic and is described in 33 U.S.C. 1508(a)(1) as: "any coastal State which (A) would be directly connected by pipeline to a deepwater port as proposed in an application, or (B) would be located within 15 miles of any such proposed deepwater port." The second procedure is described in 33 U.S.C 1508(a)(2): "The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration (NOAA), designate such State as an 'adjacent coastal State' if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port."

5730

A statement in your letter says that: "these designations have historically been made by the Coast Guard in concurrence with the Maritime Administration." Actually, prior to a recent request by the State of New Jersey, there have been two instances of States requesting ACS status based on 33 U.S.C. 1508(a)(2). In 1976, Florida and Mississippi petitioned for ACS status for two proposed deepwater ports: Seadock, Inc. and the Louisiana Offshore Oil Port. In both instances, a determination was made by the Secretary of Transportation, consistent with Coast Guard regulations and the delegations in the place at the time.

Coast Guard regulations for ACS designation under 33 CFR, Part 148.217, originally stated that the Coast Guard would make ACS designations under 33 U.S.C. 1508(a)(1), and that the Secretary of Transportation would make designations under 33 U.S.C. 1508(a)(2) of the DWPA. This regulation remained in place from 1976 through the Coast Guard's transition to the Department of Homeland Security in 2003.

Current Coast Guard regulations in 33 CFR, Part 148.217 state that: "If after receiving NOAA's recommendations the Commandant (G–P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G–P), in concurrence with the MARAD Administrator, will so designate it." The Coast Guard and Maritime Administration agree, that based on the Secretary of Transportation's delegation in 2003 reserving licensing decisions within the Department of Transportation, and the past history of the Secretary of Transportation issuing ACS designations, an examination of the Deepwater Port Act implementing regulations is warranted and appropriate clarifications need to be considered.

We hope this information assists you in responding to your constituent. My House Liaison Office at (202) 225-4775 would be pleased to respond to any further questions you or your staff may have.

Sincerely,

**THAD W. ALLEN**
Admiral, U.S. Coast Guard
Commandant

JAMES M. INHOFE
OKLAHOMA

WASHINGTON OFFICE
453 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510–3603
(202) 224–4721

TULSA OFFICE
1924 SOUTH UTICA, SUITE 530
TULSA, OK 74104
(918) 748–5111

OKLAHOMA CITY OFFICE
1900 N.W. EXPRESSWAY, SUITE 1210
OKLAHOMA CITY, OK 73118
(405) 608–4381

COMMITTEES:
ARMED SERVICES

ENVIRONMENT AND
PUBLIC WORKS

# United States Senate

WASHINGTON, DC 20510–3603

December 14, 2007

Admiral Thad W. Allen
Commandant
United States Coast Guard
2100 Second Street SW
Washington, D.C. 20593

Dear Admiral Allen:

Historically, the Coast Guard has been the lead agency in processing applications for licenses for deepwater ports. This includes designations of states as "adjacent coastal States" for purposes of particular projects. Recently, the Coast Guard apparently deferred to the Maritime Administration regarding the designation of adjacent coastal States, although the current regulations state that the Coast Guard makes the determination and designation, in concurrence with the Maritime Administration.

Congress recognized when it originally enacted the Deepwater Port Act that the Coast Guard, because of its experience in matters of navigational safety and marine environmental protection, should play the major role in the licensing and regulation of deepwater ports. In 2002 when the Coast Guard was transferred to the Department of Homeland Security, Congress specifically stated that all functions and authorities that it held while it was an agency in the Department of Transportation transferred with it, and that these functions and authorities were to remain intact unless otherwise specified in subsequent acts of Congress.

I am therefore interested in knowing if there have been any changes to traditional Coast Guard responsibilities and functions in the area of deepwater ports. Specifically, I would like to know whether there have been any recent changes regarding the Coast Guard's authority under the Deepwater Port Act, especially regarding the authority to designate adjacent coastal States. Could you also provide me with information regarding how decisions to designate adjacent coastal States for deepwater ports are made, and which federal agency is responsible for making this determination and designation, both historically and currently?

Thank you for your attention to this matter, and I look forward to your response.

Sincerely,

James M. Inhofe
United States Senator

MAR530 000098



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second St. SW
Washington, DC 20593-001
Staff Symbol: CG-00
Phone: (202) 372-4400
Fax: (202) 372-4960

5730
C746283
FEB 14 2008

The Honorable James M. Inhofe
United States Senator
Washington, DC 20510-3603

Dear Senator Inhofe:

This is in response to your letter dated December 14, 2007, regarding the authority, responsibility and criteria for designating an adjacent coastal State (ACS) for purposes of licensing a deepwater port, and whether there have been any changes in Coast Guard authority under the Deepwater Port Act (DWPA), especially regarding adjacent coastal State designations.

To clarify, when the Coast Guard transferred to the Department of Homeland Security (DHS) in 2003, the Coast Guard took all existing delegated authorities, including those involving processing license applications for deepwater ports. At that time, the Coast Guard and the Maritime Administration operated under delegated authority from the Secretary of Transportation to jointly process deepwater port applications. That relationship has remained relatively unchanged. Authority to *process* applications is shared between the Maritime Administration and the Coast Guard who work jointly to complete the administrative process. The Coast Guard has never held licensing authority for deepwater ports. Licensing authority was statutorily placed with the Secretary of Transportation and delegated to the Maritime Administrator in June of 2003. The Deepwater Port Act of 1974 (33 U.S.C. 1501 et seq.) specifically names the Secretary of Transportation as the authority to permissively designated ACS status under 33 U.S.C. 1508(a)(2); the Coast Guard does not possess such statutory authority.

There are two mechanisms for designating adjacent coastal States under the Deepwater Port Act. The first procedure is automatic and is described in 33 U.S.C. 1508(a)(1) as: "any coastal State which (A) would be directly connected by pipeline to a deepwater port as proposed in an application, or (B) would be located within 15 miles of any such proposed deepwater port." The second procedure is described in 33 U.S.C. 1508(a)(2): "The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration (NOAA), designate such State as an "adjacent coastal State" if he determines that there is a risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port."

A statement in your letter says that: "Historically, the Coast Guard has been the lead agency in processing applications for licenses for deepwater ports. This includes designations of states as "adjacent coastal States" for purposes of particular projects." Actually, prior to a recent request by the State of New Jersey, there have been two instances of States requesting ACS based on 33 U.S.C. 1508(a)(2). In 1976, Florida and Mississippi petitioned for ACS status for two proposed deepwater ports: Seadock, Inc. and the Louisiana Offshore Oil Port. In both instances, a determination was made by the Secretary of Transportation, consistent with Coast Guard regulations and the delegations in place at the time.

Coast Guard regulations for ACS designation under 33 CFR, Part 148.217, originally stated that the Coast Guard would make ACS designations under 33 U.S.C. 1508(a)(1), and that the Secretary of Transportation would make designations under 33 U.S.C. 1508(a)(2) of the DWPA. This regulation remained in place from 1976 through the Coast Guard's transition to the Department of Homeland Security in 2003.

Current Coast Guard regulations in 33 CFR, Part 148.217 state that: "If after receiving NOAA's recommendations the Commandant (G–P), in concurrence with MARAD Administrator, determines that the State should be considered an adjacent coastal State, the Commandant (G–P), in concurrence with the MARAD Administrator, will so designate it." The Coast Guard and Maritime Administration agree, that based on the Secretary of Transportation's delegation in 2003 reserving licensing decisions within the Department of Transportation, and the past history of the Secretary of Transportation issuing ACS designations, an examination of the Deepwater Port Act implementing regulations is warranted and appropriate clarifications need to be considered.

We hope this information assists you in responding to your constituent. My Senate Liaison Office at (202) 224-2913 would be pleased to respond to any further questions you or your staff may have.

Sincerely,

THAD W. ALLEN
Admiral, U.S. Coast Guard
Commandant

**New York State Department of Environmental Conservation**
Division of Environmental Permits, 4th Floor
625 Broadway, Albany, New York 12233-1750
Phone: (518) 402-9167 • FAX: (518) 402-9168
Website: www.dec.ny.gov



Alexander J. Grannis
Commissioner

December 14, 2007

M. A. Prescott, Chief
Deepwater Ports Standards Division
US Coast Guard
2100 Second Street, SW
Washington, DC 20593-0001

Re:    Safe Harbor Energy Project

Dear Mr. Prescott:

The New York State Department of Environmental Conservation (the Department, DEC) has reviewed the May 2007 Deepwater Port License Application of Atlantic Sea Island Group, LLC (ASIG), transmitted with your August 16, 2007 letter to me. Our comments on the application are below.

**Background**

Atlantic Sea Island Group LLC proposes to construct and operate a liquefied natural gas (LNG) receiving, storage, and regasification plant on a man-made island in the Cholera Banks area of the Atlantic Ocean. The project includes an undersea pipeline that will carry natural gas from the island terminal to a connection in the Atlantic Ocean with an existing underwater natural gas pipeline owned by Transcontinental Gas Pipeline Corporation. Together, the terminal and pipeline are known as the Safe Harbor Energy Project. Excepting a segment of the proposed pipeline, the project lies outside the territorial waters of New York State.

The project requires a federal Deepwater Port Act License. The Maritime Administration (MARAD) has the authority for issuing the license. MARAD and the US Coast Guard (USCG) are jointly managing the application procedure, and review of the project under the National Environmental Policy Act (NEPA).

## Regulatory Oversight by New York State

The Deepwater Port Act requires consultation with the adjacent coastal states prior to license issuance, and accords to the Governor of an adjacent coastal state the authority to approve, disprove or approve with conditions the federal Deepwater Port License before it is issued. Since New York and New Jersey have been designated Adjacent Coastal States, the Governor of New York State and the Governor of New Jersey each has approval authority over the Safe Harbor Energy Project.

In addition, ASIG must obtain an Article 15, Protection of Waters permit and a Section 401 Water Quality Certificate (WQC) from this Department for excavation and installation of that segment of the proposed pipeline that lies within New York's territorial waters. The Department's decision on these applications will be based on the applicable sections of the federal Clean Water Act; relevant New York State environmental regulations, including 6 NYCRR Parts 608 (Protection of Waters); 617 (State Environmental Quality Review); and 621 (Uniform Procedures); and germane Department policies and guidance.

The Department will assess the project's substantive compliance with those New York environmental statutes, rules and regulations (and the Department's powers, duties and policies thereunder) to which the project would be subject were if within New York's jurisdictional waters:

- ECL Article 15 (Protection of Waters) and implementing regulations 6NYCRR Part 608.
- ECL Article 17 (Water Pollution Control) and 6NYCRR Parts 750 et seq., and, for water intakes and thermal discharges, 6NYCRR Part 704.
- ECL Article 19 (Air Pollution Control) and 6NYCRR Part 201 and 231.

The Department will object to any activity in noncompliance with the substantive requirements of these statutes and regulations. If other potentially applicable jurisdictions are identified in the application proceeding we will seek substantive compliance with those as well. Further, DEC will disapprove of any activity with the potential for significant adverse environmental impact that is not mitigated or otherwise balanced by social benefits or need.

## Review Summary

The Department was provided no opportunity to participate in the development of the application, despite our request to do so. Having now had an opportunity to review the application, we find that it is incomplete. In addition, we believe the application inadequately assesses important environmental factors.

Among other deficiencies, the Department believes the application makes unrealistic claims for available fill material needed to create the island; omits important environmental data (described below in our comments); inadequately assesses the action's ecological impacts, especially the island's effects on the ocean column and benthic habitat within a historically important fishery area, and the area's traditional fishing use; and insufficiently considers alternative project locations. As presented, the project is likely to cause significant adverse environmental, social and recreational effects.

The air permit application inaccurately states that the protocol used in the application modeling was submitted to this agency, and suggests that DEC approved it. The protocol was neither submitted to DEC nor did the Department approve it.

Consequently, the Department is unable to consider certain assessments, results and conclusions in the air application to be valid, and has identified major issues of concern in the overall air application, listed below. The Department must still review the application modeling analysis details to confirm projected air quality impacts.

The Department understands that MARAD and USCG will conduct public outreach relative to the scope of a NEPA draft environmental impact statement (DEIS) in the coming months. DEC hereby elects to have Cooperating Agency status under NEPA relative to the environmental impact statement. Last, the Department provides these comments both in response to the application, and for consideration in development of the scope of the DEIS.

## Review Comments

1. Air Permit Application

   a. Tables 2.5b and 2.5c of the modeling protocol and Attachment 2.1 (General Conformity) of Volume 5 show relatively large emissions of certain pollutants

from the tugs while at berth and during LNG unloading. On the other hand, Tables 3-5 to 3-7 of the permit application document do not include these emissions as part of the facility, nor are these included in the modeling results of Table 6-4 of the application.

These are incomplete analyses: the Department requires the ambient air quality impacts from all the project's emissions, which include emissions from the carriers and tugs, when stationary, to be addressed for air quality analysis purposes. This requirement is consistent with similar guidance in EPA's Draft 1990 NSR Workshop Manual (Section A.II.B.4, Secondary Emissions), and pursuant to 6NYCRR Subparts 200.6 and 257. Ambient concentrations of criteria air pollutants will be impacted by the project and must be evaluated for compliance with the NAAQS. All emissions must be included in the NAAQS analysis and discussed in terms of backup information and possible mitigation.

b. Section 3 of the permit application indicates that the particulate emissions from the generators include only the filterable portion; the application states this is per EPA policy. This is inaccurate: to the contrary, EPA has indicated that $PM_{10}$ emissions must include condensibles. EPA is yet to finalize their new source review regulations for $PM_{2.5}$, but EPA's final SIP rule for fine particulates indicates that for the purposes of developing emission inventories and attainment demonstrations, the condensible fraction should be included. As EPA notes, this is especially important for combustion sources. DEC has required the same of many projects in the last decade or more. Thus, the condensible portion of the $PM_{10}$ and $PM_{2.5}$ emissions need to be included with the filterable emissions for the purpose of both applicability and impact analysis. In addition, section 3.2 of the application does not indicate whether the PM emissions from oil firing in the vessels includes condensibles. If not, this correction must be made to the vessel unloading emissions as well.

c. The modeling results discussed in Section 6.4 of Exhibit X indicate that there are significant impacts for all pollutants except the 1- and 8-hour CO, and the annual $PM_{10}$. The Significant Impact Area (SIA) for PM should be revisited based on comments a and b above. In addition, for NAAQS compliance, only background levels are added to the facility impacts, but EPA and DEC guidance require a cumulative source analysis for all pollutants having a significant impact. Since certain SIAs are close to shoreline, it should be explained why a cumulative analysis with onshore sources was not performed.

d. For demonstration of NAAQS compliance, Table 6-4 and 6-5 of Exhibit X indicate that $PM_{10}$ compliance is used as a surrogate for $PM_{2.5}$ NAAQS compliance. The Department finds this unacceptable. An explicit demonstration of $PM_{2.5}$ compliance must be made, including the revised 24 hour standard for $PM_{2.5}$. As indicated in the application, EPA is treating the project area as if in nonattainment for $PM_{2.5}$; thus, at a minimum, a modeled demonstration of compliance of the $PM_{2.5}$ NAAQS from the project must be shown. In addition, Section 4.5.8.12 of the permit application notes that DEC staff had asked for the implementation of Commissioner's policy on fine particulates (CP-33). Although Safe Harbor believes CP-33 does not apply to their project, impacts relative to the significance levels in CP-33 are nonetheless presented in Tables 6-4 and 6-5.

These tables note that the impacts are below CP-33 levels only for the "Terminal emission" and excluding the tankers. However, CP-33 requires the inclusion of all sources, including mobile sources in its implementation. Thus, with this consideration, in addition to the issues raised in comments 1 and 2 above, Safe Harbor should provide revised impacts and address the minimization of particulate emissions from the project.

e. Section 4.4 of Exhibit X and Topic Report 8, section 8.1.1, in Volume 3 indicate that there will be limitations on the fuel sulfur content used by the LNG carriers and the types of carriers used for the project in order to keep emissions below the PSD thresholds. Safe Harbor should provide detailed description as to how these requirements will be monitored and demonstrated, given that the certain maritime requirements which United States recognizes (e.g. IMO Annex VI) allow for much higher sulfur contents for the fuels used by vessels.

f. Section 5.1 of Exhibit X summarizes the nonattainment area requirements of Subpart 231-2.4(a)(2) with respect to alternative sites, sizes, and production processes and refers to Topic Report 9 in Volume 3 and Exhibit F of Volume 2 for more details on the alternatives and site selection criteria. These latter sections, however, do not provide any additional information pertinent to the air quality aspects of the project, nor with respect to the nonattainment requirements.

A detailed discussion should be presented in conformance with the "Three Prong" test used by DEC. The test is based on EPA determinations in the Borders Chemical and CAMPO cases, and was established as Department policy in the

November 15, 2002 interim decision of DEC Commissioner Crotty in the KeySpan Spagnoli Road, Article X proceeding (DEC No. 1-4726-01500/00001) as follows:

> *First, the applicant must show whether the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible. Second, the applicant must show whether a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrate that the latter outweigh the former. Lastly, the applicant must show whether there are alternative projects or alternative sites or mitigating measures which would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable.*

The Interim Decision may be viewed on the Department's website at www.dec.ny.gov/hearings/11477.html. An example of the required analysis is enclosed and will be provided to ASIG with this letter.

g. Sections 4.4 of Exhibit X and Topic Report 8 of Volume 3 provide a brief description of the accidental ammonia release analysis while Attachment 2.2 of Volume 5 provides only the resultant impacts. A more detailed description of the approach and of the assumptions of the PHAST modeling should be provided. In addition, Exhibit D of Volume 4 is said to provide the consequence analysis, but has been kept out of DEC's copy of the application as confidential. A description of the meteorological and dispersion modeling approach and consequent impacts must be provided for our review.

h. Sections 6.4.4 and 6.4.5 of Exhibit X note that sample model outputs are provided in Appendix D.2 and D.3. We request that all input and output files, including raw meteorological data used to generate AERMET and OCD input files, be provided on a CD or similar medium for review to assure projected impacts have been properly calculated.

2. General Conformity

a. The presentation is based on the 8-hour ozone nonattainment classification of moderate and the associated conformity thresholds for VOC and NOx of 100 tpy.

In accordance with a December 22, 2006 US Court of Appeals decision (*South Coast Air Quality Management District v. EPA, 472 F.3d 882 (D.C. Cir. 2007)*), this document should reflect the 1-hour severe ozone nonattainment classification and the general conformity thresholds for NOx and VOC of 25 tpy. The conformity discussion also separates the project as emissions within 3 miles of shore and the safe zone (location of the island). The Department believes the entire project falls within the NYMA nonattainment area. We would like to know the basis for the three mile determination.

b. Construction emissions exceed 25 tpy of NOx in 2009, 2010, 2011 and 2012 within what is described as state territorial boundaries. With construction of the Island, which as noted above should be included, and there are exceedances in 2013 and 2014. Total emissions from 2009 through 2014 for construction are estimated as 222, 531, 469, 324, 172, and 115 tpy, respectively. The operation emissions are 45 tpy in what is termed state territorial waters and 204 tpy in the zone, both of which exceed the threshold. The application needs to make a clear demonstration that these are included in the State Implementation Plan (SIP).

For the SIP, the discussion of General Conformity makes comparisons to the NYMA projections. While the construction emissions on a daily basis are less than the inventory provided, it will require further review and more documentation on ASIG's part to determine if the project is in the SIP, for example, looking at all sectors of the inventory on an individual basis. For Safe Harbor to be assumed in the SIP, emissions from the Commercial Marine Vessels (CMV) need to be compared to the SIP CMV inventory and from the county where the emissions will originate.

It should be noted that while the CMV inventory in the New York harbor has been recently updated, portions of the CMV inventory for Long Island have not. A similar analysis for nonroad construction equipment should be complete as well.

c. The given oxygen content input of 0.0 on p. A-1 is incorrect. Ten percent ethanol, which is average for most of New York, equates to about 3.5% oxygen by weight.

3. Island/Terminal, Safety Zone

a. The application states that the island will be constructed over three construction seasons using 8.4 million cubic yards (cy) of sand "from New York harbor dredging or commercial sources." The Department strongly supports the beneficial reuse of dredged sediments. Generally speaking, however, sandy material is a small proportion of the roughly two to four million cy typically dredged annually in the Port of New York & New Jersey. As such, it is unlikely that millions of cubic yards of sandy material will be available from harbor dredging within the project's three consecutive construction seasons.

Thus, the island's sand fill needs will most likely be met from upland commercial sources, generating significant truck traffic to and from barge loading facilities. With a conservative estimate of 12 cy of sand per dump truck, this would be 700,000 truck trips. Upland sand sources and transfer facilities should be identified. The application and all environmental assessments of the project should include an evaluation of the traffic congestion and related air quality impacts that may result from these truck trips.

b. The filling for the proposed island will result in the irretrievable loss of approximately 116 acres of aquatic benthic habitat. Constructing the island/terminal in the Cholera Banks, an historically important fishery habitat and fishing area, heightens this impact. A more thorough description of these impacts and a comprehensive discussion of measures that would avoid, minimize or reduce them is needed. The Department believes this loss of ocean bottom area is a significant adverse environmental impact.

c. The application must identify and assess the impact of the volume of open water habitat to be lost from island/terminal construction.

d. Approximately 663 acres of the Cholera Banks area will be lost to commercial and recreational fishing from construction of the island and the closed safety zone surrounding it. Rendering inaccessible 663 acres is a potentially significant adverse impact to recreational and commercial fishing.

e. Cholera Banks has historically been an important recreational fishing area. The report presents information suggesting that Cholera Banks is used less now by charter boats and recreational fishers than in the past. Since other factors may account for a change in commercial and recreational fishing patterns, this information is not automatically relevant to determining the area's actual ecological importance to the resident fish population. Further, the report relies

on National Marine Fisheries Service (NMFS) data to characterize commercial fishing in the New York Bight, not focused on the selected site or Cholera Banks. The Department believes these data alone are not indicative of the location's ecological importance and value as a fishing site.

f. Given the lack of site-specific fishery and fishing data, the Department believes that ASIG should work closely with NMFS, the Department, and commercial fishing groups to refine the characterization of the area's use. We recommend that ASIG contact the Marine Resources Advisory Council to further involve and better represent the interests of commercial and recreational fishing.

g. Nekton data provided in the application were collected from 1977-1987 from a broad area. Because fish stocks fluctuate and have decreased for many species the utility of these data in assessing impacts is uncertain. Site specific, new data should be collected for at least one year for all life stages to establish a more accurate assessment of the potential impacts this facility will have on nekton. In addition, a thorough assessment of the benthic infauna and epifauna of the site should be conducted. Sampling should include an assessment of seasonal variation.

h. The report assumes equal distribution of resources and fishing effort throughout the bight apex. The Department believes this is an unrealistic assumption, and that it is more likely that some areas – such as Cholera Banks – are more important than others. This highlights the need to collect more site-specific information.

i. The report's statement that the 663-acre exclusion zone is an insignificant portion of the NY Bight or the Bight Apex is unpersuasive if not irrelevant to fishery impacts. It would be more germane to identify the role Cholera Banks plays in the Bight or Apex fishery and fishing efforts within the area and then assess the impacts that will result from construction of the island and the safety zone.

j. The application lacks a detailed characterization of the benthic habitat to be destroyed by the island. It suggests that impacts to the benthic habitats will be offset by new habitat associated with the island's armoring system. However, this represents only partial mitigation. The application should include a

detailed community analysis of what occupies the bottom area now and a comparison with what community(ies) is/are likely to occupy the armor.

k. The application suggests that the key mitigation proposal will be a gravel bottom created off-site. By the Department's typical application standards this is not clear mitigation, but rather a replacement of one functional habitat for another. In addition, the impacts of such alteration at the target site would also have to be described and evaluated.

4. Seawater Withdrawal

a. According to Page 3-52 in the Biological Resources section (TR-3) the facility will withdraw at least 14.4 million gallons per year (mgy) of seawater. The intake structures will be operated at a low velocity (<0.5 ft/sec) equipped with wedgewire screens with an air backwash system. While this will help minimize impingement and entrainment, the application does not state a mesh size for the wedgewire screens. To minimize impingement and entrainment impacts the Department strongly recommends 2mm or smaller wedgewire screens made of a Cu-Ni alloy.

b. Page 3-52 in the Biological Resources section (TR-3) states that with withdrawals for engine cooling and ballast water, the LNG tankers will withdraw an estimated 700 million gallons to 7 billion gallons per year of seawater. Withdrawing this volume of seawater will have significant adverse impacts on fish eggs and larvae impinged on the ships' intakes or entrained into the system. The application and environmental assessment should assess as best as possible these potential impacts and identify potential mitigation.

5. Pipeline

a. The following information is needed to complete the application for the pipeline construction:

1. The results of sediment sampling. These should include location and sample type (core vs. surficial), including a map of the 13 sampling locations.

2. Additional sampling at the proposed location of the tie-in with the Transco pipeline to ensure that sediments at the connection are coarse grained and uncontaminated.

3. The results of a detailed survey to identify boulders, outcroppings, or any other obstacles along the pipeline route that would make mechanical plowing impractical.

4. Details on dredging/jetting planned at the Transco interconnection and at any other location where plowing may not be practical.

5. A description of the potential changes to the standard plowing installation if the preferred route crosses shipping channels where greater burial depths are required.

6. An alternatives analysis which considers the use of dredged material as fill for creating a containment island, instead of the 8.4 million cubic yards of clean sand for island construction.

7. A more detailed characterization of contaminants at MP 11. This requirement is based on the statement on page 2-9 of Topic Report 2 of Volume 3 Part 1 that at MP 11 there are sample results reported that indicate the material is 63.5 percent silt and clay. Sediment containing this percentage of silt/clay would not qualify for an exemption to contaminant sampling.

b. The application states that the pipeline trench will be backfilled to restore original topography and the pipeline buried approx. four feet below the bottom surface. The application must explain the need for the proposed 300-foot wide pipeline ROW and identify all proposed restrictions within the ROW, specifically discussing how the restrictions will affect fishing activities, particularly hydraulic surf clam dredges.

c. Those portions of the pipeline within New York State will likely require a Grant of Easement in Lands Underwater from the NYS Office of General Services, as well as review by the New York State Office of Parks, Recreation and Historic Preservation to determine the project's compliance with Section 106 of the National Historic Preservation Act.

6. Alternatives

a. Site selection criteria are identified (see Exhibit F Site Selection Study F.1 Offshore LNG Terminal Site Selection Criteria). No clear basis is provided for an individual criterion (e.g., Criterion 3 requires "15 to 21 Meters of Water Depth", but no reason is given why this depth is optimum, or necessary, from any perspective). Of the nine criteria, one, number 7, has environmental relevance (see comment below).

Applying these criteria to "the offshore area from the northern end of Long Island to Delaware" the application concludes that MMS lease block 6655 is the only such block that meets all criteria. Within block 6655 the application identifies two potential sites. One site is eliminated because water depth is greater and construction will cost more.

In sum, applicant-developed criteria, which make no consideration of the environmental factors relevant to a location, are used to justify the selection of essentially one site. No alternatives are considered. The application should provide the technical basis for all criteria. The criteria should include consideration of ecological factors.

b. Exhibit F Site Selection Study F.1 Offshore LNG Terminal Site Selection Criteria provides the criteria used to select the island location. Number 7 of the Site Selection Criteria lists one criterion as "Avoid past, current, or proposed disposal areas." The rationale given is "To avoid additional environmental impact, locate the island in an area not currently or historically used for dredge disposal or waste dumping."

Locations that have never been used for dredge material disposal are typically more valuable environmentally than those that have been used for disposal or similarly activities. Destroying these cleaner, ecologically richer locations for the island's construction will therefore have greater ecological impact than would filling a previously disturbed location.

It is a common practice for a site undergoing cleanup, or remediation, whether upland or underwater, to be covered, or "capped", as a means of isolating contamination and preventing the dispersion of resident pollution to the surrounding environment.

Rather than eliminating former disposal sites from consideration, the siting criteria should include these and similarly distressed ocean areas, since covering these sites with an island may have the environmentally beneficial effect of eliminating their deleterious impacts on the surrounding ocean environment.

As explained above, we have reviewed the project for its consistency with the normally applicable regulatory programs under the Department's jurisdiction. As indicated in these comments, at this time the Department believes the project to be in substantive noncompliance with these programs.

If there are any questions please contact me at the above number.

Very truly yours,

John J. Ferguson
Project Review Coordinator

cc:    MARAD
       Atlantic Sea Island Group LLC
       Steve Riva, USEPA
       Anderw Kasius, NYS Department of State
       Ruth Ehinger, NJ Department of Environmental Protection

*Participating Organizations*

Alliance for a Living Ocean
American Littoral Society
Arthur Kill Coalition
Asbury Park Fishing Club
Bayberry Garden Club
Bayshore Saltwater Flyrodders
Belford Seafood Coop
Belmar Fishing Club
Beneath The Sea
Bergen Save the Watershed Action Network
Berkeley Shores Homeowners Civic Association
Cape May Environmental Commission
Central Jersey Anglers
Citizens Conservation Council of Ocean
Clean Air Campaign
Coalition Against Toxics
Coalition for Peace & Justice
Concerned Jersey Patriots Head Club
Great Alliance
Communication Workers of America, Local 1034
Concerned Businesses of COA
Concerned Citizens of Bennetshurst
Concerned Citizens of COA
Concerned Citizens of Middlesex
Doud's Ice Rossmere
Eastern Monmouth Chamber of Commerce
Environmental Response Network
Explorers Dive Club
Fishermen Defense Fund
Fishermen's Dock Cooperative
Fishers Island Conservancy
Friends of Island Beach State Park
Friends of Liberty State Park
Friends of Long Island Sound
Friends of the Boardwalk
Garden Club of Englewood
Garden Club of Fair Haven
Garden Club of Long Beach Island
Garden Club of Moristown
Garden Club of Navesink
Garden Club of New Jersey
Garden Club of New Vernon
Garden Club of Oceanport
Garden Club of Princeton
Garden Club of Ridgewood
Garden Club of Rumson
Garden Club of Short Hills
Garden Club of Shrewsbury
Garden Club of Spring Lake
Garden Club of Washington Valley
Great Egg Harbor Watershed Association
Highlands Business Partnership
Highlands Chamber of Commerce
Hudson River Fishermen's Association/NJ
Interact Clubs of Rotary International
Jersey Coast Shark Anglers
Jersey Shore Audubon Society
Jersey Shore Captains Association
Jersey Shore Running Club
Junior League of Monmouth County
Junior League of Summit
Kiwanis Club of Manasquan
Kiwanis Club of Shadow Lake Village
Lavanello Party & Pleasure Boat Association
Leonardo Tax Payers Association
Main Street Whitewood
Marine Trades Association of NJ
Monmouth Conservation Foundation
Monmouth County Association of Realtors
Monmouth County Audubon Society
Monmouth County Friends of Clearwater
Monmouth Fisherman's Emergency Fund
National Coalition for Marine Conservation
Natural Resources Protective Association
Navesink River Municipalities Committee
Newcomers Club of Monmouth County
NJ Beach Buggy Association
NJ Commercial Fishermen's Association
NJ Council of Dive Clubs
NJ Environmental Federation
NJ Environmental Lobby
NJ Marine Education Association
NJ PIRG Citizen Lobby
NJ Sierra Club
NJ Windsurfing Association
Nottingham Hunting & Fishing Club
NYC Sea Gypsies
NY/NJ Baykeeper
NY Marine Educators Association
Ocean Advocacy
Ocean Conservancy
Ocean County Citizens for Clean Water
Ocean Divas
Ocean Wreck Divers
Outreach/First Presbyterian Church of Rumson
Piscataway Saltwater Sportsmen Club
Raritan Riverkeeper
Riverside Drive Association
Rotary Club of Long Branch
Saint George's by the River Church, Rumson
Saltwater Anglers of Bergen County
Sandy Hook Bay Crossmans Club
Save Barnegat Bay
Save the Bay
SEAS Monmouth
Seversdam Garden Club
Shark River Cleanup Coalition
Shark River Surf Anglers
Shepphead Bay Fishing Fleet Association
Shore Adventure Club
Shore Surf Club
Sierra Club, Shore Chapter
Soroptimist Club of Cape May County
South Monmouth Board of Realtors
Staten Island Friends of Clearwater
Strathmere Fishing & Environmental Club
Surfers' Environmental Alliance
Surfrider Foundation, Jersey Shore Chapter
TACK'I
Terra Nova Garden Club
Unitarian Universalist Congregation of Mon. County
United Boatmen of NY/NJ
United Boatmen of NJ
Volunteer Friends of Boaters
Watertight
Women's Club of Brick Township
Women's Club of Keyport
Women's Club of Long Branch
Women's Club of Manchanville
Zeit Society

Printed on 100% post-consumer
recycled paper.

# Clean Ocean Action



*Ocean Advocacy Since 1984*

www.CleanOceanAction.org

■ **Main Office**
18 Hartshorne Drive
P.O. Box 505, Sandy Hook
Highlands, NJ 07732-0505
Voice: 732-872-0111
Fax: 732-872-8041
SandyHook@CleanOceanAction.org

December 18, 2007

**VIA EMAIL AND FACSIMILE**

The Honorable Sean T. Connaughton
Administrator
U.S. Maritime Administration
1200 New Jersey Ave., SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

H. Keith Lesnick
Director, Office of Deepwater Ports Licensing
And Offshore Activities
U.S. Maritime Administration
1200 New Jersey Ave., SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

M.A. Prescott
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
2100 Second St. SW
Washington, DC 20593

**RE: Docket # USCG-2007-28535; Opposition to MARAD's Consideration of Atlantic Sea Island Group's Appeal of New Jersey's Adjacent Coastal State Status**

Dear Administrator Connaughton, Mr. Prescott, and Mr. Lesnick,

Clean Ocean Action ("COA") is a regional, broad-based coalition of 125 conservation, environmental, fishing, boating, diving, student, surfing, women's, business, service, and community groups with a mission to improve the degraded water quality of the marine waters off the New Jersey/New York coast. We are writing to strongly oppose the U.S. Maritime Administration's ("MARAD") consideration of the Atlantic Sea Island Group's ("ASIG") appeal of MARAD's decision granting New Jersey adjacent coastal state ("ACS") status.

1

MAR530 000101

In a November 19, 2007 letter to James Burnley IV, an attorney for ASIG, MARAD Administrator Sean Connaughton responded to a letter from Mr. Burnley of November 13, 2007 that requested an extension of time for filing a petition to appeal MARAD's designation of New Jersey as an ACS. According to the November 19 letter, Mr. Burnley also requested a formal appeals process under 46 C.F.R. 201. As correctly noted by Administrator Connaughton, there is no law setting forth a formal appeals process of the ACS decision. Nonetheless, Administrator Connaughton stated he was "more than willing to review [ASIG's] request to reconsider the Safe Harbor ACS determination."

COA strongly objects to MARAD's consideration of ASIG's appeal. First, there is no legal provision allowing for this appeal. Administrator Connaughton did not site any law entitling him to accept and review an appeal from ASIG. It appears that ASIG also failed to cite a single law that entitles them to an appeal. Further, Administrator Connaughton cited no laws that would set forth the standards for the appeal and the level of review to be undertaken. Without such law, a decision by the Administrator to reverse his previous position would be without basis, unaccountable, and thus arbitrary and capricious.

Second, the federal government has already set an example of strictly following the letter of the law in this application process and should therefore not change its practice in favor of ASIG. On October 25, 2007, NOAA denied the New Jersey Coastal Management Program's ("NJCMP") request to review ASIG's application under the Coastal Zone Management Act ("CZMA"). While the Office of Ocean and Coastal Resource Management ("OCRM") did receive the request within the 30-day notification period, ASIG objected because it received notice of the request two (2) days after the 30-day notification period. ASIG cannot have it both ways, asking the federal government to strictly follow the letter of the law when it is advantageous and seeking flexibility when it wants a ruling to change.

Third, ASIG has already had the opportunity to raise its objections to New Jersey receiving ACS status. After New Jersey requested ACS status pursuant to 33 U.S.C. 1508(a)(2), ASIG went out of its way to write an opposition to New Jersey's request. The law envisions that MARAD will only have the Governor's request and the recommendations of the Administrator of the National Oceanic and Atmospheric Administration ("NOAA") in making its determination. In this case, MARAD also had the objections of ASIG. Therefore, ASIG already had the opportunity of having their views considered, when that is not even the standard practice. ASIG has already received more consideration than normally provided, and therefore should not get be able to continue objecting.

Finally, nothing has changed to affect the merits of the case as to New Jersey being an ACS. Governor Corzine raised many important reasons why New Jersey should be an ACS. Administrator Connaughton weighed these arguments with NOAA's recommendation and ASIG's opposition and application and found in favor of Governor Corzine. Administrator Connaughton found that "magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey" merited New Jersey being an ACS. The facts in the record thoroughly support this conclusion.

MAR530 000102

If MARAD were to grant ASIG's appeal, then MARAD must also address previous issues raised by Governor Corzine that MARAD has failed to address. For example, MARAD continues to not explain why New Jersey is not an ACS under 33 U.S.C. 1508(a)(1)(A). How can ASIG argue that New Jersey is not directly connected by pipeline to the deepwater port when New Jersey is directly connected by the Transco pipeline to the port?[1] As noted by ASIG Chairman Howard Bovers in a recent Letter to the Editor, "[m]ore than 50% of the LNG in the form of natural gas in Phase One of the project will be delivered to New Jersey."[2] The Transco pipeline comes directly onto shore in New Jersey and gas from the port will flow to New Jersey. MARAD has not addressed this and other issues. If MARAD were to consider the appeal, it must address the merits of all arguments raised in favor of ACS as it made its previous finding on a limited, though sufficient, basis. Regardless, even if MARAD considers the appeal, there is no factual basis for reaching a new, contrary conclusion.

In sum, we object to MARAD considering ASIG's appeal. In the alternative, we request that MARAD deny the appeal, as the merits of the facts have not changed.

We thank the Maritime Administration and Coast Guard for their consideration of these issues.

Sincerely,

Cindy Zipf
Executive Director

David Byer, Esq.
Water Policy Attorney

cc:    The Honorable Jon S. Corzine, Governor, New Jersey
       Mary K. Jager, U.S. Coast Guard

---

[1] ASIG's proposed pipeline, which will connect to the Transco pipeline, is by legal definition part of the deepwater port. 33 U.S.C. 1502(9)(B).
[2] Howard Bovers, Letter to the Editor, *"Environmental Demagoguery"?*, Two River Times, Nov. 30, 2007, at 8.

3

MAR530 000103



**State of New Jersey**
OFFICE OF ECONOMIC GROWTH
PO BOX 001
TRENTON NJ 08625-0001
(609) 292-6000

JON S. CORZINE
*Governor*

December 21, 2007

Admiral Thad Allen
Commandant (CG-3P)
U.S. Coast Guard
2100 Second St SW
Washington, DC 20593

Sean T. Connaughton
Maritime Administrator
U.S. Maritime Administration
1200 New Jersey Avenue, SE (MAR-530)
Second Floor, West Wing
Washington, DC 20590

Dear Admiral Allen and Mr. Connaughton:

I am writing to strongly support the decision reached on November 2, 2007 by the Maritime Administration designating New Jersey an adjacent coastal state under the Deepwater Port Act for the proposed Safe Harbor deepwater port project and to strongly object to the applicant's assertion that the designation was erroneous. I urge you to uphold your November 2, 2007 decision. It is my understanding that, as noted in Mr. Connaughton's November 19, 2007 letter to James Burnley, representing Atlantic Sea Island Group, LLC, there is no administrative appeal process set forth in the Deepwater Port Act. Furthermore, New Jersey meets the criteria for designation as an adjacent coastal state. I look forward to working closely with the U.S. Coast Guard, Maritime Administration and State of New York to properly address the region's energy needs while protecting the economy and environment of New Jersey and New York.

Sincerely,

Jon S. Corzine

*Direct Reply*
*[handwritten] let sent to ACO-A for Appropriate Action*

MAR530 000104

*New Jersey Is An Equal Opportunity Employer* ● *Printed on Recycled Paper and Recyclable*



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Policy, Planning and Science
401 East State Street, 7ᵗʰ Floor
P. O. Box 402
Trenton, NJ 08625-0402
Tel: (609) 341-5311
Fax: (609) 292-3268

December 21, 2007

Mr. H. Keith Lesnick, Director
Office of Deepwater Ports and Offshore Activities
Maritime Administration
1200 New Jersey Avenue, S.E. (MAR-530)
Second Floor, West Wing
Washington, D.C. 20590

Dear Mr. Lesnick:

I am writing to supplement the information provided in Governor Corzine's letter of September 6, 2007 requesting that New Jersey be designated an adjacent coastal state under the Deepwater Port Act for the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License, as well as the information supplied in my letters of September 25 and November 1, 2007.

## Project Purpose and Benefits

Throughout the documents submitted by the Atlantic Sea Island Group LLC, there are numerous references to the goal of the project as serving the New York Metropolitan area or New York region. New Jersey is an integral component of the New York Metropolitan area/New York region. The descriptions of the project include statements such as "the Atlantic Sea Island Group LLC ... proposes to construct, own, and operate a liquefied natural gas (LNG) receiving, storage, and regasification facility as a deepwater port that will be capable of delivering up to 1.15 billion standard cubic feet per day (bscfd) of natural gas per day to the New York metropolitan region" and "Safe Harbor Energy will bring to the region a much-needed new and reliable supply of clean-burning, cost-effective, and globally sourced natural gas." (Volume 2 Exhibit S Navigation and Safety Equipment S.1 Project Overview and Introduction)

Similarly, the Environmental Report in support of the Safe Harbor Energy Project Deepwater Port License Application May 2007 (Environmental Report) Topic Report One — General Project Description describes the purpose, need and benefits of the project as applying to the New York Metropolitan area, of which New Jersey is part, as follows:

MAR530 000105

**Purpose:** To increase available supply of Natural Gas to the metropolitan New York City area, Safe Harbor Energy will provide a strategically placed LNG importation terminal to augment existing regional pipeline delivery and to have storage capacity exceeding 15 bscf of natural gas (720,000 cubic meters of LNG). **Need:** Safe Harbor Energy will expand the natural gas supply and storage capacity available to an area of the country with high existing energy demand and growing gas needs. Its strategic location in the market area alleviates capacity constraints in existing pipeline infrastructure, thereby minimizing the need for expansion of existing land based pipelines. Further, Safe Harbor Energy will provide fuel supply diversity through global sourcing of LNG, which will help stabilize or lower natural gas prices in the region by minimizing price spikes caused by supply constraints or other system delivery disruptions. **Benefits:** Increased Natural Gas Supply to the New York Metropolitan Area. Safe Harbor Energy will provide a strategic energy supply solution for the New York metropolitan region by delivering a reliable, safe, and secure supply of natural gas to an area with increasing demand for natural gas.

This comports with the representations made to representatives of Governor Corzine's Office this year, indicating that because of capacity issues in the existing pipeline (that connects to both New Jersey and New York) there would, by necessity, be natural gas flowing to New Jersey. At that time, the applicant indicated that there were no "Letters of Intent" signed with any New Jersey entities, but requested assistance in identifying those entities whom they should approach. These capacity issues are also described in the Attachment 1-1 of the Environmental Report Topic Report One — General Project Description, Market Area Access for Supply Sendout. As noted above, the application indicates that the capacity of the project is 1.15 billion cubic feet per day of natural gas. The Long Beach Meter Station, Long Beach, New York has a maximum takeaway capacity of approximately 530 million cubic feet per day to accommodate gas transported eastward from the connection point into the Transco Pipeline. For gas transported westward from the connection point into the Transco Pipeline, the maximum capacity of the Milltown Regulator Station in New Jersey is approximately 619 million cubic feet per day. The analysis concludes the Transco pipeline is capable of receiving the full 1.15 billion cubic feet per day of natural gas through transport both eastward to New York and westward to New Jersey.

In a letter to the editor of the *Two River Times* November 30, 2007, Howard Bovers, Chairman Atlantic Sea Island Group LLC, states the following: "It has become apparent that we need access to cheaper and more environmentally sound energy sources. That is where Atlantic Sea Island Group's project comes in. More than 50 percent of the LNG in the form of natural gas in Phase One of the project will be delivered to New Jersey."

In Environmental Report Topic Report One – General Project Description, the applicant indicates that the project has been designed to accommodate the receipt, storage, regasification, and distribution of up to 2 billion standard cubic feet per day of natural gas, although it will not initially be able to operate at this level due to the ability

2

of the existing Transco Pipeline to accept gas. In 2006, the applicant indicated to representatives of NJDEP that a future pipeline to the Linden, New Jersey area was under consideration. According to the Deepwater Port Act 33 U.S.C. §1504(c)(2)(F), each application shall include a detailed description of each phase of the project. Thus, the future line should be included in the application, which would in and of itself result in New Jersey being an adjacent coastal state.

There are precedents for designating New Jersey as an adjacent coastal state. In a 2003 notice of application, the State of Louisiana was designated an adjacent coastal state for the proposed El Paso Energy Bridge Gulf of Mexico, LLC Deepwater Port License. In that case, the deepwater port pipeline was proposed to connect into an existing pipeline more than 100 miles offshore. In a 2006 notice of application, the State of Alabama was designated an adjacent coastal state for the proposed TORP Terminal LP, Bienville Offshore Energy Terminal Liquefied Natural Gas Deepwater Port, proposed 63 miles offshore and connecting into an existing pipeline approximately 60 miles offshore. In the current Atlantic Sea Island Group proposal, the deepwater port island would be located approximately 19 miles from New Jersey and the pipeline would connect into the existing Transco pipeline at a point approximately 16 miles from the New Jersey coast.

Furthermore, the December 3, 2007 letter from James Burnley, Venable LLP, representing Atlantic Sea Island Group, to US Department of Transportation Secretary Mary Peters and Maritime Administration Administrator Sean Connaughton indicates that New York was designated as an adjacent coastal state under "two pathways," both as a state located within 15 miles of the proposed port and as a state directly connected by pipeline to the proposed deepwater pipe. The pipeline directly connecting the proposed port to New York is the Transco pipeline mentioned above, which runs from New Jersey to New York. Based on the above, New Jersey would also be an adjacent coastal state by this pathway.

## Ports

The proposed island will be constructed in an open area of the ocean between the Ambrose-to-Nantucket and Hudson Canyon-to-Ambrose international shipping lanes. These shipping lanes are the lanes to and from the Port of New York/New Jersey, the largest port complex on the east coast. The proposed pipeline route would cross two traffic lanes, necessitating disruption during construction within these lanes. The report indicates that the LNG tankers traveling to the island will "sail to the New York Bight area and receive harbor pilots onboard for final vessel maneuvering to the Island. The vessels may remain offshore prior to maneuvering to the Island or may use designated or existing New York Harbor anchorage areas. The maneuvering procedure will involve vessels sailing to the northwest side of the Island under pilot control."

According to The Port of New York and New Jersey web site, "The Port of New York and New Jersey is the gateway to the most concentrated and affluent consumer market in the world. Each year, more than 25 million tons of oceanborne general cargo moves through our port, including 4.5 million TEUs (twenty-foot equivalent units) of containerized cargo. The Port Newark/Elizabeth-Port Authority Marine Terminal

MAR530 000107

complex (NJ), the PA Auto Marine Terminal (NJ), Brooklyn Piers and Red Hook Container Terminal (NY) and Howland Hook Marine Terminal (NY) handle most of the cargo and these facilities are managed by the Port Authority of New York and New Jersey. In addition, there are private operators such as Global Marine Terminal and a number of marine terminals operated by private bulk cargo operators." Furthermore, "Port Newark and the Elizabeth-Port Authority Marine Terminal operate as one fully integrated marine terminal, forming the largest and most comprehensive collection of maritime cargo handling facilities on the East Coast of North America." The New York/New Jersey Harbor is critical to the economy of both New York and New Jersey, and any disruption of traffic is of equal concern to both.

## Staging and Construction

The application indicates that five sites are under consideration for staging and laydown area for construction of the port, all within a 40 mile radius of the proposed island. New Jersey has not been provided with the location of any of these five sites, but is well within the 40 mile radius, and thus the sites are as likely to be in New Jersey as in New York.

The Environmental Report Topic Report 9—Alternatives indicates that the applicant intends to obtain fill to construct the island from dredging of the harbor. However, another option identified is "to obtain fill from upland projects generating suitable material or to purchase the fill from mining operations such as Amboy Aggregates in New Jersey, Arundal Quarry in Maryland, Trapp Rock in New York, or bringing materials from Canada. This could involve one (barging), if not two (trucking), methods of transit to the proposed Island site. Materials would be trucked to a central staging location from an onshore project/borrow source. The material would be dumped into a hopper system that conveys materials onto the barge. Two types of barges would be needed, flat deck barges and/or bottom-dump scows." If an upland site in New Jersey or the Amboy Aggregates facility were selected for the material, it would impact the state.

## Fisheries

In the Environmental Report Topic Report Five — Socioeconomics, the applicant describes the regional economy, including commercial and recreational fisheries. This section of the Environmental Report states that a 2001 U. S. Fish and Wildlife survey indicates that 806,000 state residents and non-residents 16 years and older fished in New Jersey, 572,000 of them in saltwater fishing. The survey numbers reported for New York are 1.55 million participants, 406,000 of them in saltwater fishing. It should be noted that the Marine Recreational Fisheries Statistics Survey by the National Marine Fisheries Service, a survey geared toward marine fishing, ranks New Jersey third in the number of saltwater anglers with a 5 year average (2002-2006) of 1 million anglers, as compared to New York, which is ranked 7th with three-quarter million anglers. In terms of trips made for marine species in this period, the five year average is 6.5 million trips per year for New Jersey and 5.1 million trips per year for New York.

MAR530 000108

The applicant contacted fishing charter boat companies to determine the extent to which Cholera Bank and the surrounding areas are used for recreational fishing and searched the internet. The applicant concluded that it is generally too far for many of the charter boats. Although the applicant's survey found little recreational fishing in the area, and little from New York fishermen, in a 2003 survey by New Jersey of recreational charter and party boat captains, the proposed island location and the adjacent area were identified as important recreational fishing areas, confirming the identification of these areas as recreationally important in *New Jersey's Recreational and Commercial Ocean Fishing Grounds* (1982) and in the NOAA *Anglers' Guide to the United States Atlantic Coast, Section III, Block Island to Cape May, New Jersey* (1974). The Environmental Report — Topic Report 7 Land Use, Recreation, and Aesthetics states that the project "excludes only a small fraction of a very large area available for recreational fishing." However, this "small fraction" has been documented as important to New Jersey's recreational fishing community.

The Environmental Report indicates that New York's commercial fish landings in 2004 were nearly 34 million pounds valued at over $46 million, and primarily taken in State waters. In contrast, New Jersey landed approximately 187 million pounds valued at nearly $146 million and nearly all catches occurred in federal waters. The area of the proposed project was identified as important in *New Jersey's Recreational and Commercial Ocean Fishing Grounds* (1982) by DEP and this was confirmed in recent contact with commercial fishing dock managers from Belford, New Jersey; Point Pleasant, New Jersey; and Fulton Fish Market. In discussing the effect of the project on commercial fishing, the Environmental Report states that "The 663 acres excluded represents an insignificant area in relation to the 8,100 square mile area of the New York Bight or the New York Bright Apex, which comprises 727 square miles that the Project is located within," concluding the effect would not be great. This method does not take into account the characteristics of the site, which make it a productive fishing area, or the data described above regarding New Jersey's commercial fisheries.

The application indicates that the pipeline would be buried to a depth of 3 feet in Federal waters that are less than 200 feet deep and buried a depth of 4 feet in State waters. It furthers indicates that the pipeline would cross over the top of seven cables. It also states "In the event that the installation results in less than 3 feet of cover for portions of the Pipeline in water depths less than 200 feet as mandated by 30 CFR 250.1003(a)(1) for federal waters or 4 feet cover for State Waters, concrete mats will be used to provide an equivalent degree of protection." (Volume 1) Because certain commercial fishing gear routinely penetrates the bottom, conflict with the pipeline/concrete mats may occur.

## Viewshed

The viewshed analysis in the Environmental Report indicates that the terminal will be visible from the entire 20 miles of New Jersey coastline located within the 24-mile study radius. This includes the beaches of Monmouth County, where New Jersey

MAR530 000109

has spent millions in beach nourishment, and the Sandy Hook unit of Gateway National Recreation Area. The island will also be visible from the Twin Lights Historic Site, which is on the National Register of Historic Places, and the Mount Mitchell Overlook (identified as the highest point along the eastern seaboard). Accordingly, both New Jersey's beaches and this historic site would be affected.

## Conclusion

The Environmental Report discusses existing conditions of and environmental consequences to the New York Bight. The New York Bight is generally described as the area of the Atlantic Ocean south of Long Island, New York and east of New Jersey, from Montauk Point, New York to Cape May Point, New Jersey. The ecosystem of the New York Bight is critical to both states, and impacts would be shared by both. In fact, both New York and New Jersey each enacted laws in the 1990s to work together "to provide for the maximum enhancement, enjoyment and conservation of the marine resources of the Hudson-Raritan Estuary and the New York Bight" and established a committee "to make specific recommendations concerning the maintenance, protection and restoration of such marine resources."

Clearly, a project of this magnitude, with the creation of an artificial island by the filling of 116 acres of sea floor with wide ranging impacts beyond the immediate project area, including shipping and navigation, fisheries disruptions, onshore port utilization, and the need for massive volumes of fill material, has equal effects, if not greater in certain circumstances, on the coastal environment of New Jersey as it does on New York's coastal environment. Therefore, the Maritime Administration made the correct decision in granting adjacent coastal state status to New Jersey. In conclusion, New Jersey is an adjacent coastal state under the Deepwater Port Act for the Safe Harbor Energy Liquefied Natural Gas Deepwater Port License and looks forward to working closely with the U. S. Coast Guard, Maritime Administration and State of New York to properly address the needs of the region, while protecting the economies and environments of both states.

Sincerely,

Jeanne Herb
Director

6

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: G-PSO-5
Phone: (202) 372-1440
Fax: (202) 372-1926
Email: Mark.A.Prescott@uscg.mil

16613
January 8, 2008

The Honorable Jon S. Corzine
Governor of New Jersey
Office of Economic Growth
P.O. Box 001
Trenton, NJ 08625-0001

Dear Governor Corzine:

On behalf of Admiral Allen, this is in response to your letter dated December 21, 2007 regarding your support of the Maritime Administrator's November 2, 2007 decision to designate New Jersey as an adjacent coastal state under the Deepwater Port Act for the proposed deepwater port application submitted by Atlantic Sea Island Group LLC (Safe Harbor Energy). At this time, the Maritime Administrator is reviewing the request for reconsideration received from Atlantic Sea Island Group LLC regarding New Jersey's designation as an adjacent coastal state. The U.S. Coast Guard has been in communication with the Maritime Administration regarding this issue; however, we believe the final decision rests with the Maritime Administrator.

Regardless of any action by the Maritime Administration on the matter, New Jersey will have a role in the processing of the application and we look forward to working with the State of New Jersey. My staff works closely with the Maritime Administration in processing this application and we are primarily responsible for the preparation of the Environmental Impact Statement.

If you have questions about the proposed Safe Harbor Energy deepwater port license application, you may contact me at (202) 372-1440 or by email at Mark.A.Prescott@uscg.mil.

Sincerely,

M. A. Presco

M. A. PRESCOTT
Chief, Deepwater Ports Standards Division
U.S. Coast Guard
By direction



U.S. Department
of Transportation
**Maritime**
**Administration**



1200 New Jersey Avenue, S.E.
Washington, DC 20590

2008 FEB 11  P 3:36

James H. Burnley IV
Venable LLP
575 7th Street, NW
Washington, D.C. 20004-1601

FEB - 8 2008

Re: Safe Harbor Energy LNG Deepwater Port—Request for Reconsideration of
Designation of New Jersey as an "Adjacent Coastal State"

Dear Mr. Burnley:

This is in response to your letter of December 3, 2007, in which you made certain claims
regarding the Maritime Administration's finding that New Jersey qualifies as an Adjacent
Coastal State as defined by the Deepwater Port Act of 1974, as amended. We note that,
in response to your earlier request of November 13, 2007 we emphasized that there is no
right to appeal the Adjacent Coastal State (ACS) designation under the Deepwater Port
Act of 1974, as amended (DWPA), and by that letter we accommodated your concerns by
extending to you and your client the opportunity to provide arguments presumably to
explain, in opposition to our finding, why New Jersey's coastal environment is <u>not</u>
subject to risk equal to or greater than that posed to New York's (NY). You have now
supplied us with your arguments to reconsider the designation of New Jersey (NJ) as an
ACS.

The salient factor distinguishing NY and NJ under the statute is the proximity of the port
to each State. The proximity requirement of 15 miles was not meant to bar consideration
of the potential of environmental impact to NJ, a State located at the 19-mile mark from
the proposed site. Likewise, the fact that NY is within 15 miles of the proposed site,
which, as intended by Congress, represents a clear indication of the legitimate interest
and risk posed to NY, does not establish a finding that the proposed DWP's pipeline
poses no environmental risk to any other State. Rather, as evidenced by Section
1508(a)(2) of the DWPA, Congress recognized the importance of including other States
not meeting the § 1508(a)(1) criteria of proximity or direct connection, and intended for a
State with legitimate and regional interest to be afforded the opportunity to make a case
to the Secretary of Transportation for special consideration. Accordingly, a review was
made of the available information within the statutory period, and the ACS status was
issued under the discretionary authority of the Secretary of Transportation as delegated to
the Maritime Administrator. 49 C.F.R. § 1(i)(6); § 1.66(aa)(a)(1)-(2). The Secretary
expressly delegated the authority to the Maritime Administration to process deepwater

port license applications in coordination with the Commandant of the Coast Guard. §
1.66(a)(2).

In our determination letter designating NJ an ACS, the Maritime Administration
concluded that NJ met the definition under Section 1508(a)(2) of the DWPA. Section
1508(a)(2) establishes the standard to be applied, "that there is a risk of damage to the
coastal environment of such State equal to or greater than the risk posed to the State
directly connected by the pipeline to the proposed deepwater port." In crafting this
specific section of the statute, Congress intended to provide regional interests not meeting
the proximity or direct connection requirement a role in the decision-making process if it
could be evidenced that the risk of damage to their coastal environment was equal to or
greater than the risk posed to the 1508(a)(1) designee. Congress was careful to limit
involvement and thus crafted a standard that would narrow the field of interests seeking
to be designated as an Adjacent Coastal State. In crafting Section 1508(a)(2), Congress
provided an alternative to the physical construct of (a)(1) and sought an equitable
approach. There is no better example of legitimate regional interests under the Safe
Harbor proposal than that of NY and NJ. NY and NJ have historically shared
environmental and economic concerns due to their geographic proximity, predominant
ocean currents from NY toward NJ, and common industry. They share the port and its
facilities. The staging areas for the construction and operation of the Safe Harbor DWP
implicate NY and NJ without distinction. Alternate sites required under the National
Environmental Policy Act to be reasonably foreseeable bring the possible final site to
within 9 miles of NJ, and both NY and NJ share equally in the inherent risk of losing the
Cholera Bank fishery.

With regard to the claim that I acted outside my delegated authority in unilaterally
making the designation, I disagree. You argue that the Homeland Security Act of 2002
transferred the authority of the USCG to make an ACS determination to the Department
of Homeland Security; however, the USCG was never delegated the authority to make a
§ 1508(a)(2) ACS determination and therefore the Homeland Security Act of 2002 did
not transfer that authority. In fact, that authority was reserved for the sole discretion of
the Secretary of Transportation, and was exercised only twice before, in 1976 to deny
Mississippi and Florida ACS status. The Secretary reserved that authority until
delegation to the Maritime Administrator in 2003. (68 FR 36496); 49 CFR § 1.66(aa)(2).
Consistent with the view of the USCG, as evidenced by the rulemaking published in 62
FR 11382 (1997), the Secretary first made a partial delegation of his DWPA authority to
the Maritime Administration in coordinated efforts with the USCG. Through the 2003
delegation, the Secretary delegated his remaining authority to the Maritime
Administrator, and both the USCG and the Department of Transportation have correctly
interpreted that delegation to establish the Maritime Administration as the lead decision-
making agency, which encompasses the issuance of § 1508(a)(2) ACS determinations.
The purpose of the 2003 rulemaking was to clarify certain previous delegations and to
delegate remaining authority to the Maritime Administration to implement the DWPA,
which had been recently amended in 2002. In stark contrast to your interpretation, the

2

USCG and the Maritime Administration have agreed that review of the record and the 1997 and the 2003 rulemakings establishes that once-reserved Secretarial authority, historically exercised in making ACS determinations, has been delegated exclusively to the Maritime Administrator.

Contrary to your argument that USCG regulation 33 C.F.R. § 148.217(d) provides clear evidence of delegated authority in the Commandant, a delegation to the Maritime Administrator in determining an ACS is more consistent with the overall allocation of responsibilities under the DWPA. Accordingly, both the Maritime Administration and the USCG have agreed that authority to make substantive decisions not specifically delegated, and those arising above processing decisions, are subject to the Maritime Administration as the lead decision making agency. Furthermore, Part 148 cannot be genuinely argued to evidence a delegation to the Commandant in making ACS determinations because the regulations in their current form are ambiguous. For example, 33 C.F.R. § 148.5(3) provides that only the Maritime Administrator will designate an ACS under 33 U.S.C. § 1508(a)(2) while 33 C.F.R. § 148.217(d) provides that the USCG Commandant will make an ACS designation. Even with the inconsistencies of the current USCG DWPA regulations, both agencies are in agreement as to their respective roles and authority. As my office advised ASIG just after receiving the New Jersey request, both federal agencies agree that the Maritime Administration alone has the authority to designate § 1508(a)(2) ACS status for DWPA projects and that the agencies are working together to address the ambiguities in the regulations.

You also claim that we applied an improper standard and that a factual finding is required to be released. A full and comprehensive reading of our November 2nd determination makes clear that the basis for designating NJ an ACS was in accordance with Section 1508(a)(2) of the statute, which sets forth the "equal to or greater" risk standard:

> "1508(a)(2) The Secretary shall, upon request of a State, and after having received the recommendations of the Administrator of the National Oceanic and Atmospheric Administration, designate such State as an "adjacent coastal State" if he determines that there is risk of damage to the coastal environment of such State equal to or greater than the risk posed to a State directly connected by pipeline to the proposed deepwater port. This paragraph shall apply only with respect to requests made by a State not later than the 14th day after the date of publication of notice of an application for a proposed deepwater port in the Federal Register in accordance with section 1504(c) of this title. The Secretary shall make the designation required by this paragraph not later than the 45th day after the date he receives such a request from a State."

You argue that we applied an invalid standard of "significant impact." That simply is not the case. As we stated in our determination, "upon consideration of the NOAA recommendation, as well as the magnitude and scope of the proposed project and its potential for significant environmental impact to the State of New Jersey, I have

3

determined that New Jersey is an Adjacent Coastal State <u>as defined under the Act</u> and is so designated…"(emphasis added) Our determination clearly incorporates the standard of "equal to or greater than" as defined in the statute and therefore your characterization of the standard that was applied is incorrect.

As to a factual finding, the statute requires nothing further than a decision be made by the Administrator, by delegation from the Secretary, of whether the State meets the requirements of the statute to be designated an ACS. There is no basis in the statute for your claim that our finding be subject to public scrutiny. The 1976 Mississippi ACS determination signed by the Secretary of Transportation cited only the sources used to assist in the determination and did not include a detailed finding. Furthermore, although you have obtained the NOAA recommendation from 1976, it is unclear whether that recommendation was formally released to the general public. Upon comparing my November determination to that of the Secretary's Mississippi determination from 1976, the bases offered in the determinations are equivalent. Both offer a basic justification and neither adds details of the rationale itself.

ASIG assails NJ's presentation of its case on, among other bases, its lack of documentation and support, comparing it unfavorably to those of earlier ACS cases. This approach is unpersuasive. When the prior ACS issues were resolved, in 1976, the US, and the world generally, had substantial experience with oil spills. The basic interplay among oil viscosity, water salinity, temperature, currents, and other factors was understood, although not so well as now. By contrast, the world at this time knows very much less about LNG spills, on land or water. When, in 1979 and 1980, DOT established the regulatory framework for LNG plants, the primary concerns were explosion and fire, especially in proximity to population centers. An LNG-fueled explosion or fire at a place as far removed from population centers as is proposed here would likely have some, but less, impact directly on individuals but may have significant impact on the marine environment. Since all interests, including NOAA, agree that the currents there run toward NJ, the risk from such a fire or explosion is at least as great to NJ's coastal environment as to NY's. Note: I do not at this juncture need to decide relative harm between the two States; I need only decide the relative risk of harm, and I see NJ's as at least equal to NY's.

I use this example as just that, an example, because I agree with you that the comparative risk analysis must evaluate the totality of impacts.

You also rely heavily on a methodology report prepared by Arthur Little to argue that our determination could not be properly supported. However, it is unclear whether the conclusions and guidance offered in the Little report were ever followed since it was published only 13 days before the 1976 NOAA recommendation and the following issuance of the Section 1508(a)(2) ACS determination by the Secretary. What is clear, however, is the description in the preface to the Little report authored by the then Manager of the Deepwater Ports Project, Captain K.G. Wiman. He wrote, "The contents

4

MAR530 000115

of this report do not necessarily reflect the official view or policy of the Coast Guard, and they do not constitute a standard, specification, or regulation." The Little report's preface recognizes that the methodology is not the official view of USCG and reflects the USCG understanding that each case would offer unique challenges in the availability and analysis of data. The Captain's statement also reflects deference to the Secretary as the ultimate decision-maker and to the discretion in his authority to make the ACS determination. The authority to make the designation is clearly at the discretion of the Secretary of Transportation as provided by the statute, with no requirement to concur with NOAA or USCG, or to follow USCG methods or publish a factual finding.

You claim that the time had expired for us to respond to the Governor's request. The official date the Administrator is deemed to have received the Governor's request was September 18, 2007. Because there are so many forms in which to communicate, it is necessary and practical to the proper implementation of the statute that we establish one method as the official method of receipt for the Administrator. The September 18th date is based not on telephone, email, fax, or docket notices but on the date the letter request was posted to the Administrator's controlled correspondence database. The NJ ACS determination was made on the very last day provided under the statute in an effort to grant all due consideration to the issues given the strict timeframe for making the designation.

In conclusion, the determination designating NJ ACS status was made under the authority of the Secretary of Transportation as delegated to the Maritime Administrator pursuant to delegations published in 68 FR 36496 (June 18, 2003) and 62 FR 11382 (March 12, 1997). Both Federal agencies, the Maritime Administration and the United States Coast Guard, interpret the delegations to provide exclusive authority to the Maritime Administrator to make such a decision even when faced with contradictory USCG regulations.

The ACS designation was made following the statutory standard pursuant to Section 1508(a)(2) and the rationale was formed using the data available within the 45 day timeframe. As contemplated by Congress, the statutory authority vested in the Secretary and delegated to the Maritime Administrator is discretionary, and was properly exercised to make an interlocutory decision based on the unique set of facts, procedural requirements, and regional interests of the State of NJ within the strict statutory timeframe for the review and processing of DWP applications.

Thank you for supplying us with your arguments for consideration. As a result of a thorough and comprehensive review, my determination designating the State of New Jersey an Adjacent Coastal State for purposes of the Safe Harbor deepwater port application remains unaltered. It is my hope that we can move forward in the processing of the Safe Harbor application to include the State of New Jersey in its role as an Adjacent Coastal State.

5

If you have any further questions or concerns please contact Mr. Keith Lesnick, Director, Office of Deepwater Ports and Offshore Activities at 202-366-1624 or Keith.Lesnick@dot.gov.

Sincerely,

Sean T. Connaughton
Maritime Administrator

cc:    The Honorable Frank R. Lautenberg
       The Honorable Jon S. Corzine
       The Honorable Frank Pallone

6